**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>**Plaintiff,**<br><br>v.<br><br>**RIO TINTO PLC, RIO TINTO LIMITED, THOMAS ALBANESE, and GUY ROBERT ELLIOTT,**<br><br>**Defendants.** | **No. 1:17-cv-7994**<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff, the United States Securities and Exchange Commission ("SEC"), for its Complaint against defendants Rio Tinto plc, Rio Tinto Limited (collectively, "Rio Tinto" or "Rio Tinto Group"), Thomas Albanese ("Albanese"), and Guy Robert Elliott ("Elliott"), alleges as follows:

## OVERVIEW

1.      This case concerns a course of deceptive conduct—a fraud—by Rio Tinto, its Chief Executive Officer, Albanese, and its Chief Financial Officer, Elliott (collectively, "Defendants") to conceal the rapid and dramatic decline in value of a coal business in Mozambique, Africa that Rio Tinto had acquired for $3.7 billion in April 2011.  This high-profile transaction was Rio Tinto's second large-scale acquisition under Albanese's leadership, and Rio Tinto had already experienced dramatic setbacks with Albanese's first large-scale acquisition, Alcan, Inc.  The Mozambique acquisition was expected to restore the market's confidence in Albanese's deal-making acumen, but on-the-ground realities in Mozambique quickly undermined that narrative.

2.      Rio Tinto purchased the Mozambican coal business on the central assumption that it could profitably mine, transport, and sell more than 40 million tons of coal per year by barging the majority of the coal product down the Zambezi River to a port on the Indian Ocean.  After the acquisition, the business, now called Rio Tinto Coal Mozambique ("RTCM"), began to suffer one setback after another.  By November 2011, Rio Tinto had determined that its barging assumptions were unrealistic.  In December 2011, the Government of Mozambique rejected Rio Tinto's proposal to barge coal down the Zambezi River.  Rio Tinto also learned that existing railway capacity was severely limited.  As a result, by the end of 2011, Rio Tinto knew that it could transport and sell only about five percent of the amount of coal it had originally assumed.  Rio Tinto also learned that there was significantly less and lower quality coal than it had assumed at acquisition.

3.      Defendants concealed the nature and extent of these adverse developments from Rio Tinto's Board of Directors, Audit Committee, independent auditors, and the market.  If disclosed, the developments would have triggered an impairment analysis of RTCM.  An impairment is required when an asset is worth less than its carrying value—the amount reflected on the company's public financial statements.  By the time problems with RTCM emerged, Rio Tinto had already impaired Alcan twice.  Defendants knew that impairing RTCM or publicly disclosing its rapidly declining value would call into question Albanese's and Elliott's ability to pursue the core of Rio Tinto's business model—identifying and developing long-term, low-cost, and highly-profitable mining assets.  Rio Tinto would have had two failed transactions with multi-billion dollar impairments and no successful large-scale acquisitions under Albanese's and Elliott's leadership.

4.      Albanese and Elliott were aware that setbacks at RTCM had significantly eroded RTCM's economic value.  Indeed, after spending months quantifying the effect of various adverse developments, RTCM executives advised Albanese and Elliott that RTCM's valuation under the best configuration was *negative* $680 million in May 2012.  Yet Rio Tinto continued to carry RTCM on its books at a value of more than $3 billion and Defendants continued to promote RTCM's prospects to the market.

5.      In light of the recent experience with the Alcan impairments, Albanese and Elliott were familiar with Rio Tinto's impairment review process and the governing accounting standards and corporate policies.  But neither took steps to ensure that Rio Tinto disclosed the nature of the adverse developments at RTCM or initiated an impairment process to determine its correct carrying value.  Instead, Elliott reviewed and failed to correct materially misleading documents prepared for and submitted to the company's Audit Committee and independent auditors, knowing that the Audit Committee and independent auditors would rely on the misleading information concerning RTCM.  And over the course of a year, Defendants concealed and glossed over the adverse developments by, among other things, misleading the company's Board of Directors, Audit Committee, independent auditors, and the market regarding the immediate, measurable, and devastating effect that issues with transportation infrastructure and coal quantity and quality had on RTCM's commercial value.

6.      Their misconduct paid off.  Rio Tinto raised a total of $5.5 billion in U.S. debt offerings that incorporated materially misleading statements and omissions concerning RTCM's valuation.  Of that amount, Rio Tinto raised approximately $3 billion in an offering initiated soon *after* Albanese and Elliott learned of RTCM's negative $680 million valuation.  Each of the debt offerings took place only days after Rio Tinto released misleading financial

information to the market.  Publicly, Rio Tinto continued to value RTCM at more than $3 billion for the relevant period.  Privately, Defendants knew RTCM had little or no commercial value.  Nevertheless, Defendants undermined the impairment process required under International Accounting Standards and Rio Tinto's accounting policies.

7.     Defendants publicly misrepresented and inflated RTCM's value until December 2012 when a Rio Tinto employee outside the normal financial control function discovered that the true nature and effect of adverse RTCM developments was being hidden from the Board of Directors and that RTCM was being carried at an inflated value on Rio Tinto's financial statements.  The employee bypassed Albanese and Elliott and went directly to the Chairman of the Board in order to report the true nature and effect of problems with transportation infrastructure and coal quantity and quality at RTCM.  This triggered an internal review and impairment process for RTCM that ultimately revealed the longstanding problems with RTCM's valuation.

8.     Within weeks, Rio Tinto's Chairman asked the Board to dismiss Albanese as the company's CEO.  By mid-January, Rio Tinto announced it was impairing RTCM's carrying value by more than $3 billion and, at the same time, Rio Tinto informed the market that Albanese had stepped down as CEO "by mutual agreement with the Rio Tinto Board." Elliott stepped down as the company's CFO in April 2013.

9.     The impairment wrote off more than 80 percent of RTCM's value less than two years after acquisition.  In the press release announcing the impairment and Albanese's departure, Rio Tinto's Board acknowledged "that a write-down of this scale in relation to the relatively recent Mozambique acquisition is unacceptable."

10.     And it got worse from there.  Approximately one year later, after a second write-down, in 2014, Rio Tinto sold RTCM for just $50 million—less than two percent of the original $3.7 billion acquisition price.  In the words of one of Rio Tinto's largest investors, the entire episode was evidence of a "significant mistake by [Albanese and Elliott]" and that Rio Tinto management had been "reckless and profligate" with shareholder capital.

11.     As set out herein, from in or about November 2011 until on or about January 17, 2013, Defendants engaged in a series of misrepresentations, misleading omissions, and deceptive acts to conceal from the market RTCM's devastating loss in value and their own terrible decision to acquire RTCM for more than $3 billion.

12.     By engaging in the misconduct described herein, Defendants each violated anti-fraud, reporting and internal control provisions of the Securities Exchange Act of 1934 ("Exchange Act") and the Securities Act of 1933 ("Securities Act").  Moreover, Albanese and Elliott aided and abetted multiple violations by Rio Tinto.

13.     Each Defendant will continue to violate the federal securities laws unless restrained or enjoined by this Court.

14.     The Commission seeks injunctive relief, disgorgement of ill-gotten gains, prejudgment interest, civil penalties, and other appropriate and necessary equitable relief from all Defendants.  Additionally, the Commission seeks an officer and director bar from Albanese and Elliott.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction over this action pursuant to Sections 20 and 22 of the Securities Act [15 U.S.C. §§ 77t and 77v] and Sections 21 and 27 of the Exchange Act [15 U.S.C. §§ 78u and 78aa], and 28 U.S.C. § 1331.

16.     Venue is proper in this Court pursuant to Section 22(a) and (c) of the Securities Act [15 U.S.C. § 77v(a) and (c)] and Section 27(a) and (b) of the Exchange Act [15 U.S.C. § 78aa(a) and (b)], because certain of the acts, practices, and courses of conduct constituting the violations alleged herein occurred within the Southern District of New York.  Moreover, Rio Tinto transacts business in this district through Rio Tinto Finance (USA) Limited, a wholly owned subsidiary of Rio Tinto Limited, and Rio Tinto Finance (USA) plc, an indirect wholly owned subsidiary of Rio Tinto plc.

17.     Each defendant, directly and indirectly, made use of means or instruments of transportation or communication in interstate commerce, or of the mails, or of any facility of a national securities exchange in connection with the acts, practices, and courses of conduct alleged herein.

## DEFENDANTS

18.     **Rio Tinto plc**.  Rio Tinto plc is a London and New York Stock Exchange ("NYSE") listed company with a sponsored ADR facility, the underlying shares of which are registered with the SEC and listed on the NYSE.  During the relevant period, Rio Tinto plc filed Annual Reports with the SEC on Form 20-F, and furnished other reports to the SEC on Form 6-K.  These submissions were filed with SEC headquarters *via* the SEC's internet-based EDGAR system, as required of all foreign issuers during the relevant period, and were publicly available to United States investors through the SEC's website, https://www.sec.gov.  Rio Tinto plc also regularly held earnings calls, which were attended by United States-based analysts.

19.     **Rio Tinto Limited**.  Rio Tinto Limited is listed on the Australian Securities Exchange.  During the relevant period, Rio Tinto Limited filed Annual Reports with the SEC

on Form 20-F, and furnished other reports to the SEC on Form 6-K. These submissions were filed with SEC headquarters *via* the SEC's internet-based EDGAR system, as required of all foreign issuers during the relevant period, and were publicly available to United States investors through the SEC's website, https://www.sec.gov.

20.     Collectively, Rio Tinto plc and Rio Tinto Limited comprise an international mining group that is headquartered in the United Kingdom and that does business as "Rio Tinto Group."

21.     **Thomas Albanese**, age 60, was the Chief Executive Officer of Rio Tinto from May 2007 until January 2013, when he was forced out in the wake of Rio Tinto's announced impairments. Albanese is a citizen of the United States.

22.     **Guy Robert Elliott**, age 61, served as the Chief Financial Officer of Rio Tinto plc and Rio Tinto Ltd. from 2002 to April 18, 2013. From 1996 to 1999, he served as President of Rio Tinto Brazil, having joined Rio Tinto's predecessor company in 1980. He retired from Rio Tinto at the end of 2013. Elliott is a citizen of the United Kingdom.

## **DEFINITIONS**

23.     **Rio Tinto Finance (USA) plc** is a public limited company incorporated under the laws of England and Wales, and is an indirect wholly owned subsidiary of Rio Tinto plc. Rio Tinto Finance (USA) plc is one of the finance companies through which the Rio Tinto Group conducts its treasury operations. Among other things, it raises financing from banks and third parties in the short, medium, and long-term markets for on-lending to Rio Tinto Group companies, including the issuance of corporate bonds guaranteed by Rio Tinto. Rio Tinto Finance (USA) plc's registered and principal executive office is located in London, England.

24.     **Rio Tinto Energy Product Group ("RTE")**.  During the time period relevant to the allegations herein, Rio Tinto's management structure was based on five principal product groups, one of which was RTE, which had operations, exploration, and development projects in Australia, southern Africa, and Canada and which was responsible for Rio Tinto's coal and uranium business units.  RTE's CEO reported to Rio Tinto's CEO, Albanese.

25.     **Rio Tinto Coal Mozambique ("RTCM")**.  During the time period relevant to the allegations herein, RTCM operated as a subsidiary of Rio Tinto, and managed Rio Tinto's Zambeze Project, the Tete East Project, the Benga Mine, and the Zululand Anthracite Colliery. RTCM held mining and exploration licenses in the Moatize Basin in the Tete province of Mozambique.  In October 2014, Rio Tinto sold RTCM to International Coal Ventures Private Limited for $50 million.

26.     **Rio Tinto Exploration Group**.  During the time period relevant to the allegations herein, Rio Tinto's Exploration Group was responsible for discovering deposits in new ("greenfield") geographical locations, providing technical assistance to Rio Tinto business units on existing ("brownfield") exploration, and supporting Rio Tinto business development groups in the evaluation of merger and acquisition opportunities.  Greenfield exploration was intended for establishing completely new operating business units, involving geographic or commodity diversification away from existing Rio Tinto operations.  Brownfield exploration was directed at sustaining or growing existing Rio Tinto businesses. The Exploration Group was organized geographically into regional multi-commodity teams, with head offices in London, Salt Lake City, and Brisbane.

27.     **Rio Tinto Investment Committee**.  During the time period relevant to the allegations herein, Rio Tinto's Investment Committee was the Rio Tinto body that made

investment decisions ahead of Rio Tinto's Board of Directors.  In making decisions, Rio Tinto's Investment Committee received advice from Rio Tinto's Technical Evaluation Group ("TEG"), which was designed to ensure that technical aspects around any particular proposed capital expenditure met all of Rio Tinto's requirements, and from Rio Tinto's Business Evaluation Department ("BED"), which acted as the gatekeeper for all Rio Tinto capital expenditures.  Albanese was the chairman of Rio Tinto's Investment Committee by virtue of his position as CEO, and Elliott was a member of the Investment Committee during the time period relevant to the allegations herein.

28.     **Rio Tinto Business Evaluation Department ("BED")**.  During the time period relevant to the allegations herein, the primary task of BED was to consider capital expenditure and to provide a critique to management about the wisdom of every capital expenditure and acquisition proposal—including the political, strategic, commercial, tax, and financial aspects of such expenditures or acquisitions.  Elliott was the head of BED from 1993 to 1996 and from 1999 to 2001.

29.     **Rio Tinto Technology & Innovation Group** ("T&I").  During the time period relevant to the allegations herein, Rio Tinto's Technology & Innovation Group consisted of a central team of technology professionals and centers responsible for developing leading practices and promotion of improvements in technology, mining, processing, asset management, strategic production planning, and project development, execution and evaluation.  T&I encompassed **Rio Tinto Technical Evaluation Group ("TEG")**, which was responsible for ensuring that technical aspects around any particular proposed capital expenditure met all of Rio Tinto's requirements; considering environmental, technical, and similar geological matters; and providing independent input to Rio Tinto's Investment Committee.

## FACTUAL ALLEGATIONS

**I.**     **BACKGROUND**

**A.  Governing Accounting Standards and Policies**

30.     Rio Tinto plc and Rio Tinto Limited are subject to the reporting requirements of the Exchange Act applicable to foreign private issuers.  Rio Tinto's financial statements are presented by both Rio Tinto plc and Rio Tinto Limited as consolidated accounts.

31.     During the time period relevant to the allegations herein, Rio Tinto was required to comply with the standards issued by the International Accounting Standards Board in preparing and filing annual and interim financial reports with the SEC.  These standards are referred to as either IAS or IFRS.

32.     IAS 34 sets forth the minimum content of an interim financial report and requires the inclusion of significant events such as recognizing a loss from an impaired asset. An asset is impaired if its value reported in the company's financial statements exceeds its likely recoverable amount.

33.     Pursuant to IAS 36, companies are required to assess whether an asset or cash generating unit ("CGU") is impaired at the end of each reporting period.  If there is any indication that an asset or CGU may be worth less than its carrying value, IAS 36 requires that the company generate a formal estimate of the recoverable amount.

34.     Pursuant to IAS 36 and Rio Tinto's internal accounting policies, Rio Tinto and each of its business units were required to assess at each reporting period whether there were any indications that the value of any asset or CGU may be impaired.  Rio Tinto's reporting periods were at the half year and year end.

35.     Rio Tinto's Controller's office was responsible for coordinating the impairment review process, and in connection with the process, Rio Tinto business units were responsible for providing valuations of assets and CGUs to the Controller's office.

36.     In assessing whether an asset or CGU should be tested for impairment, both the Controller's office and business units were required to consider at a minimum the following impairment indicators, which were set out in Rio Tinto's Controller's Manual and largely tracked the language and requirements of IAS 36:

- A significant decline in the market value of the asset—beyond what might be expected as a result of age and normal use;

- Significant changes that are likely to have an adverse effect in the technological, legal or economic environments in which the entity operates, or in the market to which an asset is dedicated;

- An increase in the discount rate which is likely to be material to the relationship between the recoverable amount of an asset and its book value;

- Evidence of significant physical damage or obsolescence;

- Significant changes to the extent or manner of use of the asset that are likely to have an adverse effect on its recoverable value, including restructuring or discontinuation of use;

- Indications that the economic performance of an asset is, or will be, significantly worse than expected; and

- The market capitalization of the asset falls below its carrying amount.

37.     According to Rio Tinto's Controller's Manual, three other changes were to be considered, if relevant, in determining whether there was an indication that an asset or CGU was worth less than the carrying value:

- A material change from the prior year in Rio Tinto's long run price assumption for the products of the CGU that is not mitigated by a similar offsetting change in exchange rates, input prices or other factors;

- A material change from the prior year in the estimates of proven and probable ore reserves and resources included within the current mine plan, other than a reduction through depletion; and

- Any other change that is likely to have a material impact on the value of the CGU including, but not limited to, a significant pit wall failure or a significant reorganization.

38.     Neither Rio Tinto's accounting policies nor any guidance on the applicable accounting standards permitted Rio Tinto to delay or skip any aspect of the impairment review process for any reason if an impairment indicator was identified.

39.     During the time period relevant to the allegations herein, Rio Tinto's Controller reported to Elliott, who had direct oversight of Rio Tinto's process for determining whether an impairment indicator, or "trigger," existed with respect to an asset or CGU.

**B.  Rio Tinto's Corporate Structure**

40.     During the time period relevant to the allegations herein, Rio Tinto's business was exploration, extraction, and processing of mineral resources.  Major products were aluminum, copper, diamonds, thermal and metallurgical coal, uranium, gold, industrial minerals (borax, titanium dioxide and salt), and iron ore.  Activities spanned the world and were strongly represented in Australia and North America with significant businesses in Asia, Europe, Africa, and South America.

41.     Rio Tinto's Board of Directors was responsible for setting Rio Tinto's vision and regularly reviewing its strategic direction.  To that end, the Board of Directors had responsibility for corporate governance and oversaw management's control and accountability framework.  Responsibility for day-to-day management of the business was delegated to the company's CEO—Albanese—and the Executive committee—of which Elliott was a member.

42.     The Board of Directors established Rio Tinto's Audit Committee in order to assist in ensuring that high standards of corporate governance were maintained across Rio Tinto Group.  The Audit Committee's responsibilities included monitoring decisions and processes designed to ensure the integrity of Rio Tinto's financial reporting and sound systems of internal control and risk management.  Pursuant to these responsibilities, the Audit Committee reviewed with management Rio Tinto's procedures relating to audit plans and reports, and it reviewed the scope and results of audits with Rio Tinto's independent auditors.  Albanese and Elliott attended Audit Committee meetings throughout the time period relevant to the allegations herein.

43.     The Controller's office operated within Rio Tinto and reported to Elliott.  The Controller's office oversaw impairment reviews and prepared Audit Committee papers.  As CFO, Elliott had oversight of the impairment review process.

### C.  Albanese's First Major Acquisition as CEO Resulted in Significant Impairments

44.     In July 2007, Rio Tinto acquired Alcan, Inc. ("Alcan"), an aluminum processing company, for approximately $38 billion.  Alcan was Albanese's first major acquisition as CEO of Rio Tinto.  It did not go well.  Less than two years after the acquisition, in February 2009, Rio Tinto announced a $7.9 billion impairment charge to Alcan's carrying value.  Rio Tinto

announced a second impairment to Alcan in 2010 and a third impairment of Alcan in February 2012.  The fourth and final impairment of Alcan was announced with the RTCM impairment— and Albanese's departure as CEO—in a January 17, 2013 press release.  Collectively, these impairments wrote off substantially all of Alcan's acquisition value.

45.     Both Albanese and Elliott were familiar with the impairment process based on, among other things, their experience with Alcan.  Elliott oversaw the impairment review process that led to the first Alcan impairment and he explained the impairment to the market. Further, as Rio Tinto's CFO in February 2012, Elliott presided over the impairment review process, which culminated in Rio Tinto's recognition of the third, $8.9 billion Alcan impairment.

46.     The Alcan impairments were emblematic of an acquisition that Rio Tinto's Chairman described as "disastrous" and that Elliott described as an "embarrassment" and a "failure."  Albanese and Elliott shared responsibility for the Alcan acquisition, and in conjunction with the $8.9 billion impairment announced in February 2012, Rio Tinto announced that neither Albanese nor Elliott would be paid bonuses for fiscal year 2011.

47.     Elliott understood that further impairments on the heels of Alcan would reflect a "pattern of evaluation failure or performance failure."

## II.     RIO TINTO ACQUIRES RIVERSDALE MINING LTD.

### A.  Identifying Riversdale as a Potential Acquisition Target

48.     The acquisition of the Mozambican coal business—Riversdale Mining Limited ("Riversdale")—emanated from Albanese's directive to senior Rio Tinto executives to seek out opportunities for value-accretive growth.  Albanese recognized that mining assets were by

nature depleting assets and thus Rio Tinto needed to find new resources in order to sustain its operations. Albanese believed there would be continued growth in energy, especially in emerging markets, and that a significant coking coal discovery could be of strategic importance on a long-term basis. Elliott, however, had concerns that Albanese was too inclined towards growth at the expense of value.

49.     Unlike more abundant thermal coal, which is commonly used to fire thermal-powered generators, hard coking coal is relatively rare globally and is an essential ingredient in the production of steel. Albanese understood that there were few undeveloped coking coal basins in the world and that the Moatize Basin was believed to be an emerging coking coal region.

50.     In January 2011, Riversdale owned and operated a number of exploration and early development stage projects, specializing in coal opportunities in southern Africa. Its principal interests were the Benga coal project, a joint venture with an international company, and Riversdale's wholly owned Zambezi coal project. These projects were located contiguously in the Tete and Moatize provinces of Mozambique. Riversdale's Benga coal project involved the staged development of multi-seam coal deposits, and the Zambezi coal project involved the exploration and proposed development of a coking and thermal coal mine. In April 2010, RTE's CEO recommended to Rio Tinto's Investment Committee that Rio Tinto acquire coal tenements in Mozambique as part of the company's strategic energy development.

51.     In the course of Rio Tinto's pre-acquisition due diligence, Rio Tinto's in-house experts identified a series of significant risks, including risks related to barging, other transport options, and coal quantity and quality, and they repeatedly described the risks to Albanese and

Elliott.  However, Albanese and Elliott did not disclose this material information to Rio Tinto's Board of Directors.

52.     In contrast to the risks described by Rio Tinto's in-house experts and known to Albanese and Elliott, Defendants consistently described Riversdale as a significant opportunity—a "tier one" asset—with numerous transportation options that it could develop quickly into a project producing 45 million tons of coal per year.  In Rio Tinto parlance, "tier one" referred to "what others might call 'company maker' deposits . . . that contribute disproportionately to global production of a commodity due to their size and character."

53.     In July 2010, RTE's CEO asserted in a memorandum to the Investment Committee, which included Albanese and Elliott, that Rio Tinto's acquisition of a majority interest in Riversdale was consistent with RTE's strategy to become the world's third largest coking coal producer post-2015, and would potentially double Rio Tinto's hard coking coal production to over 30 million tons per year post-2020.

## B.  Defendants Learned About Severe Transportation Risks During the Acquisition Process

54.     At an August 2010 meeting of Rio Tinto's Investment Committee, of which both Albanese and Elliott were members, RTE's CEO presented information relevant to the acquisition of Riversdale.

55.     As reflected in papers presented to the Investment Committee by RTE's CEO, RTE contended that Riversdale's tenements were worth approximately $3.4 billion based, in part, on assumptions that it had production potential of approximately 30 million tons of coal per year by 2020 and 45 million tons per year by 2030, of which 60 percent was expected to be

hard coking coal.  The relatively high percentage of hard coking coal was significant because the market price of hard coking coal was significantly higher than that for thermal coal.

56.     In August 2010, TEG told the Investment Committee that "RTE's central case assumption that the majority of product will be barged downstream to a mid-river port at the mouth of the Zambez[i] appears to be an elegant solution.  However, it is only a concept at this stage and a number of potentially 'showstopping' unknowns exist (such as the ability to dredge and maintain an open channel over the river mouth bar, the impact of cyclones/ flooding on river navigability and the ability to obtain environmental approvals)."  TEG also characterized as "optimistic" the assumptions about how quickly Rio Tinto could ramp up production.

57.     Moreover, at that time, BED identified specific uncertainties concerning the acquisition, including issues related to infrastructure, the valuation of the assets, and risks related to how much hard coking coal was present as opposed to thermal coal.

58.     The Investment Committee considered the Riversdale acquisition again at a November 18, 2010 meeting.  In advance of the meeting, TEG submitted comments that recommended caution in entering a binding Riversdale bid before due diligence was completed and there was greater certainty regarding the value of the assets.  The TEG paper observed that expanding Riversdale's coal production would be largely reliant on barging and "[c]urrent assessments are at a fairly early stage . . . and significant uncertainties remain over its practical operation, permitting, feasibility and cost."  The paper also stated that many of the key technical uncertainties noted in the previous (August 31, 2010) TEG paper still remained.

59.     The potential "showstopping" barging risk was discussed further at the November 18, 2010 Investment Committee meeting.  RTE's CEO told the Investment

Committee, including Albanese and Elliott, that barging was a viable option that was supported by the government of Mozambique.

60.     In mid-December 2010 Rio Tinto's Investment Committee authorized the presentation of the Riversdale acquisition proposal to the Board of Directors for final approval at a December 16, 2010 meeting.  Albanese and Elliott were members of Rio Tinto's Board of Directors, and they attended its December 16, 2010 meeting.  The proposal that RTE's CEO presented to Rio Tinto's Board of Directors claimed that the purchase would double Rio Tinto's managed production of coal to more than 30 million tons per year after 2020, that transporting coal to the market could be done via barging and/or railroad, and that the acquisition was valued at $3.6 billion.  Nobody shared with the Board any of the "showstopping" risks associated with barging, including Albanese and Elliott, even though both were aware of the significant risks and attended the December Board meeting.

### C.  The Final Acquisition

61.     Rio Tinto submitted its proposal for the acquisition of Riversdale on December 20, 2010 and successfully acquired a majority interest on April 8, 2011.  Rio Tinto completed the acquisition in August 2011, paying approximately $3.7 billion (net of cash acquired at acquisition).  The purchase price represented a substantial premium to Riversdale's market capitalization at the time the acquisition was proposed.

62.     Rio Tinto described the acquisition as "[i]n line with [its] strategy of developing large, long-life, low cost assets to build shareholder value" and stated that the acquisition "provide[d it] with one of the world's most prospective tier one coking coal developments." The acquisition appeared to advance RTE's objective of becoming a major global player in the

hard coking coal sector and to satisfy Albanese's directive to seek opportunities for value-accretive growth.

63.     At its annual meeting in April 2011, Rio Tinto announced the transaction to shareholders under the banner, "Growth [is] back on the agenda," and according to Albanese, the acquisition "re-instilled [Rio Tinto's] reputation in the market for M&A" after the Alcan debacle and "positioned [RTCM] to develop one of the last large coking coal basins accessible to sea borne markets."

64.     In August 2011, Albanese publicly hailed Rio Tinto's acquisition of RTCM as an important highlight that transformed RTE's growth portfolio, giving it access to a number of "tier one" coking coal development projects in Mozambique, and claimed that the acquisition was a major achievement and that RTCM was a world class asset that would deliver value to shareholders for years to come.

65.     Approximately one month later, in or around September 20, 2011, Albanese and Elliott, together with RTE's CEO, addressed analysts in London and New York.  The presentation materials used for the meeting highlighted that RTCM had a world-class portfolio of coal assets within the Moatize Basin and that Rio Tinto's strategic objective was to export 25 million tons of hard coking coal per year by 2020.

66.     At the time of the acquisition, Riversdale had publicly disclosed its estimates that the Benga and Zambezi tenements held approximately 13 billion tons of coal reserves and resources, including some of the world's largest deposits of hard coking coal.

**III.      RTCM FACES IMMEDIATE SETBACKS**

67.      Rio Tinto's acquisition of Riversdale was driven in part by assumptions that by 2020 it could produce over 25 million tons of hard coking coal per year and more than 30 million tons of coal per year in total; that by 2030 it could produce more than 45 million tons of coal per year; that it could barge up to 30 million tons of total coal product per year down the Zambezi River; and that approximately 12 to 15 million tons of coal per year could be transported by existing rail lines to the Beira port, where it could then be shipped to markets. In other words, Rio Tinto's acquisition valuation was based on an assumption that it could cheaply transport 30 million tons of coal per year by barge, that it could transport an additional 10 to 15 million tons of coal per year on existing rail infrastructure, and that 30 million of the 45 million tons would be high-value hard coking coal.  Each of those assumptions quickly proved to be incorrect.

**A.  Barging Capacity is Significantly Less than Rio Tinto Estimated**

68.      At acquisition, Rio Tinto planned to transport the majority of RTCM's coal from its Riversdale tenements to market by barging it down the Zambezi River to a port on the Indian Ocean.  This was a central assumption to the acquisition.

69.      Within months of the acquisition, the "showstopping" risks to barging that had been identified by Rio Tinto's in-house experts materialized, and it became clear that constraints on barging volumes would have a measurable and materially negative effect on RTCM's valuation.  By October 2011, RTE's VP of Logistics determined that, based on the best information available, barging capacity was limited to 10 million tons per year—not the 30 million tons per year assumed in the acquisition valuation—due to the hydrogeological

properties of the Zambezi River and to ecological constraints impeding the construction of a port at the mouth of the river, the site of an internationally-designated wetland.  Moreover, the immutable physical constraints on the river meant that barging was significantly more expensive than had been assumed previously.

71. Downgrading barging from 30 million tons per year to approximately 10 million tons per year had a negative, measureable and immediate effect on RTCM's valuation.  As part of the routine annual planning process in 2011, RTCM generated an updated valuation that reduced its value by approximately $2.1 billion as a result of the loss of barging capacity.

72. At the time, RTE's CEO advised an RTCM employee that the value differential between RTCM's purchase price and the new valuation was "causing some consternation." The RTCM employee responded that the aggressive assumptions about coal chain and capacity that were made in the acquisition model were no longer viable.  The RTCM employee further noted that Albanese "quickly identified the impact of changes in the coal chain assumptions." Elliott likewise observed that the rapid deterioration of RTCM's valuation had "rather dented his faith in RTE's evaluation capacity."

73. In December 2011, Albanese traveled to Mozambique and met with RTCM's management team and Mozambique government officials.

74. During his Mozambique visit, RTCM management provided Albanese with a "[g]reater understanding of [the] size of [the] challenge."  They explained "that if one removed

20 million tons per annum of coal haulage capacity from the barging scenario, this would have a significant potential impact of the net present value of the business." Albanese expressed "[m]ajor disappointment on infrastructure capacity" and "the state of coal chain restraints."

### B.  The Government of Mozambique Eliminates Barging as a Transportation Option

75.     Rio Tinto needed government approval in order to be able to barge any coal down the Zambezi River.  In late November 2011, officials from the Government of Mozambique notified RTCM that its Zambezi River barging proposal would be rejected.

76.     The Government of Mozambique formally rejected Rio Tinto's barging proposal in December 2011, citing 36 separate grounds for its decision.  In a letter signed by eight government ministries, the Government summarized its position, stating:

> The Zambezi River is part of a series of environmentally sensitive areas and protected by international conventions and holds the largest biodiversity in the country . . . . [T]his project will bring significant negative impacts to the [environment] and to the population living along the Zambezi . . . and therefore we suggest the assessment of other available alternatives [e.g., rail] . . . at the detriment of this current proposal.

77.     Albanese and Elliott learned that the Mozambique Government had rejected RTCM's barging proposal in December 2011 and January 2012, respectively.  Rio Tinto never formally submitted a revised or updated barging proposal, and by April 2012, it had been warned by the Government of Mozambique that, if it persisted in raising the subject of barging, it risked losing its mining licenses altogether.  Albanese believed that there was a political issue that would prevent the Government of Mozambique from approving barging because it did not want to provide Malawi—a landlocked country with which Mozambique had longstanding conflict—access to a navigable river and port.

78.     Rio Tinto's acquisition valuation of RTCM was based on an assumption that it could barge 30 million tons of coal a year—two-thirds of its anticipated production—down the Zambezi River.  The rejection of barging meant that Rio Tinto's only viable transportation strategy was the existing and capacity-constrained railway.

79.     The loss of barging was particularly embarrassing for Albanese and Elliott because TEG highlighted the "showstopping" risks for them before the acquisition. Defendants nevertheless spent more than $3 billion on RTCM and did not advise the Board of the extent of the barging risks at the time of the acquisition vote.  Thus, within eight months of acquisition, Defendants knew that the lowest-cost transportation method was not available and that they had not identified a viable alternative means of transportation that could support two-thirds of the volume that Rio Tinto assumed at acquisition.  Defendants did not disclose to the Board the full nature and extent of the problems with barging.

### C.  Rail Capacity Is Significantly Less than Rio Tinto Estimated

80.     At the time of acquisition, Rio Tinto assumed that between 12 and 15 million tons of coal per year could be shipped by rail from the coal tenements in the Moatize Basin to a port on the Indian Ocean.  But within a few months, the company came to understand that the existing rail line had a maximum capacity of six million tons of coal per year, and that only 32 percent of that capacity, *i.e.*, a little less than two million tons, would be available to Rio Tinto on a shared basis.  In other words, existing rail could transport only a small fraction of the amount of coal Rio Tinto had planned to move by rail every year.

81.     Collectively and individually, Rio Tinto's improved understanding of the physical limitations on the capacity of barging, the diminished capacity of existing rail, and the

Government of Mozambique's outright rejection of Rio Tinto's barging proposal had a material negative effect on RTCM's prospects.  At acquisition, Rio Tinto expected that RTCM would be cheaply transporting and selling more than 40 million tons of coal per year; a few months later, it realized that it had less than five percent of the assumed transportation capacity—and could thus sell less than five percent as much coal as anticipated at the time of acquisition.

### D.  Significant Reduction of RTCM's Reserves and Resources

82.     RTCM's valuation was dependent both on the amount of coal reserves and resources and the ability to mine that coal and transport it to market in a cost effective manner. In addition to mounting transportation problems, RTCM realized that its previous reserve and resource estimates were inaccurate.

83.     Before it was acquired by Rio Tinto, Riversdale declared that its coal mining and exploration tenements contained approximately 13 billion tons of coal resources (inclusive of reserves).  By contrast, based on Rio Tinto's due diligence assessment of Riversdale, Rio Tinto had estimated that Riversdale's publicly-declared resource estimates would ultimately need to be written down by approximately 50 percent, to approximately seven billion tons.

84.     But by January 2012, as RTCM evaluated the potential resources post-acquisition, it determined that they would in fact have to be written down by closer to 80 percent, to less than three billion tons—a substantially greater write-down than had been anticipated at the time of acquisition, which in turn called into question the estimates for marketable coal used in RTCM's valuation modeling.  Thus, RTCM had roughly half the

amount of coal—down from approximately seven billion tons to less than three billion tons—that it had assumed at acquisition.

85.      Albanese and Elliott learned and understood the significance of the reserves and resources write-down.

86.      In January 2012, Elliott forwarded a report on RTCM's reserves and resource estimates to Albanese, stating that they were "[w]orse by far than expected," and in a follow-up e-mail, Elliott informed Albanese that "the market won't see" what Rio Tinto assumed for the acquisition.  In other words, since "the market" did not know what Rio Tinto had assumed about Riversdale's reserves and resources estimates at the time of acquisition (approximately seven billion tons), investors would not know that Rio Tinto's 80 percent write-down to approximately three billion tons was far worse than the company had expected when it acquired Riversdale.

### E.  Business Unit Modeling Indicates That RTCM Has No Economic Value

87.      Between late 2011 and early 2012, RTCM created a ground-up valuation model that, when completed, generated valuations ranging from approximately negative $3.45 billion to approximately negative $9 billion based on RTCM's improved understanding of available coal transportation options and declining estimates related to coal quality and quantity.

88.      Even those negative valuations rested on aggressive assumptions.  The negative valuations assumed that a largely-untested coal tenement called "Minjova" would contribute hundreds of millions of tons of coal production to the overall project.  Indeed, by this time, Minjova had taken on a prominent role in RTCM valuations and business planning.  But Minjova had no declared reserves or resources, was not originally included in the Riversdale

acquisition, and was not then a component of RTCM's CGU.  The valuations also assumed that

Rio Tinto would sell millions of tons of excess rail capacity on a rail line RTCM had neither

sought nor received governmental permission to build much less fund or construct.  Thus, even

the negative valuations derived from RTCM's modeling were best-case, purely-hypothetical

scenarios.

## IV.      DEFENDANTS CONCEAL RTCM'S DETERIORATING VALUE

### A. Defendants Fail to Publicly Disclose Rejection of Rio Tinto's Barging Proposal

89.      Even though the Government of Mozambique's rejection of Rio Tinto's barging

proposal materially impacted the economic viability of RTCM, Rio Tinto did not publicly

disclose the rejection or its effect on RTCM's valuation.  To the contrary, Albanese

downplayed the significance of the government's action.  For example, in connection with the

preparation of Albanese's routine Board update, an RTCM employee recommended advising

the Board that:

> **Following the Government's rejection** on environmental grounds of Rio Tinto's
> Zambezi River barging proposal, the integrated rail and port project is critical for
> delivering the coal transport capacity required for a world-class export coal
> business.  (Emphasis added.)

90.      But Albanese's final Board update omitted any reference to the government's

rejection, and emphasized instead that barging was "being explored."  Press reports in March

2012 noted that the Government of Mozambique had rejected on environmental grounds a

"proposal put forward last year by [Riversdale] and later supported by Rio Tinto," but Rio

Tinto never disclosed the full scale of the barging-related issues facing RTCM and their

material effect on its valuation.

**B. Defendants Withhold Material Adverse Information About RTCM During the Audit Process and in Rio Tinto's Year-End 2011 Filings with the SEC**

91.     Rio Tinto conducted its required review of RTCM for impairment indicators between September and December 2011.  By the end of the review period, Defendants were aware that there was a viable plan to transport only two million tons of coal by rail (as opposed to the 15 million tons that were estimated at acquisition) and that barging had been completely rejected by the Government of Mozambique (as opposed to the 30 million tons assumed at acquisition)—thus leaving RTCM with less than five percent of the capacity assumed at acquisition.

92.     Defendants concealed the nature and effect of these materially adverse developments from Rio Tinto's Audit Committee and its independent auditors.  Consequently, in connection with their audit of Rio Tinto's financial statements for fiscal year 2011, Rio Tinto's independent auditors did not know of these adverse developments, and relied instead on Rio Tinto's assurances that nothing significant had changed since the company's acquisition of Riversdale.

93.     By concealing the true nature and effect of these adverse developments, Defendants contributed to and facilitated a series of misrepresentations and omissions in Rio Tinto's 2011 Annual Report and financial statements.

94.      Despite knowing that barging had been rejected by the Government of Mozambique and, in any event, could never support the type of volume underpinning RTCM's valuation, Rio Tinto failed to test RTCM for impairment pursuant to Rio Tinto's accounting policies and the provisions of IAS 36.

95.     Albanese and Elliott signed Rio Tinto's 2011 Annual Report, which did not disclose the adverse developments at RTCM. The report includes a "Directors' declaration," in which Albanese and Elliott each "confirmed" that the financial statements "give a true and fair view of the assets, liabilities, financial position and profit" of Rio Tinto and have been prepared in accordance with applicable accounting standards. Albanese and Elliott also "confirmed" that "there is no relevant audit information of which [Rio Tinto] Group's auditors are unaware" and that each of them has taken all the steps necessary "to establish that [Rio Tinto] Group's auditors are aware" of any relevant audit information.

96.     The 2011 Annual Report was incorporated in Rio Tinto's Form 20-F filed with the SEC on or about March 15, 2012. Both Albanese and Elliott "certified" that the Annual Report did not contain any untrue statement of a material fact or a material omission, and that the financial statements "fairly present" the financial condition, results of operations, and cash flows of Rio Tinto. Albanese and Elliott knew, were reckless in not knowing, or should have known that these certifications were false because the Annual Report continued to value RTCM at more than $3 billion even though there was no viable plan to transport more than a small fraction of the coal that would need to be sold to support that valuation.

97.     The Annual Report contained statements about RTCM that were materially misleading, and collectively depicted RTCM in a positive light that was not supported by the best information then known to Defendants and did not disclosure adverse developments at RTCM or the related valuation challenges.

98.     To the contrary, Defendants falsely declared in Rio Tinto's financial statements that the value of RTCM was the amount it paid to acquire Riversdale, *i.e.*, approximately $3.7

billion dollars.  This valuation concealed from the market that Rio Tinto did not test RTCM for impairment despite the presence of several impairment indicators.

99.     Defendants falsely stated that Rio Tinto reviewed intangible assets for impairment knowing that it did not in fact test RTCM for impairment, despite an affirmative obligation to do so, and that there were numerous indicators that RTCM's carrying value might not be recoverable.

100.     Defendants knew, were reckless in not knowing, or should have known the following facts:

- Rio Tinto's ability to transport coal to market was materially restricted because the Government of Mozambique rejected RTCM's barging proposal;

- Even if the government subsequently approved barging, the Zambezi River's barging capacity prevented RTCM from achieving the annual coal volumes necessary for RTCM to be economically viable;

- Rio Tinto could transport significantly less coal by rail than originally assumed;

-  Even if RTCM developed effective coal transportation solutions, the amount and quality of marketable coal (reserves and resources) was significantly worse than originally assumed, thereby calling in question whether or not RTCM was an economically viable asset; and

- Each of these transportation challenges resulted in significant delays in bringing coal to market.

101.     Each of the facts described in the foregoing paragraph, whether individually or collectively, qualified as an impairment trigger under IAS 36 and Rio Tinto's internal accounting policies, as the facts reflected:

- Significant changes that are likely to have an adverse effect in the technological, legal or economic environments in which the entity operates, or in the market to which an asset is dedicated.

- Significant changes to the extent or manner of use of the asset that are likely to have an adverse effect on its recoverable value, including restructuring or discontinuation of use.

- Indications that the economic performance of an asset is, or will be, significantly worse than expected.

102.    Finally, Defendants minimized the one negative fact that they did disclose.  Rio Tinto described RTCM's write-down of reserves and resources with false assurances that the full extent of the write-down had been anticipated prior to the acquisition of Riversdale, and, therefore, had no effect on RTCM's valuation.  This was in keeping with Elliott's e-mail to Albanese that the "market will not see" Rio Tinto's pre-acquisition assumptions.  In reality, the full-extent of the write-down had not been anticipated and it had a negative effect on RTCM's valuation.

103.    Albanese and Elliott signed the 2011 Annual Report and were therefore responsible for the materially misleading statements and omissions contained therein.

104.    The 2011 Annual Report was subsequently incorporated into the offering documents for Rio Tinto's March and August 2012 NYSE bond offerings.

**C.  Rio Tinto Raises $2.5 Billion in an Offering that Incorporates Defendants' False Statements About RTCM**

105.    In or around the time that Rio Tinto acquired RTCM, it secured long-sought upgrades from two major credit rating agencies.  In October 2010, a major credit rating agency upgraded Rio Tinto's long-term debt rating from Baa1 to A3 and a second major credit rating

agency followed suit in April 2011, upgrading Rio Tinto's long-term debt ratings from BBB+ to A- with a "Stable" outlook.

106.    During meetings with the credit rating agencies in early 2011, Rio Tinto described its acquisition of Riversdale as evidence of prudent capital management and its commitment to maintaining its "A" rating.  It also promoted the "[s]ignificant rise in Rio Tinto's coking coal production following increased investment" and offer for Riversdale. Albanese and Elliott recognized the importance of having a superior credit rating—indeed, achieving and retaining a strong rating was a "priority"—because it had a positive effect on costs of borrowing and it afforded Rio Tinto flexibility in corporate decision-making.

107.    In March 2012—just days after issuing its materially false and misleading 2011 Annual Report—Rio Tinto issued four bonds totaling two $2.5 billion through Rio Tinto Finance (USA) plc: a $500 million 1.125% bond due 2015, a $500 million 2.0% bond due 2017, a $1 billion 3.5% bond due 2022, and a $500 million 4.75% bond due 2042.

108.    The bonds were listed on the NYSE, and were fully and unconditionally guaranteed by Rio Tinto plc and Rio Tinto Limited.

109.    Shortly before the offerings Rio Tinto had met with a credit rating agency and highlighted the successful completion of the Riversdale acquisition.

110.    Rio Tinto's offering documents for its March 2012 NYSE bond offerings incorporated by reference the material misrepresentations and omissions in Rio Tinto's 2011 Annual Report, which was incorporated in Rio Tinto's Form 20-F filed with the SEC on or about March 15, 2012.  Albanese and Elliott signed the misleading financial statements incorporated by reference and used to raise money in the March 2012 bond offerings.

111.    The offering materials also reported "group operating profits," which are defined as *including* the effect of any impairments, of $13 billion for year-end 2011.  Due to Rio Tinto's failure to impair RTCM, the operating profits reflected in the offering materials were materially overstated.

112.    Thus, Rio Tinto's materials announcing its March 2012 NYSE bond offerings referenced a more than $3 billion valuation of RTCM and omitted any information concerning the project's transportation and ore reserve challenges.

## V.    ALBANESE CONTINUES TO PROMOTE RTCM IN SPITE OF SIGNIFICANT ADVERSE DEVELOPMENTS

113.    Rio Tinto held its annual shareholders meeting in London on April 19, 2012. During the meeting, Albanese told shareholders that Rio Tinto was growing its coal business, with a target of starting shipments from the newly-acquired hard coking coal assets in Mozambique in the first half of 2012.

114.    Neither Rio Tinto nor Albanese disclosed that the government had rejected RTCM's barging proposal, that RTCM had available to it just a small fraction of the transport infrastructure assumed at acquisition, that Rio Tinto significantly reduced the quantity of RTCM's coal reserves and resources, or that the coal quality and mix between hard coking and thermal coal was not as favorable as initially assumed.

115.    Because of these omissions, Rio Tinto's and Albanese's statements to shareholders gave the misleading impression that RTCM remained on track, and concealed from shareholders the fact that Rio Tinto was in fact on the cusp of another multi-billion dollar impairment under Albanese's leadership.

**VI.      DEFENDANTS DO NOT TRIGGER THE REQUIRED
            IMPAIRMENT ANALYSIS AFTER LEARNING
            THAT RTCM HAS A NEGATIVE VALUATION**

### A.  The May 2012 Brisbane Meeting

116.      In mid-April 2012, Elliott requested an "all hands" meeting with Albanese and RTCM representatives for a comprehensive review of the status of RTCM.  The meeting requested by Elliott was convened on May 11, 2012 in Brisbane, Australia ("the Brisbane Meeting"), and included a presentation by the director of RTCM.  In an e-mail, Elliott specifically asked the CEO of RTE to provide an "NPV," *i.e.*, a "net present value," for RTCM at that meeting.

117.      An NPV or net present value represents an approach to assessing the value of an asset using a discounted cash flow analysis.  Under a discounted cash flow, the forecasted cash flows of an asset are discounted back to the valuation date.  The NPV calculation is the output of a discounted cash flow valuation.

118.      Elliott did not invite the Controller to the Brisbane Meeting, which meant that Defendants could discuss RTCM's valuation outside the presence of the Rio Tinto employee who had day-to-day oversight of the impairment process.

119.      During the Brisbane Meeting RTCM and RTE management provided Albanese and Elliott with the following information:

- Based on the best information available and under the best potential configuration, RTCM was worth negative $680 million;

- There were formidable physical challenges associated with barging, the Government of Mozambique rejected barging, and the loss of early barging tons resulted in a huge value loss for the business;

- There was a significant negative impact on value stemming from issues related to the coal quality, *e.g.*, a less-favorable split between hard coking and thermal coal;

- There was a negative impact on valuation stemming from increased costs of $20 to $40 per ton, due to the loss of low-cost barging;

- Even RTCM's negative valuation assumed production from Minjova, which was neither part of the Riversdale acquisition nor a component of the RTCM CGU;

- The transportation options considered at the time of the RTCM acquisition were no longer realistic; and

- The only way to deliver the necessary capacity at a competitive cost was to build a new ("greenfield") rail line at a cost of  $16 billion—and that even then, the project did not have a positive valuation.

120.    At the end of the Brisbane Meeting, Albanese specifically rejected a proposal for Rio Tinto to construct a new, $16 billion ("greenfield") rail line by itself in light of capital constraints.  Instead, Albanese instructed RTCM managers to seek out partners to construct or bring online an existing small rail operation.  However, existing rail infrastructure could not transport the amount of coal underpinning Rio Tinto's estimates and thus could not support RTCM's carrying value of over $3 billion.

121.    At the end of the Brisbane Meeting, Albanese and Elliott determined that it was premature to settle on a valuation for RTCM.  This decision contributed to the company's deficient half-year impairment review for RTCM.

### B. RTCM's 2012 Half-Year Impairment Review

122.     As the CEO and CFO of Rio Tinto, Albanese and Elliott were ultimately responsible for the integrity of the financial reporting process, including the impairment review process.  Rio Tinto's impairment process for its interim or half-year financial reports started a few weeks after the Brisbane Meeting, but Albanese and Elliott kept key facts that they had learned at the Brisbane Meeting from the Controller's office and Rio Tinto's independent auditors.  Their decision to cabin or conceal negative information about RTCM corrupted the integrity of the half-year reporting process.

123.     The first phase of the impairment review process culminated with a June 18, 2012 Audit Committee meeting attended by Albanese, Elliott, and Rio Tinto's independent auditors.  At the meeting, the Audit Committee reviewed a paper submitted by Rio Tinto's Controller that addressed the RTCM purchase price allocation (*i.e.* the process that determined how RTCM would be carried on Rio Tinto's books and records) and the consideration of potential impairment indicators (the "First Controller's Paper").

124.     The First Controller's Paper, which Elliott reviewed prior to its submission to the Audit Committee, contained a series of material misrepresentations and omissions concerning RTCM.  Specifically, it claimed that "[a] number of options are available" for increasing export capacity "including securing incremental capacity on the existing rail lines, greenfield rail and port development … and revised partial barging options."  These assertions were materially misleading because—as Defendants well knew—one of the purported "options" (barging) was not available, Albanese had rejected another (greenfield rail and port), and the third (securing incremental rail capacity) could only support a small fraction of the production volumes assumed at acquisition.

125.    The First Controller's Paper also asserted that "it is not expected that any impairment will need to be recorded as it is too early to assess the impact of the developments on the fair value of the [RTCM]."  This assertion was materially misleading because—again, as Defendants knew—the impact of the post-acquisition developments had been assessed by RTCM and resulted in a negative valuation based on the best information available.

126.    The First Controller's Paper also stated that the significantly lower coal reserves and resources were "anticipated in the due diligence."  This assertion was materially misleading because the write-down was in fact significantly greater than what had been anticipated in due diligence.  The First Controller's Paper claimed that the auditing firm that performed the initial RTCM valuation for the purchase price allocation advised Rio Tinto that the change in reserves and resources would not change their valuation.  This assertion was materially misleading, however, because this advice was contingent on confirmation from Rio Tinto's technical experts that it was appropriate to assume that RTCM could convert nearly 70 percent of resource into marketable coal instead of the roughly 17 percent assumed at acquisition.  Even though Rio Tinto's  technical experts had made no such determination, the First Controller's Paper asserted that the initial valuation firm had reviewed their model and indicated that the change in reserves and resources "alone would not change their [purchase price allocation]."

127.    Collectively, the misrepresentations and omissions in the First Controller's Paper put a materially misleading, soft focus on the transportation and resource challenges that RTCM was facing, and omitted the following material facts that were known to Defendants: for both hydrogeological and political reasons, barging was not a viable option for transporting coal from RTCM's tenements; Rio Tinto had already decided it could not independently

finance the new greenfield railway because of capital constraints; existing rail could only transport approximately five percent of the volume assumed in the initial RTCM valuation; there was less and lower quality coal than had been estimated at acquisition; and Rio Tinto's internal models generated large negative valuations for RTCM.

128.    Elliott reviewed a draft of the First Controller's Paper before it was submitted to the Audit Committee and Rio Tinto's independent auditors.  Even though Elliott knew about the gravity of the transportation and resource challenges RTCM was facing and the negative $680 million valuation, his only comment was to question whether it was really appropriate to highlight potential impairment matters so early in the year as to RTCM.

129.    Neither Elliot nor Albanese corrected the materially misleading statements in the First Controller's Paper when it was presented to the Audit Committee and Rio Tinto's independent auditors at the June 18, 2012 Audit Committee meeting.  Nor did they take any steps to inform the Audit Committee or Rio Tinto's independent auditors of the significant adverse developments that they discussed at the Brisbane Meeting.

130.    Because Albanese and Elliott concealed the crucial information presented to them at the Brisbane Meeting, the same types of material misstatements and omissions that were in the First Controller's Paper were reiterated in a paper that Rio Tinto subsequently submitted to its independent auditors in connection with the half-year impairment review related to RTCM (the "Impairment Paper").

131.    Like the First Controller's Paper, the Impairment Paper failed to identify an impairment indicator, concluding that Rio Tinto was "confident of finding a viable infrastructure path [and that] the breadth of options mean[s] that a central case view is still under development …."  However, the Impairment Paper went one step further and claimed

with no reasonable basis in fact that "a potential value of $5.1 billion" gave an "indication of value" for RTCM, and that on top of the $5.1 billion, there was an additional "$1 billion of value designated as possible upside."

132.    The Impairment Paper also contained misleading statements about the initial valuation firm's "advice" that the revised resource and reserve numbers would not impact the acquisition valuation.  The Impairment Paper did not disclose that this "advice" was contingent on Rio Tinto's reserve engineers confirming than 70 percent of the Zambezi resources would be converted to marketable product, as opposed to the 17 percent assumed at acquisition—a confirmation that Rio Tinto's engineers had not provided.  In fact, Rio Tinto's reserve engineers were never consulted regarding this assumption.

133.    Finally, the Impairment Paper concluded that it was not yet possible to determine whether the available options had an adverse impact on RTCM's value since "the options available have not been quantified with any degree of accuracy yet."   This was not true.  The options had been quantified through extensive modelling performed by RTCM, and the models revealed that, under the best information and configuration, RTCM had a negative value.  Moreover, the options that were available could only transport about five percent of the volume underpinning Rio Tinto's valuation which meant that it was virtually impossible that RTCM was still worth more than $3 billion.

134.    A Controller's paper (the "Second Controller's Paper") presented to the Audit Committee and independent auditors in connection with the July 30, 2012 Audit Committee meeting—the last meeting prior to the publication of Rio Tinto's half-year 2012 financials— concluded that Rio Tinto "[did] not believe there [was] an impairment indicator" with respect to RTCM, and that "whilst [Rio Tinto was] confident of finding a viable infrastructure path the

breadth of the options mean that a central case view is still under development."   The Second Controller's Paper contained the independent auditor's concurrence with the conclusion that there were no impairment indicators.

135.     Albanese and Elliott attended the July 30, 2012 Audit Committee meeting and therefore reviewed or should have reviewed the Second Controller's Paper.  Albanese and Elliott knew, were reckless in not knowing, or should have known that the independent auditors had based their concurring opinion on incomplete and misleading information.

136.     Albanese and Elliott knew that a claimed "breadth of [infrastructure] options" was not the barrier to developing a "central case view" for RTCM.  To the contrary, Albanese and Elliott knew that due to a lack of infrastructure options, RTCM had little or no commercial value.

137.     In fact, the adverse developments known to Albanese and Elliott—including the loss of barging, dramatically reduced rail capacity, declining coal quality, delays, and the negative valuation—qualified as impairment indicators, as they represented:

- Significant changes that are likely to have an adverse effect in the technological, legal or economic environments in which the entity operates, or in the market to which an asset is dedicated;

- Significant changes to the extent or manner of use of the asset that are likely to have an adverse effect on its recoverable value, including restructuring or discontinuation of use.

- Indications that the economic performance of an asset is, or will be, significantly worse than expected; and

- Any other change that is likely to have a material impact on the value of the CGU.

138.    Neither the Audit Committee nor the independent auditors recognized these impairment indicators because they were relying on the First and Second Controller's Papers. Albanese and Elliott reviewed the Controller's Papers and knew facts that rendered them materially false and misleading.  Albanese and Elliott attended Audit Committee meetings where the First and Second Controller's Papers were reviewed and discussed with Rio Tinto's independent auditors.  At those meetings, neither Albanese nor Elliott took any steps to communicate the extent and scope of the adverse developments that would impact RTCM's valuation to the Audit Committee or the independent auditors.  Instead, they allowed the Audit Committee and the independent auditors to base their decisions regarding impairment on the misleading information in the Controller's Papers.

### C.  Defendants Fail to Disclose Material Information

139.    Rio Tinto filed its interim financial report for half-year 2012 as an exhibit to a Form 6-K filed with the SEC on August 9, 2012.  The interim financial report recorded a valuation of more than $3 billion for RTCM, and reported net earnings for Rio Tinto for the period of approximately $5.8 billion.  The RTCM valuation reflected in the interim financial report was materially misleading and resulted in a material overstatement of Rio Tinto's net earnings and assets.  Had Rio Tinto properly impaired RTCM, Rio Tinto's net earnings would have been reduced by more than 50 percent at the half-year 2012.

140.    In addition, in the Form 6-K filed with the SEC on August 9, 2012, which included a press release about RTCM's first shipment of hard coking coal, Rio Tinto failed to disclose the material information known by Albanese and Elliott concerning RTCM's significantly reduced valuation or the significant challenges RTCM faced.

141.    During Rio Tinto's August 8, 2012 North American presentation of its half-year results, which included a question and answer session with Albanese, Albanese materially misrepresented that Rio Tinto was looking at a "greenfield" rail development in Mozambique, and that Benga, Zambezi and the regional area in the Moatize Basin was "more prospective" than he would have said a year earlier.

142.    In a similar exchange with analysts that same day—August 8, 2012—Albanese materially misrepresented to investors that the work RTCM had been doing over the past 12 months indicated that the company probably had even "more potential in total as [it went] forward," and that the Moatize was truly a world-class basin coal deposit.

143.    Elliott participated in the August 8, 2012 session with analysts and he failed to correct Albanese's material misrepresentations regarding RTCM thereby concealing from analysts the true valuation of RTCM and the existence of impairment indicators.

144.    At the time of these statements, Albanese and Elliott knew, were reckless in not knowing, or should have known that the only way to deliver the necessary capacity at a competitive cost was to build a new rail line at a cost of approximately $16 billion, a plan Albanese rejected at the end of the Brisbane Meeting.  They also knew, were reckless in not knowing, or should have known that the best information available indicated that RTCM was worth negative $680 million and that there was a less-favorable split between hard coking and thermal coal than Rio Tinto assumed at acquisition.  These facts completely contradict Albanese's statement that the Moatize Basin represented an opportunity for Rio Tinto to have a "tier one," world-class coking coal operation.

**D. Rio Tinto Raises $3 Billion in an Offering that Incorporates Defendants' False Statements About RTCM**

145.     Days after filing its false and misleading interim financial reports for half-year 2012, Rio Tinto issued three bonds through Rio Tinto Finance (USA) plc listed on the NYSE: a $1.25 billion, 1.625% bond due 2017; a $1 billion, 2.875% bond due 2022; and a $750 million, 4.125% bond due 2042.

146.     The bonds were fully and unconditionally guaranteed by Rio Tinto plc and Rio Tinto Limited.

147.     Prior to the offering, Rio Tinto met with a credit rating agency and reiterated its commitment to investing in and operating "large, long-term, cost competitive mines and assets," and highlighted the Riversdale acquisition.

148.     Rio Tinto's offering documents for its August 2012 NYSE bond offering incorporated by reference the material misrepresentations and omissions in Rio Tinto's 2011 Annual Report, which was incorporated in Rio Tinto's Form 20-F filed with the SEC on or about March 15, 2012, and in Rio Tinto's half-year 2012 interim report.  Albanese and Elliott signed the misleading 2011 Annual Report incorporated by reference and used to raise money in the August 2012 bond offerings.

149.     Rio Tinto's offering documents reported "group operating profits," which are defined as including the effect of any impairments, of $6.6 billion for half-year 2012 and $13 billion for year-end 2011.  Due to Rio Tinto's failure to impair RTCM, those operating profits were materially overstated.

150.     Rio Tinto's offering documents for its August 2012 NYSE bond offerings omitted any information concerning rejection by the government of Mozambique of RTCM's

barging proposal, that Rio Tinto significantly reduced the value of RTCM's coal reserves and resources, or that the best available models showed RTCM to have a negative value.

### E.   The November 26, 2012 Rio Tinto Audit Committee Meeting

151.   In August 2012, Rio Tinto's in-house valuation experts in the Technology & Innovation division initiated a review of RTCM's valuation, concluding that the value ranged from negative $4.9 billion to $300 million.

152.   The Audit Committee was scheduled to review impairments of Rio Tinto's assets, including RTCM, for its 2012 year-end financial statement at a November 26, 2012 meeting.  Prior to that meeting, Elliott was on a phone call with the head of T&I and a Rio Tinto geology expert who again informed Elliott that RTCM had little or no commercial value. On the call, Elliott assured the head of T&I that Elliott would raise the significant valuation challenges confronting RTCM at the upcoming Audit Committee meeting.

153.   In advance of the November 26, 2012 Audit Committee meeting, Rio Tinto's Controller submitted a paper showing the results of an annual review of carrying values of Rio Tinto assets, including RTCM (the "Third Controller's Paper").  The Third Controller's Paper stated that current modelling indicated a recoverable amount for RTCM in the range of $4 billion to $5 billion and, therefore, no impairment was likely to be required.  Albanese and Elliot knew, were reckless in not knowing, or should have known that the $4 billion to $5 billion RTCM valuation was fundamentally flawed because RTCM had suffered several setbacks and there had been no significant positive developments since the Brisbane Meeting.

154.   Elliott received and edited a draft of the Third Controller's Paper in advance of the November 26, 2012 Audit Committee meeting.  Elliott did not correct any of the materially

misleading statements in the Third Controller's Paper, including the $4 billion to $5 billion valuation, even though he knew that RTCM and T&I had generated negative valuations for RTCM.

155.    Albanese, Elliott, and Rio Tinto's independent auditors attended the November 26, 2012 Audit Committee meeting and received final versions of the Third Controller's Paper. The Third Controller's Paper contained the following materially misleading  statements:

- "Current modeling is indicating a recoverable amount in the range of $4 billion to $5 billion and the models are in the process of being finalised.  The recoverable amount [of $4 to $5 billion] has been determined on a [fair value less cost to sell] basis, using the approved Rio Tinto plan process as a foundation.  As such, we do not envisage impairment of the RTCM goodwill."

- "The long-term coal-chain solution required to support the expansion of the business . . . require[s] the construction of a Greenfield rail and port system . . . .  For the purposes of the [fair value less cost to sell] model, conservative capital assumptions have been used which assume Rio Tinto pays for the large proportion of the costs of the rail and port."

- RTCM's valuation is affected by "[e]xternally imposed limitations to the short to medium term usage of a barge solution and necessary consideration of alternative coal chain solutions."

156.    At the time of the November 26, 2012 Audit Committee meeting, almost a full year had passed since Albanese and Elliott had been apprised of the significant transportation challenges confronting RTCM.  As of November 26, 2012, Albanese and Elliott knew, were reckless in not knowing, or should have known that RTCM had made no formal proposals

either to Rio Tinto's Investment Committee or to the Government of Mozambique to build a greenfield railroad.  On the contrary, Albanese had rejected it at the Brisbane Meeting.

157.    At the November 26, 2012 Audit Committee meeting, Albanese and Elliott did not correct any of the materially misleading statements in the Third Controller's Paper, thereby allowing the Audit Committee and Rio Tinto's independent auditors to rely on a $4 billion to $5 billion RTCM valuation, which had no basis in reality.  Albanese and Elliot did not advise the Audit Committee or Rio Tinto's independent auditors that Albanese had rejected the $16 billion greenfield rail and port system six months earlier.   Albanese and Elliott did not advise the Audit Committee and Rio Tinto's independent auditors of the significant adverse developments at RTCM, the lack of any viable transportation option for more than two million tons of coal, or the negative valuations generated by RTCM and T&I.

158.    Contrary to his promise, Elliot did not disclose the significant valuation challenges that T&I had flagged for him in their previous call.  Rather, Elliott merely alluded to the information he had received from T&I as "late breaking" news of a "technical nature."

159.    As a result of the materially misleading statements in the Third Controller's Paper and Elliott's concealment of the information he recently learned from T&I, there was no plan to impair RTCM following the November 26, 2012 Audit Committee meeting.

**F.  Albanese and Elliott Continue to Promote RTCM at Rio Tinto's October and November 2012 Investor Seminars**

160.    Throughout October and November 2012 Albanese and Elliott continued to tout RTCM to the market, thereby concealing that the second large-scale acquisition under their leadership was also significantly impaired.

161.    During an October 2012 Rio Tinto investor seminar, Elliott described Rio Tinto's acquisition of Riversdale as the purchase of a highly prospective, "tier one" coking coal resource with first production in mid-2012 and the objective of 25 million tons of coal production per year by 2020.  At the time of these statements, Elliott knew, was reckless in not knowing, or should have known that based on the best information available:

- There was only a viable transportation option for approximately 2 million tons of coal per year;

- The only way to deliver the 25 million tons touted by Elliott was to build a new ("greenfield") rail line at a cost of approximately $16 billion, which Albanese rejected;

- RTCM generated a negative $680 million valuation based on the best available information;

- There was a significant negative impact on RTCM's value stemming from issues related to the coal quality, e.g., lower product yield and a less-favorable split between hard coking and thermal coal; and

- There was a significant negative impact on RTCM's valuation stemming from increased costs of $20 to $40 dollars per ton, due to the loss of the low-cost barging solution.

162.    Similarly, during a November 2012 investor seminar, Albanese was asked if barging was still on "the agenda" to which he responded that the company would need to look at all the transportation options.  This statement was materially misleading because Albanese knew, was reckless in not knowing, or should have known that Rio Tinto was at risk of losing its mining license if it continued to pursue barging, which it did not do, and that he personally rejected building a new rail line at the Brisbane Meeting.  As a result, the only transportation

option that was currently on the table was the use of existing rail, which had extremely limited capacity.

163.     During the same investor seminar, Albanese discussed the long term optionality in RTE's portfolio, referencing both the first shipment of coal from Mozambique and describing the Moatize Basin as a long-term opportunity with the potential to grow beyond 25 million tons of coal per year.  At the time of these statements, Albanese knew, was reckless in not knowing, or should have known that the ability to transport any coal to market was severely limited because RTCM's barging proposal had been rejected by the Government of Mozambique, Albanese had personally rejected the $16 billion new railroad, and existing rail had extremely limited capacity.  He also knew that RTCM had a lower product yield and a less-favorable split between hard coking and thermal coal than what Rio Tinto assumed at acquisition.  Moreover, Albanese also knew, was reckless in not knowing, or should have known that, as of November 2012—a full year after learning that the Government of Mozambique had rejected RTCM's barging proposal—RTCM had made not submitted a revised barging proposal to the Government.

### G.  Rio Tinto Finally Impairs the Value of RTCM

164.     The executive in charge of T&I expected Elliott to share information about RTCM's valuation challenges with the Audit Committee in November 2012.  He expected that high level executives would call him to discuss the valuation challenges after the November 26, 2012 Audit Committee meeting but no one did.  As a result, the week after the meeting, the executive in charge of T&I advised Albanese that RTCM had a negative valuation.  Albanese

requested verification of the information, and, upon the project's completion in the third week of December 2012, the information was confirmed as correct.

165.    Around the same time, the T&I executive became increasingly concerned about the extent to which the Board of Directors had been made aware of RTCM's negative valuation.  As a result, he bypassed Albanese and Elliot and spoke directly with the Chairman of Rio Tinto's Board about RTCM's negative valuation.

166.    The Chairman requested an investigation in December 2012 and at a January 15, 2013 Board meeting the value of RTCM was revised downward to $611 million.  This constituted a write-down of more than 80 percent of RTCM's value within two years of acquisition.  Moreover, at the time, there was considerable discussion with Rio Tinto's independent auditors about whether the write-down should be even larger.

167.    According to the press release issued by Rio Tinto, the substantial RTCM impairment was based on the following facts—all of which had been well known to Albanese and Elliott for nearly a year:

- "In Mozambique, the development of infrastructure to support the coal assets is more challenging than Rio Tinto originally anticipated.  Rio Tinto sought to transport coal by barge along the Zambezi River, but this option did not receive formal approvals."

- "These infrastructure constraints, combined with a downward revision to estimates of recoverable coking coal volumes on the RTCM tenements, have led to a reassessment of the overall scale and ramp up schedule of RTCM, and consequently to the impairment announced today."

168.    Rio Tinto's Chairman was "shocked" that some senior executives held the view that RTCM was "close to worthless."  With this news coming on top of the failed Alcan

acquisition, the Chairman felt that he "probably [had] no choice but to ask the board to dismiss the chief executive." The Chairman made this request a few weeks later.

169. On January 17, 2013, Rio Tinto announced that it expected to recognize a non-cash impairment charge of approximately $14 billion on its 2012 full year results, including an approximately $3 billion impairment of RTCM's value. The same press release announced that Albanese was stepping down as CEO "by mutual agreement with the Board."

170. In the press release, the Chairman stated: "The Rio Tinto Board fully acknowledges that a write-down of this scale in relation to the relatively recent Mozambique acquisition is unacceptable." And Albanese stated: "While I leave the business in good shape in many respects, I fully recognise that accountability for all aspects of the business rests with the CEO."

171. One of Rio Tinto's largest investors described this entire episode as evidence of a "significant mistake by [Albanese and Elliott]" and that Rio Tinto management had been "reckless and profligate" with shareholder capital. Research analysts declared that the impairment would "remind shareholders of [Rio Tinto's] recent chequered M&A track record" and that the impairment spoke to "poor historical capital allocation."

172. On February 14, 2013, Rio Tinto announced its financial results for the year ending on December 31, 2012, reporting a net loss of almost $3 billion, the first loss in the company's history. On February 25, 2013, a credit rating agency revised its outlook for Rio Tinto from "Stable" to "Negative."

173. Albanese stepped down as Rio Tinto's CEO on January 17, 2013. He did not receive a bonus for 2012 or 2013, and he left Rio Tinto in July of 2013.

174.    Elliott did not receive a bonus for 2012 or 2013.  He was replaced as Rio Tinto's CFO effective April 18, 2013 and he retired from Rio Tinto at the end of 2013.

175.    In 2014, Rio Tinto reported a further impairment to RTCM's carrying value to $119 million.  Soon thereafter, in October 2014, Rio Tinto sold RTCM for approximately $50 million.   The $50 million sale represented less than two percent of what Rio Tinto had paid for RTCM three years earlier.

## VII.    THIS ACTION IS TIMELY FILED

176.    Defendants Rio Tinto, Albanese, and Elliott entered into agreements with the SEC in which they agreed to toll, for various periods and various lengths of time, any statute of limitations applicable to the conduct and claims alleged herein.  Defendants' tolling agreements cover the period between March 15, 2017 to, and including, October 18, 2017.

## <u>CLAIMS</u>

## <u>FIRST CLAIM FOR RELIEF</u>

**(Against Rio Tinto, Albanese and Elliott for Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder)**

177.    Paragraphs 1 through 176 are realleged and incorporated by reference as if fully set forth herein.

178.    By reason of the conduct described above, Rio Tinto, Albanese and Elliott, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, directly or indirectly: (a) used or employed devices, schemes, or artifices to defraud; (b) made an untrue statement of a material fact or  omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not

misleading; and (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons, in violation of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

179.    While engaging in the conduct described above, Rio Tinto, Albanese and Elliott acted knowingly or recklessly.

180.    By engaging in the conduct described above, Rio Tinto, Albanese and Elliott violated, and unless restrained and enjoined will again violate, Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].


## SECOND CLAIM FOR RELIEF

**(Against Albanese and Elliott for Aiding and Abetting Rio Tinto's Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder)**

181.    Paragraphs 1 through 180 are realleged and incorporated by reference as if fully set forth herein.

182.    By reason of the conduct described above, and as alleged in the First Claim, which is hereby incorporated by reference, Rio Tinto violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5].  By reason of the conduct described above, Albanese and Elliott, knowingly or recklessly, provided substantial assistance to and thereby aided and abetted Rio Tinto's violation of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

183.    Accordingly, pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Albanese and Elliott are liable for those violations.

## THIRD CLAIM FOR RELIEF

**(Against Rio Tinto, Albanese and Elliott for Violations of
Section 17(a) of the Securities Act)**

184.     Paragraphs 1 through 176 are realleged and incorporated by reference as if fully
set forth herein.

185.     By reason of the conduct described above, Rio Tinto, Albanese and Elliott in the
offer or sale of securities, by the use of the means or instruments of transportation or
communication in interstate commerce or by use of the mails, directly or indirectly: (i)
employed devices, schemes, or artifices to defraud; (ii) obtained money or property by means
of any untrue statement of a material fact or any omission to state a material fact necessary in
order to make the statements made, in light of the circumstances under which they were made,
not misleading; and/or (iii) engaged in transactions, practices, or courses of business which
operated or would operate as a fraud or deceit upon the purchaser.

186.     While engaging in the conduct described above, Rio Tinto, Albanese and Elliott
acted knowingly, recklessly, or negligently.

187.     By engaging in the conduct described above, Rio Tinto, Albanese and Elliott
violated, and unless restrained and enjoined will again violate, Sections 17(a) of the Securities
Act [15 U.S.C. §§ 77q(a)(1), (2), (3)].

## FOURTH CLAIM FOR RELIEF

**(Against Albanese and Elliott for Aiding and Abetting Rio Tinto's Violations of
Section 17(a) of the Securities Act)**

188.     Paragraphs 1 through 176 and 184 through 187 are realleged and incorporated
by reference as if fully set forth herein.

189.     By reason of the conduct described above, and as alleged in Third Claim which is hereby incorporated by reference, Rio Tinto violated Section 17(a) of the Securities Act [15 U.S.C. §§ 77q(a)(1), (2), (3)].   Albanese and Elliott knowingly or recklessly provided substantial assistance that aided and abetted Rio Tinto's violation of Section 17(a) of the Securities Act [15 U.S.C. §§ 77q(a)(1) - (3)].

190.     Accordingly, pursuant to Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)], Albanese and Elliott are liable for those violations.

### FIFTH CLAIM FOR RELIEF

**(Against Rio Tinto for violations of Section 13(a) of the Exchange Act and Rules 12b-20 13a-1, and 13a-16 Thereunder)**

191.     Paragraphs 1 through 176 are realleged and incorporated by reference as if fully set forth herein.

192.     By reason of the conduct described above, Rio Tinto filed the following reports and/or statements which either made an untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading: (a) Rio Tinto's Form 20-F filed with the SEC on March 15, 2012; (b) Rio Tinto's Form 6-K file with the SEC on August 9, 2012; and (c) the offering documents for Rio Tinto's March and August bond offerings.

193.     By engaging in the conduct described above, Rio Tinto violated, and unless enjoined, will again violate Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, and 13a-16 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-16].

## SIXTH CLAIM FOR RELIEF

**(Against Albanese and Elliott for Aiding and Abetting Rio Tinto's Violations of Section 13(a) of the Exchange Act, and Rules 12b-20 13a-1, and 13a-16 Thereunder)**

194.    Paragraphs 1 through 176 and 191 through 193 are realleged and incorporated by reference as if fully set forth herein.

195.    By reason of the conduct described above, and as alleged in the Fifth Claim above, which is hereby incorporated by reference, Rio Tinto violated Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, and 13a-16 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-16].   Albanese and Elliott knowingly or recklessly provided substantial assistance that aided and abetted Rio Tinto's violation of Section 13(a) of the Exchange Act.

196.    Accordingly, pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Albanese and Elliott are liable for those violations.

## SEVENTH CLAIM FOR RELIEF

**(Against Rio Tinto for Violating Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act)**

197.    Paragraphs 1 through 176 are realleged and incorporated by reference as if fully set forth herein.

198.    By reason of the conduct described above, Rio Tinto failed to make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer.  Further, Rio Tinto failed to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions were recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to

such statements, and to maintain accountability for assets.  Finally, Rio Tinto failed to compare the recorded accountability for assets with the existing assets at reasonable intervals and failed to take appropriate action with respect to any differences.

199.    By engaging in the conduct described above, Rio Tinto violated, and unless restrained and enjoined will again violate, Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A) and (b)(2)(B)].

## EIGHTH CLAIM FOR RELIEF

### (Against Albanese and Elliott for Violating Section 13(b)(5) of the Exchange Act and Rule 13b2-1 Thereunder)

200.    Paragraphs 1 through 176 are realleged and incorporated by reference as if fully set forth herein.

201.    By reason of the conduct describe above, Albanese and Elliott, directly or indirectly,  knowingly circumvented or knowingly failed to implement a system of internal accounting controls or knowingly falsified, or caused to be falsified, books, records, or accounts that Rio Tinto was required to maintain under Section 13(b)(2) of the Exchange Act [15 U.S.C. § 78m(b)(2)].

202.    By engaging in the conduct described above, Albanese and Elliott violated, and unless restrained and enjoined will again violate, Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)] and Rule 13b2-1 thereunder [17 C.F.R. § 240.13b2-1].

## NINTH CLAIM FOR RELIEF

### (Against Albanese and Elliott for Aiding and Abetting Rio Tinto's Violations of 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act)

203.    Paragraphs 1 through 176 and 197 through 199 are realleged and incorporated by reference as if fully set forth herein.

204.    By reason of the conduct described above, and as alleged in the Seventh Claim, which is hereby incorporated by reference, Rio Tinto violated Section 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A) and (b)(2)(b)].  By reason of the conduct described above, Albanese and Elliott knowingly or recklessly provided substantial assistance to and thereby aided and abetted Rio Tinto's violations of Section 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A) and (b)(2)(b)].

205.    Accordingly, pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Albanese and Elliott are liable for those violations.

## TENTH CLAIM FOR RELIEF

### (Against Albanese and Elliott for Violating Exchange Act Rule 13b2-2)

206.    Paragraphs 1 through 176 are realleged and incorporated by reference as if fully set forth herein.

207.    By reason of the conduct described above, Albanese and Elliott, while acting as officers of Rio Tinto, directly or indirectly, (i) made or caused to be made materially false or misleading statements to an accountant; or (ii) omitted to state, or caused another person to omit to state, material facts necessary in order to make statements made, in light of the circumstances under which such statements were made, not misleading, to an accountant in connection with (1) any audit, review or examination of the financial statements of the issuer required by the Exchange Act or rules thereunder; or (2) the preparation or filing of any document or report required to be filed with the SEC pursuant to Section 13(b)(2) of the Exchange Act [15 U.S.C. § 78m(b)(2)], or otherwise.

208.    By engaging in the conduct described above, Albanese and Elliott violated, and unless restrained and enjoined, will continue to violate Rule 13b2-2 of the Exchange Act [17 C.F.R. § 240.13b2-2].

## ELEVENTH CLAIM FOR RELIEF

### (Against Albanese for Violations of Exchange Act Rule 13a-14)

209.    Paragraphs 1 through 176 are realleged and incorporated by reference as if fully set forth herein.

210.    By reason of the conduct described above, Albanese, as the Chief Executive Officer of Rio Tinto, certified on March 15, 2012, Rio Tinto's Form 20-F for the fiscal year ended December 31, 2011 in accordance with Section 302 of the Sarbanes-Oxley Act of 2002 and Rule 13a-14 [17 C.F.R. § 240.13a-14], promulgated thereunder.  The certification was false because Albanese represented that (1) the report did not contain any untrue statement or omission of a material fact necessary to make the statements not misleading in light of the circumstances in which they were made, and (2) the financial statements in the report fairly presented in all material respects the financial condition and results of the operations of Rio Tinto.  At the time he signed the certification, Albanese was aware that Rio Tinto's Form 20-F contained material misstatements and omissions.

211.    While engaging in the conduct described above, Albanese acted knowingly or negligently.

212.    By engaging in the conduct described above, Albanese violated, and unless restrained and enjoined, will again violate, Rule 13a-14of the Exchange Act [17 C.F.R. § 240.13a-14].

## TWELFTH CLAIM FOR RELIEF

### (Against Elliott for Violating Exchange Act Rule 13a-14)

213.    Paragraphs 1 through 176 are realleged and incorporated by reference as if fully set forth herein.

214.    By reason of the conduct described above, Elliott, as the Chief Financial Officer of Rio Tinto, certified on March 15, 2012, Rio Tinto's Form 20-F for the fiscal year ended December 31, 2011 in accordance with Section 302 of the Sarbanes-Oxley Act of 2002 and Rule 13a-14 [17 C.F.R. § 240.13a-14], promulgated thereunder.  The certification was false because Elliott represented that (1) the report did not contain any untrue statement or omission of material fact necessary to make the statements not misleading in light of the circumstances in which they were made, and (2) the financial statements in the report fairly presented in all material respects the financial condition and results of the operations of Rio Tinto.  At the time he signed the certification, Elliott was aware that Rio Tinto's Form 20-F contained material misstatements and omissions.

215.    While engaging in the conduct described above, Elliott acted knowingly or negligently.

216.    By engaging in the conduct described above, Elliott violated, and unless restrained and enjoined, will again violate Rule 13a-14 of the Exchange Act [17 C.F.R. § 240.13a-14].

## PRAYER FOR RELIEF

**WHEREFORE**, the Securities and Exchange Commission respectfully requests that this Court enter a Final Judgment:

**I.**

Finding that Defendants Rio Tinto, Albanese and Elliott violated the federal securities laws alleged in the Complaint.

**II.**

Permanently enjoining Defendants Rio Tinto, Albanese, and Elliott, and all persons in active concert or participation with them, from violating the federal securities laws alleged in this Complaint.

**III.**

Ordering Defendants Rio Tinto, Albanese, and Elliott to disgorge all ill-gotten gains as a result of their unlawful conduct, plus prejudgment interest.

**IV.**

Ordering Defendants Rio Tinto, Albanese, and Elliott to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

**V.**

Ordering that Defendants Albanese and Elliott each be barred from acting as officers or directors of any public company pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)], and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)].

**VI.**

Granting such other and further equitable relief as the Court may deem just and proper.

## JURY TRIAL DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the SEC hereby demands

trial by jury.


Dated:  Washington, D.C.
        October 17, 2017


By: /s/ David Mark Cave
David Mark Cave (New York Bar No. 4170908)
Gregory N. Miller
Dean M. Conway
*Attorneys for Plaintiff*
U.S. Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549
(202) 551-4694 (Cave)
E-mail:  CaveD@sec.gov