PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

1285 AVENUE OF THE AMERICAS      NEW YORK, NEW YORK 10019-6064
TELEPHONE (212) 373-3000

UNIT 3601, OFFICE TOWER A
BEIJING FORTUNE PLAZA
NO. 7 DONGSANHUAN ZHONGLU
CHAOYANG DISTRICT
BEIJING 100020
PEOPLE'S REPUBLIC OF CHINA
TELEPHONE (86-10) 5828-6300

12TH FLOOR, HONG KONG CLUB BUILDING
3A CHATER ROAD, CENTRAL
HONG KONG
TELEPHONE (852) 2846-0300

ALDER CASTLE
10 NOBLE STREET
LONDON EC2V 7JU, U.K.
TELEPHONE (44 20) 7367 1600

FUKOKU SEIMEI BUILDING
2-2 UCHISAIWAICHO 2-CHOME
CHIYODA-KU, TOKYO 100-0011, JAPAN
TELEPHONE (81-3) 3597-8101

TORONTO-DOMINION CENTRE
77 KING STREET WEST, SUITE 3100
P.O. BOX 226
TORONTO, ONTARIO M5K 1J3
TELEPHONE (416) 504-0520

2001 K STREET, NW
WASHINGTON, DC 20006-1047
TELEPHONE (202) 223-7300

500 DELAWARE AVENUE, SUITE 200
POST OFFICE BOX 32
WILMINGTON, DE 19899-0032
TELEPHONE (302) 655-4410

WRITER'S DIRECT DIAL NUMBER
212 373-3350

WRITER'S DIRECT FACSIMILE
212 492-0350

WRITER'S DIRECT E-MAIL ADDRESS
wricciardi@paulweiss.com

January 16, 2018

<u>Via ECF and Email</u>

The Honorable Analisa Torres
United States District Court
Southern District of New York
500 Pearl St.
New York, NY 10007-1312

*SEC* v. *Rio Tinto et al.*, No. 1:17-cv-07994

Dear Judge Torres:

Pursuant to Section III of Your Honor's Individual Practices, we write on behalf of Defendant Guy Elliott to set forth the arguments that Mr. Elliott anticipates raising on a motion to dismiss the SEC's complaint pursuant to Fed. R. Civ. P. 9(b) and 12(b)(6). These arguments are in addition to any arguments raised by co-defendants Rio Tinto and Tom Albanese. We have raised these arguments with the SEC, and they have declined to amend their complaint. Accordingly, we respectfully request the Court set a briefing schedule.

Guy Elliott began his career at Rio Tinto in 1980 and worked there for over 33 years. Through hard work and diligence, he rose through the ranks, eventually becoming CFO. Over decades, he earned a reputation for honesty and integrity. He has never until this matter been the subject of a regulatory inquiry or lawsuit.

As CFO, Mr. Elliott, who is not an accountant by training, relied on a well-tested and rigorous process designed to ensure that Rio Tinto's financial statements—including its balance sheet of over $100 billion—were fairly stated and reported properly. That process began with executives in the business unit, who had first-line responsibility for analyzing whether asset values should be reduced (or impaired). Business unit assessments were then scrutinized by Rio Tinto's in-house experts in the Controller's office and by independent, outside auditors (PricewaterhouseCoopers ("PwC")), who closely reviewed valuations and at all relevant times concurred with the business unit and Controller conclusions.

This case is about the valuation of one of Rio Tinto's assets: a largely undeveloped, exploratory property approximately the size of Rhode Island located in a remote region of Mozambique. Rio Tinto, through its energy division ("RTE"), acquired the property in 2011 for $3.7 billion. Mr. Elliott did not source, advocate for, or sponsor the deal. RTE called the project Rio Tinto Coal Mozambique ("RTCM"), and hoped through its deep expertise to develop RTCM into a world-class coking coal mine that would produce coal over the next 50-plus years.

For a little over a year following the acquisition, RTE and RTCM worked to develop a business model and ran complex and extensive orebody drilling tests. Mr. Elliott, as CFO of the parent company, never oversaw operations at RTE or RTCM: RTE and RTCM executives never reported to him. When, in late 2012, orebody tests revealed that much of RTCM's coal was geologically compromised, Rio Tinto responded quickly and wrote off $3 billion of RTCM's $3.7 billion carrying value. The impairment came in January 2013, approximately 17 months after Rio Tinto had acquired full control of RTCM—a remarkably short period in an industry where it can take years or even decades to ramp up coal production. Given the immateriality of RTCM to Rio Tinto's overall balance sheet, and the public knowledge that the Government of Mozambique had already rejected RTCM's barging proposals, the market did not react to news of the impairment. In fact, Rio Tinto's stock price rose after the announcement. Moody's announced that the impairment had no impact on Rio Tinto's credit ratings.

The SEC alleges in its complaint that Rio Tinto, Mr. Albanese, and Mr. Elliott concealed adverse developments at RTCM at the end of 2011 and into 2012 to avoid an impairment. (¶ 3.) Those allegations are utterly false. The SEC takes snippets of documents out of context and tries to conjure a fraud out of a mere unsuccessful business venture. The allegations regarding Mr. Elliott are fabricated: (1) Mr. Elliott had no personal stake in the acquisition of RTCM or its success and in fact announced his forthcoming retirement from Rio Tinto in the middle of 2012; (2) Rio Tinto repeatedly disclosed significant and ongoing risks at RTCM; (3) it was exceedingly difficult to value RTCM in light of the early stage of its development, its size and complexity, and the constantly changing positive and negative information; (4) the responsibility for valuation and impairment lay in the first instance with RTE and RTCM executives, who, along with the Controller and the independent auditors at PwC all agreed that no impairment was necessary at year-end 2011 or half-year 2012, and certified as much in writing; (5) Rio Tinto impaired RTCM as soon as new information warranted it; (6) Rio Tinto took several impairments in the relevant period, including ones far larger than at RTCM; and (7) Rio Tinto's relevant financial statements regarding RTCM have never been restated and auditor opinions have not been withdrawn, despite an auditor's obligation to do so if it becomes aware of information indicating a material misstatement.

Even accepting the SEC's allegations as true, however, the SEC's claims against Mr. Elliott should be dismissed on their face because the complaint does not adequately plead the elements of securities fraud or any other claims against Mr. Elliott.

**I.       Even if There Were Misstatements or Omissions, Mr. Elliott Did not Make Them**

The Section 10(b) claim (Count 1) against Mr. Elliott must be dismissed because Mr. Elliott was not the "maker" of any purported misstatements. *See Janus Capital Grp.* v. *First Derivative Traders*, 564 U.S. 135, 142 (2011). Mr. Elliott did not sign, certify, or create (i) the 2012 half-year report, (ii) the March 2012 bond offering, or (iii) the August 2012 bond offering. Thus, Mr. Elliott cannot be liable for any purported misstatements therein because "only those officers whose signatures appear on misleading statements may be liable as the 'makers' of those statements." *In re Smith Barney Transfer Agent Litig.*, 884 F. Supp. 2d 152, 165 (S.D.N.Y. 2012). The SEC does not dispute that Mr. Elliott cannot be directly liable for (i) the 2012 half-year report, so its claim regarding that document must be dismissed. The SEC asserts that Mr. Elliott can be directly liable for (ii) the March 2012 bond offering and (iii) the August 2012

bond offering because they incorporated by reference a different disclosure—Rio Tinto's 2011 Annual Report—that Mr. Elliott did sign. But that is not the law. That the offerings merely reference the earlier disclosure does not make Mr. Elliott a "maker" of statements in the offerings. Under *Janus*, a defendant must have prepared or reviewed the allegedly false statement itself. *E.g.*, *In Re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731, 764 (S.D.N.Y. 2017).

As for Rio Tinto's 2011 Annual Report, which Mr. Elliott did sign, the complaint fails adequately to allege that it was misleading. The 2011 Annual Report was filed mere months after the RTCM acquisition and disclosed known risks such as infrastructure constraints. *See In re Nokia Corp. Sec. Litig.*, 423 F. Supp. 2d 364, 399–400 (S.D.N.Y. 2006).[1]

## II. The Complaint Fails Adequately to Allege Mr. Elliott Acted with Scienter

The Section 10(b) claim must be dismissed for the additional reason that the SEC fails to plead with particularity facts giving rise to a strong inference that Mr. Elliott acted with an intent to defraud or with a recklessness that represented "an extreme departure from the standards of ordinary care." *See ECA* v. *JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009). To survive a motion to dismiss, the complaint's inference of intent or recklessness "must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007). *See also SEC* v. *Syron*, 934 F. Supp. 2d 609, 631 (S.D.N.Y. 2013). Here, the far more compelling inference is that Mr. Elliott had no intent to deceive anyone regarding the status of RTCM. The SEC does not allege that Mr. Elliott acted for his personal benefit or to enrich himself. There are no allegations that Mr. Elliott sold Rio Tinto shares or even received bonuses. The SEC's bare allegations of motive reduce to nothing more than Mr. Elliott wanting Rio Tinto's investment in RTCM to succeed, which is a motive common to officers and directors, and insufficient to plead scienter as a matter of law. *Novak* v. *Kasaks*, 216 F.3d 300, 307–08 (2d Cir. 2000). Moreover, the complaint's allegations regarding communications and documents that contain isolated adverse developments—most of which Mr. Elliott was not a party to and never saw—fail to raise an inference of fraud that is as compelling as the opposing inference of nonfraudulent intent.

## III. Scheme Liability Claims Must Be Dismissed Because the SEC Fails to Allege Any "Inherently Deceptive" Conduct Beyond Purported Misstatements

The law in the Second Circuit is clear that scheme liability claims—based on Rule 10b-5(a), (c) and/or Section 17(a)(1), (3) (Counts 1 and 3)—must be dismissed where a plaintiff does not allege inherently deceptive conduct beyond misstatements or omissions. *Lentell* v. *Merrill Lynch & Co., Inc.*, 396 F.3d 161, 177 (2d Cir. 2005); *SEC* v. *Kelly*, 817 F. Supp. 2d 340, 343–44 (S.D.N.Y. 2011). Here, the "core misconduct" alleged are misstatements and omissions regarding RTCM. The complaint does not allege other deceptive acts, let alone allege them with the necessary particularity. *See ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*, 493 F.3d 87, 102 (2d

---

[1] The SEC also fails to allege Mr. Elliott made false or misleading statements to investors. While they allege Mr. Elliott described RTCM as a "tier one" asset at an October 2012 investor conference (¶ 161), the transcript of the conference, which the Court may consider at this stage, shows that he did not even mention RTCM.

Cir. 2007). The SEC relies on out-of-circuit cases, where the law is different, and on an argument that Mr. Elliott "manipulated the flow of information," which they cannot distinguish from allegedly making misstatements or omissions. Their arguments fail.

### IV. Section 17(a)(2) Claim Must Be Dismissed Because Mr. Elliot Did not Personally Gain "Money or Property"

The Section 17(a)(2) claim (Count 3) must be dismissed because the SEC does not allege Mr. Elliott "personally gained money or property from [a] fraud." *Syron*, 934 F. Supp. 2d at 640. In fact, the only allegations in the complaint related to Mr. Elliott's income allege that Mr. Elliott did *not* receive a bonus from Rio Tinto during the relevant period. (¶¶ 46, 174.) Although the SEC asserts it can pursue a Section 17(a)(2) claim because Mr. Elliott helped obtain money or property *for his employer*, the clear weight of authority in the Southern District has rejected that argument. *E.g.*, *SEC* v. *Wey*, 246 F. Supp. 3d 894, 914–15 (S.D.N.Y. 2017); *SEC* v. *DiMaria*, 207 F. Supp. 3d 343, 358 (S.D.N.Y. 2016); *SEC* v. *Jankovic*, 2017 WL 1067788, at *15 (S.D.N.Y. Mar. 21, 2017).

### V. Section 13(b)(5), Rule 13b2-2, and Rule 13a-14 Claims Must Be Dismissed

The Section 13(b)(5) claim (Count 8) must be dismissed because the complaint does not allege that Mr. Elliott knowingly circumvented the Company's internal controls. *SEC* v. *Egan*, 994 F. Supp. 2d 558, 568 (S.D.N.Y. 2014). The 13b2-2 claim (Count 10) must be dismissed because the SEC fails to allege that Mr. Elliott made any materially misleading statements or omissions to an accountant or auditor. Information that was public, such as the government's rejection of barging, cannot be the basis for such a claim. The 13a-14 claim (Count 12) must be dismissed because, as noted above, the SEC fails to allege that the 2011 Annual Report contained material misstatements or omissions or that Mr. Elliott knowingly made a false certification. *See SEC* v. *Stanard*, 2009 WL 196023, at *28 (S.D.N.Y. Jan. 27, 2009). In any event, the complaint fails to allege that Mr. Elliott acted unreasonably. *SEC* v. *Espuelas*, 579 F. Supp. 2d 461, 486–87 (S.D.N.Y. 2008) (liability under Section 13 "is predicated on standards of reasonableness") (quotations omitted).

### VI. Aiding and Abetting Claims Must Be Dismissed

Aiding and abetting claims against Mr. Elliott (Counts 2, 4, 6, and 9) must be dismissed for failure to plead a primary violation against Rio Tinto. As detailed in Rio Tinto's letter, the complaint fails adequately to allege that the Company violated the underlying statutes; there can be no aiding and abetting claim absent a primary violation. *E.g.*, *SEC* v. *Apuzzo*, 689 F.3d 204, 211 (2d Cir. 2012). Moreover, the complaint fails to plead that Mr. Elliott had knowledge of any alleged violations or that he substantially participated in any violations. *Id.* at 206.

Sincerely,

/s/ Walter G. Ricciardi
Walter G. Ricciardi

Cc:  All counsel (by ECF)