**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

v.

RIO TINTO PLC, RIO TINTO LIMITED,
THOMAS ALBANESE, and GUY ROBERT
ELLIOTT,

Defendants.

No. 1:17-cv-7994-AT-DCF

---

## PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S MEMORANDUM IN OPPOSITION TO MOTION TO DISMISS

Plaintiff Securities and Exchange Commission ("SEC" or "Commission") respectfully submits this memorandum of law in opposition to the Consolidated Motion to Dismiss the Complaint filed by Defendants Rio Tinto plc, Rio Tinto Limited (collectively "Rio Tinto"), Thomas Albanese ("Albanese"), and Guy Robert Elliott ("Elliott") (collectively, the "Defendants").[1] Defendants seek dismissal by asking the Court essentially to ignore the violations of the federal securities laws set forth in the Complaint and to consider a host of purported facts not found in the Complaint. Because neither request is proper at this stage, Defendants' Motion should be denied.

---

[1] Throughout this Memorandum, the Memorandum of Law in Support of Defendants' Consolidated Motion to Dismiss the Complaint is referred to as "Motion" or "Mot.," and page numbers cited are those on the bottom of each page of the Motion, not the page numbers reflected in the ECF header. Citations to the Complaint (ECF No. 1) are styled as "Compl. ¶ __." Exhibits to the Declaration of Gregory Miller, filed simultaneously herewith, are styled as "Miller Decl. __." Exhibits to the Declaration of Jennifer L. Conn (ECF No.74) are styled as "Conn Decl. __."

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

STANDARD OF REVIEW .................................................................................. 3

BACKGROUND ................................................................................................... 5

ARGUMENT ......................................................................................................... 8

  I.   The Complaint Adequately Pleads Fraud ......................................................... 8

    A.  The Complaint Adequately Alleges Facts Giving Rise to Liability Under Sections 17(a)(1) and (3) and Rules 10b-5(a) and (c) ........................................................ 8

    B.  The Complaint Adequately Alleges Falsity ................................................. 19

    C.  The Complaint Adequately Alleges That Albanese and Elliott "Made" Fraudulent Statements ...................................................................................... 25

    *D.*  The Complaint Adequately Alleges Facts Giving Rise To An Inference of Defendants' *Scienter* ........................................................................................ 31

    E.  The Complaint Adequately Alleges That Defendants' Misconduct Was Material ........ 38

    F.  The Complaint Adequately Alleges That Defendants Obtained Money or Property in Violation of Section 17(a)(2) Of the Securities Act ............................................. 41

  II.  The Complaint Adequately Alleges an Accounting Violation Pursuant to Section 13(b)(2)(A) ...................................................................................................... 43

III.    The Complaint Adequately Alleges That Albanese and Elliott Falsified Books and Records, Knowingly Circumvented a System of Internal Controls, and Made Misrepresentations to Accountants or Auditors ........................................................................ 46

IV.    The Complaint Adequately Alleges That Albanese and Elliott Made False Certifications ........................................................................................................... 48

V.    The Complaint Adequately Alleges Albanese and Elliott's Aiding Abetting Liability .... 48

VI.    The Complaint Pleads The Elements Of Each Claim With Particularity ..................... 50

VII.    The Court Has Authority To Order Disgorgement To Prevent Unjust Enrichment ...... 51

CONCLUSION ................................................................................................................. 53

# TABLE OF AUTHORITIES

**Cases**

525 F. App'x 16 (2d Cir. 2013) ................................................................. 27

652 F. App'x. 35 (2d Cir. 2016) ................................................................ 41

*Aaron v. SEC*, 446 U.S. 680 (1980) ......................................................... 9

*Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972) ......................................... 12

*Aldridge v. A.T. Cross Corp.*, 284 F.3d 72 (1st Cir.2002) ....................................... 44

*Angres v. Smallworldwide PLC*, 94 F. Supp. 2d 1167 (D. Colo.) ................................. 35

*Artistic Entm't, Inc. v. City of Warner Robins*, 331 F.3d 1196 (11th Cir. 2003) ........................ 27

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ..................................................... 3

*Auer v. Robbins*, 519 U.S. 452 (1997) ...................................................... 13

*Bank of America Corp. Securities, Derivative, and Employee Retirement Income Security Act Litig.*, 2011 WL 3211472 (S.D.N.Y. July 29, 2011) ................................... 31

*Basic Inc. v. Levinson.*, 485 U.S. 224 (1988) ........................................... 25, 38

*Brodsky v. U.S. Nuclear Regulatory Comm'n*, 578 F.3d 175 (2d Cir. 2009) ..................... 13

*Cady, Roberts & Co.*, 40 SEC 907, 1961 WL 60638 (Nov. 8, 1961) ........................... 13

*CFTC v. Wilson*, 27 F. Supp. 3d 517 (S.D.N.Y. 2014) ..................................... 3, 4, 23

*Chambers v. Time Warner, Inc.*, 282 F.3d 147 (2d Cir. 2002) ................................. 4

*Chevron v. Natural Res. Def. Council*, 467 U.S. 837 (1984) ................................... 13

*City of Austin Police Ret. Sys. v. Kinross Gold Corp.*, 957 F. Supp. 2d 277 (S.D.N.Y. 2013) .... 25

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605 (9th Cir. 2017) ................................................................. 25

*Cognex Corp. v. Microscan Sys., Inc.*, 990 F. Supp. 2d 408 (S.D.N.Y. 2013) ................... 50

*Collins Sec. Corp.*, 8 SEC Docket 250, 1975 WL 160411 (Oct. 23, 1975)..................................... 13

*Dennis J. Malouf*, Rel. No. 4463, 2016 WL 4035575 (July 27, 2016)......................................... 12

*Dura Pharms., Inc. v. Broudo*, 544 U.S. 336 (2005) ..................................................... 13

*Fait v. Regions Fin. Corp,* 655 F.3d 105 (2d Cir. 2011) ................................................. 25

*Federal Housing Finance Agency v. Nomura Holding America, Inc.*, 104 F. Supp. 3d 441

    (S.D.N.Y. 2015) ................................................................................. 24

*Fresno County Employees' Retirement Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526 (S.D.N.Y.

    2017) ..................................................................................... 23, 40

*Freudenberg v. E\*Trade Financial Corp.*, 712 F. Supp. 2d 171 (S.D.N.Y. 2010) ..................... 34

*Ganino v. Citizens Utilities Co.*, 228 F.3d 154 (2d Cir. 2000) ....................................... 40

*Harris v. AmTrust Fin. Servs., Inc.*, 135 F. Supp. 3d 155 (S.D.N.Y. 2015) ................................. 44

*Heller v. Goldin Restructuring Fund,* 590 F. Supp. 2d 603 (S.D.N.Y. 2008) ............................. 31

*IBEW Local Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scot. Grp., PLC*,

    783 F.3d 383 (2d Cir. 2015)............................................................... 38, 39

*In re Complete Mgmt. Inc. Sec. Litig.*, 153 F. Supp. 2d 314 (S.D.N.Y. 2001) ............................ 35

*In re Fannie Mae 2008 Sec. Litig.*, 891 F. Supp. 2d 458 (S.D.N.Y. 2012) ................................. 27

*In re Global Crossing, Ltd. Sec. Litig.,* 322 F.Supp.2d 319 (S.D.N.Y. 2004)............................. 19

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11 MDL 2262 NRB, 2015 WL

    6243526 (S.D.N.Y. Oct. 20, 2015) ......................................................... 44

*In re Pfizer Inc. Securities Litigation*, 819 F.3d 642 (2d Cir. 2016)............................................ 29

*In re Ply Gem Holdings, Inc. Securities Litig.,* 2016 WL 5339541 (SDNY 2016) ..................... 39

*In re St. Jude Medical, Inc. Sec. Litig.*, 836 F.Supp.2d 878 (D. Minn. 2011) ............................. 44

*In re Take-Two Interactive Securities Litigation*, 551 F. Supp. 2d 247 (S.D.N.Y. 2008) ............ 34

*Int'l Ass'n of Heat & Frost Insulators & Asbestos Workers Local #6 Pension Fund v. IBM Corp.*, 205 F. Supp. 3d 527 (S.D.N.Y. 2016) ........................................................................ 33

*Int'l Audiotext Network, Inc. v. Am. Tel & Tel. Co.*, 62 F.3d 69 (2d Cir. 1995) ............................ 4

*Iron Workers Local 16 Pension Fund v. Hilb Rogal & Hobbs Co.*, 432 F. Supp. 2d 571 (E.D. Va. 2006) ........................................................................................................................... 44

*Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135 (2011) ................................ 25

*KCG Americas LLC v. Brazilmed LLC*, 15:CV:4600 (AT), 2016 WL 900396 (S.D.N.Y. Feb. 26, 2016) ........................................................................................................................... 51

*Kokesh v. SEC*, 137 S. Ct. 1635 (2017) .................................................................................. 51

*Kuriakose v. Fed. Home Loan Mortg. Corp.*, 897 F. Supp. 2d 168 (S.D.N.Y. 2012) .................. 34

*Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161 (2d Cir. 2005) ............................................. 11

*Litwin v. Blackstone Group, L.P.*, 634 F.3d 706 (2d Cir. 2011) ....................................... 22, 38, 40

*Lloyd v. CVB Financial Corp.*, No. CV 10-06256 MMM (PJWx), 2012 WL 12883522 (C.D. Cal. Jan. 12, 2012) ............................................................................................................... 44

*Lorenzo v. SEC*, 872 F.3d 578 (D.C. Cir. 2017) .................................................................. 12, 26

*Malouf v. SEC*, 16-9546 (10th Cir. Sep. 8, 2016) ..................................................................... 12

*Moon Joo Yu v. Premiere Power LLC*, No. 14-7588, 2018 WL 456244 (S.D.N.Y. Jan. 17, 2018) .................................................................................................................................. 30

*Nieto v. Village Red Restaurant Corp.*, No. 17 Civ. 2037 (JCF), 2017 WL 4539327 (S.D.N.Y. Oct. 10, 2017) ..................................................................................................................... 21

*Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000) ........................................................................ 32

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 135 S.Ct. 1318 (2015) 23, 24, 25

*Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce*, 694
    F. Supp. 2d 287 (S.D.N.Y. 2010) ................................................................................ 33

*Santa Fe Indus., Inc. v. Green*, 430 U.S. 462 (1977) ............................................... 12, 22

*SEC v. Apuzzo,* 689 F.2d 204 (2d Cir. 2012) .............................................................. 49

*SEC v. Arcturus Corp.*, No. 3:13-cv-4861, 2018 U.S. Dist. LEXIS 4325 (N.D. Tex. Jan. 10,
    2018) .......................................................................................................................... 52

*SEC v. Bankatlantic Bancorp, Inc.*, Case No. 12-60082, 2012 WL 1936112 (S.D. Fla. May 29,
    2012) .......................................................................................................................... 45

*SEC v. Big Apple Consulting USA, Inc.*, 783 F.3d 786 (11th Cir. 2015) ...................... 26

*SEC v. Brooks*, No. 07-cv-61526, 2017 WL 3315137 (S.D. Fla. Aug. 3, 2017) ......... 52

*SEC v. Capital Gains Research Bureau*, 375 U.S. 180 (1963) .................................... 12

*SEC v. Cavanagh*, 445 F.3d 105 (2d Cir. 2006) .......................................................... 51

*SEC v. Clark*, 915 F.2d 439 (9th Cir. 1990) ................................................................. 9

*SEC v. Cohen*, No. 4:05CV371-DJS, 2006 WL 2225410 (E.D. Mo. Aug. 2, 2006) ....... 49

*SEC v. Collins & Aikman Corp.*, 524 F. Supp. 2d 477 (S.D.N.Y. 2007) .......... 3, 10, 50

*SEC v. Egan*, 994 F. Supp. 2d 558 (S.D.N.Y. 2014) .................................................. 31

*SEC v. Espuelas*, 908 F. Supp. 2d 414 (S.D.N.Y. 2012) ............................................ 50

*SEC v. Familant*, 910 F. Supp. 2d 83 (D.D.C. 2012) ............................................ 10, 19

*SEC v. Jammin Java Corp.*, No. 2:15-cv-08921, 2017 WL 4286180 (C.D. Cal. Sept. 14, 2017) 52

*SEC v. Kearns*, 691 F. Supp. 2d 601 (D.N.J. 2010) .................................................... 18

*SEC v. Kelly*, 817 F. Supp. 2d 340 (S.D.N.Y. 2011) ................................................... 12

*SEC v. Koenig*, No. 02 C 2180, 2007 WL 1074901 (N.D. Ill. Apr. 5, 2007) .............. 49

*SEC v. Kokesh*, No. 15-2081, 2018 WL 1187714 (10th Cir. March 5, 2018) .............. 51

*SEC v. Langford*, Case No. 8:12CV344, 2013 WL 1943484 (D. Neb. May 9, 2013) ................. 18

*SEC v. Lee,* 720 F.Supp.2d 305 (S.D.N.Y. 2010) ........................................................ 19

*SEC v. Metter*, No. 16-526-cv, 2017 WL 3708084 (2d Cir. Aug. 29, 2017) .............................. 52

*SEC v. Monterosso*, 756 F.3d 1326 (11th Cir. 2014) .......................................... 13, 26

*SEC v. Morgan Keegan & Co., Inc.,* 678 F.3d 1233 (11th Cir. 2012) ......................... 12

*SEC v. Mudd*, 885 F. Supp. 2d 654 (same) ........................................................ 41, 49

*SEC v. Norstra Energy Inc.*, 202 F. Supp. 3d 391 (S.D.N.Y. 2016) .......................... 29

*SEC v. Palmisano*, 135 F.3d 860 (2d Cir. 1998) .............................................. 51

*SEC v. Pentagon Capital Mgmt. PLC*, 612 F.Supp.2d 241 (S.D.N.Y. 2009) ................. 44

*SEC v. Pentagon Capital Mgt. PLC*, 725 F.3d 279 (2d Cir. 2013) .................. 10, 26, 30

*SEC v. RPM Int'l., Inc.*, No. 16-1803, 2017 WL 4358693 (D.D.C. Sept. 29, 2017) .................. 24

*SEC v. Sample*, No. 3:14-CV-1218-B, 2017 WL 5569873 (N.D. Tex. Nov. 20, 2017) .............. 52

*SEC v. Sells*, No. C 11-4941 CW, 2012 WL 3242551 (N.D. Cal. Aug. 10, 2012) ...................... 49

*SEC v. Stoker*, 865 F. Supp. 2d 457 (S.D.N.Y. 2012) (same) ........................................ 41

*SEC v. StratoComm Corp.*, 2 F. Supp. 3d 240 (N.D.N.Y. 2014) ................................... 41

*SEC v. Syron*, 934 F. Supp. 2d 609 (S.D.N.Y. 2013) ............................................ 41, 49

*SEC v. Thompson*, No. 14-CV-9126 (KBF), 238 F.Supp.3d 575, 2017 WL 874973 (S.D.N.Y.

   Mar. 2, 2017) ................................................................................ 23

*SEC v. Tourre*, No. 10-cv-3229 (KBF), 2014 WL 61864 (S.D.N.Y. Jan. 7, 2014) ............... 42, 49

*SEC v. Treadway*, 430 F. Supp. 2d 293 (S.D.N.Y. 2006) .......................................... 38

*SEC v. Wey*, 246 F. Supp. 3d 894 (S.D.N.Y. 2017) ............................................. 50

*SEC v. Zandford*, 535 U.S. 813 (2002) ........................................................ 12

*SEC. v. Dunn*, 587 F. Supp.2d. 486 (S.D.N.Y. 2008) ............................................. 11

*See SEC v. Revolutions Medl Corp.*, No. 1:12-cv-03298-LMM (N.D. Ga. March 16, 2018), ECF No. 279 ........................................................................................................................... 52

*Smith v. Miller*, No. 15-CV-9561 (NSR), 2017 WL 4838322 (S.D.N.Y. Oct. 23, 2017) ............ 21

*Staehr v. Hartford Fin. Servs. Group, Inc.*, 547 F.3d 406 (2d Cir. 2008) ...................................... 4

*VanCook v. SEC*, 653 F.3d 130 (2d Cir. 2011) ............................................................................. 10

*WPP Lux. Gamma Three Sarl v. Spot Runner, Inc.*, 655 F.3d 1039 (9th Cir. 2011) ................... 11

*Xechem Inc. v. Bristol-Myers Squibb Co.*, 372 F.3d 899 (7th Cir. 2004) ...................................... 3

## Statutes

15 U.S.C. § 77q(a)(3) ...................................................................................................................... 9

17 C.F.R. 240.10b-5(a)(c) ................................................................................................................ 9

15 U.S.C. § 77q(a)(1) ...................................................................................................................... 9

15 U.S.C. § 78u-4 .......................................................................................................................... 11

17 C.F.R. § 240.10b-5(b) ............................................................................................................... 25

17 C.F.R. 240.10b-5(a) .................................................................................................................... 9

17 CFR § 240.13a-14 ..................................................................................................................... 48

## Other Authorities

*Black's Law Dictionary* (10th ed. 2014) ..................................................................................... 27

Fed. R. Civ. P. 9(b) .................................................................................................................... 4, 31

*Mozambique Rejects Coal Barging Study: Minister*, Reuters (March 1, 2012) ........................... 21

*Rio Tinto in talks on $3.5 billion bid for Riversdale*, Reuters (December 5, 2010) ..................... 21

*Riversdale Hails New Rio Tinto Bid Riversdale Hails New Rio Tinto Bid*, Wall Street Journal (December 23, 2010) ................................................................................................................ 21

*Webster's International Dictionary* (2d ed. 1934) ......................................................................... 9

## INTRODUCTION

The fifty pages of well-pleaded factual allegations in the Complaint establish multiple violations of the federal securities laws with particularity, including fraud. Essentially, Rio Tinto's Chief Executive Officer, Albanese, and Chief Financial Officer, Elliott, convinced the company to pay some $3.7 billion for a coal business in Mozambique (hereinafter, "RTCM") and soon learned it was a lemon. Rather than owning up to this expensive embarrassment, Defendants engaged in a sustained, multi-pronged fraud to conceal the truth from Rio Tinto's internal and external gatekeepers and from the investing public, while misleadingly touting the deal as proof of their acquisition acumen. Defendants engaged in this deception because Albanese and Elliott were on the hook for a recent "disastrous," "embarrassment" of an acquisition, which cost them their bonuses, and put them on notice that further impairments would reflect a "pattern of … failure." Compl. ¶¶ 46-47.

For almost a year, Defendants knew that they only had a viable transportation solution for approximately five percent of the 40 million tons of coal Rio Tinto had assumed it could sell annually when it valued the Mozambican coal business at $3.7 billion at acquisition. Compl. ¶ 2. Defendants nevertheless continued to tout the deal to the market and to certify financial statements that valued RTCM at more than $3 billion. Compl. ¶¶ 4-5. And, during this time, Rio Tinto raised $5.5 billion in U.S. debt offerings that incorporated the materially misleading $3 billion valuation of RTCM. Compl. ¶ 6.

Defendants endeavor to excuse this misconduct by arguing that it was too soon to impair RTCM because it had only been eleven months since they acquired the asset. Mot. 2. However, Rio Tinto was *required* to assess impairment at every reporting period. In the event Rio Tinto resolved the problems RTCM encountered, it could have written the value of RTCM back up,

but it did not have the option to simply ignore an impairment trigger.[2]   Compl. ¶¶ 33-34.

Moreover, although Defendants now seek credit for impairing RTCM within 17 months of

acquisition, they had no intention of doing so until an in-house valuation executive in Rio Tinto's

Technology and Innovation division (hereinafter, the "T&I executive") went around Albanese

and Elliott to make sure Rio Tinto's Board of Directors knew that RTCM had a potentially

negative valuation. Compl. ¶ 165. When this fact was revealed, the Board quickly wrote down

almost the full value of RTCM, the company reported its first-ever annual operating loss, and

Albanese was shown the door. Compl. ¶¶ 166-169, 172-173.

Before the T&I executive disclosed RTCM's problems to the Board, Defendants were in

the process of deceiving Rio Tinto's Audit Committee and independent auditors into believing

that RTCM should still be valued at $3 billion.  In advance of the Audit Committee's November

26, 2012 meeting, the T&I executive told Elliott that "RTCM had little or no commercial value."

Compl. ¶ 152. Elliott assured him that "Elliott would raise the significant valuation challenges

confronting RTCM at the upcoming Audit Committee meeting."  Compl. ¶ 152. Contrary to this

promise, Elliott did not advise the Audit Committee of any problems with RTCM at its

November 26, 2012 meeting.  Compl. ¶ 158. Instead, Elliott and Albanese, who had been told

that RTCM's value was negative $680 million, allowed the Committee to rely on an unsupported

valuation that showed RTCM's value as having *increased* by $1-2 billion even though RTCM

had suffered multiple, undisclosed setbacks, there was no plan to transport 95 percent of the coal

---

[2]    IAS 36 ¶ 9 ("An entity shall assess at the end of each reporting period whether there is
any indication that an asset may be impaired. If any such indication exists, the entity shall
estimate the recoverable amount of the asset."); IAS 36 ¶ 114 ("An impairment loss recognised
in prior periods for an asset other than goodwill shall be reversed if, and only if, there has been a
change in the estimates used to determine the asset's recoverable amount since the last
impairment loss was recognised. If this is the case, the carrying amount of the asset shall, except
as described in paragraph 117, be increased to its recoverable amount. That increase is a reversal
of an impairment loss."). Miller Decl. 1–IAS 36 *Impairment of Assets*.

RTCM planned to sell, and Rio Tinto had made no progress on RTCM's transportation issues over the past year. Compl. ¶¶ 153-158. As a result of Defendants' deception, Rio Tinto still planned to value RTCM at $3 billion after the November 26, 2012 Audit Committee meeting, and until the T&I executive intervened. Compl. ¶ 159.

As set forth in more detail below, the extensive allegations in the Complaint establish that Defendants violated multiple provisions of the federal securities laws by engaging in a prolonged fraudulent course of conduct. Accordingly, Defendants' Motion to Dismiss should be denied.

## STANDARD OF REVIEW

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "A court must construe the complaint liberally, accept all factual allegations in the complaint as true, and draw all reasonable inferences in the nonmovant's favor." *CFTC v. Wilson*, 27 F. Supp. 3d 517, 531 (S.D.N.Y. 2014). "[A] defendant cannot defeat a claim by pointing to facts that are omitted if the allegations as pled meet the requisite standard." *SEC v. Collins & Aikman Corp.*, 524 F. Supp. 2d 477, 493 (S.D.N.Y. 2007). Affirmative defenses, like Defendants' claim that they acted in good faith by relying on auditors, cannot defeat well-pleaded allegations, for "[c]omplaints need not contain *any* information about defenses, and may not be dismissed for that omission." *Xechem Inc. v. Bristol-Myers Squibb Co.*, 372 F.3d 899, 901 (7th Cir. 2004) (emphasis in original). Federal Rule of Civil Procedure 9(b) provides that, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake," while

"[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

Defendants submit some thirty exhibits with their Motion that serve only to illustrate factual disputes that are not ripe for resolution. At this stage, the Court "may consider only the complaint, documents attached to the complaint, matters of which a court can take judicial notice, or documents that plaintiff knew about and relied upon," *Wilson*, 27 F. Supp. 3d at 531, meaning the complaint "relies heavily upon [the] terms and effect" of the document, rendering it "integral" to the complaint. *Int'l Audiotext Network, Inc. v. Am. Tel & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) (per curiam). Because "a plaintiff's *reliance* on the terms and effect of a document in drafting the complaint is a necessary prerequisite to the court's consideration of the document on a dismissal motion," the Court should not consider any of Defendants' exhibits unless it provides notice that the motion is being converted to one for summary judgment. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002) (emphasis in original).

For instance, many of Defendants' exhibits are news stories that are not integral to the Complaint and should not be considered. Defendants cite to *Staehr v. Hartford Fin. Servs. Group, Inc.*, 547 F.3d 406, 424-26 (2d Cir. 2008), in which the Second Circuit had "no quarrel with the District Court's decision to take judicial notice of what information was 'out there'" for the purpose of determining whether investors had been put on inquiry notice sufficient to trigger the statute of limitations. The Court of Appeals reversed and remanded, however, because "the total mix of information" represented by the judicially noticed materials was not "sufficient to rule, as a matter of law, that an investor of ordinary intelligence was on inquiry notice," an issue better addressed "at the summary judgment stage or at trial." *Id*. at 426. To the extent the Court finds any of Defendants' outside materials persuasive, the outcome should be the same here

because many of Defendants' exhibits relate to issues that will be hotly disputed in litigation and, standing alone at this stage, do not refute the allegations in the Complaint.

## BACKGROUND

The specific allegations supporting every claim in the Complaint are set forth in more detail below. This Section is intended to provide an overview of the nature and timing of the setbacks RTCM faced after Rio Tinto acquired the business for $3.7 billion in April 2011. Compl. ¶ 61. At acquisition, Rio Tinto assumed "that it could profitably mine, transport, and sell more than 40 million tons of coal per year by barging the majority of the coal product down the Zambezi River to a port on the Indian Ocean." Compl. ¶ 2. Rio Tinto expected that 60 percent of this coal (or 30 million tons) would be "hard coking coal," which is essential to the production of steel and, therefore, had a much higher price than thermal coal. Compl. ¶¶ 49, 55, 67.

**Problem One: The Zambezi River**. RTCM planned to barge 30 million tons of coal down the Zambezi River each year to ships on the Indian Ocean. The river's ability to carry 30 million tons was a "central assumption" of the acquisition. Compl. ¶¶ 2, 67-68. Prior to the acquisition, Albanese and Elliott were advised that it would be a "showstopping" risk if the river could not support this volume. Compl. ¶¶ 56-59. It could not. Within months of the acquisition, Defendants learned from their own in-house experts that "based on the best information available," barging capacity was limited to 10 million tons per year, because of the Zambezi River's "hydrogeological properties" and the "internationally-designated wetland" at its mouth. Compl. ¶ 69. Moreover, using the river to barge coal was "significantly more expensive" than previously thought because of "immutable physical constraints." Compl. ¶ 69. Based on this information, during its routine planning process in 2011, RTCM generated an updated valuation that reduced its value by approximately $2.1 billion. Compl. ¶ 71.

5

RTCM's problems with barging grew. Rio Tinto needed government approval to barge any coal down the river. The government of Mozambique rejected Rio Tinto's barging proposal in December 2011, citing 36 separate grounds for its decision. Compl. ¶¶ 75-76. Further, in April 2012, the Government warned Rio Tinto that if it persisted in raising the subject of barging, it risked losing its mining licenses altogether. Compl. ¶ 77.

**Problem Two: Limited Rail Capacity**. At acquisition, Rio Tinto planned to transport one-third of its annual coal production (approximately 12-15 million tons) on existing rail lines. Compl. ¶ 80. Within a few months of acquisition, Rio Tinto learned that there was not enough rail capacity. RTCM would only be able to transport "a little less than two million tons" on the existing rail lines. Compl. ¶ 80. Within months of the acquisition, thus Defendants knew that RTCM could ship to market less than five percent of the coal originally assumed. Compl. ¶ 81. Rio Tinto considered building a new rail line to resolve this problem – the greenfield line – but the cost was too steep ($16 billion that Rio Tinto did not have). Compl. ¶ 119. For this reason, Albanese rejected the idea that Rio Tinto would fund a railroad in May 2012 and directed RTCM to look for partners for the project (which they never found). Compl. ¶ 120.

**Problem Three: Reserves and Resources**. At acquisition, the Mozambican coal business claimed to have approximately 13 billion in coal reserves, a number Rio Tinto anticipated writing down by 50 percent. Compl. ¶ 83. By January 2012, RTCM determined that resources and reserves actually would have to be written down by 80 percent. Compl. ¶ 84. In forwarding this news to Albanese, Elliott wrote, "[w]orse by far than expected" and "the market won't see." Compl. ¶ 84-86. But RTCM's problems got even worse. By May 2012, Defendants learned that there was "a less favorable split" between high-value hard coking coal

and lower-value thermal coal, which had "a significant negative impact on value" for RTCM. Compl ¶ 119.

**Problem Four: Negative Internal Valuations**.  Elliott and Albanese attended a meeting in Brisbane, Australia, on May 11, 2012 ("the Brisbane Meeting").  Compl. ¶ 116. During the Brisbane Meeting, management from RTCM and its corporate parent within Rio Tinto, Rio Tinto Energy ("RTE"), advised Albanese and Elliott that "[b]ased on the best available information and under the best potential configuration, RTCM was worth negative $680 million."  Compl. ¶ 119. Albanese and Elliott did not share RTCM's negative valuation with the key stakeholders in Rio Tinto's financial reporting process. Compl. ¶ 122. Instead, Rio Tinto claimed to its Audit Committee and external auditors that the firm that performed the initial RTCM valuation had advised that the changes in resources and reserves would not change their valuation.  Compl. ¶ 126. However, "this advice was contingent on confirmation from Rio Tinto's technical experts that it was appropriate to assume that RTCM could convert nearly 70 percent of its resources into marketable coal instead of the roughly 17 percent assumed at acquisition."  Compl. ¶ 126. "Rio Tinto's technical experts had made no such determination."  Compl. ¶ 126.

***

Collectively, these problems demonstrate that Defendants knew that RTCM had lost the majority of its transportation capacity by December 2011, knew that it had lost at least half of its anticipated coal resources and reserves by January 2012, and knew that their own valuation models were generating negative valuations by May 2012. Nevertheless, Defendants engaged in conduct to conceal these facts from Rio Tinto's Board of Directors, its Audit Committee, its independent auditors, and the market.  Compl. ¶ 3. As a result of this conduct, Rio Tinto valued RTCM at more than $3 billion in its 2011 Annual Report and financial statement (both filed with

7

the SEC in March 2012) and in its financial statement for half-year 2012 (filed with the SEC in August 2012). Compl. ¶¶ 98, 139. Indeed, Rio Tinto was still on track to value RTCM at $3billion in its public disclosures until the T&I executive went to the Board of Directors in November 2012. Compl. ¶ 159.

## ARGUMENT

## I.    The Complaint Adequately Pleads Fraud

The Complaint alleges several violations of the federal securities laws based on the conduct described above, including violations of all subsections of the antifraud provisions set forth in Section 10(b) of the Exchange Act (and Rule 10b-5, thereunder) and Section 17(a) of the Securities Act. Largely ignoring the content of the Complaint, Defendants claim that the Commission cannot support any element of any subpart of these statutes. This claim is without merit. As set forth in more detail below, the Complaint alleges: (A) deceptive conduct sufficient to support liability under Sections 17(a)(1) and (a)(3) and Rules 10b-5(a) and c); (B) falsity as required by Section 10(b), Section 17(a), and Section 13(B)(2)(a) of the Exchange Act; (C) that Albanese and Elliott "made" false or misleading statements; (D) facts giving rise to an inference of scienter; (E) alleges that Defendants' misconduct was material; and (F) that Albanese and Elliott "obtained money or property" as required for liability under Section 17(a)(2). Accordingly, there is no basis to dismiss any of the Commission's fraud claims.

### A.    The Complaint Adequately Alleges Facts Giving Rise to Liability Under Sections 17(a)(1) and (3) and Rules 10b-5(a) and (c)

Defendants contend that the Complaint fails to allege "scheme liability" such that its claims under Rules 10b-5(a) and (c) (Count 1) and Sections 17(a)(1) and (3) (Count 3) "fail as a matter of law." Mot. § IIE. Underpinning this argument is Defendants' assumption that misrepresentations or omissions cannot be the basis for "scheme liability." Mot. 46. This

assumption, however, adopts an unduly narrow version of the law that is contrary to the expansive language of the relevant statutes and regulations.

> ### 1. Sections 17(a)(1) and (3) and Rules 10b-5(a) and (c) Are Broad Antifraud Provisions, and Defendants Ignore Their Text When Arguing to the Contrary

Section 17(a)(1) makes it unlawful "to employ *any* device, scheme, or artifice to defraud" in offering or selling a security, while Section 17(a)(3) precludes a person from "engag[ing] in *any* transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser." 15 U.S.C. § 77q(a)(1), (3) (emphasis added). Exchange Act Rule 10b-5(a) prohibits "employ[ing] *any* device, scheme, or artifice to defraud . . . in connection with the purchase or sale of any security," while Rule 10b-5(c) bars "engag[ing] in *any* act, practice, or course of business which operates or would operate as a fraud or deceit upon any person . . . in connection with the purchase or sale of any security." 17 C.F.R. 240.10b-5(a), (c) (emphasis added). Nothing in that expansive text justifies adopting Defendants' cramped view, which would preclude liability under those provisions whenever misconduct includes or relates to misstatements or omissions.

"Words and phrases like 'fraud,' 'deceit,' and 'device, scheme or artifice' provide a broad linguistic frame within which a large number of practices may fit." *SEC v. Clark*, 915 F.2d 439, 448 (9th Cir. 1990); *see, e.g.*, *Aaron v. SEC*, 446 U.S. 680, 696 n.13 (1980) ("*Webster's International Dictionary* (2d ed. 1934) defines (1) 'device' as '[t]hat which is devised, or formed by design; a contrivance; an invention; project; scheme; often, a scheme to deceive; a stratagem; an artifice,' (2) 'scheme' as '[a] plan or program of something to be done; an enterprise; a project; as, a business scheme[, or] [a] crafty, unethical project,' and (3) 'artifice' as a '[c]rafty device; trickery; also, an artful stratagem or trick; artfulness; ingeniousness.'").

Given the breadth of conduct embraced by this language, it is a misnomer to refer to these as only "scheme liability" provisions, as Defendants do.

Recognizing this breadth, courts in the Second Circuit have held that liability can arise under all three prongs of Section 17 and Rule 10b-5 out of the same set of facts involving misrepresentations. *See*, *e.g.*, *SEC v. Pentagon Capital Mgt. PLC*, 725 F.3d 279, 284-87 (2d Cir. 2013) (liability upheld under all prongs of Section 17(a) and Rule 10b-5 in late-trading case involving misrepresentations, use of different broker numbers, and other methods to evade detection); *VanCook v. SEC*, 653 F.3d 130, 138-42 (2d Cir. 2011) (defendant violated antifraud provisions by making misrepresentations about late trading and "by taking numerous steps to hide it"); *SEC v. Collins & Aikman Corp.*, 524 F. Supp. 2d at 492-93 (complaint stated claim under all prongs of antifraud provisions by alleging defendants structured transactions that resulted in publicly overstated revenue and engaged in "activities designed to conceal their fraud from the Audit Committee's investigators"); *see also SEC v. Familant*, 910 F. Supp. 2d 83, 86-88, 92-97 (D.D.C. 2012) (finding "much deceptive conduct" in defendants' "elaborate plot meant to fool [their] accountants and, in turn, the public," including use of misleading internal accounting documents). Defendants' misconduct in this case, involving making and using misrepresentations and omissions and acts of concealment, fits comfortably within the textual parameters of the antifraud provisions.

## 2. Defendants Argue For An Overly Narrow Standard, Which the Complaint Nonetheless Satisfies

Instead of focusing on the plain text of the relevant statutes, Defendants seek to narrow the scope of Sections 17(a)(1) and (3) and Rules 10b-5(a) and (c) as a way to escape liability, even though their alleged misconduct constitutes the types of devices, artifices, acts, schemes,

practices, and courses of business encompassed by those provisions and embraced by courts. Defendants' arguments are wrong on the law, but do not warrant dismissal in any event.

First, Defendants urge that *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161 (2d Cir. 2005), bars the Commission's claims.  Mot. 46.  In *Lentell*, the Second Circuit affirmed the dismissal of a class action alleging misrepresentations because the plaintiffs could not establish loss causation.  *Lentell,* 396 F.3d at 172-77.  At the end of its opinion, the court added that, "where the *sole basis* for such claims is alleged misrepresentations or omissions, plaintiffs have not made out a market manipulation claim under Rules 10b-5(a) and (c), and remain subject to the heightened pleading requirements of the PSLRA."[3]  *Id.* at 177.  Because the plaintiffs' allegations involved *only* misstatements and omissions that were insufficient as a matter of law, *see id.* at 172, they could not repackage the same flawed allegations as a claim under Rule 10b-5(a) or (c) to avoid the PSLRA.  *See also WPP Lux. Gamma Three Sarl v. Spot Runner, Inc.*, 655 F.3d 1039, 1057 (9th Cir. 2011) (citing *Lentell* in private suit and noting that a failed Rule 10b-5(b) omissions claim may not be "recast as Rule 10b-5(a) or (c) scheme liability claim").

This case is on starkly different footing.  The Complaint alleges violations of Section 17(a), a statute not at issue in, or mentioned by, *Lentell*.  Moreover, it is uncontested that the PSLRA does not apply to this case.  *See, e.g., SEC. v. Dunn*, 587 F. Supp.2d 486, 501 (S.D.N.Y. 2008) ("Of course, by its terms, the PSLRA does not apply to this SEC enforcement action.").  Indeed, the Second Circuit has never applied the statement from *Lentell* invoked by Defendants to a case brought by the Commission.  *Lentell* simply does not apply here, where the Commission is the plaintiff and the Second Circuit's concerns about private parties evading the PSLRA's pleading requirements—by relabeling insufficient misrepresentation-or-omission

---

[3]    "PSLRA" refers to the Private Securities Litigation Reform Act, which governs private securities class actions. 15 U.S.C. § 78u-4.

claims as claims under different antifraud provisions—are absent.  Even if *Lentell* applied, it would make no difference, for the Complaint adequately alleges not just misrepresentations and omissions, but also other acts aimed at concealing the truth.

Second, Defendants cite *SEC v. Kelly*, 817 F. Supp. 2d 340 (S.D.N.Y. 2011), which argues against the possibility that federal securities antifraud provisions may overlap.  Mot. 47.  *Kelly*'s proposition that the subsections of Section 17(a) and Rule 10b-5 should be treated as mutually exclusive has never been adopted by the Supreme Court or Second Circuit, and should not be adopted by this Court.

Indeed, the D.C. Circuit recently held—in a decision that squarely rejects *Kelly*'s logic— that there is no reason to treat Section 17(a) and Rule 10b-5 "as occupying mutually exclusive territory, such that false-statement cases must reside exclusively within the province of Rule 10b-5(b)."  *Lorenzo v. SEC,* 872 F.3d 578, 591 (D.C. Cir. 2017)*, cert. petition filed,* No. 17-1077 (Jan 26, 2018); *see also Dennis J. Malouf*, Rel. No. 4463, 2016 WL 4035575, *8-9 (July 27, 2016), *petition for rev. filed*, *Malouf v. SEC*, 16-9546 (10th Cir. Sep. 8, 2016) (similar).  The "proscriptions" in Section 17(a) and Rule 10b-5 "are broad and, by repeated use of the word 'any,' are obviously meant to be inclusive," *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 151 (1972), and must be "construed not technically and restrictively, but flexibly to effectuate [their] remedial purposes."  *SEC v. Zandford*, 535 U.S. 813, 819 (2002) (quotation marks omitted);  *see also Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 475-76 (1977); *SEC v. Capital Gains Research Bureau*, 375 U.S. 180, 186 (1963).[4]

---

[4]       To the extent Defendants' concern is that a plain-language interpretation of Sections 17(a)(1) and (3) and Rules 10b-5(a) and (c) would open the door to meritless private-party suits, that is wrong.  Unlike the Commission, private plaintiffs must show reliance on the defendant's misconduct,  *SEC v. Morgan Keegan & Co., Inc.,* 678 F.3d 1233, 1244 (11th Cir. 2012), and

As the Commission has explained, the language of the subsections of Section 17(a) and Rule 10b-5 are "mutually supporting rather than mutually exclusive," *Cady, Roberts & Co.*, 40 SEC 907, 1961 WL 60638, at *4 (Nov. 8, 1961), and Rule 10b-5's subsections are "designed to encompass the infinite variety of devices that are alien to the climate of fair dealing," *Collins Sec. Corp.*, 8 SEC Docket 250, 1975 WL 160411, at *10 (Oct. 23, 1975) (quotation marks omitted).[5] Defendants' argument to the contrary and the small number of cases they cite do not grapple with either the text or purposes of the antifraud provisions and should be rejected.[6]

### 3. The Complaint Alleges Misconduct That Violates Sections 17(a)(1) and (3) and Rules 10b-5(a) and (c)

The factual allegations in the Complaint set forth that Defendants engaged in the type of deceptive conduct that Sections 17(a)(1) and (3) and Rules 10b-5(a) and (c) were designed to prohibit. For almost a year, Defendants engaged in a venture whose purpose was to conceal the truth regarding the lack of success of management's acquisition strategy, and to deceive the

---

prove economic loss and loss causation, *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005), and they may not invoke Section 17(a), which does not allow a private right of action.

[5]   To the extent Section 17(a) and Rule 10b-5 are ambiguous, the Commission's interpretation is entitled to deference. The Commission's interpretation of Rule 10b-5 is entitled to deference because it is not "'plainly erroneous or inconsistent'" with Section 10(b)(5), *Brodsky v. U.S. Nuclear Regulatory Comm'n*, 578 F.3d 175, 182 (2d Cir. 2009) (quoting *Auer v. Robbins*, 519 U.S. 452, 461 (1997)), and its interpretation of Section 17(a) is entitled to deference because it is not unreasonable, *Chevron v. Natural Res. Def. Council*, 467 U.S. 837, 842-43 (1984).

[6]   The Complaint still satisfies the more stringent logic of *Kelly* and cases like it, by alleging that each defendant "made deceptive contributions to an overall fraudulent scheme." *SEC v. Monterosso*, 756 F.3d 1326, 1334 (11th Cir. 2014). According to *Kelly*, the SEC failed to allege *any* deceptive conduct other than facilitating the preparation of AOL's false public filings. The defendants structured the transactions at issue, but these were not meant to deceive anyone—they were "considered within AOL to be typical" and were "touted . . . in the media"— and "*became* deceptive only through AOL's misstatements in its public filings." *Id.* at 344 (emphasis added). In this case, by contrast, the SEC alleges not just that Defendants contributed to false public statements, but that they used false assurances and documents and other devices to fool their auditors and others.

market about the present value of RTCM and Rio Tinto's adherence to its own accounting controls. In a large company like Rio Tinto, it took more than a few misleading statements to sustain such a false impression. By necessity, Defendants' fraud required concerted, ongoing conduct aimed at concealing the existence of impairment indicators within Rio Tinto, conduct that contributed to, but that also went beyond, the various misleading statements Defendants made to the market. The Complaint chronicles the following actions, which Defendants undertook to pervert Rio Tinto's accounting and financial reporting system and to perpetrate their fraud.

*Failure to trigger impairment.* In late 2011 and early 2012, Defendants learned of multiple impairment triggers at RTCM, such as the loss of 95 percent of the transport capacity assumed at acquisition. Compl. ¶¶ 100-101. Neither Albanese nor Elliott acted on these impairment triggers, instead working to conceal them.

*2011 Annual Report.* Albanese and Elliott signed the 2011 Annual Report, which omitted the existence of impairment triggers and claimed that Rio Tinto had fully anticipated RTCM's write-down of reserves and resources, when in reality, as Elliott admitted to Albanese, the write-down was "[w]orse by far than expected." Compl. ¶¶ 82-86, 95-97, 102-03.

*Deceiving auditors in connection with 2011 financial statements.* When Rio Tinto's 2011 financial statements were being audited, Albanese and Elliott withheld their knowledge of RTCM's greatly diminished transport capacity and valuation, yet falsely attested that all "relevant audit information" had been provided. Compl. ¶¶ 91-95. As a result, the financials falsely reported that RTCM was still worth what was paid to acquire it and that Rio Tinto was reviewing assets for impairment in accord with IAS 36, even though it was not. Compl. ¶¶ 98-

101. Defendants used the false 2011 financial statement several times throughout the fraud, such as in connection with SEC filings and debt offerings. Compl. ¶¶ 104-112.

     *False statements to shareholders.* Albanese misleadingly touted Rio Tinto's coal business at an April 2012 shareholders' meeting. Compl. ¶¶ 113-115.

     *Misleading statements in connection with March bond offerings.* The offering documents for Rio Tinto's March 2012 $2.5 billion U.S. bond issuance incorporated the misleading 2011 Annual Report and just-released financial statements, thus reporting materially inflated operating profits. Compl. ¶¶ 96, 110-112.

     *Concealing data from the Brisbane Meeting.* In May 2012, Albanese and Elliott were told by the responsible executives that RTCM had a negative $680 million valuation "[b]ased on the best information available and under the best potential configuration." Compl. ¶¶ 116-119. Nevertheless, the duo decided it was "premature to settle on a valuation," even though Rio Tinto was about to release a financial statement valuing RTCM at over $3 billion. Compl. ¶ 121.

     The significance of the Brisbane Meeting is not simply that Elliott chose not to invite the Controller who oversaw the impairment process, but Albanese's and Elliott's sustained effort to keep the information revealed in Brisbane from sparking an impairment review.[7] They failed to inform the Controller, independent auditors, Audit Committee, or Board of Directors that the best-case valuation for RTCM was negative. Instead, they permitted the Controller to present a

---

[7]     Defendants claim, Mot. 20 n.8, that the Complaint "failed to acknowledge" that the Controller was later emailed the PowerPoint presentation used at the Brisbane Meeting. This is a non-issue because the PowerPoint slides did not reveal that a valuation had been prepared and that it was negative $680 million. Defendants' argument here shows the danger of relying on outside documents at the motion-to-dismiss stage. Indeed, they go so far as to suggest, Mot. 13 n.6, that Albanese and Elliott did not learn of the negative valuation because it was not on the PowerPoint slides. However, as documents provided to Defendants during the course of the SEC's investigation make clear, including contemporaneous notes from the Brisbane Meeting discussion of the negative $680 million valuation occurred. Miller Decl. 2 at RT_00241295.

series of key audit reports that omitted this valuation, and which rested on a misleading assumption that a broad range of transport options were on the table. Compl. ¶¶ 119-120.

*First Controller's Paper.* Elliott reviewed and did not correct what he knew to be a series of material misrepresentations and misleading omissions in the First Controller's Paper. Compl. ¶¶ 124-128. The Paper misleadingly claimed that the audit firm that prepared the initial valuation of RTCM had opined that the downgrade in RTCM's resources and reserves would not change its valuation. The Paper omitted the audit firm's caveat that its valuation was contingent on confirmation from Rio Tinto's technical experts that it was appropriate to assume that RTCM could convert nearly 70 percent of its resources (as opposed to the 17 percent previously assumed). Nor did the Paper disclose the absence of any such technical confirmation by Rio Tinto's experts. Compl. ¶ 126. Elliott reviewed the Paper, and let it go through without correction, to the Audit Committee and independent auditors. Compl. ¶¶ 124, 128.

*June 2012 Audit Committee.* The misleading First Controller's Paper was presented at a June 2012 meeting to assist the Audit Committee as it considered how RTCM should be carried on Rio Tinto's books, and whether there were impairment indicators. Compl. ¶ 123. Albanese and Elliott were at the meeting, yet did nothing to correct the misleading report or share the impairment indicators they had learned at the Brisbane Meeting. Compl. ¶ 129.

*Impairment Paper.* An Impairment Paper was submitted to the independent auditors as part of their review of whether RTCM should be tested for impairment. It failed to identify the impairment triggers known to Albanese and Elliott, baselessly claiming that $5.1 billion was an "indication of value" for RTCM with "$1 billion of . . . possible upside," and omitting that "extensive modeling" led to a negative $680 million valuation. Compl. ¶¶ 130-133, 119.

16

*Second Controller's Paper.* A Second Controller's Paper was presented to the Audit Committee and independent auditors in July 2012, as they prepared to publish the half-year financials. Compl. ¶ 134. The Paper claimed there were no impairment indicators for RTCM and falsely claimed that RTCM's business case remained undeveloped due to a "breadth" of transport options. Compl. ¶¶ 134, 136. On the basis of this materially incomplete report, the independent auditors agreed there were no impairment indicators. Albanese and Elliott were at the Audit Committee meeting and took no corrective action. Compl. ¶¶ 134-138.

*Half-year financials.* On the basis of these flawed inputs, the half-year 2012 financial statement, filed with the SEC in August 2012, contained false and misleading statements that valued RTCM at over $3 billion, resulting in materially overstated net earnings. Compl. ¶ 139.

*False and misleading statements to the market.* Defendants continued to spin a wholly positive RTCM narrative to the market, omitting material negative facts about the business, including misleading statements by Albanese, Compl. ¶¶ 141-144, some of which Elliott heard but left uncorrected, despite all his contrary knowledge. Compl. ¶¶ 143-144.

*Use of false statements in second bond offering.* "Days after filing its false and misleading interim financial reports" in August 2012, Rio Tinto raised another $3 billion in bond offerings, again using misleading documents that inflated operating profits by failing to properly impair RTCM and incorporating the misleading 2011 Annual Report. Compl. ¶¶ 145-150.

*False assurances to the T&I executive and providing false information to the Audit Committee.* In November 2012, in preparation for the year-end financial statement, the Audit Committee was scheduled to meet and review potential impairments of assets, including RTCM. Compl. ¶ 152. In advance of that meeting, the T&I executive and an in-house geology expert informed Elliott that RTCM had little or no commercial value. Compl. ¶¶ 151-152. Elliott

provided false assurances that he would raise RTCM's significant valuation challenges at the November Audit Committee meeting. Compl. ¶ 151-152. He never did, instead alluding to the information as "late breaking" news of a "technical nature" and allowing the Audit Committee to rely on the Third Controller's Paper, which did not disclose any of the challenges to RTCM's valuation and concluded that no impairment was likely to be necessary. Compl. ¶¶ 153, 158-159. Like Elliott, Albanese failed to correct any of the materially misleading assertions in the Third Controller's Paper when he participated in the November 26, 2012 Audit Committee Meeting. Compl. ¶¶ 155-159.

**Continued false statements.** At the same time, Defendants continued to portray RTCM in a falsely positive light to the investing public. Compl. ¶¶161-163.

*** 

The deceptive acts set forth above are well within the mainstream of conduct that courts have found adequate to support liability under Sections 17(a)(1) and (3) and Rules 10b-5(a) and (c). For instance, liability under those provisions is appropriate when executives give false assurances to auditors while withholding material information. *See, e.g., SEC v. Kearns*, 691 F. Supp. 2d 601, 605-07 (D.N.J. 2010) (executive gave false assurances to auditors, allowed employee to give them false document, and failed to correct misleading statements on investor calls); *SEC v. Langford*, Case No. 8:12CV344, 2013 WL 1943484, at *2-3, 7 (D. Neb. May 9, 2013) (bank officer's conduct "inherently designed to deceive" by failing to inform auditors of negative loan valuation information, permitting auditors to receive misleading documents, passing on false assurances, and taking no action to correct false financial statements). Directing or permitting employees to prepare internal documents that will have the effect of misleading accountants and auditors is "deceptive conduct" "meant to fool . . . accountants and, in turn, the

public," sufficient to state a claim under Rules 10b-5(a) and (c). *Familant*, 910 F. Supp. 2d at 92-93. That such misconduct has a nexus to later misstatements does not change the analysis, for it is well established that "[a] defendant can be held liable under subsections (a) and (c) [of Rule 10b-5] for conduct in one period that gives rise to a misstatement in a later period." *SEC v. Lee,* 720 F.Supp.2d 305, 325 (S.D.N.Y. 2010) (*citing In re Global Crossing, Ltd. Sec. Litig.,* 322 F.Supp.2d 319, 335-36 (S.D.N.Y. 2004)). Accordingly, the Complaint states claims under Sections 17(a)(1) and (3) and Rules 10b-5(a) and (c).

### B.   The Complaint Adequately Alleges Falsity

Defendants assert that the Complaint fails to plead falsity as a matter of law and therefore cannot support the fraud and false filing claims in Counts 1, 3 and 5. Mot. § II. B. Defendants incorrectly contend that the "SEC has failed to specify what statements were fraudulent." Mot. 28. To the contrary, the Commission's Complaint richly details, among other things:

- The misleading statements in SEC filings that continued to value RTCM at $3 billion even though RTCM had "less than five percent of the capacity assumed at acquisition." Compl. ¶¶ 91, 97-102, 139.

- The misleading nature of RTCM's write-down of reserves and resources with false assurances that the full extent of the write-down had been anticipated prior to the acquisition of Riversdale. Compl. ¶ 102.

- The false assertions that Rio Tinto's books were kept in accordance with accounting standards, *see, e.g.,* Compl. ¶ 95 (2011 Annual Report), which it was required to do for all SEC filings. Compl. ¶¶ 31, 32-37.

- The misleading nature of the March 2012 and August 2012 offering documents that incorporated the $3 billion RTCM valuation by reference. Compl. ¶¶ 110, 148-150.

- The misleading nature of Albanese and Elliott's statements to shareholders touting RTCM. Compl. ¶¶ 113-114, 141-144, 161-163.[8]

---

[8]   Defendants maintain that their statements to investors are "inactionable puffery." Mot. 29. This self-serving and benign characterization of their own statements is at odds with Defendants' ongoing effort to conceal the nature and extent of problems at RTCM. Based on the

Collectively and individually these statements "gave the misleading impression that RTCM remained on track, and concealed from shareholders that Rio Tinto was on the cusp of another multi-billion dollar impairment under Albanese's leadership." Compl. ¶ 115.

### 1. Defendants Point to No Facts That Undercut the Highly Misleading Nature of Their Statements

Defendants make a series of factual pronouncements in an effort to argue that "when properly contextualized" the false statements outlined above were not misleading and, thus, cannot be actionable. Mot. 23. First, Defendants contend that "the Complaint does not adequately allege that RTCM's value was, in fact, overstated." Mot. 24. The Complaint, however, alleges that internal models generated negative valuations of RTCM, Compl. ¶ 127, and that, within weeks of the T&I executive sounding the alarm bell, Rio Tinto wrote down more than 80 percent of RTCM's value based largely on information that Defendants had known for a year. Compl. ¶¶ 164-166. The Complaint further alleges that "there was considerable discussion with Rio Tinto's auditors about whether the write-down should be even larger." Compl. ¶ 166. A reasonable factfinder could easily infer that RTCM's value was overstated based on these allegations and/ or the litany of undisclosed negative developments at RTCM that were not incorporated into its valuation. Compl. ¶¶ 128, 137.

Defendants next endeavor to prop up the $3 billion valuation of RTCM. Impermissibly referencing outside sources, Defendants contend that "internal models … concluded that RTCM's fair value had increased $1.2 billion due to the projected raise in coal prices." Mot. 27. These internal models, however, were based on the construction of a $16 billion new railroad (which Albanese had rejected) and did not incorporate the numerous setbacks RTCM had

allegations in the Complaint, a factfinder could easily infer that Albanese's comments were not merely "statements of general corporate optimism" but, rather, lies. Compl. ¶¶ 113-15, 139-42.

encountered.  Compl. ¶¶ 153-155.  Defendants also accuse the Commission–again relying on
outside documents–of ignoring that "coking coal prices had already risen 9 percent since the
acquisition."  Mot. 27.  Even assuming that this lone positive development was accurate, it seems
far-fetched that a 9 percent price increase could compensate for the 95 percent loss in volume
due to transportation constraints.  Compl. ¶ 2.  And, it seems far-fetched that Rio Tinto's use of
acquisition value was – as Defendants contend – the best indication of its price, when RTCM had
no plan to transport 95 percent of the coal it planned to sell annually at the time of acquisition
Mot. 6, 24.

Defendants' final factual argument in support of RTCM's $3 billion valuation is to assert
that "investors were well aware" of Rio Tinto's infrastructure problems based on "boilerplate"
risk disclosures contained in Rio Tinto's 2011 Annual Report and a single news article that
referenced the government's decision to reject barging.  Mot. 25, 31.[9]  Ironically, Rio Tinto did
not confirm the report; rather it "declined to comment" on the article.  Conn Decl. 12 at 3.  Thus,
taking Defendants' arguments to their logical conclusion, as long as one newspaper publishes an
article about an adverse development and an issuer includes boilerplate caveats in their annual
report, that issuer can value its assets as high as it wants.[10]  Such an absurd result would be

---

[9]     Rio Tinto's reference to documents not in the record—*Mozambique Rejects Coal
Barging Study: Minister*, Reuters (March 1, 2012).  Conn Decl. 12—should be ignored as
beyond the four corners of the Complaint.   *Smith v. Miller*, No. 15-CV-9561 (NSR), 2017 WL
4838322, at *5 (S.D.N.Y. Oct. 23, 2017) ("Courts typically 'may not look beyond the four
corners of the complaint in considering a motion to dismiss.'").  Additionally, Rio Tinto's
attempt to argue about the weight of alleged facts must also fail because the Court's charge on a
motion to dismiss "is merely to assess the legal feasibility of the complaint, not to assay the
weight of the evidence which might be offered in support thereof."  *Nieto v. Village Red
Restaurant Corp.*, No. 17 Civ. 2037 (JCF), 2017 WL 4539327, at *2 (S.D.N.Y. Oct. 10, 2017).

[10]    Defendants also reference two pre-acquisition articles: *Rio Tinto in talks on $3.5 billion
bid for Riversdale*, Reuters (December 5, 2010) and *Riversdale Hails New Rio Tinto Bid
Riversdale Hails New Rio Tinto Bid*, Wall Street Journal (December 23, 2010).  For the same

contrary to the purpose of the federal securities laws. *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 477 (1977) ("'fundamental' purpose of the securities laws is 'to substitute a philosophy of full disclosure for the philosophy of caveat emptor.'"); *see also Litwin v. Blackstone Group, L.P.*, 634 F.3d 706, 718-19 (2d Cir. 2011) (noting that "case law does not support the sweeping proposition that an issuer of securities is never required to disclose publicly available information" and that, even if some information is public, issuer may have to disclose "whether, and to what extent, the particular known trend, event, or uncertainty might have been reasonably expected to materially affect [defendant's] investments").

Moreover, neither the March 1, 2012 newspaper article nor Rio Tinto's 2011 Annual Report disclosed that the government of Mozambique had threatened to pull Rio Tinto's mining license if it continued to press for barging, Compl. ¶ 77, or that Rio Tinto had never reapplied for a barging permit. In other words, there was no way for shareholders to divine from publicly available information that Rio Tinto was no longer even pursuing the cheapest transportation method available. Nor was there any way for shareholders to divine that Rio Tinto did not have the money to fund the only other purportedly viable transportation option–a new railroad–an option that was so expensive it resulted in a negative valuation. Compl. ¶ 119. In this context, Defendants statements valuing RTCM at $3 billion, discussing its upside, and referencing the variety of purportedly available transportation options were false.

---

reasons as set forth at n.9, these articles should be rejected by the Court. In any event, both articles predate the litany of negative developments that became known to Defendants after the Riversdale acquisition closed. (Similar to the March 1, 2012 Reuter's article, Rio Tinto also "declined to comment" in the Wall Street Journal article.) It is unreasonable to suggest that these two articles, concerning Rio Tinto's purchase bid for Riversdale, serve as a substitute for Defendants' obligation of "full disclosure."

## 2.  Defendants' Legal Analysis is Flawed

Relying heavily on the Supreme Court's decision in *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 135 S.Ct. 1318, 1329 (2015),[11] Defendants endeavor to shield themselves from liability for these false statements by simply claiming that their misstatements were opinions and therefore only actionable in three circumstances: (1) "if the speaker did not hold the belief she professed," (2) "if the supporting fact she supplied were untrue," or (3) "if the speaker omits information whose omission makes the statement misleading to a reasonable investor."  Mot. 24-26. Defendants then simply assume that the Commission has not pled either of the first two circumstances.  Mot. 26.

Defendants' assumption ignores the well-established principle that a Court must "draw all reasonable inferences in the nonmovant's favor" at the motion to dismiss phase. *CFTC v. Wilson*, 27 F. Supp. 3d 517, 531 (S.D.N.Y. 2014).  The Complaint alleges that Albanese and Elliott continued to promote RTCM after learning at the Brisbane Meeting that the best available information indicated a negative $680 million valuation, Compl. ¶ 119, and continued to promote transportation options that had either been rejected without recourse (barging) or rejected due to lack of funds (new rail).  Compl. ¶¶ 77, 120, 134, 136, 141, 155, 162.  A factfinder could easily infer from these allegations that neither Albanese nor Elliott held the beliefs they professed thus giving rise to liability under the first category of *Omnicare* statements.  *Omnicare*, 135 S. Ct. at 1329; *see also Federal Housing Finance Agency v. Nomura*

---

[11]     Defendants simply assume that *Omnicare* applies to Section 10(b) and 17(a) claims, even though the case addressed Section 11 of the Securities Act. "The Second Circuit has not directly held that *Omnicare* applies to Section 10(b), Rule 10b–5 or Section 17(a) claims." *SEC v. Thompson*, No. 14-CV-9126 (KBF), 238 F.Supp.3d 575, 601 n.13, 2017 WL 874973, at *17 n.13 (S.D.N.Y. Mar. 2, 2017). However, it "is unnecessary to address the precise reach of *Omnicare* because its application would not affect the outcome of this case." *Fresno County Employees' Retirement Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 549 (S.D.N.Y. 2017).

*Holding America, Inc.*, 104 F. Supp. 3d 441, 566 (S.D.N.Y. 2015) (Defendant found liable when "statements of belief implied that defendants knew 'facts sufficient to justify' forming the opinion they expressed…. [and] defendants were aware of information contradicting the representations in the Supplements…."); *SEC v. RPM Int'l., Inc.*, No. 16-1803, 2017 WL 4358693, at *19 (D.D.C. Sept. 29, 2017) ("The facts alleged in the complaint about what was known to Moore and RPM but omitted from the filings would render the statements misleading to a reasonable reader.").

Regardless, Defendants' misleading statements easily fit into the third category of statements that are actionable under *Omnicare*. Defendants omitted all of the negative developments at RTCM that would have placed their continued $3 billion valuation in context such that shareholders could have understood that this valuation had gone from being "prospective" or "provisional" to *extremely* unlikely. Defendants did not make any meaningful disclosure about the acute difficulties alleged in the Complaint in the 2011 Annual Report or elsewhere. Compl. ¶ 69. To the contrary, known material facts, such as barging constraints, were glaringly absent from the 2011 Annual Report and misleading information about RTCM was purposely injected into the marketplace by Defendants. Compl. ¶¶ 113-115.

"[A reasonable investor] expects not just that the issuer believes the opinion (however irrationally), but that it fairly aligns with the information in the issuer's possession at the time." *Id.* at 1329. Here, Defendants claim that that their "[s]tatements about RTCM's valuation plainly had a reasonable basis" strains credulity given the many negative facts Defendants knew but kept to themselves. Mot. 27. As noted by the Supreme Court in *Omnicare*:

> An issuer must as well desist from misleading investors by saying one thing and holding back another. Omnicare would nullify that statutory requirement for all sentences starting with the phrases "we believe" or "we think." But those magic words can preface nearly any conclusion, and the resulting statements, as we have shown, remain

perfectly capable of misleading investors. Thus, Omnicare's view would punch a hole in the statute for half-truths in the form of opinion statements. And the difficulty of showing that such statements are literally false—which requires proving an issuer did not believe them—would make that opening yet more consequential: Were Omnicare right, companies would have virtual *carte blanche* to assert opinions in registration statements free from worry about § 11.

135 S. Ct. at 1331 (citations omitted). Accordingly, it would be inappropriate to dismiss the Commission's complaint at this stage because there are abundant misleading and omitted facts that would be "viewed by the reasonable investor as having significantly altered the total mix of information made available." *Basic Inc. v. Levinson.*, 485 U.S. 224, 231-32 (1988).[12]

### C.   The Complaint Adequately Alleges That Albanese and Elliott "Made" Fraudulent Statements

Albanese and Elliott assert that they cannot be liable under the Supreme Court's decision in *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135 (2011), because they did not "make" the majority of the misstatements alleged in the Complaint. Mot. § II. B.

Rule 10b-5(b) prohibits "mak[ing] any untrue statement of a material fact." 17 C.F.R. § 240.10b-5(b). In *Janus First Cap. Group, Inc. v. First Derivative Traders*, 564 U.S. 135, the Supreme Court held that, to "make" a statement under Rule 10b-5(b), a person must have "ultimate authority" or "control" over the statement. *Id.* at 142. Albanese and Elliott argue,

---

[12]      The Complaint is replete with specific allegations concerning the manipulation of the company's impairment process by Albanese and Elliott. There are also allegations that Defendants knew that their public statements omitted or misrepresented facts and were not simply good faith opinions. Accordingly, the facts here are distinguishable from those in the cases relied upon by Defendants in which the plaintiff did not plead with similar precision. *See, e.g., Fait v. Regions Fin. Corp,* 655 F.3d 105 (2d Cir. 2011) ("Because the complaint does not plausibly allege subjective falsity, it fails to state a claim."); *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 619 (9th Cir. 2017) ("Without identifying what negative factors and assumptions Defendants already incorporated into their goodwill valuations, Plaintiff cannot demonstrate that Defendants were aware of additional 'facts and circumstances' that would have indicated that 'the fair value of the [SCCS division] may be less than [its] carrying amount.'"); *City of Austin Police Ret. Sys. v. Kinross Gold Corp.*, 957 F. Supp. 2d 277, 299 (S.D.N.Y. 2013) ("Other than simply alleging that Burt's 'homework' statement was false, Austin has failed to point to evidence showing that it was actually false, or that Kinross knew or had reason to know it was false.").

Mot. 31-35, that they cannot be liable as a matter of law "under Section 10(b) for statements they did not make," but that argument fails for several reasons.

### 1. *Janus* Only Applies to Claims Under Rule 10b-5(b)

At the outset, while Defendants assert that "most Section 10(b) claims" against Albanese and Elliott should be dismissed pursuant to *Janus*. Mot. 31. That decision applies only to misstatement claims under Rule 10b-5(b), not to any claims brought pursuant to Rules 10b-5(a) or (c) or Sections 17(a)(1) or (3). That is because, unlike Rule 10b-5(b), "Rules 10b-5(a) and (c), along with Sections 10(b) and 17(a)(1)" and (a)(3) "do not speak in terms of an individual's 'making' a false statement." *Lorenzo*, 872 F.3d at 589; *see id.* ("Indeed, '[t]o make any . . . statement" was the critical language construed in *Janus*: what the Court described as the 'phrase at issue.' That language appears in Rule 10b-5(b), but not in the other" antifraud provisions. (citation omitted)).[13]   Any effort to extend *Janus* beyond the provision at issue in that case does not withstand scrutiny.

### 2. Defendants "Made" Statements They Signed, Which Were Incorporated into Later Statements

Nor do Albanese and Elliott offer any reason why any Rule 10b-5(b) claims should be dismissed. They acknowledge signing and certifying the 2011 Annual Report. *See* Mot. 12, 31. They likewise certified Rio Tinto's Form 20-F filed with the Commission in March 2012. Compl. ¶¶ 96-100, 210, 214. They thus "made" any misstatements in those documents.

---

[13]   *See also Pentagon Capital Mgmt.*, 725 F.3d at 287 ("[S]ubsection (b) . . . was the only subsection at issue in *Janus*."); *SEC v. Big Apple Consulting USA, Inc.*, 783 F.3d 786, 797 (11th Cir. 2015) (*Janus*'s holding "does not apply" beyond Rule 10b-5(b) because its reasoning is based on the text of that subsection); *Monterosso*, 756 F.3d at 1334 ("*Janus* only discussed what it means to 'make' a statement for purposes of Rule 10b-5(b), and did not concern–Section 17(a)(1) or (3) or Rule 10b-5(a) or (c).").

Their effort to avoid liability as to other alleged misstatements fares no better. Albanese and Elliott assert that the Complaint does not allege that they "'made' any statements in the bond offering documents." Mot. 33. As Defendants concede, however, the Complaint alleges that the March and August 2012 bond offering documents incorporate by reference the 2011 Annual Report Albanese and Elliott signed and certified. Mot. 32 and 12 n.5 ("Rio Tinto incorporated the 2011 Annual Report into both its Form 20-F filed with the SEC on March 15, 2012, and offering documents for a March 2012 bond offering on the New York Stock Exchange."). "Incorporation by reference" is "[a] method of making a secondary document part of a primary document by including in the primary document a statement that the secondary document should be treated *as if it were contained within the primary one*." *Black's Law Dictionary* (10th ed. 2014) (emphasis added); *see, e.g.*, *Artistic Entm't, Inc. v. City of Warner Robins*, 331 F.3d 1196, 1206 (11th Cir. 2003) ("[T]he effect of an incorporation by reference is the same as if the referenced material were set out verbatim in the referencing statute."). In other words, any false statement in the 2011 Annual Report is also a false statement in a document that incorporates that document by reference. Because Albanese and Elliott had "ultimate authority" over the 2011 Annual Report, they continued to be "makers" of the misstatements contained therein when those misstatements were later incorporated into other company documents. Contrary to Defendants' suggestion, Mot. 34-35, nothing in *Janus* casts doubt on the black-letter law that documents incorporated by reference should be treated as if they were repeated verbatim. *See In re Fannie Mae 2008 Sec. Litig.*, 891 F. Supp. 2d 458, 483 (S.D.N.Y. 2012), aff'd, 525 F. App'x 16 (2d Cir. 2013) (analyzing for purposes of *Janus* which entity "had ultimate authority over statements made in its SEC filings incorporated by reference in the offering materials").

27

Defendants also assert that "[u]nder the SEC's theory, individuals who sign documents incorporated by reference into subsequent SEC filings could be liable as 'makers' of the entire subsequent filing." Mot. 34. Not so. Rather, the false statements by these Defendants in the bond offerings *were* the misstatements in the 2011 Annual Report, which were incorporated by reference. The Complaint does not allege that Albanese and Elliott were makers of statements in the bond offerings apart from the misstatements in the 2011 Annual Report.

### 3. The Complaint Alleges Facts Sufficient to Infer That Defendants Had Control Over Further Dissemination of the Annual Report, A Fact-Bound Question

To the extent Albanese and Elliott contend that, although they had "ultimate authority" over the 2011 Annual Report, they did not "control"—or could not foresee—how it was later disseminated, that argument is hollow. On March 16, 2012, Rio Tinto filed a Post-Effective Amendment to Rio Tinto's Form F-3 Registration Statement ("Amendment") that both Albanese and Elliott signed. Miller Decl. 3. The Amendment: (1) was part of the Registration Statement that was used to offer the bonds at issue to the public; (2) included the base prospectus used to offer such bonds; and (3) added Rio Tinto Finance (USA) to the Registration Statement so that it could offer such bonds. Miller Decl. 3 at Explanatory Note. The Amendment makes clear the importance—and the anticipated use—of the 2011 Annual Report on Form 20-F:

- "The SEC allows us and Rio Tinto to incorporate by reference the information that we and Rio Tinto file with them, which means that … incorporated documents are considered part of this prospectus; we can disclose important information to you by referring to those documents." (Amendment at 3).

- "The information that we incorporate by reference is an important part of this prospectus." (*Id.*).

- The documents incorporated by reference herein … contain important information about us and our financial condition: Annual Report on Form 20-F of Rio Tinto plc and Rio Tinto Limited for the year ended December 31, 2011 filed with the SEC on March 16, 2012. (*Id.*).

28

Rio Tinto's incorporation of the most recent Annual Report into the Amendment was in fact a *required* part of the bond offering at issue, as the instructions to Form F-3 make clear the prospectus must include a "registrant's latest Form 20-F … [which] *shall be incorporated by reference*." Miller Decl. 4 at 11 (emphasis added). Clearly, having signed the document (the Amendment) that specifically incorporated by reference the 2011 Annual Report at issue, Albanese and Elliott controlled the information in the 2011 Annual Report and understood not only how it could be used, but how in fact how it *was being used* in the offering at issue.

The Complaint thus adequately alleges that Albanese and Elliott made the statements at issue, though they are free to assert otherwise at a later stage, on a fully developed record. "Whether a defendant is the 'maker' of the misstatement may depend on inferential or circumstantial evidence" and is an inherently factual inquiry best resolved by a jury. *SEC v. Norstra Energy Inc.*, 202 F. Supp. 3d 391, 395-396 (S.D.N.Y. 2016). Indeed, the Second Circuit has warned against deciding *Janus* issues even at the summary-judgment stage. *See In re Pfizer Inc. Securities Litigation*, 819 F.3d 642, 657-58 (2d Cir. 2016) ("[T]he district court erred in determining that, as a matter of law, Pfizer lacked sufficient authority over the eight allegedly fraudulent statements . . . such that Pfizer could not have 'made' the statements for the purposes of Rule 10b-5."). At this stage, it would be premature to dismiss a claim based on a purported lack of control the CEO and CFO exerted over a fraudulent document's further dissemination—particularly when there is no dispute that the CEO and CFO had ultimate authority over the misstatements incorporated by reference and in fact signed an offering document (the Amendment) that specifically incorporated the Annual Report, with its misleading statements.

### 4. The Complaint Adequately Alleges That Elliott Made Misleading Oral Statements to Investors

Additionally, although Albanese does not dispute that he "made" statements to investors in August and October 2012, there is a factual dispute regarding the extent of Elliott's authority or control over alleged misstatements made at those investor conferences. Mot. 35-36. If Elliott is arguing that he cannot be liable as a matter of law for representations made by Albanese that is incorrect. *See, e.g.*, *Moon Joo Yu v. Premiere Power LLC*, No. 14-7588, 2018 WL 456244, at *10 (S.D.N.Y. Jan. 17, 2018) ("[C]ourts have consistently found that multiple persons can be considered to have made a statement."). Moreover, as the Complaint alleges—and as Elliott does not dispute—he "participated in the August 8, 2012 session." Compl. ¶ 148. The extent of his participation (and, analogously, the extent of his authority or control over the misstatements made during the session) is a question of fact for the jury, even if Albanese was "responsible for the act of communication." *SEC v. Pentagon Capital Mgmt. PLC*, 725 F.3d 279, 286-87 (2d Cir. 2013).

Defendants further maintain that Elliott did not discuss RTCM at the October 2012 investor conference, "let alone characterize its prospects." Mot. 16, 20, 32, 35. For support, they point to the transcript of that conference, a document they supplied to the Court. *See* Conn Decl. 18. The Defendants, however, overlook the slide deck that accompanied the presentation, a document they did not supply to the Court. Miller Decl. 5. Slide 15 indicates the point at which Elliott began his presentation. Slide 21, which corresponds to Elliott's comments on page 7 of the transcript, is titled, "Shaping the portfolio in line with our strategy," and it lists "Significant acquisitions and divestments since 2011." Among the "significant acquisitions," the slide names RTCM, which it characterizes as follows: "*Highly prospective, tier one coking coal resource with first production mid-2012 and objective of 25 Mtpa high quality coking coal by 2020.*" This

is the statement the Commission attributed to Elliott in the Complaint. Compl. ¶ 161. In short, while Elliott read certain comments aloud at the conference, the accompanying slide to his presentation misleadingly touted RTCM, as the Commission properly and accurately alleged.

Because Albanese's and Elliott's contentions all rely on either a misunderstanding of *Janus* or contested factual issues, their motion should be denied.[14]

### D.   The Complaint Adequately Alleges Facts Giving Rise To An Inference of Defendants' *Scienter*

Defendants argue that the Complaint fails to satisfy Rule 9(b)'s requirement that the plaintiff allege facts giving rise to a "strong inference" of scienter. Mot. § II. D. However, scienter may be alleged generally. *See* Fed. R. Civ. P. 9(b) ("Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."). The SEC need only allege facts to show that a defendant had both motive and opportunity to commit fraud, or facts indicating conscious misbehavior or recklessness. *See SEC v. Egan*, 994 F. Supp. 2d 558, 564-65 (S.D.N.Y. 2014). "Examples of recklessness include plausible allegations that the defendants knew or had access to information suggesting that their public statements were not accurate or failed to check information they had a duty to monitor." *Bank of America Corp. Securities, Derivative, and Employee Retirement Income Security Act Litig.*, 2011 WL 3211472, at *4 (S.D.N.Y. July 29, 2011) (internal quotations omitted); *see also Heller v. Goldin Restructuring Fund,* 590 F. Supp. 2d 603, 619 (S.D.N.Y. 2008).

The Complaint amply satisfies this standard. It is replete with specific allegations that Albanese and Elliott knew or had access to information suggesting that their public statements

---

[14]   The Commission agrees with Defendants that Albanese and Elliott did not make any statements in the 2012 Half-Year Report and, instead, alleges that they aided and abetted Rio Tinto's violations with respect to that report. The Complaint does not allege otherwise and no claims should be dismissed on that basis. Compl. ¶¶ 177-180.

about RTCM were inaccurate, and that they were motivated to keep bad news about RTCM under wraps. *See, e.g.*, Compl. ¶¶ 73-74 (Albanese learned of and expressed "major disappointment" in constraints in infrastructure capacity at RTCM); 76-77 (Albanese and Elliott learned that the Government of Mozambique rejected RTCM's barging proposal on environmental grounds); 84-86 (Albanese and Elliott learned of and discussed that reserve and resource estimates for RTCM were "worse by far than expected"); 116-121 (Elliott convened an "all hands" meeting at which he and Albanese learned that, based on the best information available to Rio Tinto, RTCM had no economic value); 152 (Elliott participated in a phone call in which senior Rio Tinto executives reported that RTCM had little or no economic value); 157-58 (Elliott failed to disclose any of the negative information regarding RTCM's valuation at the November 26, 2012 Audit Committee meeting contrary to his promise to the T&I executive).

The Complaint alleges that, after approving the acquisition of RTCM in the face of significant risks and uncertainties, Albanese and Elliott sought, received, and understood numerous credible reports from Rio Tinto's senior management that RTCM was not the asset they had hoped to acquire: in stark contrast to the Defendants' repeated public statements; Albanese and Elliott are alleged to have known that RTCM had less and lower quality coal resources' fewer and more expensive infrastructure options; and when all of the negative developments were factored in, a *negative* valuation. These allegations suffice to establish strong circumstantial evidence that "defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation . . . [or] failed to review or check information that they had a duty to monitor." *Novak v. Kasaks,* 216 F.3d 300, 308 (2d Cir. 2000).

The allegations are also sufficient to plead that Albanese and Elliott had both motive and

opportunity to engage in fraudulent misconduct. The Complaint alleges that Albanese and Elliott approved the RTCM acquisition in the face of known risks, and understood that "further impairments on the heels of Alcan would reflect a 'pattern of evaluation failure or performance failure.'" Compl. ¶¶ 42-47; 52-60. The Complaint thus specifically alleges that Albanese and Elliott knew they were on the hook for RTCM's failure, and were motivated to suppress bad news about the new acquisition.

### 1.  Defendants' Arguments Do Not Address the SEC's Allegations

Rather than confront the detailed allegations head-on, Defendants erect a strawman. They argue that the SEC's allegations concern only the *timing* of the RTCM impairment, and they rely principally on two decisions—*Int'l Ass'n of Heat & Frost Insulators & Asbestos Workers Local #6 Pension Fund v. IBM Corp.*, 205 F. Supp. 3d 527 (S.D.N.Y. 2016) and *Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce*, 694 F. Supp. 2d 287 (S.D.N.Y. 2010)—for the proposition that, in such cases, the SEC must allege that the "failure to take an impairment charge earlier was an error so grievous that it exceeded differences over accounting principles and rose to the level of fraud." Mot. 40-41 (Albanese) and 44-45 (Elliott).

But those and related cases are plainly inapposite. In both *Int'l Ass'n of Heat & Frost Insulators* and *Plumbers & Steamfitters*, the court found that the allegations came up short because they did not specifically identify any reports or statements in which defendants were put on notice of information that contradicted their alleged misrepresentations or omissions. *See Int'l Ass'n of Heat & Frost Insulators*, 205 F. Supp. 3d at 536; *Plumbers & Steamfitter*, 694 F. Supp. 2d at 299-300. Both cases are readily distinguishable from matters in which—as here— the defendants are alleged to have had access to credible information that contradicted their

public assertions. *See Freudenberg v. E*Trade Financial Corp.*, 712 F. Supp. 2d 171, 191-92 (S.D.N.Y. 2010) ("[t]he cases which Defendants tout are inapposite in that they fail to compare false or misleading statements with contemporaneous information").

Defendants also attempt to lump the allegations in the Complaint in with a line of cases holding motives generally possessed by most corporate directors and officers do not suffice to plead securities fraud. Mot. 39 citing, *e.g.*, *Kuriakose v. Fed. Home Loan Mortg. Corp.*, 897 F. Supp. 2d 168 (S.D.N.Y. 2012). But the Complaint does not allege that Albanese and Elliott held motives *generally* possessed by corporate directors and officers. It alleges that they had a *specific* motive to kick the RTCM can down the road grounded in their direct connection to the failed Alcan transaction and their approval of the RTCM acquisition despite personal knowledge of its significant risks. Such motives—far from being "generalized"—are sufficient for purposes of alleging scienter. *See, e.g.*, *In re Take-Two Interactive Securities Litigation*, 551 F. Supp. 2d 247, 295 (S.D.N.Y. 2008) (distinguishing motive to conceal prior misconduct from generalized desire common to most high-level corporate employees).

### 2. Defendants Fail in Their Attempt to Minimize the Significance of RTCM

The Defendants also attempt to skirt liability by pointing to Albanese's "[w]ide-ranging responsibilities" in a "massive and complex organization" as evidence that Albanese "had or chose to ignore information at the level of specificity described in the Complaint." Mot. 41-42. Defendants further contend that, given Elliott's role as CFO, he was detached from "knowledge of events on the ground" at RTCM. Mot. 44. Such arguments are unavailing. As discussed above, the Complaint does not merely presume that Albanese and Elliott *must have known* about the cataclysmic challenges facing RTCM given their roles within the organization. The Complaint instead specifically alleges that Albanese and Elliott repeatedly sought, received, and

understood detailed information indicating that their public statements were false and misleading. Moreover, as alleged in the Complaint, RTCM was a major acquisition for Rio Tinto, serving as a high-profile pivot from the Alcan debacle. Compl ¶ 63. Both Albanese and Elliott were deeply involved in the acquisition, and in 2011 and 2012, they actively monitored developments in the newly-acquired business. Accordingly, Defendants cannot validly contend that they were either too important or too busy to have formed a reasonable understanding of critical developments related to RTCM. *See, e.g.*, *In re Complete Mgmt. Inc. Sec. Litig.*, 153 F. Supp. 2d 314, 325-26 (S.D.N.Y. 2001) (citing *Angres v. Smallworldwide PLC*, 94 F. Supp. 2d 1167, 1175-76 (D. Colo.) for the proposition that "strong inference [existed] that defendants/officers had conscious knowledge of misrepresentations and omissions concerning [the] financial impact and success of integration with [an] acquired company due to their high level executive positions and the significance and importance of the acquisition.")

### 3. Albanese Fails in His Attempt to "Defeat the Inference" That He Acted With Scienter

Albanese lists six purported facts, conditions, or circumstances that, according to the Motion, "defeat the inference that [Albanese] acted with scienter or recklessness." They do no such thing.

- First, Albanese contends that Rio Tinto was such a complex organization that neither he nor anyone in his position could "control the details of each operation." The Complaint does not allege that he *controlled the details* of anything—it alleges, among other things, that he *knew or was reckless in not knowing* that his public statements about RTCM were false and misleading. His relative "control" or lack thereof is irrelevant.

- Second, Albanese contends that "responsibility for valuation and impairment

expressly lay with others in the company."  Albanese's contention is beside the point. Albanese is alleged to have made and certified statements that he knew or was reckless in not knowing were false and misleading.  He is alleged to have been personally and directly warned on multiple occasions by senior managers in Rio Tinto of the nature of the challenges facing RTCM and that, based on the best information available to the company, RTCM had a *negative* valuation.  Thus, Albanese cannot validly claim merely to have relied on Rio Tinto's valuation process.

- Third, Albanese contends that Rio Tinto took other impairments, including much larger impairments on other assets.  But as alleged in the Complaint, these "much larger impairments"—which related to the Alcan acquisition championed by Albanese—are precisely the impairments that boxed Albanese in with respect to RTCM.

- Fourth, Albanese contends that he received no bonus in 2011, 2012, or 2013, essentially arguing that he had no financial motive.  However, the fact that Albanese ultimately did not receive a bonus does not mean that he did not want one.  The Complaint alleges that Albanese and Elliott did not receive bonuses in fiscal year 2011 because of the Alcan impairment.  Compl. ¶ 46.  A reasonable factfinder could infer that Albanese was motivated not to impair RTCM because he did not want to lose his bonus again.

- Fifth, Albanese contends that RTCM was "essentially impossible accurately to value" and that assessments "varied by as much as $5 billion."  This argument is problematic in a least two respects.  The Complaint alleges that, based on the best information available to Rio Tinto and known to Albanese, RTCM had a *negative* valuation.

Accordingly, that valuations "varied" widely is of no significance—the best information indicated that RTCM was functionally worthless. In addition, Albanese's contention is, in effect, an admission that RTCM's carrying value of more than $3 billion was misstated. If RTCM was "essentially impossible accurately to value accurately" due to "constantly changing circumstances," Rio Tinto's carrying value for RTCM by extension had no reasonable basis in fact. Defendants cannot have it both ways.

- Sixth, Albanese contends that Rio Tinto's independent auditors must not have been "hoodwinked" because they have never "withdrawn or restated any relevant opinions." This contention is logically unsound. First, there is no allegation in the Complaint that Rio Tinto's independent auditors became aware of the facts or circumstances that rendered Rio Tinto's 2011 financial statements materially misleading. The independent auditors are alleged to have learned that RTCM's carrying value exceeded its carrying amount as of late 2012 or early 2013, but they are not alleged to have learned that the carrying value had in fact been inflated since 2011. Second, the filing of the Complaint in October 2017 may have finally put Rio Tinto's independent auditors on notice of potential deficiencies in Rio Tinto's 2011 financial statements, but their failure since October 2017 to withdraw a five-year-old audit, by definition, cannot have any bearing on the adequacy of the allegations in the Complaint. The withdrawal of financial statements is not required before an accounting fraud can be alleged. In any event, the basis of the independent auditors' decision not to withdraw the 2011 audit is a question of fact that is not appropriate to be resolved at this stage.

37

#### 4.   Elliott Fails in His Attempt to Defeat the Inference of Scienter

For his part, Elliott claims that the Complaint lists only a "handful of touch points to suggest that [he] had any knowledge of falsity or intent to commit fraud," and asserts that "none of them survives scrutiny." However, the "touch points" listed by Elliott are a mere sampling of the detailed allegations set out in the Complaint. Among other things, Elliott's "touch points" flatly ignore allegations about the May 2012 meeting—which he is alleged to have convened and at which he learned of the negative valuation.

#### 5.   Albanese's and Elliott's Scienter is Imputed to Rio Tinto

The scienter of company officers and management-level employees can be imputed to the company. *See, e.g., SEC v. Treadway*, 430 F. Supp. 2d 293, 337 (S.D.N.Y. 2006) ("It is settled that the scienter of executives can be imputed to corporate entities.").

### E.   The Complaint Adequately Alleges That Defendants' Misconduct Was Material

Materiality is a "fact-specific inquiry" that "depends on the significance the reasonable investor would place on the withheld or misrepresented information" and, as such, is an issue to be decided by the fact finder. *Basic Inc. v. Levinson*, 485 U.S. 224, 240 (1988). "On a motion to dismiss, a complaint may not be properly dismissed unless the misstatements are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *IBEW Local Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scot. Grp., PLC*, 783 F.3d 383, 390 (2d Cir. 2015).

In assessing materiality, both quantitative and qualitative factors should be considered in an "integrative manner." *Litwin v. Blackstone Group, L.P.*, 634 F.3d 707, 717 (2d Cir. 2011). From a qualitative perspective, Rio Tinto claimed RTCM would "'re-instill[] [its] reputation in the market for M&A'" after the Alcan debacle." Compl ¶ 63. And in meetings with credit rating

agencies in early 2011, "Rio Tinto described its acquisition of Riversdale as evidence of prudent capital management." Compl. ¶ 106. Indeed, the RTCM impairment was so qualitatively significant that Rio Tinto's Chairman "had no choice but to ask the board to dismiss [Albanese]." Compl. ¶ 168. The company announced Albanese was stepping down as CEO in the same press release that announced the impairment. Compl. ¶¶ 168-69. The same Rio Tinto press release described a write-down of this scale so soon after acquisition as "unacceptable." Compl. ¶ 169. And one of Rio Tinto's largest investors described the entire episode as evidence that "Rio Tinto management had been 'reckless and profligate' with shareholder capital." Compl. ¶ 171.

In contesting whether their misconduct was legally material, Defendants point to the lack of a negative market reaction to argue that their conduct was immaterial. Mot. 37. But "market reaction alone is 'too blunt an instrument to be depended on to determine whether a single omission is material … especially where disclosure contains many revelations." *In re Ply Gem Holdings, Inc. Securities Litig.,* 2016 WL 5339541, at *4 (SDNY 2016).

Defendants also seek to paint RTCM as a "relatively minor asset on Rio Tinto's balance sheet" and argue that its cratering value was "presumptively immaterial." Mot. 36. Defendants' assertion that materiality is lacking as a matter of law, however, both misapplies the relevant precedent and improperly glosses over the specific and detailed allegations in the Complaint. Unlike the plaintiff in *IBEW* (upon which Defendants rely), the Complaint pleads in great detail the who, what, when, where, and why of Defendants' fraud. *See IBEW*, 783 F.3d at 391 ("The [amended complaint] does not explain how the Court can determine whether the 'Total U.S. sub-prime exposures,' a subset of global CDOs, is the same subset comprised of Super Senior CDOs, other CDOs, and subprime U.S. RMBS. Without any factual allegations supporting the proposition that the two are the same, plaintiffs fail to adequately plead fraud.").

Rio Tinto's misrepresentations and omissions were in fact quantitatively material. As alleged in the Complaint, "[h]ad Rio Tinto properly impaired RTCM, Rio Tinto's net earnings would have been reduced by more than 50 percent at the half-year 2012." Compl. ¶ 139. Moreover, RTCM's carrying value in 2012 represented 40 percent of the total assets held by RTE, one of Rio Tinto's five major product groups, and RTCM's carrying value also represented close to 70 percent of its underlying earnings—the "key financial performance indicator used by [Rio Tinto] management [] internally to assess performance"—at the half-year 2012. Miller Decl. 6 at 1, 10 (reporting underlying earnings of $5.1 billion and $8.8 billion of assets held by RTE against a $3.4 billion carrying value for RTCM). *See also* Conn. Decl. 3, containing excerpts of the full content of Rio Tinto's financials for half-year 2012.

The *halving* of Rio Tinto's earnings is *not* a fact "so obviously unimportant" that reasonable minds could not differ on the question of its importance. To the contrary, this allegation alone supports an inference of materiality that is sufficient to defeat a motion to dismiss. *See Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 166 (2d Cir. 2000) ("it is inappropriate to determine at this stage of the litigation that these substantial amounts [ranging from 8% to 17.7% of net income], both in absolute terms and as percentages of total net income for the respective quarters, were immaterial as a matter of law."); *see also Litwin v. Blackstone Group, L.P.*, 634 F.3d 706, 719 (2d Cir. 2011) (holding that allegations concerning a failure to disclose the impact of known events adequately pled materiality); *Fresno County Employees' Retirement Ass'n*, 268 F. Supp. 3d at 549 (rejecting CFO's motion to dismiss in part because his misstatements concerning the company's non-monetary revenue "enabled him to give more robust (and false) guidance about [its] financial health.").

40

In sum, there is no factual or legal support for Defendants' argument that a $3 billion impairment was immaterial.

### F. The Complaint Adequately Alleges That Defendants Obtained Money or Property in Violation of Section 17(a)(2) Of the Securities Act

Albanese and Elliott seek dismissal of the Commission's Section 17(a)(2) claim on the ground that neither of them obtained money or property as required for liability under that section. Mot. § II. F. Their argument is flawed in two respects. First, Albanese and Elliott argue that the statute requires that they personally obtained money or property. Section 17(a)(2)'s "obtain money or property" element, however, can be satisfied by the more than $5 billion that their employer raised in bond offerings, which incorporated Albanese and Elliott's misleading statements and omissions. Indeed, the purpose of Section 17(a)(2) is to prohibit fraud in which money or property is obtained by means of a material misrepresentation. This prohibition turns on the individual's *misconduct* in using misrepresentations to procure money— it makes little difference to investors whether the funds procured were kept by the person making the misrepresentation or the person's employer. *See SEC v. StratoComm Corp.*, 2 F. Supp. 3d 240, 263 (N.D.N.Y. 2014), *aff'd*, 652 F. App'x. 35 (2d Cir. 2016) (summary order) (Section 17(a)(2) claim supported where defendant obtained money or property for employer); *SEC v. Mudd*, 885 F. Supp. 2d 654, 669-70 (same); *SEC v. Stoker*, 865 F. Supp. 2d 457, 463 (S.D.N.Y. 2012) (same); *but see SEC v. Syron*, 934 F. Supp. 2d 609, 640 (S.D.N.Y. 2013).[15] Here, the

---

[15] There is a split of authority between the *Stoker* and *Syron* lines of cases as to whether Section 17(a)(2) is violated by an employee obtaining money or property for his employer, or whether the employee must personally obtain money or property. The SEC submits that the *Stoker* analysis is more consistent with the text and remedial purpose of the statute. *See Stoker*, 865 F. Supp. 2d at 463. In any event, the Complaint here states a Section 17(a)(2) claim under either interpretation of the statute because Albanese and Elliott personally obtained money in the form of their respective salaries.

misconduct engaged in by Albanese and Elliott allowed Rio Tinto to raise billions of dollars and is precisely the type of behavior that Section 17(a)(2) was designed to prohibit.

Second, Albanese and Elliott incorrectly argue that Section 17(a)(2) "requires that an individual defendant's compensation in some way be 'affected' in some way by the alleged fraud…." Mot. 48. This purported requirement, however, is not found anywhere in the text of the statute. "Section 17(a)(2) does not require the SEC to show that a [defendant] received some sort of additional 'fraud bonus' on top of his base salary in order to establish liability." *SEC v. Tourre*, No. 10-cv-3229 (KBF), 2014 WL 61864, at *4 (S.D.N.Y. Jan. 7, 2014). Rather, receiving "money or property" in the form of salary is sufficient under the plain text of the statute. Albanese's and Elliott's compensation from Rio Tinto satisfies that standard.

Albanese and Elliott argue, nonetheless, that the reasoning in *Tourre* is not applicable because it was in a different procedural posture than the instant matter. Mot. 49 n.18. If anything, however, *Tourre* shows that the SEC prevailed on this argument at a stage in the proceeding where it should be more difficult. In the *Tourre* matter, defendant argued that he was entitled to a judgment as a matter of law, pursuant to Fed. R. Civ. P. 50(b), because the evidence presented at trial (which demonstrated that he received his base salary, but no bonus) could not satisfy Section 17(a)(2)'s "money or property" element. *Tourre*, 2014 WL 61864, at *3. The Court, however, denied the Rule 50(b) motion finding that defendant's salary provided a sufficient evidentiary foundation for legal liability under Section 17(a)(2) and held that defendant's interpretation of Section 17(a)(2) was "an *incorrect statement of the law* and is rejected." *Id.* at *4 (emphasis added). As such, the reasoning of the *Tourre* decision is applicable here.

42

In the present case, the Complaint shows a connection between fraud and the respective salaries received by Albanese and Elliott. As the Complaint explains, "Albanese and Elliott shared responsibility" for the disastrous "Alcan acquisition, and in conjunction with the $8.9 billion impairment announced in February 2012, Rio Tinto announced that neither Albanese nor Elliott would be paid bonuses for fiscal year 2011." Compl. ¶ 46. The Complaint likewise alleges that Elliott "understood that further impairments on the heels of Alcan would reflect a 'pattern of evaluation failure or performance failure.'" Compl. ¶ 47. Thus, even if the Court concludes that Section 17(a)(2) requires allegations that compensation received by Albanese and Elliott was affected by the alleged fraud, it would be premature to dismiss this claim when the Complaint supports a reasonable inference that their continued employment and salaries depended in large part on delaying any announcement that RTCM was a lemon (just like Alcan).

## II.    The Complaint Adequately Alleges an Accounting Violation Pursuant to Section 13(b)(2)(A)

Defendants contend that Count 7 should be dismissed because the Complaint fails to allege an accounting violation or the absence of internal controls. Mot. 53. Defendants characterize the SEC's Section 13(b) claims as "after-the-fact armchair judging," because valuation is hard and these are the types of judgments that should not be second guessed *Id*. However, because they are hard, these are not the types of judgments that should not be made without considering the impact that a lack of transportation options for 95 percent of a company's product would have on a $3 billion valuation. Indeed, when these issues were brought to the Board's attention in late 2011, the auditors quickly determined that 80 percent of RTCM's value should be written down. Compl. ¶¶ 164-169. The Commission takes no position on whether this write-down was sufficient (RTCM was quickly sold for a fraction of that value– Compl. ¶ 175). However, Rio Tinto cannot claim to have kept books and records that accurately

43

and fairly reflected its assets when it carried RTCM at over a $3 billion value without taking into account any of the severe adverse developments that devastated the value of the asset.

Rio Tinto seeks refuge in two PSLRA decisions–*Harris v. AmTrust Fin. Servs., Inc.*, 135 F. Supp. 3d 155 (S.D.N.Y. 2015), and *Iron Workers Local 16 Pension Fund v. Hilb Rogal & Hobbs Co.,* 432 F. Supp. 2d 571 (E.D. Va. 2006)–arguing that the SEC's section 13(b)(2)(A) claim must be dismissed because Rio Tinto did not restate its 2011 year end and 2012 half-year financial statements, and because Rio Tinto's auditors never withdrew their audit opinions or modified their conclusions. However, neither *Harris* nor *Iron Workers Local 16* applies to SEC enforcement actions.

First, claims are not dismissed simply because financial statements are not restated. *In re St. Jude Medical, Inc. Sec. Litig.*, 836 F.Supp.2d 878, 889 (D. Minn. 2011), *quoting with approval, Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir.2002):

> To hold otherwise would shift to accountants the responsibility that belongs to the courts. It would also allow officers and directors of corporations to exercise an unwarranted degree of control over whether they are sued, because they must agree to a restatement of the financial statements.

*Id.*; *see also Lloyd v. CVB Financial Corp.*, No. CV 10-06256 MMM (PJWx), 2012 WL 12883522, at *15 (C.D. Cal. Jan. 12, 2012).

Second, the Defendants' claims that they acted reasonably need to be resolved by a factfinder at a later stage. Mot. 54.[16] The SEC's Complaint clearly and unambiguously alleges

---

[16]     *See In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11 MDL 2262 NRB, 2015 WL 6243526, at *67 (S.D.N.Y. Oct. 20, 2015) ("'Reasonableness is normally 'not to be decided on a motion to dismiss … because a plaintiff must only plead facts sufficient to 'render the claim' of reasonableness 'plausible.'"); *SEC v. Pentagon Capital Mgmt. PLC*, 612 F.Supp.2d 241, 263 (S.D.N.Y. 2009) ("Defendants propose that it is normal business practice to maintain multiple accounts at multiple brokers, which, *inter alia,* allows the customer to take advantage of the SIPC indemnity limits. While this may be true, it is a factual issue not appropriate for resolution on a motion to dismiss.").

that Rio Tinto violated, and Albanese and Elliott caused violations of, IAS 34 and 36, which resulted in Rio Tinto filing materially misstated financial statements.  Defendants were subject to the SEC's reporting requirements, Compl. ¶ 30, which at the time were standards issued by the International Accounting Standards Board, Compl. ¶ 31; IAS 34 required Defendants to report a loss from an impaired asset, Compl. ¶ 32, and IAS 36 required Defendants to assess for impairment of assets, Compl. ¶¶ 33-37; Albanese and Elliott were familiar and experienced with the impairment process, Compl. ¶ 45; Defendants knew of specific adverse developments at RTCM that qualified as impairment triggers, Compl. ¶¶ 100-101; Defendants concealed or mischaracterized the RTCM impairment triggers, thereby contributing to and facilitating a series of misrepresentations and omissions in Rio Tinto's 2011 Annual Report and financial statements, Compl. ¶ 93, which was incorporated by reference into Rio Tinto's March and August 2012 bond offering documents, Compl. ¶ 104; and Albanese and Elliott corrupted Rio Tinto's 2012 half-year impairment process by concealing material facts about RTCM's valuation from Rio Tinto's Controller's Office and Rio Tinto's auditors.  Compl. ¶¶ 122-138.

Finally, these same allegations are equally devastating to Defendants' claim that Rio Tinto had adequate internal controls.  Mot. 55.  The Complaint clearly alleges that Albanese and Elliott knowingly circumvented or knowingly failed to implement a system of internal accounting controls or knowingly falsified, or caused to be falsified, books, records, or accounts that Rio Tinto was required to maintain under Section 13(b)(2) of the Exchange Act.[17]  Compl.

---

[17]    Defendants' reliance on *SEC v. Bankatlantic Bancorp, Inc.*, Case No. 12-60082, 2012 WL 1936112 (S.D. Fla. May 29, 2012), for their assertion that the Complaint insufficiently alleges facts about Rio Tinto's internal accounting control system, Mot. 55, is misplaced.  The court in *Bankatlantic* found that the plaintiff's allegation of failure to maintain a system of internal accounting controls "simply re-stated the statutory language without supporting factual allegations," which was insufficient.  2012 WL 1936112, at *24.  In contrast, here the Complaint describes the applicable accounting standards, Rio Tinto's system of internal accounting control,

¶¶ 5, 12, 38, 39, 45, 60, 79, 85, 86, 89-104, 110-112, 122-140, 148, 152-159, and 201.  Indeed, Defendants corrupted Rio Tinto's internal controls by allowing the Controller's Office to submit multiple misleading and false papers to Rio Tinto's Audit Committee and external auditors. Compl. ¶¶ 123-138.

In sum, the Complaint alleges facts that support liability for the accounting and internal controls violations in Count 7.

## III.    The Complaint Adequately Alleges That Albanese and Elliott Falsified Books and Records, Knowingly Circumvented a System of Internal Controls, and Made Misrepresentations to Accountants or Auditors

Defendants argue that the SEC failed to establish that Albanese and Elliot violated Section 13(b)(5) of the Exchange Act and Exchange Act Rules 13b2-1 and 13b2-2 by falsifying books and records or knowingly circumventing a system of internal accounting controls (Count 8), or making or causing to be made a materially false or misleading statement or actionably misleading omission to an accountant or auditor (Count 10). Mot. 57. Albanese and Elliott endeavor to limit the conduct relevant to these counts to the information submitted to Rio Tinto's auditors at half year 2012, Mot. 57, but the counts encompass the full scope of Albanese and Elliott's misconduct. Compl. ¶¶ 200, 206. Albanese and Elliot's primary argument in support of dismissal of these claims is that they acted reasonably and that they "had every reason to trust

_____

including its impairment review process, Compl. ¶¶ 30-39, and the establishment of the Audit Committee "to ensure the integrity of Rio Tinto's financial reporting and sound systems of internal control and risk management." Compl. ¶ 42. Details of Rio Tinto's impairment review process are alleged at length, specifically describing how the process was initiated at the half-year 2012, and how Defendants subverted the process to avoid any impairment of RTCM, resulting in a false and materially misleading interim financial report filed as an exhibit to a Form 6-K filed by Rio Tinto on August 9, 2012. Compl. ¶¶ 122-139. As it is clear that the Complaint alleges numerous facts regarding the failure to maintain and comply with Rio Tinto internal controls, *Bankatlantic Bancorp, Inc.* is inapplicable.

that Rio Tinto's multi-layered impairment review process was functioning properly." Mot. 57-59.

As noted above, Albanese and Elliott undermined the process they purport to rely on by, among other things, (1) keeping the negative valuation they learned at the Brisbane Meeting from Rio Tinto's Controller; (2) reviewing and approving impairment papers that did not account for any of the transportation challenges facing RTCM; (3) allowing Rio Tinto's Audit Committee and independent auditors to rely on a valuation that – absurdly – increased RTCM's value when the project had less coal than anticipated, a worse split between hard coking coal and thermal coal than anticipated, and mounting transportation challenges; and (4) participating in Audit Committee meetings without raising the question of whether any of the problems RTCM faced constituted an impairment trigger. Albanese and Elliott cannot sit in meetings with Rio Tinto's gatekeepers, keep information from everyone else at those meetings, and then claim that it was "reasonable" for them to rely on the resulting decisions.

Nor can they escape liability because they did not prepare the documents submitted to Rio Tinto's auditors in connection with the half year 2012 financial statement. Mot. 57. The Complaint alleges that Albanese and Elliott were provided the Controller's papers before those materials were submitted to Rio Tinto's Audit Committee, that those papers contained a series of material misrepresentations and omissions concerning RTCM, and that Albanese and Elliott failed to correct the papers' false statements and misleading omissions. Compl. ¶¶ 123-138. Accordingly, the allegations in the Complaint adequately support Albanese and Elliott's liability for the violations set forth in Counts 8 and 10.

IV.   **The Complaint Adequately Alleges That Albanese and Elliott Made False Certifications**

Defendants contend that the false certification claims set forth in Counts 11 and 12 fail because the Complaint fails to allege falsity or the necessary mental state. Mot. § VII. As demonstrated above, however, Albanese and Elliott falsely certified Rio Tinto's Form 20-F for fiscal year 2011 in violation of Exchange Act Rule 13a-14. 17 CFR § 240.13a-14. At the time of these certifications, Albanese and Elliott knew that Rio Tinto's Form 20-F contained material misrepresentations and omissions. *See, supra,* Section I B and D. Accordingly, the Complaint adequately alleges that Albanese and Elliott violated Exchange Act Rule 13a-14.

V.   **The Complaint Adequately Alleges Albanese and Elliott's Aiding Abetting Liability**

Albanese and Elliott seek to dismiss Counts 2, 4, 6, and 9 on the ground that the Complaint fails to adequately allege their liability for aiding and abetting fraud, false filing, books and records, and internal controls violations. Mot. § III. and § V. In support of dismissal, Albanese and Elliott advance four meritless arguments.

First, Albanese and Elliott contend that they cannot be liable for aiding and abetting because the Complaint fails to allege primary violations by Rio Tinto. However, as noted above, the Complaint adequately pleads that each defendant violated the anti-fraud provisions of the federal securities laws (Counts 1 and 3) as well as Rio Tinto's violations of Section 13(a) (Count 5) and Section 13(b)(2)(a-B) (Count 7) of the Exchange Act.

Second, Albanese and Elliott contend that they cannot be secondarily liable for violations by Rio Tinto that turned on their own scienter. Essentially, they argue that a defendant cannot be liable for aiding and abetting themselves. This argument ignores the principles of *respondeat superior*. Albanese and Elliott were employees of Rio Tinto acting within the scope of their employment when they did work or made statements connected to RTCM. "This is sufficient to

48

establish that [they] aided and abetted fraud provided [their] conduct meets the other elements of Section 20(e) liability." *Tourre*, 2014 WL 61864 at *7 (SDNY 2014); *see also SEC v. Sells*, No. C 11-4941 CW, 2012 WL 3242551, at *9 (N.D. Cal. Aug. 10, 2012) (holding that individual defendant's conduct and intent may be attributed to the company in determining whether company committed a primary violation that the individual defendant aided and abetted); *SEC v. Koenig*, No. 02 C 2180, 2007 WL 1074901, at *7 (N.D. Ill. Apr. 5, 2007) (same); *SEC v. Cohen*, No. 4:05CV371-DJS, 2006 WL 2225410, at *4 (E.D. Mo. Aug. 2, 2006) (same). Regardless, the Complaint contains extensive allegations regarding both Elliott and Albanese's scienter. Consequently, either defendant could be liable for aiding and abetting a violation by Rio Tinto based on the other defendant's scienter.

Third, Albanese and Elliott contend that, even if Rio Tinto violated the securities laws, the Complaint fails to allege that either of them substantially assisted Rio Tinto's violation. This assertion simply ignores the content of the Complaint. The substantial assistance prong of aiding and abetting liability is satisfied when a defendant associates himself with the venture, participates in it as something he wishes to bring about, and seeks by his actions to make it succeed. *SEC v. Apuzzo,* 689 F.2d 204, 212 (2d Cir. 2012). Here, Albanese and Elliott made a litany of misstatements and corrupted Rio Tinto's internal processes to conceal information about negative developments at RTCM. This level of intentional conduct to promote a deceptive perception establishes the requisite "substantial assistance." *See Mudd*, 885 F. Supp. 2d at 671 (complaint adequately alleged defendants consciously assisted the venture to misstate their employer's exposure to subprime when they received, reviewed, discussed, signed and/or sub-certified their employer's periodic SEC filings); *SEC v. Syron*, 934 F. Supp. 2d at (employees'

certifications and sub-certifications of company's misleading disclosures "meet the standard for substantial assistance").[18]

Finally, Albanese and Elliott contend that the Complaint fails to allege that they acted with the requisite scienter. As discussed in more detail in Section I D above, the Complaint contains extensive allegations giving rise to an inference that both Albanese and Elliott acted with scienter.[19]

In sum, Albanese and Elliott's challenges to the aiding and abetting claims in the Complaint fail because the complaint adequately alleges that each of them aided and abetted Rio Tinto's violations of the federal securities laws.

## VI.   The Complaint Pleads The Elements Of Each Claim With Particularity

As the factual allegations discussed in this Memorandum demonstrate, the Complaint has satisfied Rule 9(b), which requires it to "set forth the who, what, when, where and how of the alleged fraud." *Cognex Corp. v. Microscan Sys., Inc.*, 990 F. Supp. 2d 408, 418 (S.D.N.Y. 2013). While Rule 9(b) "demands specificity, … it does not demand that a plaintiff plead every fact that forms the alleged violations," *Collins & Aikman*, 524 F. Supp. 2d at 493, and "does not require that a complaint plead fraud with the detail of a desk calendar or a street map." *KCG Americas LLC v. Brazilmed LLC*, 15:CV:4600 (AT), 2016 WL 900396, *3 (S.D.N.Y. Feb. 26,

---

[18]    *See also SEC v. Espuelas*, 908 F. Supp. 2d 414, 414-15 (S.D.N.Y. 2012) (trier of fact could find substantial assistance based on facilitating wire transfers and signing letters to the primary violator's auditors that contained misrepresentations); *SEC v. Wey*, 246 F. Supp. 3d 894, 929 (S.D.N.Y. 2017) (extensive circumstantial evidence that lawyer knew of client's fraud and willing participated in it by, among other things, failing to disclose relevant information in response to questions from underwriter, was sufficient to allege aiding and abetting).

[19]    Although Defendants' Motion analyzes the substantial assistance and scienter elements separately, "[a] high degree of substantial assistance may lessen the SEC's burden in proving scienter and vice versa." *SEC v. Wey*, 246 F. Supp. 3d at 928 (internal citations omitted).

2016). Here, each element of each of the SEC's claims has been supported by particularized allegations of fact, which is sufficient at this stage of the litigation.

## VII.   The Court Has Authority To Order Disgorgement To Prevent Unjust Enrichment

Defendants' final argument relies on the purported "sea change" announced in *Kokesh v. SEC*, 137 S. Ct. 1635 (2017), to argue that claims for disgorgement should be stricken because they are "inherently punitive" and not statutorily authorized.  Mot. 60. This argument ignores the context of the *Kokesh* opinion, which described disgorgement as a penalty "within the meaning" of the statute of limitations in 28 U.S.C. § 2462, and the Supreme Court's explicit statement that "nothing in [its] opinion should be interpreted as an opinion on whether courts possess authority to order disgorgement in SEC enforcement proceedings."  *Kokesh*, 137 at 1640 and 1642 n.3.  In other words, *Kokesh* did not address longstanding precedent recognizing courts' inherent equitable authority to order disgorgement in SEC enforcement proceedings. Indeed, Mr. Kokesh himself was ordered to pay $5 million in disgorgement by the Tenth Circuit on remand from the Supreme Court's decision.  *SEC v. Kokesh*, No. 15-2081, 2018 WL 1187714, at *5 (10th Cir. March 5, 2018).

Rio Tinto's challenge to the Court's authority to order disgorgement is thus foreclosed by circuit precedent holding that "'disgorgement' is a well-established remedy in the Second Circuit, particularly in securities enforcement actions."  *SEC v. Cavanagh*, 445 F.3d 105, 116 (2d Cir. 2006); *see also SEC v. Palmisano*, 135 F.3d 860, 865 (2d Cir. 1998) (explaining that the disgorgement remedy not only "has long been upheld as within the general equity powers granted to the district court," but "Congress has expressly endorsed that sanction").  Every court to have considered the question since *Kokesh* has held that well-established precedent recognizing disgorgement as an available remedy in SEC enforcement proceedings continues to

be valid and binding. *See SEC v. Revolutions Medl Corp.,* No. 1:12-cv-03298-LMM (N.D. Ga. March 16, 2018), ECF No. 279 at *6 ("every court to address this argument has found that nothing in *Kokesh* has affected the SEC's legal authority to seek disgorgement"); *see also SEC v. Jammin Java Corp.*, No. 2:15-cv-08921, 2017 WL 4286180, at *2-4 (C.D. Cal. Sept. 14, 2017) (holding that "*Kokesh* is best seen as a decision clarifying the statutory scope of § 2462, rather than one redefining the essential attributes of disgorgement," and ordering disgorgement); *SEC v. Arcturus Corp.*, No. 3:13-cv-4861, 2018 U.S. Dist. LEXIS 4325, at *6 (N.D. Tex. Jan. 10, 2018) ("Unless, and until, current binding authority changes, this Court understands its authority to order disgorgement in SEC proceedings such as this."); *SEC v. Sample*, No. 3:14-CV-1218-B, 2017 WL 5569873, at *2 (N.D. Tex. Nov. 20, 2017) ("*Kokesh* merely held that disgorgement claims are subject to [a] five-year statute of limitations. *Kokesh* had no effect on how courts apply disgorgement principles.") (citation omitted); *see also SEC v. Metter*, No. 16-526-cv, 2017 WL 3708084 (2d Cir. Aug. 29, 2017) (upholding disgorgement award after *Kokesh*); *SEC v. Brooks*, No. 07-cv-61526, 2017 WL 3315137, at *8 (S.D. Fla. Aug. 3, 2017) ("*Kokesh's* holding cannot be plucked from the statutory context that gives it force.").

In sum, the Court should deny Defendants' request to strike the Commission's demand for disgorgement from the Complaint because it has no legal support.

## CONCLUSION

For the forgoing reasons, the Commission respectfully submits that the Defendants' Consolidated Motion to Dismiss the Complaint should be denied in its entirety.


Dated: March 19, 2018                     By:  */s/ Gregory N. Miller*
                                          Thomas A. Bednar
                                          Dean M. Conway
                                          Gregory N. Miller
                                          D. Mark Cave
                                          Martin Totaro
                                          Counsel for Plaintiff
                                          Securities and Exchange Commission
                                          100 F Street N.E.
                                          Washington, D.C. 20549-5977
                                          (202) 551-4469 (Miller)


## CERTIFICATE OF SERVICE

I certify that on March 19, 2018, a copy of the foregoing document was served upon all counsel of record via the Court's electronic filing system.

*/s/ Gregory N. Miller*
Gregory N. Miller
Counsel for Plaintiff