**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------x
                                                :

SECURITIES AND EXCHANGE
COMMISSION,

                    Plaintiff,

        v.

RIO TINTO PLC, RIO TINTO LIMITED,
THOMAS ALBANESE, and GUY ROBERT
ELLIOTT,

                  Defendants.

---------------------------------------------------------x

            Case No. 17 Civ. 7994 (AT) (DCF)


<u>**REPLY BRIEF IN FURTHER SUPPORT OF**</u>
<u>**DEFENDANTS' CONSOLIDATED MOTION TO DISMISS**</u>

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................ 1

LEGAL STANDARD........................................................................................... 4

ARGUMENT ....................................................................................................... 5

    I.      The Entire Complaint Must Be Dismissed under Rule 9(b). ................................. 5

    II.     The Fraud and False-Filing Claims (Counts 1, 3, and 5) Must Be Dismissed. ................................................................................................ 6

          A.      The Complaint Fails to Plead Falsity as a Matter of Law......................... 7

          B.      Most Section 10(b) Claims against Mr. Albanese and Mr. Elliott Must Be Dismissed Because Neither Defendant "Made" the Alleged Misstatements. ............................................................. 12

          C.      The SEC Has Failed to Plead Materiality as a Matter of Law................. 14

          D.      The Complaint Fails Adequately to Allege Defendants' Scienter........... 15

          E.      The Complaint Fails to Plead Scheme Liability as a Matter of Law. ...... 20

          F.      The Section 17(a)(2) Claims Fail as to the Individual Defendants.......... 23

    III.    The Section 13(b) Claim (Count 7) against Rio Tinto Must Be Dismissed. ....... 24

          A.      The SEC Has Not Pleaded an Accounting Violation as a Matter of Law. ............................................................................................ 24

          B.      The SEC Has Not Pleaded Inadequate Internal Controls as a Matter of Law. ............................................................................................ 26

    IV.    The Aiding-and-Abetting Claims (Counts 2, 4, 6, and 9) Must Be Dismissed. ............................................................................................... 27

    V.     The Rule 13b2-1 and 13b2-2 Claims (Counts 8 and 10) Must Be Dismissed. ............................................................................................... 28

    VI.    The False-Certification Claims (Counts 11 and 12) Must Be Dismissed........... 30

    VII.   The SEC Is Not Entitled to Disgorgement as a Matter of Law. ......................... 30

CONCLUSION.................................................................................................... 30

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*ATSI Commc'ns v. Shaar Fund, Ltd.*,
    493 F.3d 87 (2d Cir. 2007)...................................................................................4

*Baraliu v. Vinya Capital, L.P.*,
    2009 WL 959578 (S.D.N.Y. Mar. 31, 2009) ...............................................4

*In re Barclays Bank PLC Sec. Litig.*,
    2017 WL 4082305 (S.D.N.Y. Sept. 13, 2017).............................................12

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988).....................................................................................12

*Chambers v. Time Warner, Inc.*,
    282 F.3d 147 (2d Cir. 2002).....................................................................4, 19

*Chill v. Gen. Elec. Co.*,
    101 F.3d 263 (2d Cir. 1996)..........................................................................16

*City of Austin Police Ret. Sys. v. Kinross Gold Corp.*,
    957 F. Supp. 2d 277 (S.D.N.Y. 2013)..........................................................10

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
    856 F.3d 605 (9th Cir. 2017) ........................................................................10

*City of Omaha Civilian Empls.' Ret. Sys. v. CBS Corp.*,
    679 F.3d 64 (2d Cir. 2012)..............................................................................7

*Dietrich v. Bauer*,
    76 F. Supp. 2d 312 (S.D.N.Y. 1999)...........................................................5, 6

*ECA v. JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009).........................................................12, 14, 15, 20

*In re Fairway Grp. Holdings Corp. Sec. Litig.*,
    2015 WL 4931357 (S.D.N.Y. Aug. 19, 2015)................................................9

*Fait v. Regions Fin. Corp.*,
    655 F.3d 105 (2d Cir. 2011)..................................................................7, 8, 10

*In re Fannie Mae 2008 Sec. Litig.*,
    742 F. Supp. 2d 382 (S.D.N.Y. 2010)...........................................................25

*In re Fannie Mae 2008 Sec. Litig.*,
    891 F. Supp. 2d 458 (S.D.N.Y. 2012)...........................................................13

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*FHFA v. Nomura Holding Am., Inc.*,
  104 F. Supp. 3d 441 (S.D.N.Y. 2015)....................................................................8

*Fresno Cty. Emps.' Ret. Ass'n v. comScore, Inc.*,
  268 F. Supp. 3d 526 (S.D.N.Y. 2017)...................................................................14

*Ganino v. Citizens Utils. Co.*,
  228 F.3d 154 (2d Cir. 2000).................................................................................14

*Halperin v. eBanker USA.com, Inc.*,
  295 F.3d 352 (2d Cir. 2002)...................................................................................9

*Harris v. AmTrust Fin. Servs., Inc.*,
  135 F. Supp. 3d 155 (S.D.N.Y. 2015)............................................................24, 25

*Ho v. Duoyuan Glob. Water, Inc.*,
  887 F. Supp. 2d 547 (S.D.N.Y. 2012)...................................................................13

*IBEW Local Union No. 58 Pension Tr. Fund & Annuity Fund v.*
  *Royal Bank of Scot. Grp., PLC*,
  783 F.3d 383 (2d Cir. 2015)............................................................................14, 15

*Janus Capital Grp., Inc. v. First Derivative Traders*,
  564 U.S. 135 (2011)........................................................................................12, 13

*Kokesh v. SEC*,
  137 S. Ct. 1635 (2017)..........................................................................................30

*Kuriakose v. Fed. Home Loan Mortg. Corp.*,
  897 F. Supp. 2d 168 (S.D.N.Y. 2012)...................................................................16

*Lentell v. Merrill Lynch & Co.*,
  396 F.3d 161 (2d Cir. 2005)............................................................................20, 21

*Litwin v. Blackstone Grp., L.P.*,
  634 F.3d 706 (2d Cir. 2011).................................................................................14

*Lorenzo v. SEC*,
  872 F.3d 578 (D.C. Cir. 2017).........................................................................21, 22

*Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*,
  277 F. Supp. 3d 500 (S.D.N.Y. 2017)...................................................................21

*Mills v. Polar Molecular Corp.*,
  12 F.3d 1170 (2d Cir. 1993)...................................................................................6

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Moon Joo Yu v. Premiere Power LLC*,
    2018 WL 456244 (S.D.N.Y. Jan. 17, 2018) ..........................................................................13

*N. Collier Fire Control & Rescue Dist. Firefighter Pension Plan v.*
    *MDC Partners, Inc.*,
    2016 WL 5794774 (S.D.N.Y. Sept. 30, 2016)......................................................................9

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000)...............................................................................................16

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    135 S. Ct. 1318 (2015)....................................................................................................7, 8

*Parnes v. Gateway 2000, Inc.*,
    122 F.3d 539 (8th Cir. 1997) ..............................................................................................14

*In re Sanofi Sec. Litig.*,
    87 F. Supp. 3d 510 (S.D.N.Y. 2015)....................................................................................9

*SEC v. Apuzzo*,
    689 F.3d 204 (2d Cir. 2012)................................................................................................27

*SEC v. Cavanagh*,
    445 F.3d 105 (2d Cir. 2006)................................................................................................30

*SEC v. DiMaria*,
    207 F. Supp. 3d 343 (S.D.N.Y. 2016)............................................................................23, 24

*SEC v. Egan*,
    994 F. Supp. 2d 558 (S.D.N.Y. 2014)................................................................................15

*SEC v. Espuelas*,
    579 F. Supp. 2d 461 (S.D.N.Y. 2008)................................................................................26

*SEC v. Healthsouth Corp.*,
    261 F. Supp. 2d 1298 (N.D. Ala. 2003)..............................................................................27

*SEC v. Jensen*,
    835 F.3d 1100 (9th Cir. 2016) ............................................................................................30

*SEC v. Kelly*,
    817 F. Supp. 2d 340 (S.D.N.Y. 2011)............................................................................21, 22

*SEC v. Lee*,
    720 F. Supp. 2d 305 (S.D.N.Y. 2010)................................................................................21

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*SEC v. Metter*,
    706 F. App'x 699 (2d Cir. 2017) ........................................................................30

*SEC v. Mudd*,
    885 F. Supp. 2d 654 (S.D.N.Y. 2012)................................................................23

*SEC v. Palmisano*,
    135 F.3d 860 (2d Cir. 1998)................................................................................30

*SEC v. Pentagon Capital Mgmt. PLC*,
    725 F.3d 279 (2d Cir. 2013)................................................................................21

*SEC v. PIMCO Advisors Fund Mgmt. LLC*,
    341 F. Supp. 2d 454 (S.D.N.Y. 2004)................................................................21

*SEC v. RPM Int'l, Inc.*,
    2017 WL 4358693 (D.D.C. Sept. 29, 2017) ........................................................8

*SEC v. Softpoint, Inc.*,
    958 F. Supp. 846 (S.D.N.Y. 1997) ...............................................................24, 29

*SEC v. Stoker*,
    865 F. Supp. 2d 457 (S.D.N.Y. 2012)................................................................23

*SEC v. StratoComm Corp.*,
    2 F. Supp. 3d 240 (N.D.N.Y. 2014)...................................................................23

*SEC v. StratoComm Corp.*,
    652 F. App'x 35 (2d Cir. 2016) .........................................................................23

*SEC v. Syron*,
    934 F. Supp. 2d 609 (S.D.N.Y. 2013)..........................................................23, 24

*SEC v. Tex. Gulf Sulphur Co.*,
    446 F. 2d 1301 (2d Cir. 1971)............................................................................30

*SEC v. Thompson*,
    238 F. Supp. 3d 575 (S.D.N.Y. 2017)..................................................................7

*SEC v. Tourre*,
    2014 WL 61864 (S.D.N.Y. Jan. 7, 2014) ..........................................................24

*SEC v. Wey*,
    246 F. Supp. 3d 894 (S.D.N.Y. 2017)...............................................15, 23, 24, 26

# TABLE OF AUTHORITIES
(continued)

Page(s)

*SEC v. World-Wide Coin Invs., Ltd.*,
  567 F. Supp. 724 (N.D. Ga. 1983) ..................................................................24, 27

*In re Smith Barney Transfer Agent Litig.*,
  884 F. Supp. 2d 152 (S.D.N.Y. 2012) ...................................................................21

*Staehr v. Hartford Fin. Servs. Grp., Inc.*,
  547 F.3d 406 (2d Cir. 2008) ....................................................................................5

*In re Take-Two Interactive Sec. Litig.*,
  551 F. Supp. 2d 247 (S.D.N.Y. 2008) ...................................................................17

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*,
  531 F.3d 190 (2d Cir. 2008) ..................................................................................20

*Tongue v. Sanofi*,
  816 F.3d 199 (2d Cir. 2016) ....................................................................................7

*TRW Inc. v. Andrews*,
  534 U.S. 19 (2001) .................................................................................................21

**Statutes**

15 U.S.C. § 77q .....................................................................................................23, 24

15 U.S.C. § 78m .........................................................................................................26

**Other Authorities**

PCAOB AS 2905 ("Subsequent Discovery of Facts Existing at the Date of the
  Auditor's Report") .................................................................................................25

*In re Sunbeam Corp.*, S.E.C. Release No. 7976, 2001 WL 616627 (May 15, 2001) ...................29

## INTRODUCTION

Four years of investigation and six months of litigation later, the SEC *still* cannot explain when Rio Tinto should have impaired RTCM or by how much.[1]  The SEC claims that Defendants should have completed their evaluation of these complex questions within one year of acquiring an untested, exploratory asset expected to last for at least fifty years.  Yet it never explains why Rio Tinto spent tens of millions of dollars in 2011 and throughout 2012 studying infrastructure options and coal quantity and quality if, as the SEC contends (at 1), it had already determined in 2011 that RTCM "was a lemon."  The SEC is wrong, and it has failed to allege facts that could support its theory.  It is easy to second-guess complicated valuation and accounting judgments years later, but the SEC's conclusory allegations fail to establish fraud.

Unable to defend the Complaint's flaws, the SEC employs sleight-of-hand, presenting a selective view of the facts while attacking Defendants for putting those allegations in proper context.  The SEC attempts to distill this case into a few over-simplified challenges—"problems," in the SEC's view (at 5–7), that developed in 2011 and 2012 and purportedly required an impairment—but the SEC misleadingly blurs the timing of those developments.  It ignores, for example, that the Government of Mozambique did not completely reject the barging option until after YE 2011, ¶ 77; that Rio Tinto continued to evaluate various rail options throughout 2012; that Individual Defendants are not even alleged to have learned of any negative internal valuations by YE 2011; and that projected coal prices were rising significantly.  The SEC also misleadingly asserts (at 1–2) that Rio Tinto could have taken an impairment and then "written the value of RTCM back up"—but omits that part of RTCM's value was recorded as goodwill, 2011 AR at

---

[1]  Capitalized terms not defined herein have the same meanings as defined in the Memorandum filed by Defendants in support of their Motion to Dismiss, dated March 5, 2018 ("Mot.").

190, and that impairment losses on goodwill cannot "be reversed in a subsequent period" under IAS 36.  Miller Decl. Ex. 1, ¶ 124.

When the SEC's pleading is contextualized, it is clear that Rio Tinto was not required to take an impairment within 11 months of acquisition at HY 2012.  By the even earlier YE 2011, five months after acquisition, only some of the alleged "problems" had appeared:  one (limited rail capacity) could have been addressed by a greenfield railway solution that was being considered; another (barging) was not yet subject to a final determination; and a third (revised coal estimates) was not a "problem" because the amount of available coal still significantly exceeded the lifetime needs of the mine.  Even at HY 2012, the SEC's claims fail because it ignores that transportation options (including partnership options) remained in flux, studies of the coal quantity and quality were not yet complete, and projected coal prices continued to rise.

The claims against Rio Tinto must be dismissed.  The fraud and false-filing claims (Counts 1, 3, and 5) fail because the SEC has not adequately alleged any actionable misstatement or omission (II.A) or materiality (II.C).  Because the SEC uses hindsight to allege the Individual Defendants' scienter and does not allege wrongdoing by any other employees, the fraud claims must be dismissed against Rio Tinto too (II.D.3).  The scheme-liability claims fail because they rest solely on alleged misrepresentations and omissions (II.E).  The Section 13(b) claims (Count 7) fail because Rio Tinto was never required to restate its financial statements (III.A), and alleged fraud cannot be the sole basis for an internal-controls claim (III.B).

The claims against the Individual Defendants must also be dismissed.  The SEC's central assertion against Mr. Albanese is that he learned in mid-2012 that RTCM "had no commercial value," but continued to make positive statements about the asset and allegedly concealed information that should have led to impairment.  The Complaint does not support this claim.  In the

roughly one year from acquisition to mid-year 2012, Mr. Albanese allegedly was told only once—at the Brisbane Meeting—that RTCM's value was less than its carrying value. ¶ 119.  On their face, the meeting notes from which the SEC apparently drew this allegation—and which the SEC filed with the Court—also state that the valuation was based on "limited modelling," was dismissed as "indicative only," and was "typical of capital-intensive Tier 1 greenfield projects" at that stage.  Miller Decl. Ex. 2, at 5.  Far from suggesting that RTCM had no value, the notes reveal the extremely tentative nature of any figures:  "We've purposely removed dollar figures . . . as our numbers are indicative only.  There is considerable scope to increase business value through pre-feasibility studies." *Id.*  Moreover, there is no allegation that Mr. Albanese ever gave any direction to avoid impairment, was ever told that RTCM should have been impaired, or played any role whatsoever in the impairment determinations.  So much for the "scheme" alleged by the SEC.  Because the SEC's entire case against Mr. Albanese is based on bare assertions, rather than particularized facts, all claims against Mr. Albanese must be dismissed.

The claims against Mr. Elliott must be dismissed for the same reasons.  He did not propose, source, or advocate for the RTCM acquisition; he had no day-to-day oversight of RTCM.  Mr. Elliott made almost no representations at all about RTCM.  He signed the 2011 Annual Report on March 16, 2012, but the SEC alleges two things—both insufficient—that it claims would have led him to believe as of that date that the Annual Report was false (II.D.2).  After March 16, 2012, the SEC concedes that he signed no relevant filings and said nothing about RTCM to investors.  The scienter allegations fail too.  Mr. Elliott had no reason to fear for his job:  he was retiring and had overseen larger impairments when warranted.  Allegations that he "concealed" information are implausible.  The impairment process began with RTCM, which reported in the

first instance to Controllers and PwC.  Mr. Elliott could not have kept—and did not keep—information from anyone.  His actions did not amount to fraud or any other violation of law.

## LEGAL STANDARD

The Court may consider on this Motion "documents possessed by or known to the plaintiff and upon which it relied in bringing the suit" and matters appropriate for judicial notice. *ATSI Commc'ns v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).  Defendants' exhibits fall squarely into these well-established categories.

It is disingenuous—after a lengthy investigation and voluminous investigative discovery—for the SEC to allege facts contrary to the record, selectively quote but not submit documents, then complain (at 20) that Defendants "[i]mpermissibly referenc[e] outside sources" when relying on those same documents.  For example, the Complaint repeatedly quotes the Impairment Paper, ¶¶ 130–33, alleging that it provided a misleading valuation with "no reasonable basis," ¶ 131, while concealing that the Paper described "significant reduction in resource/reserves" and transportation setbacks and based the valuation in part on a projected increase in coal prices, Conn Decl. Ex. 13, at 3–4.  Having relied on that document, the SEC cannot now shield it from the Court's consideration.  *See Baraliu v. Vinya Capital, L.P.*, 2009 WL 959578, at *4 (S.D.N.Y. Mar. 31, 2009) ("If a plaintiff chooses not to attach to the complaint . . . a document upon which it implicitly relies and which is integral to the complaint, the defendant may proffer that document . . . ." (citing *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152–53 (2d Cir. 2002)).[2]

---

[2]  Other exhibits can be considered for the same reason.  *See* Conn Decl. Ex. 5 (Investment Committee Paper, the basis of ¶¶ 54–55); Ex. 9 (First Controller's Paper, the basis of ¶¶ 123–31); Ex. 10 (Production/Infrastructure Comparison, the basis of ¶¶ 71–72); Ex. 11 (Environmental Impact Assessment Report, the basis of ¶¶ 75–79); Ex. 12 (March 2012 press report, the basis of ¶ 90); Ex. 15 (Brisbane PowerPoint Presentation, the basis of ¶¶ 116–22); Ex. 16 (Second Controller's Paper, the basis of ¶¶ 134–38); Ex. 27 (Third Controller's Paper, the basis of ¶¶ 153–57, 159).

The SEC concedes (at 4) that the Court can properly consider news articles submitted to show that "certain things were said in the press."  *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008) ("[I]t is proper to take judicial notice of the *fact* that press coverage . . . contained certain information, without regard to the truth of their contents . . . .").  Defendants submitted news reports to show that certain allegedly concealed information was, in fact, publicly available.  *See* Conn Decl. Exs. 6–8, 14, 21–23, 30.

## ARGUMENT

**I.    The Entire Complaint Must Be Dismissed under Rule 9(b).**

As the SEC concedes, "each of [its] claims" is subject to Rule 9(b)'s heightened pleading standards.  Opp. 51.  The SEC devotes just one sentence to arguing that it has satisfied those standards through "particularized allegations of fact."  *Id.*  That blanket assertion, however, epitomizes a central problem in the Complaint:  the SEC summarily alleges that "Defendants" knew or concealed certain information, without *specifying* which Defendants knew what when.

Defendants explained (at 22) that the Complaint must be dismissed under Rule 9(b) not least because it "'clump[s]'" Defendants "'together in vague allegations'" without specifying which Defendant knew what information.  *Dietrich v. Bauer*, 76 F. Supp. 2d 312, 329 (S.D.N.Y. 1999) (citation omitted).  Rather than address those deficiencies, the SEC's brief exacerbates them by misleadingly referring to all Defendants together.  For example, the SEC states:  "Within months of the acquisition, thus Defendants knew that RTCM could ship to market less than five percent of the coal originally assumed."  Opp. 6 (citing ¶ 81).  In fact, paragraph 81 of the Complaint alleges only "Rio Tinto's improved understanding" of certain infrastructure constraints, and the Complaint never alleges when either Individual Defendant learned of the full extent of those constraints.

There is an obvious reason why the SEC conflates who knew what when:  its allegations are threadbare.  Only three allegations pertain to YE 2011—that "barging had been completely rejected," that rail capacity was limited, and that the resources and reserves estimates had been revised.  ¶¶ 86, 91–92.  These allegations cannot establish an accounting violation or fraud.  By that point in time, barging had not *yet* been completely rejected because Rio Tinto was "welcome to resubmit" a new barging proposal, Conn Decl. Ex. 12, at 2, and there was nothing yet to be barged because no substantial mining had yet occurred.  The Complaint also omits that RTCM had evaluated barging and rail limitations and found them "offset by" a potential greenfield rail-way solution.  Conn Decl. Ex. 10, at 2.  And despite a downward revision, the resources and re-serves estimates still "significantly exceed[ed]" the lifetime needs of the mine.  Conn. Decl. Ex. 13, at 7.  In short, without this obfuscation about the timing of events and who knew what when, the allegations at YE 2011 and other time periods crumble.  These pleading deficiencies warrant dismissal.  *See Dietrich*, 76 F. Supp. 2d at 329; *see also Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993) ("Rule 9(b) is not satisfied where the complaint vaguely attributes the alleged fraudulent statements to 'defendants.'").[3]

## II.     The Fraud and False-Filing Claims (Counts 1, 3, and 5) Must Be Dismissed.

The fraud and false-filing claims fail for numerous reasons.  Mot. 23–50.  Specifically, the Complaint fails to plead *any* actionable misrepresentation or fraudulent device, let alone that the Individual Defendants made such misrepresentations.  Additionally, the allegations of materi-ality, scienter, scheme liability, and Section 17(a)(2) liability fail as a matter of law.

---

[3]  The SEC also ignores the other deficiencies Defendants pointed to (at 22)—and still refuses to indicate, for example, "*when* or *by how much* . . .  an impairment should have been taken." These deficiencies, too, warrant dismissal.  *See* Mot. 22–23.

**A.      The Complaint Fails to Plead Falsity as a Matter of Law.**

The SEC offers little defense of its misrepresentations claims—applying the wrong legal standard to statements of RTCM's valuation, and all but conceding that no other alleged misstatements or omissions are actionable.

**1.      No Statement Regarding RTCM's Valuation Is Actionable.**

Statements regarding RTCM's valuation and impairment determinations (¶¶ 96–99, 111–12, 125, 131, 134–35, 139–40, 149–50) are not actionable.  The SEC concedes (at 23–25) that these are statements of opinion, not fact.  *See Fait v. Regions Fin. Corp.*, 655 F.3d 105, 110–11 (2d Cir. 2011).  Under *Omnicare*, opinion statements are actionable in only three limited circumstances—none of which is adequately alleged here.  *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318, 1327–29 (2015); *see also* Mot. 26–28.[4]

The SEC argues (at 23) that it has sufficiently pleaded *Omnicare*'s first theory of liability—that the speaker "did not hold the belief she professed."  135 S. Ct. at 1327.  But there are no allegations regarding the subjective beliefs of Mr. Albanese, Mr. Elliott, or anyone else allegedly involved in making these statements.  The SEC argues (at 23) that the Individual Defendants' subjective beliefs can be *inferred* from information they allegedly learned.  But the Second Circuit has repeatedly rejected attempts to infer subjective belief based on purported knowledge of countervailing facts.  *See, e.g.*, *City of Omaha Civilian Empls.' Ret. Sys. v. CBS Corp.*, 679

---

[4]  The SEC suggests (at 23 n.11) that *Omnicare* may not apply to claims under Sections 10(b) and 17(a).  But the Second Circuit has "reconsider[ed]" a Section 10(b) ruling "in light of *Omnicare*."  *Tongue v. Sanofi*, 816 F.3d 199, 209 (2d Cir. 2016).  Even the SEC's primary authority applied *Omnicare* to Section 10(b) and Section 17(a) claims, citing "several" cases suggesting that *Omnicare* applies to "all antifraud provisions of the securities laws."  *SEC v. Thompson*, 238 F. Supp. 3d 575, 601 n.13 (S.D.N.Y. 2017).

F.3d 64, 68–69 (2d Cir. 2012) (per curiam) (that "defendants were aware of facts that *should* have led them to begin interim impairment testing earlier" was insufficient to establish subjective beliefs contrary to their statements of opinion); *Fait*, 655 F.3d at 110–12 ("clear indications that impairment testing was necessary" were insufficient to establish that "defendants did not believe the statements regarding goodwill"). So should this Court.[5]

The SEC concedes that the Complaint does not allege *Omnicare*'s second theory of liability, but argues (at 24–25) that the opinion statements are actionable under *Omnicare*'s third theory of liability—where an omission of fact makes an opinion statement misleading to a reasonable investor, *see* 135 S. Ct. at 1332. This argument boils down to the legally inadequate assertion that Defendants knew, but failed to disclose, "some fact cutting the other way." *Id.* at 1329. The SEC argues, for example, that Defendants failed to disclose, in the 2011 Annual Report or "elsewhere" (the SEC does not say where or when), certain "negative developments at RTCM" that would have placed statements regarding RTCM's valuation "in context." Opp. 24. *Omnicare* specifically emphasized, however, that "[r]easonable investors understand that opinions sometimes rest on a weighing of competing facts," and "do[] not expect that *every* fact known to an issuer supports its opinion statement." 135 S. Ct. at 1329.

Here, the allegations fit squarely within *Omnicare*'s category of "competing facts" that are not required to be disclosed. 135 S. Ct. at 1329. The Complaint alleges at least *nine* different valuations for RTCM at various times, some significantly *exceeding* the $3.7 billion acquisition valuation. *See* ¶¶ 60, 71, 87, 119, 131, 151, 153, 166, 175. And while the Government of

---

[5]  The SEC relies on two purportedly contrary authorities, but both addressed whether a statement of opinion was actionable as an omission under *Omnicare*, not whether the statement was subjectively believed by the speaker. *See FHFA v. Nomura Holding Am., Inc.*, 104 F. Supp. 3d 441, 565–66 (S.D.N.Y. 2015); *SEC v. RPM Int'l, Inc.*, 2017 WL 4358693, at *19 (D.D.C. Sept. 29, 2017).

Mozambique rejected Rio Tinto's "current proposal" for barging in December 2011, it advised Rio Tinto to pursue "the improvement and construction of railway lines to transport coal," Conn Decl. Ex. 11, at § 4.8—an option that Rio Tinto evaluated and sought partners to pursue through HY 2012 and later, *see* ¶ 120; Conn Decl. Ex. 10, at 2.

Rio Tinto also affirmatively disclosed numerous risks relating to its exploratory mining asset which clearly informed investors that RTCM's valuation reflected a synthesis of provisional and evolving information. Mot. 25. The SEC contends that these latter disclosures were insufficient because they did not disclose certain adverse developments. Opp. 21–22. But the relevant inquiry in assessing falsity is not whether investors actually knew of specific risks, but whether omitting those risks would have misled investors to believe that they "did not actually exist." *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 359 (2d Cir. 2002). The SEC does not—and cannot—argue that investors thought that the risk of adverse developments in an untested, unproven exploratory mining operation in Mozambique "did not actually exist," and indeed, the investors' questions themselves show they understood the issues, *see* Mot. 15–16, 18.

As Defendants explained (at 27–28), ample authority within the Second Circuit illustrates that the SEC's allegations are thus insufficient under *Omnicare*'s third theory of liability. *See, e.g.*, *N. Collier Fire Control & Rescue Dist. Firefighter Pension Plan v. MDC Partners, Inc.*, 2016 WL 5794774, at *2, 11 (S.D.N.Y. Sept. 30, 2016) (dismissing fraud claims challenging goodwill assessment despite allegations that asset was "poorly performing or now-defunct"), *appeal dismissed*, 2017 WL 5201904 (2d Cir. Feb. 22, 2017); *In re Fairway Grp. Holdings Corp. Sec. Litig.*, 2015 WL 4931357, at *20 (S.D.N.Y. Aug. 19, 2015) (R. & R.) (allegations of "contradictory facts" omitted from public statements not sufficient to survive a motion to dismiss under *Omnicare*), *adopted*, 2015 WL 5255469 (S.D.N.Y. Sept. 9, 2015); *In re Sanofi Sec. Litig.*, 87

F. Supp. 3d 510, 532–33 (S.D.N.Y. 2015) (similar), *aff'd*, 816 F.3d 199 (2d Cir. 2016).  The SEC does not respond to any of these authorities—and, indeed, its omissions argument cites no cases applying *Omnicare*.  *See* Opp. 24–25.[6]  The Court therefore must dismiss the Complaint as to statements about RTCM's valuation or impairment determinations.

### 2.      Other Alleged Misstatements Are Not Actionable as a Matter of Law.

The Complaint also alleges misleading statements made in public filings, to auditors, and to investors about RTCM's prospects and operations.  *See* ¶¶ 90, 95–97, 102, 114, 124–27, 132–33, 136, 141–42, 161–63; *see also* Mot. 28–30.  The SEC has *no response* to Defendants' arguments as to most of these statements.  Its responses on the remaining statements are makeweight.

The SEC makes little attempt to defend its allegations that the 2011 Annual Report contained false or misleading statements.  *See* ¶¶ 95–97, 102.  With respect to most of these statements, the SEC does not dispute that the Complaint fails to allege why the statements were misleading.  *See* Mot. 28 (discussing ¶¶ 95–97).  And with respect to the two statements specifically referenced in the SEC's brief, the SEC merely parrots the Complaint's allegations without addressing Defendants' arguments as to why those statements were not misleading.  *See* Opp. 14, 19 (referencing write-down of reserves and resources); Opp. 19 (referencing compliance with accounting standards).  As Defendants explained (at 29), and as the SEC does not dispute, the 2011 Annual Report accurately disclosed the revised resources and reserves figures, 2011 AR at 49,

---

[6]  The SEC attempts to distinguish three other authorities as addressing allegations with less "precision" than the SEC's.  Opp. 25 n.12.  Two were pre-*Omnicare* decisions on subjective falsity, not omissions.  *See Fait*, 655 F.3d at 110–11; *City of Austin Police Ret. Sys. v. Kinross Gold Corp.*, 957 F. Supp. 2d 277, 299 (S.D.N.Y. 2013).  And in the third, the allegations of circumstances that should have triggered an impairment were *more* precise—and egregious—than those here.  *See City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 610–11, 618–19 (9th Cir. 2017) (asset engaged in "channel stuffing," revenue decreased 80% and reached "historic low," gross margins were approximately 20% lower than projected, 119 employees were fired, and relationship with an exclusive distributor "deteriorat[ed]").

52, and it was immaterial whether those estimates had been anticipated because they "still signif-

icantly exceed[ed]" the lifetime needs of the mine, Conn. Decl. Ex. 13, at 7.  And Rio Tinto com-

plied with all relevant accounting requirements at YE 2011.  *See infra* III.A.

The SEC also does not dispute that most of the statements in the board papers (¶¶ 124–

27, 132–33, 136) were not misleading as a matter of law.  *See* Opp. 19–25 (not addressing the

statements); Opp. 47 (summarily concluding that the papers "contained a series of material mis-

representations and omissions").  As Defendants explained (at 29), those "papers clearly detailed

the significant 'uncertainty' surrounding RTCM's infrastructure and resource challenges, and

that post-acquisition studies were ongoing."  Elsewhere in its brief, the SEC tries to defend the

allegations about two statements in the board papers—but neither argument holds water:

- The SEC argues (at 16) that the First Controller's Paper, when describing Deloitte's judgment that the revised resources and reserves figures would not affect RTCM's valuation, misleadingly omitted that that judgment assumed that Rio Tinto could still mine the same amount of coal.  But there are no allegations that either Individual Defendant knew of that assumption or that it was inaccurate or unreasonable—especially given that the available resources undisputedly still "significantly exceed[ed]" the anticipated lifetime needs of the mine.  Conn Decl. Ex. 13, at 7.

- The SEC states (at 17) that the Second Controller's Paper was "materially incomplete" because it "claimed that RTCM's business case remained undeveloped due to a 'breadth' of transport options."  But Rio Tinto undisputedly was still reviewing infrastructure options, *see* Mot. 7, and there are no allegations that—by HY 2012—Rio Tinto was unable to "seek out partners to construct" a greenfield railway, ¶ 120.

Finally, Defendants explained (at 29–30) that Mr. Albanese's statements to investors

(¶¶ 90, 114, 141–42, 161–63) were not misleading as a matter of law and were inactionable puff-

ery.  The SEC does not address the first argument—thereby conceding that the "statements were

consistent with the board papers" and thus not misleading.  Mot. 29.  And the SEC bizarrely ar-

gues (at 19–20 n.8) that the statements were "lies," and hence not puffery.  That confuses two

distinct concepts:  statements of corporate puffery are inactionable because they "are too general

11

to cause a reasonable investor to rely upon them." *ECA v. JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009). Because the SEC does not (and cannot) argue that investors would have relied on these optimistic statements, the claims based on them must be dismissed.

### 3. No Risks or Adverse Developments Were Concealed.

Finally, the SEC makes no argument that Defendants' alleged failure to disclose various risks and adverse developments to the Board, to the auditors, and in public filings constituted actionable omissions. *See* ¶¶ 60, 92, 95, 97, 112, 140, 143, 150. Indeed, these particular omissions are not actionable because they are not alleged to have rendered any statement misleading, Mot. 30, and Defendants undisputedly had no other "duty to disclose" them. *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988); *In re Barclays Bank PLC Sec. Litig.*, 2017 WL 4082305, at *12–13 (S.D.N.Y. Sept. 13, 2017), *appeal filed* (2d Cir. Oct. 16, 2017); *see also* Mot. 30.

The fraud and false-filing claims therefore must be dismissed against all Defendants.

### B. Most Section 10(b) Claims against Mr. Albanese and Mr. Elliott Must Be Dismissed Because Neither Defendant "Made" the Alleged Misstatements.

The SEC concedes that the Individual Defendants made no statements in the 2012 6-K or any new statements in Rio Tinto's bond offerings, and that Mr. Elliott did not make the challenged statement at the August 2012 investor conference and made no verbal statements about RTCM at the October 2012 investor conference. These concessions confirm that under *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135 (2011), the Individual Defendants cannot be liable for such statements.

First, the Individual Defendants did not "make" statements in Rio Tinto's bond offerings. The SEC concedes (at 28) that it "does not allege that Albanese and Elliott were makers of statements in the bond offerings apart from the misstatements in the 2011 Annual Report." But the bond offerings do not quote the 2011 Annual Report—they do not actually repeat any alleged

misstatements from that Report.  *Fannie Mae*, which found no misstatements and did not analyze whether defendants could be liable for *both* the offering materials and an incorporated SEC filing, does not support the SEC's theory that the Individual Defendants "made" statements in *both* the bond offerings and the 2011 Annual Report.  *See In re Fannie Mae 2008 Sec. Litig.*, 891 F. Supp. 2d 458, 483–84 (S.D.N.Y. 2012).  The SEC cannot sustain additional claims against Mr. Albanese and Mr. Elliott when neither took any steps to "make" additional statements.

Second, the SEC's argument that Mr. Elliott "made" statements in August 2012 blatantly ignores the Supreme Court's ruling that "it is the speaker who takes credit—or blame—for what is ultimately said."  *Janus*, 564 U.S. at 143.  Written statements can have multiple authors, *Moon Joo Yu v. Premiere Power LLC*, 2018 WL 456244, at *10 (S.D.N.Y. Jan. 17, 2018), but verbal statements cannot, *see Janus*, 564 U.S. at 143 ("[T]he content [of an oral statement] is entirely within the control of the person who delivers it."); *Ho v. Duoyuan Glob. Water, Inc.*, 887 F. Supp. 2d 547, 572 n.13 (S.D.N.Y. 2012) (one cannot be liable "for the allegedly false statements made by [another]" because he "fail[ed] to correct or clarify" those statements).[7]  The transcript undisputedly shows that Mr. Elliott did not deliver the statements in question.  The SEC's suggestion that Mr. Elliott may have had control over the statements does not create a question of fact; rather, it disregards express Supreme Court guidance and leads to the legal impossibility that two different individuals "made" the same oral statements.

Third, admitting that Mr. Elliott made no oral statement about RTCM at the October 2012 conference, the SEC now advances a novel alternative theory (at 30–31) that a slide in a presentation accompanying Mr. Elliott's remarks contained a false statement.  But the Complaint

---

[7]  Quoting *Moon Joo Yu*, the SEC argues (at 30) "that multiple persons can be considered to have made a statement."  But *Moon Joo Yu* involved written statements in a document in which the defendant "was listed on the first page . . . as one of the authors."  2018 WL 456244, at *10.

nowhere mentions any slide, much less alleges that Mr. Elliott drafted, edited, reviewed, approved, or controlled the content of the slide deck.  Without these allegations, Mr. Elliott cannot have "made" any of the slides in the slide deck.  This is a pleading deficiency, not a factual dispute, and it requires dismissal of the claim based on the October 2012 investor conference.

### C.      The SEC Has Failed to Plead Materiality as a Matter of Law.

The fraud and false-filing claims also must be dismissed because the alleged misstatements and omissions did not "'significantly alter[] the total mix of information'" as a matter of law.  *IBEW Local Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scot. Grp., PLC* ("*IBEW*"), 783 F.3d 383, 390 (2d Cir. 2015).  Courts consider quantitative and qualitative factors, *id.* at 390–91, and *none* of those factors supports materiality here, Mot. 36–38.

The alleged misstatements are presumptively immaterial because they "relate[] to less than 5% of a financial statement," *IBEW*, 783 F.3d at 390—indeed, just 3% of Rio Tinto's total assets of about $120 billion, *see* Mot. 36.  The SEC argues (at 40) that the statements were material based on their purported effect on net earnings, but "the items in issue should be compared to like items on the corporate financial statement."  *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 165 (2d Cir. 2000).  An apples-to-apples comparison of an *asset*'s value requires comparison to the company's total *assets*.  *See ECA*, 553 F.3d at 204 (comparing trading assets to company's total assets); *Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 547 (8th Cir. 1997) (comparing certain account reserves to total assets).  The SEC's authorities are inapposite, for each compared inflated *revenues* to total earnings.  *See Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 719 (2d Cir. 2011) ("future revenues"); *Ganino*, 228 F.3d at 158 ("new income"); *Fresno Cty. Emps.' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 534 (S.D.N.Y. 2017) ("recognition of revenue").

No qualitative factor supports a finding of materiality either.  The SEC wisely concedes "the lack of a negative market reaction," Opp. 39, given that there are no allegations that the impairment caused any stock-price drop, credit downgrade, or investor harm.  The SEC also silently concedes that, as an exploratory asset with widely varying internal valuations, RTCM was not capable of precise measurement.  *See IBEW*, 783 F.3d at 391; *see also* Mot. 37–38.  All of the remaining factors undisputedly were also absent.  *See* Mot. 37 (listing factors).

Abandoning the qualitative factors listed in its own Staff Accounting Bulletin and adopted by the Second Circuit, *see IBEW*, 783 F.3d at 390–91, the SEC instead relies on public statements about the acquisition and impairment, *see, e.g.*, ¶ 63 (acquisition would "re-instill [Rio Tinto's] reputation"), ¶ 106 (acquisition was "evidence of prudent capital management").  Those statements, however, speak to only whether the acquisition was "good" or the impairment was "bad," not whether the alleged misstatements about RTCM were material.  Finally, that Mr. Albanese stepped down by mutual agreement when the impairment was announced cannot support materiality, especially where RTCM's $3 billion impairment paled in comparison to the $11 billion Alcan impairment announced in the same press release.  *See* ¶ 169.  Because the SEC has failed adequately to plead materiality, Counts 1, 3, and 5 must be dismissed.

### D.  The Complaint Fails Adequately to Allege Defendants' Scienter.

Under Rule 9(b), "a defendant's state of mind may be alleged generally," but "'the relaxation of the particularity requirement for conditions of mind must not be mistaken for a license to base claims of fraud on speculation and conclusory allegations.'"  *SEC v. Wey*, 246 F. Supp. 3d 894, 911–12 (S.D.N.Y. 2017) (quoting *SEC v. Egan*, 994 F. Supp. 2d 558, 564–65 (S.D.N.Y. 2014)).  The SEC has adequately alleged neither "motive and opportunity to commit fraud" nor "strong circumstantial evidence" of recklessness, as Rule 9(b) requires.  *ECA*, 553 F.3d at 198.

### 1.     The SEC's Allegations of Motive Are Legally Insufficient.

The SEC concedes (at 34) that motives "*generally* possessed by corporate directors and officers" are legally insufficient, and notably declines even to defend motives such as a desire to preserve Rio Tinto's credit rating.  *See* ¶ 106.  The SEC instead theorizes that the Individual Defendants were motivated to ensure RTCM's success because of Alcan's ongoing failure.  But that supposed motive—seeking corporate success—is also "generally possessed by [all] corporate directors and officers."  It is also pure speculation, unsupported by any non-conclusory factual allegations, and wholly susceptible to hindsight pleading.  If Alcan had turned out well, the SEC would have speculated the Individual Defendants wanted to keep a string of successes going; if RTCM had been their first major investment, the SEC would have speculated that they wanted to make a good first impression.  Allowing plaintiffs to circumvent the rule against generally possessed motives so easily would create the very danger that rule prevents: that "virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions."  *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 268 (2d Cir. 1996).

This District has rejected a claim that high-ranking corporate officers were "'uniquely motivated' to commit fraud because they wanted [the company] to remain solvent and preserve their reputations."  *Kuriakose v. Fed. Home Loan Mortg. Corp.*, 897 F. Supp. 2d 168, 184 (S.D.N.Y. 2012).  The Second Circuit has rejected even "the desire to maintain a high stock price . . . to increase executive compensation or prolong the benefits of holding corporate office" as insufficiently "concrete and personal."  *Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000)

(internal citations omitted).  This Court, too, should reject the SEC's invented theory that the Individual Defendants understood that they were "on the hook for RTCM's failure."  Opp. 33.[8]

The SEC's sole authority, *In re Take-Two Interactive Securities Litigation*, 551 F. Supp. 2d 247 (S.D.N.Y. 2008), is far afield.  There, the misstatements in question concealed the fraudulent backdating of options from which the defendants had directly profited.  The court reiterated that "a 'generalized' desire common to most high-level corporate employees" was insufficient for motive,[9] but reasoned that "the desire to inflate a company's earnings in order to hide options backdating is a much more particularized desire specific to participants in the backdating scheme."  *Id.* at 295.  Involvement with an investment decision, as alleged by the SEC in this case, is far less specific.  Moreover, while the SEC accurately describes the options backdating scheme in *Take-Two* as "prior misconduct," Opp. 34, a bad investment decision—like Rio Tinto's investment here—is not "misconduct" prohibited by the securities laws.

Furthermore, unlike the backdating in *Take-Two*, events relating to Alcan were not "prior" to the events here.  During the very period at issue—when the Individual Defendants were allegedly motivated to conceal losses from acquisitions—impairments on Alcan larger than those on RTCM continued.  The SEC is unable to justify its counterintuitive position that the Individual Defendants worried about RTCM's performance to the point of engaging in fraud while *at the same time* Rio Tinto recognized larger impairments to a more significant acquisition without any allegation of wrongdoing or interference.  Far from giving rise to a strong inference of

---

[8]  Mr. Elliott was, in fact, *not* on the hook.  He announced his retirement long before the impairment and served on Rio Tinto's Board for nearly a year after the impairment.  *See* Mot. 43.

[9]  Indeed, in another part of the opinion, the court found an allegation of motive insufficient even when defendants allegedly sold stock during the relevant period.  *See id.* at 275–77.

scienter through motive, the Alcan allegations—the only basis the SEC continues to assert for its motive-and-opportunity argument against either Individual Defendant—undermine it.

> ### 2. The SEC Fails Adequately to Allege Conscious Misbehavior or Recklessness by Either Individual Defendant.

None of the statements was misleading, *see supra* II.A, so the Individual Defendants could not have been reckless as to their falsity. The SEC's argument (at 34–35) that the Individual Defendants "sought, received, and understood detailed information indicating that their public statements were false and misleading" fails because the SEC mixes and matches the timing of particular events and omits critical information. The SEC never confronts the paucity of allegations in March 2012, when the Individual Defendants signed the 2011 Annual Report. For example, the SEC argues (at 32) that they learned that the Government of Mozambique had rejected a barging proposal in 2011 or early 2012. But the rejection letter quoted in the Complaint, ¶ 76, made clear that only a specific proposal had been rejected, Conn Decl. Ex. 11, at § 4.8, and barging remained on the table until at least *April* 2012, ¶ 77. And while the SEC argues (at 32) that the Individual Defendants were aware that the resources and reserves figures were "'worse by far than expected,'" it omits that a board paper on which it relies, ¶¶ 130–33, concluded the revised figures were more than sufficient to support RTCM's valuation, Conn Decl. Ex. 13, at 7. Mr. Elliott's statement that the market would not see internal estimates was accurate, and was irrelevant because undisputedly the 2011 Annual Report accurately disclosed the revised figures.

To be sure, the Complaint alleges information known to certain teams on the ground in Mozambique as of March 2012, but the vast majority of that information is not alleged to have been shared with the CEO and CFO thousands of miles away (indeed it was not). The Complaint references changing valuations performed by RTCM staff in March 2012, ¶ 87, for example, but does not connect any of that work to Mr. Albanese or Mr. Elliott. There can be no inference of

18

scienter based on information that those individuals are not alleged to have known.  The SEC thus fails adequately to plead either Individual Defendant's scienter with respect to the 2011 Annual Report.

Indeed, the full context of the Complaint and the documents on which it relies presents a far different picture than the SEC suggests:

- The SEC alleges that simply because the Individual Defendants heard bad news about RTCM, they "must have known" that impairment was necessary.

- The Complaint makes only conclusory assertions that the Individual Defendants worked "to conceal" impairment triggers, but it alleges no facts showing that either took any affirmative step or gave any direction to avoid an impairment.

- Neither Individual Defendant is an accountant, and it is unreasonable to expect them to order an impairment or conclude there is an "impairment trigger" when the accounting experts in the company and the independent auditors reached the opposite conclusion.

- Allegations that the accountants and auditors were unaware of infrastructure and resource issues are belied by the board papers quoted from and relied upon in the Complaint.

The SEC argues (at 36) that the Individual Defendants "cannot validly claim merely to have relied on Rio Tinto's valuation process" because they were allegedly told at the Brisbane meeting that RTCM had a negative valuation.  But notes from the meeting—which the SEC filed with the Court and concededly "relied upon . . . in framing the complaint," *Chambers*, 282 F.3d at 153; *see* Opp. 15 n.7—show that Mr. Albanese and Mr. Elliott were given a cautiously optimistic view of a potential fifty-year asset only ten months after acquisition.  The negative NPV allegedly mentioned in the meeting was couched, caveated, and dismissed as "*indicative only*," based on "limited modelling" and typical of "capital-intensive Tier 1 greenfield projects" at this stage.  Miller Decl. Ex. 2, at 4–5.  Indeed, the notes explain why the PowerPoint deck contained no NPV (negative or positive) and why that "indicative" valuation should be ignored:  "We've purposely removed dollar figures . . . as our numbers are indicative only.  There is considerable

scope to increase business value through pre-feasibility studies." *Id.* at 4.  The notes state that

further study was planned, *id.* at 4–5, and never even suggest that impairment was mentioned at

the meeting.  No allegations support the SEC's central claim (at 32) that the Individual Defend-

ants "learned that, based on the best information available . . . , RTCM had no economic value."

Because the Complaint thus fails to allege "strong circumstantial evidence of conscious

misbehavior or recklessness" by either Individual Defendant, *ECA*, 553 F.3d at 198, the Section

10(b) and Section 17(a)(1) claims against the Individual Defendants must be dismissed.

### 3.    The Complaint Fails to Plead Corporate Scienter as to Rio Tinto.

The SEC concedes (at 38) that only the two Individual Defendants' alleged scienter can

be imputed to Rio Tinto.  Moreover, scienter can be imputed to Rio Tinto only if an employee

"committed a culpable act with the requisite scienter." *Teamsters Local 445 Freight Div. Pen-*

*sion Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008).  The fraud claims against Rio

Tinto thus must be dismissed as they fail to allege that either Individual Defendant *made* a false

or misleading statement, *supra* I.A–B, let alone did so with the requisite scienter, *supra* I.D.1–2.

### E.    The Complaint Fails to Plead Scheme Liability as a Matter of Law.

Without the ability to tie Defendants to any alleged misrepresentations, the SEC has re-

sorted to novel theories of scheme liability.  The Court should dismiss the SEC's scheme-liabil-

ity claims under Rule 10b–5(a) and (c) and Section 17(a)(1) and (3) not least because the SEC

misstates the law and the facts.  *See* Mot. 46–47.

First, while misstatement and scheme-liability claims may share overlapping facts, "mis-

representations or omissions" cannot be the "sole basis" for scheme liability.  *Lentell v. Merrill*

*Lynch & Co.*, 396 F.3d 161, 177 (2d Cir. 2005).  The SEC contends (at 11) that *Lentell* applies

only in private litigation under the Private Securities Litigation Reform Act ("PSLRA")—but the

PSLRA had no bearing on the Second Circuit's interpretation of Rule 10b–5(a) and (c) in *Lentell*. 396 F.3d at 177. As courts in this District have explained, "to permit scheme liability 'to attach to individuals who did no more than facilitate preparation of material misrepresentations or omissions actually communicated by others . . . would swallow' the bright-line test between primary and secondary liability." *SEC v. Kelly*, 817 F. Supp. 2d 340, 343 (S.D.N.Y. 2011) (alteration in original) (quoting *SEC v. PIMCO Advisors Fund Mgmt. LLC*, 341 F. Supp. 2d 454, 467 (S.D.N.Y. 2004)). The SEC's contrary interpretation would render Rule 10b–5(b) and Section 17(a)(2) redundant, thus violating the "'cardinal principal of statutory construction'" that "'no clause, sentence, or word shall be superfluous.'" *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001).

Even the SEC's authorities find that scheme liability requires *more* than alleged misrepresentations or omissions. *E.g.*, *SEC v. Pentagon Capital Mgmt. PLC*, 725 F.3d 279, 287 (2d Cir. 2013) (actions "beyond the communication of the trades themselves . . . independently satisfy the requirements of scheme liability"); *SEC v. Lee*, 720 F. Supp. 2d 305, 333 (S.D.N.Y. 2010) ("[A]rguments for dismissal relating to misstatements [are] inapplicable to the fraudulent scheme claims."). The SEC cites no contrary authority in this Circuit.[10] It instead relies on an out-of-circuit case that considered whether a defendant's "conduct necessarily also falls outside" of the scheme liability provisions when he did not "make" any of the statements under *Janus*. *Lorenzo v. SEC*, 872 F.3d 578, 588 (D.C. Cir. 2017), *petition for cert. filed*, No. 17–1077 (U.S. Jan. 31,

---

[10] The SEC makes no attempt to distinguish Defendants' on-point authorities in this District. *See, e.g.*, *Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*, 277 F. Supp. 3d 500, 519–20 (S.D.N.Y. 2017) ("deceptive cover-up" of misrepresentations that merely "repackag[ed] the misrepresentation allegations" was insufficient for scheme liability); *see also In re Smith Barney Transfer Agent Litig.*, 884 F. Supp. 2d 152, 161 (S.D.N.Y. 2012) (courts "must scrutinize pleadings to ensure that misrepresentation or omission claims do not proceed under the scheme liability rubric").

2018).  To the degree *Lorenzo* suggested that mere allegations of misstatements suffice for scheme liability, it did so only in express disagreement with the Second Circuit's decision in *Lentell*, *id.* at 594–95, which this Court is bound to follow.

Second, the SEC argues (at 14) that 15 facts "went beyond the various misleading statements."  None actually does so.  *Seven* of these "bad acts" are alleged false statements to investors.[11]  The others are also fundamentally allegations that Defendants misrepresented information, not separate actions potentially giving rise to scheme liability.  For example:

- **Allegedly deceiving auditors in connection with 2011 financial statements**, Opp. 14, does not support scheme liability because the SEC alleges, at most, that the Individual Defendants "falsely attested that all 'relevant audit information' had been provided"—a misrepresentation claim.  Indeed, the SEC argues (at 15) that "Defendants used the false 2011 financial statement . . . in connection with SEC filings and debt offerings," which form the basis for the misrepresentations claims.

- **Data from the Brisbane Meeting**, Opp. 15–16, does not support scheme liability because the SEC's basic allegation is that the Individual Defendants failed to disclose information.  This, too, is a classic omissions claim—and fails because silence, absent a duty to disclose, is not actionable under the federal securities laws.  *Supra* II.A.3.

- For similar reasons, the **First Controller's Paper**, the **June 2012 Audit Committee Meeting**, the **Impairment Paper**, and the **Second Controller's Paper**, Opp. 16–17, simply recast, with different descriptions, the SEC's fundamental grievance that the Individual Defendants allegedly misstated information or failed to correct misstatements, neither of which is a valid basis for a scheme-liability claim.

At bottom, the SEC's grab-bag of allegations is insufficient because it alleges "conduct that *became* deceptive only through [Defendants'] misstatements in [their] public filings."  *Kelly*, 817 F. Supp. 2d at 344.  The SEC attempts to distinguish *Kelly* by arguing (at 13 n.6) that the Defendants here provided "false assurances and documents."  That only underscores that the alleged conduct here is part-and-parcel of—not distinct from—the alleged misrepresentations.

---

[11]  These include 5 categories that the SEC *titles* as "false" or "misleading" statements, as well as the categories of "2011 Annual Report" and "Half-year financials."  Opp. 14–18.

### F.    The Section 17(a)(2) Claims Fail as to the Individual Defendants.

Section 17(a)(2) prohibits "directly or indirectly . . . obtain[ing] money or property by means of" a materially false or misleading statement or omission.  15 U.S.C. § 77q(a)(2).  Because "the requirement of personal gain inheres in the word 'obtain,'" the SEC must plead that the individual defendant personally, not his employer, obtained money or property.  *SEC v. Syron*, 934 F. Supp. 2d 609, 639 (S.D.N.Y. 2013).  Indeed, dictionaries from the time of the statute's enactment confirm that "to obtain" an object usually means to "gain possession of it."  *Id.* at 638 (citing several).  Courts in this District have thus rejected repeated SEC attempts to allege gain to only the defendant's employer, not the defendant himself.  *Wey*, 246 F. Supp. 3d at 915; *SEC v. DiMaria*, 207 F. Supp. 3d 343, 358 (S.D.N.Y. 2016); *Syron*, 934 F. Supp. 2d at 639–40.

As Defendants explained (at 48–49 n.17), two cases in this District were contrary:  in one, the relevant discussion was dicta, *SEC v. Mudd*, 885 F. Supp. 2d 654, 669–70 (S.D.N.Y. 2012), and the other improperly relied on inapposite statutory text and purpose to overcome the statute's plain meaning, *SEC v. Stoker*, 865 F. Supp. 2d 457, 462–64 (S.D.N.Y. 2012).  The SEC relies on those two cases without addressing their defects,[12] and redoubles its appeal to statutory purpose without ever addressing the plain meaning of "obtain."  These arguments are unavailing.

The SEC also insists that the mere receipt of salary or other compensation unaffected by the alleged wrongdoing suffices.  A defendant's compensation need not be "affected in some way by the alleged fraud" to satisfy Section 17(a)(2), the SEC argues (at 42), because this requirement "is not found anywhere in the text of the statute."  That is plainly wrong.  The statute

---

[12]   The SEC also relies on a Northern District case that held in the alternative that the defendant did personally profit.  *See SEC v. StratoComm Corp.*, 2 F. Supp. 3d 240, 263 (N.D.N.Y. 2014).  The Second Circuit affirmed in a summary order, but it did not address Section 17(a)(2).  *SEC v. StratoComm Corp.*, 652 F. App'x 35 (2d Cir. 2016) (summary order).

requires that a defendant "obtain money or property *by means of*" fraud.  15 U.S.C. § 77q(a)(2) (emphasis added).  Ample precedent supports the common-sense interpretation that a defendant who receives payments not *affected* by the alleged fraud has not obtained money or property "by means of" fraud.  *Syron*, 934 F. Supp. 2d at 637; *DiMaria*, 207 F. Supp. 3d at 358; *Wey*, 246 F. Supp. 3d at 915.  The SEC's sole contrary authority is an unpublished case that should be rejected as unpersuasive.  *See SEC v. Tourre*, 2014 WL 61864 (S.D.N.Y. Jan. 7, 2014).

## III.   The Section 13(b) Claim (Count 7) against Rio Tinto Must Be Dismissed.

The SEC also fails to plead a books-and-records or internal-controls violation under Section 13(b).  Although each claim is governed by a "reasonableness" standard, *SEC v. Softpoint, Inc.*, 958 F. Supp. 846, 866 (S.D.N.Y. 1997); *SEC v. World-Wide Coin Invs., Ltd.*, 567 F. Supp. 724, 751 (N.D. Ga. 1983), both claims must be dismissed as a matter of law.  *See* Mot. 53–56.

### A.   The SEC Has Not Pleaded an Accounting Violation as a Matter of Law.

The books-and-records claim must be dismissed for two reasons:  There are no allegations that any restatement was required or any auditor opinion withdrawn, and Rio Tinto's impairment determinations—inherently subjective judgments based on rapidly evolving information—were reasonable as a matter of law.  Mot. 53–55.  The SEC's two responses fail.

First, the SEC argues (at 44) that the absence of a restatement does not warrant dismissal—urging this Court to overlook Judge Caproni's well-reasoned decision to the contrary because that decision concerned private litigation under the PSLRA.  *See Harris v. AmTrust Fin. Servs., Inc.*, 135 F. Supp. 3d 155 (S.D.N.Y. 2015).  But the PSLRA had no bearing on *Harris*'s holding that the Complaint "has not alleged facts that support its conclusory allegation that AmTrust violated GAAP."  *Id.* at 172.  Besides, the SEC *itself* asks the Court (at 44) to rely on two PSLRA cases.  Even those cases are inapposite because the absence of a restatement there

did not follow a four-year SEC investigation scrutinizing the company's financial reporting.   In these circumstances, and consistent with decisions in this District, the accounting claim fails as a matter of law.   *See Harris*, 135 F. Supp. 3d at 172–73; *In re Fannie Mae 2008 Sec. Litig.*, 742 F. Supp. 2d 382, 408 (S.D.N.Y. 2010) (dismissing accounting claim where defendant "operated in a heavily regulated environment, and . . . no restatements of [its] financials have been ordered").[13]

Second, the SEC argues (at 44 & n.16) that reasonableness is a fact issue that should not be decided on a motion to dismiss.   But even the SEC's recitation of the relevant allegations (at 45) shows that Rio Tinto's impairment determinations were objectively reasonable and thus violated no accounting standards.   At YE 2011, Rio Tinto reasonably relied on the very recent acquisition value.   As Defendants explained (at 54), and as the SEC does not dispute, that determination complied with IAS 36 because the most recent recoverable amount, calculated by RTCM as part of its annual review process, factored in barging and rail limitations, yet still exceeded the acquisition value by $1.2 billion largely due to projected rising coal prices, *see* Conn Decl. Ex. 10, at 2.   Rio Tinto could resubmit a new barging proposal, Conn Decl. Ex. 12, at 2; Ex. 11, at § 4.8, and the revised resources and reserves figures still indicated enough coal for the lifetime needs of the mine, Conn. Decl. Ex. 13, at 7.

At HY 2012, Rio Tinto reasonably concluded that no formal impairment testing was required.   Mot. 54–55.   The SEC spends a single sentence discussing that impairment determina-

---

[13] The SEC argues (at 37) that the auditors' failure "to withdraw a five-year-old audit, by definition" is not dispositive.   But the auditors never withdrew their opinion during the investigation—which they were aware of and which began over 4 years ago—and if disclosure had been required, they undisputedly should have done so "as soon as practicable" *even if* the revision would have "resulted from events that had occurred in prior years."   PCAOB AS 2905.06(a) ("Subsequent Discovery of Facts Existing at the Date of the Auditor's Report").

tion, contending that the Individual Defendants "conceal[ed] material facts about RTCM's valuation" from the Controller and the independent auditors.  Opp. 45 (citing ¶¶ 122–38).  Yet Rio Tinto and its auditors comprehensively reviewed each alleged impairment indicator and reasonably concluded that none triggered a formal impairment test because their effects "ha[d] not been quantified with any degree of accuracy," ¶ 133, and modeling based on "more certain" inputs indicated a potential value well above the acquisition value, Conn Decl. Ex. 13, at 2–3; *see* Mot. 14–15.  The SEC fails to explain how Rio Tinto was supposed to know *which* of several valuations represented RTCM's true value when those valuations varied widely throughout 2012, *see*, *e.g.*, Conn Decl. Ex. 10, at 2 ($4.9 billion); ¶ 119 (-$680 million); ¶ 131 ($5.1 billion).  Despite alleged "red flags," the SEC has failed to "raise an inference of unreasonable conduct," and this claim must be dismissed.  *SEC v. Espuelas*, 579 F. Supp. 2d 461, 486–87 (S.D.N.Y. 2008) (dismissing a books-and-records claim where "the accounting of the transactions was too complex to infer that defendants should have known they were being accounted for incorrectly"), *superseded by statute on other grounds as stated in Wey*, 246 F.3d at 926.

### B.    The SEC Has Not Pleaded Inadequate Internal Controls as a Matter of Law.

The internal-controls claim must be dismissed because the SEC fails to allege any internal controls that were not "sufficient to provide reasonable assurances" of accurate books and records.  15 U.S.C. § 78m(b)(2)(B).  Rio Tinto concededly had a robust system of such controls, including monitoring by independent auditors, an impairment review process, and an Audit Committee established "to ensure the integrity of Rio Tinto's financial reporting and sound systems of internal control and risk management."  Opp. 45–46 n.17 (citing ¶¶ 30–39, 42).  The SEC fails to explain how any of these controls were unreasonable; if anything, the Complaint alleges just the opposite.  *See* Mot. 55 (citing ¶¶ 36–38).

Instead, the SEC stakes its claim on allegations that the Individual Defendants "corrupted Rio Tinto's internal controls."  Opp. 46.  But as Defendants explained (at 56), inadequate controls cannot be inferred merely from allegations of intentional fraud.  *See, e.g.*, *SEC v. Healthsouth Corp.*, 261 F. Supp. 2d 1298, 1324 (N.D. Ala. 2003) (dismissing internal-controls claim where the "sole evidence" of deficiency was that 11 employees had pleaded guilty to fraud).  That is because the statute requires only reasonable internal controls, not "fail-safe accounting control system[s]."  *World-Wide Coin*, 567 F. Supp. at 751.  The SEC never addresses this argument and cites no authority for its position.  Accordingly, Count 7 must be dismissed.

## IV.    The Aiding-and-Abetting Claims (Counts 2, 4, 6, and 9) Must Be Dismissed.

The SEC's aiding-and-abetting allegations fare no better.  There was no primary violation for either Individual Defendant to aid or abet, *supra* II–III, and the SEC fails adequately to allege knowing or reckless substantial assistance in any fraud, *supra* II.D.  In particular, despite citing a handful of unpublished district-court decisions, Opp. 49, the SEC fails to explain how imposing primary *and* secondary liability on the same defendant for the same acts comports with the Second Circuit's holding that secondary liability requires "'the existence of a securities law violation by the primary *(as opposed to the aiding and abetting)* party,'" *SEC v. Apuzzo*, 689 F.3d 204, 206 (2d Cir. 2012) (emphasis added).  Nor can the SEC patch this hole in its Complaint by arguing (at 49) that each Individual Defendant aided and abetted alleged corporate violations predicated on the other's alleged acts and scienter.  The SEC cites no authority for this proposition, and it does not sufficiently allege that either Individual Defendant "substantially assisted" the other, much less knowingly or recklessly so.[14]

---

[14]  At minimum, the SEC cannot use this mix-and-match approach to fraud at HY 2012 because concededly neither Individual Defendant made any statements in the HY 2012 report, so neither could have committed fraud.

**V.     The Rule 13b2-1 and 13b2-2 Claims (Counts 8 and 10) Must Be Dismissed.**

With respect to Counts 8 and 10, the SEC continues to obfuscate the timing and context of particular events.  The SEC criticizes the Defendants' Motion for focusing on "the information submitted to Rio Tinto's auditors at half year 2012," arguing that "the counts encompass the full scope of Albanese and Elliott's misconduct."  Opp. 46.  The Motion did so for good reason—the only allegations relevant to Counts 8 and 10 came in that part of the Complaint. ¶¶ 123–38.  Indeed, in defending Counts 8 and 10, the SEC's brief cites no factual Complaint paragraphs except those relating to HY 2012.  *See* Opp. 46–47 (citing ¶¶ 123–38).

The SEC's desire to shift focus away from the board papers is understandable.  As Defendants demonstrated (at 58–59), and as the SEC never meaningfully addresses, these papers reflected the Controller's Group and auditors' awareness of the negative information the SEC accuses the Individual Defendants of somehow concealing.  For example, the SEC's argument (at 47) that the board papers "did not account for any of the transportation challenges facing RTCM" is contradicted by the actual papers, which stated, "[w]hile barging has not been entirely ruled out in the future, it seems unlikely that the situation will be resolved in the short term," Conn Decl. Ex. 9, at 13; "there is not enough [existing] rail capacity to accommodate increased production levels," *id.*; and barging "has experienced setbacks due to environmental and other approvals being withheld," which was "likely to result in a reduction in the volume of coal brought to market in the short term with any shortfalls being deferred to later years," Conn Decl. Ex. 13, at 2.

Likewise, while the SEC may find it "absurd[]" that a project could gain value despite challenges, Opp. 47, the internal accountants and the external auditors did not.  Rather, the Impairment Paper included a chart showing the positive and negative effects of developments,

Conn Decl. Ex. 13, at 6, thus explaining how it arrived at the value the SEC alleges has "no reasonable basis in fact," ¶ 131.  Far from ignoring the negative developments, the papers expressly considered them—discussing transportation issues extensively, and addressing the most current resources and reserves figures.  While there was less coal than Riversdale had reported, the papers explained, Deloitte had advised "that the revised numbers will not impact the acquisition valuation because the revised reserves and resources still significantly exceed the . . . material assumed during the life of the project."  Conn Decl. Ex 13, at 7.  Even after the revisions, there was still more than enough coal to carry out the plans underpinning the valuation.[15]

The papers also directly addressed valuation concerns.  For example, they noted that "[i]t is not possible to provide a valuation of RTCM to an acceptable degree of accuracy while the options remain at such an early stage of development," and that "[a] valuation that only includes the items considered probable will omit material levels of value that is known to be present but has not been fully quantified" and that "would be attributed to RTCM by a market participant."  Conn Decl. Ex. 13, at 3.  The SEC suggests that this lack of certainty required an impairment, Opp. 37, but taking an impairment too *soon* undisputedly can be a deceptive practice, *see In re Sunbeam Corp.*, S.E.C. Release No. 7976, 2001 WL 616627, at *13–14 (May 15, 2001).

Given the board papers' disclosures and the Controller's Group and auditors' unanimous comfort with resting a lack of impairment trigger in part on the lack of certainty, the Individual Defendants acted reasonably.  The claims in Counts 8 and 10 require a breach of "standards of reasonableness," *Softpoint*, 958 F. Supp. at 866, that is utterly lacking here.  They must therefore be dismissed.

---

[15]  Although the SEC argues (at 7) that "this advice was contingent on confirmation from Rio Tinto's technical experts," there are no allegations either that those technical experts refused to confirm or that Individual Defendants knew of that alleged contingency.  ¶ 126.

## VI.     The False-Certification Claims (Counts 11 and 12) Must Be Dismissed.

The SEC continues to insist that the Individual Defendants falsely certified Rio Tinto's 2011 Form 20-F.  But the certifications cannot have been false because the Complaint does not plausibly allege that the Form 20-F was materially inaccurate.  *Supra* II.A.1–2.  Moreover, although the SEC argues that the Individual Defendants knew that the report "contained material misrepresentations and omissions," Opp. 48, the Complaint alleges that they acted *either* "knowingly" *or* "negligently," ¶¶ 211, 215.  The SEC does not dispute, however, that its false-certification claims require at least recklessness.  Mot. 60 n.20 (citing *SEC v. Jensen*, 835 F.3d 1100, 1117–21 (9th Cir. 2016) (Bea, J., concurring)).  These claims thus must be dismissed.

## VII.    The SEC Is Not Entitled to Disgorgement as a Matter of Law.

The SEC's disgorgement request is an impermissible "penalty assessment."  *SEC v. Tex. Gulf Sulphur Co.*, 446 F. 2d 1301, 1308 (2d Cir. 1971).  The SEC concedes (at 51) that disgorgement is a "penalty" for statutory limitations purposes, *Kokesh v. SEC*, 137 S. Ct. 1635, 1645 (2017).  Yet it fails to explain how disgorgement—which "bears all the hallmarks of a penalty," is designed for deterrence, and is "inherently punitive" in requiring payment of "a noncompensatory sanction to the Government," *id.* at 1643–44—is somehow *not* a penalty for relief purposes.  All of the SEC's authorities are out-of-circuit decisions; inapposite, pre-*Kokesh* cases, *SEC v. Cavanagh*, 445 F.3d 105, 116–17 (2d Cir. 2006) (disgorgement is an equitable remedy); *SEC v. Palmisano*, 135 F.3d 860, 864–65 (2d Cir. 1998) (disgorgement does not trigger double jeopardy); or a case that assumed that disgorgement is "punitive," *SEC v. Metter*, 706 F. App'x 699, 703 (2d Cir. 2017) (summary order).  The Court should strike the disgorgement request.

<u>**CONCLUSION**</u>

For the foregoing reasons, the Complaint should be dismissed with prejudice.

30

Dated: New York, New York
March 26, 2018

                                                          By:   /s/ Mark A. Kirsch

| | |
|---|---|
| Kristen A. Lejnieks | Mark A. Kirsch |
| Peter J. Romatowski | Lawrence J. Zweifach |
| JONES DAY | Caitlin J. Halligan |
| 51 Louisiana Avenue, NW | Jennifer L. Conn |
| Washington, DC 20001 | GIBSON, DUNN & CRUTCHER LLP |
| Tel: (202) 879-7625 | 200 Park Avenue |
| Fax: (202) 626 1700 | New York, New York 10166-0193 |
| kalejnieks@jonesday.com | Tel: (212) 351-4000 |
| pjromatowski@jonesday.com | Fax: (212) 351-4035 |
| | mkirsch@gibsondunn.com |
| David R. Woodcock (pro hac vice) | lzweifach@gibsondunn.com |
| JONES DAY | challigan@gibsondunn.com |
| 2727 North Harwood Street | jconn@gibsondunn.com |
| Dallas, TX 75201 | |
| Tel: (214) 969-3681 | Richard W. Grime (pro hac vice) |
| Fax: (214) 969-5100 | Alexander W. Mooney (pro hac vice) |
| dwoodcock@jonesday.com | Kellam M. Conover (pro hac vice) |
| | GIBSON, DUNN & CRUTCHER LLP |
| *Attorneys for Defendant Thomas Albanese* | 1050 Connecticut Avenue, NW |
| | Washington, D.C. 20036 |
| | Tel: (202) 955-8500 |
| Theodore V. Wells, Jr. | rgrime@gibsondunn.com |
| Walter G. Ricciardi | amooney@gibsondunn.com |
| Geoffrey R. Chepiga | kconover@gibsondunn.com |
| Livia Fine | |
| PAUL, WEISS, RIFKIND, WHARTON | |
| & GARRISON LLP | *Attorneys for Defendants Rio Tinto PLC and* |
| 1285 Avenue of the Americas | *Rio Tinto Limited* |
| New York, NY 10019 | |
| Tel: (212) 373-3000 | |
| Fax: (212) 757-3990 | |
| twells@paulweiss.com | |
| wricciardi@paulweiss.com | |
| gchepiga@paulweiss.com | |
| lfine@paulweiss.com | |
| | |
| *Attorneys for Defendant Guy Robert Elliott* | |