UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE
COMMISSION,

                                        Plaintiff,

                    -against-

RIO TINTO PLC, RIO TINTO LIMITED,
THOMAS ALBANESE, and GUY ROBERT
ELLIOTT,

                                        Defendants.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __3/18/2019__

17 Civ. 7994 (AT)

**ORDER**

ANALISA TORRES, District Judge:

The U.S. Securities and Exchange Commission (the "SEC") brings this enforcement

action against Defendants Rio Tinto plc and Rio Tinto Limited (collectively, "Rio Tinto"),

Thomas Albanese, and Guy Robert Elliott (Albanese and Elliott together, the "Individual

Defendants"), alleging violations of the Securities Exchange Act of 1934 (the "Exchange Act"),

15 U.S.C. § 78a *et seq.*, and the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77a *et*

*seq.*, and the rules promulgated thereunder, arising out of Rio Tinto's acquisition of a coal

mining project in the Republic of Mozambique.  Defendants move to dismiss the complaint in its

entirety.  ECF No. 70.  For the reasons stated below, Defendants' motion is GRANTED in part

and DENIED in part.

## BACKGROUND

The following facts are taken from the complaint, which the Court accepts as true for

purposes of this motion.  *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

Rio Tinto is an international mining group that is headquartered in the United Kingdom.  Compl.

¶¶ 18–20, ECF No. 1.  Thomas Albanese was Rio Tinto's Chief Executive Officer from May

2007 through January 2013. *Id.* ¶ 21. Guy Robert Elliott was Rio Tinto's Chief Financial

Officer from 2002 through April 2013. *Id.* ¶ 22.

    Rio Tinto is obligated to comply with the accounting standards issued by the

International Accounting Standards Board ("IAS" standards). *Id.* ¶ 31. Pursuant to one standard

(IAS 34), Rio Tinto is required to recognize a loss from an impaired asset in each interim

financial report. *Id.* ¶ 32. An asset is impaired if its value, as reported in a company's financial

statements, exceeds its likely recoverable amount. *Id.* Pursuant to another standard (IAS 36),

Rio Tinto must assess whether an asset is impaired at the end of each reporting period (i.e., at

each half year and year end). *Id.* ¶¶ 33–34. This is done by determining whether there are any

"impairment indicators," and if there are, by testing for impairment. *Id.* ¶ 36. Examples of

impairment indicators in IAS 36 are, among others, a significant decline in the market value of

an asset, significant changes in the technological, legal, or economic environments in which the

entity operates, and indications that the economic performance of an asset is, or will be,

significantly worse than expected. *Id.* Rio Tinto uses other impairment indicators as well—for

example, a material change in the estimates of ore reserves and resources for a project. *Id.* ¶ 37.

Rio Tinto's Controller's Office is responsible for coordinating the impairment review process,

and at all relevant times, the Controller reported to Elliott. *Id.* ¶¶ 35, 39. The Controller's Office

also prepared papers for Rio Tinto's Audit Committee, of which the Individual Defendants were

members. *Id.* ¶¶ 42–43. The Individual Defendants were also members of Rio Tinto's

"Investment Committee," which made investment decisions for the company. *Id.* ¶¶ 27, 54.

    In July 2007, Rio Tinto acquired Alcan, Inc. ("Alcan"), an aluminum processing

company, for approximately $38 billion. *Id.* ¶ 44. However, Rio Tinto "impaired" Alcan four

times over the following years, eventually writing off substantially all of its value by January 2013. *Id.*

In 2010, Rio Tinto identified a company called Riversdale Mining Limited ("Riversdale") as a potential acquisition target. *Id.* ¶¶ 48–53. Riversdale's principal interests were mining projects in contiguously-located coal tenements in Mozambique. *Id.* ¶ 50. These coal projects were located in areas of Mozambique believed to have large amounts of "hard coking" coal, which is rarer and more valuable than "thermal" coal. *Id.* ¶¶ 49–50, 55.

At an August 2010 meeting of the Investment Committee, the CEO of Rio Tinto's Energy Product Group ("RTE") contended that Riversdale's coal tenements were worth approximately $3.4 billion, based in part on two assumptions. *Id.* ¶¶ 24, 55. First, it was assumed that the tenements had production potential of approximately 30 million tons of coal annually by 2020, and 45 million tons annually by 2030. *Id.* ¶ 55. Second, it was assumed that sixty percent of the coal mined would be hard coking coal. *Id.* Additionally, Rio Tinto's Technical Evaluation Group ("TEG") informed the Investment Committee that same month that RTE's "central case assumption" was that the majority of the coal mined from the tenements would be barged down the Zambezi River. *Id.* ¶¶ 29, 56. TEG explained that barging is "only a concept at this stage and a number of potentially 'showstopping' unknowns exist (such as the ability to dredge and maintain an open channel over the river mouth bar, the impact of cyclones/flooding on river navigability and the ability to obtain environmental approvals)," and described the assumptions about Rio Tinto's production capacity as "optimistic." *Id.* ¶ 56. The SEC also alleges that it was assumed that approximately 30 million tons of coal could be barged

annually and that approximately 12 to 15 million tons of coal could be transported by existing

rail lines annually, although it does not specify when these assumptions were made.  *Id.* ¶ 67.

In advance of a November 18, 2010 Investment Committee meeting, TEG reported that

many of the technical uncertainties about the project persisted, including that with respect to

barging, "[c]urrent assessments are at a fairly early stage . . . and significant uncertainties remain

over its practical operation, permitting, feasibility and cost."  *Id.* ¶ 58 (alteration and ellipsis in

original).  Barging was discussed at that meeting, and RTE's CEO informed the Investment

Committee that barging was a viable option that was supported by Mozambique's government.

*Id.* ¶ 59.

In December 2010, the Investment Committee presented a proposal to acquire Riversdale

to Rio Tinto's Board of Directors (the "Board"), which also included the Individual Defendants.

*Id.* ¶ 60.  The proposal stated that the purchase would increase Rio Tinto's production of coal to

more than 30 million tons annually after 2020, that coal could be transported by barging or rail,

and that the value of the acquisition was $3.6 billion.  *Id.*  However, the potentially

"showstopping" risks associated with barging were not disclosed to the Board.  *Id.*  Rio Tinto

acquired Riversdale in April 2011 for approximately $3.7 billion and renamed the business "Rio

Tinto Coal Mozambique" ("RTCM").  *Id.* ¶¶ 2, 61.  Rio Tinto and the Individual Defendants

touted the Riversdale acquisition to its shareholders and the public over the following months.

*Id.* ¶¶ 62–66.  However, Rio Tinto soon ran into problems with the project.

First, Rio Tinto encountered problems with respect to barging.  *Id.* ¶¶ 68–74.  By October

2011, RTE's Vice President of Logistics determined that, based on the best information

available, barging capacity was limited to 10 million tons annually (not 30 million) due to

physical and ecological constraints.  *Id.* ¶ 69.  Thereafter, RTCM generated an updated valuation that reduced its value by approximately $2.1 billion.  *Id.* ¶ 71.  The Individual Defendants were aware of the problems, and Albanese met with RTCM's management team and Mozambique government officials in December 2011 where he learned more about the challenges, and expressed "[m]ajor disappointment on infrastructure capacity."  *Id.* ¶¶ 72–74.  Barging was contingent on government approval, and in December 2011, the Government of Mozambique rejected a barging proposal in a written letter because of environmental concerns.  *Id.* ¶ 76.  By January 2012, both Individual Defendants had learned of the rejection.  *Id.* ¶ 77.  Rio Tinto never formally submitted a revised proposal, and was warned by the Government of Mozambique in April 2012 that if it persisted in raising the subject of barging, it risked losing its mining licenses altogether.  *Id.*  Rio Tinto did not publicly disclose the rejection of the barging proposal or its effect on RTCM's valuation, nor did Albanese inform the Board about it.  *Id.* ¶¶ 89–90.  However, "press reports" in March 2012 noted that the Government of Mozambique had rejected Rio Tinto's proposal.  *Id.* ¶ 90.

Aside from barging, another option was to transport the coal by rail, and as discussed, Rio Tinto had assumed that between 12 and 15 million tons of coal could be shipped by rail annually.  *Id.* ¶ 80.  However, a few months after acquiring Riversdale, Rio Tinto learned that the total existing shared rail capacity was limited to 6 million tons per year for all users, and further, Rio Tinto would only be able to transport about 2 million tons annually.  *Id.* ¶ 80.[1]

As for the total amount of coal resources, Riversdale had publicly declared (before acquisition) that the tenements contained approximately 13 billion tons of coal resources.  *Id.*

---

[1] The SEC does not specify exactly when this was learned, or by whom.  *See* Compl. ¶¶ 80–82.

¶ 83.  However, Rio Tinto estimated pre-acquisition, while doing its due diligence, that they contained only about 7 billion tons.  *Id.*  And post-acquisition, in January 2012, Rio Tinto learned that it contained closer to 3 billion tons.  *Id.* ¶ 84.  Elliott sent emails to Albanese about this in January 2012, and noted that because Rio Tinto's pre-acquisition estimate of 7 billion tons was not publicly disclosed, "the market won't see" that their due diligence estimate was wrong. *Id.* ¶¶ 85–86.

In late 2011 and early 2012, RTCM created "ground-up" valuations that generated valuations ranging from approximately negative $3.45 billion to approximately negative $9 billion.  *Id.* ¶ 87.  These models incorporated the problems about the transportation options and the coal reserves, but were still based on "aggressive" assumptions, including that Rio Tinto would build a new railroad for coal transportation (and sell off excess capacity on it to other companies).  *Id.* ¶ 88.

Between September and December 2011, Rio Tinto conducted its review of RTCM for impairment indicators.  *Id.* ¶ 91.  However, Defendants did not disclose to Rio Tinto's auditors the barging and rail problems, to the extent they were then known.  *Id.* ¶ 92.  The auditors believed, therefore, that nothing significant had changed since acquisition and did not test for impairment.  *Id.* ¶¶ 92, 94.  RTCM was valued at its acquisition price—about $3.7 billion—in Rio Tinto's 2011 annual report (the "2011 Annual Report").  *Id.* ¶¶ 96–98.  The 2011 Annual Report also stated that Rio Tinto had anticipated the full extent of the write-down in Riversdale's resources—from 13 billion to 3 billion tons, *id.* ¶¶ 83–84—prior to acquisition.  *Id.* ¶ 102.  The Individual Defendants signed the 2011 Annual Report and confirmed, among other things, that it gave "a true and fair view of the assets, liabilities, financial position and profit" of Rio Tinto;

that it was prepared in accordance with applicable accounting standards; and that they had taken the necessary steps to establish that Rio Tinto's auditors were aware of any relevant information. *Id.* ¶ 95.  The 2011 Annual Report was incorporated into Rio Tinto's Form 20-F, which was filed with the SEC on March 15, 2012.  *Id.* ¶ 96.  The 20-F, in turn, was incorporated into offering documents for four bond offerings that Rio Tinto issued in March 2012, through which Rio Tinto raised $2.5 billion dollars.  *Id.* ¶¶ 107–110.

In October 2010 and April 2011, two credit agencies upgraded Rio Tinto's long-term debt ratings.  *Id.* ¶ 105.  In meetings with credit rating agencies in early 2011, Rio Tinto had touted its acquisition of Riversdale as evidence of prudent capital management.  *Id.* ¶ 106.

On April 19, 2012, Rio Tinto held its annual shareholders meeting, which Albanese attended.  *Id.* ¶ 113.  Albanese did not disclose any of the problems that RTCM had encountered to date, and told shareholders that Rio Tinto was growing its coal business, with a target of starting to ship coal from Mozambique in the first half of 2012.  *Id.* ¶¶ 113–114.

In mid-April 2012, Elliott requested an "all hands" meeting with Albanese and RTCM representatives to discuss RTCM.  *Id.* ¶ 116.  Elliott asked the CEO of RTE to calculate a "net present value" of RTCM in advance of the meeting.  *Id.*  The meeting was held on May 11, 2012, in Brisbane, Australia (the "Brisbane Meeting").  *Id.*  Elliott did not invite Rio Tinto's Controller to the Brisbane Meeting.  *Id.* ¶ 118.  At the meeting, RTCM and RTE management provided the Individual Defendants with certain information, including that: using the best information available, RTCM was worth negative $680 million; the coal transportation options assumed at acquisition were no longer realistic (barging had been rejected by the Government of Mozambique and in any event faced physical challenges); and there was a lower proportion of

7

hard coking coal to thermal coal than had been assumed.  *Id.* ¶ 119.  Additionally, they informed the Individual Defendants that the only way to deliver the necessary capacity of coal at a competitive cost was to build a new rail line (or a "greenfield" rail line) at a cost of $16 billion—however, a greenfield rail line would still not give the project a positive valuation.  *Id.*  At the Brisbane Meeting, Albanese rejected a proposal for Rio Tinto to build the greenfield rail line by itself because of capital constraints, but instructed RTCM to seek out potential partners to build it.  *Id.* ¶ 120.  At the Brisbane Meeting, the Individual Defendants determined that it was premature to settle on a valuation for RTCM.  *Id.* ¶ 121.  However, by this point, the existing infrastructure options would allow for transportation of only about five percent of the volume of coal resources assumed at acquisition.  *Id.* ¶ 127.

The impairment review process for Rio Tinto's half-year financials began a few weeks after the Brisbane Meeting.  *Id.* ¶ 122.  In advance of a June 18, 2012 meeting of Rio Tinto's Audit Committee (which was attended by the Individual Defendants), Rio Tinto's Controller submitted a paper (the "First Controller's Paper") which stated that "[a] number of options are available" for increasing RTCM's export capacity "including securing incremental capacity on the existing rail lines, greenfield rail and port development . . . and revised partial barging options."  *Id.* ¶¶ 123–124.  (alteration and ellipsis in original).  The First Controller's Paper also stated that "it is not expected that any impairment will need to be recorded as it is too early to assess the impact of the developments on the fair value of the [RTCM]."  *Id.* ¶ 125 (alteration in original).  Further, it stated that the lower amount of coal reserves had been "anticipated in the due diligence," and that an auditing firm that had initially valued RTCM had advised Rio Tinto that the change in the amount of coal reserves would not affect its valuation.  *Id.* ¶ 126.  The SEC

alleges, however, that the firm's statement was premised on an assumption about how much of the coal could be converted into marketable coal, and that the firm had not yet received confirmation from Rio Tinto's technical experts about whether its assumption was correct. *Id.* Elliott reviewed a draft of the First Controller's Paper before it was submitted to the Audit Committee and Rio Tinto's independent auditors, but made no corrections. *Id.* ¶¶ 123, 128. Neither of the Individual Defendants informed the Audit Committee at the June 18, 2012 meeting of the severe adverse developments learned at the Brisbane Meeting. *Id.* ¶ 129.

Rio Tinto subsequently submitted a paper to its independent auditors in connection with its 2012 half-year impairment review (the "Impairment Paper"). *Id.* ¶ 130. The Impairment Paper did not identify any impairment indicators, and stated that Rio Tinto was "confident of finding a viable infrastructure path [and that] the breadth of options mean[s] that a central case view is still under development." *Id.* ¶ 131 (alterations in original). The Impairment Paper also stated that "a potential value of $5.1 billion" was an "indication of value" for RTCM and that there was an additional "$1 billion of value designated as possible upside." *Id.* Similar to the First Controller's Paper, the Impairment Paper stated that the valuation firm had said that its valuation of RTCM was not affected by the lower-than-expected coal resources, but did not mention that the firm's opinion was contingent on receiving more information from Rio Tinto's engineers. *Id.* ¶ 132. The Impairment Paper concluded that it was not yet possible to determine whether there had been an adverse impact on RTCM's value because "the [transportation] options available have not been quantified with any degree of accuracy yet." *Id.* ¶ 133.

The Controller submitted a second paper to the Audit Committee and Rio Tinto's independent auditors (the "Second Controller's Paper") in connection with a July 30, 2012

meeting of the Audit Committee. *Id.* ¶ 134. The Second Controller's Paper concluded that Rio Tinto "[did] not believe there [was] an impairment indicator" with respect to RTCM, and that "whilst [Rio Tinto was] confident of finding a viable infrastructure path the breadth of the options means that a central case view is still under development." *Id.* (alterations in original). The Individual Defendants attended the July 30, 2012 Audit Committee meeting, but again did not explain the extent and scope of the recent severe adverse developments. *Id.* ¶¶ 135, 138.

On August 9, 2012, Rio Tinto filed its interim financial report for half-year 2012 (the "HY 2012 Report") as an exhibit to its Form 6-K filed with the SEC. *Id.* ¶ 139. The HY 2012 Report valued RTCM at more than $3 billion, and did not discuss the recent significant setbacks. *Id.* ¶¶ 139–140.

A few days later, Rio Tinto raised $3 billion in bond offerings. *Id.* ¶ 145. The offering documents incorporated the aforementioned Form 20-F (which incorporated the 2011 Annual Report), and the HY 2012 Report. *Id.* ¶ 148.

On August 8, 2012, at a presentation of Rio Tinto's half-year results, Albanese stated that Rio Tinto was looking at "greenfield" rail development in Mozambique, and that the area around RTCM was "more prospective" than he would have said a year earlier. *Id.* ¶ 141. That same day, Albanese told investors that the work RTCM had been doing over the past twelve months indicated RTCM had even "more potential in total as [it went] forward," and that the area in Mozambique was a world-class basin coal deposit. *Id.* ¶ 142 (alterations in original). Elliott also participated in this latter session. *Id.* ¶ 143.

In August 2012, Rio Tinto's in-house valuation experts in its Technology & Innovation ("T&I") division valued Rio Tinto in the range of negative $4.9 billion to $300 million. *Id.*

¶ 151.  Elliott told the head of T&I that he would inform the Audit Committee of RTCM's valuation issues at the committee's upcoming November 26, 2012 meeting.  *Id.* ¶ 152.  In advance of that meeting, the Controller submitted a paper (the "Third Controller's Paper") that indicated a recoverable amount for RTCM from $4 billion to $5 billion and stated that no impairment was likely to be required.  *Id.* ¶ 153.  Elliott received and edited a draft of the Third Controller's Paper in advance of the meeting, but did not correct the $4 to $5 billion valuation. *Id.* ¶ 154.  The Third Controller's Paper also stated that it depended on a long-term solution of building a greenfield rail and port, for which Rio Tinto would pay a "large proportion."  *Id.* ¶ 155.  The Individual Defendants attended the November 26, 2012 Audit Committee meeting. *Id.* ¶ 152.  Elliott did not disclose the valuation challenges he had discussed with the head of T&I, only stating that he had received "late breaking" news of a "technical nature" from T&I. *Id.* ¶ 158.

At an October 2012 Rio Tinto investor seminar, Elliott described Rio Tinto's acquisition of Riversdale as the purchase of a highly prospective, "tier one" coking coal resource with first production in mid-2012 and the objective of 25 million tons of coal production annually by 2020. *Id.* ¶ 161.  During a November 2012 investor seminar, Albanese was asked if barging was still on "the agenda," to which he responded that the company would need to look at all transportation options.  *Id.* ¶ 162.  He also described the Moatize Basin, where RTCM was located, as a long-term opportunity with the potential to grow beyond 25 million tons of coal per year.  *Id.* ¶ 163.

Following the November 26, 2012 Audit Committee meeting, the head of T&I informed Albanese that RTCM had a negative valuation.  *Id.* ¶ 164.  Albanese requested confirmation, which he received in December 2012.  *Id.*  The head of T&I then bypassed the Individual

Defendants and informed the Chairman of the Board about RTCM's negative valuation. *Id.*
¶ 165.  In January 2013, RTCM's value was revised downward to $611 million. *Id.* ¶ 166.  The
accompanying press release mentioned infrastructure challenges, including that barging did not
receive formal approvals, as well as estimates of less hard coking coal than anticipated. *Id.*
¶ 167.  Rio Tinto stated that it expected to impair RTCM's value by approximately $3 billion in
its 2012 annual results. *Id.* ¶ 169.  In 2014, Rio Tinto further impaired RTCM's value to $119
million, eventually selling it for approximately $50 million in October 2014. *Id.* ¶ 175.

The Chairman of the Board was "shocked" that some senior executives believed RTCM
was "close to worthless," and combined with the Alcan impairments, felt that he "probably [had]
no choice but to ask the board to dismiss the chief executive." *Id.* ¶ 168 (alteration in original).
The Chairman of the Board requested that the Board dismiss Albanese in January 2013, in
connection with the decrease in value of RTCM as well as the Alcan impairments, and Albanese
stepped down as CEO on January 17, 2013. *Id.* ¶¶ 168–169.  Albanese left Rio Tinto entirely in
July 2013. *Id.* ¶ 173.  Elliott was replaced as Rio Tinto's CFO in April 2013, and retired from
Rio Tinto at the end of 2013. *Id.* ¶ 174.

On October 17, 2017, the SEC filed this action. *See* Compl.[2]

---

[2] The parties entered into a tolling agreement, and the SEC alleges that the action is timely filed.  Compl. ¶ 176.
Defendants do not contest this.

**DISCUSSION**

I.    Legal Standard

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead sufficient factual allegations in the complaint that, accepted as true, "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A plaintiff is not required to provide "detailed factual allegations" in the complaint, but must assert "more than labels and conclusions[] and a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555.  Ultimately, the facts pleaded in the complaint "must be enough to raise a right to relief above the speculative level." *Id*.  The court must accept the allegations in the pleadings as true and draw all reasonable inferences in favor of the non-movant.  *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).

II.    Documents Properly Considered on Motion to Dismiss

On a Rule 12(b)(6) motion, the court may consider only the complaint, documents attached to the complaint, matters of which a court can take judicial notice, or documents that the plaintiff knew about and relied upon.  *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152–53 (2d Cir. 2002).  This may include SEC filings.  *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991).

As a preliminary matter, the Court must determine which documents it may consider. Defendants have attached thirty documents to their motion papers as exhibits to the Declaration

of Jennifer L. Conn, Esq. (the "Conn Declaration"), ECF No. 74.  The Court will consider those documents attached to the Conn Declaration that the SEC knew about and relied on in bringing suit.  This includes the 2011 Annual Report, Conn Decl. Ex. 1, ECF No. 74-1; the HY 2012 Report, *id.* Ex. 3, ECF No. 74-3; papers presented at the August 2010 Investment Committee Meeting, *id.* Ex. 5, ECF No. 74-5; the First Controller's Paper, *id.* Ex. 9, ECF No. 74-9; the PowerPoint containing the lower valuation for RTCM that was developed in late 2011, *id.* Ex. 10, ECF No. 74-10; the letter from the Government of Mozambique rejecting Rio Tinto's barging proposal in December 2011, *id.* Ex. 11, ECF No. 74-11; the Impairment Paper, *id.* Ex. 13, ECF No. 74-13; the Second Controller's Paper, *id.* Ex. 16, ECF No. 74-16; the press release announcing RTCM's impairment and Albanese stepping down as CEO, *id.* Ex. 20, ECF No. 74-20; the Third Controller's Paper, *id.* Ex. 27, ECF No. 74-27; the documents for the March 2012 bond offering, *id.* Ex. 28, ECF No. 74-28; and the documents for the August 2012 bond offering, *id.* Ex. 29, ECF No. 74-29.  Additionally, the Court can consider transcripts of conferences with investors, *see In re Nokia Oyj (Nokia Corp.) Sec. Litig.*, 423 F. Supp. 2d 364, 371–74 nn.3–5 (S.D.N.Y. 2006), and will, therefore, consider the transcripts of the August 8, 2012 teleconference concerning Rio Tinto's 2012 half year results, Conn. Decl. Ex. 17, ECF No. 74-17; the transcript of Rio Tinto's October 9, 2012 investor seminar, *id.* Ex. 18, ECF No. 74-18; and Rio Tinto's November 29, 2012 investor seminar, *id.* Ex. 19, ECF No. 74-19.

Defendants also attach a litany of news articles to the Conn Declaration, and argue that it is appropriate for the Court to consider them at this stage because are "offered to show that certain things were said in the press."  Def. Mem. at 5 n.1, ECF No. 71 (quoting *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008)).  The case Defendants cite for

14

this proposition, however, is inapposite.  In *Staehr*, the Second Circuit held that the district court,

when deciding the question of whether there were "storm warnings" such that the plaintiff should

have been on constructive notice of securities fraud for statute of limitations purposes, did not

abuse its discretion by considering press coverage.  547 F.3d at 425.  The Second Circuit

explained that "it is proper to take judicial notice of the *fact* that press coverage . . . contained

certain information, without regard to the truth of their contents."  *Id.*  Here, instead, Defendants

appear to submit the articles so that the Court will rely on the truth of their contents.[3]  Such a

request is improper at the motion to dismiss stage.  The Court, therefore, will not consider the

news articles attached to the Conn Declaration at ECF Nos. 74-6, 74-7, 74-8, 74-14, 74-21, 74-

22, 74-23, 74-24, and 74-30.  The Court will also not consider the article attached as Exhibit 12,

ECF No. 74-12.  Although Defendants state that the article was referenced in paragraph 90 of the

complaint, Conn Decl. ¶ 12, the article Defendants attach does not contain the language quoted

in that paragraph of the complaint.

     The Court will also not consider documents in the Conn Declaration that Defendants do

not argue Plaintiffs relied upon or that the Court should otherwise take notice of: that is, the

documents attached to the Conn Declaration as Exhibit 2, ECF No. 74-2; Exhibit 4, ECF No. 74-

4; Exhibit 25, ECF No. 74-25; and Exhibit 26, ECF No. 74-26.  Nor does the Court agree that a

PowerPoint presentation allegedly given at the Brisbane Meeting—which is not mentioned

---

[3] For example, Defendants request in the Conn Declaration that the Court consider an article about Elliott's
retirement "to show 'that certain things were said in the press.'"  Conn Decl. ¶ 30 (quoting *Staehr*, 547 F.3d at 425);
*id.* Ex. 30, ECF No. 74-30.  However, in their brief, Defendants ask the Court to rely on the truth of the contents of
that article—that is, they argue that because Elliott had already announced his retirement, as stated in the article, he
would not have the motive to commit fraud.  Def. Mem. at 43.

anywhere in the complaint—was "incorporated by reference" and "relied on" in the complaint, Conn Decl. ¶ 15, and, therefore, the Court will not consider it, *id.* Ex. 15, ECF No. 74-15.

III.   Analysis

    A.   Claim One: Violations of Section 10(b) of the Exchange Act and Rule 10b–5 Against All Defendants

Claim One is brought against all Defendants for violations of Section 10(b) of the Exchange Act and Rule 10b–5 thereunder.  Section 10(b) of the Exchange Act states that "[i]t shall be unlawful for any person . . . [t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe."  15 U.S.C. § 78j(b).  Rule 10b–5 states that, in connection with the purchase or sale of a security:

> It shall be unlawful for any person . . . (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

17 C.F.R. § 240.10b–5.

In order to state a claim under Section 10(b) of the Exchange Act and Rule 10b–5, the SEC must allege that Defendants "(1) made a material misrepresentation or a material omission as to which [they] had a duty to speak, or used a fraudulent device; (2) with scienter."  *SEC v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir. 1999).  The SEC alleges two theories by which Defendants violated Rule 10b–5: a violation of Rule 10b–5(b), and a violation of Rule 10b–5(a) and (c) (i.e., "scheme liability").  The Court will address each theory in turn.

16

### 1.  Rule 10b–5(b)

As stated, Rule 10b–5(b) prohibits, in connection with the purchase or sale of a security, "mak[ing] any untrue statement of a material fact or [] omit[ting] to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."  17 C.F.R. § 240.10b–5(b).

### a.  Falsity

The Court will first consider whether the SEC has adequately alleged that any statements were false.

### i.  Valuations of RTCM

The Court will begin by analyzing various statements made by Defendants concerning valuations of RTCM.

As discussed, before the Brisbane Meeting in May 2012, Rio Tinto valued RTCM at about $3.7 billion in the 2011 Annual Report, which was incorporated into its Form 20-F that was filed with the SEC on March 15, 2012.  Compl. ¶¶ 96, 98.  The Form 20-F was then incorporated into bond offering documents in March 2012.  *Id.* ¶¶ 111–112.  After the Brisbane Meeting, the Impairment Paper stated that there were no impairment indicators present for RTCM, *id.* ¶ 131, as did the First, Second, and Third Controller's Papers, *id.* ¶¶ 125, 134, 153.  Moreover, RTCM was valued at approximately $3 billion in the HY 2012 Report, which was attached as an exhibit to the Form 6-K filed with the SEC.  *Id.* ¶ 139.  The HY 2012 Report was also incorporated into Rio Tinto's August 2012 bond offerings.  *Id.* ¶ 148.

"[I]t is well-settled in the Second Circuit that" a company's assessment of the value of an asset and its determinations about impairment are statements of opinion, not fact.  *N. Collier Fire*

17

*Control & Rescue Dist. Firefighter Pension Plan v. MDC Partners, Inc.*, No. 15 Civ. 6034, 2016 WL 5794774, at *10 (S.D.N.Y. Sept. 30, 2016).  Under the Supreme Court's decision in *Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*, 135 S. Ct. 1318, 1327–29 (2015), a statement of opinion is only false if (1) "the speaker did not hold the belief she professed," (2) "if the supporting fact she supplied were untrue," or (3) if an omission "makes the opinion statement at issue misleading to a reasonable person."[4]

The SEC does not argue that the second *Omnicare* circumstance applies.  *See* Pl. Mem. at 23–24, ECF No. 80.  As for the first circumstance, the SEC argues that based on the severe adverse developments at RTCM, "[a] factfinder could easily infer from [its] allegations that neither Albanese nor Elliott held the beliefs they professed" concerning RTCM's valuation.  *Id.* at 23.  However, the Second Circuit has found that allegations that individuals possess facts which should have led them to test assets for impairment do not sufficiently allege that the individuals actually believed an asset's value was overstated.  *See City of Omaha Civilian Emps. Ret. Sys. v. CBS Corp.*, 679 F.3d 64, 68 (2d Cir. 2012) ("[E]ven if the . . . complaint did plausibly plead that defendants were aware of facts that *should* have led them to begin interim impairment testing earlier, such pleading alone would not suffice to state a securities fraud claim. . . .  [The] complaint is devoid even of conclusory allegations that defendants did not believe in their statements of opinion regarding [an asset's] goodwill."); *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 110, 112 (2d Cir. 2011) (finding that "clear indications that impairment testing was necessary" did not "plausibly allege that defendants did not believe the statements regarding

---

[4] Although *Omnicare* concerned Section 11 of the Securities Act, the Second Circuit has applied it to Section 10(b) of the Exchange Act.  *Fogel v. Vega*, __ F. App'x __, 2018 WL 6753799, at *5 (2d Cir. Dec. 26, 2018).

goodwill at the time they made them").  Accordingly, the SEC has not alleged that the statements concerning valuation were false under the first *Omnicare* circumstance.

With respect to the third circumstance, the Court in *Omnicare* emphasized that a reasonable investor "does not expect that *every* fact known to an issuer supports its opinion statement" and "understand[s] that opinions sometimes rest on a weighing of competing facts," but that she does expect that the opinion "fairly aligns with the information in the issuer's possession at the time," and interprets any statement "in light of all its surrounding text."  135 S. Ct. at 1329–30.  Put differently, "[a]n opinion statement . . . is not misleading simply because the issuer knows, but fails to disclose, some fact cutting the other way."  *Id.* at 1329.

The only statement from before the Brisbane Meeting concerning RTCM's valuation is its $3.7 billion valuation in the 2011 Annual Report (which was incorporated into the Form 20-F and the March 2012 bond offering documents).  Compl. ¶¶ 96, 98, 111–112.  The SEC has not adequately alleged that this statement was false.  In the 2011 Annual Report, Rio Tinto stated that its valuation was "provisional" and "was based on fair values at the acquisition date."  Conn Decl. Ex. 1 at 162.  By this point, the Government of Mozambique had rejected a specific barging proposal, Compl. ¶ 76, but it was not until April 2012 that it rejected barging altogether, *id.* ¶ 77.  Nor does the SEC allege that Rio Tinto had come to fully appreciate the difficulties with transportation by railroad by the time of the 2011 Annual Report, *id.* ¶¶ 80–82, or that it was understood there was a less favorable split of hard coking coal and thermal coal than anticipated by that point.

This changed, however, with the Brisbane Meeting on May 11, 2012.  The SEC alleges that there, the Individual Defendants learned that, using the best information available, RTCM

was worth negative $680 million, that barging had been rejected by the Government of Mozambique entirely, and that there was less hard coking coal than predicted. *Id.* ¶¶ 116–119. The SEC also alleges that Albanese rejected a plan for Rio Tinto to construct a greenfield rail line on its own (although he directed RTCM to seek out potential partners to build one). *Id.* ¶ 120. Defendants argue that positive valuations were also generated around this time, and that coking coal prices had risen since the acquisition of RTCM, and thus characterize the SEC's allegations as seeking to impose liability "merely because an issuer failed to disclose information that ran counter to an opinion expressed." Def. Mem. at 27 (quoting *Tongue v. Sanofi*, 816 F.3d 199, 212 (2d Cir. 2016)). However, at the motion to dismiss stage, the Court finds that the SEC adequately alleges that statements concerning RTCM's over $3 billion valuation—after the Individual Defendants learned of RTCM's severe adverse developments at the Brisbane Meeting, including a negative valuation based on the best available information—did not "fairly align[] with the information in the issuer's possession at the time." *Omnicare*, 135 S. Ct. at 1329. These include the statements about RTCM's value in the HY 2012 Report, the First, Second, and Third Controller's Papers, and the Impairment Paper. Compl. ¶¶ 125, 131, 134, 139, 153.

### ii.   Other Alleged Misstatements

The Court now considers whether the SEC has adequately alleged the falsity of any other statements.

The SEC alleges that in the 2011 Annual Report, Rio Tinto stated that the full extent of the write-down of coal reserves had been anticipated prior to the acquisition of Riversdale, *id.* ¶ 102, but that in reality, Rio Tinto had anticipated a smaller writedown, *id.* ¶¶ 83–84. A similar statement was made in the First Controller's Paper. *Id.* ¶ 126. Defendants' only response

is that these statements were immaterial, because, as the SEC alleges, the smaller, inaccurate writedown had not been publicly disclosed.  Def. Mem. at 28–29; *see also* Compl. ¶ 86. Materiality is, however, a separate inquiry from falsity, and is discussed *infra*.  Accordingly, the SEC has adequately alleged that these statements in the 2011 Annual Report and First Controller's Paper were false.  To the extent, however, that the SEC alleges that the 2011 Annual Report contained other fraudulent statements, Compl. ¶¶ 95–97, the Court finds that they have not been pleaded with particularity as required by Federal Rule of Civil Procedure 9(b).

Next, the SEC alleges misstatements in the First and Second Controller's Papers.  The First Controller's Paper stated that "[a] number of options are available" for increasing RTCM's export capacity "including securing incremental capacity on the existing rail lines, greenfield rail and port development . . . and revised partial barging options."  *Id.* ¶ 124.  (alteration and ellipsis in original).  The Second Controller's Paper stated that there were a "breadth" of transportation and infrastructure options.  *Id.* ¶ 134.  Defendants argue that these statements were accompanied by statements about uncertainties and infrastructure challenges that RTCM was facing, and when properly contextualized, were not false or misleading.  Def. Mem. at 29.  For example, the First Controller's Paper stated that "[w]hile barging has not been entirely ruled out in the future, it seems unlikely that the situation will be resolved in the short term," and that Rio Tinto was exploring a shared greenfield rail development.  Conn Decl. Ex. 9 at 13.  However, the SEC has sufficiently alleged that by this point, existing infrastructure options only allowed for transportation of about five percent of the coal resources assumed at acquisition.  Compl. ¶ 127. Nor is there any indication that the shared greenfield rail development appeared likely to occur, or that Rio Tinto had found partners that would make it a plausible option.  In other words, the

SEC has plausibly alleged that Rio Tinto was not just facing risks and challenges, but that it was apparent, at least to the Individual Defendants, that Rio Tinto had no realistic options to transport large amounts of coal, rendering RTCM worthless.  Accordingly, the SEC has adequately alleged the falsity of these statements in the First and Second Controller's Papers.

Additionally, the First Controller's Paper stated that an auditing firm, which had initially valued RTCM, had advised Rio Tinto that the amount of coal reserves would not change their valuation.  *Id.* ¶ 126.  The SEC alleges, however, that this was materially misleading because the firm's opinion was also premised on an assumption about how much of the coal could be converted into marketable coal, and that the firm had not yet received confirmation from Rio Tinto's technical experts about whether its assumption was correct.  *Id.*  (The SEC alleges that a similar statement about the valuation firm's opinion was made in the Impairment Paper.  *Id.* ¶ 132.)  But the SEC does not allege that it was unreasonable for the auditing firm to make its assumption, and in any event, the First Controller's Paper also states that the lower-than-anticipated volume of coal resources still exceeded the total amount Rio Tinto intended to mine over RTCM's lifetime.  Conn Decl. Ex. 9 at 3.  Accordingly, the Court disagrees with the SEC that these statements about Rio Tinto's auditor's valuation were false or misleading.  *See Kleinman v. Elan Corp., plc*, 706 F.3d 145, 152 (2d Cir. 2013) (noting that the securities laws "do not create an affirmative duty to disclose any and all material information" (internal quotation marks and citation omitted)).

Finally, the SEC alleges that the Individual Defendants made a series of misrepresentations to investors.  As discussed, in April 2012, Albanese told shareholders that Rio Tinto was growing its coal business and had a target to start shipping coal from Mozambique in

the first half of 2012.  Compl. ¶ 113.  On August 8, 2012, at a presentation of the half-year

results, Albanese stated that Rio Tinto was looking at greenfield rail development in

Mozambique, and that the regional area in the Moatize Basin was "more prospective" than he

would have said a year earlier.  *Id.* ¶ 141.[5]  In a different exchange that day, Albanese stated that

RTCM probably had "more potential in total as [it went] forward" and that the Moatize Basin

was truly a world-class basin coal deposit, statements which Elliott "failed to correct."  *Id.*

¶¶ 142–143 (alteration in original).  At a November 2012 seminar, Albanese responded to a

question of whether barging was on "the agenda" by stating that the company would need to look

at all transportation options, and described the Moatize Basin as a long-term opportunity with the

potential to grow beyond 25 million tons of coal per year.  *Id.* ¶¶ 162–163.[6]

Defendants argue that these statements are "inactionable puffery."  Def. Mem. at 29.  "Up

to a point, companies must be permitted to operate with a hopeful outlook[.]  People in charge of

an enterprise are not required to take a gloomy, fearful or defeatist view of the future; subject to

---

[5] Defendants contend that by "more prospective," Albanese meant that RTCM had "more potential" than expected. *See* Def. Mem. at 29.

[6] The SEC also alleges in the complaint that "[d]uring an October 2012 Rio Tinto investor seminar, Elliott described Rio Tinto's acquisition of Riversdale as the purchase of a highly prospective, 'tier one' coking coal resource with first production in mid-2012 and the objective of 25 million tons of coal production per year by 2020." Compl. ¶ 161.  However, the transcript of the seminar reveals that he did not make that statement, or discuss RTCM at all. Conn Decl. Ex. 18.  In its opposition papers, the SEC changes its allegation and argues for the first time that the statement was presented in a PowerPoint presentation that was displayed during Elliott's remarks.  Pl. Mem. at 30–31; *see also* Miller Decl. Ex. 5, ECF No. 79-5 at 21 (PowerPoint presentation).  Thus, it argues, "while Elliott read certain comments aloud at the conference, the accompanying slide to his presentation misleadingly touted RTCM." Pl. Mem. at 31.  This is not in line with the complaint, which does not mention a PowerPoint presentation, much less how it was used during the presentation (which apparently had four speakers from Rio Tinto, *see* Conn Decl. Ex. 18) or who was involved in preparing it.  Rather, the complaint alleged that "Elliott described" RTCM in a certain way. Compl. ¶ 161.  "[I]t is well-settled that a claim for relief may not be amended by the briefs in opposition to a motion to dismiss."  *LaFlamme v. Société Air France*, 702 F. Supp. 2d 136, 148 n.18 (E.D.N.Y. 2010) (citing *Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998)).  Having concluded that the statement alleged in paragraph 161 was not made, the Court dismisses any claim predicated on it.

what current data indicates, they can be expected to be confident about their stewardship and the prospects of the business that they manage." *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004). With respect to the April 2012 statements, which were made prior to the Brisbane Meeting, the SEC has not adequately alleged that they were false or fraudulent, and the Court agrees that "subject to what current data indicate[d]," they were merely optimistic, and not false. With respect to Albanese's two statements in August 2012 and his statement in November 2012, however, the SEC has adequately alleged that after the Brisbane Meeting, "the current data indicate[d]" that RTCM was, as the SEC puts it, "a lemon." Pl. Mem. at 1. That is, the SEC has plausibly alleged that Albanese described RTCM as having significant potential going forward, when he knew or had reason to believe that it had no potential at all. *See Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000) (defendants' statements that company's inventory was "in good shape" and "under control" were not puffery "while they allegedly knew that the contrary was true").[7]

Accordingly, the SEC has adequately alleged the falsity of Albanese's statements in August 2012 that the regional area in the Moatize Basin was "more prospective" than he would have said a year earlier, that RTCM probably had "more potential in total as [it went] forward," and that the Moatize Basin was truly a world-class basin coal deposit, and his statement in

---

[7] The Court finds, however, that the SEC has not alleged the falsity of Albanese's August 2012 statement about looking at greenfield rail development, or his November 2012 statement about barging. Compl. ¶¶ 141, 162. As for the statement about greenfield rail development, Albanese had instructed RTCM managers to seek partners for such a project at the Brisbane Meeting, so his statement to investors was not false. *Id.* ¶ 120. As for the November 2012 statement about barging, the transcript reveals that the investor asked, "In the past, certainly in Riversdale and then subsequently, you have talked about barging coal down the Zambezi River. Is that still on the agenda or has that been given up on?" Conn Decl. Ex. 19 at 9. Albanese responded, "I think that what we would need to look at would be all the transportation options, but realistically continued upgrades of the Beira [rail] line and then looking at a transportation corridor of probably the highest probability, a sort of pathway for expansions, but again I think we need to keep in mind that any of the options should always be looked at, at different times." *Id.* In context, the Court concludes that this statement was not false.

November 2012 that the Moatize Basin was a long-term opportunity with the potential to grow

beyond 25 million tons of coal per year (together, the "Albanese Statements").  Compl. ¶¶ 141–

143, 162–163.

Relatedly, the SEC alleges that the failure to disclose RTCM's adverse developments and

their effect on RTCM's valuation constituted actionable omissions.  Although the securities laws

"do not create an affirmative duty to disclose any and all material information," disclosure is

required "when necessary to make statements made, in the light of the circumstances under

which they were made, not misleading."  *Kleinman*, 706 F.3d at 152–53 (internal quotation

marks and citation omitted) (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44

(2011)).  The Court agrees that the failure to disclose the severe adverse developments in various

papers—i.e., the HY 2012 Report (which was incorporated into the August 2012 Form 6-K and

the August 2012 bond offering documents), the First, Second, and Third Controller's Papers, and

the Impairment Paper, Compl. ¶¶ 124, 130, 135, 139–140, 148, 150, 153—constituted actionable

omissions, because they rendered the statements about RTCM's over $3 billion valuation

misleading.  Defendants contend that these statements cannot be misleading because "no

reasonable investor could have been misled into thinking that the omitted risks did not actually

exist."  Def. Mem. at 30 (alterations, internal quotation marks, and ellipsis omitted) (quoting

*Halperin v. eBanker.com, Inc.*, 295 F.3d 352, 359 (2d Cir. 2002)).  In support, Defendants argue

that Rio Tinto sufficiently disclosed that RTCM's value was subject to further review and that

there were "significant infrastructure and resource risks in Mozambique" that could cause

previously-held assumptions about RTCM to change.  *Id.* at 30–31; *see also id.* at 24–25.  For

example, in its August 2012 bond offering documents, Rio Tinto listed as a "risk" that it "may be

unable to find willing and suitable joint venture partners to share the cost of developing large

projects." Conn Decl. Ex. 29 at S-8. The Court disagrees, and finds that even if Rio Tinto

disclosed some potential risks it faced in a general, boilerplate fashion, the SEC has plausibly

alleged that it failed to disclose the concrete challenges RTCM faced that, based on the best

available information, rendered it worthless. However, because the Court does not find any

statements prior to the Brisbane Meeting concerning RTCM's valuation to be misleading, the

failure to disclose any adverse developments RTCM faced prior to May 2012 are not actionable

omissions. *See* Compl. ¶¶ 60, 92, 95, 97, 112.

In conclusion, the Court finds that the SEC has plausibly alleged the falsity of the

following: RTCM's over $3 billion valuation in the HY 2012 Report, the First, Second, and

Third Controller's Papers, and the Impairment Paper, and the omission in all five documents of

information about RTCM's severe adverse developments; the statements in the First and Second

Controller's Papers concerning the "number" and "breadth" of options for transportation and

infrastructure; the statements in the 2011 Annual Report and the First Controller's Paper that the

extent of the writedown in coal resources had been anticipated in due diligence; and the

Albanese Statements.

b.   Materiality

Next, the Court considers whether any of the above false statements were material. The

materiality inquiry is "fact-specific" and "depends on the significance the reasonable investor

would place on the withheld or misrepresented information." *Basic Inc. v. Levinson*, 485 U.S.

224, 240 (1988). "On a motion to dismiss, a complaint may not be properly dismissed unless the

misstatements are so obviously unimportant to a reasonable investor that reasonable minds could

not differ on the question of their importance." *IBEW Local Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scotland Group, PLC*, 783 F.3d 383, 390 (2d Cir. 2015) (internal quotation marks and citation omitted).

With respect to the statements in the 2011 Annual Report and the First Controller's Paper that the extent of the writedown in coal reserves had been anticipated by Rio Tinto in due diligence—despite the SEC's allegation that that the writedown was greater than had been anticipated—Defendants argue that these statements are immaterial because the new estimate still exceeded the lifetime needs of the mine.  Def. Mem. at 28–29; *see* Impairment Paper, Conn Decl. Ex. 13 at 7.  Moreover, the amount actually estimated in due diligence was not publicly disclosed.  The SEC agrees with the latter point, alleging that "since 'the market' did not know what Rio Tinto had assumed about Riversdale's reserves and resources estimates at the time of acquisition . . . investors would not know that [the writedown] was far worse than the company had expected."  Compl. ¶ 86.  Accordingly, the Court agrees with Defendants that these statements were not material, and they cannot form the basis of a Section 10(b) or Rule 10b–5 claim.

With respect to the remaining statements for which the SEC has adequately pleaded falsity—those about RTCM's valuation, its value to the company, and the infrastructure challenges it faced—Defendants argue that they are "presumptively immaterial" because RTCM related to less than five percent of Rio Tinto's balance sheet, which has about $120 billion in assets.  Def. Mem. at 36 (citing *ECA v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009)).  This "preliminary assumption" of immateriality, however, "is not dispositive," and a court must "consider all relevant qualitative circumstances related to the alleged misstatements."

*IBEW*, 783 F.3d at 391.[8]  Here, the SEC alleges that Albanese stepped down as CEO in part because of the RTCM impairment—and both events were announced in the same press release, which referred to the RTCM impairment as "unacceptable."  Compl. ¶¶ 168–170; *see also* Conn Decl. Ex. 20 (press release).  The SEC also claims that one of Rio Tinto's largest investors referred to RTCM's writedown as a "significant mistake" by the Individual Defendants and said that management had been "reckless and profligate" with shareholder capital.  Compl. ¶ 171.  In addition, the SEC alleges that before the writedown, Rio Tinto had touted the purchase of Riversdale as evidence of "prudent capital management" in meetings with credit rating agencies. *Id.* ¶ 106.  Defendants argue that "there is no allegation that the market as a whole reacted negatively" and that Rio Tinto's stock price did not drop when the impairment was announced. Def. Mem. at 37.  However, considering the qualitative factors, the Court is not persuaded that statements concerning RTCM's value were "so obviously unimportant" that reasonable minds could not differ as to their importance.  *IBEW*, 783 F.3d at 390.

Accordingly, the Court finds that the SEC has alleged both falsity and materiality with respect to RTCM's $3 billion valuation in the HY 2012 Report and the First, Second, and Third Controller's Papers and the Impairment Paper, and the omission therefrom of information about RTCM's severe adverse developments; the statements in the First and Second Controller's Papers concerning the "number of options" and "breadth" of options for transportation and infrastructure; and the Albanese Statements.

---

[8] In *IBEW*, the Second Circuit lists some qualitative factors to be considered, 783 F.3d at 391, which Defendants treat in their papers as an exclusive list, Def. Mem. at 37.  The factors the Second Circuit discusses are drawn, however, from an SEC Staff Accounting Bulletin, No. 99, 64 Fed. Reg. 45150-01 (Aug. 19, 1999), which sets forth more qualitative factors to be considered (such as whether the misstatement has an effect on management's compensation), and in any event, notes that it "is not an exhaustive list of the circumstances that may affect the materiality of a quantitatively small misstatement."

c.   "Making" a Misstatement

In order to be liable under Section 10(b), a speaker must have "made" the misstatement. In *Janus Capital Grp., Inc. v. First Derivative Traders*, the Supreme Court held that "the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it."  564 U.S. 135, 142 (2011).  It is not enough to be "significantly involved" in preparing the statement, and "attribution" to the speaker is "necessary."  *Id.* at 147 n.11, 148.

In its opposition brief, the SEC states that it "agrees with Defendants that Albanese and Elliott did not make any statements in the [HY 2012] Report and, instead, alleges that they aided and abetted Rio Tinto's violations with respect to that report."  Pl. Mem. at 31 n.14.  Rio Tinto, therefore, is the only Defendant who can be considered the "maker" of a statement in the HY 2012 Report, or of the material omissions therein about the severe adverse developments that rendered RTCM's over $3 billion valuation false.

The SEC alleges that Rio Tinto's Controller—not the Individual Defendants—wrote the First, Second, and Third Controller's Papers.  Compl. ¶¶ 123, 134, 153.  The SEC does not allege who wrote the Impairment Paper, *id.* ¶¶ 130–133, although it appears to be authored by Rio Tinto's Energy Product Group, Conn Decl. Ex. 13.  Therefore, the only Defendant who is a "maker" of any statements therein is Rio Tinto.

With respect to the Albanese Statements, he is obviously a "maker" of these statements under *Janus*.  The SEC notes that with respect to one of Albanese's August 2012 statements, Elliott "participated in the . . . session with analysts and he failed to correct Albanese's material misrepresentations."  Compl. ¶ 143.  However, with respect to oral statements, an allegation that

one speaker "fail[ed] to correct or clarify the false and misleading statements made by" another does not satisfy the requirements of *Janus*. *Ho v. Duoyuan Glob. Water, Inc.*, 887 F. Supp. 2d 547, 572 & n.13 (S.D.N.Y. 2012).

Accordingly, taking into account falsity, materiality, and the requirements of *Janus*, the SEC has plausibly alleged only the following actionable statements: RTCM's over $3 billion valuation in the HY 2012 Report and the First, Second, and Third Controller's Papers and the Impairment Paper, and the omission therefrom of information about RTCM's severe adverse developments (against Defendant Rio Tinto only); the statements in the First and Second Controller's Papers concerning the "number" and "breadth" of options for transportation and infrastructure (against Rio Tinto only); and the Albanese Statements (against Albanese and Rio Tinto).

### d.   Scienter

Under Section 10(b) and Rule 10b–5, the SEC must also allege scienter with respect to each statement or omission. *Monarch Funding Corp.*, 192 F.3d at 308.  Pursuant to Federal Rule of Civil Procedure 9(b), "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  However, the SEC must still "allege facts that give rise to a strong inference of fraudulent intent."  *SEC v. Egan*, 994 F. Supp. 2d 558, 565 (S.D.N.Y. 2014) (internal quotation marks and citation omitted).  This can be done in one of two ways: by alleging facts that (a) "show that defendants had both motive and opportunity to commit fraud," or (b) "constitute strong circumstantial evidence of conscious misbehavior or recklessness."  *Id.* (internal quotation marks and citation omitted).

In order for scienter to be imputed to a corporation, the SEC must allege "that an agent of the corporation committed a culpable act with the requisite scienter." *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.*, 531 F.3d 190, 195 (2d Cir. 2008); *see also SEC v. Treadway*, 430 F. Supp. 2d 293, 337 (S.D.N.Y. 2006) ("It is settled that the scienter of executives can be imputed to corporate entities."). In *Dynex*, the Second Circuit noted that "[t]o prove liability against a corporation, of course, a plaintiff must prove that an agent of the corporation committed a culpable act with the requisite scienter, and that the act (and accompanying mental state) are attributable to the corporation." 531 F.3d at 195. It continued by stating that "[i]n most cases, the most straightforward way to [allege this] will be to plead [scienter] for an individual defendant." *Id.* It noted, however, that there may be exceptions—for example, if a company "announced that it had sold one million SUVs in 2006, and the actual number was zero, [t]here would be a strong inference of corporate scienter, since so dramatic an announcement would have been approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false." *Id.* at 195–96 (quoting *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008)). No such dramatic allegations are present here, and the only individuals that the SEC alleges had the requisite scienter are the Individual Defendants. *See* Pl. Mem. at 38. Therefore, to the extent that the Individual Defendants do not have the requisite scienter for a particular statement or omission, Rio Tinto cannot have it either.

In connection with the over $3 billion valuation of RTCM in the HY 2012 Report and the related omissions, the SEC has not alleged that anyone acted with the requisite scienter. *See* Compl. ¶ 139. Nor does the SEC allege that an agent of Rio Tinto had the requisite scienter in

writing the First, Second, and Third Controller's Papers, or the Impairment Paper. *Id.* ¶¶ 123, 131, 134, 153.  With no agent of Rio Tinto alleged to have the requisite scienter, Rio Tinto did not have it either.

The Court turns to the only remaining statements: the Albanese Statements.

### i.   Motive and Opportunity

"[A] generalized motive, one which could be imputed to any publicly-owned, for-profit endeavor, is not sufficiently concrete for purposes of inferring scienter."  *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 268 (2d Cir. 1996).  In *Chill*, the Second Circuit held that a company's motive "in justifying its substantial investment" in a recent acquisition was not sufficient to allege scienter for that reason.  *Id.* at 267.  Similarly, in *Novak*, the Second Circuit noted that allegations of "the desire to maintain a high corporate credit rating or otherwise sustain the appearance of corporate profitability, or of the success of an investment," and "the desire to maintain a high stock price in order to increase executive compensation or prolong the benefits of holding corporate office" did not establish scienter.  216 F.3d at 307 (internal quotation marks and citations omitted).  And in *Kuriakose v. Federal Home Loan Mortgage Corp.*, a court in this district held that allegations that individuals "wanted [their company] to remain solvent and preserve their reputations" did not establish motive because, "[f]ar from 'unique,' these motivations are ubiquitous in business." 897 F. Supp. 2d 168, 184 (S.D.N.Y. 2012).

The only motive that the SEC alleges that Albanese held was the "specific motive to kick the RTCM can down the road grounded in [his] direct connection to the failed Alcan transaction and [his] approval of the RTCM acquisition despite personal knowledge of significant risks."  Pl. Mem. at 34.  The sole case the SEC cites, *In re Take-Two Sec. Litig.*, 551 F. Supp. 247, 295

(S.D.N.Y. 2008), is inapposite, because in that case, the court found that the defendants acted in order to "conceal their options-backdating scheme"—i.e., to cover up prior fraud.  Here, like in *Kuriakose*, the only motives alleged by the SEC—the desire for the Albanese to preserve his reputation and for RTCM to appear profitable—are "ubiquitous in business."  Accordingly, the Court finds that the SEC has not alleged sufficient motive to support a Section 10(b) or Rule 10b–5 claim.

### ii.   Conscious Misbehavior or Recklessness

Without an allegation of motive, the strength of allegations of conscious misbehavior or recklessness "must be correspondingly greater."  *Egan*, 994 F. Supp. 2d at 565 (internal quotation marks and citation omitted).  Reckless conduct is, "at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care[,] to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it."  *Novak*, 216 F.3d at 308 (internal quotation marks and citation omitted).  "Where the complaint alleges that defendants knew facts or had access to non-public information contradicting their public statements, recklessness is adequately pled for defendants who knew or should have known they were misrepresenting material facts with respect to the corporate business."  *Egan*, 994 F. Supp. 2d at 565 (quoting *Hollin v. Scholastic Corp. (In re Scholastic Corp. Sec. Litig.)*, 252 F.3d 63, 76 (2d Cir. 2001)).

The SEC has met this standard with respect to the Albanese Statements.  The SEC has alleged that after the Brisbane Meeting, Albanese was aware that the best information indicated that RTCM had no value and no realistic options for transportation of coal, but he continued to tout it as being "prospective" and a "long-term opportunity with the potential to grow beyond 25

million tons of coal per year," and described the Moatize Basin as a world-class basin coal deposit.  Compl. ¶¶ 141–143, 162–163.  Through these statements, Albanese was "misrepresenting material facts" to investors.  *Egan*, 994 F. Supp. 2d at 565.

Accordingly, the Court holds that the SEC has alleged all of the required elements for a violation of Section 10(b) and Rule 10b–5(b) thereunder with respect to the Albanese Statements.

### 2.   Rule 10b–5(a) and (c)

Having analyzed the SEC's allegations under Rule 10b–5(b), the Court will now consider whether the SEC has alleged violations of Rule 10b–5(a) and (c), which make it unlawful, in connection with the purchase or sale of any security, "[t]o employ any device, scheme, or artifice to defraud," or "[t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person."  17 C.F.R. § 240.10b–5(a), (c).  Courts analyze claims brought under subsections (a) and (c) of Rule 10b–5 together, and often describe claims brought under these sections as alleging "scheme liability."  *See, e.g.*, *SEC v. Kelly*, 817 F. Supp. 2d 340, 343 (S.D.N.Y. 2011).

Defendants argue that a claim premised on these subsections cannot be based solely on misrepresentations or omissions that are actionable under subsection (b), and that there must be acts beyond those misrepresentations or omissions to state a claim.  Def. Mem. at 46–47; Def. Reply at 20–22, ECF No. 81.  The SEC argues that these subsections are not so limited.  Pl. Mem. at 9–13.

In *Lentell v. Merrill Lynch & Co.*, the Second Circuit held, with respect to market manipulation claims brought under subsections (a) and (c), "that where the sole basis for such

claims is alleged misrepresentations or omissions, plaintiffs have not made out" a claim under those subsections. 396 F.3d 161, 177 (2d Cir. 2005). The SEC argues that *Lentell*'s holding is limited to suits brought by private parties, not the SEC, Pl. Mem. at 11–12, but cites no authority from this district to support its argument. Rather, courts in this district have held that in order to state a claim based on scheme liability, the SEC must allege conduct beyond misrepresentations or omissions that form the basis of a claim under subsection (b). *See, e.g.*, *Kelly*, 817 F. Supp. 2d at 343 ("[W]here the primary purpose and effect of a purported scheme is to make a public misrepresentation or omission, courts have routinely rejected the SEC's attempt to bypass the elements necessary to impose 'misstatement' liability under subsection (b) by labeling the alleged misconduct a 'scheme' rather than a 'misstatement.'"); *see also SEC v. Pentagon Capital Mgmt. PLC*, 725 F.3d 279, 287 (2d Cir. 2013) (affirming liability for all three subsections where defendants engaged in activity in addition to misrepresentations). Nor do cases brought by private plaintiffs which state this principle imply that it is limited to the context of private litigation. *See, e.g.*, *Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*, 277 F. Supp. 3d 500, 519 (S.D.N.Y. 2017) (in private litigation, dismissing complaint premised on scheme liability because it "does not contain plausible allegations of a deceptive cover-up aside from the underlying bribery and the alleged misrepresentations"); *In re Smith Barney Transfer Agent Litig.*, 884 F. Supp. 2d 152, 161 (S.D.N.Y. 2012) ("[C]ourts must scrutinize pleadings to ensure that misrepresentation or omission claims do not proceed under the scheme liability rubric."). The Court holds, therefore, that in order to allege scheme liability under subsections (a) and (c)

or Rule 10b–5, the SEC must allege "the performance of an inherently deceptive act that is distinct from an alleged misstatement." *Kelly*, 817 F. Supp. 2d at 344.[9]

In its opposition brief, the SEC lists all of the "actions" and "conduct" it alleges Defendants took that would form the basis of scheme liability. Pl. Mem. at 14–18. However, everything listed is either a misstatement or omission that would form the basis of liability under Rule 10b–5(b)—for example, statements in the 2011 Annual Report, misleading statements in the documents for the bond offerings, false statements to shareholders, or failing to disclose information learned at the Brisbane Meeting. Accordingly, the SEC has not stated a claim for scheme liability under Rules 10b–5(a) and (c).

### B. Claim Two: Aiding and Abetting Rio Tinto's Violations of Section 10(b) of the Exchange Act and Rule 10b–5 Against the Individual Defendants

In Claim Two, the SEC alleges that the Individual Defendants aided and abetted Rio Tinto's violations of Section 10(b) of the Exchange Act and Rule 10b–5 thereunder. *See* 18 U.S.C. § 78t(e) ("[A]ny person that knowingly or recklessly provides substantial assistance to another person in violation of a provision of this chapter, or of any rule or regulation issued under this chapter, shall be deemed to be in violation of such provision to the same extent as the person to whom such assistance is provided.").

To state a claim for aiding and abetting liability, the SEC must allege: "(1) the existence of a securities law violation by the primary (as opposed to the aiding and abetting) party; (2) knowledge of this violation on the part of the aider and abettor; and (3) 'substantial assistance'

---

[9] The Court recognizes that a pending Supreme Court decision may clarify the matter. *Lorenzo v. SEC*, 872 F.3d 578 (D.C. Cir. 2017), *cert. granted*, 138 S. Ct. 2650 (U.S. June 18, 2018) (No. 17-1077) (argued Dec. 3, 2018).

by the aider and abettor in the achievement of the primary violation." *SEC v. Apuzzo*, 689 F.3d 204, 211 (2d Cir. 2012).

Because the only primary violations alleged in Claim One are the Albanese Statements, the Court need only consider whether Elliott aided and abetted those violations. With respect to the August 2012 statements, the SEC alleges that Elliott "participated" in one session and "failed to correct Albanese's material misrepresentations regarding RTCM." Compl. ¶ 143. The SEC cites no authority for the proposition that the mere "failure to correct" a misleading statement, without more, is equivalent to the "substantial assistance" needed to plead an aiding and abetting violation. The SEC does not allege Elliott's presence while Albanese made the November 2012 statement. *Id.* ¶ 163. Accordingly, Claim Two is DISMISSED in its entirety.

### C.   Claim Three: Violations of Section 17(a) of the Securities Act Against all Defendants

Claim Three is brought for violations of Section 17(a) of the Securities Act. Section 17(a) of the Securities Act states that "[i]t shall be unlawful for any person in the offer or sale of any securities . . . directly or indirectly (1) to employ any device, scheme, or artifice to defraud, or (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser." 17 U.S.C. § 77q(a).

"Essentially the same elements are required under Section 17(a)(1)–(3) in connection with the offer or sale of a security" as are required to have violated Section 10(b) of the Exchange Act and Rule 10b–5 thereunder, including scienter. *Monarch Funding Grp.*, 192 F.3d

at 308.  The only allegations the SEC makes about the offer or sale of securities relate to the

March 2012 bond offering, which incorporated the 2011 Annual Report, and the August 2012

bond offering, which incorporated the 2011 Annual Report and the HY 2012 Report.  Compl.

¶¶ 104, 148.  As discussed, however, the SEC has not properly alleged the elements of securities

fraud with respect to those reports.  Moreover, the SEC has not alleged scheme liability

predicated on Section 17(a)(1) and (3) for the same reasons it has not alleged it under Rule 10b–

5(a) and (c).  *See Kelly*, 817 F. Supp. 2d at 346.

  However, scienter is not a required element for the SEC to obtain an injunction under

Section 17(a)(2).  With respect to Claim Three, the SEC alleges that "[b]y engaging in the

conduct described above, [Defendants] violated, and unless restrained and enjoined will again

violate, Section[] 17(a) of the Securities Act."  Compl. ¶ 187.  The SEC's second prayer for

relief, moreover, is to "[p]ermanently enjoin[] Defendants . . . and all persons in active concert or

participation with them, from violating the federal securities laws alleged in this [c]omplaint."

*Id.* at 59.  As discussed, with respect to the HY 2012 Report, the SEC has adequately alleged that

the over $3 billion valuation of RTCM was materially false, but has not alleged scienter.  (It did

not, however, adequately allege falsity with respect to the 2011 Annual Report.)  Therefore, the

Court must consider whether, for purposes of seeking injunctive relief, the SEC has alleged a

violation of Section 17(a).  The Court agrees with the analysis in *Kelly*, which holds that for an

individual to be held liable under Section 17(a), she must be the "maker" of a statement pursuant

to the Supreme Court's decision in *Janus*.  817 F. Supp. 2d at 345 (citing *Janus*, 564 U.S. at

141).  Because the SEC agrees that the Individual Defendants did not make any statement in the

HY 2012 Report, Pl. Mem. at 31 n.14, and does not allege their involvement in writing the

August 2012 bond offering documents, *see* Compl. ¶ 139, any request for injunctive relief

pursuant to Section 17(a) against the Individual Defendants related to the HY 2012 Report is

dismissed.  To the extent that the SEC seeks injunctive relief with respect to Rio Tinto, however,

which is undoubtedly the "maker" of the statements in the HY 2012 Report and the August 2012

bond offering documents, such request is not dismissed.

Accordingly, Claim Three is DISMISSED, except with respect to any injunctive relief the

SEC seeks in connection with Rio Tinto's filing of the August 2012 bond offering documents.

> D.  Claim Four: Aiding and Abetting Rio Tinto's Violations of Section 17(a) of the
>     Securities Act against the Individual Defendants

Claim Four alleges the Individual Defendants aided and abetted Rio Tinto's violations of

Section 17(a) of the Securities Act.  15 U.S.C. § 77o(b).  Aiding and abetting liability under

Section 17(a) of the Securities Act also requires the existence of a primary violation.  *See SEC v.*

*Wey*, 246 F. Supp. 3d 894, 926 (S.D.N.Y. 2017).  Because the SEC has not adequately alleged a

primary violation of Section 17(a), Claim Four is DISMISSED.

> E.  Claim Five: Violations of Section 13(a) of the Exchange Act and Rules 12b–20,
>     13a–1, and 13a–16 Against Rio Tinto

Section 13(a) of the Exchange Act requires issuers of securities to file certain documents

with the SEC.  17 U.S.C. § 78m(a).  Rule 12b–20 states that "[i]n addition to the information

expressly required to be included in a statement or report, there shall be added such further

material information, if any, as may be necessary to make the required statements, in the light of

the circumstances under which they are made not misleading."  17 C.F.R. § 240.12b–20.  Rule

13a–1 concerns annual reports.  *Id.* § 240.13a–1.  Rule 13a–16 concerns Form 6-K.  *Id.*

§ 240.13a–16.  To state a claim under Section 13(a) of the Exchange Act, the SEC must allege

that Defendants made "materially false" statements in their filings, *SEC v. Stanard*, No. 06 Civ. 7736, 2009 WL 196023, at *31 (S.D.N.Y. Jan. 27, 2009), although scienter is not a required element, *SEC v. McNulty*, 137 F.3d 732, 740–41 (2d Cir. 1998).

The SEC has alleged that Rio Tinto's August 2012 Form 6-K incorporated its HY 2012 Report, including its over \$3 billion valuation of RTCM.  Compl. ¶ 139.  As discussed, the SEC has adequately alleged that this valuation was materially false, and that the failure to disclose RTCM's serious adverse developments constituted material omissions.  Therefore, it has adequately alleged a violation by Rio Tinto of Section 13(a) of the Exchange Act and Rules 12b–20 and 13a–16.  Because the SEC has not adequately alleged that the 2011 Annual Report was materially misleading, however, the SEC's claims premised on Rule 13a–1 are dismissed.

> F.   Claim Six: Aiding and Abetting Rio Tinto's Violations of Section 13(a) of the Exchange Act, and Rules 12b–20, 13a–1, and 13a–16 Against the Individual Defendants

The SEC alleges that the Individual Defendants aided and abetted Rio Tinto's violations of Section 13(a) of the Exchange Act and the rules thereunder.  Aiding and abetting claims under Section 13(a) require the same elements as aiding and abetting claims under Section 10(b) and Rule 10b–5.  *See SEC v. Espuelas*, 767 F. Supp. 2d 467, 475 (S.D.N.Y. 2011); *SEC v. Cedric Kushner Promotions, Inc.*, 417 F. Supp. 2d 326, 336 (S.D.N.Y. 2006).  The SEC must allege, therefore: "(1) the existence of a securities law violation by the primary (as opposed to the aiding and abetting) party; (2) knowledge of this violation on the part of the aider and abettor; and (3) 'substantial assistance' by the aider and abettor in the achievement of the primary violation." *Apuzzo*, 689 F.3d at 211.  As discussed, with respect to the over \$3 billion valuation in the August 2012 Form 6-K, the SEC has alleged a primary violation.

With respect to knowledge of the violation, the Individual Defendants were present at the July 30, 2012 Audit Committee meeting, which was the last meeting prior to the publication of the HY 2012 Report.  Compl. ¶¶ 134–135.  At that meeting, the Second Controller's Paper was presented, which concluded that there were no impairment indicators with respect to RTCM, and that Rio Tinto was confident of finding a viable infrastructure path.  *Id.* ¶ 134.  Therefore, the SEC has adequately alleged that the Individual Defendants had knowledge of the materially false valuation in the HY 2012 Report, and its related omissions.

Finally, the Court must consider whether the SEC adequately alleges that the Individual Defendants offered "substantial assistance" to the materially false over $3 billion valuation of RTCM in the HY 2012 Report.  In order to be held liable as an aider or abettor, the plaintiff must allege that a defendant "in some sort associated himself with the venture, that the defendant participated in it as in something that he wished to bring about, and that he sought by his action to make it succeed."  *Apuzzo*, 689 F.3d at 212 (alterations, internal quotation marks, and citation omitted).  The SEC alleges that Elliott did not invite Rio Tinto's Controller to the Brisbane Meeting.  Compl. ¶ 118.  Neither Individual Defendant informed the Audit Committee of the severe adverse developments they learned about at the Brisbane Meeting.  *Id.* ¶ 129.  Elliott reviewed a draft of the First Controller's Paper—which stated, among other things, that impairment of RTCM was not necessary—before the June 18, 2012 Audit Committee meeting, and did not make any corrections.  *Id.* ¶¶ 125, 128–129.  The SEC does not allege the Individual Defendants' involvement in the preparation of the Impairment Paper, which was submitted to Rio Tinto's independent auditors.  *See id.* ¶¶ 130–133.  The Individual Defendants also attended the July 30, 2012 Audit Committee meeting, where the Second Controller's Paper was discussed

41

(which, among other things, stated that there were no impairment indicators), and therefore they "reviewed or should have reviewed the Second Controller's Paper." *Id.* ¶¶ 134–135. The Individual Defendants did not sign or certify the HY 2012 Report. *See* Pl. Mem. at 31 n.14.

Although the question is somewhat close, especially with respect to Elliott, the Court holds that the SEC has not plausibly alleged that the Individual Defendants "substantially assisted" the inclusion of the materially false over $3 billion valuation in the HY 2012 Report. The SEC cites *SEC v. Mudd*, 885 F. Supp. 2d 654, 671 (S.D.N.Y. 2012) as support, Pl. Mem. at 49, but in that case, the SEC alleged more than the simple review of misleading filings. There, the SEC alleged that individual defendants drafted misleading filings, commented on multiple drafts of each filing, signed and certified relevant filings, and spoke to investors and repeated the misleading statements in the filings. 885 F. Supp. 2d at 671. Here, by contrast, the SEC alleges only that the Individual Defendants were aware of the materially false valuation in various papers (and in one instance, reviewed a draft of a paper), but did not correct them at meetings of the Audit Committee. Nor does the Court find that Elliott's failure to invite the Controller—who was apparently located in London, Def. Mem. at 20—to the Brisbane Meeting to be an allegation of substantial assistance without further allegations that Elliott affirmatively tried to conceal the results of the meeting from the Controller.

Accordingly, Claim Six is DISMISSED in its entirety.

### G.  Claim Seven: Violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act against Rio Tinto

The SEC alleges that Rio Tinto violated Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act. Pursuant to Section 13(b)(2)(A), a company is required to "make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the

transactions and dispositions of the assets of the issuer." 15 U.S.C. § 78m(b)(2)(A). Pursuant to

Section 13(b)(2)(B), a company must, among other things, "devise and maintain a system of

internal accounting controls sufficient to provide reasonable assurances that . . . transactions are

recorded as necessary (I) to permit preparation of financial statements in conformity with

generally accepted accounting principles or any other criteria applicable to such statements, and

(II) to maintain accountability for assets." *Id.* § 78m(b)(2)(B)(ii). The legislative history for

these provisions indicates that "standards of reasonableness" must apply in evaluating

compliance with these provisions, because "management must exercise judgment in

determining" how to comply. S. Rep. No. 95-114, at 8 (1977).

> 1. Section 13(b)(2)(A) Claim

As discussed, the SEC has alleged that the over $3 billion valuation of RTCM in the HY

2012 Report was materially false and that, therefore, Rio Tinto violated Section 13(b)(2)(A),

which requires it to keep accurate books and records. Defendants first state that Rio Tinto's

auditors have never withdrawn or restated the HY 2012 Report, which Defendants argue

undermines the SEC's claim that Rio Tinto's records were inaccurate. Def. Mem. at 53 (citing

*Harris v. AmTrust Fin. Servs.*, 135 F. Supp. 3d 155, 172 (S.D.N.Y. 2015)). However, the Court

agrees with the SEC that the actions of Rio Tinto's auditors are not dispositive of this claim,

because "[t]o hold otherwise would shift to accountants the responsibility that belongs to the

courts." *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002), *cited in* Pl. Mem. at 44.

Defendants also argue that Rio Tinto acted reasonably by choosing not to impair RTCM

in its HY 2012 Report. Def. Mem. at 54. They argue that at that point, Rio Tinto was still

evaluating the infrastructure options available for RTCM, and state that Rio Tinto had generated

conflicting valuations for RTCM, some of which were positive.  *Id.* at 54–55.  However, as discussed, the SEC has plausibly alleged that the Individual Defendants possessed information that indicated that there were no realistic transportation options, that there was a lower proportion of hard coking coal than anticipated, and that based on the best available information, RTCM had no value at all.  At the motion to dismiss stage, the SEC has plausibly alleged that it was unreasonable, under the relevant accounting principles, to value RTCM at more than $3 billion in the HY 2012 Report.

### 2.  Section 13(b)(2)(B) claim

The SEC also argues that Rio Tinto failed to devise and maintain a system of internal accounting controls as required by Section 13(b)(2)(B) of the Exchange Act.  It argues that the Individual Defendants "knowingly circumvented or knowingly failed to implement" Rio Tinto's controls, and that they "corrupted Rio Tinto's internal controls by allowing the Controller's Office to submit multiple misleading and false papers to Rio Tinto's Audit Committee and external auditors."  Pl. Mem. at 45–46.

This is insufficient to state a claim under Section 13(b)(2)(B).  *See SEC v. World-Wide Coin Invs., Ltd.*, 567 F. Supp. 724, 751 (N.D. Ga. 1983) ("It does not appear that either the SEC or Congress . . . intended that the statute should require that each affected issuer install a fail-safe accounting control system at all costs.").  The SEC has not alleged sufficient facts concerning Rio Tinto's internal controls for the Court to conclude that they may have been violated.  *See McConville v. SEC*, 465 F.3d 780, 790 (7th Cir. 2006) ("Examples of internal controls include manual or automated review of records to check for completeness, accuracy and authenticity; a method to record transactions completely and accurately; and reconciliation of accounting entries

to detect errors.").  To the extent the SEC does describe Rio Tinto's impairment process, it alleges that Rio Tinto was attempting to comply with the relevant accounting standards.  *See* Compl. ¶¶ 36–38.  The mere fact that accounting controls may have been circumvented does not state a claim for a violation of Section 13(b)(2)(B) of the Exchange Act.  *See SEC v. Healthsouth Corp.*, 261 F. Supp. 2d 1298, 1324 (N.D. Ala. 2003) ("The sole evidence that the SEC has put forth regarding a lack of internal controls at HealthSouth is the fact that eleven individuals at the corporation have pled guilty to accounting fraud.  However, this in and of itself is insufficient to demonstrate a lack of internal controls at HealthSouth.  An internal control system that can catch every type of fraud occurring at a corporation is as prevalent as the mythical pink elephant.").

Accordingly, Claim Seven is DISMISSED to the extent it alleges a violation of Section 13(b)(2)(B) of the Exchange Act.

### H.   Claim Eight: Violations of Section 13(b)(5) of the Exchange Act and Rule 13b2–1 Against the Individual Defendants

Section 13(b)(5) of the Exchange Act states that "[n]o person shall knowingly circumvent or knowingly fail to implement a system of internal accounting controls or knowingly falsify any book, record, or account described in paragraph (2)," which includes the violations the SEC alleges in Claim Seven.  15 U.S.C. § 78m(b)(5).  Rule 13b2–1 states that "[n]o person shall directly or indirectly, falsify or cause to be falsified, any book, record or account subject to section 13(b)(2)(A) of the [] Exchange Act."  17 C.F.R. § 240.13b2–1.  Scienter is not required under these provisions, but "the SEC must demonstrate that a defendant knew of facts that contradicted the substance of the reported accounting."  *SEC v. Straub*, No. 11 Civ. 9645, 2016 WL 5793398, at *21 (S.D.N.Y. Sept. 30, 2016) (internal quotation marks, citations, and alterations omitted).

45

This claim depends on the SEC's allegations that the Individual Defendants failed to correct misstatements in various papers submitted to Rio Tinto's auditors while the HY 2012 Report was being drafted or otherwise provide relevant information to Rio Tinto's auditors during this period. *See* Pl. Mem. at 46–47. First, Defendants argue that such a claim has not been stated because there were no inaccuracies in the First and Second Controller's Papers and the Impairment Paper. Def. Mem. at 58–59. However, as discussed, even though these papers disclosed some of the challenges faced by RTCM, the SEC has adequately alleged that they did not disclose the severe adverse developments that rendered RTCM worthless. Defendants also argue that the Individual Defendants "reasonably relied on Rio Tinto's well-functioning impairment process," which previously and concurrently resulted in impairments of Alcan. Def. Mem. at 58–59. However, the SEC alleges that the Individual Defendants possessed information about the severe adverse developments that the Controller did not have, and that they attended Audit Committee meetings but did not disclose the information, thus corrupting the impairment process with respect to RTCM. Although the SEC has not adequately alleged that the Individual Defendants aided and abetted the materially false over $3 billion valuation in the HY 2012 Report as alleged in Claim Six, it has alleged that they indirectly caused the valuation in the HY 2012 Report to be falsified with respect to Claim Eight through their conduct.

I. Claim Nine: Aiding and Abetting Rio Tinto's Violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act against the Individual Defendants

In Claim Nine, the SEC alleges that the Individual Defendants aided and abetted Rio Tinto's violations in Claim Seven. However, with respect to Section 13(b)(2)(A), although the SEC has adequately alleged a primary violation by Rio Tinto in Claim Seven, it has not alleged substantial assistance by the Individual Defendants, for the same reasons as those discussed in

Claim Six.  With respect to Section 13(b)(2)(B), the SEC has not alleged a primary violation.

Accordingly, Claim Nine is DISMISSED.

   J.   Claim Ten: Violations of Rule 13b2–2 of the Exchange Act against the Individual
        Defendants

Rule 13b2–2(a) of the Exchange Act states that:

> No director or officer of an issuer shall, directly or indirectly: (1) Make or cause
> to be made a materially false or misleading statement to an accountant in
> connection with; or (2) Omit to state, or cause another person to omit to state, any
> material fact necessary in order to make statements made, in light of the
> circumstances under which such statements were made, not misleading, to an
> accountant in connection with: (i) Any audit, review or examination of the
> financial statements of the issuer required to be made pursuant to this subpart; or
> (ii) The preparation or filing of any document or report required to be filed with
> the Commission pursuant to this subpart or otherwise.

17 C.F.R. § 240.13b2–2(a).

   As discussed, the SEC has adequately alleged that the Individual Defendants possessed

material information about severe adverse developments at RTCM, but that they did not share

this information at Rio Tinto's Audit Committee meetings or otherwise, and thus caused the HY

2012 Report to contain a materially false valuation of RTCM.  Accordingly, the SEC has stated a

claim under Rule 13b2–2(a) of the Exchange Act.

   K.   Claims Eleven and Twelve: Violations of Rule 13a–14 of the Exchange Act
        against the Individual Defendants

Rule 13a–14 of the Exchange Act requires the CEO and CFO of a company to certify

certain documents submitted to the SEC, including Form 20-F.  17 C.F.R. § 240.13a–14(a).

Because the Individual Defendants certified Rio Tinto's Form 20-F for 2011, which incorporated

the 2011 Annual Report, Compl. ¶ 96, the SEC alleges that Albanese (in Claim Eleven) and

Elliott (in Claim Twelve) violated this rule.  However, as discussed, the SEC has not adequately

alleged that the valuation of RTCM in the 2011 Annual Report was materially false. Accordingly, Claims Eleven and Twelve are DISMISSED.

### L.  Disgorgement

Finally, the SEC seeks disgorgement of Defendants' "ill-gotten gains" as a remedy. Compl. at 59.  Defendants seek to strike this request from the complaint, arguing that it is an impermissible penalty.  Def. Mem. at 60.

The Second Circuit has held that "the SEC may seek other than injunctive relief . . . so long as such relief is remedial relief and is not a penalty assessment."  *SEC v. Tex. Gulf Sulphur Co.*, 446 F.2d 1301, 1308 (2d Cir. 1971).  In *Kokesh v. SEC*, the Supreme Court analyzed disgorgement as a remedy under 28 U.S.C. § 2462, a statute not implicated by this motion. __ U.S. __, 137 S. Ct. 1635 (2017).  Under § 2462, any suit seeking a "penalty" must be brought within five years of the date of accrual.  In *Kokesh*, the Supreme Court held that "[d]isgorgement in the securities-enforcement context is a 'penalty' within the meaning of § 2462, and so disgorgement actions must be commenced within five years" of accrual.  137 S. Ct. at 1639.  The Court added, however, that "[n]othing in this opinion should be interpreted as an opinion on whether courts possess authority to order disgorgement in SEC enforcement proceedings or on whether courts have properly applied disgorgement principles in this context[.]  The sole question presented in this case is whether disgorgement, as applied in SEC enforcement actions, is subject to § 2462's limitations period."  *Id.* at 1642 n.3.

In cases prior to *Kokesh*, it was observed that "disgorgement is a well-established remedy in the Second Circuit, particularly in securities enforcement actions."  *SEC v. Cavanagh*, 445 F.3d 105, 116 (2d Cir. 2006) (internal quotation marks omitted).  Although the Second Circuit

has not expressly addressed whether disgorgement remains a permissible remedy, it has upheld a disgorgement award post-*Kokesh*. *See SEC v. Metter*, 706 F. App'x 699, 702 (2d Cir. 2017) (assuming, without deciding, that the disgorgement ordered was "punitive in nature" and still upholding the award); *see also SEC v. Ahmed*, 343 F. Supp. 3d 16, 26–27 (D. Conn. 2018) (collecting cases from around the country upholding disgorgement awards post-*Kokesh* and holding that "nothing in *Kokesh* disturbed Second Circuit precedent that disgorgement is a proper equitable remedy").

Accordingly, Defendants' request to strike the SEC's request for disgorgement from the complaint is DENIED.

## CONCLUSION

For the reasons stated above, Defendants' motion to dismiss the complaint is GRANTED in part and DENIED in part, as follows:

- **Claim One**: the motion is DENIED insofar as the SEC alleges violations of Section 10(b) of the Exchange Act and Rule 10b–5(b) by Albanese and Rio Tinto with respect to the Albanese Statements, and GRANTED in all other respects;

- **Claim Two**: the motion is GRANTED;

- **Claim Three**: the motion is DENIED insofar as the SEC seeks injunctive relief against Rio Tinto under Section 17(a)(2) of the Securities Act with respect to the HY 2012 Report, and GRANTED in all other respects;

- **Claim Four**: the motion is GRANTED;

- **Claim Five**: the motion is DENIED insofar as the SEC alleges violations of Section 13(a) and Rules 12b–20 and 13a–16 with respect to the HY 2012 Report, and GRANTED in all other respects;

- **Claim Six**: the motion is GRANTED;

- **Claim Seven**: the motion is DENIED insofar as the SEC alleges that Rio Tinto violated Section 13(b)(2)(A) of the Exchange Act with respect to the

HY 2012 Report, and GRANTED in all other respects;

- **Claim Eight**: the motion is DENIED;

- **Claim Nine**: the motion is GRANTED;

- **Claim Ten**: the motion is DENIED;

- **Claim Eleven**: the motion is GRANTED; and

- **Claim Twelve**: the motion is GRANTED.

- **Disgorgement**: Additionally, the Court DENIES Defendants' request to strike disgorgement as a remedy from the complaint.

The Clerk of Court is directed to terminate the motion at ECF No. 70.

SO ORDERED.

Dated: March 18, 2019
New York, New York

_____
ANALISA TORRES
United States District Judge

50