

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/9/20

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE
COMMISSION,

                     Plaintiff,

       -against-

RIO TINTO PLC, et al.,

                  Defendants.

17cv07994 (AT) (DF)

**MEMORANDUM &**
**ORDER**

**DEBRA FREEMAN, United States Magistrate Judge:**

In this securities action, which has been referred to this Court for general pretrial supervision, plaintiff Securities and Exchange Commission (the "SEC") brings claims under the Securities Exchange Act of 1934, 15 U.S.C. § 78a, *et seq.*, the Securities Act of 1933, 15 U.S.C. § 77a, *et seq.*, and rules promulgated thereunder, against defendants Rio Tinto plc, Rio Tinto Limited (together, "Rio Tinto"), Thomas Albanese ("Albanese"), and Guy Robert Elliot ("Elliot") (together, the "Individual Defendants") (all, collectively, "Defendants"). The SEC alleges, in short, that Defendants knowingly made materially misleading statements and omissions concerning the value of a coal mining project in Mozambique and incorporated those misleading statements and omissions into U.S. debt offerings, all the while concealing serious problems with the project from auditors and the market, in violation of books-and-records, internal-controls, and anti-fraud provisions of the federal securities laws. Before this Court is the SEC's motion to amend its Complaint to add a large volume of new factual allegations in support of its claims, some of which were dismissed by the Honorable Analisa Torres, U.S.D.J., in an earlier ruling. For the reasons discussed below, the motion to amend (Dkt. 161) is denied.

## BACKGROUND

In Judge Torres's March 18, 2019 Order granting in part and denying in part Defendants' motion to dismiss the SEC's Complaint (Order, dated Mar. 18, 2019 ("3/18/19 Order") (Dkt. 135)), the Court summarized, in detail, the extensive factual allegations in this case, relating to Defendants' acquisition of the coal mining project in Mozambique, which came to be called Rio Tinto Coal Mozambique ("RTCM"), the project's diminution in value, and the misrepresentations that the Individual Defendants allegedly made to auditors and the market. This Court incorporates that summary into this Order by reference and assumes familiarity with its contents, including with respect to any abbreviations used therein.

### A.   Procedural History

#### 1.   Fact Discovery

##### a.   Witness Testimony

The SEC commenced this action in 2017, after a nearly five-year investigation of Defendants. (*See* Joint Status Letter, dated Sept. 7, 2018 ("9/7/18 Joint Ltr.") (Dkt. 105), at 2.) Defendants filed a motion to dismiss the action on March 5, 2018 (Dkt. 70), and this Court then held an initial pretrial conference with the parties on March 6, 2018 (*see* Transcript of Proceedings Held on March 6, 2018 Before Magistrate Judge Debra Freeman ("3/6/18 Hrg. Tr.") (Dkt. 76)). At the initial conference, counsel for both the SEC and Defendants described what they expected to be an unusually lengthy discovery process. (*See id.*, at 20:2-9, 23:21-23.) The SEC's counsel advised the Court that the SEC planned to take the depositions of 15 witnesses, and that "probably 80 percent of those witnesses [were] outside of the U.S." and thus beyond the reach of the Court. (*Id.*, at 20:22–21:3.) Counsel for Rio Tinto added that "a large number" of the anticipated witnesses were its former employees, who were not only located outside of the United States, but were also outside of Rio Tinto's control and were thought to be potentially

2

reluctant to testify.  (*Id.*, at 23:21-23; *see also id.*, at 20:2-9 (counsel for the SEC explaining that a "lengthy" discovery period was necessary because "the vast majority of these witnesses are located either in the U.K or Australia" and "there's [sic] a lot of logistical hurdles I think to getting people to sit down for the deposition").)

Importantly, both parties agreed that, with respect to witnesses outside of the United States, the depositions would be videotaped and used as trial testimony, as these witnesses could not be compelled by a U.S. court to appear for trial, and the expectation was that they would not agree to do so voluntarily.  (*See id.*, at 9:7-13, 24:2-7.)  Counsel for Rio Tinto stressed that the depositions, therefore, were "not just a process of discovery," and Elliot's counsel echoed that "these [would] not [be] discovery [depositions]" because Defendants would essentially need to prepare their trial plan before the depositions, and each witness would need to be viewed "not in the context of that particular witness'[s] documents," but in the context of how the witness would "fit in with [counsel's] defense themes" and how the videotaped deposition would "play in the context of the overall defense."  (*Id.*, at 24:5, 31:12, 16-20.)  Rio Tinto's counsel further expressed his belief that the non-party witnesses would not "want to sit twice" for a deposition, and the parties would thus have only "one shot . . . with most of the witnesses."  (*Id.*, at 36:9-12.) The SEC's counsel expressed a nearly identical position on the matter during a later conference, telling the Court that "these [depositions] [were] essentially one[-]time opportunities to take trial testimony of these foreign deponents."  (*See* Transcript of Proceedings Held on September 17, 2018 Before Magistrate Judge Debra Freeman ("9/17/18 Hrg. Tr.") (Dkt. 109), at 9:2-4.)

Following the March 2018 conference, this Court issued a Scheduling Order that, *inter alia*, required any motion to amend to be filed by September 7, 2018.  (Dkt. 75.)  When this

Court set this particular deadline at the conference, it expressly cautioned the SEC of the importance of that deadline under Rule 16 of the Federal Rules of Civil Procedure:

> And also bear in mind, it may be irrelevant because there may be no need [for amendment], but if there is a need, bear in mind that the liberal standard for amendments under Rule 15 can kind of go out the window if you miss a date in the [S]cheduling [Order] under Rule 16 because then you have to show good cause why you couldn't have done it sooner.  And if you can't show that, you may not get the benefit from that liberal amendment standard.  So just be aware, okay?

(3/6/18 Hrg. Tr., at 42:6-14.)  Counsel for the SEC acknowledged this warning.  (*See id.*, at 42:15 ("Yes, Your Honor.").)  The Scheduling Order set the close of fact discovery for March 29, 2019, although requests for extensions were anticipated because of the logistical difficulties presented by the many foreign witnesses.  (*See id.*, at 29:14-25.)

Of the 23 witnesses in this case who were ultimately deposed, it appears that 10 were deposed sometime in 2018 (*see* Joint Status Report, dated Feb. 11, 2019 (Dkt. 130), at 1 (citing Dkt. 128)), seven more in February 2019 (*id.*), and the remainder in June, July, September, and October of 2019 (*see* Joint Status Letter, dated June 14, 2019 ("6/14/19 Joint Ltr.") (Dkt. 159), at 1).  The depositions of at least four of the witnesses – partners in Defendants' independent auditing firm – were taken by Defendants pursuant to Hague Convention applications (*see* Defendants' Consolidated Brief in Opposition to Plaintiff's Motion for Leave To Amend the Complaint, dated July 22, 2019 ("Defs. Mem.") (Dkt. 163), at 16; Defendants' Memorandum of Law in Support of Defendants' Motion for Issuance of Letters of Request for International Judicial Assistance To Obtain Evidence, dated July 31, 2018 ("Hague Memorandum" or "Defs. Hague Mtn.") (Dkt. 93), at 6, 9), which required advance logistical planning and introduced an element of uncertainty as to whether, and the extent to which, the testimony could be obtained.

As Defendants explained in their Hague Memorandum, "[t]he Hague Convention allows judicial authorities in one signatory country to obtain evidence located in another signatory country for use in judicial proceedings" when the party seeking the evidence makes the necessary showing to a domestic court, and that court then issues a letter of request to "the competent authority in the foreign state."  (*Id.*, at 6-7 (quoting *Tulip Computs. Int'l B.V. v. Dell Comput. Corp.*, 254 F. Supp. 2d 469, 474 (D. Del. 2003) (internal quotation marks omitted), and citing Hague Convention, art. 1); *see also Société Nationale Industrielle Aerospatiale v. U.S. District Court*, 482 U.S. 522, 532 (1987)).  More precisely, the showing the requesting party must make is that a letter of request from the court is a "necessary and appropriate" means of obtaining the evidence sought.  (Defs. Hague Mtn., at 10 (internal quotation marks and citation omitted).)  An adequate showing was made in this case by Defendants' representation, supported by an attorney declaration and copies of communications with the foreign witnesses, that "Defendants [could not] secure this evidence from the [independent auditor] through voluntary cooperation [because] the firms ha[d] declined to turn over the requested evidence in the absence of a court order."  (*Id.* (citing Dkt. 94 (attorney declaration), Exs. 7-9).)  The SEC did not oppose Defendants' application for letters of request (*id.*, at 1), and, on or about October 12, 2018, this Court proceeded to issue letters to the relevant authorities in the United Kingdom, Australia, and South Africa (*see* Dkt. 116).

### b.    <u>Documents</u>

With respect to document discovery, the SEC represented at the March 2018 conference that it was already in possession of a "large volume of documents" produced by Rio Tinto during the investigation that preceded this litigation, and that these documents would likely comprise the "vast majority" of the documents the SEC would need.  (3/6/18 Hrg. Tr., at 21:24-25–22:2-4,

14-15.)  In the parties' September 7, 2018 joint status letter, the parties estimated, more specifically, that the SEC had obtained approximately 100,000 documents from Rio Tinto prior to the commencement of the litigation.  (*See* 9/7/18 Joint Ltr., at 2.)  Nevertheless, once in litigation, the SEC made additional document demands, and Rio Tinto ultimately produced approximately 30,000 more documents.[1]  (*See id.*; Joint Status Letter, dated May 3, 2019 ("5/3/19 Joint Ltr.") (Dkt. 153), at 1-2.)  Most of these documents were produced prior to the parties' report to the Court in September 2018 (*see* 9/7/18 Joint Ltr., at 2), but, due to a technical error on the part of Rio Tinto's document vendor, approximately 8,500 of the documents were not produced until June 1, 2019 (5/3/19 Joint Ltr.; 6/14/19 Joint Ltr., at 1).[2]  Rio Tinto reportedly notified the SEC of the existence of these additional documents on March 29, 2019, three days after the SEC had filed a pre-motion letter preliminarily seeking leave to amend its Complaint. (*See* 5/3/19 Joint Ltr., at 1.)

As for documents and other materials produced by the SEC to Defendants, the SEC not only provided Defendants, during discovery, with the documents that it had collected and transcripts of the witness testimony that it had taken during its pre-litigation investigation (9/7/18 Joint Ltr., at 2), but it also produced documents in response to eight requests served by Defendants in March 2018 (*id.*).  Additionally, in their September 2018 letter, the parties reported that they had received roughly 3,000 documents from third parties, and noted that "additional productions" were then "expected shortly."  (*Id.*)  The parties further stated that, at

---

[1] Elliot also produced documents to the SEC sometime in 2018, but it is not clear how many.  (*See id.*)

[2] In their June 2019 joint status letter, the parties stated that they "[had] agreed upon search parameters for the SEC's Third Request for Production of Documents" (6/14/19 Joint Ltr., at 2), but there are no later submissions discussing whether that further search had located any responsive documents, or, if it did, when those documents were produced.

that time, Defendants were expecting "significant" additional discovery from foreign third

parties, including Rio Tinto's outside auditor, but that those third parties were "unwilling to

produce documents outside of the formal Hague Convention process," which Defendants

initiated on or shortly after August 31, 2018.  (*Id.*, at 2-3.)

### c.  Current Status of Discovery

According to a November 13, 2019 joint status letter from the parties, fact discovery,

aside from contention interrogatories, was completed on October 11, 2019, when the last witness

was deposed.  (Joint Status Letter, dated Nov. 13, 2019 ("11/13/19 Joint Ltr.") (Dkt. 167), at 1.)

Expert discovery is currently underway, but expert depositions and the close of expert discovery

are stayed pending the Court's resolution of the SEC's motion to amend.  (*See id.*; Dkt. 170.)

Additionally, the parties' June and November 2019 letters expressed agreement that, were this

Court to grant that motion, Defendants should be permitted to request a reopening of fact

discovery to the extent "the amended complaint raise[s] new factual issues, altered allegations, or

any matter that requires the discovery of additional facts," although the SEC reserved the right to

object to any such request.  (11/13/19 Joint Ltr., at 1; *see also* 6/14/19 Joint Ltr., at 2.)

### 2.  Defendants' Motion To Dismiss

Pursuant to Judge Torres's individual rules, on January 16, 2018, Rio Tinto, Elliot, and

Albanese each submitted a pre-motion letter setting forth the bases for an anticipated motion to

dismiss, and they also sent letters to the SEC describing the purported deficiencies they had

identified in the Complaint.  (*See* Rio Tinto's Pre-Motion Letter, dated Jan. 16, 2018 ("Rio Tinto

Pre-Mtn. Ltr.") (Dkt. 52); Guy Elliot's Pre-Motion Letter, dated Jan. 16, 2018 ("Elliot Pre-Mtn.

Ltr.") (Dkt. 53); Thomas Albanese's Pre-Motion Letter, dated Jan. 16, 2018 ("Albanese Pre-Mtn.

Ltr.") (Dkt. 54).)  Rio Tinto argued, *inter alia*, that the SEC had not adequately pleaded falsity

and materiality with respect to certain statements made by the company.  (Rio Tinto Pre-Mtn.
Ltr., at 2-4.)  The Individual Defendants each argued that, to the extent any material
misstatements or omissions were made in connection with RTCM, the SEC had not pleaded that
the Individual Defendants made them, and had also failed to plead that the Individual
Defendants' conduct was "inherently deceptive."  (Elliot Pre-Mtn. Ltr., at 2-4; Albanese
Pre-Mtn. Ltr., at 2-3.)  All Defendants asserted that the SEC's allegations were insufficient to
plead scienter, a necessary element of its fraud claims.  (Rio Tinto Pre-Mtn. Ltr., at 3-4; Elliot
Pre-Mtn. Ltr., at 3; Albanese Pre-Mtn. Ltr., at 2-3.)

Under Judge Torres's rules, if a plaintiff declines to amend its complaint within 21 days
of the filing of a motion to dismiss, then "no further opportunities to amend to address the
deficiencies identified by the motion to dismiss will ordinary be granted absent good cause."
*See* Hon. Analisa Torres Individual Rules of Practice § III(B)(iv).  The SEC chose not to amend,
and, as noted above, Defendants moved to dismiss the Complaint on March 5, 2018.  (*See*
Dkts. 70-71.)

In her Order ruling on Defendants' motion the following March, Judge Torres dismissed
or narrowed several of the SEC's claims.  Specifically, Judge Torres found that the SEC had
alleged all of the requisite elements of a Section 10(b) or Rule 10b-5(b) fraud claim only with
respect to a narrow set of statements, referred to in the Order as the "Albanese Statements."  (*See*
3/18/19 Order, at 34.)  All of the SEC's other fraud claims were dismissed for lack of adequate
allegations of falsity, materiality, or scienter.  (*See id.*, at 19, 22, 24, 26-27, 31-32.)  Most notable
among these deficiencies was the SEC's failure to plead the element of scienter.  Although
Judge Torres found that the Complaint had adequately pleaded falsity and materiality for eight

different sets of statements made by one of the Defendants, only the Albanese Statements
survived the scienter analysis.  (*See id.*, at 30-34.)

Based largely on the deficiencies that the Court identified with respect to the SEC's
pleading of falsity and scienter, Judge Torres dismissed, in their entirety, the SEC's claims under
Rules 10b-5(a) and (c), 13a-1, and 13a-14, and Sections 13(b)(2)(B) and 17(a), except to the
extent that the SEC had sought a limited form of injunctive relief under Section 17(a).[3]  (*Id.*, at
36, 39-40, 45, 47-48.)  The Court also rejected all claims that the Individual Defendants had
aided and abetted Rio Tinto's alleged violations of certain statutory and regulatory provisions,
even those provisions as to which the SEC had successfully alleged a primary violation.  (*Id.*, at
37, 39, 42, 46-47.)

**B.      The SEC's Motion To Amend**

About a week after the Court's issuance of its March 18, 2019 Order granting in part and
denying in part Defendants' motion to dismiss, the SEC submitted a pre-motion letter to the
Court requesting leave to file a motion to amend its Complaint, primarily for the purpose of
curing the deficiencies identified in the Order.  (SEC's Letter Motion for Leave To Amend
Complaint, dated Mar. 26, 2019 ("Pl. 3/26/19 Ltr.") (Dkt. 139).)  In a supplemental letter the
following day, the SEC added that, if the Court were to deny leave to amend, then the SEC
would move for reconsideration of Judge Torres's partial dismissal Order.  (Dkt. 140, at 2.)
Following further submissions, Judge Torres directed the SEC to file a formal motion to amend,
rather than a motion for reconsideration, and set an "extended briefing schedule" for the motion

---

[3] Judge Torres explained that claims for injunctive relief brought pursuant to
Section 17(a)(2), unlike damages claims brought under Sections (a)(1) and (3), do not require an
allegation of scienter, again highlighting the SEC's difficulty with that element.  (*Id.*, at 38-39.)

to account for the fact that there were apparently still documents outstanding from Defendants' production.  (Dkt. 154, at 1 n.1.)

As set out above, Rio Tinto produced the 8,500 outstanding documents on June 1, 2019, and, on July 8, 2019, the SEC filed its motion to amend (Dkt. 161), together with a memorandum of law (Plaintiff Securities and Exchange Commission's Memorandum in Support of Motion for Leave To Amend the Complaint, dated July 8, 2019 ("Pl. Mem.") (Dkt. 162)) and a proposed amended complaint (*id.*, Ex. A (the "Proposed Amended Complaint" or "Proposed Am. Compl.") (Dkt. 162-1)).  It is this motion that is now before this Court.

The SEC devotes most of its opening brief to arguing that its proposed amendment would not be futile (Pl. Mem., at 15-25), although it also adds, briefly, that it has not acted in bad faith or unduly delayed in seeking to amend the Complaint, and that Defendants would not be prejudiced by the proposed amendment (*id.*, at 13).  As to the standard governing its motion, the SEC notably spends only a short paragraph attempting to persuade the Court that it is not required to meet the "good cause" standard for amendments under Rule 16 of the Federal Rules of Civil Procedure (*see* Discussion, *infra*, at Section I(B)), and, instead, largely assumes that Rule 15 applies and that amendment should be "freely given" under that Rule (*see* Pl. Mem., at 12-13).

On July 22, 2019, Defendants filed a consolidated memorandum in opposition to the SEC's motion.  (*See* Defs. Mem.)  In contrast to the SEC, Defendants argue at the outset that Rule 16's "good cause" standard applies and that the SEC has failed to meet it.  (*Id.*, at 10-15.) Defendants additionally contend that, even under Rule 15's more liberal standard, the SEC's proposed amendment would prejudice Defendants (*id.*, at 15-18), and, in any event, the amendment would be futile (*id.*, at 18-30).

In its reply brief, filed on July 29, 2019, the SEC again primarily argues that its proposed amendment would not be futile (*see* Plaintiff's Reply in Support of Motion for Leave To Amend the Complaint, dated July 29, 2019 ("Pl. Reply") (Dkt. 166), at 2-10), although it also challenges Defendants' arguments regarding the applicability of Rule 16 and the potentially prejudicial impact of the proposed amendment (*id.*, at 11-15).

### C.   The Proposed Amended Complaint

In its pre-motion letter, filed in anticipation of the instant motion, the SEC represented that it sought to amend its Complaint "for the purpose of alleging additional facts in support of claims that were partially or completely dismissed pursuant to the [C]ourt's ruling, and reordering certain factual allegations already in the Complaint to make their application to the dismissed claims more explicit."[4]  (Pl. 3/26/19 Ltr., at 1.)  The SEC stated, though, that the proposed amendment would "encompass[] the same general facts" as the original Complaint (*id.*, at 2), and, while it also stated (somewhat misleadingly) that fact discovery was "ongoing"[5] (*see id.*), it did not claim that an amendment was necessary to incorporate any information learned through discovery since the time Defendants had filed their motion to dismiss.  To the contrary, it appears that virtually all of the additional factual allegations that the SEC seeks to add to the Complaint are based on information that the SEC obtained prior to its moving to amend.[6]

---

[4] It is undisputed that the SEC does not seek to add any legal claims that it had not previously asserted in the Complaint.

[5] As stated above, almost all document discovery concluded in 2018 (*see* 9/7/18 Joint Ltr., at 2), and it appears that the very last witnesses from whom testimony was sought were deposed shortly after the SEC filed its motion to amend (*see* Background, *supra*, at Section A(1)(a)).  Therefore, although discovery was technically "ongoing" at the time of the above statement by the SEC, it was very near its end.

[6] Although the SEC now argues, in support of the instant motion, that any delay in seeking leave to amend was due, in part, to its waiting for Rio Tinto to produce the approximately 8,500 documents not included in its earlier productions (*see* Pl. Mem., at 13-14),

The SEC's Proposed Amended Complaint would, however, add a substantial amount of factual detail to its pleading. The Proposed Amended Complaint is nearly triple the size of the original, expanding from 50 pages to 129, and from 176 paragraphs to 414. (*Compare* Complaint, dated Oct. 17, 2017 ("Compl.") (Dkt. 1), *with* Proposed Am. Compl.) This Court does not find it necessary, here, to wade through every change the SEC is proposing, but a document attached to the SEC's memorandum of law, entitled "Chart of Examples of Allegations in Proposed Amended Complaint," conveys the general idea. (Pl. Mem., Ex. C.) In the chart, the SEC describes, among other things, how it seeks to bolster allegations supporting the element of scienter, which was fatal to so many of its claims, by adding 15 new paragraphs. (*Id.*, at 2.) As an aside, this Court has found that five of these purportedly new paragraphs are the same or substantially the same as paragraphs in the original Complaint (*compare* Compl. ¶¶ 124-29 *with* Proposed Am. Compl. ¶¶ 310-13, 315), sometimes differing only by the addition of phrases like "as Albanese and Elliot knew" or "[i]n breach of their fiduciary duties" (Proposed Am. Compl. ¶¶ 310, 312).

As for the allegations that are truly new, the SEC proposes to add references to several previously unmentioned topics, including, for example, an August 8, 2012 "media release" posted to Rio Tinto's website (*id.* ¶¶ 349, 353) and a meeting Elliot had "with the audit partner and other representatives of the independent auditor, on or around July 23, 2012" (*id.* ¶ 323; *see also id.* ¶¶ 324-28). Additionally, a newly proposed paragraph 316 would add an allegation that the "Impairment Paper," important to several of the SEC's claims as initially pleaded, was

---

neither party was apparently aware that those documents existed until after the SEC had filed its March 26, 2019 pre-motion letter (*see* 5/3/19 Joint Ltr., at 1 (stating that Rio Tinto did not learn of additional documents until March 26, 2019, and did not inform the SEC of this until March 29)). Moreover, as discussed below, the SEC's new allegations are generally not based on information derived from those 8,500 documents. (*See* Discussion, *infra*, at Section II(B).)

"prepared by staff at RTCM and Rio Tinto Energy" (*id.* ¶ 316); in contrast, the original

Complaint ascribed no relevant conduct to Rio Tinto Energy.

As another example of new facts that the SEC proposes to add to its pleading, it asserts

that the Proposed Amended Complaint would add 21 new paragraphs in support of the SEC's

original allegation that RTCM's valuation in the 2011 Annual Report was "false" – an allegation

that the Court had rejected in its dismissal Order as insufficiently pleaded, affecting the viability

of several of the SEC's claims.  (*See* Pl. Mem., Ex. C, at 1.)  The SEC's proposed additions on

this topic, like those discussed above, refer to certain events or physical evidence that were not

mentioned in the Complaint.  For example, proposed paragraphs 151 to 154 refer to two separate

slideshow presentations made, seemingly by different people, at two different November 2011

meetings that one or both of the Individual Defendants purportedly attended.  (*See* Proposed Am.

Compl. ¶¶ 151-54.)  The new paragraphs describe in detail the information that the Individual

Defendants allegedly learned during these presentations, whereas, in its original Complaint, the

SEC mentioned neither the contents of the slideshows nor the existence of the meetings at which

they were presented.  (*See id.*)

Other examples of the ways in which the SEC has sought to expand the allegations in the

Complaint are identified in the chart cited above and also in the parties' respective briefs.  (*See*

Pl. Mem., at 15-25; Defs. Mem., at 18-30; Pl. Reply, at 2-8.)

## DISCUSSION

**I.**   **APPLICABLE LEGAL STANDARDS**

### A.   Amendment of Pleadings Under Rule 15(a)

Rule 15(a) of the Federal Rules of Civil Procedure provides that a "court should freely

give leave when justice so requires."  Fed. R. Civ. P. 15(a)(2).  Nonetheless, a motion to amend

should be denied "if there is an 'apparent or declared reason – such as undue delay, bad faith or dilatory motive . . . repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of the allowance of an amendment, [or] futility of amendment.'"  *Dluhos v. Floating and Abandoned Vessel, Known as "New York,"* 162 F.3d 63, 69 (2d Cir. 1998) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).  "An amendment to a pleading is futile if the proposed claim could not withstand a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6)."  *Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 258 (2d Cir. 2002) (citing *Dougherty v. N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 88 (2d Cir. 2002)).

"Amendment may be prejudicial when, among other things, it would require the opponent to expend significant additional resources to conduct discovery and prepare for trial or significantly delay the resolution of the dispute."  *AEP Energy Servs. Gas Holding Corp. v. Bank of Am., N.A.*, 626 F.3d 699, 725-26 (2d Cir. 2010) (internal quotation marks and citation omitted).  "Obviously, '[u]ndue prejudice arises when an amendment comes on the eve of trial and would result in new problems of proof.'"  *Fresh Del Monte Produce, Inc. v. Del Monte Foods, Inc.*, 304 F.R.D. 170, 174 (S.D.N.Y. 2014) (quoting *Ruotolo v. City of New York*, 514 F.3d 184, 192 (2d Cir. 2008)).  That a proposed amendment would necessitate additional discovery or merely the expenditure of money and time, alone, is not a sufficient basis for denying leave to amend, *id.*, but the likelihood of undue prejudice increases when discovery is nearly or already complete and/or the cost of additional discovery would be significant, *see, e.g.*, *In re Interest Rate Swaps Antitrust Litig.*, Nos. 16-MD-2704 (PAE), 16-MC-2704 (PAE), 2018 WL 2332069, at *22-23 (S.D.N.Y. May 23, 2018); *Lyondell-Citgo Refining, LP v. Petroleos De Venezuela S.A.*, No. 02cv0795 (CBM) (AJP), 2004 WL 2650884, at *1 (S.D.N.Y. Nov. 22, 2004); *Kirlin v. Conopco, Inc.*, No. 94cv2675 (AGS), 1996 WL 263026, at *2 (S.D.N.Y.

May 16, 1996).  Courts often consider, in particular, whether "more discovery would be necessary from non-parties and [whether] knowledgeable witnesses are not readily available." *In re Enron Corp.*, 367 B.R. 373, 381 (Bankr. S.D.N.Y. 2007) (citing cases); *see also Kirlin v. Conopco, Inc.*, No. 94cv2675 (AGS), 1996 WL 263026, at *2 (S.D.N.Y. May 16, 1996) (finding prejudice where, *inter alia*, "at least one witness which [plaintiff] now identifies as central to the fraud claim may not be available").

### B.   **"Good Cause" Under Rule 16(b)**

Rule 16(b) requires the district court to enter a scheduling order that sets a deadline for, *inter alia*, motions to amend the pleadings, *see* Fed. R. Civ. P. 16(b)(1), (3)(A), and then dictates that the schedule "may be modified only for good cause," Fed. R. Civ. P. 16(b)(4).  The purpose of Rule 16(b) is "to offer a measure of certainty in pretrial proceedings, ensuring that at some point both the parties and the pleadings will be fixed."  *Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 339-40 (2d Cir. 2000) (internal quotation marks and citations omitted).  Accordingly, the Second Circuit has held that, "despite the lenient standard of Rule 15(a), a district court does not abuse its discretion in denying leave to amend the pleadings after the deadline set in the scheduling order where the moving party has failed to establish good cause."  *Id.* at 340.

Good cause in this context "depends on the diligence of the moving party," *id.*, and, to satisfy the standard, the movant must demonstrate that it has been diligent in its efforts to meet the court's deadlines, *see Grochowski v. Phoenix Constr.*, 318 F.3d 80, 86 (2d Cir. 2003).  In other words, the party must show that, despite its having exercised diligence, the applicable deadline could not have been reasonably met. *Rent-A-Center Inc. v. 47 Mamaroneck Ave. Corp.*, 215 F.R.D. 100, 104 (S.D.N.Y. 2003); *see also Parker*, 204 F.3d at 340.  Examples of a party's failure to act with sufficient diligence include where the party knew or should have known "in

advance of the deadline that her complaint was inadequate." *See Parker*, 204 F.3d at 340

(quoting *Sosa v. Airprint Sys., Inc.*, 133 F.3d 1417, 1419 (11th Cir. 1998)).  In contrast, good

cause is often found where a proposed amendment is based on particular evidence that, even with

the exercise of reasonable diligence, could not have been discovered before the deadline expired.

*See, e.g.*, *Sokol Holdings, Inc. v. BMD Munai, Inc.*, No. 05cv3749 (KMW) (DF), 2009 WL

2524611, at *8 (S.D.N.Y. Aug. 14, 2009); *Estate of Ratcliffe v. Pradera Realty Co.*, No.

05cv10272 (JFK), 2007 WL 3084977, at *4 (S.D.N.Y. Oct. 19, 2007).

        In a case where a party seeks to amend its pleading after the deadline for motions to

amend has passed, the court should first consider whether the movant is able to show that

Rule 16's good cause standard has been met, and "[o]nly if [the movant] is able to do so, would

the Court need to consider whether the proposed amendment would be futile, unduly prejudicial,

or otherwise improper based on the Rule 15(a) standards that otherwise govern motions to

amend." *Fuller v. Interview, Inc.*, No. 07cv5728 (RJS) (DF), 2011 WL 724533, at *3 (S.D.N.Y.

Feb. 25, 2011); *see also Myers v. Moore*, 326 F.R.D. 50, 64 (S.D.N.Y. 2018) (finding that, where

good cause for missing a deadline in a Rule 16 scheduling order is not demonstrated, the court

"is not required to reach the issue of prejudice").  Nonetheless, even where good cause is not

shown, the district court retains the discretion under Rule 16(b) to "consider other relevant

factors[,] including, in particular, whether allowing the amendment of the pleading . . . [would]

prejudice defendants." *Kassner v. 2nd Ave. Delicatessen, Inc.*, 496 F.3d 229, 244 (2d Cir. 2007).

## II.     THE APPLICABLE LAW DICTATES THAT THE
##         SEC'S MOTION TO AMEND SHOULD BE DENIED.

### A.     The "Good Cause" Standard of Rule 16 Applies to the SEC's Motion.

        As discussed above, following the March 2018 conference, this Court issued a

Scheduling Order that set September 7, 2018 as the deadline for motions to amend the pleadings.

(Dkt. 75.)  The SEC did not seek to extend that deadline before it expired (*see* generally Dkt.), and it filed the instant motion to amend a full 10 months after the deadline had passed (*see* Dkt. 161 (filed July 8, 2019)).  The presumption, therefore, is that the SEC's motion falls within the ambit of Rule 16 and the case authority that has been developed in this Circuit applying that Rule.  (*See* Discussion, *supra*, at Section I(B).)  Nevertheless, in its opening brief, the SEC summarily dismisses any notion that Rule 16 applies, contending that Defendants' anticipated position that it must meet the Rule 16 standard would run contrary to the Second Circuit's decision in *Loreley Financing (Jersey) No. 3 Ltd. v. Wells Fargo Secs., LLC*, 797 F.3d 160 (2d Cir. 2015).  (*See* Pl. Mem., at 10-12.)

   In *Loreley*, the Second Circuit reversed a district court's decision that, *inter alia*, had denied the plaintiffs leave to amend their complaint; in reversing, the Circuit expressed disapproval of the lower court's individual practice of forcing plaintiffs to decide whether to amend their complaint at a pre-motion conference for a motion to dismiss, before the motion to dismiss had been fully briefed and before the court had issued a ruling identifying the defects in the complaint.  *Loreley*, 797 F.3d at 189-91.  The court stated that, "[w]ithout the benefit of a ruling, many a plaintiff will not see the necessity of amendment or be in a position to weigh the practicality and possible means of curing specific deficiencies."  *Id.* at 190.  The Second Circuit characterized its decision as "hew[ing] to the liberal standard set forth in Rule 15, which states that '[t]he court should freely give leave [to amend] when justice so requires.'"  *Id.*[7]  In so holding, the court announced a principle that, under the liberal standard of Rule 15, a plaintiff should ordinarily be afforded the opportunity to amend its complaint after a motion to dismiss

---

[7] The panel clarified that "[o]ur opinion today, of course, leaves unaltered the grounds on which denial of leave to amend has long been held proper, such as undue delay, bad faith, dilatory motive, and futility."  *Id.*

has been decided (or, at least, fully briefed), and the district court has pointed out defects that the plaintiff may be able to cure in an amended pleading.[8]

*Loreley* did not, however, hold that Rule 15's liberal standard must apply whenever a plaintiff moves to amend following a ruling on a motion to dismiss; rather, it held that, when Rule 15 *does* apply, then leave to amend should ordinarily be granted, as dictated by that Rule. The applicability of Rule 16 was not at issue in *Loreley*, as no case-specific scheduling order had been issued and no motions deadline had passed, *see generally Loreley Financing (Jersey) No. 3 Ltd. v. Wells Fargo Secs., LLC*, No. 13cv3723 (RJS) (S.D.N.Y.), and, on appeal, Rule 16 was not even mentioned by the circuit court, *see generally Loreley*, 797 F.3d 160. Yet, the SEC here contends that, because the deadline for amendment of pleadings in this Court's Scheduling Order passed before Judge Torres issued a ruling on the motion to dismiss, *Loreley* necessarily "rebuts Defendants' contention" that Rule 16 has any applicability. (Pl. Mem., at 11; *see also id.* (arguing that it would be "inconsistent with *Loreley*" to deny the SEC "the protections afforded by Rule 15 . . . simply because the time to amend in the scheduling order passed while a definitive ruling on defendants' fully submitted motion to dismiss was still under consideration" (internal quotation marks and citation omitted)).)

While this Court understands the principle to which the SEC would have this Court adhere, there is actually no support for the SEC's suggestion, implicit in its argument, that *Loreley* effectively nullified Rule 16 in all cases in which a plaintiff's request for leave to amend follows a dismissal order. In its reply brief, the SEC criticizes Defendants' "attempt[] to use the

---

[8] The Second Circuit also emphasized the particular applicability of this principle in complex cases presenting questions that are "borderline" or "subject to reasonable dispute," *id.* at 191, indicating that it perhaps applies with greater force when dismissal orders are based on close calls.

procedural mechanism of the Rule 16 scheduling order to improperly deny the [SEC] the opportunity to amend" (Pl. Reply, at 12), and argues that "[t]he Second Circuit has . . . consistently rejected efforts, via various procedural mechanisms, to require a plaintiff to decide whether to amend its complaint before receiving an initial ruling on a motion to dismiss," seemingly implying that one of the "procedural mechanisms" the Second Circuit has rejected is Rule 16 (*see id.*, at 11-12 (emphasis removed) (citing *Kopchik v. Town of East Fishkill*, 759 F. App'x 31 (2d Cir. 2018) (summary order); *Cresci v. Mohawk Valley Cmty. Coll.*, 693 F. App'x 21 (2d Cir. 2017) (summary order))). In fact, none of the cases cited by the SEC – *Kopchik*, *Cresci*, and also *Miller v. Metropolitan Life Ins. Co.*, 2018 WL 5993477 (S.D.N.Y. Nov. 15, 2018) – addresses Rule 16 at all, let alone holds that *Loreley* in any way affected its applicability in a case where the district court opted not to stay proceedings pending the outcome of a pending motion to dismiss, but rather set a full discovery schedule, including an amendment deadline, which the defendant then let expire, without seeking any extension.

Moreover, although this Court is not aware of any cases, since *Loreley*, that have squarely addressed the issue in this precise context, there are cases in this Circuit in which courts have rejected plaintiffs' reliance on *Loreley* in circumstances analogous to those present here, and have highlighted the importance of scheduling orders. *See, e.g.*, *In re Fyre Festival Litig.*, 399 F. Supp. 3d 203, 225 (S.D.N.Y. 2019) ("Limiting the time to file further motions to amend in the Scheduling Order is not a meaningless technicality. One of its main purposes is to avoid the Court['s] needlessly working on a lengthy motion to dismiss. The SEC's placeholder statements asking for leave to amend should the Court grant either motion to dismiss undermines the very purpose of the Scheduling Order."); *Lopez v. Ctpartners Executive Search Inc.*, 173 F. Supp. 3d 12, 42-43 (S.D.N.Y. 2016) (holding that *Loreley* did not apply where "the Court [had]

advised plaintiff that[,] while the Court's ordinary practice [was] to permit plaintiff to file an amended complaint after defendants file[d] a motion to dismiss, it would, in deference to the schedule jointly proposed by the parties, set the deadline for an amended complaint for a date prior to the deadline for defendants' motion to dismiss").

The SEC's statement that Rule 16 "cannot be used to do an end-run around the specific holdings set forth in *Loreley* and its progeny" (Pl. Reply, at 12) shows a disregard for Rule 16 and its purpose.  Rule 16 is not a pointless exercise; it is a Federal Rule of Civil Procedure, and the Court's setting a case management schedule under the Rule serves an important function. Defendants were entitled to proceed with discovery in reliance on the time limits and boundaries set by the Court after due conference with the parties – who, this Court notes, were fully aware that a motion to dismiss was pending at the time this Court set that schedule.  (*See* Dkt. 70 (motion to dismiss filed March 5, 2018, one day before the March 6 conference at which this Court discussed with counsel the setting of September 7, 2018 as the deadline for amendments).) In the view of this Court, the SEC has framed the issue backwards, as its argument demonstrates an attempt to use *Loreley* and its progeny too far beyond their context, so as to enable an "end-run" around Rule 16.[9]  In short, this Court rejects the SEC's argument that Rule 16 should simply be disregarded here, and finds, instead, that, as the SEC failed either to meet or to seek an extension of the amendment deadline specified in this Court's Scheduling Order, the Rule's

---

[9] The SEC's argument that, as in *Loreley*, Judge Torres' individual rules in this case gave it the "Hobson's choice" of either amending its Complaint shortly after Defendants had filed their motion to dismiss, or forfeiting the opportunity to amend (*see* Pl. Mem., at 11), is of no moment.  This Court's view that a "good cause" standard applies to the SEC's motion is based on the fact that the SEC ignored the deadline for amendments set in a Rule 16 Scheduling Order, issued after a conference at which this Court heard fully from the parties regarding the unique needs of this case, not because the SEC failed to amend following Defendants' filing of their motion to dismiss.

"good cause" standard applies.  Accordingly, this Court will proceed to determine whether the SEC has demonstrated good cause for its untimely motion to amend.

> ### B.  The SEC Has Not Demonstrated Good Cause For Failing To Seek Leave To Amend Prior to the Deadline Set in the Court's Scheduling Order.

As the Court's deadline for motions to amend passed on September 7, 2018, the SEC must demonstrate good cause why, despite its diligence, it could not have reasonably been expected to amend the Complaint prior to that date.  (*See* Discussion, *supra*, at Section I(B).)  On this point, the SEC argues that, "[e]ven if the 'good cause' standard . . . d[oes] apply, the [SEC's] diligence in moving to amend immediately after the Court's ruling [on Defendants' motion to dismiss] . . . meets that standard."  (Pl. Mem., at 11 n.3; *see also* Pl. Reply, at 13 (arguing that, "to the extent that Rule 16 requires good cause [in these circumstances] . . . that good cause is supplied . . . by the fact that the SEC was waiting for this Court's initial ruling on the motion to dismiss").)  Having considered this argument, this Court finds that, while not having the benefit of a court's ruling on a motion to dismiss could, in some cases, constitute good cause for a failure to meet a motion deadline that expired before that ruling, it does not in this case.

First, this Court notes that it has been held by a number of courts that the pendency of a dismissal motion, standing alone, is not sufficient to constitute good cause for missing an amendment deadline set under Rule 16.  *See, e.g.*, *Lewis Family Grp. Fund LP v. JS Barkats PLLC*, No. 16cv5255 (AJN), 2018 WL 3579844, at *2-3 (S.D.N.Y. July 25, 2018) (holding that plaintiffs had not shown good cause based, *inter alia*, on their argument that they sought to add additional facts, "the 'significance' of which did not become clear until the Court's [dismissal] order," because "these facts . . . were certainly known to [plaintiffs], and counsel could have

added the supposedly curative allegations" prior to the court's ruling); *Sokol Holdings, Inc. v. BMD Munai, Inc.*, No. 05cv3749 (KMW) (DF), 2009 WL 2524611, at *10 (S.D.N.Y. Aug. 14, 2009) ("[A]s Plaintiffs easily could have sought to extend the motion deadline for amendments, but failed to do so, the pendency of the appeal does not, in itself, constitute 'good cause' for Plaintiff's failure to comply with this Court's scheduling order."); *In re Bank of N.Y. Corp. Forex Transactions Litig.*, Master Dkt. No. 12md2335 (LAK), 2014 WL 4494158, at *3 (S.D.N.Y. Sept. 4, 2014) (rejecting plaintiffs' argument "that Rule 15 should apply because the Court had not yet ruled on the motion to dismiss at the time the scheduling order issued").[10]

Second, and more importantly, even to the extent that, in some circumstances, a pending motion to dismiss may constitute good cause for failing to amend earlier, those circumstances are not present here, because there is every indication that the SEC should have known what the deficiencies in its Complaint were even without the Court's guidance. This is nowhere more apparent than with respect to the issue of scienter, the most problematic element of many of the SEC's claims. When discussing scienter in her dismissal Order, Judge Torres simply stated, without more, that, "[i]n connection with the over $3 billion valuation of RTCM in the HY 2012 Report" and also "in [the] writing [of] the First, Second, and Third Controller's Papers, [and] the Impairment Paper," "the SEC ha[d] not alleged that anyone acted with the requisite scienter." (3/18/19 Order, at 31-32.) In making this finding, the Court did not provide the SEC with any particular guidance as to what was deficient in its scienter allegations, other than to suggest that,

---

[10] While at least one court seems to have determined (albeit implicitly) that a pending motion to dismiss did constitute good cause for a party's not amending before an amendment deadline set by the court's scheduling order, *see Nguyen v. New Link Genetics Corp.*, 297 F. Supp. 3d 472, 501 (S.D.N.Y. 2018), the court also noted in that case that activity in the action had been quite limited to that point, such that granting leave to amend would not be prejudicial to the defendants, *see id*; *see also* Discussion, *infra*, at Section II(C).

in order to have pleaded these claims adequately, the SEC would have needed to make at least *some* allegation regarding Defendants' state of mind.  This is hardly the type of deficiency that is so nuanced or unexpected that the SEC could not reasonably have known about it without the Court's help, particularly given the SEC's expertise in the area, and the fact that all of the Defendants had raised and discussed the issue in both their pre-motion letters and in the motion to dismiss itself.  (*See* Background, *supra*, at Section A(2); *see also* Dkts. 71, 81.)

Furthermore, the SEC does not argue that the factual allegations it seeks to add on the element on scienter, or on any other element of fraud, or with respect to any other claim (*see* Background, *supra*, at Section C), are derived from information it did not have prior to the September 7, 2018 motion deadline.  Therefore, the SEC's neglecting to include in its original Complaint the additional detail it now seeks to add was not a consequence of its not having the necessary information, but rather one of failing to recognize that such additional detail was necessary to state adequate claims for, among other things, fraud.  As more than one court in this District has pointed out, "case law is unequivocal that 'attorney neglect, carelessness, or oversight is not a sufficient basis for a court to amend a Scheduling Order pursuant to Rule 16(b).'"  *Nunez v. Shinobi NY LLC*, No. 12cv5313 (LTS) (KNF), 2013 WL 12107728, at *4 (S.D.N.Y. Sept. 13, 2013) (quoting *Multi-Juice, S.A. v. Snapple Beverage Corp.*, No. 02cv4635 (RPP), 2005 WL 1138470, at *2 (S.D.N.Y. May 12, 2005)); *see also Int'l Techs. Marketing, Inc. v. Verint Sys., Ltd.*, No. 15cv2457 (GHW), 2019 WL 1245013, at *4 (S.D.N.Y. Feb. 18, 2019) (same).  Likewise, "any misunderstanding on [a] [p]laintiff's part of his own Complaint [does not] constitute a reasonable basis for his delay" in moving to amend, when the plaintiff "had access to the information needed to support" his claims before the applicable deadline passed.  *Baez v. Delta Airlines, Inc.*, No. 12cv3672 (KPF), 2013 WL 5272935, at *5-7 (S.D.N.Y.

Sept. 18, 2013); *see also Moore v. Publicis Groupe SA*, No. 11cv1279 (ALC) (AJP), 2013 WL

4483531, at *7 (S.D.N.Y. Aug. 23, 2013) ("It is well-established that a party's failure to act on

previously available information precludes a finding of good cause." (citing cases)), *report and*

*recommendation adopted*, 2013 WL 5951903 (Oct. 30, 2013).  This Court adds that this general

rule would seem to apply with particular force in cases where the party claiming it was clueless

about pleading deficiencies until being blindsided by a court's ruling is a highly sophisticated

party that *specializes* in asserting the very type of claims that it contends it could not have known

how to plead properly without judicial guidance.  As the SEC is such a party, this Court is not

persuaded by its argument that it needed a Court order to explain the elements of securities fraud,

or that some factual basis for scienter needed to be pleaded.

> For all of these reasons, the fact that the Court had not yet ruled on Defendants' motion to

dismiss by the expiration of the deadline for motions to amend does not constitute good cause for

the SEC's failure to move to amend by that deadline, or, at a minimum, to request, in timely

fashion, that the deadline be extended.  *Cf. Sokol*, 2009 WL 2524611, at *10 ("[A]s Plaintiffs

easily could have sought to extend the motion deadline for amendments, but failed to do so, the

pendency of the appeal does not, in itself, constitute 'good cause' for Plaintiff[s'] failure to

comply with this Court's scheduling order.").

> Finally, this Court rejects any potential argument by the SEC that amending its

Complaint is necessary because of new information contained in the approximately 8,500

documents Rio Tinto belatedly produced on June 1, 2019, due to an earlier error by its document

vendor.  (*See* Background, *supra*, at Section A(1)(b); 5/3/19 Joint Ltr.; 6/14/19 Joint Ltr.)  To

clarify, the SEC does not cite these previously unavailable documents as a basis for showing

good cause under Rule 16, but rather mentions them in arguing that it did not unduly delay in

violation of Rule 15.  (*See* Pl. Mem., at 13-14.)  Nevertheless, even if the SEC had argued that its

lack of access to these documents prior to the Scheduling Order's amendment deadline amounts

to good cause for a belated amendment, this Court would find that it does not.

To demonstrate good cause based on newly discovered information, a party must be able

to show, *inter alia*, that the previously unknown information is the "primary basis" of its

proposed amendment.  *See Moore*, 2013 WL 4483531, at *8; *see also SEC v. Aragon Capital

Mgmt., LLC*, No. 07cv919 (FM), 2010 WL 4456302, at *5 (S.D.N.Y. Oct. 28, 2010) (denying

late amendment where "[t]he proposed fraudulent conveyance claims . . . are not premised on

any new facts that the [SEC] was able to unearth or confirm during the course of discovery in

this case").  When belated discovery merely "contain[s] some new information, that alone [does]

not suffice to establish good cause."  *Moore*, 2013 WL 4483531, at *8.

Here, as noted above, the SEC seeks nearly to triple the size of the Complaint by adding

238 paragraphs to its pleading (*see* Background, *supra*, at Section C), yet the SEC concedes that,

at most, only three of those paragraphs (in other words, barely more than one percent) are

derived from the belatedly produced documents.  (*See* Pl. Mem., at 14.)  Defendants suggest that

even the allegations contained in those three paragraphs "are not qualitatively new" (Defs. Mem.,

at 11), but, regardless, they can hardly be seen as the "primary basis" of the proposed

amendment.[11]  As nearly 99 percent of the SEC's proposed new allegations is based on

---

[11] Furthermore, this Court agrees with Defendants that the three paragraphs purportedly
based on the 8,500 documents add little new information and certainly do not add anything so
critical that these paragraphs, alone, would justify allowing the SEC to amend its Complaint.  For
example, paragraph 145 in the Proposed Amended Complaint refers to a November 2011 email
in which an RTCM executive described RTCM's development plans for the Mozambique project
and told colleagues, among other things, "our high logistics costs will be a long term challenge"
due to issues with barging costs and volume.  (Proposed Am. Compl. ¶ 145.)  In the original
Complaint, the SEC alleged that, by October 2011, "in-house experts" and even the "VP of
Logistics" had realized that "constraints on barging volumes" and the resulting costs presented

information that was plainly in the SEC's possession well before the amendment deadline, the SEC cannot justify its late amendment by relying on the fact that it lacked access to documents that were only later produced.

In sum, this Court finds that the SEC's failure to seek leave to amend its Complaint before the deadline set in this Court's Scheduling Order is excused neither by the fact that Judge Torres had not yet ruled on Defendants' motion to dismiss when the deadline passed nor by Defendants' late production of certain documents.  As the SEC has failed to demonstrate good cause for seeking leave to amend its Complaint 10 months after the amendment deadline set in this Court's Rule 16 Scheduling Order, the SEC's request for leave to amend can be denied on that basis alone.

      **C.**     **Even If Rule 15 Were To Apply to the SEC's Motion, This Court Would Deny Leave To Amend Based on <u>the Significant Prejudice Defendants Would Likely Suffer.</u>**

As set out above, this Court, having found that the SEC has not demonstrated good cause to amend, "is not required to reach the issue of prejudice."  *Myers*, 326 F.R.D. at 64.  In an exercise of its discretion, however, this Court will consider the issue, *see Kassner*, 496 F.3d at 244, and finds that, even if, as the SEC argues, Rule 15's liberal standard for amendment could be found to apply to its motion, the likely prejudice to Defendants in this case is significant and

---

"'showstopping' risks" to RTCM's valuation.  (*See* Compl. ¶ 69.)  Although the Proposed Amended Complaint adds detail to the SEC's original allegations, the Complaint nevertheless alleged that, in the fall of 2011, RTCM executives were aware of the problems with shipping coal out of Mozambique and understood that those problems could significantly affect RTCM's valuation.  (*See id.* ¶¶ 69-71.)  Defendants persuasively demonstrate that the other two paragraphs in question are also substantially similar to allegations already in the Complaint, and, in at least one instance, the supposedly new allegations are actually based on documents that the SEC already had, and merely received duplicates of, when Rio Tinto produced the additional 8,500 documents in 2019.  (*See* Defs. Mem., at 12.)

would provide a separate and independent ground for denying the SEC leave to amend at this juncture.

As explained above, under Rule 15, a court may deny leave to amend if it finds there would be "undue prejudice to the opposing party by virtue of the allowance of an amendment." *Dluhos*, 162 F.3d at 69 (internal quotation marks and citation omitted); *see* Discussion, *supra*, at Section I(A).  Defendants argue they will suffer prejudice if the SEC is permitted to amend because the SEC has not only sought to add "factual detail" to its Complaint (Defs. Mem., at 15 (quoting Pl. Mem., at 13)), but has also sought to introduce new conversations or meetings, without having given Defendants any prior notice that it would seek to rely on such events as underlying its claims (*id.*, at 16).  According to Defendants, a number of witnesses, most of whom reside outside of the Court's jurisdiction, would need to be re-deposed about these events, and thus, if the amendment were permitted, they would need to ask to extend discovery and delay the resolution of this case, likely for a substantial period of time.  (*Id.*, at 16-17.)

The SEC disputes Defendants' claims of prejudice, arguing that:  (1) "[w]hile the SEC's amendments [would] add significant detail, they [would] not transform the case" and "[a]ll parties have directed discovery toward [the] topics" in the Proposed Amended Complaint; (2) Defendants' ominous projections of "expensive, additional discovery" are too speculative to be credited; (3) Defendants are overstating the difficulty of re-deposing witnesses, and it is unclear if they will need to do so; and, (4) in any case, "no party is guaranteed to get all the discovery it wants."  (Pl. Reply, at 14-15.)

As an initial matter, this Court finds that Defendants have adequately demonstrated that additional discovery would, indeed, be necessary if the SEC were allowed to amend its Complaint.  This Court has described some examples of instances in which the Proposed

Amended Complaint refers to topics that were not referenced in the Complaint.  (*See*

Background, *supra*, at Section C.)  Some of these topics, such as a media release posted on

Rio Tinto's own website (*see* Proposed Am. Compl. ¶¶ 349, 353), would presumably not require

Defendants to undertake additional discovery.  Others, however, such as a dinner at which Elliot

discussed RTCM "with the audit partner and other representatives of the independent auditor"

(*id.* ¶ 323; *see also id.* ¶¶ 324-28), could well require supplemental depositions of those present,

including witnesses representing the independent auditor.  The SEC's Proposed Amended

Complaint adds new allegations about what Elliot disclosed and failed to disclose to auditors at

the dinner, and, as Defendants point out, "other than Mr. Elliot, the only deponent to attend that

dinner was an individual who was deposed in Australia."  (Defs. Mem., at 16.)  Although the

SEC represents that "[a]ll parties have directed discovery toward [the] topics" in the Proposed

Amended Complaint, it cites no evidence that the parties questioned Rio Tinto's auditors about

this dinner, and it seems unlikely that Defendants would have unnecessarily introduced a new

issue into this case by asking a witness about events not mentioned in the Complaint.

Many other meetings and similar events are also mentioned for the first time in the

Proposed Amended Complaint, as Defendants note (*see* Defs. Mem., at 16 (citing additional

examples)), and as this Court has discovered by reviewing just a small sample of both the

original and proposed amended pleadings.  The SEC has cited no evidence that, at depositions,

the parties questioned the relevant witnesses about these events.  It is reasonable to assume that,

if the SEC intends to use what was said at these events as evidence against Defendants at trial,

then Defendants would want to have witness testimony disputing the SEC's account, particularly

to the extent that partners in the independent auditing firm were involved, as they would seem to

be among the most least-interested witnesses.  The SEC's assertion that Defendants have "failed

to state with any specificity how or why [they] will be prejudiced" (Pl. Reply, at 14 (internal

quotation marks and citation omitted)) ignores what Defendants have argued.  For instance, in

their opposition brief, Defendants detail a specific example of a new allegation – the dinner with

auditors just described – and explain why that event is relevant to their defense and why they

would need witness testimony to dispute the SEC's characterization of it.  (Defs. Mem., at 16

("[T]he evidence will show[] that dinner actually occurred the night before – not after – the

Brisbane Meeting.").)  Defendants cite further examples of meetings and other events about

which they would likely need additional testimony for similar reasons.  (*See id.*)  Therefore, this

Court rejects the SEC's argument that Defendants' claims regarding their anticipated need for

additional witness testimony or other discovery are too vague or speculative.

Having determined that additional discovery would likely be required if the SEC were

allowed to amend its Complaint, this Court turns to whether the need for such discovery would

cause Defendants undue prejudice.  While a need to reopen or extend discovery will not

necessarily be found to be prejudicial, especially where it will not cause substantial delay, *see,*

*e.g.*, *Fresh Del Monte Produce*, 304 F.R.D. at 177 ("While we expect that the amendment . . .

will require [defendant] to expend additional resources and that the discovery schedule will need

to be extended, we do not consider that the new claims will result in a 'significant' delay in the

larger scheme of things." (citation omitted)), prejudice will be found where a defendant is

required to "expend significant additional resources to conduct discovery and prepare for trial,"

*AEP Energy*, 626 F.3d at 725-26.  The most obvious feature of this case favoring a finding of

prejudice is that discovery – which has been time-consuming, extensive, costly, and logistically

difficult – has nearly concluded.  Contrary to the SEC's facile claim that fact discovery "is

ongoing" (Pl. 3/26/19 Ltr., at 2), almost all document discovery concluded in 2018 and it appears

that the last witnesses were deposed shortly before or after the SEC filed the instant motion (*see* Background, *supra*, at Section A(1)).  Reopening fact discovery at this stage, when the parties are working towards completing expert discovery (11/13/19 Joint Ltr., at 1), increases the likelihood of Defendants' having to "expend significant additional resources," *AEP Energy*, 626 F.3d at 725-26; *see also, e.g.*, *In re Interest Rate Swaps Antitrust Litig.*, 2018 WL 2332069, at *22-23; *Lyondell-Citgo*, 2004 WL 2650884, at *1; *Kirlin*, 1996 WL 263026, at *2.  This is particularly true given that, despite what it says, the SEC's proposed amendment would go well beyond "reordering certain factual allegations" (Pl. 3/26/19 Ltr., at 1), and, instead, would substantially enlarge the Complaint, *see Kowa Company, Ltd. v. Sawai USA, Inc.*, No. 14cv5575 (PAC), 2016 WL 3681459, at *3 (S.D.N.Y. July 5, 2016) (denying leave to amend as prejudicial where plaintiff requested leave "a year after the amendment deadline, and after the close of protracted and repeatedly extended fact discovery" and where plaintiff "[sought] to triple the number of pages in its pleadings and quadruple the number of paragraphs . . . [that the Defendant would have had to] answer and ultimately defend against").

Additionally, to the extent witnesses would need to be re-deposed, the burden on Defendants would be greater than in most cases.  As discussed above, many witnesses in this case are overseas and outside of Defendants' control.  (*See* Background, *supra*, at Section A(1)(a).)  The SEC's statement that, "if past is prologue, Defendants may not have difficulties in obtaining testimony" (Pl. Reply, at 15) is disingenuous.  During the March 2018 conference before this Court, both parties pressed the Court to allow a longer-than-normal discovery period because of the difficulties they would face in obtaining witness testimony.  (*See, e.g.*, 3/6/18 Hrg. Tr., at 19:16-24, 20:2-9, 30:9-11.)  Counsel for the SEC, in fact, spoke of there being "a lot of logistical hurdles . . . to getting these people to sit down for [a] deposition,"

noting that "the vast majority of the[] witnesses [were] located" overseas.  (*Id.*, at 20:2-9.)

Counsel's prediction of significant logistical hurdles was accurate, and, despite counsel's efforts,

fact discovery in this case took over a year and a half, due almost entirely to difficulties

arranging depositions.  (*See* 11/13/19 Joint Ltr., at 1 (fact discovery completed in October 2019

when last witness deposed).)  For the SEC to claim now that "Defendants may not have

difficulties in obtaining testimony" is contradicted both by what the SEC said previously and by

what actually happened in this case.

 Similarly, the SEC's assertion that "[f]our of the [ ] witnesses were partners in the

auditing firm, who cooperated with conducting depositions" (*see* Pl. Reply, at 15) is undermined

by the SEC's earlier statements and contrary to what is known to have occurred earlier in this

action.  Defendants filed a motion to compel these witnesses to testify through Hague

Convention procedures (Defs. Hague Mtn.), and this Court signed formal letters of request

directed to authorities in three different countries (*see* Dkt. 94, Exs. 1-4 (letters of request);

Dkt. 116 (noting Court had signed letters)).  In their motion, Defendants explicitly noted that

they "[could not] secure [the witnesses' testimony] . . . through voluntary cooperation" (Defs.

Hague Mtn., at 10), a representation that was well supported and unchallenged by the SEC (*see*

Background, *supra*, at Section A(1)(a)).  In issuing the letters of request, this Court found that

using Hague Convention procedures was a necessary and appropriate means of obtaining

testimony from the witnesses in question.  (*Id.*)  It is unclear why this undertaking would have

been necessary if these four witnesses, as the SEC now seems to imply, had been willing to

appear voluntarily to give testimony.  Separately, the SEC's counsel's representation to the Court

that the depositions of foreign witnesses, in general, "[were] essentially one[-]time opportunities

to take trial testimony" (9/17/18 Hrg. Tr., at 9:2-4) both belies the SEC's current position and

suggests the difficulty that may be inherent in any effort by Defendants to attempt to re-depose these witnesses.

Overall, this Court finds that the re-deposition of witnesses in this case, most of whom reside outside of the United States, would be exceptionally expensive and likely to delay this action for a significant period of time.  Furthermore, it is entirely possible that some of the witnesses with knowledge relevant to the new allegations in the Proposed Amended Complaint, having already been compelled once to testify under the Hague Convention through the direction of foreign courts, would not be similarly compelled by those courts to testify again, even if Defendants were to request it.  The fact that key witnesses, particularly partners in Defendants' auditing firm, would not be readily available to testify about the SEC's new factual allegations supports the conclusion that Defendants would be prejudiced by the SEC's proposed amendment.  *See In re Enron Corp.*, 367 B.R. at 381 (finding prejudice where "more discovery would be necessary from non-parties and knowledgeable witnesses are not readily available"); *Kirlin*, 1996 WL 263026, at *2 (finding prejudice where at least one witness would potentially have been unavailable).

Finally, it is worth emphasizing that, although the parties and the Court refer to witness *depositions*, what the 23 witnesses in this case actually gave was trial testimony.  As explained above, because most of the relevant fact witnesses cannot be compelled to appear at trial, their video-taped questioning, consisting of direct and cross-examination, will serve as the witnesses' trial testimony, to be played for a jury, should this case proceed to trial.  (*See* Background, *supra*, at Section A(1)(a).)  In view of this fact, the SEC's rationalization as to why Defendants will not be prejudiced by the unavailability of witnesses – that "no party is guaranteed to get all the discovery it wants" (Pl. Reply, at 15) – fails to address the realities of discovery in this particular

case.  The depositions of the foreign witnesses in this case were not conducted as exploratory, fact-finding exercises, as they would have been in the more typical context of discovery; rather, to recall again the SEC's own words, the depositions were "essentially one[-]time opportunities to take trial testimony."  (9/17/18 Hrg. Tr., at 9:2-4.)  Defendants telegraphed this distinction at the March 2018 conference, saying "the[] [depositions were] going to be by and large trial depositions, and . . . all parties [would] have to prepare carefully, [and it would] take longer than it normally does."  (3/6/18 Hrg. Tr., at 24:2-5.)  Indeed, if the idea behind these depositions was to present the witnesses' narrative accounts of events with a logical flow, for the benefit of a jury, it is unclear to this Court how Defendants even *could* reopen the depositions to cover the many new allegations that the SEC now seeks to plead without conducting the questioning again from scratch.

Although it is true that no party is entitled "to get all the discovery it wants," prejudice clearly arises when "an amendment comes on the eve of trial and would result in new problems of proof."  *Fresh Del Monte Produce*, 304 F.R.D. at 174 (quoting *Ruotolo*, 514 F.3d at 192).  No trial of this action has yet been scheduled, but, with respect to the majority of the 23 witnesses already deposed, trial testimony has, in effect, already been taken.  In light of this, case law finding amendments to be prejudicial "on the eve of trial" should apply with equal force here.

Accordingly, as the SEC has not shown good cause for having substantially missed the amendment deadline set in this Court's Scheduling Order, and as, separate and apart from this, Defendants have demonstrated convincingly that they would suffer undue prejudice if the proposed amendment were allowed at this late stage, the SEC's motion to amend is appropriately denied, regardless of whether the motion is properly analyzed under Rule 16 or Rule 15.

## **CONCLUSION**

For all of the foregoing reasons, the SEC's motion for leave to amend the Complaint

(Dkt. 161) is denied.

The Clerk of Court is directed to close Dkt. 161 on the Docket of this action.

Dated: New York, New York
March 9, 2020

SO ORDERED

DEBRA FREEMAN
United States Magistrate Judge

Copies to:

All counsel (via ECF)