**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**SECURITIES AND EXCHANGE COMMISSION,**

                                   **Plaintiff,**

**v.**

**RIO TINTO PLC, RIO TINTO LIMITED,**
**THOMAS ALBANESE, and GUY ROBERT**
**ELLIOTT,**

    **Defendants.**

**No. 1:17-cv-7994-AT-DCF**

ORAL ARGUMENT REQUESTED

---

**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S**
**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR RECONSIDERATION**
**OF THE MARCH 18, 2019 ORDER ON THE DEFENDANTS'**
**CONSOLIDATED MOTION TO DISMISS THE COMPLAINT**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................... 1

BACKGROUND .................................................................................................... 4

LEGAL STANDARD............................................................................................. 7

ARGUMENT .......................................................................................................... 8

   I.   UNDER *LORENZO*, THE COMPLAINT PROPERLY ALLEGED VIOLATIONS
       OF RULE  10b-5(a) AND (c) AND SECTION 17(a)(1) AND (a)(3) ............................... 8

      A.   The Supreme Court's *Lorenzo* decision ................................................... 9

      B.   *Lorenzo* confirms that the SEC sufficiently pled violations of Rule 10b-5(a)
          and (c) as well as Section 17(a)(1) and (3)................................................. 11

      C.   The SEC sufficiently pled that Albanese and Elliott's violations of
          Rule 10b-5(a) and (c) as well as Section 17(a)(1) and (3) were reckless.................. 18

   II.   THE INDIVIDUAL DEFENDANTS ARE LIABLE UNDER SECTION 17(a)(2)
       DESPITE NOT BEING  "MAKERS" OF STATEMENTS ............................................ 23

   III.  DEFENDANTS' FALSE STATEMENTS ABOUT RTCM'S RESERVES WERE
       MATERIAL ................................................................................................. 25

   IV.  THE COURT SHOULD RECONSIDER ITS AIDING AND ABETTING RULINGS... 28

CONCLUSION..................................................................................................... 30

# TABLE OF AUTHORITIES

## CASES

*In re Am. Bank Note Holographics, Inc. Sec. Litig.*,
    93 F. Supp. 2d 424 (S.D.N.Y. 2000)................................................................22

*In re AOL Time Warner*,
    381 F. Supp. 2d 192 (S.D.N.Y. 2004)................................................................22

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)................................................................27

*In re Bank of Am. Corp. Secs., Deriv. & ERISA Litig.*,
    No. 09-2058, 2011 WL 3211472 (S.D.N.Y. July 29, 2011)................................21

*Chen-Oster v. Goldman, Sachs & Co.*,
    251 F. Supp. 3d 579 (S.D.N.Y. 2017)................................................................8, 10

*In re Eletrobas Sec. Litig.*,
    245 F. Supp. 3d 450 (S.D.N.Y. 2017)................................................................28

*Faulkner v. Beer*,
    463 F.3d 130 (2d Cir. 2006)................................................................26, 27

*IBEW Local Union No. 58 Pension Tr. Fund & Annuity Fund*
 *v. Royal Bank of Scotland Group, PLC*,
    783 F.3d 383 (2d Cir. 2015)................................................................28

*In re IMAX Sec. Litig.*,
    587 F. Supp. 2d 471 (S.D.N.Y. 2008)................................................................22

*Iowa Pub. Employee's Ret. Sys. v. Deloitte & Touche LLP*,
    919 F. Supp. 2d 321 (S.D.N.Y. 2013)................................................................22

*Janus Capital Group, Inc. v. First Derivative Traders*,
    564 U.S. 135 (2011)................................................................2, 23

*King County, Wash. v. IKB Deutsche Industriebank AG*,
    863 F. Supp. 2d 317 (S.D.N.Y. 2012)................................................................8, 25

ii

*Litwin v. Blackstone Group, L.P.*,
    634 F.3d 706 (2d Cir. 2011) ............................................................................... 28

*Lorenzo v. SEC*,
    139 S. Ct. 1094 (2019) ............................................................................... *passim*

*Malouf v. SEC*,
    933 F.3d 1248 (10th Cir. 2019) .................................................................... 18, 20

*In re Morgan Stanley Info. Fund Sec. Litig.*,
    592 F.3d 347 (2d Cir. 2010) .............................................................................. 27

*SEC v. Apuzzo*,
    689 F.3d 204 (2d Cir. 2012) .............................................................................. 29

*SEC v. Big Apple Consulting USA, Inc.*,
    783 F.3d 786 (11th Cir. 2015) .......................................................................... 24

*SEC v. Conaway*,
    No. 2:05-40263, 2009 WL 902063 (E.D. Mich. March 31, 2009) .................... 29

*SEC v. Daifotis*,
    No. 11-00137, 2011 WL 3295139 (N.D. Cal. Aug. 1, 2011) ........................... 24

*SEC v. Das*,
    723 F.3d 943 (8th Cir. 2013) ............................................................................ 22

*SEC v. DiBella*,
    587 F.3d 553 (2d Cir. 2009) .............................................................................. 30

*SEC v. Dunn*,
    587 F. Supp. 2d 486 (S.D.N.Y. 2008) .............................................................. 21

*SEC v. Egan*,
    994 F. Supp. 2d 558 (S.D.N.Y 2014) ............................................................... 20

*SEC v. Enterprises Sols., Inc.*,
    142 F. Supp. 2d 561 (S.D.N.Y. 2001) ......................................................... 22, 28

*SEC v. Fiore*,
    416 F. Supp. 3d 306 (S.D.N.Y. 2019)..........................................................................11, 18

*SEC v. Geswein*,
    No. 5:10-1235, 2011 WL 4565861 (N.D. Ohio Sept. 29, 2011) .....................................24

*SEC v. Jankovic*,
    No. 15-1248, 2018 WL 301160 (S.D.N.Y Jan. 4, 2018) ..................................................19

*SEC v. Koenig*,
    No. 02-2180, 2007 WL 1074901 (N.D. Ill. Apr. 5, 2007).................................................28

*SEC v. Mercury Interactive, LLC*,
    No. 5:07-02822, 2011 WL 5871020 (N.D. Cal. Nov. 22, 2011) .......................................24

*SEC v. Merchant Capital, LLC*,
    397 F. App'x. 593 (11th Cir. 2010) ................................................................................19

*SEC v. Monarch Funding Corp.*,
    192 F.3d 295 (2d Cir. 1999).............................................................................................19

*SEC v. Monterosso*,
    756 F.3d 1326 (11th Cir. 2014) ......................................................................................24

*SEC v. Mudd*,
    885 F. Supp. 2d 654 (S.D.N.Y. 2012)..............................................................................30

*SEC v. Pentagon Capital Mgmt. PLC*,
    844 F. Supp. 2d 377 (S.D.N.Y. 2012)
    *aff'd in part, vacated in part and remanded in part on other grounds*,
    725 F.3d 279 (2d Cir. 2013).............................................................................................24

*SEC v. SeeThruEquity, LLC*,
    No. 18-10374, 2019 WL 1998027 (S.D.N.Y. Apr. 26, 2019) .............................................8

*SEC v. Sells*,
    No. 11-4941, 2012 WL 3242551 (N.D. Cal. Aug. 10, 2012) ......................................24, 29

*SEC v. Sentinel Mgmt. Group, Inc.*,
    No. 07-4684, 2012 WL 1079961 (N.D. Ill. March 30, 2012)............................................24

*SEC v. Stoker*,
    865 F. Supp. 2d 457 (S.D.N.Y. 2012).................................................................24

*SEC v. Takeyasu*,
    No. 1:17-4866, 2018 WL 2849777 (S.D.N.Y. June 11, 2018) ...........................21

*SEC v. Tourre*,
    No 10-3229, 2014 WL 61864 (S.D.N.Y. Jan. 7, 2014) .......................................28

*SEC v. Wealth Strategy Partners, LC*,
    No. 8:14-02427-T-27, 2015 WL 3603621 (M.D. Fla. June 5, 2015) ..................24

*Shrader v. CSC Transp.*,
    70 F.3d 255 (2d Cir. 1995)...................................................................................8

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*,
    531 F.3d 190 (2d Cir. 2008).................................................................................23

*TSC Indus., Inc. v. Northway, Inc.*,
    426 U.S. 438 (1976).............................................................................................8

**STATUTES AND RULES**

15 U.S.C. § 77h-1(g)....................................................................................................19

15 U.S.C. § 78j(b) ............................................................................................... *passim*

15 U.S.C. § 78j-1 ......................................................................................................6, 12

15 U.S.C. § 77q(a) .............................................................................................. *passim*

15 U.S.C. § 78u-2(b)....................................................................................................19

15 U.S.C. § 7241 .......................................................................................................6, 12

15 U.S.C. § 7242 .......................................................................................................6, 12

15 U.S.C. § 7243 ............................................................................................................12

15 U.S.C. § 7262 .......................................................................................................6, 12

17 C.F.R. § 240.10b-5................................................................................................. *passim*

17 C.F.R. § 240.13b2-2..............................................................................................12

Fed. R. Civ. P. 54(b) ...................................................................................................7

Local Civ. R. 6.3 .........................................................................................................7

## INTRODUCTION

On March 18, 2019, this Court issued an Opinion and Order granting in part and denying in part the Motion to Dismiss the Complaint filed by Defendants Rio Tinto PLC, Rio Tinto LTD, its former Chief Executive Officer, Thomas Albanese, and its former Chief Financial Officer, Guy Robert Elliott (collectively, "Defendants").[1]  The Opinion held that the SEC had adequately alleged fraud based on Albanese's reckless endorsement of a recent coal acquisition to investors when he knew—based on the best information available—that the business had little to no value and "no realistic options for transportation of coal."  Op. at 24-25, 30, 33-34.  The Court held that these allegations state a claim for violation of Securities Exchange Act Section 10(b) and Rule 10b-5(b) thereunder.  *Id*. at 34.  The court also held that the SEC sufficiently alleged Rio Tinto's violation of Securities Act Section 17(a)(2) because the company raised billions of dollars in bond offerings that attached financial statements valuing that same virtually worthless business at more than $3 billion.  *Id*. at 39.  And the Court held that the SEC sufficiently alleged that Albanese and Elliott violated Exchange Act Section 13(b)(5) and Rule 13b2-1 thereunder by failing to correct misstatements about that same business in various papers submitted to Rio Tinto's auditors in advance of filing its Half Year ("HY") 2012 Report with the SEC.  *Id*. at 46.

After upholding those claims based on two sets of alleged misstatements—the Albanese Statements and Rio Tinto's misleading HY 2012 Report—the Court dismissed the SEC's remaining claims.  The Court held that liability under Rule 10b-5(a) and (c) and Section 17(a)(1) and (a)(3) could be premised only on "an inherently deceptive act distinct from an alleged misrepresentation."  Op. 35-36 (quotation marks omitted).  The Court held that misrepresentations could form the basis for claims only under Rule 10b-5(b) and Section 17(a)(2), and only then for

---

[1]    The March 18, 2019 opinion will hereinafter be referred to as "the Opinion" or "Op."  All page citations are to the version of the opinion on ECF docket number 135.

one who "makes" the misrepresentation.  *Id*. at 34-36, 38 (relying on *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135 (2011)).  On the SEC's claims for aiding and abetting violations of various securities law provisions, the Court either did not reach the issue because it found no primary violation, *see, e.g., id*. at 37, 39, or found that the SEC failed to allege "substantial assistance" by pleading "only that the Individual Defendants were aware of the materially false valuation [of RTCM] in various papers . . . but did not correct them at meetings of the Audit Committee."  *Id*. at 40-42.

These rulings significantly constrain the scope of the anti-fraud provisions of the federal securities laws.  In this case, the two top executives at Rio Tinto were told that a coal business had little-to-no value and then oversaw a process that assigned a false, multibillion dollar value to that business in the company's HY 2012 Report.  Throughout this process, they both had multiple opportunities to speak up and correct the record, but instead chose to allow misleading statements to be disseminated throughout Rio Tinto's financial reporting system, resulting in the dissemination of false and misleading financial reports to the investing public.  Such an outcome is contrary to the role of CEOs and CFOs as the statutory guardians of any issuer's financial reporting.  It would create an environment in which top public company executives could escape primary liability for culpable involvement in false financial statements, so long as they manage to avoid becoming direct "makers" of misrepresentations, and escape secondary liability if their "only" failure is not correcting false information that they know is being provided to the company's audit committee and auditors.  This runs contrary to the text and intent of the securities laws, for as the Supreme Court reiterated in *Lorenzo v. SEC*, 139 S. Ct. 1094 (2019), issued just one week after this Court's Order, "Congress intended to root out all manner of fraud in the securities industry.  And it gave to the Commission the tools to accomplish that job." *Id.* at 1104.

This Court acknowledged that *Lorenzo* could "clarify" the scope of the different anti-fraud provisions.   Op. 36 n.9.   As discussed below, *Lorenzo* expressly overrules or significantly undermines several legal principles on which this Court relied in its Opinion.   For example, *Lorenzo* squarely rejected the contention that "only those who 'make' untrue statements under subsection [10b-5(b)] can violate [Rule 10b-5 or Section 17(a)] in connection with the statements." 139 S. Ct. at 1101.   Rather, false statements can be involved in a violation of *any* of the Rule 10b-5 or Section 17(a) subsections, which "capture a wide range of conduct."   *Id*.

By letter filed the day *Lorenzo* was decided, the SEC notified the Court that it would move for reconsideration if its motion to amend was not granted.   ECF No. 140.   The Court agreed that "'the most efficient course' is to allow Plaintiff to seek leave to amend its complaint" before litigating a reconsideration motion.   ECF No. 154.   On March 10, 2020, Magistrate Judge Freeman denied the SEC's motion for leave to amend.   ECF No. 175.   The SEC files this motion for reconsideration simultaneously with its objections to Judge Freeman's ruling so that the Court will have a full picture of the procedural posture of this case: the Court has dismissed claims and conduct from this case based on legal principles that have been overruled by the Supreme Court. This intervening change in controlling law and manifest injustice warrant reconsideration.

The SEC respectfully requests that this Court reconsider its ruling that Defendants' material false statements, misleading omissions, and conduct related to misleading statements and omissions cannot be considered in evaluating the sufficiency of the SEC's claims for violations of Rule 10b-5(a) and (c) and Section 17(a)(1) and (a)(3), because that ruling cannot be reconciled with the Supreme Court's ruling in *Lorenzo*.   Further, *Lorenzo* upends the rulings that *Janus* applies to Section 17(a) claims and that the individual defendants' scienter could not be imputed to Rio Tinto.   And although the SEC does not seek reconsideration of most rulings related to the

3

sufficiency of its factual allegations, the Court's ruling that Defendants' statements about the resources and reserves of the relevant coal business was immaterial was premised on an extrinsic document that could not be considered at this stage because the Complaint alleged it was false. The SEC thus requests that the Court revisit this narrow materiality ruling without crediting the content of the disputed document. Finally, to the extent the Court reconsiders its primary liability rulings, the SEC requests that it reevaluate whether Albanese and Elliott aided and abetted those violations. The SEC has provided a Proposed Modified Ruling, which is attached as exhibit A.

## BACKGROUND

According to the Complaint, on December 20, 2010, Rio Tinto sought to acquire Riversdale Mining Ltd., a company that owned a coal mining business in Mozambique, and completed the acquisition in August 2011—paying approximately $3.7 billion. Compl. ¶¶ 48, 50, 61. After the acquisition, Riversdale was renamed Rio Tinto Coal Mozambique ("RTCM"). *Id*. ¶¶ 2, 25. Thomas Albanese was Rio Tinto's Chief Executive Officer, and Guy Elliot was Rio Tinto's Chief Financial Officer. *Id*. ¶¶ 21, 22. Riversdale was Rio Tinto's second large acquisition under Albanese's leadership, after the first acquisition dramatically failed. *Id*. ¶¶ 1, 44.

At the time of the acquisition, Riversdale had publicly disclosed that it estimated its coal reserves at 13 billion tons, boasting that its assets included some of the world's largest deposits of hard coking coal—which is essential to steel production, and therefore commands a higher price than thermal coal. Compl. ¶¶ 49, 55, 66. Before proceeding with the $3.7 billion acquisition, Rio Tinto internally estimated Riversdale's coal reserves at about 50 percent of what Riversdale claimed, or approximately 7 billion tons. *Id*. ¶ 83. Nevertheless, Rio Tinto concluded that it could profitably mine, transport, and sell over 40 million tons of coal per year by barging the majority of the coal—about 30 million tons—down the Zambezi River. *Id*. ¶¶ 2, 55-60, 78. The rest was intended to be shipped by rail. *Id*. ¶ 80. Rio Tinto expected that over 60 percent of coal production

would consist of higher-priced coking coal. *Id*. ¶ 55. While Rio Tinto's due diligence recognized that the barging transport solution was only a concept at that stage, and included a number of "showstopping" risks, neither Albanese nor Elliott communicated those risks to the Board of Directors when it made the decision to approve the multibillion dollar acquisition. *Id*. ¶¶ 56-60.

Within months after the acquisition, Defendants learned that many of their pre-acquisition assumptions were wrong or had changed. For example, by October 2011, Rio Tinto learned that barging capacity on the Zambezi River was limited to 10 million tons per year—not the 30 million anticipated—and that the cost of barging would be significantly higher. Compl. ¶ 69. By Rio Tinto's initial estimate, the loss of barging capacity and increased cost decreased RTCM's valuation by *$2.1 billion dollars*. *Id*. ¶ 71. Similarly, Defendants learned that the existing rail line could only transport 6 million tons of coal per year, and that RTCM's share of that capacity would only be about 2 million tons per year—much less than previously anticipated. *Id*. ¶ 80. Even more devastating, by December 2011, officials from the Government of Mozambique informed RTCM that its barging proposal would be altogether rejected. *Id*. ¶¶ 75-77.

By January 2012, Rio Tinto received more bad news—RTCM's coal resources and reserves would be written down 80 percent from the level declared by Riversdale, to less than 3 billion tons, or half what had been assumed during the acquisition. Compl. ¶ 84. In response, Elliott sent the report to Albanese, stating that the resource numbers were "[w]orse by far than expected," and in another email he told Albanese that "the market won't see" what Rio Tinto assumed during the acquisition and therefore realize that Rio Tinto had received far less mineable material than it had anticipated when it agreed to pay $3.7 billion. *Id*. Rio Tinto's 2011 Annual Report, however, falsely stated that the write down in RTCM's coal reserves had been anticipated before the acquisition. Op. at 20-21; Compl. ¶¶ 91-104.

At a critical May 2012 meeting in Brisbane, Australia, ("the Brisbane Meeting"), moreover, Albanese and Elliot were told, among other things, that: (1) the Government of Mozambique had again rejected barging, resulting in a huge value loss; (2) contrary to acquisition assumptions, there was a higher proportion of less valuable thermal coal; and (3) based on the best information available, RTCM was worth negative $680 million.  Compl. ¶¶ 116-119.  A few weeks after the Brisbane Meeting, Rio Tinto began its impairment review process for its HY 2012 Report. *Id.* ¶ 122.  Rio Tinto's impairment review process was part of its system of internal control over financial reporting and was spelled out in the Controller's Manual, implemented by the business units and Controller's staff, and overseen by Elliott in his role as CFO.[2]  *Id.* ¶¶ 30-39, 43.  As the top executive and financial officers of an issuer, Albanese and Elliott had statutory obligations with respect to Rio Tinto's financial reporting, communications with auditors, and internal controls over financial reporting.  *See, e.g.,* 15 U.S.C. §§ 7241, 7242, 7262.  As at any public company, Rio Tinto's Audit Committee served a role in the internal accounting control system, with a statutory obligation to oversee the external auditors.  *Id.* § 78j-1; Compl. ¶ 42.[3]

As a foreign issuer, Rio Tinto filed interim financial reports with the SEC.  Compl. ¶¶ 18, 139.  In contradiction of the best available information, in its HY 2012 Report, Rio Tinto carried RTCM at its unimpaired value of over $3 billion and: (1) did not—as required—conduct an impairment test for RTCM; (2) omitted or failed to disclose material information to its auditors

---

[2]    Rio Tinto's accounting policies and procedures, including the impairment review process, are set forth in the notes to its annual financial statements.  *See* Conn Decl. Ex 1 at 143.

[3]    In light of these Complaint allegations regarding Rio Tinto's accounting policies—which the SEC alleges Albanese and Elliott circumvented by concealing indications of impairment that Rio Tinto was obligated to consider and which would have triggered an impairment test Rio Tinto was obligated to perform—the SEC respectfully disagrees with the Court's conclusion that it did "not alleg[e] sufficient facts concerning Rio Tinto's internal controls for the Court to conclude that they may have been violated."  Op. at 44.

and others related to adverse developments; and (3) made a number of statements about RTCM's valuation and circumstances that were either false or not consistent with the available information. *Id*. ¶¶ 122-144. For example, as this Court found, the Complaint properly alleged that Defendants knew that RTCM's existing infrastructure options only allowed for transporting five percent of the coal production assumed during RTCM's acquisition, which would adversely impact its value. Op. at 21. Similarly, the Court held that the Complaint properly alleged both the falsity and materiality of: (1) RTCM's over $3 billion valuation reflected in the HY 2012 Report and other papers; (2) the omission of information about adverse developments in those papers; (3) the affirmative statements about the breadth of transportation and infrastructure options in some of those papers; (4) as well as certain Albanese statements to investors about RTCM in August and November of 2012 ("the Albanese Statements"). *Id.* at 28.

Even as late as November 2012, there was no plan at Rio Tinto to impair RTCM's value. Compl. ¶ 159. But a Rio Tinto executive sidestepped Elliott and Albanese to inform Rio Tinto's Chairman of the Board that RTCM had little or no value, and the Chairman requested an investigation. *Id*. ¶¶ 151-158, 164-166, 168. RTCM's value was then revised down to $611 million—a write-down of more than 80 percent. *Id*. ¶ 166. Rio Tinto announced the termination of Albanese as CEO at the same time it announced RTCM's impairment. *Id*. ¶ 173. Elliott stepped down as CFO in April 2013, leaving the company at the end of 2013. *Id*. ¶ 174. In October 2014, Rio Tinto sold RTCM for $50 million—less than 2 percent of what Rio Tinto had paid for the company only three years earlier. *Id*. ¶ 175.

## **LEGAL STANDARD**

District courts may reconsider interlocutory rulings until entry of final judgment. *See* Fed. R. Civ. P. 54(b); Local Civ. R. 6.3. The standard "is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court

overlooked—matters, in other words, that might reasonably be expected to alter the decision of the court." *Shrader v. CSC Transp.*, 70 F.3d 255, 257 (2d Cir. 1995).  Reconsideration may be warranted by (1) an intervening change of controlling law, (2) production of new evidence, or (3) the need to correct an error or prevent "manifest injustice." *King County Wash.. v. IKB Deutsche Industriebank AG*, 863 F. Supp. 2d 317, 319 (S.D.N.Y. 2012); *see Chen-Oster v. Goldman, Sachs & Co.*, 251 F. Supp. 3d 579, 586 (S.D.N.Y. 2017) (Torres, J.) (reconsideration may be warranted if "the original ruling is clearly erroneous").

## ARGUMENT

I.    **UNDER *LORENZO*, THE COMPLAINT PROPERLY ALLEGED VIOLATIONS OF RULE 10b-5(a) AND (c) AND SECTION 17(a)(1) AND (a)(3)**

Relying on *SEC v. Kelly*, 817 F. Supp. 2d, 340 (S.D.N.Y.) 2011), this Court held that "to allege scheme liability under subsections (a) and (c) of Rule 10b-5, the SEC must allege the performance of an inherently deceptive act that is distinct from an alleged misstatement."  Op. at 36.  Applying the same logic, this Court also dismissed the SEC's "scheme claims" predicated on Section 17(a)(1) and (3).  *Id.* at 37-38.

The analysis in *Kelly* that this Court relied on has been overruled by *Lorenzo*.  *See SEC v. SeeThruEquity, LLC*, No. 18-10374, 2019 WL 1998027, at *5 (S.D.N.Y. Apr. 26, 2019) (rejecting the analysis in *Kelly* as overruled by *Lorenzo*).  In *Lorenzo*, the Supreme Court addressed whether misstatements can form the basis for liability under Rule 10b-5(a) and (c) and Section 17(a)(1) and reached a contrary decision, holding that "these provisions capture a wide range of conduct" and are "sufficiently broad to include within their scope the dissemination of false or misleading information with the intent to defraud."  139 S. Ct. at 1101.  The Court rejected an identical argument offered by Defendants in this case, that "the only way to be liable for false statements is

through those provisions that relate *specifically* to false statements," namely Rule 10b-5(b) and

Section 17(a)(2).  *Id.*  The Supreme Court reasoned:

> We do not know why Congress or the Commission would have wanted to disarm
> enforcement in this way.  And we cannot easily reconcile [defendant's] approach
> with the basic purpose behind these laws: "to substitute a philosophy of full
> disclosure for the philosophy of caveat emptor and thus to achieve a high standard
> of business ethics in the securities industry."

*Id.* (quoting *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 186 (1963)).  In light of

*Lorenzo*, this Court should reconsider its prior conclusion that the SEC did not adequately allege

violations of Rule 10b-5(a) and (c) and Section 17(a)(1) and (3).

### A.    The Supreme Court's *Lorenzo* decision

In *Lorenzo*, the Supreme Court addressed whether "those who do not 'make' statements"

under Rule 10b-5(b) may be liable under other parts of Rule 10b-5 and Securities Act Section

17(a) by engaging in fraudulent conduct where the allegations involved a misstatement.  In that

case, Francis Lorenzo, the director of investment banking at a registered broker-dealer,

disseminated misstatements with fraudulent intent but was found not to have made the

misstatements himself.  139 S. Ct. at 1099-1100.  The Court held that one who "d[oes] not 'make'

the statements and consequently falls outside subsection (b) of the Rule" may be liable under the

other antifraud provisions based on fraudulent conduct.  *Id.* at 1101.

In doing so, the Supreme Court reaffirmed and clarified several critical points relevant to

this case.  *First*, the Court made clear that the text of the antifraud provisions is "expansive," 139

S. Ct. at 1102, "broad," *id.* at 1101, and "capture[s] a wide range of conduct," *id.*; *see also id.*

(examining dictionary definitions to determine the meaning of the provisions).  *Second*, there is

"considerable overlap among the subsections of the Rule and related provisions of the securities

laws."  *Id.* at 1102.  The Supreme Court addressed that issue while rejecting Lorenzo's argument

that "only those who 'make' untrue statements under subsection (b) can violate Rule 10b-5 in

connection with statements," because the argument was based on the mistaken premise "that each of these provisions should be read as governing different, mutually exclusive, spheres of conduct." *Id.* at 1101-02; *see id.* at 1102 ("The idea that each subsection of Rule 10b-5 governs a separate type of conduct is also difficult to reconcile with the language of subsections (a) and (c)."). *Third*, the Court warned against interpretations that would allow fraudulent behavior to "fall outside the scope" of the antifraud provisions. *Id.* at 1102. In that case, for example, "Lorenzo's view that subsection (b), the making-false-statements provision, exclusively regulates conduct involving false or misleading statements would mean those who disseminate false statements with the intent to cheat investors might escape liability under the Rule altogether." *Id.* at 1102-03.

*Lorenzo*'s holding and reasoning present "an intervening change in controlling law," *Chen-Oster*, 251 F. Supp. 3d at 586, that warrants reconsideration of the Court's prior acceptance of Defendants' argument that their alleged violations of Rule 10b-5(a) and (c) and Section 17(a)(1) and (3) must be dismissed because the SEC did not "allege conduct beyond misrepresentations or omissions that form the basis of a claim under subsection (b)." Op. 35 (discussing Rule 10b-5); *see id.* 38 (discussing Section 17(a)). *Lorenzo* squarely and decisively rejected Defendants' argument. As *Lorenzo* made clear, allegations that otherwise satisfy the plain text of Rule 10b-5(a) and (c) and Section 17(a)(1) and (3) cannot be dismissed merely because the case involves misstatements or omissions. Instead, where conduct—in *Lorenzo*, the activity involved dissemination of false statements—constitutes employing a "device," "scheme," or "artifice to defraud," or engaging in an "act, practice, or course of business" that "operate[d] . . . as a fraud or

deceit," primary liability may be imposed regardless of whether a separate Rule 10b-5(b) claim may be brought.  *Lorenzo*, 139 S. Ct. at 1102.[4]

### B.   *Lorenzo* confirms that the SEC sufficiently pled violations of Rule 10b-5(a) and (c) as well as Section 17(a)(1) and (3)

Post-*Lorenzo*, "it is difficult to see how [Defendants'] actions could escape the reach" of Rule 10b-5(a) and (c) and Section 17(a)(1) and (3).  *Lorenzo*, 139 S. Ct. at 1101.  In evaluating these claims, the Court should look at the Defendants' entire course of conduct, rather than analyzing each action piecemeal.  *See SEC v. Fiore*, 416 F. Supp. 3d 306, 320-321 (S.D.N.Y. 2019) (referencing market manipulation, misleading statements and omissions, and a promotional campaign in evaluating sufficiency of claims under Rule 10b-5(a) and (c)).

The Complaint alleged that Albanese and Elliott were the CEO and CFO, respectively, and members of Rio Tinto's Board of Directors.  Compl. ¶¶ 21-22, 60.  They thus undertook their actions as fiduciaries and as the officers who "were ultimately responsible for the integrity of the financial reporting process, including the impairment review process."  *Id.* ¶ 122.  As Rio Tinto's principal executive and financial officers, Albanese and Elliott were charged under the securities laws with particular responsibilities giving rise to a duty to act when they learned of information indicating that Rio Tinto would be disseminating false financial information.

For instance, in their roles, Albanese and Elliott were required to certify with each annual financial statement that they had provided material information to Rio Tinto's outside auditors,

---

[4]     Defendants' motion to dismiss briefing further demonstrates that *Lorenzo* compels reconsideration.  Instead of trying to distinguish the D.C. Circuit decision that was upheld by the Supreme Court in *Lorenzo*, Defendants merely dismissed the decision as "an out-of-circuit case." MTD Reply 21.  Further, to support their motion to dismiss, Defendants cited (at 47) *WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*, 655 F.3d 1039 (9th Cir. 2011)—the same case *Lorenzo* identified as authority it *rejected* when it affirmed the judgment of the D.C. Circuit. *See Lorenzo*, 139 S. Ct. at 1100.

that they were not aware of false or misleading statements in the financial reporting, and that they had devised and implemented an effective system of internal control over financial reporting, certification requirements that impose substantive responsibilities to undertake those activities during each reporting period. *See* 15 U.S.C. §§ 7241, 7262; Exchange Rules 13a-14 (requiring certifications of every issuer's principal executive and financial officer with each report) and 13a-15(b), (c) (issuer's principal executive and financial officers must evaluate the effectiveness of the issuer's controls and procedures for disclosure and financial reporting). Similarly, Albanese and Elliott had an affirmative obligation not to mislead accountants and auditors, 15 U.S.C. § 7242; 17 C.F.R § 240.13b2-2, and to implement and regularly assess internal controls. 15 U.S.C. § 7262. The responsibility of public company CEOs and CFOs is so great that they alone risk forfeiture of certain compensation if an accounting restatement is required due to misconduct at the public company. *Id*. § 7243. Moreover, when Albanese and Elliott attended meetings of the Audit Committee, their responsibilities were no less compelling, for they attended as the top representatives of management, and as fellow directors. For its part, the Audit Committee was a committee of the Board, charged by statute to provide independent oversight of the company's external audit. *See* 15 U.S.C. § 78j-1.

Especially when viewed in light of the affirmative duties imposed on them by the federal securities laws and their well-positioned ability to correct statements they knew were misleading, the acts and omissions of Albanese and Elliott clearly qualify as a device, scheme, or artifice to defraud, or an act, practice, or course of business which operated as a fraud or deceit. First, when Defendants learned that RTCM had approximately *half* as much coal as they anticipated, Defendants' first instinct was to hide that information from the public. Elliott emailed the information to Albanese, stating that the news was "worse by far than expected" and later assuring

Albanese that "the market won't see" what Rio Tinto assumed for the acquisition. Compl. ¶¶ 85-86. Carrying forward this misleading intention, Rio Tinto's Annual Report falsely asserted that the write-down of reserves and resources "had been anticipated prior to the acquisition of Riversdale and, therefore, had no effect on RTCM's valuation." *Id*. ¶ 102. This statement was false, as this Court already found. Op. at 20-21. Moreover, as discussed in more detail in Section III below, the Complaint properly alleged this statement was material. Albanese and Elliott knew the statement was false and—as their email exchange reflects—knew that the market would care that Rio Tinto only bought half the coal it expected when it spent $3.7 billion in the Riversdale acquisition. Albanese and Elliott nevertheless signed the 2011 Annual Report and certified that it did not contain any untrue statements of material fact or a material omission. Compl. ¶¶ 96, 103.

The status of RTCM was important enough to Albanese and Elliott that they attended an "all hands" meeting in Brisbane, Australia on May 11, 2012.[5] Compl. ¶ 116. During the meeting, management with primary responsibility for RTCM advised Albanese and Elliott that—based on the best information available—RTCM was worth *negative* $680 million. *Id*. ¶ 119. RTCM and Rio Tinto Energy management then provided significant detail regarding the adverse developments that resulted in a negative valuation, including issues related to coal quality and the lack of a viable transportation option. *Id*. Management also advised Albanese and Elliott that the "only way to deliver the necessary capacity at a competitive cost was to build a new (greenfield)

---

[5]    Entering the Brisbane Meeting, Albanese and Elliott already knew that the government had rejected a proposal for RTCM to barge coal on the Zambezi River, Compl. ¶ 77, and that RTCM had not identified a viable alternative for all of its transportation needs, *id*. ¶ 79, they knew that adverse developments at RTCM had eroded an estimated $2.1 billion in value by late 2011, *id*. ¶ 72, and they knew that RTCM's actual resources and reserves were "worse by far than expected" when Rio Tinto bought RTCM. *Id*. ¶¶ 82-86. And Albanese knew that, even if the government were to reverse course and permit river barging, the river could not support the amount of barging originally estimated; no more than a third of the original estimate was feasible. *Id*. ¶ 74.

rail line at a cost of $16 billion—and that, even then, the project did not have a positive valuation." *Id*. Albanese rejected this proposal at the meeting. *Id*. ¶ 120.

At the conclusion of the Brisbane Meeting, and despite the information provided, Albanese and Elliott "determined that it was premature to settle on a valuation for RTCM," a decision that flew in the face of accounting standards and Rio Tinto's internal accounting controls related to impairment review—which "contributed to the company's deficient half-year impairment review for RTCM." Compl. ¶ 121. This deficient impairment review process resulted in the presentation of multiple false and misleading papers that were reviewed at Rio Tinto's Audit Committee meetings attended by Albanese and Elliott, who did nothing to correct the false information being disseminated, and who did nothing to otherwise bring the information to light, which resulted in a misleading Impairment Paper being sent to Rio Tinto's external auditor. *Id*. ¶¶ 123-159.

Rio Tinto's HY 2012 Report was filed approximately three months after the Brisbane Meeting and—in stark contrast to the information Albanese and Elliott learned at that meeting— failed to impair the value of RTCM, reflecting a value of RTCM at more than $3 billion. Compl. ¶ 139. The Court has already found that the SEC adequately alleged the falsity and materiality of the following misstatements:

> RTCM's $3 billion valuation in HY 2012 Report and the First, Second and Third Controller's Papers and the Impairment Paper, and the omission therefrom of information about RTCM's severe adverse developments; [and] the statements in the First and Second Controller's Papers concerning the "number of options" and "breadth" of options for transportation and infrastructure ….

Op. at 28.

"As the CEO and CFO of Rio Tinto, Albanese and Elliott were ultimately responsible for the integrity of the financial reporting process." Compl. ¶ 122. As noted above, when the Court evaluates their role in the reporting process, it must be within the context of the allegation that both Albanese and Elliott were the top officers of Rio Tinto, with statutory responsibilities with

14

respect to the presentation of financial information. They were also long-tenured senior officers at Rio Tinto and therefore familiar with the process for approving financial statements before they are disseminated to the public and their obligation to provide accurate information to accountants during an audit. *Id.* ¶¶ 21, 22. And they had knowledge of, and the ability to correct, misleading statements that were disseminated to the public.

Elliott, for example, oversaw the Controller's Office, which was responsible for Rio Tinto's impairment review process and had an obligation to consider whether specified impairment triggers existed during each reporting period. Compl. ¶¶ 35-39, 43. Elliott thus had "direct oversight of Rio Tinto's process for determining whether" an impairment occurred and needed to be reported. *Id*. ¶ 39. When he reviewed the First, Second, and Third Controller's Papers—all of which this Court has found were sufficiently alleged as false—Elliott had an obligation to correct the relevant misstatements and misleading omissions. He knew that the information in those papers differed dramatically from the best information available and that the employees involved in drafting the papers—like the Controller—had not attended the Brisbane Meeting. *Id*. ¶ 118. Moreover, as a long-tenured CFO, Elliott was familiar enough with the reporting process to know that the misleading work generated by the Controller's Office would be passed through and relied on by Rio Tinto's independent auditors and the Audit Committee after Elliott reviewed and approved the documents. *Id*. ¶¶ 18, 22, 30-39, 42-43.

Elliott then sat in Audit Committee meetings—with full knowledge of the misrepresentations and while representing management as a top officer of the company—and allowed these misleading papers, which he had reviewed, to be presented to and relied upon by the Audit Committee members and external auditors, without providing any of the critical contrary information that he had learned. Compl. ¶¶ 129, 134-138, 155-159. In large part because of the

cumulative impact of Elliott's deceptive conduct, Rio Tinto issued its materially misleading HY 2012 Report after the July 2012 Audit Committee meeting, where Elliott again failed to correct misleading information.[6]

Albanese, similarly, certified the materially misleading statement in the 2011 Annual Report that Rio Tinto anticipated the write-down of coal resources and reserves. Compl. ¶ 96. After learning that RTCM and RTE management had been conducting extensive modeling and produced a valuation of negative $680 million based on the best information available, Albanese attended multiple Audit Committee meetings while representing management as the top officer of the company, and sat silently as the Audit Committee and Rio Tinto's independent auditors relied on the materially false Controller's Papers. *Id.* ¶¶ 123-59. In particular, Albanese silently watched as the Audit Committee relied on the description of the "breadth of transportation options available" when he knew that barging had been rejected and that he himself had rejected a new (greenfield) railroad, leaving RTCM with no viable transportation options for 95 percent of the coal it needed to ship to meet publicly announced projections. *Id.*

Like Elliott, Albanese was an officer and director with a duty to speak when he saw material inaccuracies being spread to Rio Tinto's Audit Committee and external auditors (particularly where he knew of the misstatements and had the ability to correct them). And, like Elliott, Albanese was a long-tenured officer at Rio Tinto, familiar with the reporting process, and

---

[6]    This Court explained: "With respect to knowledge of the violation, the Individual Defendants were present at the July 30, 2012 Audit Committee meeting, which was the last meeting prior to the publication of the HY 2012 Report. Compl. ¶¶ 134–135. At that meeting, the Second Controller's Paper was presented, which concluded that there were no impairment indicators with respect to RTCM, and that Rio Tinto was confident of finding a viable infrastructure path. *Id.* ¶ 134. Therefore, the SEC has adequately alleged that the Individual Defendants had knowledge of the materially false valuation in the HY 2012 Report, and its related omissions." Op. at 41.

knew that if false statements passed through the Audit Committee and auditors they would be disseminated to the public in Rio Tinto's required financial disclosures.  And he knew those false statements would perpetuate the image Albanese desired: that the Riversdale acquisition was still on track to be a great success.  Indeed, in August 2012, Albanese continued to tout the acquisition to investors, stating that the regional area in the Moatize Basin was "more prospective" than he would have said a year earlier, that RTCM probably had "more potential in total as [it went] forward," and that the Moatize Basin was truly a world-class basin coal deposit.  Compl. ¶¶ 141-142.  Even as late as November 2012, Albanese stated that the Moatize Basin was a long-term opportunity with the potential to grow beyond 25 million tons of coal per year.  *Id*. ¶¶ 163.  As this Court found, the Complaint properly alleged that "Albanese was misrepresenting material facts to investors."  Op. at 34 (quotation marks omitted).

These allegations establish a plausible claim for violations of Rule 10b-5(a) and (c) and Section 17(a)(1) and (3).  *Lorenzo* instructs that a misrepresentation of material facts to investors constitutes employing a "device," "scheme," or "artifice to defraud," or engaging in an "act, practice, or course of business" that "operate[d] . . . as a fraud or deceit" under the expansive scope of those terms.  139 S. Ct. at 1101 (providing the same definition of the relevant terms the SEC cited in this case (at ECF No. 80 at 9) in its opposition to the motion to dismiss).  The statements that this Court has already found were properly alleged as false—including the 2011 Annual Report's statements about the write-down of resource and reserves, the HY 2012 Report's more than $3 billion valuation of RTCM and other misleading statements and the Albanese statements—more than satisfy this standard.  *See id.* (holding that cutting and pasting two false emails and sending them to investors, with scienter, violates Rule 10b-5(a) and (c) and Section 17(a)(1)).

The Tenth Circuit's application of the *Lorenzo* decision in *Malouf v. SEC*, 933 F.3d 1248 (10th Cir. 2019), is particularly instructive in this case.  In *Malouf,* the court applied *Lorenzo* and held that an individual's "failure to correct" his investment firm's "misstatements could trigger liability" under Rule 10b-5(a) and (c) and Section 17(a)(1) and (3).  *Id.* at 1260; *see id.* at 1259 (rejecting argument that "failure to correct . . . misstatements does not constitute a separate violation of the securities laws"); *id.* at 1260 (concluding that *Lorenzo* applies to Section 17(a)(3)). *Malouf* demonstrates that a defendant who plays an integral role in overseeing, preparing, or disseminating false statements—as Albanese and Elliott did here—cannot sit back and do nothing when he knows misstatements or omissions are being disseminated.

A contrary interpretation of these statutes would flout "the basic purpose" behind the antifraud provisions, which was "to substitute a philosophy of full disclosure for the philosophy of caveat emptor and thus to achieve a high standard of business ethics in the securities industry." *Lorenzo*, 139 S. Ct. at 1103 (quotation marks omitted).  After all, "even a bit participant in the securities markets" may be liable as a primary violator where the requirements are met.  *Id.* at 1104.  It is no less true that the CEO and CFO may be liable, particularly where they do not just ignore red flags but *know* misstatements are being disseminated and fail to correct them.  *See* Op. 41 ("[T]he SEC has adequately alleged that the Individual Defendants had knowledge of the materially false valuation in the HY 2012 Report, and its related omissions"); *see also Fiore*, 416 F. Supp. 3d at 320-321 (SEC alleged deceptive scheme involving multiple forms of misconduct, including misstatements, that were "designed" to convince the public of a false status of affairs).

### C.    The SEC sufficiently pled that Albanese and Elliott's violations of Rule 10b-5(a) and (c) as well as Section 17(a)(1) and (3) were reckless

This Court did not reach the issue of scienter with respect to claims under Rule 10b-5(a) and (c) and Section 17(a)(1) and (3) because it dismissed them solely on the ground that all of the

conduct listed related to either a misstatement or omission.  Op. at 36.  In setting forth the elements

of a violation of Section 17(a), however, the Court stated that Rule 10b-5 and Section 17(a) have

"[e]ssentially the same elements," "including scienter."  *Id.* at 37.  The Court should correct this

statement because, as set forth in the case cited by the Court, "[e]ssentially the same elements are

required under Section 17(a)(1)-(3) in connection with the offer or sale of a security, *though no*

*showing of scienter is required for the SEC to obtain an injunction under subsections (a)(2) or*

*(a)(3)*."[7]  *SEC v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir. 1999) (emphasis added).

This aspect of the Court's opinion warrants clarification within the broader context created by

*Lorenzo*.  While the SEC contends it has pleaded scienter for all Defendants, it has at a minimum

established that the individual defendants, and therefore Rio Tinto, acted negligently by

unreasonably failing to take action to prevent the dissemination of statements they knew to be

materially false.  This portion of the Court's opinion should be reconsidered.

In evaluating Defendants' entire fraudulent course of conduct, moreover, this Court should

reach the same decision as to scienter as it did with respect to the Albanese Statements.  There, the

---

[7]     While the Court separately addressed Rio Tinto's liability under Section 17(a)(2) under a
negligence standard—but did not address negligence liability for any defendant under 17(a)(3)—
it appears to have taken the view that *only* an injunction may be obtained for a negligent violation
of Section 17(a).  *See* Op. 37 ("scienter is not a required element for the SEC to obtain an injunction
under Section 17(a)(2)"); *id*. at 38 ("The Court must consider, for purposes of seeking injunctive
relief, the SEC has alleged a violation of Section 17(a)."); *id*. at 39 ("any request for injunctive
relief" under 17(a) dismissed as to individual defendants, while sustaining 17(a)(2) claim against
Rio Tinto "[t]o the extent the SEC seeks injunctive relief").  But negligent violations of Section
17(a)(2) and (a)(3) support disgorgement and civil penalties, not just injunctions.  *See, e.g., SEC
v. Merchant Capital, LLC,* 397 F. App'x. 593, 595 (11th Cir. 2010) ( "[d]isgorgement is not
dependent on scienter, but is tied instead to the idea of unjust enrichment"); *SEC v. Jankovic*, No.
15 Civ. 1248, 2018 WL 301160, at *10 (S.D.N.Y Jan. 4, 2018) (ordering disgorgement solely with
respect to claims under Sections 17(a)(2) and (3)).  Similarly, first tier civil money penalties are
available for any violation, with no scienter required.  *See* 15 U.S.C. §78u-2(b), 15 U.S.C. §77h-
1(g).  The SEC should be permitted to pursue all available remedies for its claims under 17(a)(2)
and (a)(3), including the 17(a)(2) claim the Court already sustained against Rio Tinto.

Court reasoned, the SEC adequately alleged that "after the Brisbane Meeting, Albanese was aware that the best information indicated that RTCM had no value and no realistic options for transportation of coal, but he continue to tout it."  Op. at 33.  Likewise, allegations that both Albanese and Elliott played essential roles in disseminating false information as part of the HY 2012 Report process support the same finding of "circumstantial evidence of conscious misbehavior or recklessness" with respect to the Rule 10b-5(a) and (c) and Section 17(a)(1) and (3) claims.  *SEC v. Egan*, 994 F. Supp. 2d 558, 565 (S.D.N.Y. 2014).  Indeed, with respect to these claims, the inference of recklessness is even more compelling because the allegations of Albanese and Elliott's scienter encompass their stated desire to keep the adverse developments regarding resource and reserves from the public—which they succeeded in doing.  Compl. ¶ 84.  Moreover, the recklessness of their misconduct must be evaluated through the lens of their duties as officers and directors at Rio Tinto, responsible for overseeing the integrity of the financial reporting and disclosure processes.

The Tenth Circuit confronted a similar fact pattern in *Malouf*.  In that case, the defendant "bore responsibility for preparing" the firm's required filings but the firm "delegated compliance with these responsibilities to a chief compliance officer and hired an outside consultant to review" the compliance procedures and forms.  933 F.3d at 1254.  The court upheld a finding of scienter, rejecting the defendant's "effort to shift the blame" to the compliance officer, while noting that the defendant "was familiar with the contents" of the inaccurate financial forms but "took no action to correct material misstatements."  *Id.*  The duty of management to correct material misstatements applies, post-*Lorenzo*, regardless of whether the defendant is a "maker" under Rule 10b-5(b).

Even before *Lorenzo*, courts regularly found that liability under Rules 10b-5(a) and (c), and Section 17(a)(1) and (a)(3), is adequately alleged where top executives are aware of improper

accounting and do nothing to correct it, even though they know their omission will result in the dissemination of false financial information.  For instance, scienter-based violations of the anti-fraud provisions were adequately alleged where senior executives were aware of improper accounting practices but did not investigate "or otherwise [take] steps to correct the failed internal controls," for such "allegations of failing internal controls, to which the Individual Defendants turned a blind eye, support an inference of scienter."  *SEC v. Takeyasu*, No. 1:17-cv-4866, 2018 WL 2849777, at *19 (S.D.N.Y. June 11, 2018).

Similarly, plaintiffs adequately pled liability where a CFO was "personally informed" of huge losses at an acquisition target that should have been disclosed, then failed to fully inform disclosure counsel, who were thus "left out of the loop," "imped[ing]" them "from making a fully informed analysis."  *In re Bank of Am. Corp. Secs., Deriv. & ERISA Litig.,* No. 09-2058, 2011 WL 3211472, at *5-10 (S.D.N.Y. July 29, 2011).  This fact pattern captures the conduct of Albanese and Elliott, who were fully informed about RTCM, and kept the auditors, Audit Committee, and Board "out of the loop."  The *Bank of America* court also found anti-fraud liability was properly alleged for the CEO, who allegedly "was informed of Merrill's losses, but . . . took no action to review or ensure compliance with Bank of America's disclosure obligations."  *Id*.  "[B]y virtue of his position within Bank of America and his awareness of Merrill's losses," the court explained, the CEO's "inaction on the disclosure issue raises a strong issue of recklessness."  *Id*.

Likewise, when a CFO was alleged to have had some involvement in an accounting practice and knowledge of its impact on the financial statements, his involvement and "failure to investigate further the details and propriety" of the accounting "by a person in [the CFO's] senior financial position constitutes an extreme departure from the standards of ordinary care and an egregious refusal to see the obvious, or to investigate the doubtful."  *SEC v. Dunn*, 587 F. Supp.

2d 486, 507 (S.D.N.Y. 2008) (quotation marks and citations omitted).  As these cases demonstrate, senior executives act with "reckless disregard for the truth" when informed of facts that render public statements materially misleading and then "failing to see to it" that those facts are disclosed. *SEC v. Enterprises Sols., Inc.*, 142 F. Supp. 2d 561, 576 (S.D.N.Y. 2001).

A long line of cases consistently holds that even the presence of red flags can raise an inference of scienter, particularly where the individual was extensively involved in the process of compiling or reviewing the false or misleading financial statements.[8]  The requirement to take action when knowing that false financial information is to be reported is especially pronounced for Elliott, because "[a]s chief financial officer, [his] very job" at Rio Tinto was to "manage its financial department and ensure its records and documents were accurately maintained, and there is substantial evidence that [he] failed to do so."  *SEC v. Das*, 723 F.3d 943, 952 (8th Cir. 2013) (quotation marks omitted); *see also In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*, 381 F. Supp. 2d 192, 222 (S.D.N.Y. 2004) (finding scienter met based on individual defendant's position as "the executive most responsible for the Company's accounting" and attendance at meetings where issues were discussed); *In re Am. Bank Note Holographics, Inc. Sec. Litig.*, 93 F. Supp. 2d 424, 448 (S.D.N.Y. 2000) (finding scienter allegation sufficient as to CFO and Comptroller where they were "uniquely situated" to control accounting procedures).

---

[8]  *E.g.*, *Iowa Pub. Employee's Ret. Sys. v. Deloitte & Touche LLP*, 919 F. Supp. 2d 321, 332 (S.D.N.Y. 2013) ("[W]hile blanket allegations of GAAS or GAAP violations will not alone suffice to state a claim of securities fraud, such claims together with various red flags are sufficient to support a strong inference of scienter." (quotation marks and emphasis omitted)); *In re IMAX Sec. Litig.*, 587 F. Supp. 2d 471, 484 (S.D.N.Y. 2008) (finding that defendant auditor was "extensively involved" in creating and maintaining accounting policy that gave rise to the alleged fraud, leading to the inference that audited company reviewed documents containing red flags, and, on the basis of this finding, ruling that the complaint adequately pled scienter).

In sum, the Complaint adequately alleged that Albanese and Elliott engaged in materially deceptive conduct and courses of business with scienter in violation of Rule 10b-5(a) and (c) and Section 17(a)(1) and (3).  Moreover, the Complaint sufficiently alleged the same claims against Rio Tinto for violations of Rule 10b-5(a) and (c) and Section 17(a)(1) and (3), because it is responsible for the actions of its corporate agents and the scienter of those agents may be imputed to the corporation itself.  *See, e.g.*, *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008).[9]

## II. THE INDIVIDUAL DEFENDANTS ARE LIABLE UNDER SECTION 17(a)(2) DESPITE NOT BEING "MAKERS" OF STATEMENTS

In its Order, this Court held that "for an individual to be liable under Section 17(a)(2), he must be the 'maker' of a statement" pursuant to *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135 (2011).  Op. at 38.  In so ruling, the Court relied solely on *SEC v. Kelly,* 817 F. Supp. 2d 340 (S.D.N.Y. 2011).  The Supreme Court's decision in *Lorenzo* overruled *Kelly*, *see supra* at 8, and, accordingly, this Court should reconsider its decision dismissing the SEC's Section 17(a)(2) claim against the individual defendants.

In *Lorenzo*, the Court upheld the Commission's finding that Lorenzo was liable under Section 17(a)(1), despite the fact that a different entity was the maker of the misstatements at issue.  *Id.* at 1099.  As the Supreme Court explained in *Lorenzo*, the *Janus* decision involved "Rule 10b–5(b)" only, and not any other provision.  139 S. Ct. at 1098.  *Lorenzo* mandates interpreting the text of the antifraud statutes according to their terms, and the *Janus* holding interpreting the term

---

[9]    If the Court finds that the SEC sufficiently alleged liability for violations of Section 10(b) and Rule 10b-5 (a) and (c) or Section 17(a)(1) and (3), it should reexamine the sufficiency of Claims Two and Four, which generally allege that the individual defendants aided and abetted those same violations.  The Court's dismissal of those claims was predicated on a theory of primary liability that has been rejected by *Lorenzo*.  *See* Op. at 36-37, 39.

"make" in Rule 10b-5(b) does not carry over to other parts of that Rule, nor can it be imported to Section 17(a), which nowhere contains the word "make." *See id.* at 1102 (relying on the Rule's "expansive language, which readily embraces the conduct" in the other subparts of the Rule, irrespective of whether liability under Rule 10b-5(b) was foreclosed).

In this regard, *Lorenzo* affirmed the overwhelming majority of courts that had found *Janus* inapplicable to Section 17(a)(2).[10]  Accordingly, under Section 17(a)(2), a defendant can be liable if "he obtains money or property *by use* of a false statement, whether prepared by himself or by another." *SEC v. Stoker*, 865 F. Supp. 2d 457, 465 (S.D.N.Y. 2012).  Here, all Defendants used materially misleading statements in a bond offering that raised $3 billion for Rio Tinto.  Compl. ¶¶ 145-150.  The SEC adequately alleged a violation of Section 17(a)(2) against the individual defendants regardless of whether they were the "makers" of the false statements.

---

[10]    *SEC v. Sells*, No. 11-4941, 2012 WL 3242551, at *7 (N.D. Cal. Aug. 10, 2012) ("*Janus* does not apply to claims premised on § 17(a)"); *SEC v. Mercury Interactive, LLC*, No. 5:07-02822, 2011 WL 5871020, at *3 (N.D. Cal. Nov. 22, 2011) (*Janus* does not apply to Section 17(a) claims); *SEC v. Daifotis*, No. 11-00137 2011 WL 3295139, at *5 (N.D. Cal. Aug. 1, 2011) ("*Janus* does not apply to claims brought under Section 17(a)"); *SEC v. Big Apple Consulting USA, Inc.*, 783 F.3d 786, 796 (11th Cir. 2015) ("any attempts by the defendants to import the [Supreme] Court's narrow holding [in *Janus*] to the *entirety* of § 17(a) is untenable on its face"); *SEC v. Monterosso*, 756 F.3d 1326, 1334 (11th Cir. 2014) ("*Janus* has no bearing on this case" involving claims under Section 17(a) and 10b-5(a) and (c)); *SEC v. Wealth Strategy Partners, LC*, No. 8:14-02427-T-27, 2015 WL 3603621, at *7 (M.D. Fla. June 5, 2015) ("*Janus Capital* applies only to claims based on Rule 10b-5(b), not claims based on Section 17(a), Section 10(b), and other parts of Rule 10b-5."); *Stoker*, 865 F. Supp. 2d at 465 ("*Janus* implicitly suggests that Section 17(a)(2) should be read differently from, and more broadly then, Section 10(b)"); *SEC v. Pentagon Capital Mgmt. PLC*, 844 F. Supp. 2d 377, 422 (S.D.N.Y. 2012), *aff'd in part, vacated in part and remanded in part on other grounds*, 725 F.3d 279 (2d Cir. 2013) ("Nor does *Janus* apply to SEC enforcement actions brought pursuant to Section 17(a) of the Securities Act"); *SEC v. Sentinel Mgmt. Group, Inc.*, No. 07 C 4684, 2012 WL 1079961, at *14-15 (N.D. Ill. March 30, 2012) ("*Janus* does not preclude [the defendant's] liability under Section 17(a)."); *SEC v. Geswein*, No. 5:10- 1235, 2011 WL 4565861, at *2 (N.D. Ohio Sept. 29, 2011) (upholding magistrate ruling that *Janus* does not apply to Section 17(a) claim).

### III.    DEFENDANTS' FALSE STATEMENTS ABOUT RTCM'S RESERVES WERE MATERIAL

Although the SEC does not ask the Court to revisit its ruling that the $3.7 billion valuation of RTCM in the 2011 Annual Report was not false because of the legal standard governing a motion for reconsideration, the SEC respectfully requests the Court to reconsider its ruling that Defendants' false statements that the full extent of the write-down of coal reserves had been anticipated before the acquisition of Riversdale were immaterial.  Reconsideration is warranted "to correct an error or prevent 'manifest injustice.'"  *King County*, 863 F. Supp. 2d at 319.

As this Court recognized, Rio Tinto's 2011 Annual Report falsely stated that the extent of RTCM's write-downs in resources and reserves had been expected at the time of acquisition.  Op. at 20-21.  But the Court agreed with Defendants that the statements were immaterial because: (1) the public was not aware of how much reserves and resources had been assumed at acquisition; and (2) Rio Tinto's post-acquisition resources and reserves estimate "still exceeded the lifetime needs of the mine."  *Id.* at 27.  The SEC respectfully asserts that neither point withstands scrutiny, although it need only prevail on either point to merit reconsideration.

Even if the public did not know how much reserves and resources had been assumed at acquisition, the write-down—which in fact was a more than 50-percent drop in estimated resources since the acquisition—is material because it shows that Rio Tinto failed to come close to estimating the actual resources and reserves of its acquisition.  To downplay the importance of the write-down, Rio Tinto falsely stated that it had been anticipated *before* the acquisition.  *See* Op. at 20-21; Compl. ¶¶ 91-104.  Those misstatements created the false impression that what Rio Tinto found at Riversdale after the acquisition was in line with its expectations at the time of the acquisition. Certainly, a reasonable investor would find it material that Rio Tinto did not get remotely what it thought it had paid for in the $3.7 billion acquisition.

25

Indeed, the only reason the Defendants were able to falsely depict the write-down as expected was that, as Elliott pointed out to Albanese at the time, the public had no idea what the actual assumptions at acquisition had been.  Compl. ¶ 86.  Despite Rio Tinto's cover-up, the write-down represented a significant departure in value from what a reasonable investor would have assumed at the time of the acquisition of what was purportedly "one of the world's most prospective" set of mining assets.  *Id.* ¶¶ 62-65.  But Defendants hid from the public the decline in value of the assets since acquisition and Rio Tinto's own failure to be able to come close to estimating the actual resources and reserves of a major acquisition.

This Court should also reconsider its conclusion that Rio Tinto's post-acquisition resources and reserves estimate exceeded the lifetime needs of the mine.  As support for that conclusion, it relied on one portion of the Impairment Paper, in which Rio Tinto represented to its outside auditors "that the revised numbers will not impact the acquisition valuation because the revised reserves and resources still significantly exceed the . . . material assumed during the life of the project."  *See* Op. at 27 (citing Conn Decl. Ex. 13 at 7).  The Impairment Paper, however, was a document outside the record.  The Second Circuit has held that materials outside the record cannot be a basis to dismiss a complaint unless it is "clear on the record that no dispute exists regarding the authenticity or accuracy of the document."  *Faulkner v. Beer*, 463 F.3d 130, 135 (2d Cir. 2006).  Here, the veracity of the information in the Impairment Paper is a disputed fact.

The Complaint itself alleged that the Impairment Paper misleadingly concealed and minimized the extent of the decrease in RTCM's value, and that the section on resources and reserves—that the Court relied on for its ruling—was misleading.  Compl. ¶¶ 130-133.  Indeed, the Court found the Impairment Paper to be misleading, at least in part, Op. at 20-26, and the assertions in the Impairment Paper are flatly at odds with the allegations in the Complaint.

*Compare* Compl. ¶ 102 ("In reality, the full extent of the write-down had not been anticipated . . ."); *with* Conn Decl. Ex. 13 at 7 ("The restatement was anticipated at acquisition . . ."). A complaint cannot be dismissed based on assuming the truth of statements in an extrinsic document where "the terms of the complaint itself clearly put that factual assumption in dispute." *Faulkner*, 463 F.3d at 135.

In any event, even if Rio Tinto's post-acquisition resources and reserves estimate "still exceeded the lifetime needs of the mine," Op. at 27, this does not establish immateriality as a matter of law. The Complaint alleged that Defendants themselves understood and acknowledged the importance of the write-downs by emailing each other about how bad the write-downs were and reassuring themselves that "the market won't see" their full extent. Compl. ¶¶ 85-86, 102. Moreover, cutting the amount of available coal in *half* greatly affects the mine's prospective value: it nearly eliminates a much-needed margin of error, precludes the possibility of expanding operations over time, and requires that a far greater percentage of the available coal makes it to market than had previously been assumed. Finally, the size of the miss called into question management's ability to assess mineral resources, a core competency of any mining company.

Materiality "will rarely be dispositive in a motion to dismiss." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 360 (2d Cir. 2010). At the motion to dismiss stage, when the inquiry is whether a claim to relief is "plausible on its face" and the Court must draw all reasonable inferences in favor of the SEC, the correct inquiry is not whether a reasonable investor *may* have accepted this development if there were enough coal for the lifetime of the mine. *See Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). Rather, the question is, if Rio Tinto had publicly reported the huge disparity between the amount of coal the company thought it was buying as a result of its due diligence—7 billion tons—and the amount of coal Rio Tinto was now declaring—3 billion tons—

27

would a reasonable investor find that information "so obviously unimportant . . . that reasonable minds could not differ on the question of [its] importance." *IBEW Local Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scotland Group, PLC,* 783 F.3d 383, 390 (2d Cir. 2015) (quotation marks and citation omitted).[11]

The SEC therefore respectfully requests that this Court reconsider its ruling dismissing all or portions of Claim One (10b-5(b)), Claim Three (17(a)(2)), Claim Eleven (Exchange Act Rule 13a-14), and Claim Twelve (Exchange Act Rule 13a-14) to the extent those claims are based on Defendants' false statements about the write-down in resource and reserves being anticipated.

## IV.    THE COURT SHOULD RECONSIDER ITS AIDING AND ABETTING RULINGS

To the extent that the Court revisits Defendants' primary liability for a violation of the securities laws, it should also revisit whether Albanese and Elliott are liable for aiding and abetting that violation.  As the Supreme Court noted *in Lorenzo*, "it is hardly unusual for the same conduct to be a primary violation with respect to one offense and aiding and abetting with respect to another." *Lorenzo*, 139 S. Ct. at 1103.  Indeed, the same conduct can form the basis for primary and secondary liability for an individual, *Enterprises Sols.*, 142 F. Supp. 2d at 576, and an executive's scienter can form the imputed basis for a corporation's liability, which in turn can form the basis for that executive's secondary liability, *In re Eletrobas Sec. Litig.*, 245 F. Supp. 3d 450, 469-70, 472-73 (S.D.N.Y. 2017).  "One may aid and abet a corporate entity even if, unlike here, there was evidence of misconduct by only one agent."  *SEC v. Koenig*, No. 02-2180, 2007 WL 1074901, at *7 (N.D. Ill. Apr. 5, 2007); *see also SEC v. Tourre*, No 10-3229, 2014 WL 61864, at

---

[11]    *See also, TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976) (materiality "requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact"); *Litwin v. Blackstone Group, L.P.*, 634 F.3d 706, 719 (2d Cir. 2011) (allegations of failure to disclose the impact of known events adequately pled materiality).

*6-7 (S.D.N.Y. Jan. 7, 2014) (finding defendant's argument that he "cannot be found to have aided and abetted his own violation of Section 10(b) and Rule 10b-5," "wrong as a matter of fact and law"); *SEC v. Sells*, No. 11-4941, 2012 WL 3242551, at *9 (N.D. Cal. Aug. 10, 2012) (imputing Sells' scienter to other defendant for purposes of primary liability, and denying Sells' motion to dismiss aiding and abetting claim).

The Court's aiding and abetting analysis will turn, as it did in the Opinion, on the sufficiency of the SEC's allegations regarding Albanese and Elliott's substantial assistance of the primary violation and their scienter. *See SEC v. Apuzzo*, 689 F.3d 204, 215 (2d Cir. 2012) ("A high degree of knowledge may lessen the SEC's burden in proving substantial assistance, just as a high degree of substantial assistance may lessen the SEC's burden in proving *scienter*"). Albanese and Elliott's reckless scienter is discussed at length above, particularly in connection with the SEC's claims based on their fraudulent course of conduct.

Under *Lorenzo*, the Court should consider *all* of Albanese and Elliott's acts and omissions, including those related to misleading statements and omissions. The Court also should consider that Albanese and Elliott had the primary responsibility for the financial reporting process at Rio Tinto, attended the presentation of documents at Audit Committee as officers and directors with statutory and fiduciary duties to speak when there were material inaccuracies, knew of the material misstatements, and continued to hide the truth despite their ability to take corrective actions. *See, e.g.*, *SEC v. Conaway*, No. 2:05-40263, 2009 WL 902063, at *13 (E.D. Mich. Mar. 31, 2009) (CEO "had a direct and immediate fiduciary duty to Kmart's shareholders that carried with it the duty to speak truthfully on material matters and to correct untruths where he found them.").

Albanese and Elliott's tacit approval of multiple materially misleading documents by remaining silent at multiple meetings of the Audit Committee must be evaluated within this context.[12]

When viewed in that light, and making all inferences in favor of the SEC, there is only one possible conclusion: Albanese and Elliott substantially assisted Rio Tinto's dissemination of materially false and misleading statements. Rio Tinto's false statements about the write-down of reserves and resources and its false statements about RTCM in the HY 2012 Report never would have been disseminated if Albanese or Elliott had not decided to conceal the truth of RTCM's value. It is therefore appropriate for aiding and abetting claims to proceed against them in connection with those statements. *See SEC v. DiBella*, 587 F.3d 553, 566 (2d Cir. 2009) (a defendant is liable for aiding and abetting when "his efforts contributed to [the violation's] success" and "consciously assisted" in "some active way."); *SEC v. Mudd*, 885 F. Supp. 2d 654, 671 (S.D.N.Y. 2012) (same).

## CONCLUSION

The SEC respectfully requests that this Court modify its ruling as indicated in the Proposed Order attached as exhibit A. The SEC also respectfully requests telephonic oral argument to address the important issues raised by this motion.

---

[12] *See, e.g.,* Compl. ¶¶ 91-93 (silence in advance of the 2011 Annual report), 129-134 (silence in advance of the June and July 2012 Audit Committee meetings), 138 (silence in advance of the HY 2012 Report), 154-157 (silence in advance of the November 2012 Audit Committee meeting).

Dated: March 24, 2020                 Respectfully submitted,


                                      By: */s/ Thomas A. Bednar*
                                      Thomas A. Bednar
                                      Fernando Campoamor Sanchez
                                      Dean M. Conway
                                      Gregory N. Miller
                                      Martin Totaro
                                      Securities and Exchange Commission
                                      100 F Street N.E.
                                      Washington, D.C. 20549
                                      (202) 551-6218 (Bednar)
                                      bednart@sec.gov

                                      Counsel for Plaintiff


## CERTIFICATE OF SERVICE

I certify that on March 24, 2020, a copy of the foregoing document was served upon all

counsel of record via the Court's electronic filing system.


                                      */s/ Thomas A. Bednar*
                                      Thomas A. Bednar
                                      Counsel for Plaintiff