

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
100 F. Street N.E.
Washington, D.C. 20549

August 28, 2020

<u>Via ECF and Email to Chambers</u>

The Honorable Analisa Torres
United States District Judge
U.S. District Court for the
Southern District of New York
500 Pearl Street
New York, NY 10007-1312
Torres_NYSDChambers@nysd.uscourts.gov

Re:   *SEC v. Rio Tinto, et al.,* No. 1:17-cv-07994-AT-DCF
       Plaintiff SEC's Pre-Motion Letter Regarding *Daubert* Motions

Dear Judge Torres:

In accordance with this Court's Individual Practices in Civil Cases and the July 13, 2020, Scheduling Order (ECF No. 200), Plaintiff Securities and Exchange Commission (SEC) submits this letter setting forth the general bases for its anticipated motions to exclude, in whole or in part as set forth in more detail below, the testimony of the following witnesses proffered by Defendants as experts in this case: Robert Edwards, Barnaby Fletcher, Peter Christensen, John Lacey, and Glenn Hubbard.[1]

The testimony from these witnesses that should be excluded suffers from many of the same problems, such as: (1) opinions that lack any proper methodology or are based on unreliable methodologies; (2) opinions that rely on speculative assumptions, including opining on the state of mind of parties and other actors; and (3) opinions that impermissibly act as conduits for hearsay evidence and factual narration, usurping the role of the trier of fact. Additionally, Defendants' proffered experts seek to provide opinions that are simply irrelevant to the task at hand, or seek to offer opinions as to ultimate legal conclusions. Finally, some of the proffered experts are not qualified to give the opinions they offer.

I.   <u>Background</u>

This case centers on the half-year 2012 accounting for RTCM, a Mozambican coal company Rio Tinto acquired in mid-2011. RTCM had suffered several early setbacks that its

---

[1] Instead of submitting a separate pre-motion letter for each individual expert, the SEC respectfully submits this seven-page consolidated pre-motion letter addressing the five experts to reduce repetition and streamline the issues for the Court. *See* Individual Practices in Civil Cases III.A.ii (pre-motion letters should "normally" not exceed four pages). The authorities and arguments the SEC offers in this letter should not be construed to limit or waive the SEC's right to cite additional or different authorities or make additional or different arguments in its motions.

management identified as detrimental to its value—the loss of a high-volume, low-cost river barging solution for transporting coal, worse coal quality and quantity than expected, and a slower rate of development than anticipated, among other things. These facts indicated that RTCM might be worth less than the value at which it was being carried on Rio Tinto's books—that is, they indicated it was "impaired." Under the applicable accounting standards, in light of these indications of impairment, Rio Tinto was required to "test" RTCM for impairment by estimating its present value based on the circumstances at the time.

## II. The Court's Role as Gatekeeper for Expert Testimony

Federal Rule of Evidence 702 governs the admissibility of expert testimony. It provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if" (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case. Fed. R. Evid. 702; *see also Packard v. City of New York*, No. 1:15-cv-07130-AT-SDA, 2020 WL 1479016, at *1 (S.D.N.Y. March 25, 2020). "While the proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied, the district court is the ultimate gatekeeper." *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007) (internal citations omitted); *see also Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 597 (1993).

## III. Proffered Expert Witnesses Whose Testimony Should Be Fully Excluded

### A. Robert Edwards

Edwards is not qualified to provide the opinions stated in his report. Edwards' opinions were provided in response to the opinions expressed by Christopher Drewe and Chris Milburn, two SEC-designated experts. Drewe, a chartered accountant, concluded that if RTCM had conducted an impairment test as of June 30, 2012, it would have led to a material impairment in Rio Tinto's 2012 Interim Financial Statements. Milburn, a CPA and chartered business valuator, concluded that the acquisition model was not a viable measure of RTCM's fair market value as of June 30, 2012. In contrast, Edwards is not an accountant, nor does he have any formal education as a valuator. *See*, *e.g.*, Edwards Tr. 22-24; *see also id*. at 22 ("I'm not an accountant, so I'm not qualified to undertake accounting-style valuations or processes."). Instead, Edwards' experience is limited to his background as a mining engineer, and then as an analyst for investment banks, primarily with respect to gold and other metals. Edwards Report ¶¶ 1-6. Nevertheless, Edwards attempts to criticize how Drewe and Milburn followed accounting and valuation principles—in addition to Rio Tinto's own internal guidelines—to reach their opinions. Moreover, no court or arbitral tribunal has ever recognized Edwards as an expert in any field. *See* Edwards Tr. 29-30. Such non-relevant experience does not qualify Edwards to criticize the methodology or opinions expressed by Drewe or Milburn as professional accountants, and as a valuator in Milburn's case. *See Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 642 (S.D.N.Y. 2007) ("Testimony on subject matters unrelated to the witness's area of expertise is prohibited by Rule 702."). Indeed,

Edwards did not offer an opinion as to whether there would have been a material impairment to the value of RTCM at the relevant time—or any opinion on RTCM's value or how Rio Tinto could have determined that value—and when asked whether he could have offered such an opinion, he said that he was not sure, as it would be a "very complex process." Edwards Tr. 20-21.

In addition to his lack of qualifications, Edwards' opinions should also be excluded because they are not based on a reliable methodology. *See Kumho Tire v. Carmichael*, 526 U.S. 137, 152 (1999) (court must "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field"). For example, Edwards opines that Drewe "erroneously relies solely on the internal financial models created by the RTCM business evaluation team" and that both Drewe and Milburn "misunderstand the business unit modeling Process" and "fail to acknowledge and account for the time required to generate reliable business unit models and their inputs." Edwards Report ¶ 21. However, when asked to explain what methodology he used to opine that the RTCM financial models from mid-2012 that Drewe and Milburn relied upon were unreliable, he was unable to provide any basis or methodology, stating only that "[w]ell, there's no – I'm simply stating that the inputs don't appear to be reliable," and that rather than apply his own (or any) methodology, he relied on the "testimony" of others to determine whether the models were reliable. Edwards Tr. 294-96.

Finally, in addition to his lack of qualifications or reliable methodology for his opinions, Edwards' opinions should also be excluded because they are used to convey Defendants' factual narrative, and opine on contested facts, which is an inappropriate use of expert testimony. *See Scentsational Techs., LLC v. Pepsi, Inc.*, No. 13-CV-8645 (KBF), 2018 WL 1889763, *4 (S.D.N.Y. Apr. 18, 2018) ("[E]xperts are not percipient witnesses. They are witnesses who, by virtue of specialized expertise, are able to provide opinions or information beyond the ken of the layperson. It is therefore inappropriate for experts to act as a vehicle to present a factual narrative of interesting or useful documents for a case, in effect simply accumulating and putting together one party's 'story.'"); *see also SEC v. Tourre*, 950 F. Supp. 2d 666, 681 (S.D.N.Y. 2013) (expert "cannot be a conduit for a factual narrative" and "may not invade the province of the jury by 'finding facts' that are in contention"). For example, a large portion of Edwards' report is devoted to defending Rio Tinto's acquisition of Riversdale, inappropriately opining on the factors that influenced the price that Rio Tinto paid during acquisition (¶ 54), why Mozambique was a strategic opportunity for Rio Tinto (¶ 72), how Rio Tinto's acquisition model helped the company to identify operating assumptions (¶ 104), and yet how Rio Tinto was nevertheless "limited" during the acquisition to the information provided by Riversdale (¶ 105). Similarly, Edwards inappropriately opines on the purpose of the RTCM business models (¶ 147), whether, as he "would expect," the middle of 2012 was too early for RTCM to have developed reliable model inputs (¶ 173), and that he agrees with the assessment of certain RTCM employees that it would have been inappropriate to present a definitive valuation at half year 2012 in light of the uncertainties that remained (¶ 183). In short, many of Edwards' opinions in his report simply repeat hearsay information and improperly vouch for the actions and/or opinions of certain Rio Tinto employees.

Hon. Analisa Torres
*SEC v. Rio Tinto*, 1:17-cv-07994-AT-DCF
Pre-Motion *Daubert* Letter
August 28, 2020
Page 4

### B.     Barnaby Fletcher

Fletcher, an analyst who advises companies operating and investing in Africa, purports to opine on whether the government of Mozambique's rejection of RTCM's barging proposal foreclosed RTCM's barging or other infrastructure options in the future. Fletcher's opinions should be excluded as impermissibly speculative. *See Scentsational Techs.*, 2018 WL 1889763 at *3 ("[P]roffered expert testimony should be excluded if it is speculative or conjectural."). Indeed, Fletcher's report is simply a litany of impermissible inferences as to the intent or motive of others, going so far as to attempt to speculate as to the motive and intent of an entire "[g]overnment" of a country. *See* Fletcher Report at 3-4 (opining that "[p]ermitting the use of barging for coal transport aligned with several of the Government's priorities at the time," and "the Government was often flexible and willing to negotiate on matters related to 'mega-projects' or other foreign investment by multinational corporations like Rio Tinto"). "Inferences about the intent or motive of parties or others lie outside the bounds of expert testimony." *In re Rezulin Prods. Liability Litig.*, 309 F. Supp. 2d 531, 547 (S.D.N.Y. 2004).

In addition to offering opinions based solely upon speculation, Fletcher improperly acts as a conduit for factual narrative by describing hearsay documents and building a selective chronology of events in the case from them. *See*, *e.g.*, Fletcher Report at 5-13; *see also Scentsational Techs.*, 2018 WL 1889763 at *4; *Tourre*, 950 F. Supp. 2d at 681. In so doing, Fletcher often impermissibly contradicts the testimony of Rio Tinto's own percipient witnesses.

Finally, Fletcher's testimony should also be excluded because it is irrelevant to the task at hand. *See Packard*, 2020 WL 1479016 at *1-2 (courts must decide "whether the expert's testimony (as to a particular matter) will assist the trier of fact" and to do so expert testimony must be "relevant to the task at hand"). Fletcher opines that the government of Mozambique's rejection of RTCM's barging proposal "did not foreclose RTCM's barging or other infrastructure options *in the future*." Fletcher Report at 3 (emphasis added). But the relevant question is whether RTCM should have taken an impairment *at half-year 2012*; even if Fletcher was correct that barging may have been approved at some undetermined future date, Rio Tinto did not have such approval at the half-year, and Fletcher's testimony will not assist the trier of fact. Similarly, while Fletcher opines on what the government of Mozambique was allegedly thinking when it "threatened or refused to approve project development plans in order to gain leverage in these negotiations," the examples Fletcher provides to illustrate his point all come *after* half-year 2012, and are thus irrelevant to whether RTCM should have taken an impairment at half-year 2012. Fletcher Report at 20.

### IV.    **Proffered Expert Witnesses for Which Specific Testimony Should Be Excluded**

### A.     Peter Christensen

Christensen, a mining engineer, was retained by Defendants to provide an overview of what coal is and how it is used; describe the process for exploring, evaluating, and developing a business plan for potential coal assets; and opine on certain issues relating to Rio Tinto's exploration and mine planning efforts in Mozambique. While Christensen is qualified (at best) to offer general testimony to a jury defining specialized mining terms and explaining technical

Hon. Analisa Torres
*SEC v. Rio Tinto*, 1:17-cv-07994-AT-DCF
Pre-Motion *Daubert* Letter
August 28, 2020
Page 5

mining information, he strays well beyond that permissible area by offering opinions that far exceed his experience and training. He also offers opinions that must be excluded because, to the extent he provides any basis for them at all, he relies entirely on his own personal experience without ever explaining how that experience provides a basis for his conclusions. *See Linkco, Inc. v. Fujitsu Ltd.*, 2002 WL 1585551, at *4 (S.D.N.Y. July 16, 2002) (experts "must provide some explanation for their conclusions, rather than referring generally to their experience"). Indeed, nowhere in his report or his deposition testimony does Christensen identify the particular expertise that he is ostensibly applying to the opinions Defendants asked him to provide. For example, Christensen posits that the development of a coal mine is a complex venture, which takes many years and the outcomes can "vary significantly" from what was "initially projected." Christensen Report at 5. Christensen uses these general observations as the foundation for his extraneous opinion that the timing of the RTCM impairment was "atypical." *Id.* at 6. With no reliable methodology, he muses that RTCM would not have spent "significant resources" in mid-2012 exploring tenements if the "expected return" did not "justify further investment in that project." *Id.* at 53. Christensen then relies on this speculation to support his misguided conclusion that it was only "new [mining] data" learned in late 2012 that caused the RTCM project to no longer be "economic[ly] viable." *Id.* at 67. To the contrary, under the relevant accounting standards and the facts that existed at mid-2012, RTCM was impaired at half-year 2012.

Christensen does not provide any methodology (let alone a reliable one) for arriving at his speculative and unsupported conclusions. For example, in proffering his subjective opinion that another company's impairment taken 12 years after it commenced exploration efforts is more typical than RTCM's time frame for impairment, Christensen testified that his process for determining comparable companies to RTCM was to "**spitball**[]" with a few colleagues and then "I might have tried something random in Google like large mining impairments. That's probably something one of us did." Christensen Tr. 162, 166-167, 171 (emphasis added); *see also id.* at 180-183 ("likely we did some Google searches"). He also testified that his opinion as to the typicality of the impairment was "in no way based on" the relevant accounting standard, but rather was "based on my experience and observations in the industry for a project of this type." *Id.* at 180-183. The Court should exercise its gatekeeping function to exclude such unreliable "expert" testimony. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (courts are not required to "admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert").

Christensen also offers several opinions on the supposed reasonableness of various RTCM actions or thoughts. *See* Christensen Report at 5-6. In addition to improperly speculating as to RTCM's subjective state of mind, *see In re Rezulin Prods. Liability Litig.*, 309 F. Supp. 2d at 547, and providing no discernible methodology for his opinions, *see supra*, much of Christensen's report with respect to these opinions improperly "act[s] as a vehicle to present a factual narrative of interesting or useful documents for a case, in effect simply accumulating and putting together [Defendants] 'story.'" *See Scentsational Techs.*, 2018 WL 1889763 at *4.

    **B.**    **John Lacey**

Lacey proffers opinions with respect to accounting principles relevant to impairment and the impairment process. One of Lacey's proffered opinions is that "a reasonable accountant could

conclude that no indication of impairment existed at half-year 2012 for the RTCM CGU under IFRS 6, which was applicable to the entire RTCM CGU during the Relevant Period." Lacey Report ¶ 31(b). This opinion and any testimony as to impairment under IFRS 6 should be excluded because it is irrelevant. *See Packard*, 2020 WL 1479016 at *1. Rio Tinto did not apply IFRS 6 at half-year 2012, but rather used the standard set forth in IFRS 36, as per its internal accounting policies. Indeed, Lacey's report *concedes* that "during the Relevant Period, Rio Tinto elected to assess the RTCM CGU for impairment in accordance with IAS 36," and *not* IFRS 6. Lacey Report ¶ 31(b). Lacey's counterfactual speculation about what an impairment analysis under IFRS 6 might have looked like is irrelevant, and would only serve to confuse the jury, where it is undisputed that Rio Tinto actually applied a different standard. *Cf. CFTC v. Moncada*, No. 12 CIV. 8791 CM, 2014 WL 2945793, at *5 (S.D.N.Y. June 30, 2014) ("[I]t is not helpful to have an expert … who opines about what a defendant's motives 'might' have been when the defendant himself has testified about what his motives in fact 'were.'"). Lacey should not be allowed to testify regarding his opinion as to IFRS 6.

In addition, Lacey's opinion regarding whether or not it was "reasonable" for Rio Tinto to conclude that there were no indications of impairment for RTCM at half-year 2012 should be excluded. *See, e.g.*, Lacey Report ¶¶ 11, 253. "Such legal conclusions are inadmissible as a matter of law." *Hatala v. Port Auth. of NY & NJ*, No. 15CIV9218ATJCF, 2017 WL 9832293, at *5 (S.D.N.Y. Oct. 30, 2017).

  C. **Glenn Hubbard**

Hubbard was retained by Defendants to, among other things, analyze Rio Tinto security prices after the announcement of the impairment of RTCM and certain statements made by Mr. Albanese in late 2012. Hubbard impermissibly purports to opine on whether certain statements were immaterial to investors. *See* Hubbard Tr. 151 (defining "material" as "something that a reasonable investor would want to know that would be important in changing the price at which that investor would trade a security"); *see also* Hubbard Report ¶ 4 ("I have been asked . . . to independently assess the materiality of the impairment of Rio Tinto Coal Mozambique ("RTCM") and certain statements made by Mr. Albanese in late 2012."). Whether certain statements are material or not is an ultimate issue for the jury to decide in this case. "[N]o witness, expert or otherwise, may testify as to legal conclusions, including whether a particular statement is material or not." *United States v. Mavashev*, No. 08-CR-902(DLI)(MDG), 2010 WL 234773, at *4 (E.D.N.Y. Jan. 14, 2010) (citing *United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1993)). While Hubbard attempts to couch his opinions in terms of "economic" materiality, it is clear from his report and testimony that he is attempting to opine on the ultimate legal issue, and he should be precluded from doing so. *United States v. Bilzerian*, 926 F.2d 1285, 1295 (2d Cir. 1991) ("testimony encompassing an ultimate legal conclusion based upon the facts of the case is not admissible, and may not be made so simply because it is presented in terms of industry practice").

Hubbard should also be prohibited from testifying about an event study he performed related to Rio Tinto bonds, both because he impermissibly claims this establishes "immateriality," *see supra*, and because he failed to follow his own event study methodology by, among other things, failing to establish market efficiency, relying on sparse observed prices, and failing to

Hon. Analisa Torres
*SEC v. Rio Tinto*, 1:17-cv-07994-AT-DCF
Pre-Motion *Daubert* Letter
August 28, 2020
Page 7

employ an industry index. *See, e.g.,* Hubbard Tr. 30-32, 234, 236; *see Kumho Tire v. Carmichael*, 526 U.S. at 152. Indeed, Hubbard's methodology involved studying the trading in only eight out of dozens of different Rio Tinto bonds outstanding in January of 2013. Even though Hubbard selected the most actively trading Rio Tinto bonds, they were still very thinly traded when compared to Rio Tinto ADRs: one of the bonds Hubbard chose to study was involved in only a handful of trades on January 17, 2013, the day at issue, for a *total* of $52,000. Hubbard Tr. 243; *see also id*. at 239-240 (acknowledging that bond event study would involve no trading on 15% or more of days, and even more missing observations, and admitting "I don't know how quantitatively important it is").

The Court should also preclude Hubbard from testifying about his improper application of the event study methodology to the Albanese statements, which consisted of misleading omissions and the reiteration of misleading statements, not an announcement of new information about Rio Tinto. "Such use of an event study is completely improper" because "an event study is designed to quantify the effect of disclosed information, not undisclosed information." Frank Torchio, *Proper Event Study Analysis in Securities Litigation*, 35 Journal of Corporation Law 159, 160 (2009); *see also id.* ("it is improper and a misapplication of event study methodology to draw any conclusion from the lack of statistically significant price reactions on days that merely reiterate the first instance of a misrepresentation"). The Albanese statements were material and served to maintain Rio Tinto's inflated share price, but this is not the proper subject of an event study.

Finally, Hubbard should be precluded from testifying about his critique of the SEC's event study expert for using an industry index that Hubbard claims was insufficiently correlated to what Hubbard claims were rising prices for metals and iron ore on a day the SEC's expert studied. *See, e.g.,* Hubbard Report ¶¶ 57-58. The sources cited in Hubbard's report do not establish that there was *any* increase in iron ore prices announced on the day at issue, let alone that he had done an analysis showing that a particular iron ore price would be expected to impact Rio Tinto's share price. *See* Hubbard Tr. 116-133. Similarly, Hubbard's report does not establish what metals prices were at issue, and he could not testify to doing any analysis showing that those metals prices were relevant to Rio Tinto's share prices. *Id*. at 110-116. Hubbard should not be allowed to critique the SEC's expert for failing to consider certain "news" where Hubbard has failed to establish the existence of the "news" or its relevance to Rio Tinto's share price.

Respectfully submitted,

/s/ *Emily T. Parise*
Emily T. Parise
Securities & Exchange Commission
(202) 551-5169
parisee@sec.gov
Counsel for Plaintiff

cc:     Counsel for Defendants via ECF