

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

January 28, 2021

**Via ECF**
The Honorable Debra Freeman
United States Magistrate Judge
U.S. District Court, Southern District of New York
500 Pearl Street, New York, NY 10007-1312

Re:   *SEC v. Rio Tinto, et al.*, No. 1:17-cv-07994 (AT) (DCF)

Dear Judge Freeman:

Despite having waited three months after this issue seemed to be resolved, Defendants now seek to compel production of protected SEC trial preparation materials. ECF 208. The law is clear that the work of a consulting expert remains protected if it is clearly distinct—as it is here—from opinions about which the expert will testify. The SEC hired Dr. Albert Metz to provide litigation consulting and also to serve as a testifying expert on separate, distinct topics. At his deposition, Dr. Metz explained that his consulting analysis was "not pertinent or relevant to the opinions in either of my reports," ECF 208-9 at 44, and Defendants' own expert unambiguously opined that Dr. Metz expressed no analysis or opinions related to the subject covered by his consulting work. ECF 208-9 ¶123. Defendants inaccurately describe Dr. Metz's consulting work and his opinions, while simultaneously arguing that because Dr. Metz *could have* opined on the subject of his consulting work, he should be required to disclose it.[1]

The Court should reject this effort to compel production of materials that relate solely to Dr. Metz's consulting work. First, Dr. Metz's consulting work relates only to regression analysis of bonds and thus does not relate to his testimonial opinions, which involve regression analysis for equity securities. Second, the SEC did not waive any privilege by allowing Dr. Metz to generally explain the type of work he did, or by providing a privilege log. Finally, Defendants incorrectly assume—without any evidence—that the SEC provided Dr. Metz with undisclosed facts or assumptions that underlie his opinions.

I. **The Federal Rules Protect an Expert's Consulting Work**

A witness retained "to provide expert testimony" must provide a report that discloses "a complete statement of all opinions the witness will express and the basis and

---

[1] Most inaccuracies in Defendants' letter could have been corrected sooner had Defendants accepted the SEC's offer to meet and confer about the privilege log. ECF 208-6 at 5-6.

reasons for them," and "the facts or data considered by the witness in forming them." Fed. R. Civ. P. 26(a)(2)(B). Dr. Metz complied with this obligation, and has disclosed all materials he considered—at any point in his engagement, whether or not he relied on them—in forming the opinions detailed in his reports.

The Rules permit the use of an "expert employed only for trial preparation," and provide that a party ordinarily may not discover "facts known or opinions held by" such an expert. *Id*. 26(b)(4)(D). Adopted as part of the 2010 amendments to the Rule, this protection "establishes a high barrier to discovering opinions of a non-testifying consultant," *Sara Lee Corp. v. Kraft Foods Inc.*, 273 F.R.D. 416, 418 (N.D. Ill. 2011), and "is designed to promote fairness by precluding unreasonable access to an opposing party's diligent trial preparation," and thus "prevent a party from replacing the work of its own experts with that of its opponents." *Ark. Riv. Power Auth. v. Babcock & Wilcox Power Generation Grp., Inc.*, 2015 WL 10521444 (D. Colo. 2015) (internal citation omitted).

"Commonly in litigation involving complex and specialized areas," an expert witness "will perform dual roles, one as testifying expert, and one as consulting expert." *Bro-Tech Corp. v. Thermax, Inc.*, 2008 WL 724627 at *2 (E.D. Pa. Mar. 17, 2008). "If an expert is retained as both a consultant and a testifying witness, the work product doctrine may be invoked to protect work completed by the expert in her consultative capacity as long as there exists a clear distinction between the two roles." *Messier v. Southbury Training School*, 1998 WL 422858, *2 (D. Conn. June 29, 1998). Accordingly, consulting materials have been deemed to have been "considered by the witness in forming" his testimonial opinions where the expert admitted the consulting work related to his testimony, *U.S. v. Clark*, 2019 WL 7116100 at *3 (D. Nev. Dec. 23 2019), or where the expert's testimonial opinions and consulting work were so related that he reviewed the consulting work to prepare for his deposition, *Yeda Research &Dev. Co. v. Abbott GmbH & CO KG*, 292 F.R.D. 97, 114 (D.D.C. 2013), or read from it while testifying. *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 293 F.R.D. 568, 571 (S.D.N.Y. 2013).

On the other hand, consulting materials are clearly distinct from the expert's testimonial opinions, and thus immune from discovery, when the consulting and testifying work involve different parts of the same case, such as different ads, *Sara Lee*, 273 F.R.D. at 419-420, searches of different electronic devices, *Bro-Tech*, 2008 WL 724627 at *2, or "strategy recommendations" distinct from the expert's testimony. *Messier*, 1998 WL 422858 at *2. It is not enough to show a "mere overlap of a generic 'technical' background," between the consulting and testifying work to require disclosure of the consulting work. *Kleiman v. Wright*, 2020 WL 679362 at *12 (S.D. Fla. Nov. 16, 2020).

## II. Dr. Metz's Consulting Work is Distinct From His Testimonial Opinions

### 1. Dr. Metz's Work for the SEC

The SEC retained Dr. Metz to provide litigation consulting followed by an expert report and testimony on certain subjects. In December 2019, Dr. Metz provided an expert report, ECF 208-10, focused on his event studies of prices for trades in Rio Tinto American

2

Depositary Receipts—"ADRs" are equity securities linked to the issuer's common stock—on April 8, 2011, the day Rio Tinto announced the acquisition of a Mozambican coal business at issue in this case, and January 17, 2013, the day Rio Tinto announced it was writing the $3.7 billion asset's value down to $611 million. ECF 208-10 ¶¶27-86; *see also id.* App. C ¶¶1-40. Dr. Metz's work concerning his ADR event study was not related to or informed by his bond consulting work. Dr. Metz found that Rio Tinto ADRs trade in an efficient market and experienced a statistically significant price increase when the acquisition was announced, indicating that investors thought the acquisition added value. Dr. Metz opined that the presence of other, confounding news on the day of the write-down—such as the positive announcement that Albanese had been fired—made it difficult to draw conclusions about ADR price movement for that day. ECF 208-10. None of this work relates to regression analysis of bond trades.

Dr. Metz also gave "a brief introduction and overview of corporate bonds, their pricing and their market structure." ECF 208-10 ¶¶87-112. This "summary of the basic or 'plain vanilla' corporate bond market" is "a basic explanation of how the market perception of a company's risk can impact its cost of debt financing." *Id*. ¶87. "Particularly in complex cases involving the securities industry, expert testimony may help a jury understand unfamiliar terms and concepts," *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991), and experts need not "testify only in the form of opinions." Adv. Comm. Notes to Fed. R. Evid. 702. The bond market primer, which contains no opinions, will help the jury understand evidence about Rio Tinto's marketing of bonds and interactions with credit rating agencies. It is undisputed that, as Defendants' own expert opined, Dr. Metz's report "provides no analysis of the effect of the RTCM Impairment Announcement on Rio Tinto's bond prices or credit ratings." ECF 208-9 ¶¶123, 130, 152, 154.

In April 2020, Dr. Metz submitted a report in rebuttal of Defendants' expert, Dr. Glenn Hubbard, comprised mostly of a critique of how Dr. Hubbard conducted his own ADR event study and the conclusions he drew. *See* ECF 208-11 pp. 8-77, ¶¶11-176. Dr. Hubbard also conducted a regression analysis of bond prices on January 17, 2013 and found no statistically significant movement. Contrary to Defendants' suggestion, Dr. Metz did not provide any opinion or analysis of this bond price regression analysis in his rebuttal report, nor will he be asked to testify about bond price regression analysis at trial. Dr. Hubbard also speculated that Rio Tinto's bond prices and credit ratings would not have gone down in the event of "a hypothetical earlier announcement" of a write-down. Dr. Metz provided a succinct opinion on this hypothetical: "It is pure speculation to assert that because a write down (commingled with confounding positive information) on one date is not associated with bond price movements or credit downgrades, then a similar write down (in isolation) on another day could not have impacted prices or credit ratings." ECF 208-11 ¶180. Dr. Metz's opinion clearly takes Dr. Hubbard's analysis of bond price movements and credit ratings as a given, and simply critiques Dr. Hubbard's "unfounded logical leap." *Id*. Again, the opinions Dr. Metz expressed in his rebuttal report on the subject of regression analysis were strictly limited to ADRs, not regression analysis of bonds.

In mid-2019, before he worked on his expert report, Dr. Metz separately consulted with the SEC about regression analyses of bond price movements in secondary market

trading of certain Rio Tinto bonds on certain days.  Dr. Metz testified that his consulting analyses were "not pertinent or relevant to the opinions in either of my reports and would have been extraneous to have included."  *Id*. at 44.  Dr. Metz said that Dr. Hubbard had performed similar analysis, the conclusions of which were, "in my view, extraneous to the matter at hand."  *Id*. at 45.  When asked if his consulting analysis was not favorable to the SEC, Dr. Metz testified "[n]o, I'm not saying that in any way."  *Id*. at 45.

In its correspondence and privilege log, in a good faith attempt to resolve this dispute, the SEC disclosed to Defendants additional detail about these analyses, ECF 208-4, 208-6, which Dr. Metz summarized in three short memos to SEC staff.  The memos discuss litigation strategies related to regression analysis of secondary market trading in Rio Tinto bonds, and discuss different ways of constructing regression analyses and their limitations.  The memos focus on secondary market trading and do not discuss why or how the terms of any bonds could have been different at the time of issuance.  The August 13, 2019, memo concerns trades in certain Rio Tinto bonds on January 17, 2013, while the September 11 and October 15, 2019 memos deal with a larger set of 33 Rio Tinto bonds traded on January 17, 2013, and additional dates which were not analyzed in the Metz or Hubbard reports.  All three memos discuss theories and questions posed by SEC staff, and the September and October memos summarize discussions with SEC staff.  The October memo also discusses additional bond data Dr. Metz could obtain and analysis he could conduct, which was not done.  The memos clearly describe analysis done to answer SEC staff questions, and do not represent a complete event study of bonds—they represent unfinished regression analysis work and do not include the analysis of market efficiency necessary to an event study.  A comparison of each memo to Dr. Metz's reports confirms his testimony that there is no overlap.  To be clear, the memos do not set forth any facts, data, or assumptions considered by Dr. Metz in forming his testimonial opinions.

### 2. Defendants Mischaracterize Dr. Metz's Clearly Distinct Work

The bond regression analyses Dr. Metz performed as a consultant are clearly distinct from his testimonial opinions about the reaction of ADR prices to certain events, which do not involve regression analysis of bond prices.  There are important differences between bonds and equity securities such as ADRs, *see* ECF 208-10 ¶¶89, 91, 108, 110, and hence Dr. Hubbard himself used different regression analysis methods for bonds as opposed to ADRs.  *See* ECF 208-9 ¶¶64-66, 126-28.  Dr. Metz used different regression programs in his consulting work on bonds than he did for his testimonial work on ADRs.  As such, Dr. Metz did not consider the consulting work in forming his testimonial opinions—and could not have considered that work—because it "was not pertinent or relevant to the opinions" and "would have been extraneous."  ECF 208-8 at 44.  Instead, the memos on their faces are meant to discuss litigation strategy with SEC staff, and are protected from disclosure under Rule 26(b)(4)(D).

*Sara Lee*, 273 F.R.D. at 417, is instructive.  There, two hot dog makers accused each other of deceptive advertising.  Kraft hired an expert "to testify about one of Plaintiff's advertisements and to consult, but not testify, about another."  *Id*.  In acting as a consultant, the expert "did nothing more than advise defense counsel how they might conduct pilot

surveys" of a different ad on which the expert did not opine in his report and testimony. *Id*. at 418. The witness was thus a "testifying expert" for one ad and a "non-testifying consultant" for the second ad. *Id*. at 420. He had "not expressed any opinion regarding" the second ad and "will not offer any testimony with respect to it at trial." *Id*. Because "the requested materials on their face relate only to the" second ad, the court held "that they were generated uniquely in the expert's role as a consultant." *Id.*

Indeed, courts consistently reject attempts to pierce Rule 26(b)(4)(D) protection where the expert consults on a part of a case that is separate from his testimonial opinion. *See Bro-Tech*, 2008 WL 724627, at *2 (overruling magistrate's order to produce the consulting analysis because the testimonial report "exclusively concerned the contents of other devices"); *see also id. Kleiman* 2020 WL 6729362 at *12 ("mere overlap of a generic 'technical' background" between consulting and testimonial work insufficient to pierce Rule 26(b)(4)(D) where expert testified his consulting was not related to drafting of his report). Courts likewise routinely deny motions to compel where an expert's consulting work relates to litigation strategy and not his own testimonial opinions. There is "no obligation to disclose" expert notes prepared "in a consultative role, dealing strictly with strategy recommendations" to counsel, *Messier*, 1998 WL 422858 at *2, and notes that only served "to prepare Plaintiff's counsel for deposing Defendant's expert and to help counsel understand the reports provided by Defendant's expert" are "protected work product" because they were not considered "in developing the opinions *that he will provide at trial*." *Int'l Aloe Science Council Inc. v. Fruit of the Earth, Inc.*, 2012 WL 1900536 at *2 (D. Md. May 23, 2012) (emphasis in original). Dr. Metz's bond memos clearly discuss strategy considerations with counsel, unrelated to his testimonial opinions.

The materials Dr. Metz considered when conducting his consulting analyses are also not subject to disclosure. First, he obtained Rio Tinto bond trade data from a widely available subscription database. Second, he subjected that data to regression analysis computer programs that he created with his team specifically for the bond analyses summarized in the memos.[2] These materials do not relate to any testimonial opinions.

Defendants speculate that Dr. Metz *must* have considered his consulting work in forming his opinions in this case, because Dr. Hubbard conducted a bond regression analysis, and Dr. Metz *could* have opined on that analysis. But he did not so opine, and the Rules require disclosure of "facts and data considered by the witness in forming" "all opinions the witness *will express*." Rule 26(a)(2)(B). The Rules clearly do not reach

---

[2] In their letter to the Court, Defendants mischaracterize the analysis at issue. While they now state they seek production of "analyses of Rio Tinto's bond prices and credit ratings," ECF 208 at 1, they have not mentioned credit ratings in their correspondence, the privilege log specifies that the consulting analysis only concerned bonds, ECF 208-6, and Dr. Metz testified that he did not consult on credit ratings. ECF 208-8 at 46:2-5. In addition, Defendants claim that Dr. Metz consulted about "bonds issued" on certain dates, ECF 208 at 3, but Rio Tinto did not issue bonds on any of these dates. Rather, Dr. Metz analyzed trading in previously issued bonds. These factual mistakes are important, because they blur an otherwise clear line between Dr. Metz's consulting work and testimonial opinions.

5

opinions the expert will *not* express, but theoretically could form. If that were the rule, it would swallow the exception that testifying experts can consult on subjects that are related to the same case but distinct from their testimonial opinions.

Furthermore, Defendants cite cases with starkly different facts. In *Yeda Research*, for instance, a scientist's consulting work consisted of observing and opining about processes that were "part of the very protocol contained in the" patent application at issue in his testimony, and he read his consulting report "in preparation for his fact deposition in this case." 292 F.R.D. at 114. The expert in *MTBE* conducted consulting work that was so relevant to the opinions in his report that he brought a spreadsheet summarizing that analysis to his deposition, read from it when answering questions, and said it "contains information . . . relate[d] to the issue we have been discussing." *MTBE*, 293 F.R.D. at 576-77. Similarly, in *Clark*, an expert valued property using two methods and arrived at different conclusions. 2019 WL 7116100 at * 1. He sought to testify about one valuation and not disclose the other, even though he testified that his earlier appraisal would be relevant to evaluating the later appraisal on which he opined. *Id*. at *1 n.1. These cases do not support the relief Defendants seek, because Dr. Metz's consulting work does not relate to his testimonial opinions, he did not and does not seek to testify about the consulting work, and he disclosed all analysis, facts, and data related to his testimonial opinions.

### III.     The SEC Did Not Waive The Protections of Rule 26

Defendants claim the SEC has waived protection for Dr. Metz's non-testimonial consulting work because, when defense counsel asked him at his deposition if he performed economic analysis of bonds in a consulting capacity, he said yes and explained that "Dr. Hubbard conducted a similar analysis and reached a similar conclusion . . ." ECF 208 at 4-5. Dr. Metz provided no more than the kind of information found in a privilege log. Unlike the experts in *Yeda Research* and *MTBE*, he did not seek to rely on his consulting work in his deposition. *See, e.g., MTBE*, 293 F.R.D. at 578 ("when a testifying expert considers factual information in forming an opinion that she intends to offer at trial, an unconditional claim of privilege cannot be maintained"). Courts are split as to whether the protections of Rule 26(b)(4)(D) are even subject to waiver, *see Eidos Display, LLC v. Chunghwa Picture Tubes, Ltd.*, 296 F.R.D. 3, 6-8 (D.D.C. July 25, 2013), but courts are consistent in finding that waivers occur only upon disclosure of a "significant part of the privileged matter." *Hartford Fire Ins. Co. v. Pure Air on the Lake Ltd. Ptshp.*, 154 F.R.D. 202, 211 (N.D. Ind. 1993). The SEC has diligently protected its privilege, with no waiver.

### IV.     The Metz Memos Do Not Reflect Discoverable Facts or Assumptions

The Metz memos are protected communications. Rule 26(b)(4)(C). Defendants speculate that they may reflect facts or assumptions provided by the SEC and considered by Dr. Metz in forming opinions. An examination of the memos shows the SEC did not provide Dr. Metz with facts or data for his bond regression analysis—which does not relate to his testimonial opinions—because he obtained bond price data on his own. Nor do the memos reveal any assumptions provided by the SEC, let alone any that Dr. Metz "relied on in forming the opinions to be expressed." Rule 26(b)(4)(C)(iii).

\*\*\*

For the foregoing reasons, the Court should deny Defendants' request to compel production of Dr. Metz's consulting analysis.

Sincerely,

/s/ Tom Bednar

Thomas A. Bednar
Supervisory Trial Counsel
U.S. Securities & Exchange Commission
100 F Street NE, Washington, DC 20549
(202) 551-6218
Bednart@sec.gov

cc: All Defense Counsel