**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------x

SECURITIES AND EXCHANGE
COMMISSION,

                Plaintiff,

     v.

RIO TINTO PLC, RIO TINTO LIMITED,
THOMAS ALBANESE, and GUY ROBERT
ELLIOTT,

              Defendants.

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

Case No. 17 Civ. 7994 (AT) (DCF)

---------------------------------------------------------x

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' CONSOLIDATED *DAUBERT* MOTIONS
## TO EXCLUDE EXPERT OPINIONS AND TESTIMONY

## TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................... 1

FACTUAL BACKGROUND ............................................................................... 7

LEGAL STANDARD........................................................................................... 9

ARGUMENT ...................................................................................................... 11

    I.    The Court Should Exclude Certain Opinions By Metz. ..................... 11

        A.    Metz's Opinions.................................................................... 11

        B.    Metz's Opinion that the RTCM Impairment "Could Well Have" Affected Rio Tinto's Stock Price Is Speculative, Prejudicial, and Unreliable................................................................... 13

        C.    Metz's Opinions on Artificial Price Inflation and Hypothetical Bond Prices Are Speculative, Unreliable, and Prejudicial. ............................... 18

        D.    Metz's Opinion that the April 2011 Riversdale Acquisition Affected the Stock Price Is Irrelevant and Unreliable. ........................................... 20

    II.    The Court Should Exclude Brice's Opinions On Unrelated Impairments........... 24

        A.    Brice's Opinions ...................................................................... 25

        B.    Brice's Opinions Regarding Unrelated Impairments Are Irrelevant, Prejudicial, and Unreliable....................................................... 26

    III.    The Court Should Exclude Certain Opinions By Milburn.................................. 33

        A.    Milburn's Opinions................................................................... 34

        B.    Milburn's Opinions in His Opening Report Are Speculative, Unreliable, and Irrelevant. ....................................................... 35

            1.    Milburn's Opinions about the Utility of the Acquisition Model at YE 2011 and HY 2012 Are Unsubstantiated and Irrelevant. ............................................ 35

            2.    Milburn's Opinions about the Use of the RTCM BU Model at HY 2012 Are Unreliable. ....................................... 37

            3.    Milburn's Opinions about the RTCM BU Model and Its Functionality Are Irrelevant....................................... 40

**TABLE OF CONTENTS**
**(continued)**

**Page**

C.  Milburn's Opinions in His Rebuttal Report Are Untimely, Unreliable, and Beyond His Expertise.................................................... 41

1.  Milburn's Valuations of Minjova and Opinions on Comparable Transactions Are Untimely under FRCP 26............ 42

2.  Milburn's Valuations of Minjova Are Unreliable. ...................... 43

3.  Milburn's Opinion on Rio Tinto's Comparable-Transactions Analysis Is Unreliable. ........................................... 46

4.  Milburn's Responses to the Edwards and Christensen Reports Are Not Within His Expertise. ....................................... 47

IV.  The Court Should Exclude Drewe's Opinions And Testimony Entirely............. 52

A.  Drewe's Opinions .................................................................................. 53

B.  Drewe Admits He Lacks Relevant Expertise for His Opinions.............. 55

C.  Drewe's Calculation of RTCM's Value at HY 2012 Is Not Based  on a Reliable Methodology. .......................................................................... 57

1.  Drewe Ignored—and Violated—Established Standards for the Valuation of Mineral Assets. .................................................... 57

2.  Drewe Started with an Early Business Planning Model the Assumptions of Which Were Rejected, Superseded, and Never Pursued. ........................................................................... 61

3.  Drewe's Analysis Ended with a Nonsensical Business Configuration. ........................................................................... 62

4.  Drewe Improperly Relied on Post-HY 2012 Developments. ...... 65

V.  The Court Should Exclude Weber's Opinions And Testimony Entirely............. 67

A.  Weber's Testimony Will Not Help the Jury. ........................................... 68

B.  Weber's Testimony also Should Be Excluded under FRE 403. .............. 72

CONCLUSION..................................................................................................... 75

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*523 IP LLC v. CureMD.com*,
  48 F. Supp. 3d 600 (S.D.N.Y. 2014)...........................................................................10, 50

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
  2014 WL 7882100 (E.D.N.Y. Oct. 15, 2014).................................................................18, 19

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
  303 F.3d 256 (2d Cir. 2002)...........................................10, 15, 17, 35, 36, 40, 57

*Andrews v. Metro N. Commuter R.R. Co.*,
  882 F.2d 705 (2d Cir. 1989)...........................................................................10, 29

*Arista Records LLC v. Lime Grp. LLC*,
  2011 WL 1674796 (S.D.N.Y. May 2, 2011) ...........................................................26, 72

*AUSA Life Ins. Co. v. Dwyer*,
  899 F. Supp. 1200 (S.D.N.Y. 1995).....................................................................73

*Bayoh v. Afropunk LLC*,
  2020 WL 6269300 (S.D.N.Y. Oct. 26, 2020) ...........................................................71

*Boucher v. U.S. Suzuki Motor Corp.*,
  73 F.3d 18 (2d Cir. 1996) .............................................................................10

*Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Sec. (USA) LLC*,
  752 F.3d 82 (1st Cir. 2014)............................................................................23, 24

*Buck v. Ford Motor Co.*,
  810 F. Supp. 2d 815 (N.D. Ohio 2011)...............................................................33

*Buckley v. Deloitte & Touche USA LLP*,
  888 F. Supp. 2d 404 (S.D.N.Y. 2012)...............................................................20

*Busher v. Barry*,
  2019 WL 6895281 (S.D.N.Y. Dec. 18, 2019) .........................................................69

*Chill v. Calamos Advisors LLC*,
  417 F. Supp. 3d 208 (S.D.N.Y. 2019)................................................................51

*Daubert v. Merrell Dow Pharm., Inc.*,
  509 U.S. 579 (1993)....................................................9, 10, 26, 35, 36, 40, 67

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Deutsch v. Novartis Pharm. Corp.*,
    768 F. Supp. 2d 420 (E.D.N.Y. 2011) ...................................................................58

*Ebbert v. Nassau County*,
    2008 WL 4443238 (E.D.N.Y. Sept. 26, 2008) .......................................................43

*Paine ex rel. Eilman v. Johnson*,
    2010 WL 749851 (N.D. Ill. Feb. 25, 2010) .....................................................47, 59

*In re Exec. Telecard, Ltd. Sec. Litig.*,
    979 F. Supp. 1021 (S.D.N.Y. 1997)...................................................14, 19, 23, 24

*FHFA v. Nomura Holding Am., Inc.*,
    2015 WL 731209 (S.D.N.Y. Feb. 20, 2015)..........................................................75

*Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*,
    2020 WL 4251229 (S.D.N.Y. Feb. 19, 2020)..............................14, 19, 20, 21, 35, 36, 39, 40

*In re Fresh Del Monte Pineapples Antitrust Litig.*,
    2009 WL 3241401 (S.D.N.Y. Sept. 30, 2009)......................................16, 39, 41, 45

*Gen. Elec. Co. v. Joiner*,
    522 U.S. 136 (1997)........................................................................................10, 59

*Hygh v. Jacobs*,
    961 F.2d 359 (2d Cir. 1992)...................................................................................75

*IBM v. Fasco Indus., Inc.*,
    1995 WL 115421 (N.D. Cal. Mar. 15, 1995)........................................................43

*In re Imperial Credit Indus., Inc. Sec. Litig.*,
    252 F. Supp. 2d 1005 (C.D. Cal. 2003) ...............................................................14

*Jorgensen Forge Corp. v. Consarc Corp.*,
    2002 WL 34363668 (W.D. Wash. Jan. 9, 2002)....................................................42

*Kumho Tire Co. v. Carmichael*,
    526 U.S. 137 (1999)........................................................................................41, 44

*LaSalle Bank Nat'l Ass'n v. CIBC Inc.*,
    2012 WL 466785 (S.D.N.Y. Feb. 14, 2012).....................................................49, 60

*Laumann v. Nat'l Hockey League*,
    117 F. Supp. 3d 299 (S.D.N.Y. 2015)................................................................2, 20

iv

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
  299 F. Supp. 3d 430 (S.D.N.Y. 2018)......................................14, 16, 21, 22, 30, 38, 45, 47, 58

*Linde v. Arab Bank, PLC*,
  922 F. Supp. 2d 316 (E.D.N.Y. 2013) ...................................................................................71

*Lopez v. Ctpartners Exec. Search Inc.*,
  173 F. Supp. 3d 12 (S.D.N.Y. 2016)......................................................................................66

*In re Lyman Good Dietary Supplements Litig.*,
  2019 WL 5682880 (S.D.N.Y. Oct. 31, 2019) ...........................................................26, 28, 29

*Malletier v. Dooney & Bourke, Inc.*,
  525 F. Supp. 2d 558 (S.D.N.Y. 2007)..............................................................................18, 19

*Mastercard Int'l Inc. v. First Nat'l Bank of Omaha, Inc.*,
  2004 WL 326708 (S.D.N.Y. Feb. 23, 2004)..........................................................................22

*MF Glob. Holdings Ltd. v. PricewaterhouseCoopers LLP*,
  232 F. Supp. 3d 558 (S.D.N.Y. 2017).......................................................................42, 43, 51

*Miller v. Four Winds Int'l Corp.*,
  2012 WL 465445 (D. Idaho Feb. 13, 2012)....................................................................29, 30

*In re Mirena IUD Prods. Liab. Litig.*,
  169 F. Supp. 3d 396 (S.D.N.Y. 2016)....................................................................................21

*In re MV MSC Flaminia*,
  2017 WL 3208598 (S.D.N.Y. July 28, 2017) ..................................................................50, 57

*Myers v. Ill. Cent. R.R. Co.*,
  629 F.3d 639 (7th Cir. 2010) .................................................................................................33

*In re N. Telecom Sec. Litig.*,
  116 F. Supp. 2d 446 (S.D.N.Y. 2000)....................................................................................14

*Newell Rubbermaid, Inc. v. Raymond Corp.*,
  2010 WL 2643417 (N.D. Ohio July 1, 2010) ........................................................................32

*Nimely v. City of New York*,
  414 F.3d 381 (2d Cir. 2005)...........................................................................10, 18, 19, 75

*Noffsinger v. Valspar Corp.*,
  2011 WL 9795 (N.D. Ill. Jan. 3, 2011) .................................................................................43

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Packard v. City of New York*,
2020 WL 1479016 (S.D.N.Y. Mar. 25, 2020) ................................................................1, 9, 10

*Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec. LLC*,
691 F. Supp. 2d 448 (S.D.N.Y. 2010)........................................................................42

*In re Pfizer Inc. Sec. Litig.*,
819 F.3d 642 (2d Cir. 2016)............................................................14, 19, 30, 33

*Popovich v. Sony Music Entm't*,
2005 WL 1126756 (N.D. Ohio May 2, 2005) ..............................................................61

*Price v. Fox Entm't Grp., Inc.*,
499 F. Supp. 2d 382 (S.D.N.Y. 2007)........................................................................73

*Procter & Gamble Co. v. McNeil-PPC, Inc.*,
615 F. Supp. 2d 832 (W.D. Wis. 2009) ........................................................................42

*Protostorm LLC v. Antonelli, Terry, Stout & Kraus, LLP*,
2014 WL 12788845 (E.D.N.Y. Mar. 31, 2014)............................................................38, 45

*Querub v. Hong Kong*,
649 F. App'x 55 (2d Cir. 2016) ........................................................................69

*In re Reserve Fund Sec. & Derivative Litig.*,
2012 WL 12356742 (S.D.N.Y. Sept. 10, 2012)............................................................29, 70

*In re Rezulin Prods. Liab. Litig.*,
309 F. Supp. 2d 531 (S.D.N.Y. 2004)........................................................................21

*In re Rezulin Prods. Liab. Litig.*,
369 F. Supp. 2d 398 (S.D.N.Y. 2005)........................................................................16, 17

*Richman v. Respironics, Inc.*,
2012 WL 13102265 (S.D.N.Y. Mar. 13, 2012) ..............................................................43

*Scott v. Chipotle Mexican Grill, Inc.*,
315 F.R.D. 33 (S.D.N.Y. 2016) ........................................................................75

*Seawell v. Brown*,
2010 WL 11561287 (S.D. Ohio Sept. 9, 2010) ..............................................................66

*SEC v. Ferrone*,
163 F. Supp. 3d 549 (N.D. Ill. Feb. 22, 2016) ..............................................................72

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*SEC v. Jensen*,
   835 F.3d 1100 (9th Cir. 2016) ...................................................................66

*SEC v. Life Partners Holdings, Inc.*,
   2013 WL 12076933 (W.D. Tex. Oct. 23, 2013) ........................................69

*SEC v. Mudd*,
   2016 WL 2593980 (S.D.N.Y. May 4, 2016) ...............................68, 70, 74

*SEC v. U.S. Envtl., Inc.*,
   2002 WL 31323832 (S.D.N.Y. Oct. 16, 2002) ..........................................75

*Smith v. Allstate Ins. Co.*,
   912 F. Supp. 2d 242 (W.D. Pa. 2012) ...................................................49, 60

*Sun Ins. Mktg. Network, Inc. v. AIG Life Ins. Co.*,
   254 F. Supp. 2d 1239 (M.D. Fla. 2003) ................................................49, 55

*Talley v. Novartis Pharm. Corp.*,
   2011 WL 7941938 (W.D.N.C. June 28, 2011) ...........................................66

*In re TFT-LCT (Flag Panel) Antitrust Litig.*,
   2012 WL 12919150 (N.D. Cal. July 13, 2012) ..........................................43

*U.S. CFTC v. Wilson*,
   2016 WL 7229056 (S.D.N.Y. Sept. 30, 2016) ...........................................14

*U.S. Info. Sys., Inc. v. IBEW Local Union No. 3*,
   313 F. Supp. 2d 213 (S.D.N.Y. 2004) ........................................................52

*United States v. Kahn*,
   711 F. Supp. 2d 9 (D.D.C. 2010) ...............................................................68

*United States v. Kokenis*,
   662 F.3d 919 (7th Cir. 2011) ......................................................................69

*United States v. Lumpkin*,
   192 F.3d 280 (2d Cir. 1999) .......................................................................10

*United States v. Stewart*,
   433 F.3d 273 (2d Cir. 2006) ..................................................................68, 70

*United States v. Tomasetta*,
   2011 WL 6382562 (S.D.N.Y. Dec. 12, 2011) ...........................................69

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*United States v. Williams*,
  506 F.3d 151 (2d Cir. 2007) .................................................... 10

*In re Vivendi, S.A. Sec. Litig.*,
  838 F.3d 223 (2d Cir. 2016) .................................................... 23

*Washington v. Kellwood Co.*,
  105 F. Supp. 3d 293 (S.D.N.Y. 2015) ................................. 50, 55, 57, 67

*In re Williams Sec. Litig.*,
  496 F. Supp. 2d 1195 (N.D. Okla. 2007) .............................. 48, 55

*Williams v. Mosaic Fertilizer, LLC*,
  889 F.3d 1239 (11th Cir. 2018) ............................................. 46

*Woolgar v. Kingstone Cos., Inc.*,
  2020 WL 4586792 (S.D.N.Y. Aug. 10, 2020) ....................... 66

**Rules**

Fed. R. Civ. P. 26(a)(2)(B) ....................................................... 42

Fed. R. Evid. 403 ............................... 11, 18, 19, 21, 26, 29, 36, 39, 40

Fed. R. Evid. 702 ................................................... 18, 47, 55

Fed. R. Evid. 702(a) .............................................. 26, 29, 35, 68

Fed. R. Evid. 702(b) ................................................................. 13

Fed. R. Evid. 702(c) .............................................. 13, 35, 43, 57

**Regulations**

17 C.F.R. §240.10A-3(b)(2) ..................................................... 74

**Other Authorities**

J. Adams and S. Mansi,
  "CEO turnover and bondholder wealth,"
  33 *J. of Banking & Fin.* 522 (2009) ..................................... 17

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

AS 2201: An Audit of Internal Control Over Financial Reporting That Is
    Integrated with An Audit of Financial Statements, PCAOB
    ("Effective Date of Standard: Fiscal years ending on or after Nov. 15, 2007")......................74

Barrick Gold Corporation,
    Technical Report on the Lumwana Mine, Mar. 16, 2012.......................................................27

K. Borokhovich, R. Parrino, and T. Trapani,
    "Outside Directors and CEO Selection,"
    31 *J. of Fin. & Quant. Analysis* 337 (1996)............................................................................17

C. Ferreira-Marques and S. Young,
    "Lonmin Rebuffs Xstrata Proposals to Take Control," Reuters, Nov. 9, 2012 ......................28

M. Huson, P. Malatesta, and R. Parrino,
    "Managerial Succession and Firm Performance,"
    74 *J. of Fin. Econ.* 237 (2004) ..............................................................................................17

D. Worrell, W. Davidson III, and J. Glascock,
    "Stockholder Reactions to Departures and Appointments of Key Executives
    Attributable to Firings," 36 *Acad. of Mgmt. J.* 387 (1993).....................................................17

Defendants Rio Tinto PLC and Rio Tinto Limited (collectively, "Rio Tinto"), Thomas Albanese, and Guy Robert Elliott (together, "Defendants") respectfully move to exclude certain opinions and testimony of the Securities and Exchange Commission's ("SEC") expert witnesses.

## INTRODUCTION

This case is a textbook illustration of why district courts are tasked with being vigilant "gatekeepers of expert testimony." *Packard v. City of New York*, 2020 WL 1479016, at *1 (S.D.N.Y. Mar. 25, 2020) (Torres, J.). Fact discovery has destroyed the SEC's theory that Rio Tinto committed fraud in failing to impair the carrying value of an undeveloped and recently acquired coal-mining asset in Mozambique (named RTCM) a few months earlier than it did. The SEC has therefore sought to use expert testimony from five witnesses—Albert Metz, Steven Brice, Chris Milburn, Christopher Drewe, and Joseph Weber—to mask the gaping holes in its case. Given the lopsided factual record, the SEC's experts frequently have been forced to resort to bald speculation, unconventional and unproven methodologies, and opinions well beyond their expertise. The Court should exercise its gatekeeping role and exclude significant portions of the opinions of three SEC experts and exclude all opinions and testimony of two SEC experts.

This Court previously dismissed all but a handful of the SEC's claims. The only surviving Section 10(b) claims are against Rio Tinto and Mr. Albanese and are premised on three statements by Mr. Albanese from August and November 2012 (the "Albanese Statements"). *See* ECF 135 at 24–25. The remaining claims are premised on purported misstatements and omissions in accounting papers from RTCM's Half-Year ("HY") 2012 impairment review, which allegedly led to a false $3.4 billion carrying value for RTCM in Rio Tinto's HY 2012 Report, *see id.* at 38–47.

The SEC has proffered five experts: one on materiality issues (Metz), three on HY 2012 accounting issues (Brice, Milburn, and Drewe), and one offering background on financial topics (Weber). Defendants also proffered five experts: one each on materiality (Glenn Hubbard), coal

1

issues (Peter Christensen), Mozambican government relations (Barnaby Fletcher), the HY 2012 accounting (John Lacey), and mining valuation (Robert Edwards). As will be explained in Defendants' summary judgment motion, while Defendants are entitled to judgment regardless, exclusion of certain SEC expert opinions would only reinforce Defendants' already strong arguments that the SEC cannot establish key elements of its claims—*e.g.*, the materiality of the Albanese Statements or the RTCM impairment, or that RTCM was impaired at HY 2012 when no one involved in the HY 2012 review believed RTCM had any indication of impairment.

**Materiality (Metz):** Because the factual record clearly shows the market was indifferent to RTCM's impairment, Dr. Albert Metz could offer only rank speculation and unreliable opinions. Metz found no statistically significant change in the stock price when the impairment was announced, Ex. 7, Metz Rpt. ¶ 63, and he was not asked to opine on any impact on Rio Tinto's bond prices—as he had already found *no* such impact, Ex. 16 (Metz) at 44:5–46:9.[1]

As these findings are fatal to the SEC's case, Metz resorted to conjecture and unreliable opinion "for the sole purpose of bolstering [the SEC's] position." *Laumann v. Nat'l Hockey League*, 117 F. Supp. 3d 299, 319 (S.D.N.Y. 2015). He tried to bolster the SEC's ability to establish materiality in three ways. First, Metz speculated the impairment "could well have" affected the stock price, Ex. 7, Metz Rpt. ¶ 86, but then admitted he "had no statistical evidence" of such price impact and "didn't conduct any analysis" to "measure" it, Ex. 16 (Metz) at 214:7–215:21. Next, he offered bald hypotheses as to the Albanese Statements and the impairment's effect on Rio Tinto's bond prices: a "hypothetical" discussion of artificial price inflation theorizing that the Albanese Statements merely "could serve"—not that they did serve—to "maintain or increase . . .

---

[1] Docket citations are styled as "ECF __," Defendants' Statement of Undisputed Facts (ECF 203-1) as "SUF ¶ __," exhibits to the attached Declaration of Richard W. Grime as "Ex. __," and depositions as, *e.g.*, "Ex. 18 (Weber) at 12:34."

artificial inflation," Ex. 8, Metz Rebuttal ¶¶ 185, 187, and a "hypothetical illustration" of how the price of Rio Tinto's bond offerings "might have changed" in a counterfactual world, *id.* ¶ 106 & n.112, when Metz knew there was no such change in the real world.  Finally, Metz tried to deem the *impairment* significant based on the market's reaction to one part of the *acquisition* twenty months earlier, *id.* ¶¶ 53–61, even though the latter is not relevant to the materiality of any statements at issue, *see* Ex. 15 (Hubbard) at 134:9–135:21.  Each of these opinions should be excluded as speculation or junk science.

**HY 2012 Accounting (Brice, Milburn, Drewe):**  At HY 2012, Rio Tinto undertook an impairment analysis under the two-step process laid out in International Accounting Standard ("IAS") 36, which provides that at Step One, an entity must assess if "there is any indication that [the] asset may be impaired"; if so, at Step Two, the entity must prepare a formal estimate of the asset's recoverable amount—and the asset is impaired if that formal estimate is less than the carrying amount.  SUF ¶¶ 235, 244.  At HY 2012, RTCM, Rio Tinto Energy (RTCM's product group), Rio Tinto's Controller's Office, Rio Tinto's Audit Committee, and Rio Tinto's independent auditor PricewaterhouseCoopers ("PwC") all agreed that RTCM had no impairment indicators at Step One and, hence, Step Two was not required.  SUF ¶¶ 244, 292–293.  That determination rested in large part on Rio Tinto's opinions about the quantity and quality of available coal at RTCM and its ability to develop an infrastructure solution to transport RTCM's coal to market—judgments firmly supported by the factual record and the opinions of Defendants' experts on coal (Christensen) and the political and business environment in Mozambique (Fletcher).

Because the SEC did not offer a coal or Mozambique country expert to opine on the facts on the ground, it instead rested its theory that RTCM should have been impaired at HY 2012 on a three-legged stool made of:  (1) Brice's opinion, based in part on several unrelated impairments,

that at Step One of an impairment analysis RTCM had indications of impairment at HY 2012 and thus Step Two was required; (2) Milburn's opinion on the proper approach to valuing mineral assets, such as RTCM, at Step Two of the analysis; and (3) Drewe's opinion as to RTCM's formal estimate of recoverable amount at Step Two, even though he admits he lacks expertise to value mining assets, Ex. 14 (Drewe) at 54:14–25, and did not follow the "best practices" set forth by Milburn, Ex. 10, Milburn Rebuttal ¶ 2.122. The Court should exclude each of these opinions.

**Brice:** *First*, the SEC did not even ask its *accounting* expert, Steven Brice, to opine that RTCM was impaired at HY 2012. Rather, Brice opined only that RTCM had indications of impairment at Step One, meaning Rio Tinto should have proceeded to Step Two to determine whether RTCM was actually impaired. Ex. 1, Brice Rpt. ¶¶ 2.1.6–2.1.7. But even this opinion rests on certain unrelated and cherry-picked impairments by Rio Tinto and other mining companies that, in Brice's view, "demonstrate" how certain accounting provisions "are applied in practice." *Id.* ¶¶ 5.5.1, 9.5.11, 9.5.15–9.5.17, 9.5.22–9.5.26, 11.5.4–11.5.5; App'x E. Although Brice conceded that "as part of the [impairment] assessment . . . you need to consider the facts and circumstances about an event," Ex. 12 (Brice) at 141:15–142:3, he performed only a cursory review of public disclosures about these unrelated impairments. He neither knows nor made any attempt to learn the underlying facts and circumstances of the impairments he used as comparators; conducted no real analysis to determine whether they were analogous to the facts of this case; and ultimately agreed their "relevance . . . was relatively low." *Id.* at 341:24–371:5, 399:5–400:8. His opinions on these unrelated impairments should be excluded.

**Milburn:** *Second*, the SEC proffered Chris Milburn to opine on the appropriate analysis for determining RTCM's fair market value ("FMV") if Rio Tinto had conducted Step Two of an impairment analysis. Milburn's Opening Report offered two core opinions at issue here. Milburn

opined that (1) the valuation model Rio Tinto used in connection with RTCM's acquisition (the "RTCM Acquisition Model") could not "provide[ ] a reliable measure of" RTCM's FMV at HY 2012, Ex. 9, Milburn Rpt. ¶¶ 5.1, 5.5, but that (2) RTCM's *later-developed* internal business models could have done so, assuming they were populated with reliable inputs, *id.* ¶ 5.10.  The first opinion is irrelevant, as the evidence makes clear that no one at Rio Tinto believed that the RTCM Acquisition Model *was* a reliable measure of RTCM's FMV at HY 2012, or that, as Milburn assumed, an infrastructure option for transporting the coal by barge down the Zambezi River was permanently foreclosed; and his opinion is a straw man, inaccurately implying that Rio Tinto used the attendant assumptions of the RTCM Acquisition Model at HY 2012, which is contrary to the record.  Milburn's second opinion would not help the jury, as he explained at his deposition that he intended to make only the obvious point that the formulas in Rio Tinto's Excel spreadsheets were capable of producing outputs reflecting the inputs. Ex. 17 (Milburn) at 229:18–233:13.  The Court should exclude these unhelpful and potentially misleading opinions.

Milburn was even further out of his depth in his Rebuttal Report, which includes three new opinions:  two valuations of Minjova, an adjacent property; and a critique of a comparable-transactions analysis Rio Tinto conducted at HY 2012.  Ex. 10, Milburn Rebuttal ¶¶ 2.33–2.104, 4.43–4.51.  The Court should exclude these opinions because they far exceed the scope of a proper "rebuttal" report and contradict Milburn's own stated methodology and industry-accepted requirements.  He also improperly responded to Defendants' experts by offering opinions on accounting and internal Rio Tinto documents that are well beyond the scope of his asserted expertise.

**Drewe:** *Third*, the SEC asked Christopher Drewe to opine on RTCM's HY 2012 valuation at Step Two of an impairment analysis, Ex. 3, Drewe Rpt. ¶ 1.3.4—an analysis Drewe was not qualified to undertake.  According to the SEC's own expert Milburn, an expert in the "specialty

area of valuation" of mineral assets "must understand the mining industry and have experience with the valuation of mineral projects." Ex. 9, Milburn Rpt. ¶ 3.4. But Drewe admitted that valuing mining assets is "not [his] area of expertise," Ex. 14 (Drewe) at 54:14–25, and he rejected best practices in the field and did *not* do what would be expected of an expert asked to value a mining asset. Rather than make use of at least two well-recognized valuation approaches, *see*, *e.g.*, Ex. 9, Milburn Rpt. ¶ 3.22, he instead arbitrarily relied on a single model, the assumptions of which reflected an outdated business configuration that RTCM had already rejected by HY 2012. Drewe then arbitrarily manipulated those assumptions by revising the inputs based on his own personal view of what was "reasonable"—eliminating, *e.g.*, the value of nearly all coal production from two tenements, while simultaneously maintaining enormous costs associated with construction of a large-scale railway to transport the coal even though that never would have been built without production from those two tenements. Ex. 3, Drewe Rpt. ¶¶ 6.4.8, 11.4.1, tbl. 13C. Drewe's analysis also repeatedly relied on assumptions and information that were not available to Rio Tinto at HY 2012. For these and other reasons, Drewe's testimony should be excluded in its entirety.

**Background (Weber):** Finally, in a last-ditch attempt to bolster its own case and prejudice Defendants, the SEC offers the testimony of Joseph Weber. But as Weber admits, his 34-page report offers "no opinions" at all, Ex. 18 (Weber) at 140:7–16—and instead holds forth on a range of "background" topics that will be unhelpful and irrelevant to any matter a jury will consider, *see id.* at 23:11–20, 140:7–10. For example, he discusses accounting standards that even the SEC agrees do not apply in this case. He also fails even to accurately describe the topics he does address, offering testimony that he acknowledged at his deposition was confusing. His irrelevant, confusing and inaccurate testimony should be excluded in its entirety.

6

For all of these reasons and the reasons explained below, the Court should grant Defendants' *Daubert* motions in their entirety.

## FACTUAL BACKGROUND

In August 2011, Rio Tinto completed its acquisition of Riversdale, a publicly traded company that owned the rights to early-stage coal tenements, for approximately $3.7 billion, and renamed it RTCM.  *See* SUF ¶¶ 29–38.  As Rio Tinto's investors knew, RTCM faced immense challenges at the outset:  Its coal quantity and quality were not known with any certainty; existing infrastructure for transporting coal was limited; and developing multi-decade business plans for untested properties is fraught with uncertainty.  SUF ¶¶ 39–49, 467–468.  Most analysts considered the acquisition "small," as RTCM was less than 3% of Rio Tinto's total assets.  SUF ¶¶ 461, 463.

Following RTCM's acquisition, Rio Tinto undertook one of the world's biggest exploration programs, spending hundreds of millions of dollars drilling, exploring, and testing the coal, and pursuing options for transporting it, especially by barge or newly constructed ("greenfield") rail.  SUF ¶¶ 109–132, 191–206.  As is common in early-stage mining projects, RTCM faced challenges in 2012:  Testing indicated the coal quality might not be as high as believed, and the Government of Mozambique ("GoM") did not approve initial applications for barging.  SUF ¶¶ 109–119, 147–158.  But there were positive developments too: rising projected coal prices, SUF ¶ 231; more apparently mineable coal than expected, with yet more expected from an adjacent property, Minjova, SUF ¶¶ 191–206; a good probability of a partnership for constructing greenfield rail, SUF ¶¶ 126–127; and new business opportunities, *e.g.*, development of a power plant and coal bed methane, potentially worth billions, SUF ¶¶ 172–173.  As exploration continued, RTCM created a discounted cash flow ("DCF") model—the "BU Model"—that used iterations of different inputs, assumptions, and evolving development scenarios to generate internal business valuations for RTCM to use for planning.  SUF ¶¶ 207–211.  The hundreds of valuations generated by iterations

of this model varied widely based on the inputs and assumptions used, SUF ¶¶ 218, 224–225, 229–230, but many exceeded the carrying value, including at HY 2012, SUF ¶¶ 225, 229.

At HY 2012, Rio Tinto performed Step One of the IAS 36 analysis and found no indication of impairment at RTCM and thus no need to undertake Step Two.  SUF ¶¶ 292–293.  PwC, its independent auditor, agreed.  SUF ¶ 293.  RTCM's potential coal production and infrastructure options for transporting the coal were salient considerations in this analysis.  In terms of coal volume, RTCM's estimates were lower than prior Riversdale estimates, but they "still significantly exceed[ed]" the amounts needed for the mining plan and "would not" have changed the purchase price allocation, and it was thought Minjova could add "significant [production] upside."  SUF ¶¶ 313–314.  In terms of infrastructure, Rio Tinto assumed barging was "unlikely . . . in the short term" after the GoM's rejection of its initial barging applications, but was exploring other options—*e.g.*, joint greenfield rail construction—and was confident of finding a solution.  *Id.*

As part of the HY 2012 impairment review process, Rio Tinto Energy prepared a key "Impairment Indicator Paper" that explained RTCM's challenges to the Controllers and PwC and concluded that, although it was "not yet possible to" accurately measure how infrastructure changes would affect RTCM's value, "inclu[ding]" Minjova and rising projected coal prices "should offset any potential loss" from such changes.  SUF ¶¶ 323–331.  "[T]o give some indication of" RTCM's value, the paper (1) modeled how "more certain" developments would have affected the value at acquisition, resulting in "a potential value of $5.1 billion" "caveat[ed]" by the "uncertainty of the central case," and (2) benchmarked RTCM's resource and reserve estimates against "comparable transaction[s]," showing that RTCM's carrying value was "well within (or even below)" those benchmarks.  SUF ¶¶ 326–329.  The paper found no impairment indicator:  Despite "uncertainty

over future transportation," RTE was "confident of finding a viable infrastructure path," and "the breadth of the options mean[t] that a central case view [was] still under development."  SUF ¶ 331.

In August and November 2012, Mr. Albanese made the three Albanese Statements, but these did not affect the price of Rio Tinto PLC's ADRs ("the stock price").  SUF ¶¶ 479–481.  Specifically, he said, (1) "the Moatize . . . is more prospective than I would have said a year ago as we look at the full range of opportunities, not just in coking coal," SUF ¶ 388; (2) "we probably have more potential in total as we go forward," and "this is truly a world-class basin deposit," SUF ¶ 386; and (3) the Moatize Basin was a "long-term opportunity with the potential to grow beyond" certain production capacity, SUF ¶ 393.  In December 2012, Rio Tinto concluded—based on new lab results of the coal at Minjova and the RTCM tenement at Tete East—RTCM would not, as expected, produce enough coal to justify the cost of building a large-scale greenfield railway.  SUF ¶¶ 445–446, 452, 456.  Having lost its capacity for economies of scale, RTCM was promptly impaired in January 2013, at which time Mr. Albanese stepped down as CEO.  SUF ¶¶ 454–458.  The market was indifferent to this announcement:  Long aware of RTCM's challenges, investors appreciated that RTCM amounted to less than 3% of Rio Tinto's total assets and was undeveloped, unproven, and under extensive study.  SUF ¶¶ 463–475.  Indeed, as the SEC concedes, Rio Tinto's public statements about RTCM did not affect the stock price, SUF ¶¶ 479–481; there was no statistically significant stock drop at the time of the impairment, SUF ¶ 482; and the impairment did not affect Rio Tinto's bond prices or credit ratings, SUF ¶¶ 490–495.

## LEGAL STANDARD

"District courts are the gatekeepers of expert testimony," tasked with ensuring the relevance and reliability of that evidence.  *Packard v. City of New York*, 2020 WL 1479016, at *1 (S.D.N.Y. Mar. 25, 2020) (Torres, J.) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993)).

When assessing the admissibility of expert testimony under Federal Rule of Evidence ("FRE") 702, courts "consider[ ] the expert's qualifications," "determine whether the expert testimony is reliable," and decide "'whether the expert's testimony . . . will assist the trier of fact.'" *Packard*, 2020 WL 1479016, at *1–2. "[T]he proponent of expert testimony has the burden" of satisfying these requirements "by a preponderance." *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007). *First*, the witness must be "'qualified as an expert by knowledge, skill, experience, training or education' to render his or her opinions." *Nimely v. City of New York*, 414 F.3d 381, 396 n.11 (2d Cir. 2005) (citation omitted). "[A]n expert qualified in one subject matter does not thereby become an expert for all purposes"; opinions "unrelated to [his or her] area of expertise [are] prohibited." *523 IP LLC v. CureMD.com*, 48 F. Supp. 3d 600, 642 (S.D.N.Y. 2014). *Second*, "the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods" must undergo "rigorous examination." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002). Neither "speculative or conjectural" opinions, *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996), nor opinions supported "only by the [expert's] *ipse dixit*," *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997), should be admitted. *Third*, an expert does not assist the jury by offering "testimony which does not relate to any issue in the case," *Daubert*, 509 U.S. at 591, opining on "lay matters which a jury is capable of understanding and deciding without the expert's help," *Andrews v. Metro N. Commuter R.R. Co.*, 882 F.2d 705, 708 (2d Cir. 1989), or "usurp[ing]" the Court's role to instruct the jury on the law, *United States v. Lumpkin*, 192 F.3d 280, 289 (2d Cir. 1999).

FRE 403 also plays an "important role . . . in a district court's scrutiny of expert testimony, given the unique weight such evidence may have in a jury's deliberations." *Nimely*, 414 F.3d at 397; *see also Daubert*, 509 U.S. at 595 ("Expert evidence can be both powerful and quite

misleading because of the difficulty in evaluating it.  Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 . . . exercises more control over experts than over lay witnesses.").  Where the "probative value" of expert evidence "is substantially outweighed" by its prejudicial effect—including "unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, [and] needlessly presenting cumulative evidence"—the entirety of that evidence should be excluded.  Fed. R. Evid. 403.

## ARGUMENT

### I.    The Court Should Exclude Certain Opinions By Metz.

The SEC engaged as its materiality expert Dr. Albert Metz, an economist focused on *bond*-price event studies who has never previously been retained to conduct a *stock*-price event study, Ex. 16 (Metz) at 340:10–16, never previously published an article or issued a report on such studies, *id.* at 31:18–32:2, 193:23–194:5, and never qualified as an expert in any court regarding such studies, *id.* at 20:11–19.  In his earlier role as the SEC's "consulting expert," Metz found that the RTCM impairment did not affect Rio Tinto's bond prices.  *Id.* at 44:5–46:9.  Finding itself in the unenviable position of having its own expert directly contradict a central theory of its case, the SEC asked him to opine on subjects with which he had no experience.  And it shows.  Metz's reports are riddled with speculative, unreliable, and irrelevant opinions that should be excluded.

### A.    Metz's Opinions

Both Defendants' expert Glenn Hubbard and the SEC's expert Metz conducted event studies of Rio Tinto PLC's ADR price and found no statistically significant abnormal return when the RTCM impairment was announced—*i.e.*, no effect on the stock price.  *See* Ex. 6, Hubbard Rpt. ¶ 75, Ex. 7, Metz Rpt. ¶ 63.  Metz had also previously found (in his capacity as a "consulting expert") that the impairment had no effect on Rio Tinto's bond prices.  *See* Ex. 16 (Metz) at 44:5–46:9.  And while Metz did not conduct an event study with respect to the Albanese Statements,

Defendants' expert did and found no effect on the stock price. Ex. 6, Hubbard Rpt. ¶ 157. Metz attempted to dodge the results of the findings in three ways, each of which should be excluded.

*First*, Metz speculated that the lack of any market response as reflected in the ADR price "*may be* explained by the competing news released that day"—*i.e.*, that the RTCM impairment, "by itself, *could well have* put significant negative pressure on the ADR price, while the change in Company leadership, by itself, *could well have* put significant positive pressure on the ADR price." Ex. 7, Metz Rpt. ¶ 86 (emphases added).

*Second*, Metz further speculated as to the impact of the Albanese Statements on the stock price and the impairment's effect on Rio Tinto's bond prices. In response to Hubbard's conclusion that the Albanese Statements did not affect the stock price, Metz offered an expressly "hypothetical" discussion of artificial price inflation that noted that public statements generally "could serve to" maintain artificial inflation. Ex. 8, Metz Rebuttal ¶¶ 185, 187. And despite his own conclusion that the bond prices did *not* change in response to the impairment, Ex. 16 (Metz) at 44:5–46:9, he speculated as to how the prices of Rio Tinto's "bond offerings *might have* changed had the bonds been rated one notch higher (A2) or one notch lower (Baa1)"—as merely "a hypothetical illustration of the typical or representative differences in pricing between differently rated bonds." Ex. 7, Metz Rpt. ¶ 106 & n.112 (emphasis added).

*Finally*, unable to provide evidence that *the impairment* was significant to investors, Metz instead opined that Rio Tinto PLC's ADR price movement on one day related to *the acquisition* twenty months earlier was significant: specifically, that on April 8, 2011—when Rio Tinto announced it had assumed control of Riversdale by acquiring more than 50% ownership—there was a statistically significant abnormal positive return on the stock price, which Metz attributed solely to the acquisition. Ex. 7, Metz Rpt. ¶¶ 53–61.

Defendants therefore seek to exclude the following opinions:

- **Metz Report ¶¶ 64–86**, which speculate that the impairment "could well have" affected the stock price.

- **Metz Rebuttal ¶¶ 181–187**, which provide a "hypothetical" discussion of artificial price inflation and Metz's view that public statements generally "could serve to" maintain artificial inflation.

- **Metz Report ¶ 106 & n.112**, which offers "a hypothetical illustration" to speculate how the price of Rio Tinto's "bond offerings might have changed" in a counterfactual world.

- **Metz Report ¶¶ 53–61**, which speculate that the Riversdale acquisition was significant to investors.

### B.   Metz's Opinion that the RTCM Impairment "Could Well Have" Affected Rio Tinto's Stock Price Is Speculative, Prejudicial, and Unreliable.

Metz admitted at deposition that he *could not* opine that the impairment did "in fact" put negative pressure on the stock price because he had *no* "statistical evidence" to back that up, Ex. 16 (Metz) 214:7–215:21, and "didn't conduct any analysis" to "measure" it, *id.* at 215:11–18. He therefore opined only that the impairment "could well have put significant negative pressure on the ADR price, while the change in Company leadership, by itself, could well have put significant positive pressure on the ADR price." Ex. 7, Metz Rpt. ¶ 86. Metz's speculation is neither "based on sufficient facts or data," Fed. R. Evid. 702(b), nor "the product of reliable principles and methods," Fed. R. Evid. 702(c), and it risks unfair prejudice under FRE 403. It therefore should be excluded under both FRE 702 and 403.

**1.** Metz did not, and could not, perform an event study or statistical analysis to show that either the impairment or the CEO change put significant negative pressure on the stock price— much less that downward pressure from the former offset upward pressure from the latter. Bereft of economic or statistical analysis, Metz's opinion that the RTCM impairment could have affected

13

the stock price is "supported only by his ipse dixit, which is insufficient." *In re LIBOR-Based Fin. Instruments Antitrust Litig.* ("*LIBOR*"), 299 F. Supp. 3d 430, 500 (S.D.N.Y. 2018).

The Second Circuit has been clear:  An expert's unadorned assertion that a disclosure "*must have*" affected the stock price must be excluded.  *In re Pfizer Inc. Sec. Litig.*, 819 F.3d 642, 664–65 (2d Cir. 2016) (emphasis added).  As this Court recently explained, where an expert "admits that he did not model such a scenario," "the Court has no mechanism for assessing the 'theory's testability,' whether there are 'standards controlling the technique's operation,' or even the 'potential rate of error,' factors the Court must assess in determining whether an expert's opinion is reliable." *Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, 2020 WL 4251229, at *7 (S.D.N.Y. Feb. 19, 2020) (Torres, J.) (citation omitted); *see also U.S. CFTC v. Wilson*, 2016 WL 7229056, at *7 (S.D.N.Y. Sept. 30, 2016) (Torres, J.) (excluding expert testimony asserting that "two pricing regimes would have been 'nearly the same'" as speculative).

Courts thus routinely exclude expert opinions on stock price movement that are not supported by accepted statistical analysis, such as an event study.  *See, e.g.*, *In re N. Telecom Sec. Litig.*, 116 F. Supp. 2d 446, 460 (S.D.N.Y. 2000) (excluding opinion as "fatally deficient" because the expert "did not perform an event study or similar analysis to remove the effects on stock price of market and industry information"); *In re Exec. Telecard, Ltd. Sec. Litig.*, 979 F. Supp. 1021, 1024–26 (S.D.N.Y. 1997) (same where expert failed to conduct "'event study' to determine whether . . . stock price was affected by company specific factors exclusive of the challenged fraud"); *In re Imperial Credit Indus., Inc. Sec. Litig.*, 252 F. Supp. 2d 1005, 1014–16 (C.D. Cal. 2003) (similar), *aff'd*, 145 F. App'x 218 (9th Cir. 2005).  Metz's opinion should be excluded.

**2.** Metz's speculative opinion also is inadmissible because he cherry-picked statements from equity analysts' reports without any methodology, distorted academic studies, and ignored

findings in authorities cited in his own report and Hubbard's report that contradict his opinion. Such a biased, results-oriented approach is the opposite of a reliable methodology.

**a.** It is well-established that each step of an expert's analysis must be supported by "'good grounds,'" and "'*any* step that renders the analysis unreliable under the *Daubert factors renders the expert's testimony inadmissible*.'"  *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002) (citation omitted).  Subjected to the required "rigorous examination," *id.*, Metz's speculative opinion that the impairment "could well have" impacted the ADRs, Ex. 7, Metz Rpt. ¶ 86, must be excluded because it has no reliable methodological foundation.

Although Metz cited certain equity analyst reports that purportedly support this opinion, Ex. 7, Metz Rpt. ¶¶ 65–84; Ex. 8, Metz Rebuttal ¶¶ 123–135, he admitted at his deposition that he had no methodology for reviewing analyst reports other than a results-oriented desire to "illustrate a mixed reaction to confounding news by citing some analysts who reacted negatively to the Mozambique write-down and other analysts who reacted positively to the CEO change," Ex. 16 (Metz) at 298:10–299:8.  He was not "attempting to illustrate" a "consensus" view among analysts—only "that multiple analysts held certain views at certain times." *Id.* at 299:9–301:10.

With no reliable methodology for selecting analyst reports, Metz instead cherry-picked favorable quotes and ignored the consensus among analysts that, in fact, the RTCM impairment had *no impact* on Rio Tinto's valuation. *See* Ex. 6, Hubbard Rpt. ¶¶ 97–105.  For example:

- Although Metz cited a J.P. Morgan report as an example of a market analyst finding the impairment "important and surprising," Ex. 7, Metz. Rpt. ¶ 65, he omitted J.P. Morgan's conclusion in the same report that the RTCM impairment was "in line with [its] valuation" of RTCM and would have a "negligible impact" on its valuation of Rio Tinto, which already incorporated a "$0.6bn NPV" valuation for RTCM—the precise valuation that RTCM reached after the impairment, Ex. 27 at 1.

- Metz similarly distorted an HSBC report that he found "conveyed surprise at the extent and suddenness" of the impairment.  Ex. 7, Metz. Rpt. ¶ 66.  In fact, Metz omitted that the analyst had "never incorporated Mozambique assets into our earnings estimates, as we have

been unsure of the development path," Ex. 28 at 2, thereby demonstrating that the RTCM impairment had no negative effect on the HSBC analyst's valuation of Rio Tinto. *See* Ex. 16 (Metz) at 246:16–247:8.

- Metz cited a Société Générale report as an example of a market analyst that "found the news of the write-down surprising." Ex. 7, Metz. Rpt. ¶ 69. Yet he again selectively quoted the analyst, omitting any reference to the analyst's conclusion that the write-off is "mostly a non-event." Ex. 29 at 4.

Thus, contrary to Metz's characterization, the analysts he cited did not change their view of Rio Tinto PLC's ADR price based on a "surprising" impairment, but rather concluded the impairment did not affect the stock price.

"Such a vague methodology is not a methodology at all, and it is certainly not a methodology that can or has been tested." *LIBOR*, 299 F. Supp. 3d at 502. Because Metz's analysis of analyst reports "is governed only by arbitrary criteria susceptible to cherry-picking," *id.* at 503, his opinion regarding the impact of the impairment must be excluded, *see In re Rezulin Prods. Liab. Litig.* ("*Rezulin II*"), 369 F. Supp. 2d 398, 425 (S.D.N.Y. 2005); *see also In re Fresh Del Monte Pineapples Antitrust Litig.* ("*Del Monte*"), 2009 WL 3241401, at *8 (S.D.N.Y. Sept. 30, 2009) (excluding expert testimony that "cherry-pick[s] the facts" supporting the expert's view while failing "to discuss the import of, or even mention, [countervailing] material facts").

**b.**   Metz took the same unreliable approach in opining that "academic literature on CEO turnover indicates that management changes provide the market with new information *which can be* associated with statistically significant abnormal price changes." Ex. 7, Metz Rpt. ¶ 80 (emphasis added). As Defendants' expert Hubbard explained after reviewing the same literature (and more), Metz "fail[ed] to account for the characteristics of the management change in this case"— *i.e.*, that a senior executive, Mr. Albanese, was replaced by an *internal* appointee, Sam Walsh, the chief executive of Rio Tinto's Iron Ore Group. Ex. 6, Hubbard Rpt. ¶¶ 114–115. In these circumstances, the academic studies "show that . . . the abnormal return of the company's stock price on

the date of the announcement is not statistically significantly different from zero." *Id.*  Instead of

engaging with the gaps in his review of the literature, Metz's Rebuttal maintained his position and

tried to equate Mr. Walsh with an "outsider" CEO.  Ex. 8, Metz Rebuttal ¶¶ 171, 175.

In concluding that CEO turnover can affect stock price, Metz cherry-picked from the aca-

demic literature and ignored findings that conflict with his opinion.  For example:

- Metz cited Worrell, *et al.* (1993), Ex. 7, Metz Rpt. ¶ 82, yet failed to acknowledge that study's "find[ing] that if an insider is appointed to replace a fired key executive and these actions are announced simultaneously, then the abnormal return is not statistically signifi-cantly different from zero," Ex. 6, Hubbard Rpt. ¶ 117 (citing D. Worrell, W. Davidson III, and J. Glascock, "Stockholder Reactions to Departures and Appointments of Key Execu-tives Attributable to Firings," 36 *Acad. of Mgmt. J.* 387, 395–96 (1993)).

- Metz cited Huson, *et al.* (2004), as finding a CEO's departure can be associated with a positive stock price change, Ex. 7, Metz Rpt. ¶ 80, but "fail[ed] to note that [this study] break[s] down this finding by type of departure and succession, and find[s] that the abnor-mal return following a forced CEO departure with an insider replacement—the character-istics of the management change in this case—is negative and not statistically significant." Ex. 6, Hubbard Rpt. ¶ 117 (citing M. Huson, P. Malatesta, and R. Parrino, "Managerial Succession and Firm Performance," 74 *J. of Fin. Econ.* 237, 258 (2004)).

- Metz also cited Furtado and Rozeff (1987), Ex. 7, Metz Rpt. ¶ 80, but he later admitted at his deposition that this study did not analyze the management change at issue here:  the simultaneous announcement of a top executive's dismissal and his replacement, Ex. 16 (Metz) at 255:4–14.

- Metz failed to cite at least two other studies "that confirm that abnormal returns following the forced replacement of a top executive by an insider are not typically positive and sta-tistically significant."  Ex. 6, Hubbard Rpt. ¶ 118 (citing J. Adams and S. Mansi, "CEO turnover and bondholder wealth," 33 *J. of Banking & Fin.* 522, 528 (2009), and K. Borokhovich, R. Parrino, and T. Trapani, "Outside Directors and CEO Selection," 31 *J. of Fin. & Quant. Analysis* 337, 338, 348 (1996)).

"[I]f the relevant scientific literature contains evidence tending to refute the expert's theory and

the expert does not acknowledge or account for [it], the expert's opinion is unreliable."  *Rezulin*

*II*, 369 F. Supp. 2d at 425; *see also Amorgianos*, 303 F.3d at 270 (similar).  Metz's efforts to distort

and ignore relevant academic studies are thus an independent basis for excluding his speculative

opinion that the impairment "could well have" affected the stock price.

**3.**  Metz's speculative and unreliable testimony is also inadmissible under FRE 403.  *See In re Air Cargo Shipping Servs. Antitrust Litig.*, 2014 WL 7882100, at *13 (E.D.N.Y. Oct. 15, 2014) (striking testimony under FRE 403 due to "the absence of any reliable basis" for the expert's analysis); *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 574 (S.D.N.Y. 2007) (excluding testimony under FRE 403 where "the cumulative effect of the methodological flaws . . . diminishes the reliability and probative value" of the expert's analysis).  Because Metz's speculation concerns the RTCM impairment, which "lay[s] at the heart of this [case]," the risk of unfair prejudice is great, and the testimony should be excluded.  *Nimely*, 414 F.3d at 398.

### C.   Metz's Opinions on Artificial Price Inflation and Hypothetical Bond Prices Are Speculative, Unreliable, and Prejudicial.

Metz did not stop his speculation with the effect the RTCM impairment could have had on the stock price.  He further speculated as to the effect of public statements on stock prices generally (while suggesting, without opining on, application to the Albanese Statements), *see* Ex. 8, Metz Rebuttal ¶¶ 181–187, and the effect of the impairment on Rio Tinto's bond prices, Ex. 7, Metz Rpt. ¶ 106.  These opinions should be excluded under FRE 702 and FRE 403.

**1.**  Based on the results of his own event studies and his review of market analyst reports, Defendants' expert Hubbard concluded that the Albanese Statements did not affect the stock price.  Ex. 6, Hubbard Rpt. ¶ 157.  Metz's Rebuttal contended that Hubbard "conflates stock price *increases* with stock price *inflation*" and then provided a theoretical analysis of artificial price inflation, replete with graphs depicting prices of a "hypothetical security."  Ex. 8, Metz Rebuttal ¶¶ 181–187.  Metz concluded his discussion by speculating that "[c]ompany statements that maintain investors' informational status quo *could serve* to maintain prices at the current level, and at the same time either maintain or increase the level of artificial inflation."  *Id*. ¶ 187 (emphasis added).

Critically, Metz offered no opinion that the Albanese Statements, in fact, maintained arti-
ficial inflation in the stock price.  Instead, his hypothetical discussion of artificial price inflation,
which is unsupported by an event study and fails to cite a single supporting authority, improperly
invites the jury to speculate whether the Albanese Statements "could serve to . . . either maintain
or increase the level of artificial inflation."  Ex. 8, Metz Rebuttal ¶ 187.  Metz's "calculation of
'hypothetical' [artificial inflation] does not help the factfinder understand" whether the Albanese
Statements actually maintained such inflation.  *Fin. Guar.*, 2020 WL 4251229, at *8.

Metz attempted to excuse his lack of an event study by contending that artificial price in-
flation cannot be measured with an event study because it does not actually result in a price in-
crease.  Ex. 8, Metz Rebuttal ¶¶ 182–183.  But as Metz himself admits, an event study can measure
both "stock price *increases*" and "stock price *inflation*."  *Id.* ¶ 183; *see Pfizer*, 819 F.3d at 649 (an
event study "estimat[es] the amount of artificial inflation").  While Metz thus *could have* tried to
design an event study to support his artificial price-inflation theory, he did not do so because it
would have been futile.  In inflation-maintenance cases, the amount of artificial inflation equals
"the full amount by which [the] stock price fell when the market eventually discovered the truth,"
*Pfizer*, 819 F.3d at 648—yet in this case there was no such inflation because, as Metz and Hubbard
found, the stock price did not fall when the impairment was announced.  Without an event study,
Metz's opinion on artificial inflation must be excluded because "this Court cannot conclude that it
rests on a 'reliable basis in the knowledge and experience of his discipline.'"  *Exec. Telecard*, 979
F. Supp. at 1026 (citation omitted); *accord Fin. Guar.*, 2020 WL 4251229, at *7.

Here, too, Metz's lack of any methodology and the risk that his testimony will confuse the
jury on an issue that "lay[s] at the heart of this [case]" warrant exclusion under FRE 403.  *Nimely*,
414 F.3d at 398; *see Malletier*, 525 F. Supp. 2d at 574; *Air Cargo*, 2014 WL 7882100, at *13.

**2.** Metz's "hypothetical" of how the price of Rio Tinto's bond offerings "*might have changed*" had Rio Tinto received certain credit ratings, Ex. 7, Metz Rpt. ¶ 106 & n.112 (emphasis added), should be excluded because it "relies on unfounded assumptions . . . if certain hypothetical events took place," *Buckley v. Deloitte & Touche USA LLP*, 888 F. Supp. 2d 404, 413 (S.D.N.Y. 2012), *aff'd*, 541 F. App'x 62 (2d Cir. 2013). Metz's hypothetical is "untethered from the actual facts of this case," *Laumann v. Nat'l Hockey League*, 117 F. Supp. 3d 299, 315 (S.D.N.Y. 2015), because Rio Tinto's credit ratings indisputably *did not* change after the impairment disclosure. Further, in admitting that he did not "mean[ ] to suggest that these are the prices which would most likely have been obtained if Rio Tinto's bonds were rated" lower or higher, Ex. 7, Metz Rpt. ¶ 106 & n.112, Metz "substitutes mathematical assumptions for actual, readily-obtainable information." *Laumann*, 117 F. Supp. 3d at 315. This opinion is inadmissible. *See Fin. Guar.*, 2020 WL 4251229, at *8 (excluding "calculation of 'hypothetical' losses").

**D.     Metz's Opinion that the April 2011 Riversdale Acquisition Affected the Stock Price Is Irrelevant and Unreliable.**

Metz's opinion that the acquisition affected the stock price should be excluded under FRE 702 and FRE 403 for several reasons:  It is irrelevant (and would confuse the jury), and it has numerous methodological flaws that make it wholly unreliable.

**1.** Metz's opinion on how the market reacted to the Riversdale acquisition is not relevant to any issue in the case—and Metz made no attempt to connect the market's reactions to the acquisition and the impairment. As Defendants' expert Hubbard testified, the market's reaction to the acquisition has "zero economic relevance" to the market's reaction to the impairment twenty months later. *See* Ex. 15 (Hubbard) at 134:9–135:21. Whether the original acquisition was "accret[ive]," neutral, or "value destroying" has *no* effect on the market's reaction to a later impairment because, in the interim, the market could change its view of the asset. *Id.* at 19:7–20:21,

134:9–136:22.  Thus, even if the market believed the RTCM acquisition was accretive, it still could have thought RTCM had little value months later.

Metz's opinion on the significance of the Riversdale acquisition thus "would not assist the fact-finder in determining any factual dispute in this case." *In re Rezulin Prods. Liab. Litig.* ("*Rezulin I*"), 309 F. Supp. 2d 531, 544 (S.D.N.Y. 2004).  The relevant inquiry for the jury is whether the Albanese Statements and the HY 2012 carrying value were material to a reasonable investor. Metz's analysis of the acquisition does not help the jury answer this question, *see Fin. Guar.*, 2020 WL 4251229, at *8–9, and would confuse the jury as to the appropriate inquiry—*i.e.*, the significance to investors of statements made more than a year after the acquisition, *see In re Mirena IUD Prods. Liab. Litig.*, 169 F. Supp. 3d 396, 421 (S.D.N.Y. 2016) (excluding expert testimony that was "not relevant" to the parties' theories of the case and "would waste time, and would unfairly prejudice Plaintiffs" (citing Fed. R. Evid. 403)).  Metz's opinion thus must be excluded under FRE 702 and FRE 403.  *See Rezulin I*, 309 F. Supp. 2d at 544–45.

**2.**  Even if Metz's analysis of the impact of the acquisition on the stock price "were helpful to the trier of fact, it would founder on reliability grounds," *LIBOR*, 299 F. Supp. 3d at 504, as his conclusions are nonsensical.  His opinion focused on the stock price on April 8, 2011, the day Rio Tinto crossed the 50% threshold and gained control of Riversdale.  But by just one day earlier, on April 7, Rio Tinto had acquired a 49.49% interest in Riversdale and market participants thought it "a near certainty" that Rio Tinto would achieve full control.  Ex. 6, Hubbard Rpt. ¶¶ 46, 55.  According to Metz's own event study, there was no statistically significant abnormal return on the stock price on April 7 or, indeed, in the days leading up to April 8.  *See id.* ¶¶ 50, 55; Ex. 16 (Metz) at 187:21–188:24.  It is unreasonable for Metz to conclude the market would have significantly reacted to an event that was all but certain (and had caused no reaction) one day earlier.

Indeed, Metz attributed all of Rio Tinto's 3% abnormal positive return on April 8, 2011—equivalent to a \$4.2 billion increase in Rio Tinto's market value, *see* Ex. 6, Hubbard Rpt. ¶ 69—to the fact that Rio Tinto acquired control over Riversdale, *see* Ex. 7, Metz Rpt. ¶¶ 54, 61.  Given that Rio Tinto invested \$2 billion to acquire its controlling interest in Riversdale, Metz's opinion absurdly implies that, merely by gaining such control, the market value of Rio Tinto's investment in Riversdale *tripled*.  *See* Ex. 6, Hubbard Rpt. ¶ 69.  In fact, his opinion implies the value of the Riversdale interest increased many times more, as the \$4.2 billion increase reflected only the increase in *probability* (from near certainty to certainty) that Rio Tinto would gain control over Riversdale.  *Id.* ¶¶ 68–72; Ex. 15 (Hubbard) at 213:18–215:13, 216:5–219:2.  That is absurd, and Metz offered no explanation why obtaining a controlling stake in Riversdale would be so valuable.

While an event study "is a generally accepted technique, general acceptance does not end the reliability inquiry.  Problems in implementing the technique may nonetheless render it unreliable as applied."  *LIBOR*, 299 F. Supp. 3d at 505–06.  Even if Metz's acquisition event study "can overcome a fundamental relevance problem," *id*. at 507, its methodological flaws and implausible results render it unreliable.  *See Mastercard Int'l Inc. v. First Nat'l Bank of Omaha, Inc.*, 2004 WL 326708, *8–10 (S.D.N.Y. Feb. 23, 2004) (excluding expert survey so methodologically flawed that the risks of prejudice and misleading the jury substantially outweighed its relevance).

**3.**  Metz's event study is unreliable for the additional reason that he used the S&P Metals and Mining Index  ("SPMM") as his industry sector index.  Ex. 7, Metz Rpt. ¶ 40.  Had Metz used a more appropriate industry index, he would have arrived at the opposite result.[2]

---

[2]  Testing Metz's event study, Defendants' expert Hubbard conducted an event study using two separate industry indices—the HSBC Global Mining Index and a Peer Index comprised of eight firms Rio Tinto compared itself to—and his event study found no statistically significant abnormal return on April 8, 2011.  Ex. 6, Hubbard Rpt. ¶ 56.

As the Second Circuit has explained, a properly designed event study must "disentangle[ ] the effects of two types of information on stock prices—information that is specific to the firm under question . . . and information that is likely to affect stock prices marketwide" so the expert can identify "which 'information . . . caused notable changes in the price of [a company's] securit[ies]' and the magnitude of those changes." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 253 (2d Cir. 2016) (first alteration added; citation omitted).  To disentangle such information, an event study must utilize an index of stocks with "roughly the same profitability, risks, and growth opportunities as [the] firm" at issue.  *Exec. Telecard*, 979 F. Supp. at 1027 n.3.  Metz did not do that.

Without explanation, Metz declared the SPMM "an appropriate peer index for the US traded ADR."  Ex. 7, Metz Rpt. ¶ 38 n.23.  His failure "to explain his exclusive reliance on the [SPMM] Index . . . alone raises serious questions about the reliability of [his] methodology."  *Exec. Telecard*, 979 F. Supp. at 1027.  In fact, his chosen index did not include other large, diversified mining companies that are Rio Tinto's peers—*e.g.*, Anglo American, BHP Billiton, Vale, and Xstrata—and it was over-weighted with non-mining companies, including "many" companies, *e.g.*, steel manufacturers, who "purchase the types of products that Rio Tinto sells," meaning their "stock prices are likely to react in the *opposite* direction to Rio Tinto's ADR price" in response to changes in commodities prices.  Ex. 6, Hubbard Rpt. ¶¶ 60–61 (emphasis added); *see also* Ex. 15 (Hubbard) at 76:24–77:10, 79:3–23, 86:8–90:17.  As a result, Metz's "use of the [SPMM] Index—rather than a more precisely correlated portfolio of securities—compounds the serious reliability questions" over his event-study methodology.  *Exec. Telecard*, 979 F. Supp. at 1027–28.

Metz's event study was methodologically unreliable also because he failed to "address confounding information that entered the market on the event date."  *Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Sec. (USA) LLC*, 752 F.3d 82, 95 (1st Cir. 2014).  Specifically,

Metz admitted that he failed to "disaggregate the extent to which Rio Tinto's ADR price increases were the result of metal price increases" on the same day, and that he did not even "think of trying" it.  Ex. 16 (Metz) at 173:17–174:4.  An April 8, 2011 increase in iron-ore spot prices would have been highly beneficial to sellers of iron ore like Rio Tinto; yet Metz's SPMM Index decreased by 0.4 percent on that day likely because, as Hubbard explains, "all eight steel manufacturers included in the SPMM Index experienced stock price declines on April 8, 2011 of between 1.1 percent and 2.8 percent."  Ex. 6, Hubbard Rpt. ¶¶ 58, 62.  Because it fails to address confounding iron-ore prices, Metz's event study "does not satisfy the requirements of *Daubert*" and should be excluded. *Bricklayers*, 752 F.3d at 95; *see also Exec. Telecard*, 979 F. Supp. at 1027 ("failure to conduct a thorough 'event study' [is] reason enough to exclude [an expert's] proposed testimony").

## II.    The Court Should Exclude Brice's Opinions On Unrelated Impairments.

The SEC's accounting expert Brice did not even opine that RTCM was materially impaired at HY 2012.  Rather, he opined merely that Step Two of an impairment analysis was required—a conclusion based largely on a summary he provided of unrelated impairments.  Brice used these unrelated impairments in three ways: (1) as evidence of "how the relevant requirements of IFRS [*i.e.*, International Financial Reporting Standards] in respect of testing for impairment are applied in practice," Ex. 1, Brice Rpt. ¶ 5.5.1, (2) as support for his key opinions that "[t]he existence of uncertainty cannot . . . be used to avoid an impairment test," *see id.* ¶¶ 9.5.11, 9.5.15–9.5.17, 11.5.4–11.5.5, and that Step Two of the analysis must still be undertaken even if there are potential mitigating factors, *id.* ¶¶ 9.5.22–9.5.26; and (3) as a partial basis for his opinion that Rio Tinto should have performed Step Two of an impairment analysis at HY 2012, *id.* ¶¶ 9.6.1–9.6.3.

Brice's testimony on these unrelated impairments should be excluded under FRE 702 and FRE 403:  It is irrelevant and will not assist the trier of fact; his testimony risks confusing the

issues for the jury, unfairly prejudicing the Defendants, and wasting the parties' and Court's resources; and he does not apply a reliable methodology in considering those other impairments.

### A.   Brice's Opinions

Brice opined that, at Step One of an impairment analysis, RTCM had impairment indicators at HY 2012 and was required to proceed to Step Two.  That key opinion, however, rested on Brice's consideration of unrelated impairments by Rio Tinto and by other mining companies.  *See* Ex. 1, Brice Rpt. ¶¶ 5.5.1, 9.5.11, 9.5.15–9.5.17, 9.5.22–9.5.26, 11.5.4–11.5.5; App'x E.  At his deposition, Brice conceded that "as part of the [impairment] assessment . . . you need to consider the facts and circumstances about an event." Ex. 12 (Brice) at 141:15–142:3.  Yet he also admitted that he neither knows nor made any attempt to learn the underlying facts and circumstances that led to each of those other impairments, conducted no real analysis of them, and ultimately believes "the relevance of th[e] examples was relatively low." *Id.* at 341:24–371:5, 399:5–400:8.

Defendants thus seek to exclude the following opinions:

- **Brice Report, Appendix E**, which quotes from the annual reports of various mining companies in connection with six impairments to mining assets that are unrelated to the RTCM impairment: (1) Barrick Gold Corporation; (2) Anglo American Plc; (3) BHP Billiton Group; (4) Xstrata Plc; (5) Rio Tinto – Alcan; and (6) Rio Tinto – Oyu Tolgoi.

- **Brice Report ¶ 5.5.1**, which refers to the impairments in Appendix E to try "to demonstrate how the relevant requirements of IFRS in respect of testing for impairment are applied in practice."

- **Brice Report ¶ 9.5.11** and **¶¶ 9.5.15–9.5.17**, which quote from Appendix E in connection with the Barrick Gold Corporation impairment and Rio Tinto's impairment of the Oyu Tolgoi project in 2019 in an attempt to provide support for Brice's opinion in ¶ 9.5.11 and ¶ 9.5.17 that "the existence of uncertainty" is not a reason to defer or avoid Step Two of the impairment analysis.

- **Brice Report ¶¶ 9.5.22–9.5.26**, which refer to the unrelated impairments in Appendix E and contain quotes from the Appendix in connection with the impairments of BHP Billiton and Barrick Gold Corporation in an attempt to provide support for Brice's opinion in ¶ 9.5.26 that "[t]he existence of 'mitigating factors' does not allow an entity to defer or avoid undertaking an impairment test."

- **Brice Report ¶¶ 11.5.4–11.5.5**, which state that "[i]t is not unusual for entities to be faced with the existence of uncertainty when undertaking an impairment test," refer back to Section 9.5 of the Report, and then opine on the applicability of the impairment analysis to RTCM.

    **B.**    **Brice's Opinions Regarding Unrelated Impairments Are Irrelevant, Prejudicial, and Unreliable.**

The Court should exclude Brice's testimony on the unrelated impairments for three independent reasons:  They will not "help the trier of fact," Fed. R. Evid. 702(a); their minimal probative value is "substantially outweighed" by the risk of unfair prejudice, Fed. R. Evid. 403; and Brice employed no methodology in compiling them.

    **1.**  Brice's testimony on the unrelated impairments will not help the trier of fact, as each is distinguishable from the RTCM impairment in salient ways and Brice does nothing to explain their significance.  This issue "goes primarily to relevance."  *Daubert*, 509 U.S. at 591; *see also, e.g., Arista Records LLC v. Lime Grp. LLC*, 2011 WL 1674796, at *4 (S.D.N.Y. May 2, 2011) (the inquiry into whether expert testimony will assist the trier of fact "essentially looks to whether the testimony is relevant").  Brice's opinions about the unrelated impairments are "not 'tied to the facts of the case' and therefore will not aid the jury in resolving the case," nor are they "based on any 'scientific, technical, or specialized' knowledge."  *In re Lyman Good Dietary Supplements Litig.*, 2019 WL 5682880, at *3–5 (S.D.N.Y. Oct. 31, 2019).

Brice himself explained that, "as part of the [impairment] assessment . . . you need to consider the facts and circumstances about an event," Ex. 12 (Brice) at 141:15–142:3, and as such, identifying comparable impairments is difficult because each is based on its own unique circumstances and the judgment of the entity.  But in this case, Brice failed to make even the most limited effort to determine that the other impairments he cited in his report were in some way analogous to the RTCM impairment or would be considered by any entity reasonably applying judgment to

assess indications of impairment.  The reasons why each of the specific impairments cited by Brice

is unrelated to the RTCM impairment include:

- **Barrick Gold Corporation – Lumwana copper mine**:

  1) Lumwana is a copper mine, *see* Ex. 1, Brice Rpt., App'x E at 1, not a coal asset like RTCM.
  2) Lumwana was at a more advanced stage than RTCM, and an updated life-of-mine plan had already been completed.  *See* Ex. 1, Brice Rpt., App'x E at 1.
  3) Pre-production mining at the Lumwana mine began in 2007, and commercial copper production was achieved in 2009, *see* Barrick Gold Corporation, Technical Report on the Lumwana Mine at 1-8, Mar. 16, 2012, https://www.sec.gov/Archives/edgar/data/756894/000119312512137665/d324012dex991.htm, but the asset was not impaired until 2012, five years after pre-production mining began and three years after commercial production began.  In contrast, RTCM was at the earliest stages of development, had only begun production from one of its tenements, and the RTCM impairment was taken much sooner following acquisition.  SUF ¶¶ 79, 196.

- **Anglo American Plc – Minas-Rio iron-ore asset**:

  1) Minas-Rio was an iron ore asset, *see* Ex. 1, Brice Rpt., App'x E at 2, not a coal asset like RTCM.
  2) Minas-Rio was acquired in 2007–2008, *see* Ex. 30  at 161, but it was not impaired until 5 years later at the end of 2012, *see* Ex. 1, Brice Rpt., App'x E at 2, which is significantly longer than the less-than-1.5 years that passed between acquisition and impairment in connection with RTCM.
  3) In its 2011 Annual Report, Anglo American identified a number of challenges facing Minas-Rio and explained it was "implementing various measures including acceleration activities within the previously announced 15% capital expenditure increase."  Ex. 31, at 10.  Nevertheless, no impairment of Minas-Rio was recognized for another year.

- **BHP Billiton Group – Natural gas asset**:

  1) The BHP Billiton impairment related to a deep-water petroleum asset located off the shore of the Gulf of Mexico, *see* Ex. 1, Brice Rpt., App'x E at 3.  Oil and gas assets—especially those located off-shore—are entirely different than mining assets, *see, e.g.*, Ex. 13 (Christensen) at 207:22–24 (industry of the BHP Billiton asset "is certainly quite a separate industry to the mining industry"), and therefore this impairment is not comparable in any way to the RTCM impairment.

- **Xstrata Plc – Platinum asset**:

  1) The Xstrata Plc impairment stemmed from Xstrata's investment in Lonmin, which is a platinum asset, *see* Ex. 33 at 105, 128, not a coal asset like RTCM.

2) Xstrata had owned an interest in Lonmin for approximately four years before impairing the asset, *see* C. Ferreira-Marques and S. Young, "Lonmin Rebuffs Xstrata Proposals to Take Control," Reuters, Nov. 9, 2012, https://www.reuters.com/article/us-lonmin-xstrata/lonmin-rebuffs-xstrata-proposals-to-take-control-idUSBRE8A80LI20121109, while Rio Tinto had only owned RTCM for slightly more than a year when it was impaired.

3) The mine associated with this asset faced a violent strike causing 34 deaths, which significantly impacted the operations and financial results in 2012. *See* Ex. 12 (Brice) at 364:10–16.  RTCM did not face even remotely similar circumstances.

- **Rio Tinto – Alcan aluminum asset**:

  1) Alcan, though a Rio Tinto asset, was not connected to RTCM in any way.
  2) Alcan was an aluminum asset, Ex. 1, Brice Rpt., App'x E at 4; aluminum is a markedly different commodity than coal in that aluminum is focused on refining and smelting (not pure extraction) and thus is subject to different market forces.
  3) The Alcan impairment was caused by the "significant weakening in economic and market circumstances" due to the 2008 financial crisis.  *See* Ex. 34 at 37 ("The acquisition price of Alcan anticipated significant growth in smelter and refinery capacity, but following the recent significant weakening in economic and market circumstances, many of these growth projects have been deferred.  These deferrals, together with the weak economic environment and increases in input costs, have resulted in the impairment charge.").  In contrast, RTCM's impairment occurred at a time when the global economy had stabilized and coal prices and production were actually expected to increase.

- **Rio Tinto – Oyu Tolgoi copper and gold asset**:

  1) The Oyu Tolgoi asset, though a Rio Tinto asset, was not connected to RTCM in any way.
  2) Oyu Tolgoi was a copper and gold asset, not a coal asset like RTCM.  *See* Ex. 35 at 12.
  3) The Oyu Tolgoi impairment was taken eight years after mining began at Oyu Tolgoi, *see* Ex. 12 (Brice) at 370:25–371:3; in contrast, the RTCM impairment was taken much sooner following acquisition.

Brice's report never addresses these and other significant distinctions, and at his deposition he never explained how his selected examples would aid the jury.  To the contrary, he admitted, "the relevance of th[e]se examples was relatively low."  Ex. 12 (Brice) at 399:5–9.  Because Brice's opinions regarding unrelated impairments are "not 'tied to the facts of the case'" and thus "will not aid the jury in resolving" a fact in issue, they must be excluded.  *Lyman*, 2019 WL 5682880, at *5.

Separately, Brice's failure to apply any "scientific, technical, or other specialized knowledge" renders his discussion of these unrelated impairments inadmissible.  Fed. R. Evid. 702(a).  In his report and Appendix E, Brice simply compiles quotes from the annual reports of various mining companies, a task that "requires no specialized knowledge."  *Lyman*, 2019 WL 5682880, at *4 (excluding expert opinions and conclusions for this reason).  Because Brice merely regurgitates various companies' publicly available statements about their own impairments—without providing any analysis of his own—his testimony amounts to impermissible opinion on "lay matters which a jury is capable of understanding and deciding without the expert's help."  *Andrews v. Metro N. Commuter R.R. Co.*, 882 F.2d 705, 708 (2d Cir. 1989).

**2.**  In addition to not helping the jury, Brice's testimony on the unrelated impairments also should be excluded because its "probative value" "is substantially outweighed by" the danger of confusing the issues, unfair prejudice, and wasting time.  Fed. R. Evid. 403.

Unrelated impairments by Rio Tinto and other mining industry companies have no probative value for the facts at issue here.  Even Brice admitted their "relevance" is "relatively low."  Ex. 12 (Brice) at 399:5–9.  And because he made no effort to establish that these other impairments included in his report were "substantial[ly] similar[ ]" to the RTCM impairment, testimony about them "may confuse the issues, mislead the jury, and ultimately result in unfair prejudice."  *Miller v. Four Winds Int'l Corp.*, 2012 WL 465445, at *2 (D. Idaho Feb. 13, 2012).  Indeed, if Brice were to testify on these unrelated impairments, that could require the Court to conduct a "mini-trial" for each impairment to allow the jury both to understand how distinguishable each example is from RTCM's impairment and to determine whether the timing of each impairment was proper.  These opinions should be excluded under FRE 403.  *See*, *e.g.*, *In re Reserve Fund Sec. & Derivative*

*Litig.*, 2012 WL 12356742, at *4 (S.D.N.Y. Sept. 10, 2012) (excluding expert opinions on "irrel-evant matter about which no expert testimony is required or helpful"); *Miller*, 2012 WL 465445, at *2 ("[a]necdotal stories" of other incidents, "without establishing substantial similarity in the incidents, may confuse the issues, mislead the jury, and ultimately result in unfair prejudice").

**3.** An independent reason why "'*Daubert* and Rule 702 mandate the exclusion of'" Brice's discussion of unrelated impairments is that his discussion "is based on 'a methodology' that is 'simply inadequate to support the conclusions reached'" in several respects. *Pfizer*, 819 F.3d at 665 (citation omitted).

In his report, Brice never explains how he identified the set of other impairments he included in Appendix E, whether there were examples he chose not to include, or whether he applied any specific criteria in selecting these particular impairments. Given his failure to articulate any discernible methodology, there is no basis to assume he applied *any* methodology in compiling the examples; he could have just selected examples he found most convenient for his conclusions. Since Brice failed to apply any methodology at all when compiling these impairments, his opinions on them are inherently unreliable. *See*, *e.g.*, *LIBOR*, 299 F. Supp. 3d at 502 (expert's technique was "unreliable because it amount[ed] to no methodology at all").

Brice's review of the other impairments was cursory at best, consisting solely of reviewing excerpts from the annual reports of various mining companies and collecting these impairments as examples. Although Brice conceded that "as part of the [impairment] assessment . . . you need to consider the facts and circumstances about an event," Ex. 12 (Brice) at 141:15–142:3, he admitted he does not "know any of the facts and circumstances of these other impairments aside from what was stated in the respective company's annual reports," *id.* at 342:4–345:10, and "didn't do any analysis of these impairments aside from reviewing what was stated in the annual report," *id.* at

399:18–400:8.  Brice made no attempt to learn the underlying facts and circumstances that led to the other impairments he cites, nor does he have enough knowledge to determine whether each impairment complied with accounting standards, let alone which accounting standard was applied. *See id.* at 341:24–371:5, 399:18–400:8.

Just how little Brice knows about each of these unrelated impairments is evident from his deposition testimony:

- As to the **Barrick Gold Corporation** impairment, Brice admitted that he does not know:
  1) "when Barrick Gold sought any preliminary results from its drilling program";
  2) "how long it took Barrick Gold to complete its drilling program";
  3) the amount by which "reserves increased at the copper mine";
  4) "what Barrick Gold was projecting in terms of copper prices";
  5) "what expectations Barrick Gold had for [its] asset in the short term"; or
  6) "any of the facts or circumstances about Barrick Gold's impairment of [the asset] beyond [what is] stated in [Barrick Gold's 2012] annual report[.]"
     Ex. 12 (Brice) at 345:11–349:11.

- As to the **Anglo American Plc** impairment, Brice admitted that he does not know:
  1) "what the initial capital requirement estimates were for th[e] project";
  2) the kind of "disruptive challenges that were faced by the project";
  3) "the impact of those disruptive challenges on Anglo American's assets";
  4) the length of time necessary to complete the "detailed reevaluation of th[e] asset [that] led to the impairment";
  5) whether there were "preliminary results before [the detailed reevaluation was] completed";
  6) "whether th[e] asset . . . was an E&E asset," or "what accounting standard Anglo American applied to determine whether and how much to impair the asset"; or
  7) "that Anglo American had disclosed challenges to th[e] asset in 2011 but chose not to impair" the asset at that time.
     Ex. 12 (Brice) at 349:12–353:11.

- As to the **BHP Billiton Group** impairment, Brice admitted that he does not know:
  1) "that there was a moratorium on drilling that was imposed in the Gulf of Mexico";
  2) "why BHP [did not] impair its asset when the moratorium was first put in place";
  3) "how long BHP expected it to take before it could resume drilling"; or
  4) the nature of the reported increase in the "acquisition [and] processing of geophysical data" cited in BHP Billiton's 2011 annual report.
     Ex. 12 (Brice) at 358:16–361:15.

- As to the **Xstrata Plc** impairment, Brice admitted that he does not know:

    1) the nature of the "revisions" to "forecast capital expenditure" cited in Xstrata's 2012 annual report or what the "forecast" was for "commodity prices";

    2) that "the mine associated with this asset faced a violent strike causing 34 deaths," which "significantly impacted the operations and financial results in 2012"; or

    3) information contained in the annual report of the "underlying entity" involved with the asset, nor any "information that led to the impairment beyond [what is] in Xstrata's [2012] annual report."
        Ex. 12 (Brice) at 363:6–365:8.

- As to the **Rio Tinto – Alcan** impairment, Brice admitted that he does not know:

    1) "any information beyond [what is] contained in [Rio Tinto's] annual report for 2008 relating to the facts and circumstances that gave rise to th[e] [Alcan] impairment[.]"
        Ex. 12 (Brice) at 366:9–368:4.

- As to the **Rio Tinto – Oyu Tolgoi** impairment, Brice admitted that he does not know:

    1) "any of the underlying facts or circumstances giving rise to this impairment beyond [what is] given in [Rio Tinto's] annual report";

    2) "when Rio Tinto first learned that there would be increased projections for capital expenditures at Oyu Tolgoi";

    3) "what the initial estimates were";

    4) "what the revised estimates were";

    5) "when mining began at Oyu Tolgoi"; or

    6) "that mining began eight years before the impairment was taken."
        Ex. 12 (Brice) at 368:5–371:5.

Brice's report thus does nothing more than arbitrarily list other impairments—some by Rio Tinto, some by other companies—and try to suggest an inference that RTCM had indications of impairment at Step One of an impairment analysis. But Brice does not even establish whether each of these unrelated impairments was taken after indications of impairment were found at Step One—information that is essential for the jury to be able to compare these impairments to Rio Tinto's Step One analysis at HY 2012. Merely collecting examples of other impairments without making any effort to identify, analyze, or verify the underlying data is an unreliable methodology. *See Newell Rubbermaid, Inc. v. Raymond Corp.*, 2010 WL 2643417, at *6 (N.D. Ohio July 1, 2010), *aff'd*, 676 F.3d 521 (6th Cir. 2012) (methodology was "clearly not scientifically sound" when the expert "merely count[ed] accidents from accident reports relating to non-[Defendant] forklifts" "[w]ithout questioning or verifying the data" or "conducting any tests of his own").

Further, without knowledge of the underlying details of these impairments, there is too great an "'analytical gap'" between the data and Brice's opinions for the opinions to be reliable. *Pfizer*, 819 F.3d at 665 (citation omitted); *see Myers v. Ill. Cent. R.R. Co.*, 629 F.3d 639, 644–45 (7th Cir. 2010) (finding experts' methodology unreliable where experts had a "lack of knowledge" and "knew little to nothing" about the facts and circumstances of plaintiff's medical history and work duties); *Buck v. Ford Motor Co.*, 810 F. Supp. 2d 815, 839 (N.D. Ohio 2011) (finding expert's opinions unreliable when the expert did not know certain relevant facts and circumstances, such as how many miles were on the vehicle, whether the driver was the original owner or primary driver, or how many times the driver had driven the vehicle). Accordingly, Brice's unreliable opinions regarding the unrelated impairments should be excluded.

## III.   The Court Should Exclude Certain Opinions By Milburn.

Milburn offers irrelevant, unreliable, and confusing opinions in this case. He has no experience advising companies about preparing financial statements or impairment testing and considers himself an expert only on valuation and damage quantification. Ex. 17 (Milburn) at 18:18–21:17, 33:3–15, 106:4–18, 118:12–14. Even then, courts and arbitration panels have repeatedly rejected his (and his team's) opinions, finding his valuations well off the mark. *Id.* at 89:7–15, 103:7–24, 110:3–111:11. One tribunal rejected Milburn's $224 to $333 million valuation—derived from a DCF model of another early-stage project that lacked necessary permits—as "too speculative and uncertain," and instead awarded his client merely $18.2 million. *See id.* at 75:9–76:25; Ex. 36, ¶¶ 604–605, 661, 738. Another rejected his $307.2 million valuation of a different pre-feasibility-stage project because his methodology did "not permit even a reasonable level of conviction regarding" damages; that tribunal awarded Milburn's client approximately $18.7 million. *See* Ex. 17 (Milburn) at 79:21–80:14, 81:23–84:12; Ex. 37, ¶¶ 844, 857, 872, 938(g).

For the following reasons, this Court should exclude significant portions of Milburn's opinions, which are unsubstantiated, irrelevant, unreliable, and untimely.

## A.    Milburn's Opinions

Presumably reflecting his limited qualifications, the SEC asked Milburn to opine on two narrow issues:  assuming that barging was deemed not viable, whether the RTCM Acquisition Model would have "provide[d] a reliable measure of [RTCM's] fair market value" at Year-End ("YE") 2011, and whether it would have provided such a reliable measure at HY 2012.  Ex. 9, Milburn Rpt. ¶ 1.4(iii).  After 45 pages of exposition largely irrelevant to those questions, *see id.* §§ 2–4, Milburn opined that (1) the RTCM Acquisition Model could not "provide[ ] a reliable measure of" RTCM's FMV at YE 2011 or HY 2012, *id.* ¶¶ 5.1, 5.5; but then added—without any further explanation—that (2) *later* iterations of the RTCM BU Model could have done so, assuming they were populated with reliable inputs, *id.* ¶ 5.10.

Milburn's Rebuttal offered three new opinions that did not actually rebut any assertions made by Defendants' experts:  (1) Minjova's FMV at HY 2012 was $5 million because that is what Rio Tinto had paid for Minjova one year earlier, Ex. 10, Milburn Rebuttal ¶¶ 4.43–4.46; (2) alternatively, Minjova's FMV at HY 2012 was between $3.5 and $8.75 million because Rio Tinto had spent $3.5 million to explore Minjova, *id.* ¶¶ 4.47–4.50; and (3) Rio Tinto's comparable-transactions analysis did not provide a reliable measure of FMV, *id.* ¶¶ 2.33–2.104.  His Rebuttal also purported to address an expansive array of opinions offered by two of Defendants' experts, Edwards and Christensen, on which Milburn is not qualified to opine.

Defendants therefore seek to exclude the following opinions:

- **Milburn Report ¶¶ 5.1, 5.5**, which rely on two premises contradicted by the record in opining that the Acquisition Model would not have provided a reliable measure of RTCM's FMV at YE 2011 and HY 2012.

- **Milburn Report ¶ 5.10**, which contradicts the record in opining on the utility and functionality of the RTCM BU Model at HY 2012.

- **Milburn Rebuttal ¶¶ 2.33–2.104**, which offer—for the first time—an analysis of and opinion on Rio Tinto's comparable-transactions analysis at HY 2012.

- **Milburn Rebuttal ¶¶ 4.43–4.50**, which offer—for the first time—two valuations of Minjova based on the market approach and the cost approach.

- **Milburn Rebuttal ¶¶ 2.2(ii), 2.17, 2.18, 2.22–2.25, 3.13, 4.21**, which purport to respond to Defendants' experts Edwards and Christensen by opining on the interpretation of Rio Tinto's policies and accounting standards that Milburn is not qualified to interpret.

**B.      Milburn's Opinions in His Opening Report Are Speculative, Unreliable, and Irrelevant.**

Milburn's opinions about the Acquisition Model should be excluded because they will not "help the trier of fact," Fed. R. Evid. 702(a), and are not "the product of reliable principles," Fed. R. Evid. 702(c).  His opinion about the BU Model is irrelevant and similarly should be excluded under FRE 702(a).

**1.      Milburn's Opinions about the Utility of the Acquisition Model at YE 2011 and HY 2012 Are Unsubstantiated and Irrelevant.**

Milburn's opinion that "the Acquisition Model <u>would not</u> have provided a reliable measure of [RTCM's] FMV" at YE 2011, Ex. 9, Milburn Rpt. ¶ 5.1 (emphasis in original), should be excluded because it does not "relate to any issue in the case," *Daubert*, 509 U.S. at 591; *see also Amorgianos*, 303 F.3d at 265 ("look[ing] to the standards of Rule 401 in analyzing whether proffered expert testimony is relevant"); *Fin. Guar.*, 2020 WL 4251229, at *8–9 (similar).  Indeed, no claims relating to RTCM's *YE 2011* value remain in this case.  *See* ECF 135 at 19.

Milburn's opinion that "the Acquisition Model <u>would not</u> have provided a reliable measure of the FMV of the RTCM Projects" *at HY 2012* if barging "was no longer viable," Ex. 9, Milburn Rpt. ¶ 5.5 (emphasis in original), fares no better—as it is based on a premise contradicted by the record.  Milburn admits it would have been "proper for [Rio Tinto employees] to include [barging]

. . . in their valuation" of RTCM if they viewed it as a viable "way forward." Ex. 17 (Milburn) at 204:14–205:5.  In fact, the evidence shows just that.  At HY 2012, Rio Tinto executives continued to believe that barging remained a viable long-term option.  *See* Ex. 26 (Ritchie) at 170:24–25 ("[F]rom Rio Tinto's point of view barging always remained a live option."); Ex. 23 (Lynch) at 105:10–107:25 ("I don't think anybody had given up on . . . barging"); Ex. 19 (Albanese) at 244:18–245:3 ("I was always of the view that barging was something that should continue to be pursued"); SUF ¶¶ 116, 118–119.  Milburn conceded that he did not comprehensively analyze the record to determine whether his contrary assumption was "in line with the evidence," Ex. 17 (Milburn) at 205:6–24, and that assessing the reasonableness of Rio Tinto's barging assumptions was "not within [his] area of expertise," *id.* at 51:22–52:8.  His opinions, based on an assumption flatly contradicted by the record, are "not relevant and, ergo, non-helpful." *Daubert*, 509 U.S. at 591; *see also Amorgianos*, 303 F.3d at 265; *Fin. Guar.*, 2020 WL 4251229, at *9.[3]

Milburn's opinions about the Acquisition Model's utility should also be excluded to avoid the "danger[s] of . . . unfair prejudice, confusing the issues, [and] misleading the jury."  Fed. R. Evid. 403.  His testimony suggests that Rio Tinto used an *unmodified* Acquisition Model to provide a purportedly *reliable* measure of RTCM's FMV at HY 2012.  *See* Ex. 9, Milburn Rpt. ¶¶ 4.4–4.9, 5.5–5.9.  This testimony misses on multiple fronts.  *First*, the Impairment Indicator Paper concluded there was no indication of impairment, meaning Rio Tinto was not required to proceed to

---

[3]  Milburn also erroneously deems the use of the Acquisition Model the "primary" valuation technique in the Impairment Indicator Paper.  Ex. 10, Milburn Rebuttal ¶¶ 2.35–2.36; Ex. 17 (Milburn) at 216:7–217:3.  That paper discussed "two different analyses" "to give some indication of [RTCM's] value," Ex. 39 at 3, and nothing in it suggests the Acquisition Model was somehow more "primary" than the comparable-transactions analysis Rio Tinto also conducted.  In fact, the paper made clear it was "not possible to provide a valuation of RTCM to an acceptable degree of accuracy" and used the heavily caveated Acquisition Model merely "to give some indication of" RTCM's value based on "[t]he impact of some of the more certain changes" since acquisition.  *Id.*

Step Two to measure RTCM's FMV, *see* Ex. 39 at 6, and the record is clear Rio Tinto did not

calculate RTCM's FMV at HY 2012, much less rely on the Acquisition Model to do so. *Second*,

the record is clear that the Acquisition Model, which was used "to give some indication of RTCM's

value," *was modified* to reflect certain conditions at RTCM that had changed since the acquisition,

*see id.* at 5, 7. Permitting testimony on this point will unfairly prejudice Defendants because it

sets up a strawman, misleading the jury to believe that Rio Tinto conducted an FMV analysis that

it did not and used an Acquisition Model that did not reflect current conditions at RTCM.

### 2. Milburn's Opinions about the Use of the RTCM BU Model at HY 2012 Are Unreliable.

Despite being asked by the SEC to opine only on the reliability of the RTCM Acquisition

Model at HY 2012, Ex. 9, Milburn Rpt. ¶ 1.4(iii), Milburn also opined that a *later*, preliminary

iteration of the RTCM BU Model could have "provide[d] a reliable measure of the FMV of the

RTCM Projects as of mid-2012," *id.* ¶ 5.10. As Milburn admitted, however, it was understood at

HY 2012 that Rio Tinto could not "provide a valuation for RTCM to an acceptable degree of

accuracy" *at all*. Ex. 17 (Milburn) at 212:2–10. As a basis for offering this opinion about the

reliability of the RTCM BU Model, Milburn claimed that Rio Tinto used the RTCM BU Model

(which contained discounted cash flow, or "DCF," models) for "financial reporting purposes" and

"impairment testing" at HY 2012.[4] *See* Ex. 9, Milburn Rpt. ¶ 4.1; Ex. 10, Milburn Rebuttal ¶ 2.16.

That, too, contradicts the record.

---

[4] In support of this opinion, Milburn opined that, when sufficient information is available, the "preferred" valuation approach is to use a DCF model. Ex. 9, Milburn Rpt. ¶¶ 3.21, 3.34. But rather than "conduct any sort of analysis or survey" to support that assertion, Milburn vaguely explained he "think[s]" his "theoretical[ ]" and "conceptual" preference would be endorsed by valuation textbooks—yet he cited none. Ex. 17 (Milburn) at 153:24–154:19. In fact, his opinion has no support in the relevant literature. A survey of his peer Canadian valuators revealed that the "dominant" approach to valuing mining projects is to look at the value of comparable projects while "complement[ing]" that approach with financial modeling when feasible. Ex. 38 at 5–

At HY 2012, the RTCM BU Model was a work in progress and used solely for business planning purposes.  SUF ¶¶ 211, 257.  Rio Tinto personnel consistently testified that the net present values ("NPVs") created by DCF models provide a "very imprecise measure of the value of an asset particularly at an early stage."  Ex. 26  (Ritchie) at 59:23–60:9 (NPV "certainly doesn't capture" a project's full value); *see also*, *e.g.*, Ex. 20 (Coulter) at 243:25–244:23 (NPV "is definitely not perfect" and "doesn't necessarily tell you . . . what someone is prepared to pay").  In fact, the results of the RTCM BU Model were viewed at the time as erratic and even "nonsensical."  Ex. 24 (Maglione) at 124:23–125:3; SUF ¶ 224; *see also*, *e.g.*, Ex. 21 (Finlayson) at 178:8–18 (RTCM's NPV "was dynamic and was changing" in May 2012); Ex. 26 (Ritchie) at 327:11–25 ("the variables just were enormous"); Ex. 22 (Larsen) at 204:19–205:19 ("the volatility is very big").  As a result, RTCM personnel were skeptical of the RTCM BU Model's results and concluded they "should not be relied upon."  Ex. 21 (Finlayson) at 303:21–304:4; SUF ¶ 226; *see also*, *e.g.*, Ex. 25 (Morris) at 173:14–18; Ex. 24 (Maglione) at 172:22–173:16.

Milburn's assumption has no record support because he did not adequately review the record.  Out of nearly thirty percipient fact-witness depositions, Milburn reviewed the deposition transcripts of only a few, *see* Ex 9, Milburn Rpt., App'x 1; Ex. 10, Milburn Rebuttal, App'x 1, and thus did not consider a wealth of testimony on how Rio Tinto personnel actually viewed and used the RTCM BU Model.  Even when purporting to "explain[ ] the purpose of" those models, Ex. 10, Milburn Rebuttal ¶ 2.107, Milburn cited testimony that offered no such explanation, and he omitted testimony that the models were built only to "guide investment decision-making" and "direct

---

6.  Milburn's personal preference for DCF models is thus "supported only by his *ipse dixit*, which is insufficient."  *LIBOR*, 299 F. Supp. 3d at 500; *see also Protostorm LLC v. Antonelli, Terry, Stout & Kraus, LLP*, 2014 WL 12788845, at *10 (E.D.N.Y. Mar. 31, 2014) ("a vague citation to unspecified authority adds nothing meaningful").

operating decisions" for RTCM—not for accounting purposes, *see* Ex. 24 (Maglione) at 34:14–35:3; Ex. 25 (Morris) at 24:6–25:14. Milburn's attempt to "cherry-pick[ ] the facts" that support his view while failing "to discuss the import of, or even mention, [countervailing] material facts" does not "satisfy the scientific method and *Daubert*." *Del Monte*, 2009 WL 3241401, at *8 (citation omitted); *see also Fin. Guar.*, 2020 WL 4251229, at *4 (excluding opinion that "contradict[ed] the factual record").

That Rio Tinto used DCF models at other points in time for other limited purposes, *see* Ex. 9, Milburn Rpt. ¶ 4.1, does not support a conclusion that DCF models were used to produce meaningful and reliable valuations for RTCM *prior to* YE 2012. Earlier DCF models, including iterations of the RTCM BU Model, were used exclusively for planning the design of the RTCM business, not for making accounting judgments. *See* Ex. 10, Milburn Rebuttal ¶¶ 2.16(i), (ii), (iv). Even at HY 2012, the "indication of value" that the Impairment Indicator Paper included as a reference point, Ex. 39 at 3, was not a formal estimate of RTCM's FMV, *compare* Ex. 10, Milburn Rebuttal ¶ 2.16(iii), *with* Ex. 17 (Milburn) at 210:19–212:10.[5] The critical point is that a model that accurately calculates mathematical formulas can still be unreliable if its inputs or assumptions are unreliable, *see, e.g.*, Ex. 9, Milburn Rpt. ¶ 3.36; Ex. 17 (Milburn) at 157:6–14, 159:17–160:15, and there is no evidence here that the inputs and assumptions used in various iterations and configurations of the BU Model were deemed reliable enough, before YE 2012, for use in creating a

---

[5]  While Rio Tinto relied on financial models during the due diligence process, Milburn's assertion that the "fundamental purchase price . . . was based on" financial modeling, Ex. 10, Milburn Rebuttal ¶ 2.5, is wrong and risks "misleading the jury," Fed. R. Evid. 403. In fact, Rio Tinto used other valuation approaches at acquisition. *E.g.*, Ex. 40 at -73–74. Milburn did not know this, was "not certain" what "impact" strategic considerations had on the purchase price, and—tellingly—was "just not clear" why Rio Tinto was prepared to acquire Riversdale for 20% more than an NPV calculated at acquisition. Ex. 17 (Milburn) at 54:15–55:9, 188:4–194:4; *see also* Ex. 41 at -66.

formal estimate of recoverable amount (or any other accounting purpose). Thus, Milburn's opinion could not help the jury decide whether Rio Tinto found the inputs and assumptions of such models reliable enough to calculate formal estimates of RTCM's recoverable amount at HY 2012. *See Daubert*, 509 U.S. at 591; *Amorgianos*, 303 F.3d at 265.

### 3. Milburn's Opinions about the RTCM BU Model and Its Functionality Are Irrelevant.

Although the SEC did not request it, Milburn also opined that the RTCM BU Model "had the necessary functionality to provide a reliable measure of the FMV of the RTCM Projects as of mid-2012 (and thereafter)." Ex. 9, Milburn Rpt. ¶ 5.10. Milburn premised this opinion on the "assump[tion]"—which he did not independently assess—that the model "was populated with the appropriate inputs, in a manner consistent with accepted international mineral valuation standards and guidelines." *Id.* This opinion should be excluded as irrelevant, unfairly prejudicial, and divorced from any generally accepted methodology.

As Milburn explained, his reference to the models' "functionality" simply meant that the models used mathematical formulas that worked as intended, *see* Ex. 17 (Milburn) at 229:18–233:13—*i.e.*, they were Microsoft Excel spreadsheets that "like a calculator" would "just spit out whatever mathematical equations [ ] you put into it. Depending on what inputs you put in, it'll give you the answer mathematically," *id.* at 159:21–160:15. Because no party here disputes the functionality of Excel spreadsheets, that is not at issue in this case, and Milburn's opinion would not help the jury. *See Fin. Guar.*, 2020 WL 4251229, at *10.

This opinion also should be excluded to avoid the "danger[s] of . . . unfair prejudice, confusing the issues, [and] misleading the jury." Fed. R. Evid. 403. There is no genuine dispute that, in light of changing development scenarios and ongoing uncertainty, the numbers produced by the model were considered *not* reliable and even "nonsensical" at HY 2012. *Supra* III.B.2. While

Milburn freely "assum[es] [the BU Model] was populated with the appropriate inputs," Ex. 9, Milburn Rpt. ¶ 5.10, that does not help the jury decide whether those inputs were, in fact, reliable. His opinion thus would not help, and would likely confuse, the jury as to the appropriate issue.

Finally, Milburn's methodology fails to demonstrate the "level of intellectual rigor" characteristic of financial modeling. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). In effect, he opined on the models' functionality without examining how the models actually worked. While he claimed to have "reviewed approximately 300 iterations of Rio Tinto's DCF models," Ex. 9, Milburn Rpt. ¶ 4.4 n.107, in reality he "reviewed three in detail"—and for the remaining 99% simply "looked at summaries" of their "dates, the[ir] inputs, [and their] outputs," Ex. 17 (Milburn) at 184:23–185:8. He offered no explanation of how such cursory review could possibly demonstrate that the models functioned properly or the outputs were calculated correctly, especially when "hundreds of inputs" were used and "small changes in some of the inputs can actually yield very dramatic disparities" in outputs. Ex. 17 (Milburn) at 157:15–158:10. Because Milburn "failed sufficiently to explain what [his] reasoned . . . analysis entailed and how it was applied" to summaries of these hundreds of variables per model, he has "not demonstrate[d] any particular scientific expertise that can be assessed for reliability." *Del Monte*, 2009 WL 3241401, at *16.

## C.    Milburn's Opinions in His Rebuttal Report Are Untimely, Unreliable, and Beyond His Expertise.

In his Rebuttal Report, Milburn provided (1) two valuations of Minjova, one calculated using the "market approach" and the other using the "cost approach," Ex. 10, Milburn Rebuttal ¶¶ 4.43–4.51; (2) a "detailed discussion" of the nine comparable transactions listed in the Impairment Indicator Paper and an opinion that they were insufficiently similar to RTCM, *id.* ¶¶ 2.19, 2.33–2.104; and (3) various responses to the reports of Defendants' experts Christensen and Edwards. The first two sets of opinions should be excluded under Federal Rule of Civil Procedure

("FRCP") 26 and FRE 702(c).  The third set of opinions should be excluded under FRE 702 primarily because they far exceed the bounds of Milburn's own expertise.

> **1.    Milburn's Valuations of Minjova and Opinions on Comparable Transactions Are Untimely under FRCP 26.**

Because an expert's opening report "must contain . . . a complete statement of all opinions the witness will express," Fed. R. Civ. P. 26(a)(2)(B), it cannot be augmented based upon information "that was available" prior to its submission.  *MF Glob. Holdings Ltd. v. Pricewaterhouse-Coopers LLP*, 232 F. Supp. 3d 558, 572 (S.D.N.Y. 2017).  Accordingly, "rebuttal reports are limited to responding to the issues raised by the opposing parties' experts."  *Procter & Gamble Co. v. McNeil-PPC, Inc.*, 615 F. Supp. 2d 832, 838 (W.D. Wis. 2009); *accord Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec. LLC*, 691 F. Supp. 2d 448, 467–68 (S.D.N.Y. 2010).  Milburn's Rebuttal Report, however, is the first and *only* expert report to offer opinions on Minjova's valuation and Rio Tinto's comparable-transactions analysis.  Because these "new opinions" do not actually rebut any opposing testimony, they should be excluded under FRCP 26.  *Jorgensen Forge Corp. v. Consarc Corp.*, 2002 WL 34363668, at *1 (W.D. Wash. Jan. 9, 2002).

With respect to the Minjova valuations, Milburn purported to respond to Defendants' expert Edwards, who opined that Minjova's $5 million purchase price was "not a reliable approach for determining what [it] was worth to Rio Tinto in mid-2012."  Ex. 5, Edwards Rpt. ¶ 141.  But as Milburn repeatedly acknowledged, Edwards "does not opine on the [fair value] of Minjova."  Ex. 10, Milburn Rebuttal ¶ 4.2; *see also id.* ¶¶ 2.29, 4.22.  Milburn should not be permitted to lie in wait until his Rebuttal to offer non-responsive valuations of Minjova that he could have offered in his Opening Report, depriving Defendants of any opportunity to rebut this testimony.

Similarly, although Milburn's criticism of Rio Tinto's comparable-transactions analysis purported to respond to the Edwards report, it did not actually do so.  Edwards was responding to

the claim of the SEC's expert Drewe that the Impairment Indicator Paper had "[u]nreasonably [d]ismisse[d] the [m]arket [v]aluation [a]pproach." Ex. 5, Edwards Rpt. ¶¶ 137–140.  Edwards explained that the comparable-transaction method is, in fact, "an appropriate tool for ensuring that value estimates are congruent with what the market would actually pay," *id.* ¶ 132, and noted that the opening reports by Drewe and Milburn failed to "meaningfully engage[ ] with the comparable analysis Rio Tinto performed," *id.* ¶ 140; *see also id.* ¶ 21(b).  As Milburn concedes, however, Defendants' expert Edwards did "not undertake[ ] an analysis to review the comparability" of the transactions at issue, Ex. 10, Milburn Rebuttal ¶ 2.44, but instead merely observed that the SEC's experts failed to "meaningfully engage[ ]" with Rio Tinto's analysis, Ex. 5, Edwards Rpt. ¶ 140. Milburn's belated attempt to provide such analysis in a rebuttal—based entirely on information available at the time of his Opening Report, *see* Ex. 17 (Milburn) at 256:8–258:7—is improper.

Courts routinely exclude similar "rebuttal" opinions that exceed the scope of proper rebuttal because such opinions fail to "abide by the [Court's] discovery deadlines."  *MF Glob.*, 232 F. Supp. 3d at 572; *see also*, *e.g.*, *Richman v. Respironics, Inc.*, 2012 WL 13102265, at *10 (S.D.N.Y. Mar. 13, 2012); *In re TFT-LCT (Flag Panel) Antitrust Litig.*, 2012 WL 12919150, at *2–3 (N.D. Cal. July 13, 2012); *Noffsinger v. Valspar Corp.*, 2011 WL 9795, at *6 (N.D. Ill. Jan. 3, 2011); *Ebbert v. Nassau County*, 2008 WL 4443238, at *14 (E.D.N.Y. Sept. 26, 2008); *IBM v. Fasco Indus., Inc.*, 1995 WL 115421, at *3 (N.D. Cal. Mar. 15, 1995).  This Court should do the same.

## 2.    Milburn's Valuations of Minjova Are Unreliable.

Milburn's valuations of Minjova should be excluded for the independent reason that they are not "the product of reliable principles" in several respects.  Fed. R. Evid. 702(c).

*First*, Milburn concedes that both valuations are based on "a limited review, analysis and corroboration of the relevant information," and "may have been different had [he] prepared a Comprehensive Valuation Report," Ex. 10, Milburn Rebuttal at 51 n.216, which would have allowed

him to work with technical experts to assess "available" record information that he himself is "not qualified to assess," Ex. 17 (Milburn) at 311:15–312:19.  Yet Milburn has done just that in other disputes, *see, e.g., id.* at 80:15–81:18, 91:12–94:16, and could not recall "provid[ing] a report short of a comprehensive report" in any prior matter, *id.* at 308:12–20.  The SEC strategically chose not to retain a coal-mining expert to interpret the "technical information that [Defendants' expert] reviewed and relied upon," *id.* at 312:5–22; now it must live with the consequences of that choice:  Milburn should not be allowed to offer opinions that do not meet "the same level of intellectual rigor that characterizes" his own "practice."  *Kumho*, 526 U.S. at 152.

*Second*, both valuations are unreliable because they defy generally accepted principles.  For example, Milburn opines that, under the market approach, Rio Tinto's earlier purchase of an interest in Minjova for $5 million indicates that Minjova's fair market value at HY 2012 was $5 million.  Ex. 10, Milburn Rebuttal ¶¶ 4.43–4.46.  But while Milburn based this valuation on what Rio Tinto had earlier paid for the *same* interest, *id.* ¶¶ 4.26, 4.43–4.46, his Report acknowledges that, under the market approach, he is required to look to "transactions of *other* mining projects that are deemed suitably similar to" Minjova, Ex. 9, Milburn Rpt. ¶ 3.56(i) (emphasis added); *see id.* ¶ 3.21(ii) (market approach considers "the value of similar assets that are traded in efficient public markets").  Moreover, Milburn's valuation ignores the value of Rio Tinto's post-acquisition exploration and coal analysis.  *See* Ex. 2, Christensen Rpt. at 43–44, 48–53.  These developments distinguish Minjova's value at the time of purchase from its value at HY 2012 such that they are not "similar assets . . . at a similar time and under similar circumstances," as required for a market approach.  Ex. 5, Edwards Rpt. ¶ 132; *see also* Ex. 42 at 15–16.  Finally, Milburn states that the market approach requires that the interest be "traded in efficient public markets," Ex. 9, Milburn Rpt. ¶ 3.21(ii)—yet he cites no such evidence for Minjova.

  
Because Milburn "provide[s] no basis at all for the jury to do anything other than accept or reject" his application of the market approach "on faith," his valuation should be excluded. *Protostorm*, 2014 WL 12788845, at *9 n.12; *accord Del Monte*, 2009 WL 3241401, at *8 (excluding expert who failed "to discuss the import of, or even mention, [countervailing] material facts").

As to his alternative cost-based approach, Milburn opines that Minjova's FMV at HY 2012 was between $3.5 and $8.75 million because by that time Rio Tinto had spent $3.5 million exploring Minjova. Ex. 10, Milburn Rebuttal ¶¶ 4.47–4.50. While Milburn describes the cost approach as "based on the principle that historical costs incurred contribute to future value," Ex. 9, Milburn Rpt. ¶ 3.21(iii), that is *his own assertion based on no authority or evidence*. In fact, he has opined elsewhere that "costs incurred are *not* indicative of value," and thus "costs invested" do "*not* meet the [FMV] standard." Ex. 43, ¶¶ 5.9–5.10 (emphases added); *see* Ex. 17 (Milburn) at 285:17–287:4. This "fundamental disagreement[ ] between a party's *own* experts"—indeed, the same expert—indicates a disqualifying "lack of reliability," *LIBOR*, 299 F. Supp. 3d at 481–82.

Milburn's *ipse dixit* is especially problematic because his methodology is unreliable. He computed his $3.5 to $8.75 million figure by multiplying Rio Tinto's $3.5 million in exploration costs at Minjova by "1.0x to 2.5x." Ex. 10, Milburn Rebuttal ¶¶ 4.47–4.50. Yet he derived this multiplier from a chart of a "simplified example" of "typical adjustment factors," *id.*, and never explains why he relied on a "simplified example," why he applied these "adjustment factors" here, or how he determined a proper range of multipliers. Even his chart is unreliable, as it apparently comes from a PowerPoint prepared by a consultant who may never have published or presented it anywhere, and who has stated that the valuation methodology Milburn uses "is not accepted by Canadian securities commissions." Ex. 44 at 30–31.

Milburn's choice to use $3.5 million as Minjova's base value is likewise unreliable. Even the authorities on which Milburn relies acknowledge that a base value should include acquisition costs, "previous exploration expenditure and/or future committed expenditure," and "[m]arket factors" based on the prospects of adjacent properties. *See*, *e.g.*, Ex. 44 at 30, 33–35; Ex. 10, Milburn Rebuttal ¶ 4.28 (noting "'warranted future (exploration) costs'"); Ex. 45 at 70 (acquisition costs and "warranted future expenditures contribute a significant portion of the property value" under a cost-based approach); Ex. 46 at 3 (cited in Ex. 9, Milburn Rpt. ¶ 3.62 n.105) (acquisition costs). Yet Milburn's base value excludes (1) Rio Tinto's $5 million acquisition cost for its Minjova interest, (2) predecessor's exploration costs prior to Rio Tinto's acquisition of its interests in Minjova, (3) anticipated exploration costs *after* HY 2012, and (4) consideration of RTCM's adjacent properties and their potential, which would have benefited from operational efficiencies that would not have been possible if the properties were developed separately. Ex. 17 (Milburn) at 304:18–306:7; *see also* Ex. 2, Christensen Rpt. at 43–44, 48–53. By failing to "cite with specificity [any] studies and peer-reviewed literature" that he relied on for his contrary cost-based approach, Milburn has "failed to meet [his] burden" of showing that his valuations are "methodologically sound," and his cost-based valuation should be excluded. *Williams v. Mosaic Fertilizer, LLC*, 889 F.3d 1239, 1248 (11th Cir. 2018).

### 3.    Milburn's Opinion on Rio Tinto's Comparable-Transactions Analysis Is Unreliable.

Milburn's "detailed discussion" of, and opinion on, the nine comparable transactions in the Impairment Indicator Paper, *see* Ex. 10, Milburn Rebuttal ¶¶ 2.19, 2.33–2.104, should also be excluded under FRE 702(c) as unreliable. Milburn asserts that Rio Tinto benchmarked RTCM against transactions not "suitably comparable to Benga or Zambeze" in that they "differ significantly along the most important [nine] comparison factors." Ex. 10, Milburn Rebuttal ¶¶ 2.37,

2.104.  But he cited no source for those nine factors, *id*. ¶ 2.45, and even agreed that Rio Tinto was not required to apply them, Ex. 17 (Milburn) at 316:2–12.  Rather than draw on "an academic paper," "a guide or textbook," or *any* published authority, Milburn impermissibly plucked his criteria from supposed "common sense" and his "own view based on [his] experience" of what factors he personally would have applied.  *Id*. at 259:23–260:6, 267:10–16; *see LIBOR*, 299 F. Supp. 3d at 500 (explanation of "specific . . . criteria applied" cannot "be supported only by [expert's] *ipse dixit*"); *Paine ex rel. Eilman v. Johnson*, 2010 WL 749851, at *4 (N.D. Ill. Feb. 25, 2010) ("opinions reached merely by virtue of the expert's . . . intuition are not admissible").

Milburn's say-so is especially unreliable here because he lacks relevant experience.  In his twenty years providing valuations in legal disputes, Milburn has conducted a similar analysis for a coal mining project just once—and even then he did not apply "these nine [criteria] specifically." Ex. 17 (Milburn) at 260:19–261:8.  When valuing non-coal mining projects, Milburn has applied still different criteria, again without citing to any authority.  *See id.* at 272:11–19; Ex. 47, ¶ 7.66; Ex. 48, ¶ 4.12 n.67.  That Milburn *himself* has never actually applied these same nine criteria proves that his conclusions concerning Rio Tinto's comparable-transactions analysis are not "the product of reliable principles and methods . . . reliably applied."  Fed. R. Evid. 702.

### 4.  Milburn's Responses to the Edwards and Christensen Reports Are Not Within His Expertise.

In responding to the reports by Defendants' experts Edwards and Christensen, Milburn's Rebuttal Report also offers several opinions that should be excluded under FRE 702 because they are beyond the scope of Milburn's own expertise.

**a.**  Unlike Milburn, Defendants' expert Edwards is a mining engineer who has worked in the mining industry for 28 years as an executive, board member, investment banker, equity analyst, and engineer.  Ex. 5, Edwards Rpt. ¶ 1; *see also* Ex. 10, Milburn Rebuttal ¶ 2.1.  Edwards was

retained to respond to certain conclusions in the expert reports of the SEC's experts Milburn and Drewe, *see* Ex. 5, Edwards Rpt. ¶ 17, and concluded that Milburn and Drewe improperly "ignore[d] the mining industry environment at the time before and shortly after the Riversdale Acquisition," *id.* ¶ 21(a); Drewe "erroneously relie[d] solely on" the RTCM BU Model "and fail[ed] to consider other relevant valuation methods," *id.* ¶ 21(b); Milburn and Drewe "[misunderstood] the business unit modeling process when they propose[d] that the RTCM BU Model should have been used in the HY2012 Impairment Paper," *id.* ¶ 21(c); and they "fail[ed] to acknowledge and account for the time required to generate reliable business unit models and their inputs," *id.* ¶ 21(d).

In contrast to Edwards, Milburn admits he has never worked in the mining industry, *see* Ex. 17 (Milburn) at 25:7–30:19, or studied geology or mining engineering, *id.* at 18:12–17, and is "not a technical expert" "competent to interpret . . . geological data" or offer "geological opinion[s]," *id.* at 301:19–302:18. Any tangential knowledge Milburn has based on valuation work in other mining disputes is insufficient because he has never testified about a coal-mining project, *id.* at 106:8–11, nor been found qualified to opine on any matter—mining or otherwise, *id.* at 103:25–105:19.[6] His responses to the Edwards Report nevertheless consistently turn on expertise Milburn claims to have, but does not possess.

For example, Milburn opined, "[o]n my reading of" Rio Tinto's Project Evaluation Guidance ("PEG"), "Edwards' comments on the appropriate valuation methods" were "incomplete" because, in Milburn's opinion, Edwards "misse[d] the broader point that Tete East and Minjova

---

[6] Given no experience in the coal mining industry, he is similarly unqualified to provide his "overview of coal, the mining industry generally and the global coal mining industry in 2011 to 2012." Ex. 10, Milburn Rpt. ¶¶ 2.1–2.26; *In re Williams Sec. Litig.*, 496 F. Supp. 2d 1195, 1245 (N.D. Okla. 2007) (precluding testimony of expert "clearly possessing the *general* qualifications required to perform a discounted cash flow analysis" but lacking "industry-specific expertise").

were early stage exploration properties that had not yet defined JORC-compliant Resources."  Milburn Rebuttal ¶¶ 2.22–2.25.  Because Milburn has never worked at Rio Tinto, Ex. 17 (Milburn) at 58:3–9, he cannot serve as "an expert with respect to [its] manual[s]" and guidance, and his proffered interpretation of Rio Tinto's PEG "is beyond the scope of his expertise," *LaSalle Bank Nat'l Ass'n v. CIBC Inc.*, 2012 WL 466785, at *17 (S.D.N.Y. Feb. 14, 2012).  Similarly, Edwards explained that the RTCM BU Model "used a single type of valuation approach—a DCF analysis— but industry best practices for valuing mineral assets call for the use of at least two valuation methods," so the SEC's experts should have considered "other relevant valuation methods."  Ex. 5, Edwards Rpt. ¶ 21(b).  In response, Milburn asserted that Edwards "contradicts Rio Tinto's own business practices, its valuation guidance under PEG and its treatment of the RTCM Projects."  Ex. 10, Milburn Rebuttal ¶ 2.2(ii); *see also id.* ¶ 2.17.  But the jury does not need Milburn's non-expert testimony "to assess [Rio Tinto's] compliance with its company policy."  *Smith v. Allstate Ins. Co.*, 912 F. Supp. 2d 242, 251 (W.D. Pa. 2012).

Milburn's lack of expertise also militates in favor of excluding his response to Edwards' opinion that, "until there are sufficient inputs . . . business models cannot provide reliable information for corporate decision-making."  Ex. 5, Edwards Rpt. ¶ 21(c).  Edwards explained that, because "organizational consensus could not be reached" by HY 2012, "there was no RTCM BU Model developed [by that time] that could have been reliably used for external reporting purposes."  *Id.*  Milburn disagreed, asserting that "[t]he requirement of companies to determine FVLCS under IFRS . . . is not conditional upon reaching 'organizational consensus.'"  Ex. 10, Milburn Rebuttal ¶ 2.118.  While Milburn is qualified to testify generally about valuations, applicable accounting standards are a distinct field for FRE 702 purposes.  *See Sun Ins. Mktg. Network, Inc. v. AIG Life Ins. Co.*, 254 F. Supp. 2d 1239, 1245 (M.D. Fla. 2003).  Milburn took accounting classes decades

49

ago, Ex.17 (Milburn) at 18:18–21:17, but "no good faith argument can be made that [his twenty] year-old course study is a sufficient qualification to testify" as an accounting expert, *523 IP*, 48 F. Supp. 3d at 647; *see also Washington v. Kellwood Co.*, 105 F. Supp. 3d 293, 310–11 (S.D.N.Y. 2015) (taking "various marketing courses in graduate school" did not establish marketing exper- tise). Nor is he qualified to opine on IFRS based on his limited "experience as an accountant," Ex. 17 (Milburn) at 118:24–119:9, as he has never advised companies on the application of accounting standards, *id.* at 33:3–15, and has no experience conducting impairment tests, *id.* at 118:12–14. By opining on the requirements and application of IFRS, Milburn "fail[ed] to stay within the lane of his expertise." *In re MV MSC Flaminia*, 2017 WL 3208598, at *11 (S.D.N.Y. July 28, 2017).

Milburn's lack of relevant experience is apparent from his inability to consistently (and accurately) relay or understand basic accounting concepts. For example, his testimony that IAS 36 "governs the impairment of exploration and evaluation assets," Ex. 17 (Milburn) at 117:14– 118:7, contradicts the SEC's accounting expert's correct statement that such assets "are accounted for in accordance with IFRS 6," Ex. 1, Brice Rpt. ¶ 4.2.8(a). When asked why his Rebuttal omitted aspects of one accounting standard, Milburn conceded he did not "know exactly what [the standard was] trying to get at." Ex. 17 (Milburn) at 151:8–22.[7] He even contradicted himself on whether, *e.g.*, recoverable value is based on "the higher of fair value less cost to sell [FVLCS] and value in use," *id.* at 123:4–10, or only FVLCS, Ex. 10, Milburn Rebuttal ¶ 1.4 n.2, and whether fair value

---

[7] Milburn offered several inaccurate opinions on accounting standards. For example, his opinion that "IFRS standards do not require the use of multiple valuation approaches for the determination of fair value," Ex. 10, Milburn Rebuttal ¶ 2.2(ii) & n.9, contradicts both IFRS 13—which acknowl- edges instances where multiple valuation techniques may be appropriate, Ex. 64, ¶ 63—and "rec- ognized mineral valuation standards," Ex. 10, Milburn Rebuttal ¶ 2.122, which say that a valuator "should make use of at least two Valuation Approaches," Ex. 58, ¶ 8.3 (VALMIN Code); *see* Ex. 49, ¶ 2.8 (CIMVAL Code); Ex. 10, Milburn Rpt. ¶ 3.22; Ex. 17 (Milburn) at 145:3–146:10.

"must be based on" NPV, *id.* ¶ 3.3(ii), or "can be derived through a number of different ap-
proaches," Ex. 17 (Milburn) at 123:23–124:5.

Such "inattention and imprecision . . . raises (additional) questions as to his qualifications
(or lack thereof) as an expert" because, at bottom, it "reflect[s] his inexperience with . . . account-
ing." *Chill v. Calamos Advisors LLC*, 417 F. Supp. 3d 208, 252 (S.D.N.Y. 2019).  Courts routinely
exclude expert testimony in similar circumstances.  *See id.* at 243–44 (expert witness with "no
experience in preparing, auditing or analyzing financial statements" who had "never been retained
to perform costs accounting or financial accounting services" could not "opine on topics related to
accounting"); *MF Glob.*, 232 F. Supp. 3d at 576 (witnesses who were "not auditors and have no
experience" were "not qualified to interpret the requirements of PCAOB standards").  This Court
should exclude Milburn's responses to the Edwards Report for the same reason.

**b.**  For similar reasons, the Court should exclude Milburn's responses to the report pro-
vided by Defendants' expert Christensen.  Unlike Milburn, Christensen is a mining engineer with
more than 30 years' experience in the exploration, study, development, and operation of mines.
Ex. 2, Christensen Rpt. at 1.  In addition to "provid[ing] an overview" of coal exploration, evalu-
ation, and business planning, Christensen "opine[s] on certain issues relating to Rio Tinto's explo-
ration and mine planning efforts in Mozambique"—specifically, in response to Milburn's Report,
on the timing of the RTCM impairment and the acquisition and valuation of Minjova.  *Id.* at 4.

Milburn was not qualified to offer his response on the timing of the impairment.  Christen-
sen noted that he was not "aware of any mining project[,] of a scale remotely similar to RTCM,
where . . . assets were impaired in whole or in part, within just two years of acquisition," Ex. 2,
Christensen Rpt. at 6, and opined that the timing of a nearby Vale impairment, taken "12 years

after it commenced exploration efforts[,] . . . is much more typical." *Id.*; *see also id.* at 58.  Although Milburn responded that the comparison to Vale was inappropriate under the "impairment test [ ] required by accounting standards (i.e. IFRS)," Ex. 10, Milburn Rebuttal ¶ 3.13, Milburn has no real experience in coal mining, *see*, *e.g.*, Ex. 17 (Milburn) at 106:8–16, and is unqualified to opine on IFRS or impairment standards, *supra* III.C.4.a.  His opinions thus should be excluded.

The Court also should exclude Milburn's response on Rio Tinto's assessment of Minjova at HY 2012.  As Christensen explained, RTCM's internal business modeling in 2012 included anticipated "additional mineable coal from the adjacent land in Tete East and Minjova"; Christensen opined that "it was not unreasonable" for the RTCM BU Model to factor in this additional coal.  Ex. 2, Christensen Rpt. at 5–6.  Milburn responded that, in 2012, "Rio Tinto had not conducted sufficient exploration work to define any . . . resources" at Minjova or Tete East and "thus according to international mineral valuation codes (and Rio Tinto's PEG) it was not appropriate to include [this] material from Minjova in a DCF valuation of" RTCM.  Ex. 10, Milburn Rebuttal ¶ 4.21.  In addition to being unqualified to interpret Rio Tinto's PEG, *supra* III.C.4.a, Milburn misconstrued Christensen, who merely was opining as a mining engineer about the use of these models for business-planning purposes, rather than financial-reporting purposes.[8]

## IV.   The Court Should Exclude Drewe's Opinions And Testimony Entirely.

For the central issue in its framing of the case—RTCM's valuation at HY 2012—the SEC engaged Drewe, who has never studied accounting or valuation at university, has no post-graduate

---

[8]  Milburn also appears to offer improper legal opinions that Edwards' or Christensen's opinions are "not relevant" to the "key issue[s]" in this litigation, *see*, *e.g.*, Ex. 10 Milburn Rebuttal ¶¶ 1.4, 1.5, 2.2, 2.8, 2.9, 2.124, or that Christensen is not "qualified to provide opinions on impairment issues," *id.* ¶ 3.12.  Any such testimony as to what is or is not legally relevant, or which expert is or is not qualified, "is the exclusive purview of the courts."  *U.S. Info. Sys., Inc. v. IBEW Local Union No. 3*, 313 F. Supp. 2d 213, 240 (S.D.N.Y. 2004).  If necessary, Defendants will move *in limine* to exclude all such legal opinions from Milburn's testimony.

degree, and has never published any writings.  *See* Ex. 14 (Drewe) at 38:3–24.  Drewe's sole

"qualification" is that he has spent his entire career at Mazars LLP, where he has generally sup-

ported other experts, and has never before been proffered as a testifying expert.  *See id.* at 43:12–

22, 45:12–13; Ex. 3, Drewe Rpt., App'x A at 1–2, 6.  Drewe's testimony should be excluded in its

entirety on multiple independent grounds, including that he (1) is not qualified to opine on the

valuation of mineral assets; (2) is not qualified to opine on coal production; and (3) employs an

unreliable methodology, which violates established valuation standards and guidelines, is not

based upon any independently developed valuation model, reflects a nonsensical configuration of

RTCM's development, and improperly relies on post-HY 2012 developments.

## A.    Drewe's Opinions

Drewe's main opinion concerned RTCM's HY 2012 value, which he calculated based on

a May 2012 iteration of the RTCM BU Model that he dubbed the "May 2012 Brisbane Model."

Ex. 3, Drewe Rpt. ¶ 6.4.7.  There were over 350 iterations of the RTCM BU Model, each reflecting

different assumptions and business configurations that were considered, refined, rejected, or su-

perseded over time.  *See* SUF ¶ 213; Ex. 24 (Maglione) at 208:25–209:16; Ex. 21 (Finlayson) at

154:2–7.  The configuration Drewe selected as his starting point, however, was superseded as of

HY 2012 and not based on the latest assumptions:  While Drewe's starting point generated a neg-

ative $680 million NPV on the assumption that, *e.g.*, Rio Tinto would own a "100% Share" of (and

thus foot the entire bill for) a large "Greenfield Railway solution," Ex. 3, Drewe Rpt. ¶ 6.4.8, by

HY 2012 RTCM was focused on "[a]lternative sizing" and "funding options," *id.* ¶ 6.4.14, and

model iterations based on these updated assumptions reflected NPVs averaging more than $1 bil-

lion, with some up to $4 billion, *id.* ¶ 6.2.9.

To end up with a valuation of RTCM at HY 2012 that was far less than the "starting point"

of the negative $680 NPV from the May 2012 Brisbane Model, Drewe:

- Eliminated nearly all production from Minjova and Tete East, *see* Ex. 3, Drewe Rpt. tbl. 13C (approximately $1.1 billion in value); Ex. 14 (Drewe) at 187:25–188:1;

- Maintained more than $7 billion in capital costs associated with the construction of a greenfield railway, *see* Ex. 14 (Drewe) at 188:21–190:2, even though most of that railway was to be used to transport coal from Minjova and Tete East, *see* Ex. 3, Drewe Rpt. ¶¶ 6.4.8, 11.4.1 fig. 11C, and would have saleable spare capacity, *see id.*; and

- Maintained more than $4 billion in other capital costs specifically linked to Minjova and Tete East, *see* Ex. 14 (Drewe) at 191:6–14; Exs. 50–55.

Central to Drewe's model was a dramatic reduction of the value of Minjova and Tete East, Ex. 3, Drewe Rpt. ¶ 13.4.3(c)(ii), based on his opinion that production assumptions for those mines in the May 2012 Brisbane Model were "unreasonable," *id.* ¶¶ 10.4.1(a)(iv), 10.2.29, 13.4.3(c)(ii); Ex. 14 (Drewe) at 250:16–21.  Before this lawsuit was filed, however, Drewe and Brice (who are colleagues) were consulting experts for the U.K. Financial Conduct Authority ("FCA"), *see* Ex. 3, Drewe Rpt. ¶ 1.5.2, and stated in their joint 2017 FCA Report, under penalty of perjury, that:

> It is *not* within our expertise to comment upon whether the production volumes assumed by Rio Tinto in the May 2012 NPV for Minjova and Tete East are reasonable, or whether there was a "*high degree of confidence*" in their economic extraction.

Ex. 56, ¶ 8.4.18 (first emphasis added).

Moreover, in reaching his own view of what was "reasonable" to produce from Minjova and Tete East, Drewe repeatedly relied on documents regarding those two tenements reflecting testing results that were not available until late 2012—many months *after* HY 2012.  *See*, *e.g.*, Ex. 3, Drewe Rpt. ¶ 13.4.3(iii) (citing January 2013 paper); *id.* ¶¶ 10.2.29(b) nn.374–75 (citing March 2013 report); Ex. 14 (Drewe) at 207:17–24, 210:7–16 (late 2012).  After eliminating nearly all production from Minjova and Tete East, while at the same time maintaining all costs (including infrastructure) associated with large-scale production from these two mines, Drewe calculated an FVLCS of negative $1.63 billion.  Ex. 3, Drewe Rpt. ¶ 13.4.5.

## B.      Drewe Admits He Lacks Relevant Expertise for His Opinions.

The Court should exclude Drewe's valuation of RTCM under FRE 702 because, as he admits, he is not "qualified as an expert" to value mineral assets or to assess coal-production assumptions. Fed. R. Evid. 702.

**1.** As the SEC's own expert has explained, an expert in the "specialty area of valuation" of mineral assets "must understand the mining industry and have experience with the valuation of mineral projects," and "[a]ny valuation opinion" "should be conducted following international mining standards and guidelines." Ex. 9, Milburn Rpt. ¶ 3.4; Ex. 10, Milburn Rebuttal ¶ 2.26. Drewe falls far short of these baseline standards: The valuation of mining assets is "not [his] area of expertise," Ex. 14 (Drewe) at 54:23–24; he has never worked at a mining company, *id.* at 44:18–20, and has no experience in coal mining, *id.* at 32:11–13, geology, *id.* at 29:10–14, mine engineering, *id.* at 30:19–23, or coal transportation infrastructure, *id.* at 32:15–17; and he has limited (and only non-mining) experience in African countries and potentially no experience with capital projects, *see* Ex. 3, Drewe Rpt., App'x A; Ex. 14 (Drewe) at 32:19–33:25, and could not specifically identify any coal mining project on which he had worked, Ex. 14 (Drewe) at 55:8–56:2.

It is irrelevant that Drewe may have worked on valuations in other contexts. In the "specialty area of valuation" of mineral assets, Ex. 9, Milburn Rpt. ¶ 3.4, his "*general*" knowledge of accounting cannot make up for his lack of "industry-specific expertise," *In re Williams*, 496 F. Supp. 2d at 1245; *see also*, *e.g.*, *Sun Ins.*, 254 F. Supp. 2d at 1245 (excluding testimony from forensic accountant who had "never valued any insurance agencies like Plaintiff's," "does not have any background information on the long term care industry," and "has done no work in the long term care industry in the last ten years"); *Washington*, 105 F. Supp. 3d at 310–11 (excluding testimony from accountant who lacked "specialized knowledge about . . . marketing" despite taking "various marketing courses in graduate school").

**2.** Had the SEC wished to assail RTCM's contemporaneous coal-production assumptions for Minjova and Tete East, it could have tried to do so through a coal-mining expert. As a substitute, it used Drewe, who opined that production volume assumptions related to Minjova were "unreasonable in a number of the Key Models," Ex. 3, Drewe Rpt. ¶¶ 10.4.1(a)(iv), 10.2.29, and that he "ha[d] not seen anything which suggests that there was a high degree of confidence in relation to Tete East or Minjova," *id.* ¶ 13.4.3(c)(ii); *see* Ex. 14 (Drewe) at 250:16–21 ("conclud[ing] that the production assumptions for both Tete East and Minjova in the May 2012 Brisbane model were unreasonable"). Drewe admitted he was not qualified to offer these opinions.

In fact, in the 2017 FCA Report, Drewe stated, under penalty of perjury, that it was "*not within [his] expertise to comment upon whether the production volumes assumed by Rio Tinto in the May 2012 NPV for Minjova and Tete East are reasonable, or whether there was a 'high degree of confidence in their economic extraction.'*" Ex. 56, ¶ 8.4.18 (emphasis added). This affirmation to the FCA was no surprise: Drewe has no experience in geology, coal mining, or mine engineering. *See* Ex. 14 (Drewe) at 29:10–14, 30:19–23, 32:11–13. Drewe thus purports to opine here on precisely what he swore to the FCA was not within his expertise. And whereas Drewe based the analysis in the FCA investigation on the findings of a mining engineer, *see* Ex. 56 ¶ 8.4.6 n.285; Ex. 14 (Drewe) at 80:2–9, he did not enlist the help of any mining engineer here, *see* Ex. 14 (Drewe) at 29:10–32:13; *see also* Ex. 57 at 4.

Drewe's conclusion that the coal production assumptions for Minjova and Tete East were "unreasonable" is especially unreliable because he relied on post-HY 2012 documents containing information not available at HY 2012—including a January 2013 impairment paper, *see* Ex. 3, Drewe Rpt. ¶ 13.4.3(c)(iii), and a March 2013 report, s*ee id.* ¶ 10.2.29(b) nn.374–75—both of which relied on geological testing information not available at HY 2012, *see infra* IV.C.4. Based

on this hindsight analysis, Drewe removed approximately $1.1 billion of value related to Minjova and Tete East—over 95% of their value in the May 2012 Brisbane Model.  *See* Ex. 3, Drewe Rpt., tbl. 13C (removing $816 million for Minjova and $354 million for Tete East).

Whatever "experience in accounting and business valuation" Drewe may have, his opinions on coal production are "wholly outside the scope of his expertise" and must be excluded. *Washington*, 105 F. Supp. 3d at 310–11 (citation omitted) (excluding opinion on "marketing efforts" by expert whose accounting and valuation expertise "does not translate into marketing expertise"); *see also MV MSC Flaminia*, 2017 WL 3208598, at *11 (expert's "failure to stay within the lane of his expertise" warrants exclusion).

### C.    Drewe's Calculation of RTCM's Value at HY 2012 Is Not Based on a Reliable Methodology.

An independent reason for excluding Drewe's HY 2012 valuation of RTCM under FRE 702 is that "the method by which [he] draws an opinion" cannot withstand the "rigorous examination" this Court must apply.  *Amorgianos*, 303 F.3d at 267.  Drewe's valuation was not "the product of reliable principles," Fed. R. Evid. 702(c), in four separate respects:  Drewe ignored (and violated) established standards for valuing mineral assets, he began from a *superseded* version of the BU Model, ended with an absurd business configuration that no rational management ever would have adopted, and based his conclusions on information that was not even available at HY 2012.

#### 1.    Drewe Ignored—and Violated—Established Standards for the Valuation of Mineral Assets.

According to the SEC's own expert Milburn, "the valuation of mineral properties is guided by international mining codes," Ex. 9, Milburn Rpt. ¶ 3.18, and "[a]n impairment analysis under IFRS . . . should follow best practices in the field of mineral valuation which includes recognized mineral valuation standards and guidelines," Ex. 10, Milburn Rebuttal ¶ 2.122.  Drewe dismissed these "best practices" out of hand—and even violated them.

Drewe assumed that "mining codes are *not* relevant to an impairment test undertaken in accordance with IAS 36," Ex. 14 (Drewe) at 18:11–13 (emphasis added); *see also id.* at 19:2–4 ("IAS 36 doesn't require . . . reference and reliance upon mining guidelines.")—even though Milburn said such codes "*are* relevant in the determination of FVLCS at HY 2012," Ex. 9, Milburn Rpt. ¶ 2.124 (emphasis added). Drewe also dismissed as "non-relevant," Ex. 14 (Drewe) at 89:15–93:15, five "internationally recognized mining codes and standards" that Milburn identified as guiding "the valuation of mineral projects," Ex. 9, Milburn Rpt. ¶ 3.18; *see* Ex. 14 (Drewe) at 105:13–106:13 (VALMIN Code "has no standing within IFRS" and "is not relevant to what [he] did here"); Ex. 4, Drewe Rebuttal ¶ 2.4.1 & n.65 ("textbooks" are irrelevant).[9] This "misfit" between Drewe and Milburn—two of the SEC's own experts—plainly "indicates a lack of reliability." *LIBOR*, 299 F. Supp. 3d at 481–82 ("fundamental disagreements between a party's *own* experts" indicate "a lack of reliability" and "can[not] be considered a mere 'battle of the experts'"); *Deutsch v. Novartis Pharm. Corp.*, 768 F. Supp. 2d 420, 469 (E.D.N.Y. 2011) (excluding one expert's testimony as inconsistent with that of another expert by the same party).

Drewe even affirmatively violated Milburn's "best practices" for the valuation of mineral assets. Most saliently, Drewe acknowledged three widely recognized valuation approaches: (1) the "income" approach, which projects an asset's future cash flows and discounts them to the present, generally with a DCF model, Ex. 3, Drewe Rpt. ¶¶ 4.3.2(c), 4.4; (2) the "market" or "comparables" approach, which requires comparing the asset with identical or comparable assets, *id.* ¶ 4.3.2(a); and (3) the "cost" approach, which in Drewe's view provides an indication of value based on the economic principle that a buyer will pay no more to obtain an equivalent asset by

---

[9] Milburn—the SEC's own expert witness—makes clear that "[a]ny valuation opinion . . . such as FMV or FVLCS should be conducted following international mining standards and guidelines." Ex. 10, Milburn Rebuttal ¶ 2.26; *accord id.* ¶ 2.122.

purchase or construction, *id.* ¶ 4.3.2(b).  Given the uncertainty inherent in the development of mineral assets, the "internationally recognized mining codes and guidelines" identified by Milburn state that a valuation of mineral assets should "make use of at least two Valuation Approaches," Ex. 58, ¶ 8.3,[10] with the "market" or "comparables" approach "widely used across all stages of project development," Ex. 9, Milburn Rpt. ¶ 3.25.  Nonetheless, Drewe made use of only the income approach and dismissed the market approach on the ground that "each property is unique." Ex. 3, Drewe Rpt. ¶ 13.6.17.  This opinion, supported "only by [Drewe's] *ipse dixit*," is not admissible. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

Moreover, contrary to Drewe's claim that "nothing in the contemporaneous evidence" suggested that Rio Tinto relied on the market approach in its valuation of mineral assets, Ex. 4, Drewe Rebuttal ¶ 2.4.2, his own reports cited a series of documents showing that Rio Tinto *did* apply the market approach, including at HY 2012, *id.* ¶ 2.4.3; *see* Ex. 59 at 4; Ex. 39 at 6.  While Drewe dismissed Rio Tinto's application of the market approach on the assumption that "it is likely that the transactions . . . were not appropriate comparators," Ex. 3, Drewe Rpt. ¶ 13.6.16, he admitted at his deposition that he "had[n]'t checked whether these are appropriate comparators," Ex. 14 (Drewe) at 121:24–25.  Drewe's conjecture—"reached merely by virtue of [his] general expertise or intuition"—is "not admissible." *Eilman*, 2010 WL 749851, at *4.

Drewe had no justification for relying solely on the "DCF" approach.  Drewe "d[id]n't think there's anything that precludes a DCF approach," regardless of the "level of uncertainty regarding future cash flows."  Ex. 14 (Drewe) at 127:4–11.  But as Milburn explained, "a DCF should *only* be used when the future cash flows of the project can be estimated with a sufficient

---

[10]  *See* Ex. 9, Milburn Rpt. ¶ 3.22 ("Multiple approaches are typically applied and compared."); Ex. 17 (Milburn) at 146:3–10 ("definitely best practice to consider all three [approaches]").

level of certainty." Ex. 9, Milburn Rpt. ¶ 3.36 (emphasis added). As Rio Tinto's documents con-sistently explain, at HY 2012 "[t]he level of uncertainty . . . prohibit[ed] calculation of an accurate probability weighted valuation" using the DCF approach. *See* Ex. 39 at 3. Drewe's opinions thus amount to unreliable and inadmissible conjecture that is contradicted by the record.[11]

Finally, rather than apply established standards for the valuation of mineral assets, Drewe purported to anchor his analysis in *internal* Rio Tinto documents, which he labeled "contempora-neous valuation guidelines."[12] Ex. 3, Drewe Rpt. ¶ 4.5. Again, however, Rio Tinto's internal documents nowhere endorse the exclusive use of a DCF approach.[13] And because Drewe has never worked at Rio Tinto, or in the accounting department of any company, Ex. 14 (Drewe) at 44:18–20, 96:4–7, and has no experience with the application or use of Rio Tinto's internal guide-lines, *id.* at 93:24–25 (PEG), 95:19–23 (Controller's Manual), interpreting Rio Tinto's internal guidelines "is beyond the scope of his expertise." *LaSalle Bank*, 2012 WL 466785, at \*12, \*17 (excluding testimony on "whether [company] complied with . . . its own internal guidelines," where expert "is not an expert with respect to [company's] own manual"); *see also Smith*, 912 F.

---

[11] Drewe's Rebuttal Report tried to reconcile his conflicting opinion by asserting that IFRS does not explicitly *require* the use of more than one valuation methodology, *see* Ex. 4, Drewe Rebuttal ¶¶ 2.4.1–2.4.2, and that Rio Tinto relied on DCF models too, *see id.* ¶ 2.4.3. But Drewe failed to identify any authority suggesting that a DCF-only approach—without any attempt to even consider another approach—is sufficient. Similarly, while Milburn's Rebuttal Report stated that "a DCF applied to early stage projects should result in a valuation that is *consistent* with" those reached using other approaches, Ex. 10, Milburn Rebuttal ¶ 2.20 (emphasis added), Milburn did not claim that it is proper to forgo other approaches altogether "where insufficient technical and economic information is available to create a reliable cash flow forecast" for a DCF model, *id.* ¶ 2.26.

[12] These guidelines were "prepared internally by Rio Tinto, not by a valuation body," Ex. 14 (Drewe) at 89:11–14, and are not a substitute for established valuation standards, *see*, *e.g.*, Ex. 65 ¶ A1.2 (Controller's Manual "is not intended to be a wide ranging description of best practice").

[13] Though not necessarily used for accounting purposes, Rio Tinto's PEG recommends the con-sideration of the market approach, *see* Ex. 66 at -480, and the Controller's Manual recommends a variety of valuation approaches in addition to the DCF approach, *see* Ex. 65, ¶¶ 5.1, 6.1–6.3.

Supp. 2d at 251 (jury, rather than expert, should "assess [defendant's] compliance with its company policy"); *Popovich v. Sony Music Entm't*, 2005 WL 1126756, at *5 (N.D. Ohio May 2, 2005) (jury "can use their own knowledge of English to interpret" company's internal documents). Drewe's valuation thus should be excluded.

### 2. Drewe Started with an Early Business Planning Model the Assumptions of Which Were Rejected, Superseded, and Never Pursued.

Although Drewe claimed that he has constructed many DCF models in his career, Ex. 14 (Drewe) at 83:10–23, he did not create one here, *id.* at 85:7–12.  Instead, Drewe relied on an early iteration of the RTCM BU Model that no one at the time thought was a reliable output and that reflected a superseded business configuration.  That methodology is anything but reliable.

Critically, Drewe ignored that the NPV generated by the May 2012 Brisbane Model was widely regarded as unreliable even at the time it was prepared.  RTCM's chief executive testified that the NPV was merely "indicative" and "a first step in our options analysis," meaning the results "should *not* be relied upon" and "lots of work remained to be done."  Ex. 21 (Finlayson) at 303:21–304:8 (emphasis added).  The individual who prepared the valuation materials for the Brisbane Meeting agreed—testifying he did not believe that the May 2012 NPV reflected RTCM's actual value.  *See* Ex. 25 (Morris) at 173:14–18, 223:10–19; *see also* Ex. 24 (Maglione) at 173:4–16 ("no one . . . put too much weight into it").

As Drewe admitted, the May 2012 Brisbane Model also was "not the latest" iteration of the BU Model at HY 2012, as it reflected preliminary inputs and assumptions and a business configuration that had been rejected and superseded by HY 2012.  Ex. 14 (Drewe) at 149:3–4; Ex. 24 (Maglione) at 83:16-19 ("Every month of 2012, the model would have been slightly different and better in terms of accuracy and breadth of output").  Whereas the May 2012 Brisbane Model iteration of the BU Model reflected a negative $680 million NPV, valuations from later iterations of

the BU Model from June through August 2012 reflected NPVs averaging more than $1 billion, with some NPVs up to $4 billion. *See* Ex. 3, Drewe Rpt. ¶ 6.2.9. Drewe's arbitrary selection of an early iteration of RTCM's BU Model—based on still-preliminary assumptions and a later-rejected business configuration—is not a reliable methodology.

The fact that free cash flows from the May 2012 Brisbane Model "were included in presentations provided to Mr. Albanese and Mr. Elliott," as Drewe noted, Ex. 3, Drewe Rpt. ¶ 13.3.3, does not justify Drewe's use of that particular business configuration and its outputs. None of the presentation materials included an NPV, *see id.* ¶ 6.4.5; Ex. 14 (Drewe) at 160:19–161:23; *see also* Ex. 21 (Finlayson) at 178:8–18 (no NPV was included "because that number was dynamic and was changing"), and the business configuration reflected in the May 2012 Brisbane Model was *explicitly rejected* at the Brisbane Meeting, *see*, *e.g.*, Ex. 26 (Ritchie) at 213–14, and never pursued by RTCM. Drewe also posited that slides for the Brisbane Meeting were prepared "over a number of months." Ex. 3, Drewe Rpt. ¶ 13.3.3. But the Brisbane Meeting was only scheduled three weeks before it occurred, *see* SUF ¶ 161 (citing April 19, 2012 calendar invitation), and a "very early draft" of the slides—circulated only nine days before the meeting—was "no more than 30% complete" and included a "valuation" that had only been "developed last week," Ex. 60 at 1.

In short, Drewe's approach—starting from an early iteration of a business-planning model that was never pursued and that generated an output no one thought was reliable—falls far short of the "reliable methodology" *Daubert* requires.

### 3.   Drewe's Analysis Ended with a Nonsensical Business Configuration.

The end point of Drewe's analysis is even more problematic: He took the business configuration reflected in the May 2012 Brisbane Model and manipulated it into nonsense.

The problem is a straightforward mismatch between production and infrastructure. In attempting to value RTCM, Drewe eliminated nearly all the value (*i.e.*, production) of the prospective mines at Minjova and Tete East, *see* Ex. 3, Drewe Rpt., tbl. 13C; Ex. 14 (Drewe) at 187:25–188:13, yet retained billions of dollars in assumed costs related to those two mines (*e.g.*, infrastructure). The business configuration reflected in the May 2012 Brisbane Model assumed that Rio Tinto would spend more than $7 billion constructing a greenfield railway to transport the coal from the mines, with 61% of RTCM's assumed production to come from Minjova and Tete East. *See* Ex. 3, Drewe Rpt. ¶¶ 6.4.8, 11.4.1 fig. 11C. But after eliminating nearly all production from Minjova and Tete East—based on coal production assumptions he admits he is not qualified to make, *supra* IV.B.2—Drewe made no corresponding adjustments to the model's infrastructure assumptions and preserved the assumption that Rio Tinto would spend the same $7+ billion on a rail line despite transporting only 39% as much coal, *see* Ex. 14 (Drewe) at 188:21–190:2; *see also*, *e.g.*, Ex. 3, Drewe Rpt. ¶ 11.4.1 fig. 11C (RTCM's coal chain had estimated capital cost of greater than $7 billion); Ex. 61 ("Green Field Corridor" had present value of negative $2.8 billion).

Drewe further excluded any sales of excess rail capacity on the $7+ billion rail line. Drewe purported to have determined that it would have been "unreasonable" to assume the sale of any excess rail capacity. Ex. 3, Drewe Rpt. ¶ 11.1.7; Ex. 14 (Drewe) at 246:21–257:11. But here too, by his own admission, he had no grounds for making such a determination. In the 2017 FCA Report, Drewe specifically acknowledged that "it is not within [his] expertise to comment upon whether [the sale of spare capacity to a third party] is a reasonable assumption." Ex. 56 ¶ 8.4.33.

Drewe's valuation thus essentially assumed that RTCM would spend billions of dollars on a mostly empty railway. As Drewe admitted, RTCM "logically" would not have developed the greenfield railway without production from Minjova and Tete East. Ex. 14 (Drewe) at 190:17–23.

For that reason, when newly available coal testing information from Minjova and Tete East was analyzed in December 2012, RTCM determined that the development of greenfield rail would be economically infeasible.  *See* SUF ¶¶ 447, 456.

Drewe's valuation also failed to comport with how the May 2012 Brisbane Model was designed to function.  As the creator of the RTCM BU Model explained, the model's inputs were interdependent, and removing coal production from certain mines without making any corresponding changes to infrastructure—as Drewe did—"would create erroneous outputs from the model."  *See* Ex. 24 (Maglione) at 209:17–210:22; *see also*, *e.g.*, Ex. 62 at -249 (given the "interlinked sequence of mine and infrastructure projects . . . each component of the business must be considered and evaluated within the context of an integrated operation rather than as a discrete project. If one component is modified or removed, RTCM's System valuation will change.").  Because Drewe removed all production from Minjova and Tete East, but did not remove the huge costs of integrated infrastructure associated with such production, his model created erroneous outputs.

In addition to including billions to construct a railway that would not be built, Drewe's valuation assumed over $4 billion in "other capital costs" tied to Minjova and Tete East, including costs related to mining equipment, power infrastructure, and other enabling infrastructure.  *See, e.g.*, Ex. 50 (HME/LME), Ex. 51 (Mine Plant), Ex. 52 (Mine Infrastructure), Ex. 53 (Power Infrastructure), Ex. 54 (Studies), Ex. 55 (Other Enabling Infrastructure); Ex. 14 (Drewe) at 191:6–13 (agreeing that adjusted model includes other capital costs for Minjova and Tete East).[14]  Drewe cannot explain why Rio Tinto, or any "rational management" as required by IAS 36, would spend billions of dollars on items such as heavy mining equipment or power infrastructure on two mines

---

[14]  Defendants' Exhibits 434A–434G—attached here as Exhibits 61, 50–55—reflect screenshots of particular portions of the model supporting Drewe's analysis (called his "Workings" file), which is marked as Defendants' Exhibit 434.  *See* Ex. 57 at 3 (SEC production of Drewe analysis).

that, in his view, have no value.  *See* Ex. 63, ¶ BC58 ("an asset's recoverable amount should reflect the likely behavior of a rational management").  Because Drewe's valuation assumed an absurd business configuration that RTCM never would have pursued, it should be excluded as unreliable.

### 4.    Drewe Improperly Relied on Post-HY 2012 Developments.

A final reason to exclude Drewe's valuation at HY 2012 is that it relied on information that was not available until *after* HY 2012.  Drewe took "potential upsides and downsides"—including the near-elimination of production volume from Minjova and Tete East—directly from an impairment memorandum prepared in January 2013, *see* Ex. 59.  Despite conducting no "independent assessment of those figures," Ex. 14 (Drewe) at 203:22–204:7, Drewe incorporated them on the ground that "a similar quantum of upsides and downsides would have been computed" if they "had been assessed six months earlier," Ex. 3, Drewe Rpt. ¶ 13.4.3(iii).  Thus, on the basis of nothing more than his own say-so, Drewe simply assumed that Rio Tinto knew at HY 2012 what it in fact did not determine until six months later.

The January 2013 memorandum on which Drewe relied, however, shows there is no basis for Drewe's assumptions.  For example, Drewe "assume[d]" that information regarding Minjova in the January 2013 memorandum "was largely confirmatory" of the information available at HY 2012.  Ex. 14 (Drewe) at 209:10–20.  But the January 2013 memorandum states that the Minjova results were communicated in late 2012, and that "[t]he most significant change in the 21 December estimate [as compared to a November estimate] has been the removal of the Minjova mineable coal *due to recently communicated laboratory results*."  Ex. 59 at 2 (emphasis added).  In other words, only in late 2012 did Rio Tinto receive the information that prompted the downward revision of Minjova's production estimates.  Drewe similarly erred in relying on a report that, though labeled "February 2012" on its cover page, was prepared in March *2013* according to its metadata.

The March 2013 document provides details regarding Minjova's coal quality that were not available at HY 2012.  *See*, *e.g.*, Ex. 3, Drewe Rpt. ¶ 10.2.29(b) nn.374–375; Ex. 14 (Drewe) 207:17–24, 210:7–16; *see also id.* at 209:23–210:2 (agreeing that "assumption" regarding availability of information regarding Minjova rests on documents that post-date HY 2012).[15]

"The Second Circuit has firmly rejected this 'fraud by hindsight' approach."  *Lopez v. Ctpartners Exec. Search Inc.*, 173 F. Supp. 3d 12, 24 (S.D.N.Y. 2016) (citation omitted).  Indeed, in the accounting context, courts in the Second Circuit have stressed that a Plaintiff "must do more" than point to Defendants' "later" determinations; they must identify "indicator[s] that the results reported by Defendants were inaccurate at the time reported."  *Woolgar v. Kingstone Cos., Inc.*, 2020 WL 4586792, at *16 (S.D.N.Y. Aug. 10, 2020).  Drewe made precisely the logical leap that the Second Circuit has rejected—inferring from a later accounting decision that RTCM would have made the same decision six months earlier.  *See*, *e.g.*, *SEC v. Jensen*, 835 F.3d 1100, 1109 n.4 (9th Cir. 2016) (affirming ruling "discount[ing] the testimony of the SEC's expert because [the expert] . . . relied excessively on hindsight in evaluating the accounting issues in this case, rather than viewing the facts as they existed at the time" (internal quotation marks omitted)); *Seawell v. Brown*, 2010 WL 11561287, at *8 (S.D. Ohio Sept. 9, 2010) (excluding expert opinion for "rel[ying] solely on hindsight in a context where it is not appropriate to do so," where "it is easy to say in retrospect" how defendants should have made an investment that was "not so simple . . . to predict"); *see also Talley v. Novartis Pharm. Corp.*, 2011 WL 7941938, at *1–2 (W.D.N.C. June 28, 2011) (agreeing that expert "should not be allowed to offer opinions in hindsight").

---

[15]  Drewe's approach even contradicts his assignment from the SEC, which was to consider "the reasonableness of the production assumptions for both Tete [East] and Minjova . . . in accordance with . . . the available evidence of the facts and circumstances that [he] understood existed at the time."  Ex. 14 (Drewe) 249:17–250:3.

In addition to making his methodology unreliable, Drewe's use of post-HY 2012 information makes his testimony highly likely to mislead the jury and confuse the issues. "'[E]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it,'" and a district court "'in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses.'" *Washington*, 105 F. Supp. 3d at 308 (quoting *Daubert*, 509 U.S. at 595). Unless the strictures of FRE 403 are enforced, Drewe's testimony will improperly invite the jury to infer that, because RTCM ultimately discovered facts requiring impairment, it surely knew of them six months earlier at HY 2012.

Accordingly, Drewe should not be permitted to opine on RTCM's valuation at HY 2012, and the Court should exclude his opinions and testimony entirely.

## V.    The Court Should Exclude Weber's Opinions And Testimony Entirely.

The Court also should preclude Weber from testifying at all. By his own admission, Weber offered "no opinions" in his report or at his deposition, Ex. 18 (Weber) at 140:7–16, but instead purported to offer "background" on "basic accounting rules, accounting concepts and financial statements," *id.* at 23:12–14. Specifically, Weber is proffered as an expert on numerous unhelpful and irrelevant topics: (a) U.S. Generally Accepted Accounting Principles ("GAAP"), Ex. 11, Weber Rpt. at 21–23; (b) efforts to "converge" U.S. GAAP and IFRS, *id.* at 23–24; (c) the components of a company's balance sheet, *id.* at 3–12; (d) financial statement footnote disclosures, *id.* at 12–13; (e) financial reporting and disclosure obligations for companies listed on stock markets, *id.* at 13–18, and large U.S. companies regulated by the SEC, *id.* at 18–19; (f) how a hypothetical impairment transaction flows through financial statements, *id.* at 33–34; (g) the "mandate" and "mission" of the SEC and FASB, *id.* at 14; and (h) corporate governance standards relating to financial statements, *id.* at 24–29. This testimony should be excluded for two reasons:

67

It will not "help the trier of fact," Fed. R. Evid. 702(a); and it will needlessly waste time and run afoul of FRE 403.

    **A.**    **Weber's Testimony Will Not Help the Jury.**

    Weber stated at his deposition that he did not "have an opinion" on whether his testimony would be helpful for the jury, Ex. 18 (Weber) at 104:3–17, but rather was "making the assumption that there was a reason that the SEC asked [him] to provide this background information," *id.* at 104:24–105:9.  In fact, none of the topics Weber addressed—as mere "background" on "basic accounting rules, accounting concepts and financial statements," *id.* at 23:12–14—will help the jury understand the evidence or determine any facts in dispute in this case.  This Court should exclude Weber's irrelevant "background" testimony, just as other courts routinely do in similar circumstances.  *See United States v. Stewart*, 433 F.3d 273, 311–12 (2d Cir. 2006) (excluding background testimony on the principles underlying insider trading where they were irrelevant to whether the defendant lied to investigators); *SEC v. Mudd*, 2016 WL 2593980, at *4–5 (S.D.N.Y. May 4, 2016) (excluding background on financial crisis and SEC regulations); *United States v. Kahn*, 711 F. Supp. 2d 9, 10 (D.D.C. 2010) (excluding background "testimony on the creation of the United States monetary system" because it was "not relevant" and "ha[d] no effect on the existence of any fact that is of consequence to the determination of this action"), *aff'd sub nom. United States v. Hunter*, 554 F. App'x 5 (D.C. Cir. 2014).

    **1.**  Weber's testimony about U.S. GAAP will not aid the jury because Rio Tinto did not use GAAP.  *See* Ex. 11, Weber Rpt. at 21–23.  Even the SEC and its accounting expert Brice agree that IAS and IFRS, not GAAP, apply to Rio Tinto.  Ex. 1, Brice Rpt. at 20; Compl. ¶ 31.  Yet Weber "was not asked . . . to study IAS 36," and "didn't study" it as part of his assignment.  Ex. 18 (Weber) at 165:21–166:12.  Because GAAP standards do not apply to Rio Tinto, Weber's testimony would waste the Court's time and educate the jury about accounting rules that do not

apply in this case, thus creating confusion about the standards that *do* apply.  *See Querub v. Hong Kong*, 649 F. App'x 55, 57 (2d Cir. 2016) (summary order) (excluding opinions on foreign auditing standards when audit was completed under PCAOB); *Busher v. Barry*, 2019 WL 6895281, at *13 (S.D.N.Y. Dec. 18, 2019) (testimony on federal law was "nothing more than a distraction" when state securities law was at issue).

Nor would Weber's discussion of the ongoing convergence of U.S. GAAP and IFRS help the jury.  U.S. GAAP and IFRS are distinct, and an understanding of U.S. GAAP will not help the jury understand IFRS and may cause confusion.  *See* Ex. 11, Weber Rpt. at 24.  Even Weber himself could not explain why "background information" on U.S. GAAP and convergence "would be something that [he] would think jury members would find useful"—given the absence of any alleged violations of U.S. GAAP.  Ex. 18 (Weber) at 122:21–124:10; *see also id.* at 119:7–120:5.

Courts routinely exclude testimony on inapplicable accounting standards.  *See United States v. Tomasetta*, 2011 WL 6382562, at *2 (S.D.N.Y. Dec. 12, 2011) ("[T]estimony on forty years worth of accounting principles is irrelevant, improper, would confuse the jury, and be a waste of time" because "[t]he Government does not charge Defendants with violating GAAP."); *see also SEC v. Life Partners Holdings, Inc*., 2013 WL 12076933, at *2 (W.D. Tex. Oct. 23, 2013) (failing to "see how [the expert's] opinion about an accounting regime that Defendants did not actually implement or use" was "at all relevant" and ordering the expert to "limit his testimony to [Defendant's] actual accounting practices"); *United States v. Kokenis*, 662 F.3d 919, 927 (7th Cir. 2011) (excluding expert accounting evidence on a "pool of capital theory" where expert "did not offer any opinion that the theory was applicable to any transaction in this case").  All of Weber's testimony about U.S. GAAP thus should be excluded.  In fact, beyond causing confusion, Weber's frequently evasive or obstructive testimony in response to basic questions risks wasting the Court's

time.  *See*, *e.g.*, Ex. 18 (Weber) at 31:8–24 (claiming not to understand definition of "many"); 33:11–36:11 (refusing to answer whether "estimates can be accurate or inaccurate"); 201:10–207:22 (providing evasive testimony on use of judgment in preparing financial statements).

**2.**  Weber's discussion of financial statements and reporting requirements for such statements likewise should be excluded because it will not help the jury determine any fact at issue, *see Stewart*, 433 F.3d at 311–12, and thus "presents a significant risk of jury confusion," *Reserve Fund*, 2012 WL 12356742, at *4, especially because it concerns such an unfamiliar and technical concept as accounting.  For example, Weber describes how to compile a financial statement, including the balance sheet, income statement, and cash flow statement.  Ex. 11, Weber Rpt. at 3–13.  But Rio Tinto's financial statements in 2011 and 2012 included dozens of different business units, only one of which is at issue here, *see* SUF ¶ 21, and the SEC challenges only the *timing* of the RTCM impairment, not where on Rio Tinto's financial statements it was recorded.  Weber's general discussion of assets, liabilities, shareholder equity, revenue, expenses, and cash flows will not help—and more likely will confuse—the jury.

Weber also discusses various financial statement reporting requirements—*e.g.*, requirements to list a company on the New York, London, and Australian stock exchanges, *see* Ex. 11, Weber Rpt. 16–17, or reporting requirements for U.S. companies, *id.* at 18–19, or listing and registration requirements for non-U.S. companies listed on a U.S. stock exchange, *id.* at 19–21.  Because the SEC has not alleged a single violation of any listing or registration requirement, however, these requirements are not relevant and could confuse the jury by "directing their attention to potential theories of liability that the SEC has not alleged."  *Mudd*, 2016 WL 2593980, at *4.  Weber insists that "background information on financial reports that firms prepare and the regulatory bodies that influence those, and the stock exchange . . . requirements" are helpful for

the jury's understanding, but cannot explain why this "background" information would be helpful to a jury in *this case*.  Ex. 18 (Weber) at 132:4–137:4.

Much of Weber's testimony is also inaccurate, unclear, and likely to confuse jurors.  For example, Weber insists that he would show the jury a baffling illustration of how depreciation works and relates to impairment, *see* Ex. 18 (Weber) at 153:16–24, even though depreciation is not at issue in this case.  Weber's own example confusingly accounts for depreciation in 2018, but not in 2019, despite intending to demonstrate an "equal charge" *each* year.  *See* Ex. 11, Weber Rpt. at 33–34.  Contradicting himself at his deposition, Weber first stated the illustration accounted for depreciation in both years, *see* Ex. 18 (Weber) at 145:17–21, and then conceded it "is silent" as to depreciation in 2019, *id.* at 149:6–150:11.  Weber's testimony on "key accounting considerations," *see* Ex. 11, Weber Rpt. at 30—such as accrual accounting or how to measure the value of a transaction, *id.* at 30–33—has nothing to do with the issues in this case.  All of this testimony should therefore be excluded.

**3.**  Another portion of Weber's report focuses on his views of the roles of the SEC and the FASB, and the enactment of Sarbanes-Oxley in 2002—*e.g.*, that "[t]he SEC's mandate is to protect investors" and its "mission is crucial to the economy's overall well-being."  Ex. 11, Weber Rpt. at 14–15.  These statements are not based on expertise or even any notion that they would assist the jury.  To the contrary, Weber took these descriptions directly from the SEC's website, *id.* at 14 (citing SEC's "What We Do" web page), simply because the SEC wanted these statements included, Ex. 18 (Weber) at 104:18–105:9.  The SEC's attempt to bolster its own credibility through Weber is plainly improper.  *See Bayoh v. Afropunk LLC*, 2020 WL 6269300, at *4 (S.D.N.Y. Oct. 26, 2020) (excluding testimony about organization's stated mission); *Linde v. Arab*

*Bank, PLC*, 922 F. Supp. 2d 316, 332 (E.D.N.Y. 2013) (excluding testimony about a government process that did not make the conduct at issue "more or less likely").

Even worse, Weber's narrative about the adoption of Sarbanes-Oxley appears to try to prejudice the jury against Defendants by misleadingly suggesting that the timing of the RTCM impairment is somehow comparable to Enron, the biggest audit failure in history. He states, "SOX was adopted during a time when there was a significant amount of concerns regarding [ ] three high profile [fraud] cases," Ex. 18 (Weber) at 15:8–10, 15:23–16:2—namely, "Enron, Tyco International, and WorldCom," cases involving massive conspiracies and admitted criminal conduct, with which some jurors are likely familiar, Ex. 11, Weber Rpt. at 15—and leaves the jury to draw erroneous conclusions about the similarity between those cases and this case. Perhaps unsurprisingly, Weber admits that he has testified only for plaintiffs in actions such as this one. *See* Ex. 18 (Weber) at 62:5–9, 65:19–25, 76:11–13; Ex. 11, Weber Rpt., App. A at 3. His biased testimony is inadmissible. "[H]istorical information" about Sarbanes-Oxley can be excluded as "irrelevant to the facts of this case," *SEC v. Ferrone*, 163 F. Supp. 3d 549, 561 (N.D. Ill. Feb. 22, 2016) (excluding testimony about the history of the FDA and U.S. drug regulation), and Weber's suggestive and open-ended testimony has no probative value and likely would prejudice the jury against Defendants, *see Arista Records*, 2011 WL 1674796, at *20 (excluding testimony about the relationship between the recording labels and artists because the prejudice of making "jurors unsympathetic to Plaintiffs" outweighed any probative value).

### B.    Weber's Testimony also Should Be Excluded under FRE 403.

Even if Weber had addressed relevant issues in his report, admitting his testimony would pose several dangers that provide independent reasons for its exclusion under FRE 403.

Weber's unhelpful report has *de minimis* probative value—especially because it overlaps significantly with Brice's report. Both reports address the statutory and regulatory framework

72

applicable to Rio Tinto, Ex. 11, Weber Rpt. at 14–23; Ex. 1, Brice Rpt. at 17; the responsibilities of independent auditors, Ex. 11, Weber Rpt. at 27–29; Ex. 1, Brice Rpt. at 110, and the representations management should make to an independent auditor, Ex. 11, Weber Rpt. at 29–30; Ex. 1, Brice Rpt. at 108–09.[16]   The primary difference between the two reports is that Brice attempts to address the facts and applicable standards in this case, while Weber does not.   This reason alone warrants exclusion of Weber's testimony in full.   *See Price v. Fox Entm't Grp., Inc.*, 499 F. Supp. 2d 382, 390 (S.D.N.Y. 2007) (precluding expert from testifying because "there was substantial overlap between [two expert] reports and there [was] absolutely no need for both experts to testify"); *AUSA Life Ins. Co. v. Dwyer*, 899 F. Supp. 1200, 1203 n.4 (S.D.N.Y. 1995) (advising that it would "exclude any duplicative testimony" offered at trial).

Weighed against this *de minimis* probative value is the inaccuracy of much of Weber's proposed testimony.   Weber repeatedly makes basic mistakes when describing accounting concepts.   For example, he testified about Statement of Financial Accounting Concept No. 2 but was unaware that it had been superseded and wholly replaced over a decade ago, *see* Ex. 18 (Weber) 182:5–183:19, and improperly suggested that if jurors had further questions "they could go to the FASB's website," *id.* at 184:14–185:2, 187:22–188:17, 189:5–13.

Similarly, Weber's report discusses the role of outside auditors, but at his deposition he could not answer basic questions about which standards applied *in this case*.   He could not answer, for example, questions about the PCAOB and whether it has promulgated standards relating to the audit of internal controls over financial reporting (*i.e.*, the standards actually relevant to this

---

[16]   If the Court excludes Brice's opinions on the unrelated impairments (as it should, *supra* II), that will not diminish the above overlap between the Weber and Brice reports.

case).[17]  *See* Ex. 18 (Weber) at 249:21–251:4.  Nor could he answer questions about International Standard on Review Engagements 2410, which provides guidance on an auditor's professional responsibilities when undertaking an engagement to review interim financial data.  *See id.* at 254:16–257:19.  Weber's errors and lack of familiarity with subjects he discussed in his report further demonstrate that his testimony would not help the jury, and indeed would seriously risk confusing the jury and unfairly prejudicing Defendants.

Weber's testimony on corporate governance standards additionally risks intruding on the Court's province to instruct the jury on the law.  *See* Ex. 11, Weber Rpt. at 24–29.  Weber admits he was "not trying to cite to central authority as to what corporate governance is," but instead used *his own* definition of terms.  Ex. 18 (Weber) at 42:5–43:10.  His report thus presents his own views of the "legal obligations" of public companies' "high level officers and management," including under Sarbanes-Oxley, stock exchange rules, and SEC Form 20-F.  *See* Ex. 11, Weber Rpt. at 18–20, 25–26; Ex. 18 (Weber) at 49:20, 51:9–59:15.  Those views are misleading, though, as they ignore the important role played by Rio Tinto's Board of Directors, Audit Committee, and PwC, *see*, *e.g.*, 17 C.F.R. § 240.10A-3(b)(2); SUF ¶¶ 282–285, and could confuse the jury by "directing their attention to potential theories of liability that the SEC has not alleged," *Mudd*, 2016 WL 2593980, at *4.

Moreover, because the Court dismissed the SEC's false certification claims under Sarbanes-Oxley, *see* ECF 135 at 47–48, the requirements of Sarbanes-Oxley are irrelevant.  And

---

[17]  Such standards were first established in 2007, fourteen years ago, and have subsequently been amended.  *See* AS 2201: An Audit of Internal Control Over Financial Reporting That Is Integrated with An Audit of Financial Statements, PCAOB ("Effective Date of Standard: Fiscal years ending on or after Nov. 15, 2007"), https://pcaobus.org/oversight/standards/auditing-stand-ards/de-tails/AS2201#:~:text=Rather%2C%20the%20auditor's%20objective%20is,associ-ated%20with%20the%20individual%20control.

Weber cannot instruct the jury on *any* legal requirements or obligations because that would "usurp . . . the role of the trial judge in instructing the jury as to the applicable law." *Nimely*, 414 F.3d at 397; *see FHFA v. Nomura Holding Am., Inc.*, 2015 WL 731209, at *1 (S.D.N.Y. Feb. 20, 2015) (excluding testimony as to the obligations of brokers under the Securities Act). "[I]t is particularly inappropriate for a witness to track the exact language of statutes and regulations," as Weber often does here. *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 49 (S.D.N.Y. 2016) (citation omitted); *see also SEC v. U.S. Envtl., Inc.*, 2002 WL 31323832, at *4 (S.D.N.Y. Oct. 16, 2002) ("expert[s] cannot give testimony stating ultimate legal conclusions . . . nor can that testimony track the language of the statute or the law" at issue).

"Even if a jury were not misled into adopting outright a legal conclusion proffered by [Weber]," his testimony about legal obligations "would remain objectionable by communicating a legal standard—explicit or implicit—to the jury." *Hygh v. Jacobs*, 961 F.2d 359, 364 (2d Cir. 1992). While Weber has "not been to a jury trial" and did "not giv[e] any consideration to what the judge instructs the jury to do or what happens at the end of trial," a simple review of his proposed testimony indicates it will invade the role of the Court to instruct the jury. Ex. 18 (Weber) at 86:21–87:3; 89:8–13. Weber is explicitly communicating legal standards, and his testimony should be excluded for this reason.

For all of these reasons, Weber's proposed "background" testimony will not help—and will likely confuse—the jury, and thus should be excluded in its entirety.

## CONCLUSION

The Court should exclude the above opinions and testimony by the SEC's experts.

Dated: New York, New York
April 12, 2021

   /s/ Peter J. Romatowski (on consent)
Peter J. Romatowski
Kristen A. Lejnieks
JONES DAY
51 Louisiana Avenue, NW
Washington, DC 20001
Tel: (202) 879-7625
pjromatowski@jonesday.com
kalejnieks@jonesday.com

Jacqueline Vallette (pro hac vice)
JONES DAY
717 Texas, Suite 300
Houston, TX 77002
Tel: (832) 239-3939
jvallette@jonesday.com

Henry Klehm III
James P. Loonam
Donald L. R. Goodson
JONES DAY
250 Vesey Street
New York, NY 10281
Tel: (212) 326-3419
hklehm@jonesday.com
jloonam@jonesday.com
dgoodson@jonesday.com

   /s/ N. Scott Fletcher (on consent)
N. Scott Fletcher
SCOTT FLETCHER LAW, PLLC
808 Travis St. Suite 1420
Houston, TX 77002-5701
Tel:  (713) 255-0422
sfletcher@nsflaw.com

*Attorneys for Defendant Thomas Albanese*

Respectfully submitted,

By:   /s/ Mark A. Kirsch
   Mark A. Kirsch
   Lawrence J. Zweifach
   Jennifer L. Conn
   Avi Weitzman
   GIBSON, DUNN & CRUTCHER LLP
   200 Park Avenue
   New York, New York 10166-0193
   Tel: (212) 351-4000
   mkirsch@gibsondunn.com
   lzweifach@gibsondunn.com
   jconn@gibsondunn.com
   aweitzman@gibsondunn.com

   Richard W. Grime (pro hac vice)
   Alexander W. Mooney (pro hac vice)
   Kellam M. Conover (pro hac vice)
   GIBSON, DUNN & CRUTCHER LLP
   1050 Connecticut Avenue, NW
   Washington, D.C. 20036
   Tel: (202) 955-8500
   rgrime@gibsondunn.com
   amooney@gibsondunn.com
   kconover@gibsondunn.com

*Attorneys for Defendants Rio Tinto PLC and Rio Tinto Limited*

   /s/ Walter G. Ricciardi (on consent)
   Theodore V. Wells, Jr.
   Walter G. Ricciardi
   Geoffrey R. Chepiga
   Livia Fine
   PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
   1285 Avenue of the Americas
   New York, NY 10019
   Tel: (212) 373-3000
   twells@paulweiss.com
   wricciardi@paulweiss.com
   gchepiga@paulweiss.com
   lfine@paulweiss.com

*Attorneys for Defendant Guy Robert Elliott*