**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------x
:
SECURITIES AND EXCHANGE
COMMISSION,                                    :
:
Plaintiff,         :
:
v.                             :
:
RIO TINTO PLC, RIO TINTO LIMITED,    :   Case No. 17 Civ. 7994 (AT) (DCF)
THOMAS ALBANESE, and GUY ROBERT
ELLIOTT,                                       :
:
Defendants.         :
:
:
:
:
:
:
---------------------------------------------------------x

## MEMORANDUM OF LAW IN SUPPORT OF
## <u>DEFENDANTS' CONSOLIDATED MOTION FOR SUMMARY JUDGMENT</u>

## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................. 1

BACKGROUND ................................................................................................. 4

    A.    In 2011, Rio Tinto Acquired Exploratory Mining Assets in Mozambique. ....................................................................... 4

    B.    In 2011 and 2012, Rio Tinto Extensively Explored and Evaluated Its Assets. .................................................................. 5

    C.    The May 11, 2012 Brisbane Meeting. ................................... 10

    D.    As Rio Tinto Continued Its Extensive Exploration and Evaluation Program, Internal Business Modelling Improved. ................................... 13

    E.    All Involved Agreed That RTCM Had No Impairment Indicator at HY 2012. ................................................. 15

    F.    Public Statements to Investors Were Based on a Meaningful Inquiry and Fairly Aligned with Information about RTCM. ............................... 19

    G.    A November 2012 Update Led to a Full Geologic Review of RTCM. ... 22

    H.    New Test Results Reviewed in December 2012 Changed the Economics of RTCM's Development and Led to an Impairment. .......... 23

    I.    The Albanese Statements and RTCM Impairment Did Not Affect Rio Tinto's Stock Price. ......................................... 24

LEGAL STANDARD ........................................................................................ 26

ARGUMENT ..................................................................................................... 26

    I.    The SEC Fails To Properly Controvert Virtually Every Key Fact In This Case. ............................................. 28

    II.    Rio Tinto And Mr. Albanese Are Entitled To Judgment On The Section 10(b) Fraud Claims. .......................................... 31

        A.    The SEC Cannot Establish Falsity as to Any Albanese Statement. ......... 31

        B.    The SEC Cannot Establish Materiality as to Any Albanese Statement. ................................................. 39

        C.    The SEC Cannot Establish Scienter as to Any Albanese Statement. ...... 44

**TABLE OF CONTENTS**
(continued)

**Page**

III.     Rio Tinto Is Entitled To Judgment On The Section 17(a) Fraud Claim............ 49

     A.     The SEC Cannot Establish Falsity as to the HY 2012 Report................ 49

     B.     The SEC Cannot Establish Materiality as to the HY 2012 Report. ........ 53

     C.     The SEC Cannot Establish Negligence as to the HY 2012 Report.......... 57

IV.     Rio Tinto Is Entitled To Judgment On The Section 13(a) False-Filing Claim................................................................................................................ 60

V.     Mr. Albanese And Mr. Elliott Are Entitled To Judgment On The Section 13(b)(5) And Related Rule 13b2-1 Claims......................................................... 60

     A.     There Was No False Record. ................................................................. 61

     B.     Mr. Albanese and Mr. Elliott Did Not Cause a False Record................. 62

     C.     The Undisputed Record Does Not Support the SEC's Claim That Mr. Albanese and Mr. Elliott Acted Unreasonably. ................................ 66

VI.     Mr. Albanese And Mr. Elliott Are Entitled To Judgment On The Rule 13b2-2 Claims........................................................................................................ 67

VII.     Rio Tinto Is Entitled To Judgment On The Section 13(b) Accounting Claim................................................................................................................ 71

VIII.     The SEC Cannot Show Entitlement To Disgorgement Or Injunctive Relief................................................................................................................ 73

CONCLUSION.................................................................................................................. 75

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Abramson v. Newlink Genetics Corp.*,
965 F.3d 165 (2d Cir. 2020)......................................................................................41

*In re AmTrust Fin. Servs., Inc. Sec. Litig.*,
2019 WL 4257110 (S.D.N.Y. Sept. 9, 2019).............................................................40

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)...................................................................................................26

*Baity v. Kralik*,
51 F. Supp. 3d 414 (S.D.N.Y. 2014).........................................................................30

*Basic, Inc. v. Levinson*,
485 U.S. 224 (1988).......................................................................................39, 40, 41

*In re Bos. Sci. Corp. Sec. Litig.*,
708 F. Supp. 2d 110 (D. Mass. 2010)........................................................................43

*Chen-Oster v. Goldman, Sachs & Co.*,
251 F. Supp. 3d 579 (S.D.N.Y. 2017).......................................................................41

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
752 F.3d 173 (2d Cir. 2014)................................................................................40, 41

*Colbert v. Rio Tinto PLC*,
824 F. App'x 5 (2d Cir. 2020) ...........................................................................39, 42

*Crawford v. Tribeca Lending Corp.*,
815 F.3d 121 (2d Cir. 2016)......................................................................................30

*Dalberth v. Xerox Corp.*,
766 F.3d 172 (2d Cir. 2014)..........................................................................39, 43, 54

*Frankfurt-Trust Inv. Lux. AG v. United Techs. Corp.*,
336 F. Supp. 3d 196 (S.D.N.Y. 2018)...........................................................31, 32, 34, 37

*Fujitsu Ltd. v. Fed. Express Corp.*,
247 F.3d 423 (2d Cir. 2001).........................................................................26, 55, 72

*Furher v. Ericsson LM Tel. Co.*,
363 F. App'x 764 (2d Cir. 2009) .....................................................................33, 34, 37

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Ganino v. Citizens Utils. Co.*,
   228 F.3d 154 (2d Cir. 2000) ................................................................40

*In re Gen. Elec. Sec. Litig.*,
   2020 WL 2306434 (S.D.N.Y. May 7, 2020) ........................................53

*Goldstick v. The Hartford, Inc.*,
   2002 WL 1906029 (S.D.N.Y. Aug. 19, 2002) .....................................28

*Gross v. GFI Grp., Inc.*,
   784 F. App'x 27 (2d Cir. 2019) ..........................................................41

*IBEW Local Union No. 58 v. Royal Bank of Scot. Grp., PLC*,
   783 F.3d 383 (2d Cir. 2015) .........................................................40, 54

*Lasker v. N.Y. State Elec. & Gas Corp.*,
   85 F.3d 55 (2d Cir. 1996) ...................................................................40

*Levine v. NL Indus., Inc.*,
   720 F. Supp. 305 (S.D.N.Y. 1989) ...............................................38, 48

*Liu v. SEC*,
   140 S. Ct. 1936 (2020) ........................................................................73

*Long v. New York City*,
   2016 WL 4203545 (S.D.N.Y. Aug. 8, 2016) ......................................30

*Major League Baseball Props., Inc. v. Salvino, Inc.*,
   542 F.3d 290 (2d Cir. 2008) .........................................................28, 30

*Martin v. Quartermain*,
   732 F. App'x 37 (2d Cir. 2018) .................................32, 35, 37, 39, 52, 53

*In re Miller Indus., Inc. Sec. Litig.*,
   120 F. Supp. 2d 1371 (N.D. Ga. 2000) ...............................................57

*In re N. Telecom Ltd. Sec. Litig.*,
   116 F. Supp. 2d 446 (S.D.N.Y. 2000) .....................................41, 44, 48

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000) ....................................................41, 44, 45

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
   575 U.S. 175 (2015) ........................................32, 33, 35, 37, 40, 51

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*,
    691 F. Supp. 2d 448 (S.D.N.Y. 2010) ........................................................................72

*In re Pretium Res. Inc. Sec. Litig.*,
    2020 WL 953609 (S.D.N.Y. Feb. 27, 2020) ...................................31, 33, 39, 47, 53

*Pruter v. Local 210*,
    2020 WL 777333 (S.D.N.Y. Feb. 18, 2020) ..............................................................29

*Purcell v. Navient Sols., LLC*,
    2019 WL 188693 (S.D.N.Y. Jan. 14, 2019) ..............................................................30

*In re REMEC Inc. Sec. Litig.*,
    702 F. Supp. 2d 1202 (S.D. Cal. 2010) ....................................................................48

*In re Rockefeller Ctr. Props.*,
    184 F.3d 280 (3d Cir. 1999) .....................................................................................57

*S.C. Ret. Sys. Grp. Tr. v. Eaton Corp. PLC*,
    791 F. App'x 230 (2d Cir. 2019) ..............................................................................34

*San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip-Morris Cos.*,
    75 F.3d 801 (2d Cir. 1996) .......................................................................................40

*SEC v. Aly*,
    2018 WL 1581986 (S.D.N.Y. Mar. 27, 2018) .........................................................43

*SEC v. Cole*,
    2015 WL 5737275 (S.D.N.Y. Sept. 19, 2015) .........................................................58

*SEC v. Cw. Chem. Sec., Inc.*,
    574 F.2d 90 (2d Cir. 1978) .......................................................................................75

*SEC v. Dibella*,
    2008 WL 6965807 (D. Conn. Mar. 13, 2008) .........................................................75

*SEC v. Espuelas* ("*Espuelas I*"),
    579 F. Supp. 2d 461 (S.D.N.Y. 2008) ................................................................67, 69

*SEC v. Espuelas*,
    905 F. Supp. 2d 507 (S.D.N.Y. 2012) ......................................................................60

*SEC v. Ginder*,
    752 F.3d 569 (2d Cir. 2014) ...............................................................................58, 59

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*SEC v. Goldstone*,
  2015 WL 5138242 (D.N.M. Aug. 22, 2015) .........................................................68

*SEC v. Haligiannis*,
  470 F. Supp. 2d 373 (S.D.N.Y. 2007).................................................................75

*SEC v. Jones*,
  476 F. Supp. 2d 374 (S.D.N.Y. 2007).............................................................74, 75

*SEC v. Kelly*,
  765 F. Supp. 2d 301 (S.D.N.Y. 2011).............................................................62, 74

*SEC v. Lowy*,
  396 F. Supp. 2d 225 (E.D.N.Y. 2003) ................................................................61

*SEC v. Lucent Techs. Inc.*,
  2005 WL 1683741 (D.N.J. July 18, 2005)..............................................................62

*SEC v. Monarch Fund*,
  608 F.2d 938 (2d Cir. 1979)...........................................................................74, 75

*SEC v. Monarch Funding Corp.*,
  192 F.3d 295 (2d Cir. 1999)...........................................................................31, 49

*SEC v. Monterosso*,
  756 F.3d 1326 (11th Cir. 2014) ..........................................................................62

*SEC v. Orr*,
  2006 WL 542986 (E.D. Mich. 2006) ....................................................................68

*SEC v. Patel* ("*Patel I*"),
  2008 WL 781914 (D.N.H. Mar. 24, 2008) .............................................................68

*SEC v. Patel* ("*Patel II*"),
  2009 WL 3151143 (D.N.H. Sept. 30, 2009).......................................................62, 68

*SEC v. Premier Holding Corp.*,
  2019 WL 8167920 (C.D. Cal. Dec. 10, 2019) .......................................................67

*SEC v. Price Waterhouse*,
  797 F. Supp. 1217 (S.D.N.Y. 1992).................................................................74, 75

*SEC v. Razmilovic*,
  738 F.3d 14 (2d Cir. 2013).................................................................................73

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*SEC v. Softpoint, Inc.*,
    958 F. Supp. 846 (S.D.N.Y. 1997)...................................................................71

*SEC v. Stanard*,
    2009 WL 196023 (S.D.N.Y. Jan. 27, 2009) ...........................................60

*SEC v. Straub ("Straub I")*,
    921 F. Supp. 2d 244 (S.D.N.Y. 2013)....................................................67, 69, 70

*SEC v. Straub*,
    2016 WL 5793398 (S.D.N.Y. Sept. 30, 2016) .......................................60

*SEC v. Wyly*,
    56 F. Supp. 3d 260 (S.D.N.Y. 2014)......................................................73

*SEC v. Yorkville Advisors, LLC*,
    305 F. Supp. 3d 486 (S.D.N.Y. 2018)............................................44, 46, 48, 58, 64

*Shands v. Lakeland Cent. Sch. Dist.*,
    2018 WL 3315738 (S.D.N.Y. July 5, 2018) ...........................................29

*Sjunde AP-Fonden v. Gen. Elec. Co.*,
    417 F. Supp. 3d 379 (S.D.N.Y. 2019).....................................................51

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*,
    531 F.3d 190 (2d Cir. 2008)..................................................................48

*Tongue v. Sanofi*,
    816 F.3d 199 (2d Cir. 2016)...........................................32, 39, 49, 50, 51, 52, 53

*Traverso v. Eller Media Co.*,
    2002 WL 467717 (N.D. Cal. Mar. 25, 2002)..........................................57

*U.S. Info. Sys., Inc. v. IBEW Local Union No. 3*,
    2006 WL 2136249 (S.D.N.Y. Aug. 1, 2006) .........................................30

*United States v. Salameh*,
    152 F.3d 88 (2d Cir. 1998).....................................................................30

*Woolgar v. Kingstone Cos.*,
    477 F. Supp. 3d 193 (S.D.N.Y. 2020).....................................................52

vii

**TABLE OF AUTHORITIES**
(continued)

<u>Page(s)</u>

**Statutes**

15 U.S.C. § 78m(b)(2)(A) ........................................................................................71

15 U.S.C. § 78u(d)(3)(A)(ii) ...................................................................................73

**Rules**

Fed. R. Civ. P. 56(a) ...............................................................................................26

Fed. R. Civ. P. 56(c)(1)(A) ...............................................................................29, 31

Fed. R. Evid. 801(c)(2) ...........................................................................................30

Local Civ. R. 56.1(c) ...............................................................................................28

**Regulations**

17 C.F.R. § 240.12b-20 ...........................................................................................60

17 C.F.R. § 240.13b2-1 ...........................................................................................60

17 C.F.R. § 240.13b2-2(a) .......................................................................................68

Defendants Rio Tinto PLC and Rio Tinto Limited (collectively, "Rio Tinto"), Thomas Albanese, and Guy Robert Elliott respectfully move for summary judgment on all of the Securities and Exchange Commission's ("SEC") remaining claims.

## INTRODUCTION

This Court already dismissed the bulk of the SEC's Complaint, leaving a shell of the Section 10(b) fraud claims, and narrowing the other claims to the Half-Year 2012 ("HY 2012") impairment determination. *See* ECF 135.[1]  Of the SEC's original twelve claims, only four remain against Rio Tinto, three against Mr. Albanese, and two against Mr. Elliott.  The record now shows these claims are all baseless:  There was no fraud, and Rio Tinto was not required to take an impairment to its newly acquired coal asset a few months before it did.  The Court should grant judgment to all Defendants.

The following facts are not genuinely disputed.  In 2011, Rio Tinto paid $3.7 billion for a nearly 1,000 square mile, undeveloped mining asset in Mozambique ("RTCM"), then viewed by many in the industry as a strategic investment because it was thought to be one of the largest undeveloped sites for coking coal—a relatively scarce and valuable type of coal.  SUF ¶¶ 29–44.  As investors knew, RTCM faced immense challenges at the outset:  Its coal quantity and quality were not known with any certainty; infrastructure for transporting coal was limited; and developing multi-decade plans for untested properties is full of uncertainty.  SUF ¶¶ 39–49, 467–468.

Following the acquisition, Rio Tinto undertook one of the "biggest exploration program[s] in the world," Ex. 27 (Woodley) at 161:3–8; SUF ¶ 191, spending hundreds of millions of dollars drilling, exploring, and testing the coal, and pursuing options for transporting the coal by barge

---

[1]  Docket citations are styled as "ECF __," Defendants' Rule 56.1 Statement of Undisputed Facts (filed herewith) as "SUF ¶ __," the SEC's Counterstatement as "SEC SUF ¶ __," exhibits to the Declaration of Jennifer L. Conn (filed herewith) as "Ex. __," and depositions as, *e.g.*, "Ex. 17 (Morris) at 12:34."

down the Zambezi River or newly constructed ("greenfield") rail, SUF ¶¶ 109–132, 191–206.  As is common in early-stage mining projects, RTCM faced challenges in 2012:  Initial testing indicated the coal quality might not be as high as thought, and the Government of Mozambique did not approve initial applications for barging.  SUF ¶¶ 109–119, 147–158.  But there were positive developments too:  rising projected coal prices, SUF ¶ 231; more apparently mineable coal than assumed, with yet more expected from an adjacent property, Minjova, SUF ¶¶ 198–206; a good probability of partnership for a greenfield rail, SUF ¶¶ 126–127; and new business opportunities, such as coal bed methane and the development of a power plant, that were potentially worth billions, SUF ¶¶ 172–173.

As exploration continued, internal business valuations based on RTCM's evolving development scenarios varied widely, SUF ¶¶ 224–225, 229–230, with "quite a few scenarios . . . above the carrying value" at HY 2012, Ex. 26 (Witthöft) at 79:5–8; SUF ¶¶ 225, 229.  But in December 2012, Rio Tinto concluded—based on new lab results—that the Tete East and Minjova properties would not, as expected, produce enough coal to justify the cost of building a "large scale efficient greenfield" rail.  Ex. 303 at -034; SUF ¶¶ 445–446, 452, 456.  Having lost its capacity for economies of scale, RTCM was promptly impaired in January 2013.  SUF ¶¶ 454–458.

The market was indifferent to the impairment.  Long aware of RTCM's challenges, investors appreciated that RTCM amounted to less than 3% of Rio Tinto's total assets and was undeveloped, unproven, and under extensive study.  SUF ¶¶ 463–475.  Thus, "most analysts seem[ed] to assign little or no value to" RTCM.  Ex. 313 at 5; SUF ¶ 465.  The remaining challenged public statements about RTCM did not affect Rio Tinto's ADR price, SUF ¶¶ 479–481, there was no statistically significant stock drop at the time of the impairment, SUF ¶ 482, and the impairment did not affect Rio Tinto's bond prices or credit ratings, SUF ¶¶ 490–495.

The SEC's overreach was clear from the outset; the record now proves the SEC's claims are baseless.  The centerpiece of its case—a May 2012 presentation in Brisbane that allegedly sounded RTCM's death knell—in fact highlighted "higher production," "major long-term cash flows," and new options that "[c]ould be as large an economic opportunity as the coal."  Ex. 351 at 11–12, 16–17, 23; SUF ¶¶ 169–173.  The SEC touted its allegation that the Brisbane presenter noted a negative $680 million net present value ("NPV"), but that number was removed from the presentation slides, and no one viewed it (if even mentioned) as a reliable estimate of RTCM's value:  The presenter's notes stated any NPV was "only a first-step in [the] options analysis" and "indicative only," Ex. 166 at -294, meaning (as he testified) it "should not be relied upon," Ex. 10 (Finlayson) at 178:8–18, 303:21–304:13; Ex. 23 (Ritchie) at 59:23–60:9 ("NPV is a very imprecise measure"); SUF ¶¶ 178–179; and the person preparing the valuation materials did not think "RTCM was worth negative $0.68 billion," Ex. 17 (Morris) at 173:14–18; SUF ¶ 180.  Even the SEC now *agrees* that low NPVs are "very typical" of early-stage mines.  SEC SUF ¶ 222.

Given the undisputed facts, Defendants are entitled to judgment on all remaining claims.  The Section 10(b) claim (against Rio Tinto and Mr. Albanese) is premised on three statements by Mr. Albanese in 2012—none can support fraud, as each was accompanied by caution, was consistent with the May 2012 Brisbane Presentation and other contemporaneous information, was based on vetted materials, and did not affect Rio Tinto's stock price.  The Section 17(a) and Section 13(a) claims (against Rio Tinto) turn on RTCM's HY 2012 reported value, which rested on an extensive impairment-review process and fairly aligned with existing information.  That the market *did not react* to the impairment five months later confirms that these claims fail.

The Section 13(b)(5), Rule 13b2-1, and Rule 13b2-2 claims (against Mr. Albanese and Mr. Elliott) fare no better:  There were no false records; the Brisbane Presentation was sent to and

openly discussed with the Controllers, not concealed, SUF ¶¶ 300–302; Mr. Albanese and Mr. Elliott undisputedly never saw the key accounting paper by Rio Tinto Energy ("RTE"), SUF ¶ 332, that explained RTCM's challenges to the Controllers and independent auditor Pricewaterhouse-Coopers ("PwC") and found no impairment indicators, SUF ¶¶ 323–331; and the Controllers, PwC, RTCM, and RTE thoroughly discussed RTCM, *e.g.*, SUF ¶¶ 275–277.  Mr. Albanese and Mr. Elliott did not improperly affect the HY 2012 impairment process.

Finally, the Section 13(b) accounting claim (against Rio Tinto) turns on unsubstantiated speculation and three fundamentally flawed expert opinions that should be excluded as unreliable. Indeed, everyone involved agreed RTCM had no impairment indicators at HY 2012, and PwC has never withdrawn its report on those financial statements.  SUF ¶¶ 293, 349.

### BACKGROUND

### A.    In 2011, Rio Tinto Acquired Exploratory Mining Assets in Mozambique.

In 2011 and 2012, Rio Tinto, a world leader in exploring and developing new mining assets, had about $120 billion in assets and operations in nearly 20 countries.  Ex. 48 at 30, 134; SUF ¶¶ 3, 461.  Mr. Albanese was its CEO until January 2013, Mr. Elliott its CFO until April 2013; both sat on the Board of Directors, and neither received a bonus in 2011 or 2012.  Ex. 51 at -533; Ex. 308 at 2; Ex. 49 at 83, 85; Ex. 48 at 86; Ex. 7 (du Plessis) at 29:20–30:12; SUF ¶¶ 9, 11, 458–459.  Rio Tinto had five product groups including RTE, Ex. 49 at 2–4; SUF ¶ 12, which oversaw all its coal "business units," Ex. 49 at 28–29; SUF ¶¶ 22, 26.

In 2011, Rio Tinto acquired Riversdale, a publicly traded company that owned the rights to three coal tenements—Benga, Zambeze, and Tete East—covering nearly 1,000 square miles in Mozambique's Moatize Basin.  Ex. 48 at 190; Ex. 66 at -751; SUF ¶¶ 42, 44.  The vast majority of coal deposits worldwide are comprised of "thermal coal," used for heating and electricity, but the Moatize Basin was widely viewed as having both thermal coal and one of the world's last

undeveloped sites for "coking" coal, a scarcer, more valuable type of coal needed to make steel. Ex. 30 at 9–10; Ex. 15 (Lynch) at 233:13–24; SUF ¶¶ 30–31, 38.  With the acquisition, Rio Tinto aimed to capitalize on rising projected coal prices "driven primarily by growth in" India, China, and Brazil.  Ex. 56 at -582; SUF ¶¶ 33–37.  Rio Tinto completed the $3.69 billion acquisition in August 2011 and renamed the asset Rio Tinto Coal Mozambique ("RTCM").  Ex. 48 at 190; SUF ¶¶ 42–43.  Also in 2011, Rio Tinto acquired an interest and option in Minjova, an exploratory tenement next to RTCM thought to have "the potential" for 1 billion tonnes of coking coal and substantial amounts of thermal coal.  Ex. 77 at -172, -174; SUF ¶¶ 51–54.  Minjova was grouped with RTCM for planning purposes, as it enabled economies of scale and "would only ever be developed in conjunction with RTCM."  Ex. 23 (Ritchie) at 403:20–404:13; SUF ¶ 55.

During this period, market participants understood that the ore body at the acquired tenements was untested and required further evaluation, Ex. 315 at 3, 5; SUF ¶ 468, and that there were "significant infrastructure hurdles," including that a plan to barge coal down the Zambezi River was "yet to be proven to be economically viable," Ex. 309 at 3; SUF ¶ 467.  Indeed, in September 2011, Rio Tinto explained to investors that RTCM's "full potential remains under investigation," and stressed that, given "a very constrained infrastructure environment," RTCM would "need to upgrade existing capacity, implement greenfield port and rail solutions," and "investigat[e] barging capacity" while working with "government and investors, to [overcome] coal chain capacity limitations."  Ex. 321 at 7; SUF ¶ 470.  Market analysts noted a "key bottleneck" was infrastructure.  Ex. 320 at 7; *see* Ex. 319 at 4 ("entirely dependent on logistics"); SUF ¶ 470.

**B.       In 2011 and 2012, Rio Tinto Extensively Explored and Evaluated Its Assets.**

After acquisition, Rio Tinto began a program to explore and evaluate the feasibility of mining at RTCM and Minjova.  Ex. 48 at 30; SUF ¶ 57.  The exploration phase of large-scale mining projects "can take ten to 20 years," with extensive drilling and testing and an evolving

understanding of the coal.  Ex. 48 at 30; SUF ¶¶ 58, 60, 73.  Coal quantity estimates can change with new information about a coal deposit's thickness or continuity; coking-coal quality estimates can change as coal samples undergo a "particularly complicated" and time-consuming series of lab tests for coal properties.  Ex. 4 (Carter) at 199:14–200:12; Ex. 30 at 19–23, 25–26; SUF ¶¶ 63–65.  Interpreting such data requires significant judgment.  Ex. 30 at 11–12; SUF ¶ 61.  Rio Tinto studies went through four stages:  conceptual (exploration), order of magnitude (high-level assessment), pre-feasibility (narrowing of options), and feasibility (one option selected for funding request).  Ex. 85 at -759–60, SUF ¶¶ 74–78.  Often each stage had evolving inputs and assumptions, leading to new scenarios or the reevaluation of old ones.  Ex. 30 at 28–29; SUF ¶¶ 58, 73.  At acquisition, Benga was the most advanced tenement, although it did not yet have an operating mine; Zambeze was at the order-of-magnitude/pre-feasibility stage; the rest were at the conceptual stage.  Ex. 87 at -175; SUF ¶ 79.

### 1.     Initial Coal Estimates

Initial test results "generally confirm[ed]" that Benga and Zambeze were "Tier One opportunities" for coking coal.  Ex. 8 (Dupree) at 26:2–27:2; SUF ¶¶ 47, 69.  "Tier One" assets are considered "large, long-term, expandable cost-competitive mines."  Ex. 48 at 6; SUF ¶ 48.  Initial test results from Minjova also were "encouraging," indicating "coking" coal potential.  Ex. 84 at -817; SUF ¶¶ 70–72.

Riversdale had publicly estimated 4 billion tonnes of resources at Benga, 9 billion at Zambeze.[2]  Ex. 146 at -156; Ex. 147 at -058; SUF ¶ 147.  At acquisition, Rio Tinto anticipated making "significant[ly]" lower estimates pursuant to more conservative mining criteria.  Ex. 148 at -093;

---

[2]  A "resource" is a coal deposit with "reasonable prospects for eventual economic extraction"; a "reserve" is the "economically mineable part" of the resource.  Ex. 30 at 27; SUF ¶ 145.

SUF ¶ 148. "The magnitude" of this expected revision "ha[d] not been quantified," *id.*, but Rio Tinto assumed 452 million tonnes of mineable coal at Benga, 1.53 billion at Zambeze, Ex. 149 at -779; SUF ¶ 150. In its 2011 Annual Report (released March 2012), Rio Tinto reported for the first time its resource estimates of 613 million tonnes at Benga, 1.984 billion at Zambeze, Ex. 48 at 52; SUF ¶ 152—which were thought to be "in line with market expectations for a tier one resource," Ex. 5 (Chiaro) at 250:17–251:8; Ex. 154 at -103; SUF ¶ 156. In independently assessing RTCM's fair value at acquisition, Ex. 71 at 2; SUF ¶ 50, Deloitte confirmed these estimates would not have affected the value if "production assumptions" were "reasonable," Ex. 209 at -281–82; SUF ¶¶ 295–299. In fact, the revised estimated resources were enough for a multi-decade operation and did not affect RTCM's value. Ex. 23 (Ritchie) at 328:23–329:17; Ex. 30 at 47–48; Ex. 15 (Lynch) at 163:18–164:3; SUF ¶ 158.[3]

### 2.   Options for Barging and Rail Transportation

As Rio Tinto told investors in September 2011, *supra* 5, from the outset RTCM was considering transporting the coal to a port either by barging it down the Zambezi River or by rail—*e.g.*, expanding existing rail capacity or building a "greenfield" rail line, Ex. 88 at -911–20; Ex. 63 at -431 (Nov. 2010 minutes: "either [rail or barging] might be feasible"); SUF ¶¶ 40, 81, 84. To develop such large-scale transportation infrastructure, Rio Tinto would need approval from the Government of Mozambique ("GoM"), which undoubtedly knew the importance of developing

---

[3] Unlike Defendants—who engaged a coal expert to opine on this point, *see* Ex. 30 at 47–48—the SEC did not engage any coal expert, and the SEC cites no evidence for its assertion that Rio Tinto would have been unable to extract 2 billion tonnes of mineable coal, as assumed for planning purposes, *see* SEC SUF ¶¶ 153, 158. The record shows the opposite. *See* Ex. 30 at 47–48 (assumptions not "unreasonable"); Ex. 23 (Ritchie) at 328:23–329:17 (revised estimates did not "cause . . . concern" because they "[s]till give[ ] you a resource life of decades"); Ex. 27 (Woodley) at 267:14–23 ("we had enough coal"). And while the SEC notes possible "higher cost[s]" for *transportation* without "a barging model," SEC SUF ¶ 158, those costs do not establish that the *coal quantity* estimates affected RTCM's value.

infrastructure, but lacked the technical and financial capacity to develop such "megaprojects" on its own.  Ex. 23 (Ritchie) at 272:11–274:1; Ex. 34 at 17–19; SUF ¶¶ 86–87, 91–92.

**Barging:**  At acquisition, Rio Tinto viewed barging as a "medium term option[ ]" that would not begin earlier than 2015, Ex. 88 at -913, -915; SUF ¶¶ 84–85, and regarded a barging proposal prepared by Riversdale as "fairly early stage," Ex. 87 at -175; Ex. 91 at -942; SUF ¶¶ 79, 89.  One GoM agency notified RTCM in November 2011 that it was "not favourable" to this specific proposal due to environmental concerns.  Ex. 98 at -947–48; SUF ¶ 96.  A few weeks later, RTCM submitted a new proposal for a transport corridor using both barge and rail, and repeatedly discussed it with GoM officials in early 2012.  Ex. 116 at -343; Ex. 10 (Finlayson) at 86:9–21; SUF ¶¶ 109–110.  "It became apparent," however, that GoM officials viewed the addition of rail especially "favorably . . . because it had a much more significant development impact," Ex. 10 (Finlayson) at 75:11–18; SUF ¶ 120, and in April 2012 GoM officials advised RTCM to remove barging from the new proposal, Ex. 123 at -160; SUF ¶¶ 111–113.

With other "megaprojects," it appeared that the GoM often denied initial proposals to extract concessions before "almost always" granting approval.  Ex. 34 at 17–20, 30–31; SUF ¶ 117.  Here, too, the GoM claimed RTCM owed a capital-gains tax, and Mr. Albanese believed RTCM "had to solve [that] issue before barging would be affected."  Ex. 1 (Albanese) at 247:11–248:25; SUF ¶ 119.  Because barging "made logical sense" for RTCM and the GoM, Rio Tinto continued to believe it "always remained a live option," at least in the long term.  Ex. 23 (Ritchie) at 170:24–25; Ex. 1 (Albanese) at 248:17–20; *see* Ex. 19 (Newell) at 387:11–388:1 (there was never "a point in time" in 2012 when it was believed "barging was no longer to be [a] permissible" option); Ex. 125 at -393 ("finding a holistic solution" on "infrastructure and development issues"); SUF ¶¶ 116, 118–119.  After April 2012, RTCM planned "a far more widespread and aggressive response" and

continued engaging the GoM on barging.  Ex. 123 at -160; Ex. 141 at -656–57; Ex. 127 at -937–38; SUF ¶¶ 114–115, 141.  Mr. Albanese himself again raised the barging issue with senior GoM officials in September 2012.  Ex. 1 (Albanese) at 276:11–17, 294:3–295:8; SUF ¶ 115.[4]

**Rail:**  While pursuing barging options, RTCM also pursued its "longer term" option of a greenfield rail and port network.  Ex. 129 at -230; Ex. 88 at -917; SUF ¶¶ 120–121.  Rio Tinto had experience in constructing "large infrastructure corridor railways and ports," Ex. 10 (Finlayson) at 71:16–72:13; SUF ¶ 94, but major mining companies like Rio Tinto frequently partner with other companies on large infrastructure projects, Ex. 19 (Newell) at 199:15–200:6; SUF ¶ 122.

In late 2011, RTCM began actively exploring partnership opportunities to help defray capital costs associated with building greenfield rail.  Ex. 10 (Finlayson) at 105:24–106:4; SUF ¶ 123.  RTCM continued engaging with a wide range of companies on greenfield rail through 2012, and expected results on studies of potential options by early 2013.  Ex. 19 (Newell) at 465:11–16; Ex. 286 at -832; Ex. 279 at -493; Ex. 150 at -252; SUF ¶¶ 123, 125, 313, 409.  RTCM thought it had a "good probability" of finding a partner:  Chinese companies were "very active" with infrastructure projects in Africa and "able to deliver those projects cheaper" than others; and China—as owner of Rio Tinto's largest shareholder Chinalco—had a vested interest in Rio Tinto's success.  Ex. 10 (Finlayson) at 105:5–106:4, 238:5–20; SUF ¶¶ 126–127.  Rio Tinto's competitor Vale even secured a partnership for its own greenfield rail in Mozambique, built in 2017.  Ex. 30 at 38; Ex. 1 (Albanese) at 236:18–20, 243:23–244:2; SUF ¶ 190; SEC SUF ¶ 190.

---

[4]  The "briefing notes" the SEC cites in trying to dispute this fact do not reflect the only issues discussed with GoM officials:  The conversation was "fairly wide ranging," as is "typical of a CEO to a senior person in government."  Ex. 1 (Albanese) at 294:3–14.  The other document the SEC cites states in late November 2012 that barging would not "happen any time soon" for another company.  Ex. 132 at -792.  That cannot establish RTCM's knowledge earlier in 2012.

### 3.      Changing Models of RTCM's Potential Development

As RTCM's information evolved in 2012, so did potential business configurations used to shape RTCM's optimal development.   *See* SUF ¶¶ 207–234.   RTCM analyst Marcantonio Maglione created "from scratch" a planning model incorporating "upwards of 1,000" assumptions ranging from coal quantity and quality, to ramp-up speeds and projected coal prices.   Ex. 16 (Maglione) at 25:22–26:4, 27:18–24, 31:3–22, 48:4–23; Ex. 17 (Morris) at 154:3–12; SUF ¶¶ 209–212.   The NPVs the model generated measured a discounted cash flow ("DCF") and were not viewed as reliable estimates of RTCM's value in 2012.   Ex. 23 (Ritchie) at 59:23–60:9 ("very imprecise measure of the value of an asset particularly at an early stage"); Ex. 10 (Finlayson) at 303:21–304:4 ("should not be relied upon"); SUF ¶¶ 221, 226.   The model's inputs were also interdependent—*e.g.*, removing one mine's production would create "erroneous outputs" unless corresponding changes were made to infrastructure options, Ex. 16 (Maglione) at 210:3–22; SUF ¶ 214—and changed "all the time" with new updates, creating "nonsensical" outputs that fluctuated significantly, Ex. 16 (Maglione) at 124:23–125:3, 208:25–209:4; Ex. 14 (Larsen) at 204:19–205:19 ("very big" "volatility"); SUF ¶¶ 213, 224.

### C.      The May 11, 2012 Brisbane Meeting.

On May 11, 2012, after Rio Tinto's Annual General Meeting in Brisbane, Australia, Mr. Albanese and Mr. Elliott received an update on RTCM's operations and the potential "design of [its] business."   Ex. 23 (Ritchie) at 318:21–319:6; Ex. 9 (Elliott) at 208:22–209:13; SUF ¶¶ 159, 162.   RTCM's chief executive Eric Finlayson, Ex. 227 at -409; SUF ¶ 340, led this "Brisbane Meeting," with several other RTCM and RTE executives also in attendance, Ex. 158 at -966; SUF ¶ 161.   As the meeting "had nothing to do with accounting issues," the Controller's Group did not (and did not expect to) attend.   Ex. 23 (Ritchie) at 318:18–319:6; Ex. 14 (Larsen) at 189:9–22; SUF ¶ 167.

10

Mr. Finlayson gave the PowerPoint "Brisbane Presentation" (Ex. 351), and the SEC contends he used notes (Ex. 166) throughout.[5]  The slides presented RTCM's challenges (including many of the same ones already known to the market):  (1) "[c]oal production [wa]s infrastructure-constrained," barging lacked "political support," and existing rail capacity was limited, Ex. 351 at 5, 15; (2) "[c]oking coal . . . yield [wa]s lower than expected" (50% vs. 66%), *id.* at 9; and (3) "[p]roduction ramp-up [wa]s delayed," *id.* at 17.  SUF ¶ 170.  But they also described Mozambique as "the next major coal exporter," Ex. 351 at 4, and touted positive developments and upsides:  (1) "higher production," with "[p]roduction growth to 45mtpa" (million tonnes per annum) of coking and thermal coal, including from Minjova given "[c]onfidence in the scale of [the] resource," Ex. 166 at -292; Ex. 351 at 8, 17; SUF ¶ 171; and (2) two new opportunities, building a power plant at Benga to defray costs for later mine phases and add sales revenue, Ex. 351 at 11; Ex. 27 (Woodley) at 284:22–286:7; SUF ¶ 172, and extracting coal bed methane ("CBM"), which "[c]ould be as large an economic opportunity as the coal," Ex. 351 at 12; SUF ¶ 173.

Mr. Finlayson also presented a "best configuration from the limited modelling to date," which included greenfield rail, but not barging.  Ex. 351 at 21; SUF ¶ 174.  Under that configuration, RTCM expected "major long-term cash flows"—"$61B" in "free cash flows," Ex. 351 at 23; Ex. 166 at -295; SUF ¶ 175, and a different amount "if [RTCM] were applying funding from partners," Ex. 10 (Finlayson) at 178:8–18; SUF ¶ 174.  But because the "number[s] w[ere] dynamic" and "changing" with "opportunities to continue to improve" RTCM's value, the numbers were removed from the accompanying chart "so it did not cement in anyone's mind a single value."  Ex.

---

[5]  The SEC says Mr. Finlayson conveyed every point from his notes.  *See*, *e.g.*, SEC SUF ¶ 168 (citing Ex. 10 (Finlayson) at 384:21–22).  Defendants do not concede that he did, *see*, *e.g.*, SUF ¶ 177; nevertheless, his notes further support Defendants' arguments, *see*, *e.g.*, *infra* 45–46, 52.

10 (Finlayson) at 178:8–18; *see* Ex. 166 at -295 ("We've purposely removed dollar figures from this slide as our numbers are indicative only."); SUF ¶¶ 174–175.

Witnesses disagree whether Mr. Finlayson said an "indicative NPV of [this configuration] [wa]s negative $680 million." *See* Ex. 27 (Woodley) at 224:23–225:5 (did not recall any NPV); SUF ¶ 177. Even if he did, his notes show he also would have qualified it by adding that any NPV: (1) was "indicative only and only a first-step in our options analysis"—meaning it "should not be relied upon," as RTCM was "unsure of what these numbers should really be"; (2) was "typical of capital-intensive Tier 1 greenfield projects"; and (3) had "considerable scope to increase [the] business value." Ex. 166 at -294–95; Ex. 10 (Finlayson) at 303:21–304:13, 392:2–12; SUF ¶¶ 177–179. Those preparing RTCM's valuations agreed a negative $680 million NPV did not reliably indicate its value given uncertainty over its development. Ex. 17 (Morris) at 173:14–18; SUF ¶ 180. Indeed, early-stage projects with large "initial capital expenditures," *e.g.*, greenfield rail, can still "spin off billions of dollars of revenue decades" later, and initial "low NPVs" for these projects are "very typical"—as the SEC and its expert concede. Ex. 47 (SEC expert Milburn) at 174:20–175:12; SEC SUF ¶ 222 (agreeing this is a "truism").

At the meeting, Mr. Albanese endorsed sixteen proposed work streams for optimizing RTCM's development. Ex. 23 (Ritchie) at 206:1–3, 336:11–17; Ex. 351 at 27; SUF ¶ 182. To reduce capital expenses, he instructed RTCM to develop the project in phases and "procure partner funds to support the larger capital projects." Ex. 10 (Finlayson) at 181:1–5; Ex. 19 (Newell) at 199: 2–14 ("infrastructure costs" "should be done in partnership"); Ex. 166 at -296 ("[f]arm out the CBM option"); Ex. 351 at 27 ("partnering" for power plant); SUF ¶¶ 173, 183.[6] RTCM was

---

[6] The record does not support the SEC's assertion that there would be no capital "to develop *any* capital projects at RTCM." SEC SUF ¶ 183 (citing Ex. 10 (Finlayson) at 154:25–155:13). The

to continue exploring, to determine the best configuration, and to optimize it before seeking capital. Ex. 23 (Ritchie) at 205:23–206:24; Ex. 1 (Albanese) at 250:23–252:15 ("[w]e were still at the development stage" and were not "close to spending capital"); SUF ¶ 187.

### D.    As Rio Tinto Continued Its Extensive Exploration and Evaluation Program, Internal Business Modelling Improved.

After the Brisbane Meeting, Rio Tinto continued with one of the "biggest exploration pro-gram[s] in the world."  Ex. 27 (Woodley) at 161:3–8; SUF ¶ 191.  In 2012, RTCM spent $123 million in exploration and evaluation—including $27 million on drilling between July and No-vember 2012—and, in October 2012, requested $135 million more for 2013.  Ex. 169 at -700; Ex. 171 at -891–92; Ex. 172 at -512–13; SUF ¶¶ 192–195.  By HY 2012, only Benga was operational; RTCM was completing order-of-magnitude studies for Zambeze and Tete East; and Minjova was still at the pre-conceptual stage.  Ex. 173 at -717–20, -773; SUF ¶ 196.

Benga officially opened in mid-2012, just before the Brisbane Meeting.  Ex. 75 at -793; SUF ¶ 197.  Lab results "in the first half of 2012" "confirm[ed] . . . previous knowledge" of Benga's coal resources, and were "positive," indicating "an increase in the quantity of coal" at Zambeze. Ex. 8 (Dupree) at 27:3–12, 96:10–24, 108:18–110:1; SUF ¶ 198.  RTCM "awaited" test results from Tete East through Q4 2012, but "assum[ed]" based on "[p]reliminary data" that it had similar coal quality to Zambeze.  Ex. 170 at -484; Ex. 176 at -228; SUF ¶ 446.  Based on updated testing results from adjacent tenements, RTCM was "optimistic about Minjova's potential" in April 2012, and increased its estimate of coking coal from 10% to 20%.  Ex. 8 (Dupree) at 104:14–22; Ex. 182 at -811; SUF ¶ 202.  In July 2012, Rio Tinto Exploration ("RTX") received

---

only testimony the SEC cites states that Rio Tinto would not provide "capital for developing these *major* capital projects."  Ex. 10 (Finlayson) at 154:25–155:13 (emphasis added).  Notably, Rio Tinto continued to spend money on RTCM's extensive exploration.  *See* Ex. 1 (Albanese) at 251:2–15 (Rio Tinto "spent *more* than [it] had budgeted for the year for the full range of [RTCM] development studies, optimization studies" (emphasis added)); *infra* 13.

complete lab results from 3 of 23 Minjova drillholes, indicating that "semi-soft coking coal" would be Minjova's "primary product," but more information was needed. Ex. 181 at -374; SUF ¶ 201. RTX told RTCM that Minjova was believed to hold ">1bt" (over one billion tonnes) of coal, and while a "large" portion was heat affected, limited lab results were "preventing a true understanding of the resource potential." Ex. 183 at -722; SUF ¶ 205. In the interim, RTCM still viewed Minjova as having the "potential" to be a "tier one asset[ ]." Ex. 173 at -692; SUF ¶ 321.[7]

With this improved information, NPVs from RTCM's internal modelling gradually increased, with many above RTCM's carrying value in 2012, including some scenarios "generat[ing] a 3 to 4 [billion dollar] value" in July 2012. Ex. 16 (Maglione) at 224:19–22, 229:24–230:7; SUF ¶¶ 225, 229–30.[8] Still, no modeled scenario represented an agreed-upon plan that RTCM would definitely pursue, Ex. 12 (Hughes) at 223:9–20; SUF ¶ 219; and no NPV was designed "to be used for impairment analysis," Ex. 10 (Finlayson) at 345:16–347:7; Ex. 28 (SEC expert Brice) at 288:24–289:6 ("They would not be equivalent to recoverable amounts[.]"); Ex. 16 (Maglione) at

---

[7]  The SEC misleadingly tries to use two "Project Handover Reports" to "dispute" Minjova's potential at HY 2012. *E.g.*, SEC SUF ¶¶ 54–56. The "Project Handover Report 2011" actually dates to February *2012* (based on metadata), and gives only an "overview" of exploration work to date, Ex. 153 at -160, as "full results" were "outstanding," *id.* -204. It also said the northern Minjova basin had "a large amount of potential," *id.* at -212; and the southern basin had results from only one drillhole, so ultimately its "only draw back [sic] may be the quantity of coal and the consistency," *id.* at -209–10. The "Project Handover 2012 Report" does include later lab results, but as the SEC is aware, SUF ¶ 452 & n.10, that mislabeled document is from February *2013*, *see* Ex. 342, and there is no evidence RTCM, RTE, Mr. Albanese, or Mr. Elliott were informed of those results until late 2012, *see, e.g.*, Ex. 72 at -216; Ex. 302 at -898; SUF ¶¶ 199–200, 447–448; *infra* 24. Indeed, those results were not available until well after HY 2012, Ex. 72 at -214; SUF ¶¶ 445–448, and there is no evidence Mr. Albanese or Mr. Elliott saw the 2011 or 2012 Project Handover Reports.

[8]  The SEC tries to dispute SUF ¶¶ 229 and 234 by asserting the Deputy Controller knew the generated values but not the details of the underlying RTCM scenarios. That does not refute the facts that these values were really modeled or that, at HY 2012, the Deputy Controller *and* Controller were aware of "3 to 4" billion dollar NPVs, SUF ¶ 229, and "negative NPVs," SUF ¶ 234.

128:15–25 ("It would have been problematic" to give the Controllers an NPV at HY 2012 because RTCM "wouldn't have known what our base case was"); Ex. 17 (Morris) at 141:10–13 ("inappropriate" to use these NPVs in an impairment test); SUF ¶¶ 233, 259.[9]

### E.    All Involved Agreed That RTCM Had No Impairment Indicator at HY 2012.

International Accounting Standard ("IAS") 36 prescribes a two-step process for impairment reviews:  At step one, an entity must assess if "there is any indication that [the] asset may be impaired"; if so, at step two, the entity must prepare a formal estimate of the asset's recoverable amount—and the asset is impaired if that estimate is less than the carrying amount.  Ex. 190, ¶¶ 9, 24; SUF ¶ 235.  Judgment is needed to assess for impairment indicators, *e.g.*, when the "asset's market value has declined significantly" or "significant changes with an adverse effect on the entity" have occurred.  Ex. 190, ¶ 12; SUF ¶¶ 241, 243.  In addition, annually the entity must estimate the recoverable amount of an asset with goodwill regardless of whether there is any indication of impairment.  Ex. 190, ¶ 10b; SUF ¶ 244.  Given the complexities of developing early-stage mineral assets, International Financial Reporting Standard ("IFRS") 6 exempts from these requirements almost all exploratory and evaluation assets until their "technical feasibility and commercial viability" are determined.  Ex. 192, ¶ 17; SUF ¶ 249.

At HY 2012, Rio Tinto reasonably could have applied IFRS 6, as almost all of RTCM was in the exploratory and evaluation phase.  Ex. 11 (Godbehere) at 165:20–166:10, 174:7–175:7; Ex. 45 (Lacey) at 82:7–83:1; Ex. 36, ¶ 31b; SUF ¶¶ 256, 292.  But its Controllers applied the more

---

[9]  The SEC tries to dispute this fact by citing evidence that *some* DCF models can be used as a starting point in impairment determinations.  SEC SUF ¶¶ 233, 259.  But "a DCF should only be used when the future cash flows of the project can be estimated with a sufficient level of certainty."  Ex. 39, ¶ 3.36 (SEC expert).  As explained in text, the record is clear that the HY 2012 NPVs were not deemed sufficiently reliable for accounting purposes.

conservative IAS 36 standard, and RTCM, RTE, the Controllers, and PwC all agreed that RTCM had no indication of impairment. Ex. 13 (Lambert) at 222:10–22; SUF ¶¶ 292–293.

**Impairment Review:** Rio Tinto made impairment assessments pursuant to its well-documented internal controls, which Rio Tinto and PwC had repeatedly tested and found effective to provide reasonable assurance of reliable financial statements. Ex. 48 at 71, 76; Ex. 49 at 76, 82; SUF ¶¶ 350–354. Those controls included assessment of impairment indicators by business-unit experts first, then analysis by the Controllers, review by PwC, and review by Rio Tinto's Audit Committee. Ex. 55 at -972; Ex. 36, ¶¶ 110–113; Ex. 199, ¶ 6; SUF ¶¶ 246, 263–285. Rio Tinto's Group Controller from 2005 to 2015, Dan Larsen, recommended impairments fifteen times, totaling "approximately 30 billion" dollars. Ex. 14 (Larsen) at 15:1–6, 157:8–158:6; SUF ¶¶ 286–289.

By May 15, 2012, the Controllers had received the Brisbane Presentation and discussed it with RTCM and RTE, noting "clearly some areas of concern in here around infrastructure and production delays." Ex. 165 at -175; Ex. 2 (Barbrook) at 73:2–4 (noting "issues apart from barging that would impact RTCM"); SUF ¶¶ 300–302. RTCM and RTE continued to update the Controllers—*e.g.*, that barging had been set aside for now at the GoM's request, RTCM was exploring infrastructure partnering opportunities, and "there were negative NPVs" at HY 2012. Ex. 14 (Larsen) at 203:24–204:4, 219:9–220:4; Ex. 210 at -145; SUF ¶¶ 234, 303–304. By HY 2012, PwC was aware of the GoM's response to barging, revised coal estimates, and infrastructure "uncertainty," Ex. 212 at -017; Ex. 200 at -001; Ex. 214 at -002; SUF ¶¶ 306–307, 311, 313, and requested more data on certain infrastructure scenarios, *e.g.*, "Rio build, JV partner, [and] delay," Ex. 200 at -001; Ex. 201 at -001; SUF ¶¶ 308–309. PwC communicated with Rio Tinto—including RTE and RTCM—"probably . . . every day," receiving "[a]ny document [it] desired" to review. Ex. 14 (Larsen) at 152:15–153:8; Ex. 13 (Lambert) at 254:18–256:21; SUF ¶¶ 275–278.

**First Controller's Paper:**   In June 2012, the Audit Committee received a preliminary "paper from Dan Larsen and [PwC]" on general "Accounting Issues" that had been discussed with "the business units [and] product groups" and "go[ne] through several rounds" with the Controllers and PwC.  Ex. 2 (Barbrook) at 150:10–20; Ex. 150 at -240; Ex. 216 at -621; SUF ¶¶ 313, 316–317.  The paper noted (1) RTCM's revised coal estimates were "significantly lower than" Riversdale's, but "still significantly exceed[ed]" the mine's needs; (2) barging was "unlikely . . . in the short term," but other infrastructure options were being explored, *e.g.*, "shared development" of greenfield rail; (3) Minjova could add "significant [production] upside"; and (4) CBM extraction could be "a significant economic opportunity."  Ex. 150 at -240, -242, -252; SUF ¶¶ 313–314. "[W]hile there may be potential indicators," an impairment was "not expected," as "it [wa]s too early to assess" if RTCM's "fair value" was affected.  Ex. 150 at -252; SUF ¶ 315, 319.  PwC concurred: "uncertainty over future transportation might represent an impairment trigger," but "discussions [we]re not sufficiently progressed to be able to assess the impact, if any" on RTCM's value, and their status would "continue to [be] monitor[ed]" by PwC.  Ex. 150 at -253; SUF ¶ 318.

**Impairment Indicator Paper:**   On July 16, 2012, RTE sent directly to the Controllers and PwC a paper that assessed for every impairment indicator pursuant to IAS 36 and concluded RTCM had no indication of impairment.  Ex. 193 at -528–31; Ex. 222 at -299; Ex. 12 (Hughes) at 86:14–22 ("quite a comprehensive paper"); SUF ¶¶ 323, 332, 334.  Undisputedly, Mr. Albanese and Mr. Elliott never saw this paper.  SUF ¶ 332.  Like the First Controller's Paper, this "Impairment Indicator Paper" discussed developments at RTCM, including the revised coal estimates, barging, Minjova's coal potential, and possible upsides from CBM and a power plant.  Ex. 193 at -529, -534; SUF ¶¶ 324–325.  It also stated, "It is not possible to provide a valuation of RTCM . . . while the options remain at such an early stage of development."  Ex. 193 at -530; SUF ¶ 326.

Although it was "not yet possible to" measure how infrastructure changes would affect RTCM's value, as the many potential options were not "quantified with any degree of accuracy," the paper concluded that "inclu[ding]" Minjova and rising projected coal prices "should offset any potential loss" from such changes, Ex. 193 at -529–31; SUF ¶ 331.

"[T]o give some indication of" RTCM's value, the paper (1) modeled how "more certain" developments would have affected RTCM's value at acquisition, resulting in "a potential value of $5.1 billion" "caveat[ed]" by the "uncertainty of the central case,"[10] and (2) benchmarked RTCM's reserves and resources against "comparable transactions," showing that RTCM was "well within (or even below)" those benchmarks.  Ex. 193 at -530; Ex. 39, ¶ 3.56; SUF ¶¶ 326–329.  The paper found no indication of impairment, noting:  Despite "uncertainty over future transportation," RTE was "confident of finding a viable infrastructure path," and "the breadth of the options mean[t] that a central case view [was] still under development."  Ex. 193 at -531; SUF ¶ 331.[11]  Mr. Finlayson later certified that information provided by RTCM "[f]airly present[ed]" its "financial condition" with no "omission [or] misstatement," giving his sign-off on both the process and the resulting information.  Ex. 227 at -409; SUF ¶ 340.

**Second Controller's Paper:**  Later in July 2012, the Audit Committee received another "Accounting Issues" "paper from Dan Larsen and [PwC]" setting forth the Controller's and PwC's final conclusion that there was no indication of impairment.  Ex. 207 at -267, -280; SUF ¶ 342.  "[A]cknowledg[ing]" the "uncertainty over future transportation," the Controllers stated they were "confident of finding a viable infrastructure path," and "the breadth of the options mean[t] that a

---

[10]  PwC's engagement partner testified this was not a valuation, but only "a point of reference" for assessing more certain developments.  Ex. 13 (Lambert) at 143:2–21, 157:6–12; SUF ¶ 337.

[11]  PwC witnesses testified that, after months of conducting their own inquiry and observation, this paper was a principal basis for PwC's conclusion that RTCM had no impairment indicators at HY 2012.  Ex. 12 (Hughes) at 104:15–105:8; Ex. 13 (Lambert) at 28:3–22, 156:3–12.

central case view [wa]s still under development." Ex. 207 at -280; SUF ¶ 343.  Though required

to provide only a "negative assurance" on the HY 2012 financial statements as a whole, PwC

affirmatively "concur[red]" that RTCM had no impairment indicators, and has never modified its

report on the HY 2012 financial statements. Ex. 13 (Lambert) at 28:3–22, 168:6–20; Ex. 207 at

-280; SUF ¶¶ 344, 349.  "[T]here was no disagreement" by anyone at the meeting.  Ex. 14 (Larsen)

at 133:9–134:6; SUF ¶ 343.  Additionally, PwC represented to the Audit Committee that it "chal-

lenged [Rio Tinto] on the assessment of impairment triggers" at HY 2012 and was "satisfied with

[its] conclusions."  Ex. 197 at -753; SUF ¶ 345.

The Group Controller was "absolutely comfortable" with this process and determination.

Ex. 14 (Larsen) at 133:6–134:10; SUF ¶¶ 316, 342.  Consistent with established procedures, SEC

SUF ¶ 265, information flowed directly from RTCM and RTE to the Controllers and PwC; neither

Mr. Albanese nor Mr. Elliott improperly affected the process, Ex. 14 (Larsen) at 134:7–23,

137:10–13; SUF ¶¶ 316, 342.  Instead, they relied on the integrity of a process that Rio Tinto and

PwC had repeatedly audited and found effective, *supra* 16:  Mr. Albanese did not see any of the

accounting papers in advance, SUF ¶ 316, 332; and Mr. Elliott reviewed the two papers written by

the Controllers and PwC only at an "advanced stage" and "relied on [the Controllers]," Ex. 9 (El-

liott) at 252:18–253:6; Ex. 14 (Larsen) at 132:13–134:10; SUF ¶¶ 316, 342.

F.      **Public Statements to Investors Were Based on a Meaningful Inquiry and Fairly Aligned with Information about RTCM.**

The Section 10(b) claims are based on three statements by Mr. Albanese during presenta-

tions in August and November 2012.  *See* ECF 135 at 24–25.  For each presentation, Rio Tinto's

Investor Relations ("IR") team prepared a script and "a Q and A document" for likely questions.

Ex. 22 (Ovington) at 81:5–18, 102:14–22; SUF ¶ 366.  These materials were sourced from and

vetted by knowledgeable RTCM, RTE, and Controller's Group employees.  Ex. 22 (Ovington) at

85:6–86:7;  Ex. 245 at -389–90; Ex. 247 at -981–84; Ex. 258 at -635; Ex. 270 at -754; SUF ¶¶ 372–376.  An IR executive confirmed that these controls were "effective in ensuring" accurate materials and that Mr. Albanese was urged to rely on them.  Ex. 22 (Ovington) at 84:14–85:5, 103:2–13; SUF ¶¶ 368, 370.  Mr. Albanese relied on the business units for accuracy, so as not "to get ahead of [the] team on the ground," Ex. 263 at -652; SUF ¶ 378, understanding the materials reflected "information received from all of the units" following internal "processes of review and assurance," Ex. 1 (Albanese) at 274:17–25, 287:22–288:4; SUF ¶ 389.

On August 8, 2012, Rio Tinto's HY 2012 Report listed RTCM's value as $3.417 billion.  Ex. 164 at -075; SUF ¶ 355.  That day, in presentations to investors in London and in North America, Mr. Albanese's scripted remarks said Benga would produce 400,000 tonnes of coking coal in 2012, but warned it was "likely that we'll take longer to develop [RTCM's] infrastructure than previously planned due both to the timing of some of the approvals but also internal constraints on our capital."  Ex. 42 at -680; Ex. 241 at -871; SUF ¶¶ 357, 381.  Heeding this caution, analysts noted in the Q&A session that RTCM "will take longer to develop than you first thought" and "obviously there are a lot of challenges."  Ex. 241 at -865–66; Ex. 242 at -683; SUF ¶¶ 383, 387.

During the London Q&A session, in response to a question about RTCM's expected production "over the next few years," Mr. Albanese again cautioned, "to be realistic . . . constraints on capital spending will mean that [it] will probably be a slower rate of ramp up" than anticipated a year ago; he further stated that "we probably have more potential in total as we go forward" and the Moatize is "a world-class" coal basin, but that RTCM would "continue to engage with others and find . . . the optimal supply chain solutions."  Ex. 241 at -670–71; SUF ¶ 386.  At the North America Q&A session, Mr. Albanese stated, "the Moatize, if anything, is more prospective than I would have said a year ago as we look at the full range of opportunities," before cautioning,

"[f]rankly, we've got to cut our cloth according to our means and we will not be looking to spend the type of capital" anticipated a year ago, but instead will "progressively ramp[ ] up over the next several years . . . before we can really be putting [in] big capital." Ex. 242 at -683–84; SUF ¶ 388. Only 3 of 22 market analysts discussing the HY 2012 Report mentioned either statement, and each conveyed caution. Ex. 35, ¶¶ 165–166, App. C.11; SUF ¶ 480.

Mr. Albanese's statements tracked in all material respects the vetted IR materials. Ex. 22 (Ovington) at 110:11–14; SUF ¶¶ 390–391 (chart referencing Exs. 241 & 270). They also aligned with existing information: RTCM was still investigating opportunities thought to add potentially billions of dollars in value—*i.e.*, Minjova, CBM extraction, and the Benga power plant, Ex. 173 at -681, -692, -737–38, -767; Ex. 10 (Finlayson) at 282:15–284:21, 376:3–6; SUF ¶¶ 321–322; and Rio Tinto and its main regional competitor Vale often deemed their Moatize assets "world class," *e.g.*, Ex. 279 at -489; Ex. 277 at 17; SUF ¶¶ 397–399.

At a November 29, 2012 presentation to investors in Australia, Mr. Albanese's scripted remarks noted Benga's first shipment of coal, adding, "[w]e continue to view the Moatize Basin as a long-term opportunity with the potential to grow beyond 25 [Mtpa]," before cautioning that "all coal producers remained constrained by the lack of [transportation] capacity" and "[m]ajor capital will not be committed" until infrastructure studies "are complete." Ex. 244 at -859; SUF ¶ 393. This statement was verbatim to the vetted IR script. Ex. 22 (Ovington) at 110:11–14; SUF ¶¶ 376, 394–395 (chart referencing Ex. 254). At the time, RTCM and RTE were projecting 40 mtpa production for RTCM, including in materials sent to Mr. Albanese and the IR department between the Brisbane Meeting and November 2012. Ex. 136 at -416 (Sept. 2012: "RTCM product output [of] 40 mtpa"); Ex. 258 at -635 (Nov. 2012: "40 mtpa is still a realistic case"); SUF ¶¶ 405–408. No analyst report mentioned the November statement. Ex. 35, ¶ 176; SUF ¶ 481.

### G.     A November 2012 Update Led to a Full Geologic Review of RTCM.

While continuing to evaluate its assets, RTCM asked the Rio Tinto Strategic Production Planning Group ("SPP") to help "determine [its] optimal development pathway."  Ex. 4 (Carter) at 23:13–24:7, 185:12–18; SUF ¶¶ 411–412.  SPP's head, Chris Carter, visited RTCM in April 2012, but due to other commitments and the need to gather information for their analysis, SPP's work did not "start[ ] in earnest [until] August."  Ex. 4 (Carter) at 23:13–21, 60:11–24, 215:20–217:3; SUF ¶¶ 414–420.  In November 2012, SPP sent RTCM a "preliminary" analysis, with work streams still "requir[ing] resolution to complete the work," and a "[p]reliminary" NPV of negative $1.0 billion that was "no[t] inten[ded]" as "the best [SPP] can do."  Ex. 288 at -948, -950, -952, -973; Ex. 289 at -761; SUF ¶¶ 421–422.  Andrew Woodley—who had been RTCM's Chief Operating Development Officer until September 2012, when he replaced Mr. Finlayson as chief executive—"disagree[d]" with the preliminary NPV and argued it omitted "potential upsides that . . . should be factored in" to "add circa $3bn."  Ex. 27 (Woodley) at 33:22–35:9, 274:23–278:24; Ex. 290 at -613; SUF ¶ 423.  By this time, RTCM's YE 2012 impairment review had begun, and the Controllers had circulated to the Audit Committee a preliminary impairment-analysis paper anticipating no impairment to RTCM.  Ex. 291 at -848; Ex. 292 at -867; SUF ¶ 424.

On November 24, 2012, the Technology & Innovation Group Executive, Preston Chiaro—who was "shocked" by SPP's preliminary results and wanted to ensure Mr. Elliott was "aware" of them—convened a call with Mr. Elliott, Mr. Carter, Mr. Woodley, and (at Mr. Elliott's request) the Group Controller Dan Larsen.  Ex. 5 (Chiaro) at 137:9–138:8, 141:8–14; Ex. 296 at -641; Ex. 295 at -280; SUF ¶ 425.  Mr. Elliott did not receive a copy of SPP's preliminary analysis because Mr. Chiaro did not consider it ready for review.  Ex. 5 (Chiaro) at 315:13–23, 316:7–15; SUF ¶ 426.  On the call, Mr. Chiaro and Mr. Carter summarized SPP's analysis, while Mr. Woodley explained SPP had ignored "many upsides" worth "billions."  Ex. 5 (Chiaro) at 139:8–140:9; Ex.

9 (Elliott) at 269:14–271:1; SUF ¶¶ 428–429.  Mr. Elliott "asked a number of questions . . . to understand the level of confidence" in the numbers and "what work remained . . . to finalize them." Ex. 5 (Chiaro) at 140:13–19; SUF ¶¶ 428, 430.

The participants agreed "more work" was needed "to reconcile the two" views, and Mr. Elliott should "inform[ ] the [Audit] committee that new technical information had arisen that was negative."  Ex. 9 (Elliott) at 271:21–272:3; Ex. 14 (Larsen) at 124:18–125:5; SUF ¶ 431.  At an Audit Committee meeting two days later, Mr. Larsen presented the previously circulated preliminary paper; Mr. Elliott warned of a problem at RTCM and said "he would be looking into it."  Ex. 15 (Lynch) at 192:7–193:11; SUF ¶ 432.  The plan was to update the Committee at its next meeting, once there was more information.  Ex. 14 (Larsen) at 125:6–126:2; SUF ¶ 433.

Mr. Chiaro preferred to share SPP's preliminary results with Mr. Albanese in person.  Ex. 298 at -347; SUF ¶ 435.  On December 3, 2012, while in London for other meetings, Mr. Chiaro discussed SPP's analysis with Mr. Albanese, who looked "shocked" and asked about the "next steps" that had been "planned to finalize the work," Ex. 5 (Chiaro) at 311:20–23, 341:5–23, 343:10–17, 347:24–348:4; SUF ¶¶ 434–439.  Mr. Albanese promptly requested that Rio Tinto's "best ore body knowledge experts" look at the "geologic information to form a fresh view" of what Rio Tinto "really kn[e]w" about its coal assets, then feed those results into the "valuation approaches" being used for impairment testing.  Ex. 299 at -148; SUF ¶ 443.  Mr. Chiaro also summarized the preliminary results for the Board Chairman that same week while still in London.  Ex. 5 (Chiaro) at 160:15–162:25, 370:11–371:3; SUF ¶¶ 440–441.

### H.   New Test Results Reviewed in December 2012 Changed the Economics of RTCM's Development and Led to an Impairment.

Following the full geologic review that Mr. Albanese requested, the geologic team concluded in late December 2012 that, "based on recently acquired (and evolving) drillhole data and

geological interpretations," the Tete East and Minjova coal could not be economically mined.  Ex. 304 at -354, -359; SUF ¶ 452.  These "final coal quality results" were not "passed onto RTCM" until December 2012.  Ex. 72 at -216; Ex. 27 (Woodley) at 299:9–301:11 ("second week of December 2012"); Ex. 302 at -898 ("December 2012 – test results question viability of Minjova"); SUF ¶¶ 446–448.  Mr. Woodley "was devastated":  Without resources from Tete East and Minjova, "the large volume [of coal production] needed" to "underwrite a large Greenfield . . . operation had largely disappeared."  Ex. 27 (Woodley) at 300:12–301:11; SUF ¶ 447.

Around January 11, 2013, a second team finalized a "revised RTCM valuation [of] $611M" that "remov[ed]" the "mineable coal" from Minjova and Tete East that had previously been "the basis for a greenfield . . . rail."  Ex. 303 at -034–36; SUF ¶ 456.  Shortly after the Board was apprised of this new valuation, Rio Tinto announced noncash impairment charges of about $3 billion for RTCM and $10–11 billion for its Alcan assets, and that Mr. Albanese and Mr. Ritchie had stepped down by mutual agreement with the Board.  Ex. 308 at 1–2; SUF ¶¶ 457–458.

## I.    The Albanese Statements and RTCM Impairment Did Not Affect Rio Tinto's Stock Price.

In 2012, Rio Tinto PLC's American depository receipts ("ADRs") traded in an efficient market.  Ex. 35, ¶¶ 41–42; SUF ¶ 478.  The Albanese Statements in August and November 2012 did not affect their price.  Ex. 35, ¶¶ 157–177; Ex. 38, ¶¶ 181–187 (SEC expert not opining on price impact); SUF ¶¶ 479–481.  When the impairment announcement was made on January 17, 2013, there was no statistically significant stock drop, Ex. 37, ¶¶ 62–63; SUF ¶¶ 458, 482, and it did not affect Rio Tinto's bond prices or cause any credit-rating downgrade, Ex. 35, ¶¶ 124–151; Ex. 338 at -931; Ex. 339 at -297; Ex. 340 at -116; SUF ¶¶ 491–95.  Indeed, most market analysts had viewed the acquisition as "smallfry M&A for Rio [Tinto]."  Ex. 312 at 1; Ex. 309 at 2 ("transaction barely registers"); Ex. 310 at 1 ("fairly immaterial impact"); SUF ¶ 463.  By HY 2012,

market analysts observed that "[m]ost analysts seem[ed] to assign little or no value to [RTCM]." Ex. 313 at 5; Ex. 113 at 5 ("no value [for RTCM] reflected in the share price"); SUF ¶ 465.[12]

The market had long been aware, since Rio Tinto's disclosures at acquisition, that RTCM confronted "a very constrained infrastructure environment" and would "need to upgrade existing capacity, implement greenfield port and rail solutions" and "investigat[e] barging capacity." Ex. 321 at 7; Ex. 48 at 27; Ex. 314 at 2; Ex. 309 at 3; SUF ¶ 467. Market analysts and news media regularly commented on these challenges through 2012. *E.g.*, Ex. 113 at 64, 68 ("limited rail and port capacity"; "barging is not a viable option"); Ex. 344 (Rio Tinto seeking partners for greenfield rail); SUF ¶¶ 469–472. Rio Tinto also informed investors of development delays from "[l]ogistical constraints and upgrade work," and infrastructure delays due to internal "constraints on capital." Ex. 322 at 5; Ex. 241 at -871; SUF ¶¶ 386, 471. Market analysts understood, too, that RTCM's coal quantity and quality were uncertain: At acquisition, some posited it may not be of "premium" quality, Ex. 315 at 3, 5; Ex. 35, ¶¶ 88, 93, 95; SUF ¶¶ 468, 474; and analysts noted the March 2012 revised coal estimates still "ha[d] potential to support" the mine's needs, Ex. 113 at 64; Ex. 48 at 52; SUF ¶ 473, but scaled back their own assumptions after Rio Tinto reduced its 2012 coking-coal target to 400kt, Ex. 241 at -853; Ex. 345 at 7; SUF ¶ 386.

Most market analysts did not consider the RTCM impairment a significant development: the revised value was "not incommensurate with . . . the market's valuation" of RTCM. *E.g.*, Ex. 334 at 1; Ex. 333 at 1 ("we already value[d] the asset at $619m"); SUF ¶¶ 484–485. Of the twenty market analysts reporting on the impairment, the SEC's expert identified only six with a negative

---

[12] There is no triable issue on this fact. The SEC agrees the cited reports show "*other* investors had failed to price [RTCM] into the stock price." SEC SUF ¶ 465. It cites just two post-acquisition analyst reports; both postdate the Albanese Statements, *see id.*, and one attributed zero value to RTCM at HY 2012, "add[ing] USD5bn" to RTCM only in December 2012, Ex. 343 at 12.

view, Ex. 37, ¶¶ 65–69; SUF ¶ 484—with four of those stating the impairment had no impact, and one increasing its target price for other reasons.  Ex. 328 at 1; Ex. 330 at 1–2; Ex. 331 at 1; Ex. 332 at 1; Ex. 329 at 1; SUF ¶ 484.  Most market analysts also did not view the concurrent management change positively, and only one (of twenty) increased its target price on that basis.  Ex. 37, ¶¶ 78–84; Ex. 35, ¶ 113 (discussing Ex. 335); SUF ¶¶ 487–488.  Even analysts who purportedly viewed the management change positively said the RTCM impairment was insignificant.  *See*, *e.g.*, Ex. 346 at 2 ("limited impact"); Ex. 330 at 1 ("no impact"); Ex. 331 at 1 ("negligible impact"); Ex. 334 at 1 (similar); Ex. 337 at 1 (similar); SUF ¶ 488.

## LEGAL STANDARD

Summary judgment is warranted where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  For a factual dispute to be genuine, the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Although all permissible factual inferences "must be resolved in favor of" the SEC, the SEC "'may not'"—as it tries to do here—"'rely on . . . unsubstantiated speculation.'"  *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (citation omitted).

## ARGUMENT

The record now shows there was no fraud or improper accounting in this case.  The SEC stakes its case on the May 2012 Brisbane Meeting, which—it asserts—informed Defendants that RTCM was worthless.  The undisputed record shows, however, that, while discussing RTCM's challenges, the meeting *also* highlighted key positive developments—projecting "$61B" in long-term cash flows, Ex. 166 at -295, significantly "higher production" than expected, and new business options that "[c]ould be as large an economic opportunity as the coal," Ex. 351 at 11–12, 16–17, 23; SUF ¶¶ 169–173.  Despite uncertainty over its optimal development, RTCM still viewed

Mozambique as "the next major coal exporter" and believed there was "considerable scope to increase business value," so Mr. Albanese instructed RTCM to continue exploring coal and infrastructure solutions and to "pursue partnership options" to defray larger capital expenses.  Ex. 166 at -291, -295–96; SUF ¶¶ 169, 186–188.

The SEC also continues to emphasize a negative $680 million NPV allegedly conveyed at the Brisbane Meeting.  But there is no dispute that the NPV was "indicative only," meaning it "should not be relied upon," Ex. 10 (Finlayson) at 303:21–304:13; Ex. 17 (Morris) at 173:14–18; SUF ¶¶ 179–180.  Indeed, with early-stage projects, the inputs can generate "widely variable NPVs, including negative NPVs"—which is why, as the SEC now concedes, low NPVs are "very typical" for early-stage mines.  Ex. 33, ¶ 177; SEC SUF ¶ 222.  In addition, NPVs later in 2012 exceeded RTCM's carrying value, including "some" that "generated a 3 to 4 [billion dollar] value" at HY 2012.  Ex. 16 (Maglione) at 224:19–22, 229:24–230:7; SUF ¶¶ 225 (chart), 229.

Finally, the evidence has disproven the SEC's theory that Mr. Albanese and Mr. Elliott somehow improperly affected the HY 2012 impairment review.  Consistent with established procedures, the information for that review flowed directly from RTE and RTCM to the Controllers and PwC, with no interference from Mr. Albanese or Mr. Elliott.  Contrary to the SEC's previous suggestions, the Controllers promptly received a copy of the Brisbane Presentation and discussed it with RTCM and RTE.  Ex. 165 at -175–76; SUF ¶¶ 300–302.  And Mr. Albanese and Mr. Elliott undisputedly never saw the Impairment Indicator Paper, in which RTE explained to the Controllers and PwC why there were no impairment indicators for RTCM.  SUF ¶ 332; *see* Ex. 193.  The Court should grant Defendants judgment on all remaining claims.

## I.   The SEC Fails To Properly Controvert Virtually Every Key Fact In This Case.

Lacking evidence to defeat summary judgment, the SEC tries to muddy the record with a *290*-page Rule 56.1 Counterstatement.  Rather than offer evidence creating a *genuine* factual dispute, however, the SEC responds to virtually every asserted fact with improper argument and spin or meritless evidentiary objections.  The SEC's obfuscation fails.  As set forth below and summarized in the Appendix, all such facts may be deemed admitted, *see* Local Civ. R. 56.1(c), but Defendants are entitled to judgment even without any deemed admissions, *infra* II–VIII.

**A.**   Many facts are expressly not disputed,[13] and the Court should ignore any "argumentative and often lengthy narrative . . . 'spin'" the SEC adds to such facts,[14] *e.g.*, *Goldstick v. The Hartford, Inc.*, 2002 WL 1906029, at *1 (S.D.N.Y. Aug. 19, 2002), as well as any semantic objections that in substance "admit[ ] all or most of [the] assertion,"[15] *Major League Baseball*

---

[13]   *See* SEC SUF ¶¶ 2–4, 8, 11–14, 15 (part), 17–18, 20, 29–31, 37, 42, 89–90, 95, 106, 112 (part), 120–121 (parts), 122–124, 131 (part), 134 (part), 147, 176, 208, 236, 244–246, 265, 272, 292 (part), 312, 317, 319, 341, 355–357, 365, 374, 377, 378 (part), 383, 385, 387, 414, 436–438, 449–450, 453, 478, 490, 493.

[14]   For example, the SEC states that it "does not dispute that there is currently no evidence that Elliott saw the Impairment Paper," before adding spin about his purported review of a draft of a *different* accounting paper.  SEC SUF ¶ 332; *see also* SEC SUF ¶¶ 1, 5–7, 9, 16, 19, 22, 24–25, 26–27 (parts), 28, 33–34, 35 (part), 36, 38–39, 41, 43–45, 51–52, 54–56, 58–63, 65, 69–81, 83, 85–86, 88, 93–94, 96–98, 101–102, 105, 108, 118, 120 (part), 125, 133, 143, 148–149, 152–153, 155–158, 160–161, 162 (part), 163–164, 170–174, 177 (part), 178, 180, 185, 187–189, 197–199, 202, 205–207, 209, 212, 215, 216 (part), 217–218, 226, 231 (part), 235, 237–239, 241, 243, 248, 250, 252–253, 257–258, 260, 263–264, 269–271, 273–283, 290, 294–296, 304, 311, 314, 318, 323–325, 329, 331–334, 336, 338–340, 347–348, 354, 359–364, 366–368, 371, 375–376, 379–382, 384, 386, 388, 391, 393–395, 398, 411–413, 417–418, 420, 421 (part), 423–429, 430 (part), 431–435, 439–442, 446, 448, 452, 454–458, 467–472, 474–477, 480–482, 491.

[15]   For example, the SEC "[d]ispute[s]" that "[a]round July 2012, there were several scenarios that generated a $3 billion to $4 billion NPV range, including some above RTCM's carrying value" only "to the extent that" *one* witness (of *two* cited) "did not know if the models that were run were based on current assumptions."  SEC SUF ¶ 229; *see also* SEC SUF ¶¶ 10, 15 (part), 21, 26–27 (parts), 48, 50, 57, 66–69, 80–83, 99, 103 (part), 107, 113–117, 119, 121 (part), 126–127, 132, 141, 158–159, 161, 162 (part), 165, 168, 173–175, 179 (part), 180, 182–184, 190, 193, 195–196,

*Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 314–15 (2d Cir. 2008); *see also*, *e.g.*, *Shands v. Lake-land Cent. Sch. Dist.*, 2018 WL 3315738, at *1 n.1 (S.D.N.Y. July 5, 2018).

The SEC cannot manufacture a dispute by responding to its own restatement of a fact or disputing facts not asserted.[16]  *See Pruter v. Local 210*, 2020 WL 777333, at *1 n.3 (S.D.N.Y. Feb. 18, 2020) (Torres, J.); *Shands*, 2018 WL 3315738, at *1 n.1 (disregarding "purported disputes" "asserting irrelevant facts that do not contradict Defendants' factual assertions").  Nor can it establish "facts" without citing any evidence.[17]  *See* Fed. R. Civ. P. 56(c)(1)(A).

Finally, the Court can disregard SEC responses that state an asserted fact is "not material" or "not relevant" or that inject other legal arguments.[18]  *See Pruter*, 2020 WL 777333, at *1 n.3

---

198, 200–201, 203, 210, 213–214, 216 (part), 219, 221, 223–224, 234, 240, 243, 247, 249, 251, 256, 262–263, 297–299, 301–303, 307–310, 313, 318, 322, 342, 350, 392, 396, 400 (part), 402, 415, 419, 421 (part), 431, 443–444, 447, 451, 461, 465, 486.

[16]  For example, the SEC responds to the asserted fact that "NPVs generated [for RTCM] in 2012 ranged . . . [up] to positive $7 billion," by "disput[ing] that any valuations exceeding the carrying value were prepared before the release of the Half-Year Financial Statements" (ignoring that the included chart, prepared by its own expert, shows otherwise).  SEC SUF ¶ 225; *see also* SEC SUF ¶¶ 32, 41, 55, 59–60, 73–79, 82, 84, 91–92, 98, 101–102, 112 (part), 115–116, 128–129, 131, 136–140, 142, 144–146, 150–151, 154, 158, 163–167, 169 (part), 177 (part), 178, 179 (part), 180–181, 183–184, 186, 189–190, 193, 198–199, 201–203, 211, 216, 219, 221, 223, 226–228, 230, 231 (part), 232, 247, 251, 253, 255–257, 261–262, 266–267, 268 (part), 275, 278, 284–285, 289, 291, 293, 300–301, 305, 307–308, 310, 313, 315, 321, 323, 325–326, 328–331, 333, 335, 337 (part), 340, 343–346, 349–353, 370, 373, 378 (part), 397, 399, 400 (part), 401–410, 411–412 (parts), 413, 416, 422–423, 425, 432–433, 442, 445, 448, 451–452, 454–457, 462–473, 477, 479, 482–485, 487–489, 491, 494–495.

[17]  *See* SEC SUF ¶¶ 153, 157, 164, 183–184, 187, 225, 253, 266–267, 288–289, 299–300, 305, 313–316, 326, 345, 369, 390, 397, 402, 407–408, 430, 455, 466–467, 471, 474, 481, 492.

[18]  *See* SEC SUF ¶¶ 6–7, 15, 26–28, 33, 54, 59–60, 63, 65–66, 68–72, 75–78, 87, 97, 99–105, 108–111, 113–114, 116–117, 119–121, 123–132, 135, 137–142, 154, 159, 166–167, 177 (partly), 178, 180, 182, 185–186, 191, 193–195, 206, 214, 217–218, 222, 228–229, 232, 248–250, 252–254, 257, 262, 276, 286–287, 293–294, 304, 311, 316, 320, 328, 346, 358–362, 368–369, 372, 389–391, 395, 397–400, 410–413, 415–420, 454, 461–462, 464–474, 479–481, 483–485, 488–489, 491, 494.

(disregarding response that asserted facts "were 'not material to the motion'"); *Baity v. Kralik*, 51 F. Supp. 3d 414, 421 (S.D.N.Y. 2014) (disregarding "improper legal arguments"); *U.S. Info. Sys., Inc. v. IBEW Local Union No. 3*, 2006 WL 2136249, at *3–4 (S.D.N.Y. Aug. 1, 2006) (non-movant "cannot evade the impact of accepting a fact by adding legal argument").

**B.**     The SEC also repeats a small handful of meritless "objection[s] to the admissibility of a document" that cannot raise a factual dispute. *Major League Baseball*, 542 F.3d at 314. The SEC primarily objects that certain documents (mostly Rio Tinto emails) have not yet been authenticated (or are hearsay for that reason).[19]  But a "'party is not required to authenticate documents on a summary judgment motion where,'" as here, "'authenticity is not challenged by the other party,'" only lack of authentication, *Long v. New York City*, 2016 WL 4203545, at *2 n.4 (S.D.N.Y. Aug. 8, 2016) (citation omitted); and the Court has discretion to consider unauthenticated evidence that "could [be] authenticate[d]" at trial, *Purcell v. Navient Sols., LLC*, 2019 WL 188693, at *6 n.11 (S.D.N.Y. Jan. 14, 2019).[20]  The SEC's repeated objection that a document is hearsay *because* it is unauthenticated further fails because an authentication objection "is not a hearsay objection." *Crawford v. Tribeca Lending Corp.*, 815 F.3d 121, 126 (2d Cir. 2016).[21]

The SEC also challenges many documents as hearsay, but each challenged document on which Defendants rely in their Argument either is not offered for its truth, *see* Fed. R. Evid. 801(c)(2), or falls under a hearsay exception, *see United States v. Salameh*, 152 F.3d 88, 112 (2d

---

[19]  *See* SEC SUF ¶¶ 46–47, 87, 91, 103 (part), 112–114, 131, 164–165, 181, 215, 226, 306, 332–333, 369, 372–373, 375–376, 403, 405–409.

[20]  To the extent the SEC is unwilling to stipulate to the authenticity of certain documents, Defendants are prepared to authenticate those documents at trial.

[21]  *See* SEC SUF ¶¶ 47, 87, 91, 103 (part), 112 (part), 113–114, 131, 164–165, 181, 372–373, 375–376, 403, 405–409.

Cir. 1998) ("'circumstantial evidence of [a party's] state of mind'" not hearsay (citation omitted)); *infra* II.C., III.C.[22]  Although most depositions in this case were taken as trial testimony, testimony by Mr. Albanese or Mr. Elliott, as well as expert discussion of Rio Tinto records, is repeatable at trial and thus plainly sufficient on summary judgment.  *See* Fed. R. Civ. P. 56(c)(1)(A).[23]

## II.    Rio Tinto And Mr. Albanese Are Entitled To Judgment On The Section 10(b) Fraud Claims.

The only remaining Section 10(b) claims are those against Rio Tinto and Mr. Albanese based on three statements by Mr. Albanese about RTCM's prospects.  ECF 135 at 24–25.  Because none of these statements was "a material misrepresentation" made "with scienter," summary judgment is warranted.  *SEC v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir. 1999).

### A.    The SEC Cannot Establish Falsity as to Any Albanese Statement.

#### 1.    The Statements Are Opinions Subject to *Omnicare*'s Standard.

As "estimates and projections for developing and administering [a] mine," the Albanese Statements are all opinions.  *In re Pretium Res. Inc. Sec. Litig.*, 2020 WL 953609, at *4 (S.D.N.Y. Feb. 27, 2020); *see also Frankfurt-Trust Inv. Lux. AG v. United Techs. Corp.*, 336 F. Supp. 3d 196, 226 (S.D.N.Y. 2018) ("'projections about the future' are typical . . . opinion statements" (citation omitted)), *aff'd sub nom. Kapitalforeningen Laegernes Invest v. United Techs. Corp.*, 779 F. App'x 69 (2d Cir. 2019).  Under *Omnicare*, an opinion statement is actionable only if (1) "'the speaker did not hold the belief she professed,'" (2) "'the supporting fact she supplied was untrue,'" or (3) "the speaker omits information whose omission makes the statement misleading to a reasonable

---

[22]  For example, all challenged press articles (*see* SEC SUF ¶¶ 105, 306) and market analyst reports (*see* SEC SUF ¶¶ 463, 465) are cited for the fact that certain statements were made.

[23]  Mr. Albanese or Mr. Elliott:  SEC SUF ¶¶ 115–116, 119, 132, 135, 360.  Experts:  SEC SUF ¶¶ 38, 87–88, 92, 103 (part), 104, 117, 120, 222, 321, 326–327, 331, 401, 463.

investor." *Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016) (quoting *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 186 (2015)).

The SEC relies solely on *Omnicare*'s third prong.  *See* ECF 205 at 3.  It is "no small task" to establish liability under that prong, however, as an opinion need only "fairly align[ ] with the information" known at the time, after considering its "full context" and industry "customs and practices."  575 U.S. at 189–90, 194.  As the Second Circuit has emphasized, *Omnicare* cautions "against an overly expansive reading of this" prong because "'[r]easonable investors understand that opinions sometimes rest on a weighing of competing facts,'" and they "'do[ ] not expect that every fact known to an issuer supports its opinion.'"  *Tongue*, 816 F.3d at 210 (citations omitted). "[I]t is clear" under these precedents "that omitting even significant, directly contradictory information from opinion statements is not misleading, 'especially' where there are countervailing disclosures."  *Frankfurt-Trust*, 336 F. Supp. 3d at 229–30; *see Tongue*, 816 F.3d at 214 (no liability for mere "'fail[ure] to disclose . . . some fact cutting the other way'" (citation omitted)).

Applying this standard, courts in the Second Circuit have set an especially high bar for establishing the falsity of opinions about a mine's viability.  The Second Circuit has held inactionable a mining company's failure to disclose a consultant's pessimistic view that a gold mine "was not bearing out" projections about its viability, reasoning that "[g]old mining is a volatile industry," and those inherent risks are "enhanced where, as here, the mine is still under development, the physical infrastructure is not fully in place, and the mine's developers do not yet have complete information about its economic viability."  *Martin v. Quartermain*, 732 F. App'x 37, 40, 42 (2d Cir. 2018) (summary order).  In another case involving the same mine but different statements, Judge Preska held that "broad expressions of confidence in the mine plan's viability" were not misleading, despite significantly higher-than-anticipated waste rock, because "the plan was not

obviously doomed at the time" and negative information did not "render continued faith in the plan unreasonable." *Pretium*, 2020 WL 953609, at *5.

### 2.     The August 2012 Statements Are Not Actionable under *Omnicare*.

The two statements alleged to be actionable from Mr. Albanese's August 2012 investor presentations are, in fact, selectively excerpted in the Complaint (as underlined here):  (1) "the Moatize, if anything, is more prospective than I would have said a year ago as we look at the full range of opportunities not just in coking coal, in other opportunities in the basin," Ex. 242 at -684; SUF ¶¶ 387–388; and (2) "we probably have more potential in total as we go forward" and "this is truly a world-class basin deposit," Ex. 241 at -871; SUF ¶¶ 385–386; *see also* Compl. ¶¶ 141–142.  In "full context," neither statement was misleading, and each "fairly align[ed]" with known information about RTCM.  *Omnicare*, 575 U.S. at 189–90.

**a.**     The critical "context of the full discussion" of the August statements shows Mr. Albanese was subduing—not heightening—the market's expectations.  *Furher v. Ericsson LM Tel. Co.*, 363 F. App'x 764, 764 (2d Cir. 2009) (summary order).

Mr. Albanese's August 2012 statements began with prepared remarks that noted that Benga would produce only 400,000 tonnes of coking coal in 2012 and that "[s]ignificant additional tonnes may be delivered," but warned, "*however*, it's *realistic and likely* that we'll take longer to develop [RTCM's] infrastructure than previously planned due both to the timing of some approvals but also internal constraints on our capital."  Ex. 242 at -680 (emphases added); SUF ¶ 381.  Analysts picked up on this caution, noting that "Mozambique will take longer to develop than you first thought," Ex. 241 at -865–66, and "obviously there are a lot of challenges there [including] your . . . capital allocation decisions," Ex. 242 at -683; *see* Ex. 347 at 1 ("management sounded very cautious"); Ex. 348 at 14 ("pull[ing] our forecasts back"); SUF ¶¶ 383, 387.

And when making each statement at issue, Mr. Albanese included qualifying language.  He told North American investors that the Moatize Basin was "more prospective than . . . a year ago *as we look at the full range of opportunities, not just in coking coal, in other opportunities in the basin*."  Ex. 242 at -684 (emphasis added); SUF ¶ 388.  The SEC's Complaint strikingly omits this phrase, which explicitly states "more prospective" referred to opportunities beyond just coking coal.  Addressing London investors, he was doubly uncertain, noting that "we *probably* have more *potential* in total as we go forward."  Ex. 241 at -871 (emphases added); SUF ¶ 386.

In addition, after making the first statement, Mr. Albanese quickly warned, "Frankly, we've got to cut our cloth according to our means and we will not be looking to spend the type of capital that, frankly, we would have thought a year ago," but instead "will be pragmatic" and have the Benga mine "progressively ramping up *over the next several years* . . . before we can really be putting [in] big capital."  Ex. 242 at -684 (emphasis added); SUF ¶ 388.  And immediately before and after the second statement, he cautioned:  "But to be realistic our own imposed constraints on capital spending will mean that that will probably be a slower rate of ramp up than we probably would have envisaged 12 months ago," and RTCM would "continue t[o] engage with others and find . . . the optimal supply chain solutions."  Ex. 241 at -871; SUF ¶ 386.

In light of these significant "countervailing disclosures," no reasonable investor would have been misled by Mr. Albanese's qualified optimism about the Moatize Basin and RTCM. *Frankfurt-Trust*, 336 F. Supp. 3d at 229; *see also, e.g., S.C. Ret. Sys. Grp. Tr. v. Eaton Corp. PLC*, 791 F. App'x 230, 235 (2d Cir. 2019) (summary order) (in "context" the speaker "immediately noted that '[w]e really like the balance of the businesses as we have,'" which "countered any notion that a spin-off . . . would be forthcoming" (citation omitted)); *Furher*, 363 F. App'x at 764 (finding statements not misleading "in light of analysts' questions" and "the context of the full discussion").

This is especially so given that "mining is a volatile industry," and RTCM "d[id] not yet have complete information about its economic viability." *Martin*, 732 F. App'x at 42.

      **b.**    In addition, each August statement also "fairly align[ed]" with information known to Rio Tinto—and to Mr. Albanese, *infra* II.C.1.b—in August 2012. *Omnicare*, 575 U.S. at 189.

Both statements—the Moatize Basin was "more prospective" and RTCM "probably had more potential"—were consistent with available information.[24]  Even the Brisbane Presentation, while noting challenges, described Mozambique as "the next major coal exporter" and projected "higher production" for RTCM than at acquisition. Ex. 351 at 4, 6, 17; SUF ¶¶ 169, 172–173.  It also noted RTCM was exploring power plant development and CBM extraction, which "[c]ould be as large an economic opportunity as the coal." Ex. 351 at 11–12; SUF ¶¶ 172–173.  By August 2012, RTCM was estimating a power plant could defray ~$3 billion in development costs and CBM could generate billions of dollars. Ex. 173 at -737–38; SUF ¶ 322.  These potential upsides more than fairly aligned with Mr. Albanese's statements that the Moatize was "more prospective than [he] would have said a year ago as we look at the full range of opportunities," and RTCM "probably ha[d] more potential in total" going forward.

The SEC's view that these projects were not viable because Mr. Albanese "specifically instructed RTCM *not* to spend any Rio Tinto money" on them, ECF 205 at 2, is untenable, *supra* 12–13 & n.6.  There is no dispute that, at the Brisbane Meeting, RTCM proposed "partnering and alternate financing options" for the Benga power plant, Ex. 351 at 27; SUF ¶ 182, and intended to "farm out the CBM option," Ex. 166 at -296; SUF ¶ 173, and Mr. Albanese "endorse[d]" these

---

[24]  In the record, "prospective" often is used to mean "having *potential*"—as the SEC appears to recognize.  *See* SEC SUF ¶ 396; *see, e.g.*, Ex. 22 (Ovington) at 121:5–11 ("potential for [more production], but . . . high degree of uncertainty"); Ex. 23 (Ritchie) at 62:6–63:9 ("relatively early stage project"); Ex. 27 (Woodley) at 298:21–299:1 (Minjova "quite prospective" with "only four holes in it"); Ex. 170 at -480 ("highly prospective and not well drilled or understood").

partnership options, Ex. 23 (Ritchie) at 206:1–3, 336:11–17; *see* Ex. 10 (Finlayson) at 377:7–11

("He suggested bringing in a partner [for CBM development]"); Ex. 166 at -296 ("CEO guidance"

to "pursue partnership options" and "continue aggressive exploration"); SUF ¶¶ 182, 187–188.  In

fact, RTCM continued to model these upsides.  *See*, *e.g.*, Ex. 173 at -738, -767; SUF ¶ 322.

The undisputed facts also show the Moatize Basin was "world-class"—as Rio Tinto and

its main regional competitor often noted.  *E.g.*, Ex. 5 (Chiaro) at 198:4–19; Ex. 279 at -489; SUF

¶¶ 397–39.  The Brisbane Presentation described Mozambique as "the next major coal exporter,"

Ex. 351 at 4, with Mr. Finlayson's notes stating the Basin's "potential for annual coal production"

was "over 100Mt," Ex. 166 at -291; SUF ¶ 171.  Similar points were conveyed to IR for the August

2012 investor presentation.  *See* Ex. 252 at -984; SUF ¶ 373.  By that time, RTCM was estimating

that the Benga and Zambeze tenements *alone* had nearly 2.6 billion tonnes in reserves and re-

sources—sufficient for a multi-decade operation—with over 50% expected to be coking coal.  Ex.

351 at 16; Ex. 15 (Lynch) at 162:17–164:3; Ex. 23 (Ritchie) at 328:23–329:17; SUF ¶¶ 152–153,

157–158.  In addition, RTCM was planning to develop Tete East and Minjova, then thought to

have "the potential" to be "tier one assets."  Ex. 173 at -692; Ex. 303 at -034; SUF ¶¶ 321, 456.

RTCM's view of these assets changed in December when it received "devastat[ing]" new coal test

results from Minjova and Tete East.  Ex. 27 (Woodley) at 300:12–301:11; SUF ¶¶ 442–453.[25]

### 3.   The November 2012 Statement Is Not Actionable under *Omnicare*.

For similar reasons, Mr. Albanese's statement that the Moatize Basin was a "long-term

opportunity with the potential to grow beyond 25 [Mtpa]" was not misleading in context and fairly

aligned with information about the Moatize Basin in November 2012.

---

[25]  The SEC's contention that Rio Tinto *should have* reached this conclusion sooner, *see*, *e.g.*, SEC SUF ¶¶ 54–56, is based on a misleading use of two documents, *supra* 14 n.7.

a.      Reasonable investors would not have been misled by this statement, which was so caveated as to be almost meaningless.  Mr. Albanese said only that the Basin was a (1) long-term (not short- or medium-term) (2) opportunity (*i.e.*, possibility) (3) with potential (not certainty).  He then immediately followed this couched statement by tempering expectations with caution (tellingly omitted from the SEC's Complaint):  "We're continuous [sic] . . . to progress studies for long-term infrastructure corridor as *all coal producers remained constrained by lack of capacity. Major capital will not be committed until these studies are complete.*"  Ex. 244 at -859 (emphasis added); SUF ¶ 393.  As with the August statements, no reasonable investor would have been misled by such cautious optimism.  *See, e.g.*, *Frankfurt-Trust*, 336 F. Supp. 3d at 229–30; *Martin*, 732 F. App'x at 42; *Furher*, 363 F. App'x at 764.

b.      The statement also "fairly align[ed]" with information known to Rio Tinto—and to Mr. Albanese, *infra* II.C.1.b—in November 2012.  *Omnicare*, 575 U.S. at 189.  As noted, the Brisbane Presentation projected "produc[tion] around 45Mtpa of combined coking and thermal coal"—well above the 25 Mtpa Mr. Albanese stated—based on "[c]onfidence in the scale of [the] resource."  Ex. 166 at -292; SUF ¶ 171.  And RTCM undisputedly was still projecting long-term production of at least 25 Mtpa, as stated in materials given to Mr. Albanese in September 2012 and to the IR department during the November 2012 vetting process.  Ex. 258 at -635 ("40 mtpa is still a realistic case"); Ex. 136 at -416 ("RTCM product output [of] 40mtpa"); SUF ¶¶ 406–408.[26]  The SEC's assertion that the Brisbane Presentation stated "peak *coking* coal production" did not exceed 25 Mtpa, SEC SUF ¶ 404 (emphasis added), is irrelevant because Mr. Albanese said "coal," not "coking coal."  "When viewed in their entirety," the Brisbane Presentation and

---

[26]  These emails do not raise any hearsay concerns because they are being cited for the fact that experts who understood the geological data were projecting more than 25 Mtpa production.

Mr. Finlayson's notes are consistent with Mr. Albanese's "optimistic representations." *Levine v. NL Indus., Inc.*, 720 F. Supp. 305, 309 (S.D.N.Y. 1989), *aff'd*, 926 F.2d 199 (2d Cir. 1991).

These projections reasonably assumed Rio Tinto could develop a cost-effective solution for transporting the coal to market. Rio Tinto had been engaging with potential partners for green-field rail construction, and continued to do so through 2012. *See*, *e.g.*, Ex. 19 (Newell) at 465:11–16; Ex. 279 at -493; SUF ¶¶ 123–132, 409. And the SEC concedes RTCM had a "good probabil-ity" of finding a partner given China's demand for coal, ability to deliver large-scale infrastructure projects in Africa, and unique relationship with Rio Tinto. Ex. 10 (Finlayson) at 105:5–106:4, 238:5–20; SUF ¶¶ 126–127. In fact, Vale secured such a partner for its own greenfield rail. *See* Ex. 1 (Albanese) at 236:18–20, 243:23–244:2; SUF ¶ 190.

Rio Tinto also undisputedly believed that the GoM would approve barging at least in the long term. Ex. 23 (Ritchie) at 170:24–25 ("[F]rom Rio Tinto's point of view barging always re-mained a live option."); Ex. 15 (Lynch) at 106:9–107:25 ("I don't think anybody had given up on . . . barging."); Ex. 1 (Albanese) at 244:18–245:3 ("I was always of the view that barging was something that should continue to be pursued"); SUF ¶ 118. It is clear this assumption, too, was reasonable: Barging had a history on the Zambezi, Ex. 23 (Ritchie) at 272:22–274:1; SUF ¶ 92, and was "a win-win" for Rio Tinto and the GoM, which lacked the capacity to develop megapro-jects on its own, Ex. 1 (Albanese) at 294:3–14; *see* Ex. 9 (Elliott) at 223:24–224:7 ("the most rational economic thing to do"); Ex. 34 at 18–21, 30–31 (with desirable "megaprojects," the GoM "almost always" granted a proposal after an initial denial); SUF ¶¶ 117–118.

### 4.     There Was No Actionable Omission from Any Albanese Statement.

The SEC's pre-motion letter asserts that the Albanese Statements misleadingly omitted that "[1] barging was rejected, [2] there was no money for other large-scale options, and [3] a negative

valuation." ECF 205 at 3. But Mr. Albanese *repeatedly* discussed issues with government "approvals" (*i.e.*, barging) and "constraints on our capital"—highlighting that infrastructure development would take longer than expected given both issues, Ex. 241 at -871; SUF ¶ 386; and investors already knew the GoM had "rejected [the barging] proposal," Ex. 113 at 67; SUF ¶ 472; *see also* SUF ¶ 105 (citing nine articles); *Colbert v. Rio Tinto PLC*, 824 F. App'x 5, 10 n.5 (2d Cir. 2020) (summary order) (highlighting market's knowledge of the GoM's rejection of the barging proposal). *See Dalberth v. Xerox Corp.*, 766 F.3d 172, 187–88 (2d Cir. 2014) (omission not actionable where company acknowledged substance of omission).

And even if Mr. Albanese had been told of a negative NPV in Brisbane, he undisputedly also would have been told that NPV was "<u>indicative only</u> and only a first-step in [the] options analysis," "typical" of early-stage projects, and based on "limited modelling to date," with "considerable scope to increase . . . value." Ex. 166 at -295; SUF ¶ 177; *see also infra* III.A.3. Indeed, the modelling was so tentative that RTCM "purposely removed dollar figures from the slide" so that—as testified by Mr. Finlayson (the very person the SEC claims told Mr. Albanese of the negative NPV)—"it did not cement in anyone's mind a single value . . . because that number was dynamic and was changing . . . plus there were opportunities to continue to improve these NPV[s]." Ex. 10 (Finlayson) at 175:13–15, 178:10–18; Ex. 166 at -295; SUF ¶ 175. No investor would have been misled by any of these purported omissions. *See Tongue*, 816 F.3d at 212; *Martin*, 732 F. App'x at 39; *Pretium*, 2020 WL 953609, at *4–5; *infra* III.A.3.

### B. The SEC Cannot Establish Materiality as to Any Albanese Statement.

Rio Tinto and Mr. Albanese are entitled to summary judgment on the Section 10(b) claims for the separate reason that the SEC cannot establish materiality. A statement or omission is material if a reasonable investor would view it as "significantly alter[ing] the 'total mix' of information," *Basic, Inc. v. Levinson*, 485 U.S. 224, 232 (1988) (citation omitted)—that is, if it would

have been important "to the trading decision of a reasonable investor," *id.* at 236.  For three independent reasons, the Albanese Statements were "'so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.'" *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000) (citation omitted).

1.      As a matter of law, the Albanese Statements were too general "to form the basis for assessing a potential investment." *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014).  To be actionable, a statement must provide "a guarantee of some concrete fact or outcome" that "proves false or does not occur."  *Id.* at 185; *see also Omnicare*, 575 U.S. at 184 (contrasting "puffery" with a "determinate, verifiable statement").  But Mr. Albanese provided no guarantee in noting RTCM "probably ha[d] more potential" or in describing the Moatize Basin as "more prospective," "world-class," or a "long-term opportunity." His statements were, instead, optimistic views of *potential* that may not materialize—exactly the sort of "general corporate optimism" that "do[es] not give rise to securities violations." *IBEW Local Union No. 58 v. Royal Bank of Scot. Grp., PLC*, 783 F.3d 383, 392 (2d Cir. 2015) (statement that merger was "off to a promising start" is inactionable); *see also Lasker v. N.Y. State Elec. & Gas Corp.*, 85 F.3d 55, 59 (2d Cir. 1996) (per curiam) (statement that "business strategies [would] lead to continued prosperity" is inactionable (alterations in original)); *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip-Morris Cos.*, 75 F.3d 801, 811 (2d Cir. 1996) (statements that product was "expected" to perform well and "should deliver income growth" are inactionable); *see also In re AmTrust Fin. Servs., Inc. Sec. Litig.*, 2019 WL 4257110, at \*27–28 (S.D.N.Y. Sept. 9, 2019) (statements that "business was strong, growing, stable, performing well" and "the company expected those trends to continue" are inactionable).

On the motion to dismiss, the Court held these statements actionable based on the SEC's allegations that Mr. Albanese knew they were not true.  ECF 135 at 24 (citing *Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000)).  But the record now shows his statements were consistent with existing facts, *supra* II.A.2–3, and his existing knowledge, *infra* II.C.  Moreover, *Novak* applied only to "misrepresentations of *existing* facts"—not at issue here—while confirming that "expressions of optimism . . . and other puffery are insufficient."  216 F.3d at 315 (emphasis added).  And the Second Circuit has made clear that even if "statements [a]re knowingly . . . false when made," that "does not cure their generality, which is what prevents them from" being material.  *City of Pontiac*, 752 F.3d at 183; *see Gross v. GFI Grp., Inc.*, 784 F. App'x 27, 31 (2d Cir. 2019) (summary order) ("knowledge . . . does not render a statement actionable when that statement's 'generality . . . is what prevents'" it from being material (citation omitted)); *but see Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 173–74 & n.27 (2d Cir. 2020) (applying *Novak*, without citing *City of Pontiac*, in assessing falsity).  The Court thus can and should "revisit [its] ruling."  *Chen-Oster v. Goldman, Sachs & Co.*, 251 F. Supp. 3d 579, 589 (S.D.N.Y. 2017) (Torres, J.); *see also In re N. Telecom Ltd. Sec. Litig.*, 116 F. Supp. 2d 446, 465–66 & n.8 (S.D.N.Y. 2000) (granting summary judgment on puffery grounds even though statements previously held actionable).

**2.** No alleged omission from any Albanese Statement would have "significantly altered" the total mix of information, *Basic*, 485 U.S. at 232, because investors *already* knew of RTCM's challenges.  Rio Tinto had disclosed that RTCM's "full potential remains under investigation" because infrastructure was "very constrained," and "feasibility work" on "upgrad[ing] existing capacity, implement[ing] greenfield port and rail solutions, and . . . investigating barging capacity" would take years.  Ex. 321 at 7–8; Ex. 48 at 27; *see* Ex. 35, ¶ 91; SUF ¶ 469.  Throughout 2011 and 2012, media and analysts regularly commented on these challenges.  *See, e.g.*, Ex. 320

at 7 (Sept. 2011: "key bottleneck is infrastructure"); Ex. 344 (Jan. 2012: Rio Tinto engaging part-

ners for greenfield network); Ex. 349 at 2 (Mar. 2012: "limit[ations]" to "[c]urrent rail infrastruc-

ture"); Ex. 113 at 16 (Apr. 2012: "infrastructure solution remains unclear"); SUF ¶¶ 467, 469–472.

Mr. Albanese underscored this "lack of [infrastructure] capacity" and how "[m]ajor capital w[ould]

not be committed until [RTCM's] studies [we]re complete."  Ex. 244 at -859; SUF ¶ 393.

With respect to barging specifically, the market had long been aware "that the [GoM] had

rejected Rio Tinto's barging proposals." *Colbert*, 824 F. App'x at 10 n.5; *see*, *e.g.*, Ex. 113 at 67;

SUF ¶ 105 (citing nine articles); SUF ¶ 472.  Many market analysts "assum[ed] barging [wa]s not

a viable option," Ex. 113 at 68, and recognized that short-term production would be severely lim-

ited, Ex. 114 at -354 ("expected to be capped at 2mtpa"); SUF ¶¶ 471–472.  As the Second Circuit

explained in *Colbert*, because the market was aware of "the very fact that [plaintiff] asserts was

concealed," the omission of the barging rejection did not render statements about RTCM materi-

ally misleading.  824 F. App'x at 10 n.5.

By August 2012, Rio Tinto also had twice informed the market of further delays, Ex. 322

at 5 (Jan. 2012: delays from "logistical constraints and upgrade work"); Ex. 241 at -853, -871

(Aug. 2012: infrastructure delays from "constraints on capital"); SUF ¶¶ 386, 471—leading an

analyst to note it would "be some years before [RTCM] d[id] the infrastructure thing," Ex. 244 at

-870.

Throughout 2011 and 2012, investors were further aware of ongoing uncertainty regarding

coal quality and quantity.  *See* Ex. 35, ¶¶ 88, 93, 95; SUF ¶¶ 468, 474.  Before the acquisition,

investors "debate[d] . . . the quality of Moatize met [coking] coal" and suggested it might not be

of "premium" quality.  Ex. 315 at 5; SUF ¶ 468.  And at HY 2012, when Rio Tinto disclosed that,

based on initial production at Benga, RTCM's coking coal production target for 2012 was reduced

to 400kt, Ex. 241 at -853, some analysts scaled back their production forecasts and assumptions about coal quality, *see*, *e.g.*, Ex. 348 at 14; Ex. 345 at 7; SUF ¶ 386.

Given all this market information, analysts reported by July 2012 that at the time "[m]ost analysts seem[ed] to assign little or no value to [RTCM]." Ex. 313 at 5; SUF ¶ 465. Any additional information allegedly omitted from the Albanese Statements thus would not have significantly altered the total mix of information about *RTCM*, much less Rio Tinto. Even a failure to disclose a "five alarm fire" is immaterial in these circumstances—and summary judgment is proper. *See Dalberth*, 766 F.3d at 187 (failure to disclose "five alarm fire" immaterial because "the public information [already] reflected that" there had been sales "deterioration"); *In re Bos. Sci. Corp. Sec. Litig.*, 708 F. Supp. 2d 110, 128–29 (D. Mass. 2010) (recall of defective products not material because "the market knew of the manufacturing 'fix'" before the recall).

**3.**      The SEC also cannot establish materiality because there was no significant investor reaction to the Albanese Statements. *First*, there is no evidence the statements affected the price of Rio Tinto PLC's ADRs (*i.e.*, its stock price). Defendants' unrebutted expert testimony shows the November 2012 statement had *no* impact on Rio Tinto's stock price, and any positive price movement in August 2012 "resulted from other . . . information, not the Albanese statements." Ex. 35, ¶¶ 157–177; *see* Ex. 38, ¶¶ 181–187 (SEC expert not disputing these conclusions); SUF ¶¶ 479, 481. Such event studies are "'an accepted method for evaluating materiality.'" *SEC v. Aly*, 2018 WL 1581986, at *15 (S.D.N.Y. Mar. 27, 2018) (citation omitted). Even if this testimony were excluded (though it should not be), the SEC still could not establish price impact, not least because its own expert did not opine that the Albanese Statements affected the stock price. *See* Ex. 38, ¶¶ 181–187; Ex. 46 (Metz) at 214:7–215:21. Moreover, no equity analyst report mentioned the November statement; and, of the 22 analysts discussing the HY 2012 earnings release, the only

43

three who noted either August statement also conveyed caution.  *See* Ex. 35, ¶¶ 165–166, 176 app.
C.11; SUF ¶¶ 480–481.  This "lack of interest of the financial community" confirms the statements
are immaterial.  *N. Telecom*, 116 F. Supp. 2d at 465.

*Second*, any alleged omission about RTCM cannot have been material because, as ex-
plained *infra* III.B, the RTCM impairment *itself* was immaterial as a matter of law.  Thus, on this
record, the statements could not have maintained an inflated ADR price, as the disclosure of the
impairment did not itself cause any price movement.  Especially given Rio Tinto's and Mr. Al-
banese's repeated disclosures about RTCM's challenges and analysts' clear understanding of those
challenges, Mr. Albanese's limited and isolated public statements about this minor exploratory
asset—to which investors were assigning little or no value—would not have significantly changed
the total mix of information about Rio Tinto as a whole.

## C.    The SEC Cannot Establish Scienter as to Any Albanese Statement.

The SEC's Section 10(b) claims fail for yet one more reason:  The SEC cannot establish
scienter.  To establish scienter, "the 'SEC must produce evidence (1) showing that the defendants
had motive and opportunity to commit fraud, or (2) constituting strong circumstantial evidence of
conscious misbehavior or recklessness.'"  *SEC v. Yorkville Advisors, LLC*, 305 F. Supp. 3d 486,
511 (S.D.N.Y. 2018).  The Court found the SEC did not adequately allege motive, ECF 135 at 32–
33, and the SEC cannot establish that Mr. Albanese (hence Rio Tinto) was reckless.

### 1.    The Undisputed Facts Demonstrate Mr. Albanese Lacked Scienter.

Recklessness is "'*highly* unreasonable'" conduct that is "'an *extreme* departure from the
standards of ordinary care'" such that "'the danger was . . . so obvious that the defendant must
have been aware of it.'"  *Novak*, 216 F.3d at 308 (emphases added; citation omitted).  Among other
"important limitations on the scope of [such] liability" is that, "as long as the public statements are
consistent with reasonably available data, corporate officials need not present an overly gloomy or

cautious picture of current performance and future prospects." *Id.* at 309.  As a matter of law, Mr. Albanese's conduct did not rise to this level for two independent reasons.

    **a.**  *First*, Mr. Albanese's statements were "consistent with" the information he knew at the time.  *Novak*, 216 F.3d at 309.  He had been told at the Brisbane Meeting of significant potential production from Minjova and of other opportunities—*e.g.*, CBM extraction and the Benga power plant—that "[c]ould be as large an economic opportunity as the coal," Ex. 351 at 11, 12, 17; SUF ¶¶ 172–173; and he understood those projects would continue, Ex. 166 at -296 ("CEO guidance": "Farm out the CBM option," "pursue partnership options," and "continue aggressive exploration"); SUF ¶¶ 173, 182.  Mr. Albanese also had been told that the Moatize Basin was a "tier one" coking-coal opportunity, Ex. 154 at -103; Ex. 68 at -1203–05; SUF ¶ 398, and the Brisbane Presentation deemed it "the next major coal exporter," with nearly 2.6 *billion* tonnes in resources at Benga and Zambeze alone, Ex. 351 at 4, 7; SUF ¶ 169.  Finally, he had been told repeatedly, including at the Brisbane Meeting and in the months thereafter, that the Moatize Basin (and RTCM by itself) had the potential to produce well beyond 25 Mtpa.  *See* Ex. 351 at 8 ("45mtpa"); Ex. 136 at -416 ("40mtpa"); Ex. 285 at -472 (39 Mtpa); Ex. 137 at -436–37 ("30 [Mtpa] or more" plus Benga); SUF ¶¶ 171, 407–408.

    The Court held the SEC had alleged scienter based on allegations that Mr. Albanese learned at the Brisbane Meeting that "RTCM had no value" and "no realistic options for transportation of coal."  ECF 135 at 33.  The evidence contradicts both allegations.  If, as the SEC contends, Mr. Finlayson conveyed all of his notes, then if Mr. Albanese was told about a negative valuation at the Brisbane Meeting, he *also* would have been told that the NPV from "limited modelling to date" was "typical of capital-intensive Tier 1 greenfield projects" and "indicative only and only a first-step in [the] options analysis," Ex. 166 at -294–95; SUF ¶ 177, meaning "[i]t should not be relied

upon," Ex. 10 (Finlayson) at 303:21–304:4; SUF ¶ 179; *infra* III.A.3.  Such an undisputedly "pre-liminary and speculative" valuation projection—if it was even told to Mr. Albanese—"do[es] not suffice to constitute the type of conscious disregard of 'extremely obvious'" red flags needed to show scienter.  *Yorkville Advisors*, 305 F. Supp. 3d at 528.

In fact, according to Mr. Finlayson's notes (which the SEC contends were conveyed in full, *e.g.*, SEC SUF ¶ 168), Mr. Albanese was *not* informed that RTCM had no value.  Rather, he was told that, despite challenges, "[c]onfidence in the scale of our resource base allow[ed RTCM] to conceive of a business ultimately producing around 45Mtpa of combined coking and thermal coal," and—critically—that there was "*considerable scope to increase business value*," Ex. 166 at -292, -295 (emphasis added); SUF ¶¶ 171, 177.  And when asked if it was his "view at this time that RTCM had . . . long-term potential," Mr. Finlayson confirmed that that is what he was "sug-gesting" in his notes.  Ex. 10 (Finlayson) at 179:25–180:2.  Mr. Albanese was told substantially the same thing in the materials he received from RTCM in September 2012.  *Supra* II.A.3.

Similarly, there is no dispute that Mr. Albanese's "directive coming out of" the Brisbane Meeting was "to try and procure partner funds," especially for infrastructure.  Ex. 10 (Finlayson) at 181:1–5; *see also*, *e.g.*, Ex. 1 (Albanese) at 242:15–243:22 ("I was . . . very much oriented to-ward partnership options"); Ex. 19 (Newell) at 199:5–14 ("major capital projects [were to] be done in partnership"); SUF ¶ 183.  This directive makes no sense unless he thought there was a realistic option for transporting the coal through such partnership.  Mr. Albanese also knew of ongoing engagement with potential partners for greenfield rail, *e.g.*, Ex. 139 at -535; Ex. 286 at -832; Ex. 279 at -493; SUF ¶ 131, and continued to think barging would be a viable long-term option, *see* Ex. 1 (Albanese) at 248:17–25, 276:1–17, 294:3–295:8; SUF ¶¶ 115–116.[27]  Indeed, he believed

---

[27]  As explained *supra* 8–9 & n.4, 38, the SEC does not genuinely dispute these facts.

RTCM would need to reach a resolution with the GoM on a "global issue[s]," including a tax dispute and barging.  Ex. 1 (Albanese) at 247:11–248:25, 293:10–295:8; SUF ¶ 119.

In short, any NPV was preliminary, work remained to assess RTCM's path forward, and Mr. Albanese instructed RTCM to undertake that work.  Because no reasonable jury could find that he knew RTCM was so "obviously doomed at the time of" his statements "as to render continued faith in [its] plan unreasonable," he lacked scienter.  *Pretium*, 2020 WL 953609, at *5–6.

**b.**  *Second*, Mr. Albanese's statements could not have been an *extreme* departure from ordinary care for the separate reason that they were guided by an "effective" process for "ensuring" the accuracy of presentations on which he was urged to rely.  Ex. 22 (Ovington) at 84:14–85:5, 103:2–19; SUF ¶¶ 368, 370.  The SEC does not dispute that, for each presentation, IR prepared a script and Q&A document, with information sourced from and vetted by knowledgeable employees from RTCM, RTE, and the Controller's Group.  Ex. 22 (Ovington) at 81:5–18, 84:14–86:7, 89:22–90:5, 102:14–22, 128:21–129:1; Ex. 1 (Albanese) at 271:8–19, 274:17–275:4, 277:16–278:14, 288:5–289:7; Ex. 9 (Elliott) at 64:19–23;  Ex. 245 at -389–90; SUF ¶¶ 363–376, 390.

Mr. Albanese's statements did not meaningfully deviate from those vetted materials; even when answering investor questions, his statements tracked IR's script.  Ex. 22 (Ovington) at 110:11–14; SUF ¶¶ 390–391 (comparison chart), 394–395 (same).  He reasonably relied on the business units for accuracy, so as not "to get ahead of [the] team on the ground."  Ex. 263 at -652; Ex. 1 (Albanese) at 274:18–25, 287:22–288:4; SUF ¶¶ 378, 389.  Relying on up-to-date, vetted materials is consistent with ordinary care, not a departure, let alone an extreme departure.

The SEC's sole response—that Mr. Albanese allegedly had "superior knowledge" from the Brisbane Meeting, SEC SUF ¶ 378—is unsupported by the evidence.  Some of *the same* executives who had been at the Brisbane Meeting provided or vetted the IR materials Mr. Albanese relied on.

The RTCM materials sent to IR for the August 2012 presentation were "approved by Eric [Finlay-son]" and other RTCM and RTE executives.  Ex. 247 at -981–84; Ex. 248 at -293; SUF ¶¶ 373–374.  When asked to vet the November 2012 statement about the Moatize Basin's long-term po-tential, Brendon Brodie-Hall—a rising RTE executive who was at the Brisbane Meeting, Ex. 10 (Finlayson) at 276:5–9, 347:23–348:7; Ex. 158 at -966; SUF ¶ 161—confirmed that even "40 mtpa is still a realistic case as far as I know," Ex. 258 at -635; SUF ¶ 375.  Mr. Albanese had good reason to believe these up-to-date conclusions:  Even on the SEC's view that RTCM's valuation was discussed at the Brisbane Meeting, he would have been told then that RTCM's "limited mod-elling to date," Ex. 351 at 21; SUF ¶ 170, was not final, and was "indicative only," with still "con-siderable scope to increase [the] business value," Ex. 166 at -294–95; SUF ¶¶ 177–178.

At bottom, the SEC does "not dispute that [internal] documents" prepared for Mr. Al-banese's public remarks "contained optimistic predictions"; rather, it "argue[s] that the predictions were not accurate" in hindsight, which "is insufficient evidence that [he] acted with intent to de-fraud."  *N. Telecom*, 116 F. Supp. 2d at 464; *see also Levine*, 720 F. Supp. at 311 (finding no scienter where "statements followed those of the [planning department] in its internal documents"). In fact, this case bears the hallmarks of other cases where courts have granted summary judgment: Mr. Albanese "was not involved in selecting the data" in the investor presentations, *In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1251–55 (S.D. Cal. 2010), and "[t]here is no evidence that [he] . . . instructed anyone to withhold material information" during the vetting process, *Yorkville Advisors*, 305 F. Supp. 3d at 514.  No reasonable jury could find he acted with scienter.

## 2.    The Undisputed Facts Demonstrate Rio Tinto Lacked Scienter.

For the same reasons, the SEC cannot establish Rio Tinto's corporate scienter, which re-quires proof that a Rio Tinto agent "committed a culpable act with the requisite scienter."  *Team-sters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008).

There is no dispute that, to the extent Mr. Albanese "d[id] not have the requisite scienter for [any] particular statement . . . , Rio Tinto cannot have it either." ECF 135 at 31.

## III.    Rio Tinto Is Entitled To Judgment On The Section 17(a) Fraud Claim.

The Section 17(a) claim against Rio Tinto is predicated on the HY 2012 Report's $3.4 billion valuation of RTCM, Ex. 164 at -075, and has "[e]ssentially the same elements" as a Section 10(b) claim, except only negligence (not scienter) is required, *Monarch Funding*, 192 F.3d at 308; *see* ECF 135 at 37–38.  Rio Tinto is entitled to judgment on this claim because the SEC cannot establish falsity, materiality, negligence, or—as explained *infra* VIII.B—entitlement to any relief.

### A.    The SEC Cannot Establish Falsity as to the HY 2012 Report.

As the Court previously ruled, the $3.4 billion valuation in the HY 2012 Report is an opinion statement, and only *Omnicare*'s third prong is relevant to that statement.  ECF 135 at 17–19. Proving that the HY 2012 RTCM valuation was "misleading to a reasonable investor" "'is no small task,'" *Tongue*, 816 F.3d at 210 (citation omitted), and the SEC cannot do so here because—as reasonable investors would expect—Rio Tinto extensively inquired into developments at RTCM before determining there was no indication of impairment.

**1.**  The SEC concedes Rio Tinto had extensive internal controls that reasonably assured the reliability of its financial reporting, including the assessment of potential impairment indicators by business-unit experts, analysis of impairment issues by the Controllers, and review of impairment conclusions by an independent auditor (PwC).  *See generally* Ex. 36, ¶¶ 110–113 (summarizing internal controls); SUF ¶¶ 263–285; *infra* 66.  Undisputedly, these robust internal controls were repeatedly audited by Rio Tinto and PwC and found to be effective, *e.g.*, Ex. 48 at 71, 75–76; Ex. 49 at 76, 82; SUF ¶¶ 350–354, and Rio Tinto's Group Controller recommended impairments on at least fifteen occasions, totaling "approximately 30 billion" dollars, Ex. 14 (Larsen) at 157:8–158:6; SUF ¶¶ 286–289.

Rio Tinto clearly "conducted a 'meaningful' inquiry" into whether RTCM was impaired, *Tongue*, 816 F.3d at 214, as the following facts are not genuinely disputed.  By May 15, 2012— four days after the Brisbane Meeting—the Controllers had received the Brisbane Presentation and discussed its contents with RTCM and RTE.  Ex. 165 at -175–76; SUF ¶¶ 300–302.  RTCM managers and RTE continued to update the information for the Controllers and PwC for months.  *See*, *e.g.*, Ex. 14 (Larsen) at 75:3–77:21 (RTCM completed analysis of impairment indicators, which was "reviewed, approved, verified, and supported by" RTE, and "discussed" with the Controllers); SUF ¶¶ 265–266, 276, 301–303, 323; *see also infra* V.B.  As RTCM continued modelling various business configurations, some NPVs for those configurations "generated a 3 to 4 [billion dollar] value range" at HY 2012.  Ex. 16 (Maglione) at 224:19–22, 229:24–230:7; Ex. 26 (Witthöft) at 79:5–8 ("quite a few scenarios above the carrying value" in July 2012); SUF ¶ 229.

In July 2012, RTE presented the Impairment Indicator Paper to the Controllers and PwC— "quite a comprehensive paper," in PwC's view, Ex. 12 (Hughes) at 86:14–22—which discussed infrastructure, resource, and ramp-up challenges facing RTCM and concluded that none constituted an impairment indicator; the paper also explained that "[g]iven the uncertainty" in the various scenarios under review, it was "not possible to provide a valuation of RTCM to an acceptable degree of accuracy."  Ex. 193 at -529–30; SUF ¶¶ 323, 326, 331–334.  RTE nevertheless performed "two different analyses" "to give some indication of" RTCM's value while noting "significant" potential upside from the Benga power plant, CBM, and Minjova.  Ex. 193 at -529–30; SUF ¶¶ 325–328, 331.  Undisputedly, the Controllers and PwC independently reviewed that assessment and presented their opinion to the Audit Committee—and all agreed RTCM had no indication of impairment, noting "a central case view [wa]s still under development" and they were "confident of finding a viable infrastructure path."  Ex. 213 at 14; SUF ¶¶ 331, 342–344.

Rio Tinto thus employed "a complex [impairment-review] process," that repeatedly recognized impairments on its assets—just the sort of "reasoned and reliable . . . process" that courts have held forecloses liability under *Omnicare*'s third prong.  *Sjunde AP-Fonden v. Gen. Elec. Co.*, 417 F. Supp. 3d 379, 397 (S.D.N.Y. 2019); *accord Tongue*, 816 F.3d at 214 (because "Defendants conducted a 'meaningful' inquiry and in fact held that view, the statements did not mislead").

**2.**  The HY 2012 RTCM valuation also "fairly align[ed]" with information then known about RTCM.  *Omnicare*, 575 U.S. at 189.  Reasonable investors "understand that opinions sometimes rest on a weighing of competing facts," *id.* at 189–90, and that is what happened here.  Although RTCM faced challenges with barging and existing rail capacity, at HY 2012 it reasonably expected to find an infrastructure solution—which potentially included joint greenfield rail construction and barging at least in the long term, *supra* 8–9 & n.4.  As RTCM modeled these potential configurations, "some options" then under review undisputedly indicated "there would be no impact on valuation" due to the barging decision.  Ex. 26 (Witthöft) at 39:3–24; SUF ¶ 229.  Similarly, although RTCM's coal quality was not quite as favorable as expected, RTCM was projecting significantly increased coal volume from Zambeze and the addition of Minjova.  Ex. 150 at -252; Ex. 8 (Dupree) at 27:3–12, 96:10–24, 108:18–110:1; SUF ¶¶ 198, 202–203, 205, 314.  And it was further investigating new business opportunities with the Benga power plant and CBM extraction then thought to be potentially worth billions of dollars.  Ex. 173 at -737–38; SUF ¶ 322.

Given these facts, no reasonable investor would have expected Rio Tinto to ignore positive developments and potential upsides and focus instead only on the SEC's cherry-picked negative developments.  *See Omnicare*, 575 U.S. at 190 ("A reasonable investor does not expect that *every* fact known to an issuer supports its opinion statement.").  In fact, *not one person* concluded that

RTCM had any impairment indicator at HY 2012, much less that it was impaired.  Ex. 13 (Lambert) at 222:10–22; Ex. 14 (Larsen) at 241:8–24; SUF ¶ 293.  RTCM's HY 2012 carrying value thus "'fairly align[ed]'" with existing information.  *Tongue*, 186 F.3d at 212 (alterations in original; citation omitted); *see also*, *e.g.*, *Martin*, 732 F. App'x at 42.

3.  The SEC primarily contends that Rio Tinto's judgments regarding these complex accounting issues were misleading because a purported "*best* configuration" from the Brisbane Presentation had a negative NPV.  ECF 205 at 3.  This theory fails.  *First*, the SEC ignores that Mr. Finlayson would have described the negative NPV (if it was disclosed) as "indicative only," Ex. 166 at -295; SUF ¶ 177—meaning, as Mr. Finlayson stated, "it should *not* be relied upon," Ex. 10 (Finlayson) at 303:21–304:13 (emphasis added); *id.* at 392:2–7 ("[W]e just were unsure of what these numbers really should be."); SUF ¶¶ 177–179.  Even the person preparing the Brisbane valuation materials did not "believe, at the time [he] prepared this slide, that RTCM was worth negative $0.68 billion."  Ex. 17 (Morris) at 173:14–18; *see also* Ex. 23 (Ritchie) at 327:11–16 ("absolutely premature to have [that] valuation"); SUF ¶ 180.  No reasonable investor would be misled by the purported omission of an NPV when the people who prepared it believed it did *not* accurately reflect RTCM's value and should *not* be relied upon.  *See Tongue*, 816 F.3d at 214; *see Woolgar v. Kingstone Cos.*, 477 F. Supp. 3d 193, 210, 228 (S.D.N.Y. 2020) (no *Omnicare* liability even though employees allegedly flagged "the book being undervalued multiple times").

*Second*, the SEC tacitly confirms that such NPVs are unreliable by conceding it is "very, very typical in the mining sector" for early-stage mining projects to have low NPVs yet "spin off billions of dollars of revenue decades" later.  Ex. 47 (SEC expert Milburn) at 174:13–175:12; SEC SUF ¶ 222 (SEC agreeing this is a "truism[ ]").  "[E]arly stage development projects can deliver widely variable NPVs, including negative NPVs."  Ex. 33, ¶ 177; *see also* Ex. 47 (Milburn) at

174:21–175:12 ("every greenfield mine will be like that").  Even so, the NPVs for RTCM's pos-sible business configurations gradually increased throughout 2012, with many *above* the carrying value, even in July 2012.  *Supra* 14.  No reasonable factfinder could find the purported omission of a single May 2012 NPV misleading in these circumstances.

*Third*, even if the May 2012 NPV had been reliable, it still would not have rendered RTCM's HY 2012 carrying value misleading.  The NPV reflected only a "first step in [the] options analysis," with "considerable scope to increase [the] business value," Ex. 166 at -295; Ex. 351 at 21; SUF ¶¶ 177–178; and because NPVs are "a very imprecise measure of the value of an asset particularly at an early stage," NPVs generated by RTCM's planning model were used for identi-fying optimal business-development paths—not for accounting purposes, Ex. 23 (Ritchie) at 59:23–60:9; Ex. 17 (Morris) at 141:5–13 ("us[ing] any of the NPV valuations [for other purposes] . . . would be inappropriate."); SUF ¶¶ 211, 257.  Given not yet "complete information about [RTCM's] economic viability," continued optimism in the face of countervailing information cre-ated for only a "narrow purpose" and not fully "investigate[d] and confirm[ed]" did not amount to fraud.  *Martin*, 732 F. App'x at 42; *see Pretium*, 2020 WL 953609, at *5 ("confidence in [a] mine plan's viability" was not misleading, despite far higher than anticipated waste rock, as "the plan was not obviously doomed"); *In re Gen. Elec. Sec. Litig.*, 2020 WL 2306434, at *14 (S.D.N.Y. May 7, 2020) (in an impairment case, "a company's knowledge of unfavorable trends does not show [the falsity of] its goodwill balances"—which were "opinion[s]" that "rested on other judg-ments"—as such trends may later prove "to be of a different magnitude or importance than initially expected"); *Tongue*, 816 F.3d at 214.

### B.    The SEC Cannot Establish Materiality as to the HY 2012 Report.

The Section 17(a) claim also fails because the SEC cannot establish materiality.  Because "the public information [already] reflected" challenges relating to barging, infrastructure, delays,

and coal quantity and quality, any alleged omission at HY 2012 would not have been material even had it amounted to a "five alarm fire" (it did not). *Dalberth*, 766 F.3d at 187; *see supra* II.B.2. The SEC separately cannot establish materiality based on the "quantitative[ ]" and "qualitative factors" that courts consider. *IBEW*, 783 F.3d at 390. The record is clear: Investors did not view RTCM's valuation as material to Rio Tinto PLC's ADRs because it was not a significant asset for Rio Tinto and its potential to contribute to Rio Tinto's revenues was still uncertain.

As this Court recognized in ruling on the motion to dismiss, there is a "preliminary assumption of immateriality" here, *IBEW*, 783 F.3d at 390, because the $3 billion RTCM impairment related to less than 5% (in fact, less than 3%) of Rio Tinto's total assets of roughly $120 billion. ECF 135 at 27; Ex. 49 at 142 ($118 billion in assets in 2012); SUF ¶ 461. The SEC cannot overcome this presumption. It contends that (a) the RTCM acquisition was significant and (b) the impairment affected Rio Tinto's stock price, but any effect was offset by Mr. Albanese's departure from Rio Tinto. Neither argument, however, raises a triable issue.

**1.** Most market analysts viewed the acquisition as "small fry M&A for Rio [Tinto]." Ex. 312 at 1; *see, e.g.*, Ex. 309 at 2 ("the transaction barely registers"); Ex. 310 at 1 ("fairly immaterial impact"); SUF ¶ 463. But even assuming there is a triable issue on whether the *acquisition* was significant, there is no dispute that *after the acquisition*—by HY 2012—the market was "assign[ing] little or no value to [RTCM]" because of uncertainty over its development. Ex. 313 at 5 (July 2012 report); *see* Ex. 113 at 5 (April 2012 report noting, "we calculate that there is no value reflected in [Rio Tinto's] share price for" RTCM); SUF ¶ 465.[28] Any significance the market may have attached to the acquisition cannot establish the significance of RTCM's valuation one year later, especially when so many investors considered the acquisition "small fry."

---

[28] The SEC has not raised a triable issue on this point. *Supra* 25 & n.12.

**2.**   Contrary to the SEC's assertion, no reasonable factfinder could conclude that RTCM statements in the HY 2012 Report affected Rio Tinto PLC's ADR price.  The SEC concedes there was no statistically significant stock drop when the impairment was announced.  Ex. 37, ¶ 63; SUF ¶ 482.  *Sixteen* out of the twenty market analysts who discussed that impairment were either already discounting RTCM's valuation or not factoring RTCM into Rio Tinto's stock price—or both.  *See* Ex. 35, ¶ 104 (cataloguing record); SUF ¶ 483.  And of the four (of twenty) analysts who changed their target price at the time, one increased its overall target price, while the other three reduced their target prices by two percent or less.  *See* Ex. 35, ¶ 104 n.294.  In short, the market had no reaction to the impairment, as RTCM did not factor into the stock price due to its uncertain development, and the impairment charge was "non cash," Ex. 346 at 2; Ex. 337 at 1 ("negligible change to . . . cash flow"); SUF ¶ 488.

While the SEC instead tries to *infer* (a) there was a statistically significant stock drop at the time of the impairment, and (b) news of Mr. Albanese's departure counterbalanced this conjectured drop, no reasonable factfinder could draw either inference.  Even the SEC's own expert, Dr. Albert Metz, offered only conjecture, speculating that the impairment "could well have" affected Rio Tinto's stock price and that the management change "could well have" counterbalanced that effect.  Ex. 37, ¶ 86.  As Metz admitted, he could not opine that the impairment "did, in fact" affect Rio Tinto's stock price because he "d[id]n't have statistical evidence" of such price impact and "didn't conduct any analysis" to "measure" it.  Ex. 46 (Metz) at 214:7–215:18.  Metz's unreliable opinion warrants exclusion, as explained in Defendants' *Daubert* motion.  But even if it were not excluded, his "unsubstantiated speculation" cannot raise a triable issue, *Fujitsu*, 247 F.3d at 428 (citation omitted), especially given overwhelming evidence to the contrary.

**a.** *First*, there is overwhelming evidence that the market's reaction to the RTCM impairment was not negative—much less significantly negative.  The record is clear that the impairment "did not have a measurable impact on Rio Tinto's bond prices," Ex. 35, ¶ 129; *see* Ex. 46 (Metz) at 44:5–46:9 (SEC expert found no impact on bond prices); SUF ¶¶ 490–491, and did not change Rio Tinto's credit rating, Ex. 35, ¶¶ 124–151; Ex. 20 (Nikolaev) at 158:4–159:25 (S&P's rating unchanged); Ex. 338 at -931 (Moody's rating not "impact[ed]"); Ex. 340 at -116 (Fitch not mentioning RTCM impairment and stating the Alcan impairment "will not damage [Rio Tinto's] credit rating" as it is "non-cash"); SUF ¶¶ 492–495.  Most market analysts did not consider the RTCM impairment material to the ADR price because the revised value was "not incommensurate with . . . the market's valuation of these assets."  Ex. 334 at 1; SUF ¶¶ 484–485.

Analyst reactions confirm that the impairment was not significant to investors.  The SEC's expert could find only six (of twenty) market analysts with a negative view—and just one with a *significantly* negative view—of the RTCM impairment.  Ex. 37, ¶¶ 65–69; SUF ¶ 484.  Of those six analysts, moreover, four stated the impairment had no impact on their valuation of Rio Tinto, while another increased Rio Tinto's target stock price due to "higher iron ore price forecasts."  Ex. 328 at 1; *see* Ex. 329 at 1 (analyst's RTCM valuation "may well need to be re-examined," but not changing Rio Tinto target price); Ex. 330 at 1–2 (impairment was "arguably embarrassing," but "[t]he write-downs . . . have no impact on the future earnings stream"); Ex. 331 at 1 (suggesting "unexpected nature of the coal impairments," but noting "negligible impact to our valuation"); Ex. 332 at 1 (impairment was a "legacy issue[ ]" that "do[es] not impact our NPV"); SUF ¶ 484.  Even the one analyst with a significantly negative reaction had previously observed that other analysts were assigning "no value" to RTCM.  Ex. 113 at 5; SUF ¶ 465.  On this record, no reasonable factfinder could infer a significantly negative reaction to the RTCM impairment.

**b.** *Second*, there is overwhelming evidence that the market's reaction to Mr. Albanese's departure was not, as the SEC asserts, significantly positive news that offset news of the RTCM impairment.  Undisputedly, most market analysts did not think the management change was positive at all (much less significantly so), Ex. 37, ¶¶ 78–84; SUF ¶¶ 487–488, and only *one* market analyst (of twenty) viewed the change as significant enough to increase Rio Tinto's target price on that basis, Ex. 35, ¶ 113 (discussing Ex. 335); SUF ¶ 487.  Even the nine analysts on which the SEC's expert relies provide no basis for the SEC's "counterbalance" theory, as they expressly stated the RTCM impairment did not affect the stock price.  *See*, *e.g.*, Ex. 330 at 1 ("no impact on the future earnings stream on which we value the company"); Ex. 331 at 1 ("negligible impact to our valuation"); Ex. 337 at 1 ("negligible change to our cash flow outlook"); SUF ¶ 488.  Thus, no reasonable factfinder could infer an offsetting positive reaction to the management change.

Courts have not hesitated to grant summary judgment where, as here, the market understood that an asset's value was highly uncertain and contingent.  *See In re Rockefeller Ctr. Props.*, 184 F.3d 280, 290 (3d Cir. 1999) (failure to disclose air rights was immaterial because value "attach[ed] to the air rights is contingent and speculative" absent evidence they would be sold); *see also In re Miller Indus., Inc. Sec. Litig.*, 120 F. Supp. 2d 1371, 1381 (N.D. Ga. 2000) (false accounting was immaterial given unrebutted evidence "the market disregarded the [sales at issue] in calculating the sales growth" and those sales "had no effect whatsoever upon *any* earnings figure"); *Traverso v. Eller Media Co.*, 2002 WL 467717, at *9 (N.D. Cal. Mar. 25, 2002) (abandonment of planned IPO was immaterial because, though "of great magnitude," there was "little to no possibility" it would occur).  This Court should do the same.

### C.     The SEC Cannot Establish Negligence as to the HY 2012 Report.

Rio Tinto also is entitled to judgment on the Section 17(a) claims because the SEC cannot establish negligence, *i.e.*, the failure to use "the degree of care that a reasonably careful person

would use under like circumstances." *SEC v. Cole*, 2015 WL 5737275, at *6 (S.D.N.Y. Sept. 19, 2015) (citation omitted).

1. Courts within the Second Circuit have found negligence lacking as a matter of law where the defendant obtained advice from third-party experts and there were at worst "mixed signals" that the defendant should have acted otherwise. In *Ginder*, for example, the Second Circuit reversed a jury verdict, holding as a matter of law that a broker's "market timing" trading was not negligent, even though he "execut[ed] trades contrary to the funds' stated policies." *SEC v. Ginder*, 752 F.3d 569, 574–75 (2d Cir. 2014). The Second Circuit reasoned that the broker had received approval from the compliance department and "mixed signals" from the funds on the permissibility of such trading. *Id.* at 575. Similarly, in *Yorkville*, Judge Daniels held as a matter of law that a failure to take an impairment was not negligent because there was "no evidence that [d]efendants . . . instructed anyone to withhold material information from the [third-party auditors]" and the auditors issued clean opinions that were not "withdraw[n] or modif[ied]" even after the auditors later reviewed additionally disclosed information. 305 F. Supp. 3d at 513–16.

The undisputed facts here are similar to *Ginder* and *Yorkville*. As in *Yorkville*, PwC undisputedly supported Rio Tinto's conclusion with respect to the HY 2012 Report, and has "not withdrawn" or modified its report even after the SEC's investigation, Ex. 3 (Bendall) at 86:18–87:6, 99:12–24; SUF ¶ 349; and undisputedly no Rio Tinto employee instructed anyone "to withhold material information from [PwC]" or "delay any write downs," *Yorkville*, 305 F. Supp. 3d at 500; *see* Ex. 14 (Larsen) at 134:7–23, 137:10–13, 152:15–18 (PwC communicated with Rio Tinto "probably every day" and received "[a]ny document they desired"); SUF ¶¶ 275, 316. Nor were there even "mixed signals" as to the propriety of the HY 2012 impairment determination. *Ginder*,

752 F.3d at 574–75.  *Not one person* at RTCM, RTE, the Controller's Group, or PwC concluded that a formal estimate of RTCM's value was required.  SUF ¶ 293; *supra* 19.

**2.**  The SEC's pre-motion letter asserts three instances of negligence.  ECF 205 at 3.  It is "fatal" to the SEC's claim, however, that it introduced no "testimony or any other evidence on the appropriate standard of care against which a jury could measure [any individual's] conduct" under the circumstances.  *Ginder*, 752 F.3d at 576.  Regardless, none raises a triable issue.

*First*, the SEC contends the Controllers and PwC were not given "information learned at the Brisbane meeting," including the alleged negative NPV.  ECF 205 at 3.  No reasonable fact-finder could find that negligent, however.  If Brisbane Meeting attendees were told of an NPV, they also would have been told it was preliminary, typical of early-stage projects, and should not be relied on.  *Supra* 12, 39.  Besides, the Controllers received the Brisbane Presentation and spoke to RTCM and RTE about it.  *Supra* 16.  It is immaterial whether the Controllers received a specific negative NPV number, as they undisputedly were "aware that there were [other] negative NPVs . . . in the first half of 2012," Ex. 14 (Larsen) at 203:24–204:1; SUF ¶ 234; *supra* 16 and—if the SEC is correct about its contention—"even without the numbers, the charts" in the Brisbane Presentation "demonstrated" to the Controllers "that RTCM would have large negative cash flows" and a "'negative impact on NPV,'" SEC SUF ¶ 175 (citation omitted).

*Second*, the SEC warps the record in noting the Deputy Controller "did not know if the business models used were based on current assumptions."  ECF 205 at 3; *see* SEC SUF ¶ 229 (citing Ex. 26 (Witthöft) at 79:9–16).  As Mr. Witthöft clarified immediately after the testimony the SEC cites, he "rel[ied] on RTCM to provide valuations that included up-to-date operating assumptions" and "wouldn't have expected" the provided valuations to "involve[ ] out-of-date assumptions."  Ex. 26 (Witthöft) at 79:18–80:1.  No reasonable factfinder could find this negligent.

*Third*, as a matter of law it was not negligent to note in the Impairment Indicator Paper a "$5.1 billion valuation" based on the business model at acquisition, with which one RTCM employee disagreed.  *Cf.* ECF 205 at 3.  That "point of reference" undisputedly was *not* a formal estimate of RTCM's recoverable amount.  Ex. 13 (Lambert) at 143:2–21, 157:6–12; SUF ¶ 337.  Because it was "not possible to provide a valuation of RTCM to an acceptable degree of accuracy," the figure was merely "some indication" of RTCM's "potential value," based on "more certain" developments and heavily "restricted" by "caveats" about the "uncertainty of the central case view."  Ex. 193 at -530; SUF ¶ 327.  And the RTCM employee at issue—not an accountant or "responsible in any way" for the HY 2012 impairment determination, Ex. 17 (Morris) at 149:20–150:10, 202:10–13—*agreed* with those caveats, *id.* at 193:5–23, "did not have a view on what the actual value of RTCM" was, *id.* at 139:4–8, and "believe[d] that RTCM could still be developed into a profitable asset" as of June 2012, *id.* at 191:13–17.

## IV.    Rio Tinto Is Entitled To Judgment On The Section 13(a) False-Filing Claim.

Rio Tinto is entitled to summary judgment on the Section 13(a) claim because the SEC cannot establish that the HY 2012 Report was "materially false."  *SEC v. Stanard*, 2009 WL 196023, at *31 (S.D.N.Y. Jan. 27, 2009) (citing 17 C.F.R. § 240.12b-20); *supra* III.A–B.

## V.    Mr. Albanese And Mr. Elliott Are Entitled To Judgment On The Section 13(b)(5) And Related Rule 13b2-1 Claims.

The Court should grant judgment to Mr. Albanese and Mr. Elliott on the Section 13(b)(5) and related Rule 13b2-1 claims.  To prevail on these claims, the SEC must establish (a) there was a false record, (b) which Mr. Albanese or Mr. Elliott directly or indirectly made or caused to be made, (c) while acting unreasonably.  *See* 17 C.F.R. § 240.13b2-1; *SEC v. Straub*, 2016 WL 5793398, at *21 (S.D.N.Y. Sept. 30, 2016); *SEC v. Espuelas*, 905 F. Supp. 2d 507, 525–26

(S.D.N.Y. 2012) (granting summary judgment when SEC failed to establish conduct was unrea-

sonable); *SEC v. Lowy*, 396 F. Supp. 2d 225, 250 (E.D.N.Y. 2003) (same).

Instead of alleging some affirmative act by Mr. Albanese or Mr. Elliott, the SEC alleges

they failed to correct purported false statements in two "Accounting Issues" papers written by Dan

Larsen and PwC in June and July 2012, *supra* 17, 18, and the Impairment Indicator Paper.  *See*

ECF 135 at 45–46.[29]  The undisputed record now shows there was no false record, and neither Mr.

Albanese nor Mr. Elliott "caused" any such record or acted unreasonably.

### A.    There Was No False Record.

Mr. Albanese and Mr. Elliott are entitled to judgment because the three accounting papers

accurately described the RTCM challenges that the SEC alleges were concealed:

- <u>Infrastructure:</u>  The papers noted: barging had not received necessary approvals; it was "unlikely that the [barging] situation will be resolved in the short term"; infrastructure studies had commenced "with an intention to have results by the end of quarter 1 2013," Ex. 150 at -252; "[u]ncertainty remains around the ultimate infrastructure solution" although Rio Tinto was "confident of finding a viable infrastructure path," Ex. 193 at -529–30; and the "breadth of the [infrastructure] options mean that a central case view is still under development," Ex. 207 at -280.  This information is consistent with RTCM's then-ongoing exploration of infrastructure options.  *Supra*, Background, C–D.

- <u>Available Coal:</u>  The papers accurately described the change in reserves and resources, and explained that "this change alone would not change the[ ] PPA," Ex. 150 at -242 and that "the revised reserves and resources figures still significantly exceed the ROM material assumed during the life of the project," Ex. 193 at -534.  This information is consistent with positive coal tests at Benga and Zambeze, and Mr. Finlayson's statement that RTCM may have higher production in the future.  *Supra*, Background, C–D.

- <u>Valuation.</u>  As no impairment indicator was identified, there was no obligation to calculate a formal estimate of recoverable amount.  But the Impairment Indicator Paper accurately

---

[29]  The SEC previously suggested that Mr. Albanese's and Mr. Elliott's purported failure to correct these papers indirectly caused the allegedly false RTCM valuation in the HY 2012 Report. *See* ECF 135 at 46.  The SEC recently clarified, however, that there are "*no* claims remaining based on misconduct by Albanese or Elliott . . . related to the HY 2012 financial statement."  ECF 218 at 20.  Thus, to resolve the Rule 13b2-1 and Rule 13b2-2 claims against Mr. Albanese and Mr. Elliott, the Court need only examine the three papers—not the HY 2012 financial statement.  Regardless, Rio Tinto's HY 2012 financial statement was fairly stated, free from material error, and correctly recorded RTCM's carrying value as of June 30, 2012.  *Infra* VII.

disclosed that "[i]t is not possible to provide a valuation of RTCM to an acceptable degree of accuracy," Ex. 193 at -530, which is consistent with the fact that individual valuations could not be relied upon and were constantly changing. *Supra*, Background, C–D.

### B.    Mr. Albanese and Mr. Elliott Did Not Cause a False Record.

The SEC also cannot establish Mr. Albanese or Mr. Elliott "caused" any false record. There is no allegation—and no support in the record—that Mr. Albanese or Mr. Elliott took any affirmative act, such as making a false statement or submitting a false document to Rio Tinto's Audit Committee, Controllers, or PwC, or directing someone to misstate or to conceal information from any of those groups.  This case is thus far afield from other Rule 13b2-1 actions.  *E.g.*, *SEC v. Monterosso*, 756 F.3d 1326, 1336–37 (11th Cir. 2014) (defendants "created . . . fake invoices . . . and transmitted those documents"); *SEC v. Kelly*, 765 F. Supp. 2d 301, 322–23 (S.D.N.Y. 2011) (defendant "created deal summaries and contracts"); *SEC v. Lucent Techs. Inc.*, 2005 WL 1683741, at *2 (D.N.J. July 18, 2005) (defendant "lied to the chief accountant"); *see also SEC v. Patel* ("*Patel II*"), 2009 WL 3151143, at *28 (D.N.H. Sept. 30, 2009) ("[g]laring[ ] absen[ce]" of "affirmative act . . . other than reviewing" an SEC filing was insufficient).

Instead, the SEC alleges that Mr. Albanese and Mr. Elliott failed to intervene to correct alleged misstatements in three papers prepared as part of the HY 2012 impairment review process. *See*, *e.g.*, ECF 135 at 45–46.  The SEC's theory fails many times over.

**1.** *First*, after three years of discovery, the SEC has finally acknowledged that Mr. Albanese and Mr. Elliott did not author, review, or *even receive* the Impairment Indicator Paper. SEC SUF ¶¶ 323, 332; *see also* Ex. 1 (Albanese) at 268:14–23.  Unable to dispute this fact, the SEC now contends Mr. Elliott was aware of the "central analysis" of that seven-page document he never saw, based on two sentences in a *different* draft document prepared after the Impairment

Indicator Paper was shared with PwC. SEC SUF ¶ 332.[30] Not surprisingly, Mr. Elliott does not recall reviewing that separate draft document eight years later. Ex. 9 (Elliott) at 261:18–262:18. The SEC's theory is ridiculous. Mr. Albanese and Mr. Elliott cannot be liable for failing to correct a paper they never saw, and the SEC offers no authority for such liability.

**2.** *Second*, Mr. Albanese and Mr. Elliott did not author or improperly influence the other accounting papers. Ex. 14 (Larsen) at 137:10–13; Ex. 26 (Witthöft) at 230:2–20; Ex. 2 (Barbrook) at 178:6–24; SUF ¶¶ 268, 316, 342. Those papers were authored by Rio Tinto's Controller, with input from PwC, RTE, and RTCM. Ex. 216 at -621; Ex. 207 at -267; Ex. 2 (Barbrook) at 150:10– 20; Ex. 14 (Larsen) at 133:6–134:10; SUF ¶¶ 268, 316, 317, 342. While Mr. Elliott saw advanced drafts and asked questions, that does not change that he did not author or improperly influence the conclusions. Ex. 9 (Elliott) at 252:18–253:14; SUF ¶¶ 316, 342. Mr. Albanese and Mr. Elliott had no reason to believe they knew information not shared by RTCM and RTE with the Controllers and PwC, because the information for the impairment review (and the papers' contents) came directly from RTE and RTCM, the *same* groups that gave the Brisbane Presentation. Ex. 194 at -395; Ex. 14 (Larsen) at 20:3–13, 75:3–76:10, 77:1–21, 145:4–13; SUF ¶¶ 265–266.

Given that Mr. Albanese and Mr. Elliott did not author the papers, the SEC instead contends that they indirectly "caused" false or misleading statements in the papers because they had information from the Brisbane Meeting that the Controllers did not have and did not correct the papers. ECF 135 at 46. Specifically, the SEC contends Mr. Albanese and Mr. Elliott learned information about (1) RTCM's reserves and resources, (2) barging, and (3) RTCM's valuation. ECF 205 at 1. The record shows that the Controllers knew of each of these developments.

---

[30] The SEC does not even attempt to make such an outlandish connection between Mr. Albanese and the Impairment Indicator Paper, conceding he never even saw it. *See* SEC SUF ¶ 332.

As a preliminary matter, despite the SEC's erroneous claims to the contrary, members of the Controller's Group (including the Controller and Deputy Controller) were informed of the Brisbane meeting and received a copy of the Brisbane Presentation.  Ex. 75 at -784; Ex. 165 at -175; Ex. 14 (Larsen) at 196:3–5; Ex. 17 (Morris) at 175:8–12; Ex. 2 (Barbrook) at 71:21–73:4; Ex. 26 (Witthöft) at 173:18–174:2; SUF ¶ 300.  They also discussed its contents with RTCM and RTE employees, observing that it reflected "areas of concern . . . around infrastructure and production delays."  Ex. 165 at -175–76; *see also* Ex. 2 (Barbrook) at 73:2–4 (noting "more issues apart from barging that would impact RTCM"); SUF ¶¶ 300–302.  The SEC itself acknowledges that the slides the Controller's Group undisputedly received "accurately described numerous adverse developments at RTCM."  SEC SUF ¶ 169; *cf. Yorkville Advisors*, 305 F. Supp. 3d at 516 (finding "no evidence of fraud or negligence" where the "SEC does not point to any evidence to support its suggestion that Defendant . . . hid [a] Report from [a valuation firm] (or others)," particularly where the firm received the report and "proceeded to discuss [it]").

The undisputed record confirms the Controller's Group was clearly aware of the information the SEC alleges Mr. Albanese and Mr. Elliott learned from the Brisbane Presentation.  For example, the Brisbane Presentation stated that "Resources have been aligned to Rio Tinto standards" and "Resource characteristics have changed."  Ex. 351 at 7, 16; SUF ¶ 170.  The Controller received the Brisbane Presentation, Ex. 165 at -175; SUF ¶ 300, and also served on the Ore Reserves Steering Committee, where he received even more detailed information about RTCM's reserves and resources.  Ex. 5 (Chiaro) at 226:8–23; SUF ¶ 25.  Plus, RTE concluded there was sufficient coal to meet the volume RTCM planned to mine.  Ex. 193 at -534; SUF ¶ 325.  As a result, RTE, the Controller's Group, and PwC concluded that those changes did not constitute an indication of impairment.  Ex. 8 (Dupree) at 111:7–24; SUF ¶ 171.

The Controller's Group was also informed of the status of barging.  Ex. 210 at -145; Ex. 26 (Witthöft) at 37:19–38:17, 40:17–22, 43:5–44:4, 65:18–25; SUF ¶¶ 302–305.  One paper submitted to the Audit Committee noted, "it seem[ed] unlikely that the [barging] situation w[ould] be resolved in the short term," and discussed infrastructure constraints at RTCM.  Ex. 150 at -252; SUF ¶ 313, *see also* Ex. 2 (Barbrook) at 73:2–4.  While the SEC alleges the paper failed to mention that a future barging solution would be limited to 10 mtpa of coal, the accounting papers disclosed that *no coal* could be barged in the short-term.  The SEC fails to explain how omitting that a hypothetical future barging solution could only transport 10 mtpa of coal is in any way false.[31]

Finally, the Controller's Group was aware of a variety of potential development scenarios and RTCM valuations, including several negative valuations.  Ex. 26 (Witthöft) at 179:7–180:25; Ex. 14 (Larsen) at 203:7–204:4; SUF ¶¶ 175–176, 234.  Notably, the SEC itself contends that the charts in the Brisbane Presentation conveyed a large negative NPV even without numbers assigned to them. SEC SUF ¶ 175.  If so, the Controller's Group was aware of it, having received a copy of the presentation.  Ex. 165 at -175; SUF ¶¶ 170, 175, 300.  And, of course, any valuation allegedly conveyed at the Brisbane Meeting was not static.  The SEC acknowledges that RTCM's business unit modelling produced different outputs based on different configurations, which were provided to RTCM and RTE management in June and July 2012.  SEC SUF ¶ 209.

The Controller's Group concluded that negative NPVs of RTCM under specific development scenarios were not indications of impairment.  Ex. 26 (Witthöft) at 179:7–180:25; Ex. 150 at -252; SUF ¶¶ 234, 315.  The Controller's Group knew it was "not possible to provide a valuation

---

[31] Even if the new Deputy Controller (Mr. Witthöft) should have viewed the loss of barging in the short-to-medium term as an indication of impairment, SEC SUF ¶ 304, that cannot establish that Mr. Albanese or Mr. Elliott should have reached an accounting determination at odds with the Deputy Controller, or that they could be liable for respecting the bottom-up process.

of RTCM to an acceptable degree of accuracy," and that any potential, indicative, and unreliable NPVs were not formal estimates of recoverable amount.  Ex. 193 at -530; *supra* 60.[32]

In sum, the Controller's Group had more detailed and current knowledge than that provided to Mr. Albanese or Mr. Elliott at the Brisbane Meeting.  After that meeting, the Controller's Group communicated with RTCM and RTE throughout May, June, and July 2012.  *See* Ex. 165 at -176 (May 15 call); Ex. 195 at -448 (May 28 call); Ex. 222 at -299 (emails on draft Impairment Indicator Paper); Ex. 223 at -409 (further emails); SUF ¶¶ 301, 303, 332.  These conversations focused on the impairment because it was RTCM's responsibility to first determine, in consultation with the Controller's Group, whether there were any impairment indicators.  *See* Ex. 55 at -972; SUF ¶ 246.  The SEC's theory that Mr. Albanese and Mr. Elliott caused a false statement in the papers in question based on their "superior" knowledge thus fails.

### C.   The Undisputed Record Does Not Support the SEC's Claim That Mr. Albanese and Mr. Elliott Acted Unreasonably.

The SEC's claims also fail because the SEC cannot show Mr. Albanese or Mr. Elliott acted unreasonably.  The Controller's Group and PwC received information at HY 2012 directly from RTCM and RTE, and discussed it directly among themselves.  Ex. 55 at -972; Ex. 194 at -395–98; Ex. 195 at -448–49; Ex. 14 (Larsen) at 19:19–20:13, 75:3–76:10, 77:1–21, 145:4–13; Ex. 13 (Lambert) at 30:18–31:16, 62:10–63:20; 254:18–256:20, 262:2–16; Ex. 36, ¶ 162 (Lacey Rpt.); SUF ¶¶ 246, 265; SEC SUF ¶¶ 246, 265, 273, 275–277.  Indeed, the SEC acknowledges that the Controller's Group "relied on RTCM"—not Mr. Albanese or Mr. Elliott—"to provide valuations that had the most up-to-date information," SEC SUF ¶ 234, and RTCM's chief executive certified that

---

[32] Even if the Controller's Group had concluded that there was an indication of impairment, other individuals (not Mr. Albanese or Mr. Elliott) would have had to calculate a formal estimate of recoverable amount to determine whether RTCM was actually impaired.  Ex. 190, ¶ 9 (IAS 36); Ex. 2 (Barbrook) at 126:19–127:17; SUF ¶¶ 236–243, 278.

the information provided by RTCM was accurate and not misleading, Ex. 227 at -409; SUF ¶ 340. And there is no evidence that Mr. Albanese or Mr. Elliott directed anyone to misrepresent or withhold information as part of the HY 2012 review.  Because the Controller's Group and PwC received more up-to-date information from the *same sources* as Mr. Albanese and Mr. Elliott, Mr. Albanese and Mr. Elliott reasonably relied on the impairment-review process.  SUF ¶ 278.

Mr. Albanese and Mr. Elliott reasonably believed that the direct, extensive communications between and among the professionals at RTCM, RTE, the Controller's Group, and PwC would yield the right result.  This same process had already led to the recognition of billions of dollars of impairments.  Ex. 14 (Larsen) at 157:8–158:6; SUF ¶¶ 286–288.  Any decision by Mr. Albanese and Mr. Elliott to interfere with that process to dictate its outcome based only on the alleged conveyance of an uncertain and indicative-only valuation months earlier at the Brisbane Meeting—as the SEC urges they should have—may itself have been unreasonable.  *Cf. SEC v. Premier Holding Corp.*, 2019 WL 8167920, at *5–6 (C.D. Cal. Dec. 10, 2019) (defendant acted unreasonably when he published a  "preliminary valuation" that he was told was "unreliable").  The SEC's theory of liability turns common sense on its head and would require Mr. Albanese and Mr. Elliott to assume RTCM and RTE were withholding information from the Controller's Group and PwC and to assume that their own judgments on complicated accounting issues were superior to the judgments of Rio Tinto's dedicated in-house accountants and outside auditors.

## VI.    Mr. Albanese And Mr. Elliott Are Entitled To Judgment On The Rule 13b2-2 Claims.

The Court should also grant judgment on the Rule 13b2-2 claims.  To prevail, the SEC must show "(1) the individual is a director or an officer of an issuer (2) who 'directly or indirectly' made or caused to be made 'a materially false or misleading statement' or omission to an accountant (3) in connection with an SEC filing or audit," *SEC v. Straub* ("*Straub I*"), 921 F. Supp. 2d 244, 266 (S.D.N.Y. 2013) (citations omitted), judged under a "reasonableness standard," *SEC v.*

*Espuelas* ("*Espuelas I*"), 579 F. Supp. 2d 461, 487 (S.D.N.Y. 2008); *see* 17 C.F.R. § 240.13b2–2(a). Rule 13b2-2 is thus similar to Rule 13b2-1, and both claims fail for similar reasons. The Rule 13b2-2 claims fail for the additional reasons that neither Mr. Albanese nor Mr. Elliott made (directly or indirectly) a *materially* misleading statement or omission *to an accountant*.

**A.** Mr. Albanese and Mr. Elliott had no involvement with the Impairment Indicator Paper, so they cannot be liable for it. *See SEC v. Orr*, 2006 WL 542986, at *18 (E.D. Mich. 2006) (dismissing claim where no allegation defendant "directed [other's] actions, or that he was even aware of them"). The other two accounting papers were statements *by* accountants (the Controller's Group and PwC) *to* Mr. Albanese, Mr. Elliott, and the Audit Committee. Ex. 150 at -240; Ex. 207 at -267; Ex. 11 (Godbehere) at 31:15–19; SUF ¶¶ 268, 432. While Mr. Elliott asked questions of advanced drafts, this did not change the papers' authors, nor did he dictate the results. *See* Ex. 14 (Larsen) at 134: 7–23; SUF ¶¶ 268, 316. Because Mr. Albanese and Mr. Elliott made no misstatements "*to* accountants," these claims fail. *Patel II*, 2009 WL 3151143, at *30 (emphasis added).

The SEC argues Mr. Albanese and Mr. Elliott were silent when the papers were discussed at Audit Committee meetings. But the rule's plain text requires a "materially false or misleading statement to an accountant" or an omission "necessary in order to make *statements made*, in light of the circumstances under which such statements were made, not misleading, to an accountant." 17 C.F.R. § 240.13b2-2(a) (emphasis added). "[T]he rule does not impose upon directors or officers a duty to report information to accountants; it merely requires them not to make false statements to accountants and not to omit information from statements to accountants, when such an omission would result in a misleading statement," *SEC v. Patel* ("*Patel I*"), 2008 WL 781914, at *15 (D.N.H. Mar. 24, 2008)—as the SEC itself has argued to another court, *see SEC v. Goldstone*, 2015 WL 5138242, at *127 (D.N.M. Aug. 22, 2015) (citing SEC brief citing *Patel I*).

Nor can the SEC rely on the "indirectly" portion of Rule 13b2-2, as it does not allege (or identify any evidence indicating) that Mr. Albanese or Mr. Elliott indirectly shared or caused to be shared any misleading information with the Controller's Group or PwC. The SEC admits that PwC's primary sources of information were RTCM, RTE, and the Controller's Group—*not* Mr. Albanese or Mr. Elliott. *Supra* 66–67. For example, Simon Morris, who prepared the valuation materials for the Brisbane Meeting—including the negative $680 million valuation allegedly conveyed during that meeting—also helped draft the Impairment Indicator Paper that went to PwC. Ex. 17 (Morris) at 173:14–18, 149:20–150:10; SUF ¶¶ 180, 332. Nor were Mr. Albanese or Mr. Elliott informed of all the conversations between PwC and the rest of Rio Tinto. Ex. 13 (Lambert) at 30:18–31:16, 62:10–63:20; *see* SEC SUF ¶ 277 (not disputing this).

It was reasonable for Mr. Albanese and Mr. Elliott to believe that the experienced professionals who ran Rio Tinto's impairment process were appropriately communicating with accountants—especially without any contrary evidence. Indeed, the purpose of receiving sub-certifications from the business units was to ensure that "information . . . provided . . . for inclusion in the Rio Tinto 2012 interim press release" among other things, "[f]airly present[ed] in all material aspects the financial condition" of RTCM. Ex. 227 at -409; SUF ¶ 340. In short, the SEC cannot establish that Mr. Albanese or Mr. Elliott caused a false statement to be made *to* an accountant or acted unreasonably. *Espuelas I*, 579 F. Supp. 2d at 487.

**B.** The SEC cannot establish materiality: To the contrary, no allegedly misstated or omitted information was material because the Controllers and PwC were already aware of the various challenges facing RTCM. The Controllers had more—and more recent—information than Mr. Albanese and Mr. Elliott, *supra* VI.B, and no allegedly concealed information would have "significantly alter[ed] the total mix of information available," *Straub I*, 921 F. Supp. 2d at 268.

PwC had comparable information and, of course, direct access to the Controllers.  The Impairment Indicator Paper informed PwC of the changes to the reserves and resources, the two year ramp-up delay in development, the lack of a reliable NPV, and the infrastructure challenges, including barging.  Ex. 193 at -529, -531; SUF ¶¶ 323–328, 331.  PwC further discussed these challenges and changes to the reserves and resources directly with the Controller's Group, Ex. 200 at -001, and had access to RTE, *see*, *e.g.*, Ex. 214 at -001; SUF ¶¶ 306–08, 311, 313, 337.  The Impairment Indicator Paper explicitly assessed whether RTCM had ten different impairment indicators.  Ex. 193 at -528–31; SUF ¶ 323.  Regarding one potential indicator, the paper could not "provide a valuation [of RTCM] to an acceptable degree of accuracy," and offered a $5.1 billion figure as only a "potential value" "restricted by the caveats . . . regarding the uncertainty of" the valuation.  Ex. 193 at -529–31; SUF ¶¶ 326, 337.  No one claimed, however, that the $5.1 billion figure in the Impairment Indicator Paper was a formal estimate of recoverable amount, and PwC considered it "a point of reference."  Ex. 13 (Lambert) at 157:6–12; SUF ¶ 337.  The SEC's suggestion that any accountant would have believed that the $5.1 billion figure was a formal estimate of recoverable amount, *despite the express statement to the contrary*, cannot save this claim.

Finally, even after learning of the SEC's investigation and challenges to Rio Tinto's accounting in 2013, PwC has not withdrawn its opinion on the HY 2012 financials, which confirms no allegedly concealed information was material.  Ex. 13 (Lambert) at 168:6–20; SUF ¶ 349.  Although a PwC witness stated that, with hindsight, he would have wanted to inquire more about the valuation, SEC SUF ¶ 339, that does not mean "a reasonable auditor would conclude that it would significantly alter the total mix of information available to him" at the time.  *Straub I*, 921 F. Supp. 2d at 268.  Particularly when the Controllers had already considered the information, none of the

information identified by the SEC would significantly alter the mix of information or the conclusion.  No material information was omitted in statements to accountants.

## VII.    Rio Tinto Is Entitled To Judgment On The Section 13(b) Accounting Claim.

Rio Tinto is entitled to judgment on the Section 13(b) claim because its books and records "accurately and fairly reflect[ed]" RTCM.  15 U.S.C. § 78m(b)(2)(A).  This claim is based on "'standards of reasonableness.'"  *SEC v. Softpoint, Inc.*, 958 F. Supp. 846, 866 (S.D.N.Y. 1997) (citation omitted), *aff'd*, 159 F.3d 1348 (2d Cir. 1998), and the SEC cannot establish it was *unreasonable* to record a $3.4 billion value for RTCM at HY 2012.  Indeed, "there was no disagreement":  After extensively assessing for impairment indicators, RTCM, RTE, the Controllers, and PwC all agreed no impairment indicators existed and hence no formal estimate of the carrying value was needed.  Ex. 14 (Larsen) at 133:9–134:6; Ex. 207 at -280; SUF ¶¶ 293, 343–344.

The SEC's theory-in-hindsight rests on three premises from its experts:  (1) Brice's opinion that there were impairment indicators and, hence, step two of an impairment analysis was required, Ex. 28, ¶¶ 2.1.6–2.1.7; (2) Milburn's opinion that the HY 2012 comparable-transactions analysis showing RTCM was not overvalued was not "a reliable measure" of RTCM's value at step two, Ex. 40, ¶ 2.104; and (3) Drewe's opinion that, at step two, using a DCF model he based off of the May 2012 Brisbane model, RTCM would have been impaired, Ex. 31, ¶ 13.5.  This three-legged stool cannot stand if any of these opinions is excluded (as Defendants' *Daubert* motions show they all should be); even if they were all admitted, the SEC's claim still would fail.

*First*, the SEC did not even ask its *accounting* expert to opine on whether RTCM was impaired at HY 2012.  And his opinion that step two of an impairment analysis was required rests on unsupported "assumptions":  *e.g.*, "the write down to the reserves and resources" was consequential, Ex. 28, ¶ 6.7.2, "significant capital expenditure [of $5–10 billion] would be required" for greenfield rail, Ex. 28, ¶ 7.7.1(c)(iii), and "Rio Tinto was no longer pursuing barging . . . by 30

June 2012," Ex. 28, ¶ 7.3.7.  Undisputedly, however, the revised coal estimates were sufficient to support the volume of coal RTCM planned to mine, *supra* 7 & n.3—the SEC never offered a mining expert to oppose that conclusion, *see* Ex. 41 (Brice) at 228:6–20—and Rio Tinto reasonably expected to find a partner to defray greenfield construction costs and reasonably believed that at least long-term barging would be available, *supra* 38.  Because Brice's opinion at step one is "'unsubstantiated speculation,'" *Fujitsu*, 247 F.3d at 428 (citation omitted), no reasonable jury could find that step two of an impairment analysis was even required at HY 2012.

*Second*, no reasonable factfinder could rely on Milburn's rebuttal opinion on Rio Tinto's comparable-transactions analysis.  His opinion exceeds the "proper scope" of rebuttal testimony, *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 691 F. Supp. 2d 448, 467–68 (S.D.N.Y. 2010), as he conceded that Defendants' experts "ha[d] not undertaken an analysis to review the comparability" of those transactions, Ex. 40, ¶ 2.44.  It also is speculative, based on a set of factors that Milburn agrees were not required factors as they involve "a significant amount of . . . professional judgment," Ex. 47 (Milburn) at 113:10–21, 316:2–12, and that he derived merely from "common sense" and his "own view based on [his] experience" in a single coal-mining case where he did not even apply the same factors, *id.* at 259:23–260:6, 260:19–261:8, 267:10–16.  Without Milburn's opinion, the SEC cannot dispute that Rio Tinto could have relied on comparable transactions to conclude RTCM was not overvalued at HY 2012.

*Finally*, Drewe opines on RTCM's recoverable amount at HY 2012 by using his own adjusted DCF model, Ex. 31, ¶ 13.5, with no training in valuing coal assets, no expertise in coal mining or coal transportation infrastructure, and no experience testifying in "another coal mining case," Ex. 42 (Drewe) at 30:16–24, 39:13–23, 259:3–13, 271:9–18.  His DCF model lacks record support:  He assumed no production from Tete East and Minjova, Ex. 31, ¶ 13.4.3(c)(ii), and no

upside from the sale of excess rail capacity, *id.* ¶ 13.4.9—even though those assumptions were contrary to Rio Tinto's own at HY 2012, *supra* 14 & n.7, and outside Drewe's own expertise, Ex. 350, ¶ 8.4.18; Ex. 42 (Drewe) at 79:19–80:13. He also ignored that his model's inputs were interdependent—illogically assuming that Rio Tinto would have invested $7–8 *billion* in greenfield rail without any coal from Minjova and Tete East, Ex. 31, ¶ 11.4.4 even though that coal was the critical "basis for a greenfield . . . rail network," Ex. 303 at -034; SUF ¶¶ 55, 456. "[R]emov[ing] . . . those mines" "create[s] erroneous outputs" in his model, Ex. 16 (Maglione) at 210:3–10; SUF ¶ 214, because—as Drewe admits—Rio Tinto "would not have developed a Greenfield Rail without [their] production," Ex. 42 (Drewe) at 190:16–23. And he relied on *outdated* information— *e.g.*, coal price assumptions from May 2012, Ex. 31, ¶ 13.4.3(b), when his own report showed that average coal price assumptions had increased by roughly 30% by July 2012, *compare id.*, Figure 9A, *with* Ex. 33, ¶ 202. No reasonable factfinder could rely on Drewe's say-so.

## VIII.   The SEC Cannot Show Entitlement To Disgorgement Or Injunctive Relief.

**A.**   Congress recently clarified the SEC may seek disgorgement of "any unjust enrichment by the person who received such unjust enrichment as a result of [a] violation."  15 U.S.C. § 78u(d)(3)(A)(ii). This clarification aligns with the Supreme Court's holding that disgorgement may "not exceed a wrongdoer's net profits," *Liu v. SEC*, 140 S. Ct. 1936, 1940 (2020), and the longstanding principle that, to obtain disgorgement, the SEC must "establish *both* a reasonable approximation of [the Defendants'] profits *and* the causal connection between the approximation and the violations," *SEC v. Wyly*, 56 F. Supp. 3d 260, 268 (S.D.N.Y. 2014). It cannot do either.

Mr. Albanese and Mr. Elliott received no bonus in 2011 or 2012, Ex. 7 (du Plessis) at 29:20–30:12 (2012); Ex. 48 at 86 (2011); SUF ¶ 459, and there is no evidence their salaries "resulted from" alleged fraud, *SEC v. Razmilovic*, 738 F.3d 14, 32 (2d Cir. 2013). The SEC asserts Mr. Albanese was "allowed . . . to keep his job longer" due to the impairment's timing, and that

Mr. Elliott sold his stock. ECF 205 at 4. But even the SEC says Mr. Albanese's "dismissal came as a surprise to [him]," SEC SUF ¶ 10, meaning he was not worried about his job before January 2013. The record also shows his departure "was about [how] the problem with Mozambique was ultimately attributed to the resource," Ex. 1 (Albanese) at 305:17–306:14; SUF ¶ 10. But those problems could not have caused an earlier impairment: RTCM's geologic results were only received in late 2012, *supra* 24. Nor is there any evidence that Mr. Elliott traded Rio Tinto's stocks or that the price was artificially inflated after HY 2012. *Supra* 43–44.

As to Rio Tinto, no evidence supports the SEC's assertion that the August 2012 bond offering would have yielded less "after a potential credit rating downgrade" at HY 2012. ECF 205 at 4. The unrebutted expert testimony is that the impairment "did not have a measurable impact on [Rio Tinto's] bond prices," Ex. 35, ¶ 129; Ex. 46 (Metz) at 44:5–46:9 (SEC expert found no such impact); SUF ¶¶ 490–491, or its credit ratings, Ex. 35, ¶¶ 124–151; Ex. 37, ¶¶ 89–112 (SEC expert did not analyze credit ratings); SUF ¶¶ 491–95. Because the SEC has adduced "no evidence" from which the Court might reasonably approximate any net profits, summary judgment is proper. *Kelly*, 765 F. Supp. 2d at 325 (granting summary judgment on disgorgement); *SEC v. Jones*, 476 F. Supp. 2d 374, 386 (S.D.N.Y. 2007) (same).

**B.** The Court also should strike the request for injunctive relief—including any officer or director bar—because the SEC cannot establish "'a reasonable likelihood of further violation.'" *SEC v. Monarch Fund*, 608 F.2d 938, 943 (2d Cir. 1979) (citation omitted). Because the SEC relies solely on the nearly nine-year-old violations alleged in this case, "it would be irrational" to deem Defendants "persistent securities law violators who should be enjoined." *SEC v. Price Waterhouse*, 797 F. Supp. 1217, 1243 (S.D.N.Y. 1992) (denying injunction for eleven-year-old violation); *see Monarch Fund*, 608 F.2d at 943 (same where "more than seven years" had passed).

In fact, *every* factor courts consider—"the egregiousness of the violation," its "isolated or repeated nature," "the degree of scienter," and "assurances against future violations"—indicates no likelihood of future violations.  *SEC v. Haligiannis*, 470 F. Supp. 2d 373, 384 (S.D.N.Y. 2007).  This case does not involve "egregious" misconduct.  *See id.* (conduct was "purely as a 'ponzi' scheme" with "no possibility whatsoever" that it was thought lawful); *SEC v. Cw. Chem. Sec., Inc.*, 574 F.2d 90, 100 (2d Cir. 1978) ("entire transaction" was "essentially fraudulent").  And the alleged violation is "isolated," without "any evidence" of "prior or subsequent" violations.  *Monarch Fund*, 608 F.2d at 943; *see SEC v. Dibella*, 2008 WL 6965807, at *13 (D. Conn. Mar. 13, 2008) (ten years without similar violation "weighs heavily against an injunction"), *aff'd*, 587 F.3d 553 (2d Cir. 2009).

The SEC argues the last two factors should be "judged after trial."  ECF 205 at 4.  But it cannot prove intentional fraud, *supra* II.C, and has pleaded at most recklessness or negligence, ECF 135 at 32–34, 38–39.  *See Price Waterhouse*, 797 F. Supp. at 1243 (lack of scienter weighs against injunction).  And there are ample assurances against a future violation, including "several years" since the alleged violations, *Jones*, 476 F. Supp. 2d at 384, and "large scale change[s] in [Rio Tinto's] leadership" and independent auditor, *Price Waterhouse*, 797 F. Supp. at 1244; *see* Ex. 308 at 1 (Mr. Albanese left); Ex. 9 (Elliott) at 43:16–19 (Mr. Elliott retired); Ex. 12 (Hughes) at 219:5–23 (PwC rotated off of Rio Tinto engagement in 2019); SUF ¶¶ 10–11, 460.  The Court should strike the injunction request now.

The Section 17(a) claim as to Rio Tinto was dismissed "except with respect to any injunctive relief."  ECF 135 at 39.  "[B]ecause the [SEC's] only remaining remedy" on this claim "is unavailable," Rio Tinto is entitled to judgment on that claim.  *Jones*, 476 F.2d at 386.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should enter judgment for Defendants on all claims.

Dated: New York, New York
April 16, 2021

    /s/ Peter J. Romatowski (on consent)
Peter J. Romatowski
Kristen A. Lejnieks
JONES DAY
51 Louisiana Avenue, NW
Washington, D.C. 20001
Tel: (202) 879-7625
pjromatowski@jonesday.com
kalejnieks@jonesday.com

Jacqueline Vallette (pro hac vice)
JONES DAY
717 Texas, Suite 3300
Houston, TX 77002
Tel: (832) 239-3939
jvallette@jonesday.com

Henry Klehm III
James P. Loonam
Donald L. R. Goodson
JONES DAY
250 Vesey Street
New York, N.Y. 10281
Tel: (212) 326-3419
hklehm@jonesday.com
jloonam@jonesday.com
dgoodson@jonesday.com

    /s/ N. Scott Fletcher (on consent)
N. Scott Fletcher
SCOTT FLETCHER LAW, PLLC
808 Travis St. Suite 1420
Houston, TX 77002-5701
Tel:  (713) 255-0422
sfletcher@nsflaw.com

*Attorneys for Defendant Thomas Albanese*

Respectfully submitted,

By:   /s/ Mark A. Kirsch
    Mark A. Kirsch
    Lawrence J. Zweifach
    Jennifer L. Conn
    Avi Weitzman
    GIBSON, DUNN & CRUTCHER LLP
    200 Park Avenue
    New York, N.Y. 10166-0193
    Tel: (212) 351-4000
    mkirsch@gibsondunn.com
    lzweifach@gibsondunn.com
    jconn@gibsondunn.com
    aweitzman@gibsondunn.com

    Richard W. Grime (pro hac vice)
    Alexander W. Mooney (pro hac vice)
    Kellam M. Conover (pro hac vice)
    GIBSON, DUNN & CRUTCHER LLP
    1050 Connecticut Avenue, NW
    Washington, D.C. 20036
    Tel: (202) 955-8500
    rgrime@gibsondunn.com
    amooney@gibsondunn.com
    kconover@gibsondunn.com

*Attorneys for Defendants Rio Tinto PLC and
Rio Tinto Limited*

    /s/ Walter G. Ricciardi (on consent)
    Theodore V. Wells, Jr.
    Walter G. Ricciardi
    Geoffrey R. Chepiga
    Livia Fine
    PAUL, WEISS, RIFKIND, WHARTON &
    GARRISON LLP
    1285 Avenue of the Americas
    New York, N.Y. 10019
    Tel: (212) 373-3000
    twells@paulweiss.com
    wricciardi@paulweiss.com
    gchepiga@paulweiss.com
    lfine@paulweiss.com

*Attorneys for Defendant Guy Robert Elliott*