UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

| SECURITIES AND EXCHANGE COMMISSION, | |
|---|---|
| Plaintiff, | 17cv7994 (AT) (DF) |
| -against- | **MEMORANDUM AND ORDER** |
| RIO TINTO PLC, RIO TINTO LIMITED, THOMAS ALBANESE, and GUY ROBERT ELLIOTT, | |
| Defendants. | |

**DEBRA FREEMAN, United States Magistrate Judge:**

This Securities and Exchange Commission ("SEC") enforcement action has been referred to this Court for general pretrial supervision, which includes the resolution of discovery disputes. This Order addresses the particular dispute raised in a letter motion submitted by counsel for defendants Rio Tinto PLC and Rio Tinto Limited (collectively, "Rio Tinto"), on behalf of all Defendants in this action (Dkt. 208), regarding Defendants' request for the disclosure of information relating to any undisclosed bond price analyses that the SEC's testifying expert witness, Dr. Albert Metz, purportedly performed when he served as the SEC's consulting expert.

More particularly, Defendants contend that they have learned, through deposition testimony, that, prior to being retained by the SEC to testify regarding his event study analysis of prices for trades in Rio Tinto American Depositary Receipts ("ADRs"), Dr. Metz was retained by the SEC as a consultant to perform work relating to regression analyses of Rio Tinto's bond prices. According to Defendants, Dr. Metz not only served as a "dual-capacity" expert for the SEC, but his undisclosed consulting work on bonds related directly to the scope of his disclosed expert opinion on ADRs. For this reason, Defendants request that, pursuant to Rule 26 of the

Federal Rules of Civil Procedure, the Court (1) compel the disclosure of the "results and data arising from" the bond price analyses that Dr. Metz conducted as a consultant; and (2) conduct an *in camera* review of the memoranda that Dr. Metz apparently provided to the SEC regarding his bond price analyses, so as to determine what, if any, information in those memoranda should also be disclosed to Defendants. (*See* Dkts. 208, 210.) The SEC opposes both of Defendants' requests, maintaining instead that Dr. Metz's consulting work relating to bonds was distinct from his testimonial opinion concerning Rio Tinto's ADRs, and that any information relating to his consulting work is thus immune from disclosure. (*See* Dkt. 209.)

This Court has carefully reviewed the parties' written positions on the issues presented, and, as an initial matter, finds that, in light of the level of detail provided by the parties in their competing letters, which include citations to authority, no further briefing is required for the matter to be resolved. For the reasons discussed below, Defendants' letter motion (Dkt. 208) is granted.

## BACKGROUND

### A. Factual Background

In October 2017, the SEC commenced this enforcement action, alleging that Defendants had engaged in fraud by concealing – from Rio Tinto's board of directors, auditors, and the market – the significant decline in value of a coal business that Rio Tinto had acquired in 2011. (*See* Complaint, dated Oct. 17, 2017 ("Compl.") (Dkt. 1).) More particularly, the SEC alleges that, in April 2011, Rio Tinto paid $3.7 billion for a nearly 1,000 square mile, undeveloped mining asset in Mozambique (later called "Rio Tinto Coal Mozambique" or "RTCM"), which almost immediately encountered setbacks, including poor study results about the quantity and quality of the coal at the site. (*See id.* ¶¶ 1-3.) According to the SEC, by as early as the end of

2

2011, Defendants had learned of many of these setbacks affecting RTCM's economic value, yet the impairment of RTCM's value (as reflected on the company's financial statements) was not first reported until January 2013, at which time the value of RTCM was revised downward to $611 million. (*See id.* ¶¶ 3-9.) Further, the SEC alleges that, after a second write-down of RTCM's value to $119 million, Rio Tinto sold RTCM for approximately $50 million in October 2014. (*Id.* ¶ 10.) The SEC claims that Defendants' alleged concealment of RTCM's decreasing value (either through misstatements or actual omissions) misled investors and, ultimately, violated the securities laws. (*Id.* ¶¶ 5-6.)

A central issue in this case is the market's reaction to Rio Tinto's acquisition of RTCM and its later disclosure of RTCM's impairment in value. Each side has retained experts to opine on this subject, and those experts have conducted event studies to support their testimonial opinions.

As relevant here, starting "near the very end of October 2019," the SEC retained Dr. Metz as a testifying expert, and, two months later, he issued his opening expert report. (*See* Dkt. 208-4 ("SEC 10/2/20 Ltr."), at 1-2; *see also* Expert Report of Albert Metz, PH.D., dated Dec. 20, 2019 ("Metz Report") (Dkt. 208-10).) In the first 39 pages of that report, Dr. Metz described, and then drew conclusions from, the event studies that he conducted about Rio Tinto's ADR price movement on two specific days: the day that Rio Tinto announced that it acquired RTCM and the day that Rio Tinto announced an impairment in RTCM's value. (*See id.*, at 1-39.) Then, in the remaining 11 pages of his report, Dr. Metz provided a generalized "overview of corporate bonds, their pricing[,] and their market structure." (*Id.*, at 39.) Although, in these final pages, Dr. Metz described corporate bonds and the bond market in broad terms, he

did not offer any specific opinions relating to Rio Tinto's bond prices on the relevant dates. (*See id.*, at 39-50.)

Two months later, on February 21, 2020, Defendants' testifying expert, Dr. Glenn Hubbard, issued his report. (Expert Report of Glenn Hubbard, dated Feb. 21, 2020 ("Hubbard Report") (Dkt. 208-9).) In it, Dr. Hubbard first critiqued several of Dr. Metz's conclusions relating to Rio Tinto's ADR pricing and the equity market's reaction to Rio Tinto's RTCM-related announcements. (*See id.*, at 16-65.) Then, Dr. Hubbard described the results of his own ADR event study and the conclusions that he drew from that work. (*See id.*) Lastly, Dr. Hubbard discussed the methodology and results of his own event study of Rio Tinto bond prices and the opinions that he drew from that regression analysis. (*See id.*, at 69-94.)

On April 10, 2020, Dr. Metz issued a rebuttal report, in which he first noted that the SEC had instructed him to "review and respond as necessary to the methodology and conclusions" found Dr. Hubbard's report, including Dr. Hubbard's specific conclusion that Rio Tinto's bond prices had not been affected by either the announcement of the RTCM acquisition or the later news of RTCM's impairment. (Expert Rebuttal Report of Albert Metz, PH.D., dated Apr. 10, 2020 ("Metz Rebuttal") (Dkt. 208-11), at 4-5.) Although, in the body of this report, Dr. Metz did not squarely challenge many of Dr. Hubbard's bond-related conclusions, he did note that at least one of Dr. Hubbard's bond price theories had been based on "pure speculation." (*Id.*, at 78.)

After the above-mentioned reports were produced, the parties conducted expert depositions. During Dr. Metz's deposition in June 2020, Defendants learned for the first time that Dr. Metz had served as a consulting expert for the SEC in this case *before* he was retained as a testifying expert. (*See generally* Dkt. 208-8 ("Metz Tr.").) Specifically, Dr. Metz testified that prior to "being engaged to write an expert report, [he] worked in the capacity of a consulting

economist to the SEC on this case." (*See id.*, at 15.)  According to Dr. Metz, in this consulting role, which, he recalled, began in "mid 2019," he performed his own "[e]conomic or econometric analysis" of "bond prices for Rio Tinto." (*Id.*, at 44.)  When he was asked why his consulting work had not been disclosed in his reports, Dr. Metz testified that he had "agreed that [his consultative] analysis was not pertinent or relevant to the opinions in either of [his] reports and would have been extraneous to have included." (*Id.*)  At the same time, however, Dr. Metz acknowledged that Dr. Hubbard had "conducted a similar analysis" of Rio Tinto's bond prices "and reached a similar conclusion." (*Id.*, at 45.)  According to the SEC, Dr. Metz worked as a consultant in this case from August to October 15, 2019.  (*See* SEC 10/2/20 Ltr., at 1-2.)

### B. <u>Relevant Procedural History</u>

On January 26, 2021, Rio Tinto, on behalf of all Defendants, filed the instant letter motion, arguing that Defendants are entitled to discovery about any regression analyses of Rio Tinto's bond prices that Dr. Metz conducted when he served as the SEC's consulting expert. (*See* Letter to the Court from Mark A. Kirsch, Esq., dated Jan. 26, 2021 ("Defs. 1/26/21 Ltr.") (Dkt. 208); Letter to the Court from Mark A. Kirsch, Esq., dated Feb. 1, 2021 ("Defs. 2/1/21 Ltr.") (Dkt. 210).)  Although the SEC has declined to disclose any materials prepared by Dr. Metz in connection with his consulting work, on the grounds that it is protected by either the non-testimonial expert privilege or work-product immunity, Defendants contend that Dr. Metz's consulting work relating to bonds – including the underlying data and results of that work – must be disclosed because (1) in Defendants' view, it "is directly related to the scope of [his] disclosed opinions"; and (2) at a minimum, there is ambiguity as to whether Dr. Metz's bond analyses

5

informed his later expert testimony, and such ambiguity weighs in favor of production. (*See* Defs. 1/26/21 Ltr., at 4.)

In opposition, the SEC asserts that it hired Dr. Metz "to provide litigation consulting and also to serve as a testifying expert on separate, distinct topics." (Letter to the Court from Thomas A. Bednar, Esq., dated Jan. 28, 2021 ("SEC 1/28/21 Ltr.") (Dkt. 209), at 1.) According to the SEC, Dr. Metz's "bond consulting work" only involved "regression analyses of bond price movements in secondary market trading of certain Rio Tinto bonds on certain days," which Dr. Metz then summarized in a series of memoranda to the agency. (*Id.*, at 3-4.) In comparison, the SEC contends, the expert report that Dr. Metz produced in his role as a testifying expert focused on event studies that analyzed the prices of trades in Rio Tinto ADRs (equity securities) on two particular dates. (*Id.*, at 2-3.) In light of these distinctions – as well as (1) the fact that bonds and equity securities (such as ADRs) trade in markets with different features, (2) the fact that Dr. Metz purportedly used different regression programs in his bond-related work than he did for his ADR work, and (3) the fact that Dr. Metz has not been asked by the SEC to testify about his bond price analyses (unlike his work on ADRs) – the SEC maintains that the disclosure of Dr. Metz's consultative analyses is not required here. (*Id.*, at 4-5.)

## DISCUSSION

### I. APPLICABLE LEGAL STANDARDS

The issues raised by the parties implicate the legal standards governing the work-product doctrine and expert discovery.

#### A. Work-Product Doctrine

The scope of discovery under the Federal Rules of Civil Procedure is defined broadly: "Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's

6

claim or defense." Fed. R. Civ. P. 26(b)(1). Rule 26, however, provides for several exceptions to the Federal Rules' policy of allowing liberal discovery, including the work-product doctrine. Fed. R. Civ. P. 26(b)(3)(A); *see QBE Ins. Corp. v. Interstate Fire & Safety Equip. Co.*, No. 3:07CV1883 (SRU) 2011 WL 692982, at *1-2 (D. Conn. Feb. 18, 2011). "The work-product rule shields from disclosure materials prepared 'in anticipation of litigation' by a party, or the party's representative, absent a showing of substantial need." *United States v. Adlman*, 68 F.3d 1495, 1501 (2d Cir. 1995); *see Powerweb Energy, Inc. v. Hubbell Lighting, Inc.*, No. 3:12CV220 (WWE), 2014 WL 655206, at *1 (D. Conn. Feb. 20, 2014) (citing *United States v. Nobles*, 422 U.S. 225, 238 (1975) ("At its core, the work-product doctrine shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case.")).

"The initial burden of justifying the application of the work[-]product doctrine is on the asserting party, and the burden is a heavy one because privileges are neither lightly created nor expansively construed." *In re Vitamin C Antitrust Litig.*, No. 06-CV-1738 (BMC) (JO), 2012 WL 3645362, at *2 (E.D.N.Y. Aug. 22, 2012) (internal quotation marks and citation omitted); *see Chen-Oster v. Goldman, Sachs & Co.*, 293 F.R.D. 547, 554 (S.D.N.Y. 2013). Moreover, "[w]ork-product immunity is conditional," and, "[o]nce properly invoked, it may be overcome upon a showing that: (1) the requested material is otherwise discoverable; and (2) the party seeking production 'has [a] substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means." *In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig.*, 293 F.R.D. 568, 574 (S.D.N.Y. 2013) ("*In re MTBE*").

B. **Testifying Experts, Consulting Experts, and Dual-Capacity Experts**

1. **Testifying Experts**

Under Rule 26(a)(2)(B)(ii), as revised in 2010, an expert report must contain all "the facts or data *considered* by the [expert] in forming" the opinions that the expert is to offer. (emphasis added). The Advisory Committee Notes to the 2010 amendments make plain that the Rule's focus on the disclosure of "facts or data"

> is meant to limit disclosure to material of a factual nature by excluding theories or mental impressions of counsel. At the same time, [however,] the intention is that "facts or data" be interpreted broadly to require disclosure of any material considered by the expert, from whatever source, that contains factual ingredients. The disclosure obligation extends to any facts or data "considered" by the expert in forming the opinions to be expressed, not only those relied upon by the expert.

Fed. R. Civ. P. 26 Advisory Committee Notes. In addition, under Rule 26(b)(4)(C), work-product protection is afforded to communications between a party's attorney and a testifying expert required to provide a report under Rule 26(a)(2)(B), *unless* those communications: "(i) relate to compensation for the expert's study or testimony; (ii) identify facts or data that the party's attorney provided and that the expert considered in forming the opinions to be expressed; or (iii) identify assumptions that the party's attorney provided and that the expert relied on in forming the opinions to be expressed." Fed. R. Civ. P. 26(b)(4)(C)(i)-(iii).

Ultimately, "Rule 26 protects only the communications of counsel: work-product protection does not extend to an expert's *own* development of the opinions to be presented; those are subject to probing in deposition or at trial." *In re MTBE*, 293 F.R.D. at 577 (internal quotation marks, citation, and brackets omitted) (emphasis in original). Against this backdrop, courts have held that "furnishing work-product of a factual nature to a testifying expert constitutes implied waiver of work-product protection to the extent that the expert *considers* the

8

facts or data disclosed in forming [his] opinion." *Id.* at 574 (emphasis added). "[T]he cases [also] make clear" that "the burden of showing that the expert did not read or review a document lies with the party resisting discovery." *U.S. Fidelity & Guar. Co. v. Braspetro Oil Servs. Co.*, No. 97cv6124 (JGK) (THK), 2002 WL 15652, at *7-8 (S.D.N.Y. Jan. 7, 2002) (finding that defendants had not "clearly established" that "their experts did not consider everything supplied to them in informing their opinions as testifying experts").

### 2. **Consulting Experts**

"Consulting experts, *i.e.,* those not retained to provide an opinion at trial, are subject to more stringent discovery rules" than those applicable to testifying experts. *Powerweb Energy*, 2014 WL 655206, *2. Specifically, "[i]n addition to codifying the work-product doctrine, the Federal Rules of Civil Procedure also establish[] that, ordinarily, 'the [] facts known or opinions held' by a *consulting* expert are not discoverable." *In re MTBE*, 293 F.R.D. at 575 (quoting Fed. R. Civ. P. 26(b)(4)(D) (emphasis in original)); *see also Schwab v. Philip Morris USA, Inc.*, No. 04-CV-1945 (JBW), 2006 WL 721368, at *2 (E.D.N.Y. Mar. 20, 2006) ("A non-testifying expert . . . is generally immune from discovery." (internal quotation marks, citation, and emphasis omitted)). Nonetheless, a party may be entitled to such discovery upon "showing exceptional circumstances under which it is impracticable for the party to obtain [the] facts or opinions on the same subject by other means." Fed. R. Civ. P. 26(b)(4)(D)(i-ii); *see Long-Term Cap. Holdings, LP v. U.S.*, No. 01-CV-1290 (JBA), 2003 WL 21269586, at *2 (D. Conn. May 6, 2003) ("[E]xceptional circumstances . . . may exist when a non-testifying expert's report is used

9

by a testifying expert as the basis for an expert opinion, or when there is evidence of substantial collaborative effort between a testifying expert and a non-testifying expert.")

### 3. Dual-Capacity Experts

Dual-capacity experts, or "dual hat" experts, are single experts who serve as both non-testifying consulting experts and as testifying experts. *See Schwab*, 2006 WL 721368, at *2-3. When an expert serves in these two roles, courts "are forced to grapple with what must be disclosed when an expert alternately dons and doffs the 'privileged' hat of a litigation consultant and the 'non-privileged hat' of the testifying witness." *Employees Committed for Justice v. Eastman Kodak Co.*, 251 F.R.D. 101, 104 (W.D.N.Y. 2008) (internal quotation marks and citation omitted); *see B.C.F. Oil Refining, Inc. v. Consol. Edison Co. of N.Y.,* 171 F.R.D. 57, 61 (S.D.N.Y. 1997) ("It is conceivable that an expert could be retained to testify and in addition to advise counsel outside of the subject of his testimony. Under such a circumstance it might be possible to claim a work[-]product privilege if this delineation were clearly made." (quoting *Beverage Marketing v. Ogilvy & Mather Direct Response, Inc.*, 563 F. Supp. 1013, 1014 (S.D.N.Y. 1983)).

In cases involving dual-capacity experts, "[t]he party resisting disclosure bears the burden of showing that [the] expert *did not consider* certain documents in forming his [testimonial] opinion." *Schwab*, 2006 WL 721368, at *3 (emphasis added). "[T]his burden cannot generally be satisfied" merely by counsel's representations or "by the expert's representations alone." *Id. See B.C.F. Oil*, 171 F.R.D. at 62 ("Defendant should not have to rely on plaintiff's representation that these documents were not considered by the expert in forming his opinion."). Rather, the burden can be "met when the documents could not have been considered by the expert in forming his opinion, [such] as when they are reviewed by the expert only after he has testified."

10

*Schwab*, 2006 WL 721368, at *3 (citing *Aktiebolag v. Andrx Pharm., Inc.*, 208 F.R.D. 92, n.12 (S.D.N.Y. 2002)). Alternatively, the burden may be satisfied when the party opposing disclosure presents the court "with affidavits and deposition testimony 'clearly establishing' that the testifying witness never read, reviewed, or considered the subject documents in forming his opinions." *Id.* (quoting *U.S. Fidelity*, 2002 WL 15652, at *7).

Yet, ultimately, if the documents reviewed by an expert in his role as a consultant "appear to also inform his expert report supporting his proposed testimony, they [will be] subject to discovery." *Id.* ("Where ambiguity exists in the role played by an expert, the rule favors disclosure."); *see Employees Committed for Justice*, 251 F.R.D. at 104 ("'Any ambiguity as to the role played by the expert when reviewing or generating documents should be resolved in favor of the party seeking disclosure.'" (quoting *B.C.F. Oil*, 171 F.R.D. at 62)). Thus, "[i]n most instances, if the subject matter [of the consulting work] directly relates to the opinion in the expert report, there will be at least an ambiguity as to whether the materials informed the expert's opinion," and disclosure will be required. *Employees Committed for Justice*, 251 F.R.D. at 109 (applying an "objective test" that "defines 'considered' as anything received, reviewed, read, or *authored* by the expert, before or in connection with the forming of his opinion, if the subject matter relates to the facts or opinions expressed" (citation omitted) (emphasis in original)); *see also In re MTBE,* 293 F.R.D. at 575 (holding that, even after the 2010 amendments to the Federal Rules, "any ambiguity as to the role played by the expert when reviewing or generating documents should be resolved in favor of the party seeking discovery"); *Powerweb Energy,* 2014 WL 655206, at *6 (although plaintiff argued that the testifying expert did not rely on any information provided to him by the consultant, that statement was "not

dispositive in light of the broad definition given by many district courts to the word 'considered'").

## II. DEFENDANTS' MOTION

It appears undisputed that, in this case, Dr. Metz worked as a consulting expert for the SEC from August to October 15, 2019; then, starting "near the very end of October 2019," he transitioned into a testifying expert who issued an expert report on December 20, 2019. (*See* SEC 10/2/20 Ltr., at 1-2; Metz Report.) It is also undisputed that Dr. Metz did not disclose his earlier bond-related work in either his opening or rebuttal reports. Now, this Court is tasked with deciding whether Defendants are entitled to discovery about Dr. Metz's bond regression analyses. Upon review of the parties' submissions, this Court agrees with Defendants that, at a minimum, a fair amount of ambiguity exists regarding the extent to which Dr. Metz, in his capacity as a testifying expert, considered, on some level, his earlier consulting work in this same case. Accordingly, as such ambiguity should be resolved in favor of Defendants, this Court finds that certain disclosures must be made.

### A. Defendants Are Entitled to the Results of, and the Data Used in and Derived From, Dr. Metz's Consultative Analyses of Rio Tinto's Bond Prices.

There are multiple indications in the record before this Court that Dr. Metz, on some level, considered his consulting work in the preparation and execution of his testimonial opinions – or that there is at least ambiguity on this point. To start, by testifying at his deposition that he had not disclosed his prior analyses of bond market prices in his opening or rebuttal report because he had "agreed" that his prior consulting work "was not pertinent or relevant" to his produced reports (Metz Tr., at 44), Dr. Metz seemed to suggest that he made a conscious decision that his earlier work should not be referenced. Certainly, and contrary to the SEC's

12

assertions, Dr. Metz's testimony does not "clearly establish" that Dr. Metz never considered his prior consulting bond work in forming his testimonial opinions. Indeed, the choice not to include data (or certain work previously authored by the expert) in an expert report can, itself, be deemed a "consideration" of that data or authored work. *See In re MTBE*, 293 F.R.D. at 574 ("It is irrelevant whether the expert ultimately relies upon the facts or data in forming [his] expert opinion; instead, the test is whether the expert 'considered' the materials"); *Thieriot v. Jaspan Schlesinger Hoffman LLP*, No. CV 07-5315 (TCP) (AKT), 2011 WL 4543308, at *5 (E.D.N.Y. Sept. 29, 2011) ("'[P]laintiff must disclose all materials, regardless of privilege, that plaintiff's expert generated, reviewed, reflected upon, read, and/or used in *formulating his conclusions*, even if the materials were ultimately rejected by the expert in reaching his opinions.'" (quoting *Synthes Spine Co. v. Walden*, 232 F.R.D. 460, 464 (E.D. Pa. 2005) (emphasis in original))).

More tellingly, while the SEC maintains that neither of Dr. Metz's expert reports "involve [a] regression analysis of bond prices" (SEC 1/28/21 Ltr., at 4), Dr. Metz stated, at the outset of his rebuttal report, that the SEC had instructed him to "review and respond" to Dr. Hubbard's conclusions regarding, *inter alia*, the market impact on Rio Tinto bond prices. (Metz Rebuttal, at 4-5.) In his rebuttal, Dr. Metz then expressly challenged at least one of Dr. Hubbard's hypotheticals concerning Rio Tinto's bond price movements as "pure speculation" (*id.*, at 78), but he did not more broadly challenge Dr. Hubbard's event study of bond prices. Given that he had been instructed to respond to Dr. Hubbard's opinions, the logical inference could be drawn that Dr. Metz did not go farther in his challenges because, based on his own consultative bond analyses, he did not otherwise disagree with Dr. Hubbard's conclusions. Such an inference would be supported by Dr. Metz's deposition testimony, referenced above, that his own bond regression analyses had been "similar" to the work conducted by Dr. Hubbard

13

and that the two experts had "reached a similar conclusion." (Metz Dep., at 44.) Therefore, at least with respect to Dr. Metz's rebuttal report, this Court cannot accept the SEC's blanket assertion that "Dr. Metz did not consider the consulting work in forming his testimonial opinions." (SEC 1/28/21 Ltr., at 4; *see B.C.F. Oil*, 171 F.R.D. at 63 (directing disclosure of documents where it was "not clear" whether reviewed by expert solely in capacity of consultant or "whether they informed his expert opinion as well").)

Finally, the close timing of Dr. Metz's engagements by the SEC in this case distinguishes this matter from other cases, where courts have found it possible to delineate which materials were "generated or considered *uniquely* in the expert's role as a consultant," as opposed to as a testimonial witness. *In re Com. Money Ctr., Inc., Equip. Lease Litig.*, 248 F.R.D. 532, 538 (N.D. Oh. 2008) (internal quotation marks and citation omitted) (emphasis in original). As Defendants point out, a mere two weeks (at most) elapsed from the time when Dr. Metz had donned a "consulting expert hat" to the point when he switched to his "testimonial expert hat." *Compare with Employees Committed for Justice*, 251 F.R.D. at 105 (finding that the dual-hat expert's proffered expert testimony, regarding statistical analysis of employee data performed in 2008, was not sufficiently related to the consultative analysis he conducted in 2003 and 2004 to require disclosure). Although his consulting work came first, the mere chronology of Dr. Metz's engagements is not "the determining factor" here, because, if it were, then "the opportunity for parties to shield disclosure of otherwise discoverable documents considered by their experts simply by hiring those individuals first as consultants and later as experts would be too great." *Constr. Indus. Servs. Corp. v. Hanover Ins.*, 206 F.R.D. 43, 53 (E.D.N.Y. 2001) (ordering disclosure of documents the expert "reviewed historically" as a consultant because it was

14

"impossible to segregate [the expert's] role as a business consultant who advised [the party] regarding many aspects of the litigation with his role as a testifying expert").

For these reasons, this Court finds that the SEC has not "clearly established" that Dr. Metz drew "a mental line in the sand" between his expert work in his consulting and testifying capacities, *U.S. Fidelity,* 2002 WL 15652, at *7; *Yeda Rsch.*, 292 F.R.D. at 115, and that Defendants are thus entitled to the data studied by Dr. Metz in connection with his consultative analyses of Rio Tinto's bond prices, as well the results of those analyses.

### B. Dr. Metz's Memoranda to the SEC Relating to His Consulting Work Should Be Produced in Redacted Form, With Unredacted Copies Submitted to the Court For *In Camera* Review.

Having determined that Dr. Metz's consultative bond analyses should be produced to Defendants, this Court notes that Dr. Metz's memoranda to the SEC relating to that consulting work may also be subject to disclosure, if Dr. Metz chose to memorialize the results of his analyses in those memoranda and not elsewhere, such that Defendants could not otherwise obtain the information. *See Gucci America, Inc. v. Guess?, Inc.*, 271 F.R.D. 58, 74 (S.D.N.Y. 2010) (work-product protection "can be overcome . . . if the party seeking such discovery shows that it (1) has 'substantial need for the materials,' and (2) cannot obtain the substantial equivalent 'without undue hardship.'" (quoting Fed. R. Civ. P. 26(b)(3)(A)(ii))); *United States v. Fell*, No. 2:01-cr-12, 2013 WL 12385306, at *4 (D. Vt. Dec. 19, 2013) (where defendant requested notes and records pertaining to expert's work in the case, including expert's communications with the Government, holding that defendant may be entitled to such records upon a showing of "substantial need and an inability to obtain the information by other means"); *Nat'l Congress for Puerto Rican Rights v. City of New York*, 194 F.R.D. 105, 110 (S.D.N.Y. 2000) (substantial need demonstrated where data compiled by defendants was "directly probative on many of the issues

in the case" and same information could not be obtained absent undue hardship). The SEC, however, has asserted that production of the memoranda would reveal counsel's pre-litigation mental impressions, conclusions, opinions, or legal theories, and that the memoranda are therefore protected from disclosure under Rule 26(b)(4)(C). (*See* SEC 1/28/21 Ltr., at 6.)

As noted above, while attorneys' theories and mental impressions are protected by the work-product doctrine, *Nobles*, 422 U.S. at 238, "everything else is fair game," including any "facts or data" that an attorney provides to an expert witness, to be considered in forming his opinions. *Yeda Rsch. and Dev. Co., Ltd. v. Abbott GmbH & Co. KG*, 292 F.R.D. 97, 105 (D.D.C. 2013). Indeed, the Federal Rules require the disclosure of all materials of a factual nature that were considered by an expert, irrespective of their source. *See In re MTBE*, 293 F.R.D. at 577. In addition, under Rule 26(b)(4)(C)(iii), any "assumptions" provided to an expert witness by counsel, and then relied upon by the expert in forming an opinion, may be subject to production.

Consistent with the rulings herein, the SEC is directed to review Dr. Metz's memoranda and produce them – in redacted form, if appropriate – to the extent necessary to provide Defendants with all facts and data considered by Dr. Metz in connection with his bond price analyses, as well as any data or conclusions derived from those analyses, and any assumptions relied upon by Dr. Metz in formulating any resulting opinions. To the extent the SEC maintains that all or portions of the memoranda remain immune from disclosure under the applicable Rules and case law, it is directed to submit the memoranda, in unredacted form, to this Court, for *in camera* review. *See Sara Lee*, 273 F.R.D. at 420 (conducting *in camera review* to determine whether Defendants had a duty to disclose certain expert-attorney communications).

## CONCLUSION

For all of the foregoing reasons, Defendants' motion (Dkt. 208) is granted in its entirety, and the SEC is directed, within one week of the date of this Order:

(1) to disclose to Defendants the facts and data considered by Dr. Metz in any regression analyses of Rio Tinto's bond prices that he performed while serving as a consulting expert for the SEC, as well as any data, results, or conclusions derived by Dr. Metz from his analyses;

(2) to disclose to Defendants (in redacted form, if necessary) the memoranda provided to it by Dr. Metz regarding his bond price analyses, to the extent necessary to comply with paragraph (1), above; and

(3) if the SEC continues to maintain, consistent with this Memorandum and Order, that all or part of Dr. Metz's memoranda regarding his bond price analyses are protectible as work product, then to submit the memoranda to this Court, in unredacted form, for *in camera* review. Counsel for the SEC is directed to contact my Chambers for instructions as to how to make any *in camera* submission.

In light of this ruling, the Clerk of Court is directed to close Dkt. 208 on the Docket of this action.

Dated: New York, New York
May 28, 2021

SO ORDERED

_____
DEBRA FREEMAN
United States Magistrate Judge

Copies to:

All counsel (via ECF)