UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
┌─────────────────────────────────────────┐
│ USDC SDNY                                │
│ DOCUMENT                                 │
│ ELECTRONICALLY FILED                     │
│ DOC #: _____                 │
│ DATE FILED: __2/20/2025__                │
└─────────────────────────────────────────┘
```

SECURITIES AND EXCHANGE COMMISSION,

        Plaintiff,

      -against-

GUY ROBERT ELLIOTT,

        Defendant.

17 Civ. 7994 (AT)

**OPINION & ORDER**

ANALISA TORRES, District Judge:

      Plaintiff, the Securities and Exchange Commission (the "SEC"), brings this action against Defendant, Guy Robert Elliott, alleging violations of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78a *et seq.*, and the rules promulgated thereunder, in connection with Elliott's role as Chief Financial Officer of the Rio Tinto Group ("Rio Tinto") and Rio Tinto's acquisition of a coal mining enterprise in the Republic of Mozambique. *See generally* Compl., ECF No. 1.

      Elliott moves for summary judgment on the SEC's remaining claims against him, SJ Mot., ECF No. 238, and both parties seek to exclude opinions and testimony provided by various expert witnesses, Def. Daubert Mot., ECF No. 222; Pl. Daubert Mot., ECF No. 225. For the reasons stated below, Elliott's motion for summary judgment is denied, and the parties' motions to exclude are denied without prejudice to renewal.

## BACKGROUND[1]

I.    <u>Rio Tinto and Its Riversdale Acquisition</u>

Rio Tinto is a large British-Australian mining company comprised of Rio Tinto plc, a public company registered in England and Wales whose shares trade on the New York Stock Exchange, and Rio Tinto Limited, a public company registered in Australia. Def. 56.1 ¶¶ 1–5, ECF No. 256-1. Both companies are managed by a common board of directors (collectively, the "Board"). *Id.* ¶ 1. During the relevant period, Thomas Albanese served as Rio Tinto's Chief Executive Officer, and Elliott served as its Chief Financial Officer. *Id.* ¶¶ 6–7. Both men served on the Board. *Id.* ¶ 9. Also throughout that time, Rio Tinto's Group Controller's Department (the "Controller's Group") was responsible for the company's business planning and forecasting, statutory reporting, and technical accounting, which included coordinating a regular impairment review process. *Id.* ¶ 24. The head of the Controller's Group reported to Elliott. *Id.* ¶ 15.

In 2010, Rio Tinto identified Riversdale Mining Limited ("Riversdale"), an Australian mining company with assets in Mozambique's Moatize Basin, as a possible acquisition target. *Id.* ¶ 38. Rio Tinto was interested in Riversdale because the Moatize Basin was viewed as containing undeveloped sources of "metallurgical" or "coking" coal, which, unlike the coal typically burned for fuel, can be used to make steel. *Id.* ¶¶ 30–31, 38. That year, Rio Tinto began assessing the quantity and quality of coal at the Riversdale properties and the viability of transporting coal by rail and barge. *Id.* ¶ 39. Despite being informed about risks associated with the acquisition, the Board decided to acquire Riversdale in December 2010, and between April

---

[1] The facts are taken from Elliott's Rule 56.1 statement, the SEC's response, and the parties' declarations, unless otherwise noted. Disputed facts are so noted. Citations to a paragraph of Elliott's Rule 56.1 statement include the SEC's response. "[W]here there are no citations[,] or where the cited materials do not support the factual assertions in the [s]tatements, the Court is free to disregard the assertion." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) (alteration adopted) (citation omitted).

and August 2011, Rio Tinto completed the $3.69 billion purchase and changed Riversdale's name to Rio Tinto Coal Mozambique ("RTCM"). *Id.* ¶¶ 41–43, 133.

RTCM's assets included three parcels of land: Benga, Zambeze, and Tete East. *Id.* ¶ 44. At the time of the acquisition, a mine was under construction at Benga, with coal production planned to begin in late 2011. *Id.* ¶ 45. An internal Rio Tinto report from that time indicates that the company believed that Benga and Zambeze represented a "Tier One opportunit[y] in metallurgical coal," *id.* ¶ 47 (quoting Def. Ex. 66 at RT_00272738[2]), but was uncertain whether Tete East could be mined economically, *id.* ¶ 49. To assess RTCM's value, Rio Tinto engaged Deloitte Touche Tohmatsu Limited, which valued the three parcels at $3.3 billion as of April 8, 2011, the date on which Rio Tinto acquired a majority interest in Riversdale. *Id.* ¶¶ 42, 50; Def. Ex. 71 at 2, 4. In November 2011, Rio Tinto purchased a stake in Minjova, a coal tenement adjacent to Tete East that the company also believed to contain metallurgical coal. Def. 56.1 ¶¶ 51–54; *see* Def. Ex. 77.

Following these acquisitions, Rio Tinto commenced a mining exploration program to assess its Mozambique assets. Def. 56.1 ¶ 57. The company also began to seriously evaluate how coal could be transported from the RTCM parcels. *Id.* ¶¶ 80–85. Rio Tinto knew that to develop large-scale transportation infrastructure, it would need approval from the Mozambique government. *Id.* ¶ 86. In September 2011, Rio Tinto provided the Mozambique government with an Environmental and Social Impact Assessment (the "ESIA") for barging coal down the Zambezi River to the Mozambique coast. *Id.* ¶¶ 89–90. Two months later, Mozambique government officials told RTCM personnel that the government was "not favorable to barging on the Zambezi River" because of the associated environmental impacts and that, although the ESIA

---

[2] Citations to "Def. Ex." are to the attachments to Jennifer L. Conn's declaration at ECF No. 242.

was "very good," it "fail[ed]" to "provid[e] solutions to the [environmental] problems identified." *Id.* ¶ 96 (quoting Def. Ex. 98 at RT_00074947–48). Soon after, RTCM received a letter from the Mozambique government confirming that it was "not favorable" to Rio Tinto's proposal. *Id.* ¶ 98 (quoting Def. Ex. 100 at RT_SEC_00077409).

Despite this rejection, certain Rio Tinto employees believed that the Mozambique government could be persuaded to accept a revised proposal and continued to strategize about how the company could secure government approval for barging. *Id.* ¶¶ 100, 102; Def. Ex. 101 at RT_00042021–22. In December 2011, Albanese and other Rio Tinto representatives met with the Prime Minister of Mozambique to present a public-private partnership proposal that included a modified amount of barging. Def. 56.1 ¶ 109; *see* Def. Ex. 10 at 86:1–21; Def. Ex. 116. In the first months of 2012, Eric Finlayson, RTCM's managing director, shopped the proposal around to various policymakers and stakeholders. *See* Def. Ex. 10 at 86:1–87:6; Def. Ex. 117 at RT_00159456–57 (March 2012 Rio Tinto report describing meetings with Mozambique government officials and "engagement efforts firmly focused on restoring barging as a viable transport option and on approvals for [Rio Tinto's public-private partnership] proposal"); Def. Exs. 118–20, 122–23 (Rio Tinto emails from February through April 2012 describing recent meetings with Mozambique government officials to promote the proposal).

In February 2012, Elliott attended a Rio Tinto Audit Committee meeting, where he learned that RTCM's coal reserves were "significantly lower" than Riversdale reported before its acquisition, although still "significant in size and in line with market expectations for a tier one resource." Def. 56.1 ¶¶ 155–56 (quoting Def. Ex. 154 at RT_00481103). Then, in March 2012, various media outlets reported that the Mozambique government had rejected Rio Tinto's barging proposal. *Id.* ¶ 105; Def. Exs. 102–09. It was at this point that, according to Elliott's

testimony, he first learned that the Mozambique government was not favorable to barging.  Def. 56.1 ¶¶ 101, 106.

In response to these developments, in April 2012, Elliott requested an "all hands review" with RTCM personnel to discuss the project's prospects.  Pl. Ex. 18 at RT_00322204.[3]  The meeting occurred on May 11, 2012, in Brisbane, Australia (the "Brisbane Meeting").  Def. 56.1 ¶ 159.  During the meeting, Finlayson offered a slide presentation (the "Brisbane Presentation") and read from a set of prepared notes.  *Id.* ¶¶ 168, 171; *see also* Brisbane Presentation, Def. Ex. 165 at RT_00343177–203.  One slide asserted that coal barging "does not have political support" and that "[g]reenfield rail & port development is the only way of delivering substantially higher transport capacity at competitive cost."  Brisbane Presentation at RT_00343191.  Another slide claimed that RTCM would "provide major long-term cash flows" but contained an unnumbered chart projecting a negative net present value ("NPV") over the following ten years.  *Id.* at RT_00343199.  An earlier draft version of this slide, which included numbers, projected cumulative free cash flows of $61 billion and an NPV of negative $680 million.  Def. 56.1 ¶ 175.  The parties dispute whether Finlayson discussed those exact figures in his presentation, although the figures do appear in the notes he relied upon during his presentation.  *Id.* ¶ 177; *see* Def. Ex. 166 at RT_00241295; Def. Ex. 10 at 153:13–16 (Finlayson recalling that he "verbally communicated" the negative NPV); Def. Ex. 1 at 232:5–17 (Albanese being unable to recall whether he heard about the negative NPV at the Brisbane Meeting).  Although no members of the Controller's Group attended the Brisbane Meeting, several of its members, including Group Controller Dan Larsen, were told about the meeting and sent a copy of the presentation slides.  Def. 56.1 ¶¶ 167, 300.

---

[3] Citations to "Pl. Ex." are to the attachments to Gregory N. Miller's declaration at ECF No. 259.

After the Brisbane Meeting, Rio Tinto indicated that, going forward, it would be unwilling to put much of its own capital into developing the Mozambique mines, so RTCM began searching for a partner with whom it could share transportation development costs. *Id.* ¶¶ 188–89, 193; *see* Def. Ex. 10 at 154:25–155:13 (Finlayson deposition); Def. Ex. 126 at RT_00264863; Def. Ex. 128 at RT_00047703; Def. Ex. 129 at RT_SEC_00025230; Def. Ex. 131 at RT_00048406–07; Def. Ex. 132 at RT_SEC_00026792. Ultimately, no partnership materialized. *See* Def. Ex. 10 at 161:15–162:14.

II.    The Half-Year 2012 Impairment Review Process

Under International Accounting Standard ("IAS") 36, an entity must, at the end of each reporting period, identify any assets containing goodwill and assess whether there is any indication of impairment. Def. 56.1 ¶ 235. To determine whether an asset is impaired, the entity assesses whether there is an indication of impairment and, if such an indication exists, makes a formal estimate of the asset's "recoverable amount," essentially, the highest value of the asset. *Id.* If the recoverable amount is less than the asset's carrying amount—the asset's current value as recorded in the entity's books—the asset is impaired. *Id.*

IAS 36 provides a non-exhaustive list of potential impairment indicators, which include whether "an asset's market value has declined significantly more than would be expected as a result of the passage of time or normal use" and whether "evidence is available from internal reporting that indicates that the economic performance of an asset is, or will be, worse than expected." *Id.* ¶ 241 (quoting IAS 36 ¶ 12). In limited circumstances, an entity need not estimate an asset's recoverable amount if previous analyses of the recoverable amount demonstrate that an indicator of impairment will not result in a material impairment. *Id.* ¶ 242.

Regardless of whether an impairment indicator is found, an entity must perform an annual impairment assessment on every asset to which goodwill is attached. *Id.* ¶ 244.

The Rio Tinto Controllers Manual (the "Controllers Manual") sets forth Rio Tinto's application of IAS 36. *Id.* ¶ 245. Pursuant to the Controllers Manual, it is the responsibility of each business unit to first determine whether an asset possesses any indications of impairment, and if such an indication exists for a "significant individual asset," the business unit must raise the indication with the Controller's Group. *Id* ¶ 246. The Controllers Manual directs assessors, in deciding whether an asset is impaired, to rely, in part, on the asset's NPV. Pl. Ex. 22 at RT_SEC_00011972–75.

Rio Tinto conducted its half-year ("HY") 2012 impairment review between May and July 2012. Def. 56.1 ¶ 263. On June 18, 2012, the Audit Committee held a meeting to discuss outstanding accounting issues. *Id.* ¶ 312. Representatives from the Controller's Group and PricewaterhouseCoopers ("PwC"), Rio Tinto's external auditor, attended. *Id.* In advance of the meeting, Group Controller Larsen circulated a memorandum detailing the issues to be discussed (the "First Controller's Paper"). *Id.* ¶¶ 312–13; First Controller's Paper, Def. Ex. 150. The memorandum discussed Riversdale, stating that since its acquisition, "some uncertainty has arisen about the method that will be used to transport coal for export" and that, "[w]hile barging has not been entirely ruled out in the future, it seems unlikely that the situation will be resolved in the short term." First Controller's Paper at RT_00000252. Larsen asserted that "[a] number of [other transportation] options are available," including "securing incremental capacity on the existing rail lines, greenfield rail and port development[,] . . . and revised partial barging options." *Id.* He added that "there are also positive developments at RTCM," including that Rio Tinto "now holds licences for several exploration properties which lie adjacent to the RTCM

properties," *i.e.*, Minjova. *Id.* Larsen concluded that, "[o]n balance, while there may be potential indicators for the need to consider impairment at half year, it is not expected that any impairment will need to be recorded as it is too early to assess the impact of the developments on the fair value of the projects." *Id.* Although, as Elliott points out, there is no evidence that he reviewed the First Controller's Paper specifically before it was provided to the Audit Committee, it was his standard practice to review an advance copy of these types of Controller's Group papers. *See* Def. 56.1 ¶ 316; Pl. Exs. 26–27; Elliott Dep. at 55:22–56:7, 60:12–61:7, Def. Ex. 9.

The following month, Rio Tinto Energy, a product group that included the RTCM business unit, submitted a memorandum with the subject line "RTCM 2012 HY impairment indicator review" to the Controller's Group and PwC (the "Impairment Indicator Paper"). Def. 56.1 ¶¶ 19, 22, 323; Impairment Indicator Paper, Def. Ex. 206. Although the paper noted that barging coal was no longer feasible and that this "setback" would likely "result in a reduction in the volume of coal brought to market in the short term," it also cited a "potential [RTCM] value of $5.1 billion" and concluded that no impairment indicators were present. Impairment Indicator Paper at PwCUK000001423_0001–04. There is no evidence that Elliott was sent or reviewed the Impairment Indicator Paper. Def. 56.1 ¶ 332.

On July 30, 2012, the Audit Committee held another meeting. *Id.* ¶ 341. In attendance were Albanese and Elliot, in addition to representatives from PwC and the Controller's Group. *Id.* Before the meeting, the Audit Committee was again provided with a memorandum from Larsen (the "Second Controller's Paper"). *Id.* ¶ 342; Second Controller's Paper, Def. Ex. 207. Like the Impairment Indicator Paper, the Second Controller's Paper stated that the Controller's Group "d[id] not believe that there [was] an impairment indicator" and that, because of the "uncertainty over future transportation" and the "breadth of [transportation] options" available,

"a central case view is still under development [for RTCM]."  Second Controller's Paper at

RT_00000280.  As usual, Elliott reviewed an advanced draft of the Second Controller's Paper.

*See* Def. 56.1 ¶¶ 316, 342.

On August 8, 2012, Rio Tinto released its financial results for the first half of 2012 (the

"HY 2012 Report").  Def. 56.1 ¶ 355; HY 2012 Report, Def. Ex. 164.  That same day, the

company gave two investor presentations summarizing the HY 2012 financial results, both of

which Elliott and Albanese attended.  Def. 56.1 ¶ 357.  The presentations did not focus primarily

on Rio Tinto's Mozambique assets, but Albanese made several comments about RTCM's

progress.  *Id.* ¶¶ 359–61, 381–82.  For example, Albanese asserted that, as regards Mozambique,

"the work we've been doing over the past 12 months indicates we probably have more potential

in total as we go forward," and "I think this is a truly valuable asset with a lot of optionality."  *Id.*

¶¶ 359–60 (first quoting Brisbane Presentation at RT_SEC_00121871; and then quoting Def.

Ex. 167 at RT_SEC_00290684).  Then, at a November 2012 investor seminar in Sydney

attended by both Elliott and Albanese, Albanese stated that Rio Tinto "[c]ontinue[s] to view the

Moatize Basin as a long-term opportunity with the potential to grow beyond 25 million tonnes

per annum."  *Id.* ¶ 362 (quoting Def. Ex. 244 at RT_SEC_00294859).  Neither Albanese nor

Elliott referenced the possibility of Rio Tinto's Mozambique assets possessing a negative NPV.

III.    The 2012 End-of-Year Impairment Review Process

Earlier that year, after it learned that it would need to completely rethink its coal

transportation strategy, RTCM asked for the assistance of Rio Tinto's Strategic Production

Planning Group ("SPP"), a component of the company's Technology & Innovation Group, in

crafting a viable business plan.  *Id.* ¶ 411; *see* Pl. Ex. 2 at RT_00220199.  In April 2012, Chris

Carter, SPP's General Manager, visited Mozambique to meet with the RTCM team and evaluate

the project's operations. Def. 56.1 ¶ 414. After his visit, Carter asked RTCM for additional information to aid SPP's review process. *Id.* ¶ 419. In November, SPP sent a report previewing its analysis to several individuals within RTCM. *Id.* ¶ 421; Def. Ex. 288. The report assessed a preliminary central NPV of negative $1 billion but considered various business scenarios, with the best having an NPV of $300 million and the worst having NPVs of negative $3.6 billion. *Id.* ¶ 422; Def. Ex. 288 at RT_00347952–53; Carter Dep. at 78:8–25, Def. Ex. 4.

Shortly after, Preston Chiaro, the head of the Technology & Innovation Group, arranged a call between himself, Carter, Elliott, Larsen, and RTCM representatives to discuss SPP's findings. Def. 56.1 ¶¶ 20, 425; Def. Exs. 294–96. On the call, Chiaro informed Elliott about SPP's valuation numbers, letting him know that it was unlikely that additional analysis would lead to a positive NPV. Def. 56.1 ¶ 428. Chiaro also asked, and Elliott agreed, to communicate SPP's analysis to the Audit Committee. *Id.* ¶ 431; *see also* Def. Ex. 298.

On November 26, 2012, the Audit Committee held a meeting to discuss Rio Tinto's annual impairment review. Def. 56.1 ¶ 432. The attendees received the usual summary memorandum from Larsen in advance of the meeting, which, like before, articulated the Controller's Group's view that RTCM would likely not need impairment. *Id.* ¶ 424; Def. Exs. 291–92. At the end of the meeting, Elliott told the committee, without putting forth any of SPP's valuations, that he had received some bad news regarding RTCM from the "technical side of the house" and that the team would look into the issue. Def. 56.1 ¶ 432. Both Larsen and Elliott promised that they would provide additional information at the Audit Committee's December meeting. *Id.* ¶ 433.

Over the following days, Chiaro discussed the details of SPP's analysis with Albanese and Rio Tinto Board Chairman Jan du Plessis, and the three of them, plus Elliott, strategized

about how to move forward, ultimately deciding that Rio Tinto's ore body experts should re-evaluate RTCM's coal resources for use in the valuation model.  *Id.* ¶¶ 435–40, 442–43, 449; Def. Exs. 299–300.  On December 21, 2012, Chiaro circulated the results of the experts' analysis, which found that the potential for economic coal extraction was limited to a small portion of RTCM's land.  *See* Def. 56.1 ¶¶ 450, 452; Def. Ex. 304 at RT_00320354–55.  On a follow-up call, Elliott and Larsen agreed that, based on the analysis, Rio Tinto had no choice but to impair RTCM.  Def. 56.1 ¶ 453.

In early 2013, the Controller's Group contacted PwC to alert it to RTCM's need for impairment and to discuss the SPP's valuation analysis.  *Id.* ¶ 455; Def. Ex. 307.  Concurrently, the experts assigned to evaluate RTCM sent the Controller's Group a memorandum with a "revised" RTCM valuation of $611 million, which reflected "reduced mineable coal estimates" and more expensive coal chain infrastructure.  Def. 56.1 ¶ 456; Def. Ex. 303 at RT_00124036.  That same month, Rio Tinto announced that it would recognize an impairment of around $3 billion for RTCM and that Albanese had "stepped down as chief executive by mutual agreement with the Rio Tinto Board."  Def. 56.1 ¶ 458.

IV.    Procedural History

On October 17, 2017, the SEC filed this action against Rio Tinto, Albanese, and Elliott.[4] Compl.  The SEC brought twelve claims for violations of the Exchange Act, the Securities Act of 1933, 15 U.S.C. § 77a *et seq.*, and the rules promulgated thereunder.  Compl. ¶¶ 177–216.  The Court granted Defendants' motion to dismiss several of the SEC's claims, ECF No. 135, and denied the SEC's subsequent motion for reconsideration, ECF No. 213.  In November 2023, Rio

---

[4] The parties agreed to toll any relevant statute of limitations until the date that the SEC filed its complaint.  Compl. ¶ 176.

Tinto and Albanese reached a settlement with the SEC, leaving Elliott as the only remaining defendant. ECF Nos. 297, 299–300. Before the Court are Elliott's motion for summary judgment and each party's motion to exclude the opinions and testimony of the other's experts. SJ Mot.; Def. Daubert Mot.; Pl. Daubert Mot.

## DISCUSSION

I. <u>Summary Judgment</u>

    A. Legal Standard

A party is entitled to summary judgment if it can establish that "there is no genuine dispute as to any material fact" and that the party "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247–48 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–26 (1986). A genuine dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

The moving party bears the initial burden of informing the Court of the absence of a genuine dispute of material fact by citing particular evidence in the record. Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 323–24. In making this showing, the party may rely on "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). If the moving party meets its initial burden, the burden then shifts to the opposing party to establish a genuine dispute of material fact. *See Beard v. Banks*, 548 U.S. 521, 529 (2006); *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir.

2002).  The Court views all facts "in the light most favorable to the non-movant, resolving all ambiguities in h[is] favor." *Borley v. United States*, 22 F.4th 75, 78 (2d Cir. 2021).

B.  Application

Elliott seeks summary judgment on the SEC's two remaining claims against him.  The first is for violating Section 13(b)(5) of the Exchange Act and Rule 13b2-1 promulgated thereunder, Compl. ¶¶ 200–02, and the second is for violating Exchange Act Rule 13b2-2, *id.* ¶¶ 206–08.

1.  Section 13(b)(5) and Rule 13b2-1

Pursuant to Section 13(b)(2)(A) of the Exchange Act, an issuer of a registered security— here, Rio Tinto—must "make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer."  15 U.S.C. § 78m(b)(2)(A).  Section 13(b)(5) of the Exchange Act, in turn, states that "[n]o person shall knowingly circumvent or knowingly fail to implement a system of internal accounting controls or knowingly falsify any book, record, or account described in [Section 13(b)(2)(A)]." *Id.* § 78m(b)(5).  One of the law's implementing regulations, Rule 13b2-1, specifies that "[n]o person shall directly or indirectly, falsify or cause to be falsified, any book, record or account subject to [S]ection 13(b)(2)(A)."  17 C.F.R. § 240.13b2-1.  Although scienter is not required to succeed under these provisions, *SEC v. McNulty*, 137 F.3d 732, 740–41 (2d Cir. 1998), the SEC must "demonstrate that a defendant knew of facts that contradicted the substance of the reported accounting," *SEC v. Straub*, No. 11 Civ. 9645, 2016 WL 5793398, at *21 (S.D.N.Y. Sept. 30, 2016) (alteration adopted) (citation omitted).  Ultimately, "liability is predicated on standards of

reasonableness." *SEC v. Farnsworth*, 692 F. Supp. 3d 157, 193 (S.D.N.Y. 2023) (quoting *SEC v. Espuelas*, 905 F. Supp. 2d 507, 526 (S.D.N.Y. 2012)).

The SEC argues that Elliott unreasonably "cause[d] to be falsified" three accounting papers: the First Controller's Paper, the Impairment Indicator Paper, and the Second Controller's Paper.[5]  Pl. SJ Mem. at 61–67, ECF No. 258.  Elliott maintains that the record conclusively establishes, first, that none of these records was false, second, that he did not "cause" them to be false, and third, that he did not act unreasonably.  Def. SJ Mem. at 61–67, ECF No. 239.

The Court largely disagrees.  First, there exists a genuine dispute of material fact as to whether the three records contained false information.  As Elliott observes, the accounting papers disclose that, for example: "[t]he [r]eserves and [r]esources declared in March 2012 in respect of . . . Benga and Zambeze[] were significantly lower than had previously been declared by Riversdale" and that, "[w]hile barging has not been entirely ruled out in the future, it seems unlikely that the situation will be resolved in the short term," First Controller's Paper at RT_00000242, RT_00000252; "there is uncertainty over future transportation," Second Controller's Paper at RT_00000280; and the Riversdale acquisition "was predicated on using barging to move coal from site to port, but this assumption has experienced setbacks" that are "likely to result in a reduction in the volume of coal brought to market in the short term," Impairment Indicator Paper at PwCUK000001423_0002.  According to Elliott, these statements

---

[5] These papers fall within the statutory definition of a "record."  *See* 15 U.S.C. § 78c(37).

The SEC also contends that Elliott "cause[d] to be falsified" a fourth record, namely, the HY 2012 Report.  Pl. SJ Mem. at 61 & n.26, ECF No. 258.  The Court agrees with Elliott that the SEC waived any claims against him concerning this allegedly false record when it stated, in its memorandum in support of its earlier motion to certify an interlocutory appeal, that "*no* claims remain[ed] based on misconduct by . . . Elliott, or involving scienter-based charges, related to the HY 2012 financial statement."  ECF No. 218 at 20 (emphasis in original); *see New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (explaining that judicial estoppel "generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase" (quoting *Pegram v. Herdrich*, 530 U.S. 211, 227 n.8 (2000))).

were true at the time and comported with the information he received at the Brisbane Meeting, where he heard from Finlayson that any existing NPV was "indicative only" and that there was "considerable opportunity to add value."  *See* Def. Reply at 22–23, ECF No. 260 (quoting Def. Ex. 166 at RT_00241294–95).

That is one reasonable view of the accounting papers, but not the only one.  Indeed, the papers also contain the following statements: "[I]t is too early to assess the impact of the developments on the fair value of the projects," First Controller's Paper at RT_00000252; "We acknowledge that there is uncertainty over future transportation" but "are confident of finding a viable infrastructure path," Second Controller's Paper at RT_00000280; and "Although there are likely to be significant changes to the coal chain strategy employed by RTCM, it is not yet possible to conclude whether these will have an adverse impact on the business valuation," and "we are confident of finding a viable infrastructure path," Impairment Indicator Paper at PwCUK000001423_0002–03.  Furthermore, although all the papers explain that uncertainty exists concerning RTCM's valuation, the Impairment Indicator Paper still puts forth a "potential value" of $5.1 billion.  Impairment Indicator Paper at PwCUK000001423_0003.

A reasonable jury could find that, when these accounting papers were written, in mid-2012, Rio Tinto was not merely "uncertain" about securing coal transportation, but rather, having essentially ruled out barging and having decided not to expend significant additional capital on RTCM, Rio Tinto was relatively confident that transportation was a major obstacle to the business' success.  *See* Brisbane Presentation at RT_00343191 (noting that barging "does not have political support" and that "[g]reenfield rail & port development is the only way of delivering substantially higher transport capacity at competitive cost"); Def. Ex. 166 at RT_00241295 (Finlayson's notes concerning RTCM's negative NPV); Def. Ex. 10 at 154:25–

155:13 (Finlayson's testimony that additional capital would not come from Rio Tinto).  That same reasonable jury could also find that the Impairment Indicator Paper's valuation of RTCM at $5.1 billion, although caveated as lacking "an acceptable degree of accuracy," was false.  Impairment Indicator Paper at PwCUK000001423_0003.

Accordingly, the Court considers whether Elliott, who admittedly did not author any of the accounting papers, "caused" them to be false.  17 C.F.R. § 240.13b2-1.  Elliott is correct that there is "no support in the record" that he "took any affirmative act, such as making a false statement or submitting a false document . . . , or directing someone to misstate or to conceal information."  Def. Mem. at 62.  However, an affirmative act is not necessary to violate the law; an omission may suffice.  *See SEC v. Rosenberger*, No. 22 Civ. 4736, 2024 WL 308198, at *18 (S.D.N.Y. Jan. 26, 2024) (explaining that liability is possible for "fail[ure] to inform").  Although the parties dispute whether Finlayson gave the Brisbane Meeting attendees exact numbers concerning RTCM's estimated NPV, the Brisbane Presentation showed RTCM as having, according to the business' best estimate at the time, a negative NPV.  Def. 56.1 ¶ 177; Brisbane Presentation at RT_00343199.  While in Brisbane, Elliott also saw that barging was off the table and that "[a] new rail network will be the only economically viable way to export coal," while at the same time hearing that Rio Tinto is "capital-constrained."  Brisbane Presentation at RT_00343191, RT_00343196; Def. Ex. 166 at RT_00241296.

Despite knowing the troubles RTCM faced—despite calling an "all hands review" specifically to discuss those troubles, Pl. Ex. 18 at RT_00322204—Elliott tacitly approved the determination in the First and Second Controller's Papers that RTCM had no impairment indicators, even going so far as to ask Group Controller Larsen whether it was "really appropriate to highlight potential [i]mpairment matters so early in the year."  Pl. Ex. 27.  A

reasonable jury could find that Elliott's failure to communicate to the Audit Committee and PwC what he learned at the Brisbane Meeting, especially after failing to object to the drafts of the First and Second Controller's Papers, both of which advised that impairment of RTCM was not needed, "caused" these papers to be false.  *See* First Controller's Paper at RT_00000252; Second Controller's Paper at RT_00000280; *see also Farnsworth*, 692 F. Supp. 3d at 193 (explaining that "approving" accounting-related documents "before submitting them to a company's accountants is plainly a basis for liability under Section 13(b)(5) and Rule 13b2-1"); *SEC v. Rosenberger*, No. 22 Civ. 4736, 2023 WL 1928093, at *7 (S.D.N.Y. Feb. 10, 2023).

The Court does agree with Elliott that no reasonable jury could find that he "caused" the Impairment Indicator Paper to be false.  The record contains no evidence that Elliott approved the paper; in fact, there is no evidence that he even saw it.  Def. 56.1 ¶ 332.  The only connection the SEC draws between Elliott and the Impairment Indicator Paper is that Elliott reviewed an early draft of the Second Controller's Paper, which stated that RTCM's updated value was "in excess of [its] carrying amount."  Def. SJ Mem. at 54; Pl. Ex. 51 at RT_00358768.  According to the SEC, Elliott's failure to contest this statement "caused" the Impairment Indicator Paper to falsely provide an estimated value for RTCM of $5.1 billion.  Impairment Indicator Paper at PwCUK000001423_0003.  Because the Court cannot see how this attenuated connection could possibly provide a reasonable basis for liability, it will grant Elliott summary judgment as to this record.

It remains an open question of fact as to whether Elliott acted unreasonably.  On the one hand, the existing evidence could be viewed as demonstrating that Elliott did not challenge the First or Second Controller's Papers because he reasonably understood RTCM to be a still-viable project and trusted the Controller's Group's accounting expertise.  *See* Elliott Dep. at 214:13–

215:14 (Elliott describing himself as walking away from the Brisbane Meeting "under the strong impression that [RTCM] was a tier-one resource" with "challenges").  On the other hand, a reasonable jury could also find that Elliott's failure to push back against the papers' conclusion that RTCM possessed no impairment indicators—despite knowing that RTCM had fewer coal resources than initially believed, that the most efficient method of transporting coal was off the table, and that the business was now tentatively valued at negative $680 million—was unreasonable.  *See* Pl. Ex. 11 (January 2012 email from Elliott to Albanese stating that RTCM's coal resources were "[w]orse by far than expected" and "w[ould] result probably in a large goodwill allocation [in] 2012"); Brisbane Presentation at RT_00343191 (slide asserting that barging "does not have political support" and that "[g]reenfield rail & port development is the only way of delivering substantially higher transport capacity at competitive cost"); Def. 56.1 ¶ 177; Def. Ex. 166 at RT_00241295 (Finlayson's notes from the Brisbane Meeting stating that RTCM's NPV is negative $680 million); Def. Ex. 10 at 153:13–16 (Finlayson recalling that he "verbally communicated" the negative NPV).  The Court leaves the issue to a factfinder.

## 2.  Rule 13b2-2

Elliott also seeks summary judgment on the SEC's Rule 13b2-2 claim.  To succeed on a Rule 13b2-2 claim, the Government must show that "(1) the [defendant] [was] a director or an officer of an issuer (2) who 'directly or indirectly' made or caused to be made 'a materially false or misleading statement' or omission to an accountant (3) in connection with an SEC filing or audit."  *SEC v. Straub*, 921 F. Supp. 2d 244, 265 (S.D.N.Y. 2013) (quoting 17 C.F.R. § 240.13b2-2(a)).  Like Rule 13b2-1, Rule 13b2-2 has no scienter requirement, and liability turns on "reasonableness."  *Rosenberger*, 2023 WL 1928093, at *6; *SEC v. Espuelas*, 767 F. Supp. 2d 467, 480 (S.D.N.Y. 2011).  Unlike Rule 13b2-1, Rule 13b2-2 contains a materiality requirement.

*See* Rule 13b2-2 (prohibiting a "*materially* false or misleading statement" and the omission of "any *material* fact" (emphasis added)); *Straub*, 921 F. Supp. 2d at 267–68.

Elliott contends that summary judgment is warranted, first, because he did not make any false statements to an accountant, and second, because any statements he did make were not material. Def. SJ Mem. 67–71. Regarding the first point, and as the Court just discussed, a question of fact exists as to whether Elliott, a Rio Tinto director, "directly or indirectly made or caused to be made" a "false or misleading statement or omission" when he did not inform the Audit Committee meeting attendees, a group that included PwC representatives, that the First and Second Controller's Papers arguably misstated RTCM's financial position.[6] *Straub*, 921 F. Supp. 2d at 265 (quotation omitted); Def. 56.1 ¶¶ 312, 341. The issue is one for trial, although as before, the Court concludes that Elliott is not liable for any false statements made in the Impairment Indicator Paper, of which he had no knowledge.

The issue of materiality is also one for a factfinder. A statement is "material" in the Rule 13b2-2 context if "a reasonable auditor would conclude that [the statement] would significantly alter the total mix of information available to him." *Straub*, 921 F. Supp. 2d at 268 (citation omitted). Elliott makes a strong argument that PwC and the Group Controller, the latter of whom received a copy of the Brisbane Presentation, knew what challenges RTCM faced and would not have recommended impairment even had Elliott provided the Controller's Group with the business' estimated valuation and his knowledge that coal transportation remained highly constrained. *See* Def. 56.1 ¶ 300; Def. SJ Mem. at 69–71. Conversely, the SEC makes a plausible case that, had Elliott told the Audit Committee about RTCM's negative $680 valuation

---

[6] The SEC contends that Elliott caused multiple false or misleading statements to be made in connection with the HY 2012 Report. Pl. SJ Mem. at 67–68. As discussed supra note 5, the SEC has waived any claims concerning this report.

and the lack of a feasible option to transport coal in large quantities, PwC may have more fully considered the need for impairment. *See* Pl. SJ Mem. at 69–71. These competing narratives prevent the Court from deciding this mixed question of law and fact at summary judgment. *See SEC v. Collins & Aikman Corp.*, 524 F. Supp. 2d 477, 496 (S.D.N.Y. 2007).

II.    <u>Motions to Exclude</u>

Each party moves to exclude the opinions and testimony offered by the other's expert witnesses. Def. Daubert Mot.; Pl. Daubert Mot. Elliott's expert witnesses include: (1) Robert Edwards, a mining sector executive and equity analyst who opined on how mining companies value projects and use financial models, ECF Nos. 231-3, -5; (2) Barnaby Fletcher, a risk consultant to companies operating in Africa, who evaluated whether the Government of Mozambique's actions foreclosed RTCM's use of barging or other transportation infrastructure, ECF No. 231-7; (3) Peter Christensen, a mining engineer who explained how mining companies develop business plans for potential coal assets and assessed the reasonableness of RTCM's actions, ECF Nos. 231-7, -9; (4) John Lacey, a professor of accounting who outlined the responsibility of executives and auditors regarding impairment review and assessed whether it was reasonable for Rio Tinto to conclude that RTCM had no indication of impairment in half-year 2012, ECF Nos. 231-9 to -10; and (5) Glenn Hubbard, a professor of finance and economics who evaluated the market's response to Rio Tinto's Riversdale acquisition and whether Elliott's allegedly false statements impacted the price of Rio Tinto securities, ECF Nos. 231-10 to -11.

The SEC's witnesses include: (1) Steven Brice, a chartered accountant who opined on the accounting standards relevant to Rio Tinto's half-year 2012 financial report and its related impairment review, ECF Nos. 229-1, -6 to -13, -25; (2) Christopher Drewe, a chartered accountant specializing in forensic accounting who detailed how Rio Tinto could have conducted

a proper impairment review as of half-year 2012, ECF Nos. 229-3, -15, -25; (3) Chris Milburn, a chartered accountant and chartered business valuator who assessed the quality of RTCM's business and valuation models, ECF Nos. 229-4, -18; (4) Albert Metz, an economist who conducted an event study of the market's reaction to Rio Tinto's Riversdale acquisition, ECF Nos. 229-3, -17; and (5) Joseph Weber, a professor of financial accounting who offered background information on the preparation of financial statements and the rules governing such preparation in the United States, ECF Nos. 229-4, -19.

The opinions and testimony of these experts were solicited years ago, before Rio Tinto and Albanese reached settlements with the SEC, and they address facts and evidence that are mostly irrelevant to deciding the two claims remaining against Elliott. To that end, the Court did not rely on any of the expert materials in deciding Elliott's summary judgment motion. Accordingly, the parties' motions to exclude are denied as moot without prejudice to renewal at trial, should expert testimony be warranted.

## CONCLUSION

For the foregoing reasons, Elliott's motion for summary judgment is DENIED. The parties' motions to exclude are DENIED without prejudice to renewal.

SO ORDERED.

Dated: February 20, 2025
        New York, New York

_____
ANALISA TORRES
United States District Judge